**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

|  |  |  |
|---|---|---|
| LAURA LOOMER, | } | |
| | } | |
| | } | |
| Plaintiff | } | |
| | } | **Case Number: 5:24-cv-00625-JSM-PRL** |
| v. | } | |
| | } | <u>**ORAL ARGUMENT REQUESTED**</u> |
| BILL MAHER and HOME BOX | } | |
| OFFICE, INC., et al | } | |
| | } | |
| Defendants. | } | |

**PLAINTIFF LAURA LOOMER'S RESPONSE IN OPPOSITION TO**
**DEFENDANTS BILL MAHER AND HOME BOX OFFICE INC.'S MOTIONS**
<u>**TO DISMISS**</u>

Plaintiff Laura Loomer ("Mr. Loomer") hereby submits her opposition to Defendants Bill Maher ("Defendant Maher") and Home Box Office, Inc.'s ("Defendant HBO")(collectively "Defendants") Motion to Dismiss. ("Defendants' Motion"). Ms. Loomer has not taken the position that Defendant Maher has been served with the Complaint. Ms. Loomer simply filed the affidavits of service provided to her by the licensed process server that was retained to serve Defendants. The licensed process server was led to believe by the agent for service of process for Defendant HBO, CT Corporation, that they were accepting service on behalf of Defendant Maher as well. However, efforts to serve Defendant Maher personally are still underway, as Ms. Loomer has attempted to serve him at a known address but Defendant Maher appears to be evading service of process. However, given the fact that the time prescribed by Federal Rule of Civil Procedure 4 has not yet passed to serve Defendant Maher and therefore the Defendants' Motion is not only frivolous, but also untimely and must be denied. Once service upon Defendant Maher has been perfected, however, he cannot be given a second bite of the apple and allowed another motion to dismiss, as he has expressly joined in on Defendant HBO's motion to dismiss for failure to state a claim under FRCP 12(b)(6), rendering this issue moot given that his counsel has already appeared and litigated on his behalf.

## INTRODUCTION AND STATEMENT OF RELEVANT FACTS

There is simply nothing funny about what Defendants said, and it is incredibly insulting, demeaning and outrageous for counsel for Defendants to try to mock and misrepresent Ms. Loomer's Complaint as being the result of not

being able to "take a joke." One only has to wonder how Ms. Katherine M. Bolger – a female partner at mega-firm Davis Wright Tremaine - might feel if someone went on a network with a huge Florida, national and global reach such HBO and baselessly and maliciously stated that she slept her way to her current esteemed position and even committed adultery along the way? Certainly, one would presume that Ms. Bolger would not be too pleased in this hypothetical scenario as not only would this demean what was certainly years of grueling, hard work and merit-based advancement, but it would also perpetuate baseless stereotypes about women in the workplace that should have been eliminated decades ago. Fortunately for Ms. Bolger, this is only a hypothetical for her, whereas it has now become a reality for Ms. Loomer as a result of the Defendants' malicious conduct.

Ms. Loomer's Complaint clearly sets forth the false and defamatory statement made by the Defendants of and concerning Mr. Loomer with actual malice. On a September 13, 2024 episode of Defendant Maher's show "Real Time," which was broadcasted by Defendant HBO, Defendant Maher made and published the following malicious, and defamatory statement:

> **I think maybe Laura Loomer's in an arranged relationship to affect the election because she's very close to Trump. She's 31, looks like his type. We did an editorial here a few years ago…it was basically, who's Trump fucking? Because I said, you know, it's not nobody. He's been a dog for too long, and it's not Melania. I think we may have our answer this week. I think it might be Laura Loomer**. Comp. ¶ 18. (the "Defamatory Statement").

This is a statement of objectively verifiable fact of and concerning Ms. Loomer. Defendant Maher poses the vulvar and highly offensive question, "**who's Trump fucking**?" He then states that "**we may have our answer**" to this

question: "**Laura Loomer**."  This is reasonably understood by any reasonable viewer as Defendant Maher making a factual – and false -  statement of objectively verifiable fact of and concerning Ms. Loomer. Comp. ¶¶ 20, 21.

The Complaint also explains the motivation for  the Defendants to have engaged in this pattern and practice of making the Defamatory Statement:

> "to seek to influence, with their unlawful actions, the 2024 presidential election by also defaming President Donald Trump, who Defendants loathe, if not hate, outright. This malicious hate was then projected onto Ms. Loomer as an improper vehicle to harm President Trump's presidential campaign." Comp. ¶ 28[1].

This is of particular importance, as it is textbook black-letter law that constitutional and actual malice can be evidenced not just by direct evidence but also by circumstantial facts which show the intent of the speaker, among the other many badges of actual malice. Am. Comp. ¶ 23, Exhibit 1.  As one compelling example, Ms. Loomer offered to mitigate the severe damage caused before resorting to litigation through a public apology and being a guest on "Real Time," but counsel for Defendants responded threatening her with attorneys fees despite knowing full well that Florida's Anti-SLAPP statute does not apply to the federal court sitting in diversity,  Comp. ¶ 28, *Infra* section III, and Defendants

---

[1] The same firm and lawyers representing Defendants here also represented ABC and George Stephanopoulos in a case where they were defendants in a defamation action brought by President Trump over false published statements that President Trump had been "found liable for rape." *Trump v. American Broadcasting Companies, Inc. et al*, No. 1:2024cv21050 (S.D. Fla. 2024) ("Trump Case"). The Defendants there just settled for $15 million dollars and also had to pay attorneys fees. Exhibit 2. Notably the allegations in that case are less egregious than the defamation in this instant action, since President Trump had been found liable for sexual abuse. There is no evidence here that Ms. Loomer had sex with and engaged in adultery, that is "fucked" in Maher's words, President Trump.

retaliated and compounded the damage to Ms. Loomer on the following episode of "Real Time." Comp. ¶ 25.

## LEGAL STANDARD

A motion to dismiss is designed to test the legal sufficiency of a complaint and not to determine any factual issues. *Dorleus v. Bank of New York*, No. 14-80124-CIV, 2014 WL 1621941, at *2 (S.D. Fla. Apr. 23, 2014). All allegations of the complaint must be taken as true and all reasonable inferences drawn therefrom must be construed in favor the non-moving party. *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009). A complaint "does not require detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (U.S. 2009) (internal quotations omitted). To survive a motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotations omitted). Finally, when considering such a motion, trial courts are limited to the four corners of the complaint and may only consider documents incorporated in the complaint—i.e., either documents attached to the complaint or documents which do not allege acts extrinsic to the pleadings. *Dershowitz v. Cable News Network, Inc.* 541 F. Supp. 3d 1354, 1360-61 (S.D. Fla. 2021).

## LEGAL ARGUMENT

## I.    MS. LOOMER HAS MORE THAN SUFFICIENTLY ALLEGED DEFAMATION

The elements of defamation are "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person;

(4) actual damages; and (5) statement must be defamatory." *Peerenboom v. Perlmutter*, 2017 Fla. Cir. LEXIS 14957, *24. To determine whether a statement is defamatory, it must be considered in context of the publication. *Smith v. Cuban Am. Nat'l Found.*, 731 So.2d 702, 705 (Fla. 3d DCA 1999). A jury issue is present whenever a phrase is "ambiguous and reasonably susceptible of a defamatory meaning." *Perry v. Cosgrove*, 464 So. 2d 664 (Fla. Dist. Ct. App.1985).[2]

Furthermore, of particular importance to this instant matter is the fact that Florida courts have found that one may not escape liability for defamatory conduct simply by attempting to couch a defamatory statement as "opinion." *Barnes v. Horan*, 841 So. 2d 472, 476-77 (Fla. Dist. Ct. App. 2002); *Hay v. Indep. Newspapers, Inc.*, 450 So. 2d 293, 295 (Fla. Dist. Ct. App. 1984).

### a.    The Defamatory Statement Is An Actionable Statement of Fact

Defendants do not challenge the fact that Defamatory Statement is "of and concerning" Ms. Loomer and they do not challenge its falsity either. These elements must be conceded. Defendants' primary argument is that the Defamatory Statement is not a statement of fact. Defendants attempt to argue that the Defamatory Statement is "speculative in nature" and "protected rhetorical hyperbole" and that Defendant Maher should apparently be granted

---

[2] This principle was set forth by the Chief Judge of the U.S. District Court for the Southern District of Florida, Hon. Cecilia Altonaga, in the Trump Case, whose order denying Defendants' Motion to Dismiss is attached hereto as <u>Exhibit 3</u>. Judge Altonaga found that in a case where President Trump was falsely alleged to have "raped" instead of "sexually abused" E. Jean Carroll, she could not grant Defendants' motion to dismiss because "Where a court first determines the statements are susceptible to a defamatory interpretation, factual questions arise that should be resolved by the trier of fact — here, a jury." This is compelling here, where there is not even any ambiguity involved, because if Judge Altonaga did not dismiss the Trump Case, certainly this case cannot be either.

some form of blanket "immunity" from defamation because he claims to be a "comedian and political satirist." None of these arguments have any merit.

> ### i. There is No Blanket "Immunity" For "Comedians" Against Defamation

Put simply, this novel form of "immunity" proffered by the Defendants has no basis in law. The relevant inquiry as to whether a statement is capable of a defamatory meaning remains unchanged whether the statement was intended as a joke or not. This is clearly set forth in Restatement 2d of Torts, § 563, cmt. c:

> The question to be determined is whether the communication is reasonably understood in a defamatory sense by the recipient….In determining the reasonableness of the recipient's understanding, that meaning is to be given to words which is ordinarily attached to them….. The defamatory imputation may be made by innuendo, by figure of speech, by expressions of belief, by allusion or by irony or satire. So too, it may be made by words spoken in jest if not so understood. (emphasis added).

"The proper focus of judicial inquiry in a case such as this is thus not whether the allegedly defamatory statement succeeds as comedy, nor whether its audience thought it to be humorous or believed it to be true; the threshold inquiry is simply whether the communication in question could reasonably be understood in a defamatory sense by those who received it." *Polygram Records, Inc. v. Superior Court*, 170 Cal. App. 3d 543, 554, 216 Cal. Rptr. 252, 259 (1985).

The cases disingenuously advanced by Defendants do not support their untenable position that courts "around the country have held statements made by comedians or satirists like Bill Maher to be protected opinion." ECF 17 at 10.

In *Pierce v. Warner Bros Entm't, Inc.*, 237 F. Supp. 3d 1375 (M.D. Ga. 2017), a Plaintiff sued based on a segment called "*What's Wrong with These These Signs?*

*Signs*" on the Ellen DeGeneres Show. *Id*. at 1377. Specifically, in this segment, DeGeneres featured signs from businesses that contained errors or unfortunate double entendres, such as picture of a sign reading "$exchange." DeGeneres proceeds to make a quick joke about the sign, like pronouncing "the word in the sign as 'sex change' and suggest[ing] that 'you can come back from your vacation feeling like a new man.'" *Id*. Plaintiff Titi Pierce had her yard sign featured on this segment, and DeGeneres mispronounces her name as "titty," slang for a woman's breast, instead of its proper pronunciation, "tē-tē." *Id*. Under these facts, the Court found that the Plaintiff failed to state a claim for defamation. *Id*. at 1378. However, importantly, the Court did not make this finding simply because the case involved a segment on DeGeneres' comedic show. Instead, the Court made sure to point out the fact that:

> In determining whether an allegedly false statement is protected under the First Amendment as rhetorical hyperbole, "the pivotal questions are whether [the challenged] statements can reasonably be interpreted as stating or implying defamatory facts about plaintiff and, if so, whether the defamatory assertions are capable of being proved false. *Id*. at 1379.

The *Pierce* Court found that under the specific facts of its case, which have no applicability or bearing on this case, that the Ms. Pierce had failed to allege a defamatory meaning. *Id*. at 1379 – 80. Thus, this case[3] actually cuts against the Defendants' legally unsupported position that Defendant Maher is entitled to

---

[3] The same applies to Defendants' other cases. In *Lapine v. Seinfeld,*, 918 N.Y.S.2d 313 (Sup. Ct.), the Court found that "Plaintiff correctly argues that 'humor and comedy have never been held to be entitled to absolute or categorical 1st Amendment protection,'" *id*. at 328, but found that the Plaintiff's specific defamation claim failed as a matter of law.

some form of blanket "immunity" from defamation simply because he claims to be a comedian and satirist, the former of which in particular is in dispute. There is nothing funny about Defendant Maher and his disgusting low class statements as only his hatred of Donald Trump and those who the newly elected president associates with is evident. Nevertheless, the Court still must undertake the same analysis as to whether the Defamatory Statement could be reasonably understood as a false statement of fact regardless of who Defendant Maher is.

This is further underscored by the context of the Defamatory Statement. Defendant Maher made the Defamatory Statement during a panel discussion with conservative pollster Kristen Soltis Anderson and former U.S. senator Al Franken which involved serious topics such as alleged police brutality involving Miami Dolphins receiver Tyreek Hill. ECF 17-1. Then when Defendant Maher told the purported "joke", it drew more groans from the audience than sparse laughter. *Id*. Below is a screenshot of the reaction of the two panelists immediately following the Defamatory Statement:



The expression and reaction of the panelists, and Mr. Franken's in particular, are not ones that the Court might typically expect to see from someone who had just understood Defendant Maher's Defamatory Statement as a "satire" or "joke," evidencing that many people understood it as a statement of fact.

Accordingly, the Defendants' argument in this regard totally fails. There is no special protection afforded to Defendant Maher because he claims to be a "comedian." And, even assuming *arguendo* that there was, it is clear from the audience and panel reaction to the Defamatory Statement that it was not understood as being merely "rhetorical hyperbole" or a "joke."

### ii.      The Defamatory Statement Is Defamatory Despite How Defendant Maher Attempted to Couch It

Defendants also attempt to argue that the Defamatory Statement is not one that "a reasonable viewer would understand to convey actual facts about the plaintiff" because it is "speculative in nature." In advancing this meritless argument, Defendants predictably rely on the fact that Defendant Maher – a veteran, trained media professional – attempted to couch his statements by saying that he "think[s]" that Ms. Loomer "might" be "fucking" President Trump.  Unfortunately for Defendants, this outrageous tactic does not protect them from liability for the Defamatory Statement.

The United Supreme Court has conclusively found that a party cannot escape liability for defamation simply by couching his defamatory statement under the guise of opinion, and has even provided a clear illustrative example of this fundamental principle:

> If a speaker says, "In my opinion John Jones is a liar," he implies a
> knowledge of facts which lead to the conclusion that Jones told an
> untruth. Even if the speaker states the facts upon which he bases
> his opinion, if those facts are either incorrect or incomplete, or if his
> assessment of them is erroneous, the statement may still imply a
> false assertion of fact. **Simply couching such statements in terms
> of opinion does not dispel these implications**; and the statement,
> "In my opinion Jones is a liar," can cause as much damage to
> reputation as the statement, "Jones is a liar." *Milkovich v. Lorain
> Journal Co.*, 497 U.S. 1, 18-19 (1990) (emphasis added).

The *Milkovich* Court apparently predicted Defendant's meritless arguments back
in 1990 and found that a Defendant cannot escape liability for his defamatory
statements simply by using the phrase, "I think:"

> It would be destructive of the law of libel if a writer could escape
> liability for accusations of [defamatory conduct] simply by using,
> explicitly or implicitly, the words 'I think.'" *Id.* at 19.

*StopLoss Specialists, LLC v. VeriClaim, Inc.,* 340 F. Supp. 3d 1334 (N.D. Ga. 2018) is
particularly on point. *StopLoss* was a summary judgment opinion that involved a
Plaintiff emergency mitigation and remediation services provider who was
retained by Escambia County to be its primary mitigation contractor following a
severe rainstorm in 2014. *Id.* at 1338-39. Defendant VeriClaim was hired by
Escambia County's insurance carriers to be the insurance adjuster for this project.
*Id.* at 1339. At one point during this project, Tom Rongstad, the general claims
adjuster for VeriClaim, sent an email to eight people involved with the Escambia
County loss that stated the following:

> Team,
> This will confirm documentation exists in several forms:
> 1. Stop Loss is Dumping water into dried buildings.
> 2. Stop Loss then employs 12 temp labors [sic.] to push it around on
> the concrete slab with squeegees.
> <u>This appears to be Insurance Fraud</u>**.**

10

> An investigation has been initiated.... *Id.* at 1342-43 (emphasis added).

This email led to litigation for defamation between the parties, and in particularly the bolded portion of the email was under contention. On summary judgment, the Court found that "Rongstad's use of the phrase '[t]his appears to be insurance fraud,' constitutes defamation per se":

> Rather, a natural reading of the statement, even considering Rongstad's use of the qualifying phrase "this appears," would lead the average reader to the conclusion that the writing, on its face, is stating a defamatory fact about the Plaintiffs that can potentially be proven false (*i.e.*, Rongstad's allegation that Plaintiffs have engaged in insurance fraud can arguably be proven false by Plaintiffs' proffering of relevant facts and evidence that the activities engaged in were undertaken for a lawful purpose). *Id.* at 1352.

Applying this same reasoning to this instant case, Defendant Maher's statement that Ms. Loomer "might" be "fucking" President Trump is also capable of being proven false. Either Ms. Loomer did this and committed adultery, or she did not. This can be proven through affidavits from Ms. Loomer and President Trump.

Similarly, the Court can turn to *Dougherty v. Harvey*, 317 F. Supp. 3d 1287 (N.D. Ga. 2018), which involved the following statement:

> [T]he guy in the middle there he may or may not be HIV positive, I don't know, I have no idea, I have no idea I can't confirm nor deny that, that he is or isn't, I don't know, Chad, I don't know, I don't know . . . I have no idea. *Id.* at 1289.

The Court denied summary judgment on Plaintiff's count for defamation *per se* based on this statement. *Id.* at 1292. In doing so, the Court reasoned that "the out-of-place insertion of Harvey's apophatic HIV statement is susceptible to but one interpretation—that Dougherty is HIV positive." *Id*. The *Dougherty* Court

provided a lesson on linguistics that explains why Harvey's statement was defamatory *per se*, and which also describes Defendant Maher's conduct:

> On its face, Harvey's statement is a form of apophasis—a common rhetorical device in which the speaker or writer brings up a subject couched in a denial or dismissal and stated expressly to make the point denied or dismissed. That is, the device is utilized in order to "deny[] one's intention to speak of a subject that is at the same time mentioned or insinuated. See Webster's Unabridged Dictionary of the English Language, RHR Press (2001). The use of this device has the effect of emphasizing the subject while maintaining plausible deniability. See www.merriam-webster.com/dictionary/apophasis (last visited June 26, 2018)." Robinson v. Perales, 894 F.3d 818, 829 (7th Cir. 2018).Though the term itself is perhaps obscure to non-rhetoricians, apophasis is a common and familiar device that has been used for thousands of years to communicate—on the face of a statement—the very facts the statement pretends to disclaim. **To ignore the obvious import of the defining feature of Harvey's statement would be to improperly elevate form over substance.** *Id.* at 1191-92 (emphasis added).

"Apophasis" describes exactly what Defendant Maher has attempted to do here in an even more egregious fashion than in *Dougherty*. Harvey published that Dougherty "may or may not be HIV positive" and Defendant Maher published that Ms. Loomer "might" be "fucking" President Trump.

Thus, in sum, Defendant Maher's couching of the Defamatory Statement using the term "think" and "might" are of no force and effect. Courts have specifically addressed and rejected the use of these dishonest and disingenuous tactics to escape defamation liability and the same result must occur here.

### iii.        The Defamatory Statement is Not Rhetorical Hyperbole

Lastly, Defendant advance the, frankly, bizarre argument that Defendant Maher's Defamatory Statement constitutes "rhetorical hyperbole" and is therefore not actionable. It is difficult to discern what portion of the challenged

Defamatory Statement that Ms. Loomer is "fucking" President Trump and committing adultery constitutes "rhetorical hyperbole."  Counsel for Defendants apparently were unable to do so either, as the example that they give to the Court involves Defendant Maher calling President Trump a "dog" and that "[n]o reasonable viewer would believe Mr. Maher was actually calling Trump a dog." The problem with this example is that counsel for Defendants appear to have confused who the Plaintiff is in this case. President Trump is not suing Defendants. Ms. Loomer is. The false allegations *as to Ms. Loomer* involve her having committed adultery with President Trump, not her being a canine.

*Dibble v. Avrich*, 2014 U.S. Dist. LEXIS 146844 (S.D. Fla. Oct. 14, 2014) is illustrative of the Defendants' failed argument. *Dibble* involved a defamation suit based the following published statement:

> What in Tarnation is a Surrogate Dibble, No way this can be a real human beings name, low class redneck pig excrement, redneck asshole, PATHETIC, LOWCLASS, INBRED REDNECK SCUMBAG, venom-spewing, mud-sucking, LOW-CLASS REDNECK, REDNECK LOSERS, SON OF A BITCH, SCUMBAG DRIBBLE, Now do us all a big favor and go play some Russian Roulette with SIX rounds in the chamber

> WHAT IN TARNATION IS A SURROGATE DIBBLE, This low-class, inbred, half-witted, redneck, idiot, horse's ass, bully, CHEAPSKATE AND ASSHOLE, venom-spewing, mud-sucking clown, NON-CUSTOMER, pig-farmer, miserable redneck loser, Surrogate Dibble yo-yo, son of a bitch, SCUMBAG DRIBBLE. *Id*. at 2.

On a motion to dismiss, the Defendant argued for dismissal on the grounds that the complained of words constituted "rhetorical name-calling or expressions of opinion which cannot be construed as statements of fact." *Id*. at 8. The Court rejected this argument, and reasoned that "Defendant's publications also contain

statements about Plaintiff's intelligence, class, ancestry and business-relevant qualities. As examples of the latter, Defendant allegedly stated that Plaintiff might not be a real person, is a cheapskate, a 'non-customer,' and lacks any credibility." *Id*. Thus, the Court was unable to "conclude at this stage that Defendant's comments are mere rhetoric and cannot constitute defamatory publications." *Id*. at 8-9. If the facts of *Dibble* could not justify dismissal on the basis of "rhetorical hyperbole," it is clear that this instant case does not even warrant consideration under this theory. There is nothing outlandish, rhetorical, or hyperbolic about Defendant Maher's statements as to Ms. Loomer, which is exactly why she has been damaged so severely. Defendant Maher delivered the Defamatory Statement as if it were a statement of fact, and it was more than reasonably understood as such.

### b. Alternatively, The Defamatory Statement Is Actionable Mixed-Opinion

Because the preceding section more than conclusively shows that the Defamatory Statement is an actionable statement of fact, no further analysis in this regard must be undertaken. However, as an alternative argument, the Defamatory Statement also constitutes an actionable "mixed-opinion" statement.

> A statement of "'mixed opinion,' which is based on undisclosed facts that infer the plaintiff has committed an illegal act, or one that damages his or her business reputation, is actionable." Id. (citation omitted). Additionally, courts have recognized that "'[e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications." *Gottwald v. Bellamy*, 2011 U.S. Dist. LEXIS 62972, at *10 (M.D. Fla. June 15, 2011) (emphasis added).

*Gottwald* involved a defamation case brought by music producer Dr. Luke against a Defendant country music duo, the Bellamy Brothers. *Id*. at 2. The Defendants launched a campaign asserting that one of Plaintiff's songs infringed on their copyrighted song, and published the following statement:

> This isn't the first time [Plaintiffs Max Martin and Dr. Luke] have been accused of copyright infringement. Dr. Luke was sued in 2007 for copyright infringement . . . for "lifting" portions of Avril's hit song "Girlfriend." The suit subsequently settled in 2008. There is also a current Katy Perry song . . . called "California Gurls" produced and co-written by Dr. Luke and Max Martin . . . where the Beach Boys' record label has filed a diminutive claim against the writers and publishers of the song for credit and royalties. Dr. Luke was party to yet another copyright infringement suit in 2008 for the song "Feels Like Tonight" by Daughtry. <u>Although this is not conclusive evidence that Dr. Luke intentionally lifted a phrase from a Bellamy Brothers song, it certainly shows a possible pattern and warrants a more serious look into the matter</u>. *Id*. at 2-3 (emphasis added).

The Court denied the Defendants' motion to dismiss and found that the challenged underlined portion of the statement above was not "pure opinion." *Id*. at 10 – 11. The same applies to the facts here.

Like in *Gottwald*, Defendant Maher details the contrived "facts" which support the Defamatory Statement: (1) Ms. Loomer is  very close to Trump, (2) Ms. Loomer is 31 years old, (3) Ms. Loomer looks like [Trump's] type, and  (4) Trump is a  "dog" who is fucking *someone*, but not his wife, Melania." Comp. ¶ 13. Because Defendant Maher's recitation of "facts" is both inaccurate and incomplete—notwithstanding his assessment being totally inaccurate—under *Gottwald*, this constitutes a mixed-opinion which is also actionable as defamation.

      **c.**    **Ms. Loomer Has More Than Sufficiently Alleged Defamation By Implication**

"Defamation by implication arises…from what is implied when a defendant '(1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts, [such that] he may be held responsible for the defamatory implication . . . .'" *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). Defamation by implication' is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements." *Id*.

In *Block v. Matesic*, 2023 U.S. Dist. LEXIS 97530 (S.D. Fla. June 5, 2023) the Court denied the defendants' motion to dismiss the plaintiff's claim for defamation by implication on facts that are highly analogous to this instant case. *Block* involved a letter sent by defendant members of a condo association concerning the Plaintiff, which stated:

> Recently Tower One's members were subjected to at least two email blasts from a disgruntled owner disparaging the Association, its directors, the construction project, and its associated professionals with incorrect statements and facts. These unsolicited emails [sic] blasts to owners visibly listed each member's email address causing serious privacy and security concerns for everyone. Neither the Association nor its management was the source of our owners' email addresses and the method of obtainment by the owner remains unknown. The Association and management staff take your privacy and security seriously. We advise all members to check and consider updating their computer's security and privacy setting. *Id*. at 1-2.

The Plaintiff filed suit, alleging among other causes of action, defamation by implication. The Court found that the subject letter supported a claim for defamation by implication because the Plaintiff had alleged three facts contained in the letter which "imply a defamatory connection between them":

16

First, the letter claimed that "[t]hese unsolicited emails [sic] blasts to owners visibly listed each member's email address causing serious privacy and security concerns for everyone."...Second, the letter noted that "[n]either the Association nor its management was the source of our owners' email addresses and the method of obtainment by the owner remains unknown".....Third, the letter "advise[d] all members to check and consider updating their computer's security and privacy settings." *Id*. at 12 – 13.

This facts of *Block* fit the facts here "like a glove." Defendant Maher juxtaposes five separate statements which are presented as facts, and of which at least two are true, in order to create the defamatory implication that Ms. Loomer had committed adultery with President Trump. These statements are: (1) Ms. Loomer is "very close to Trump,"[true], (2) Ms. Loomer is 31 years old [true], (3) Ms. Loomer "looks like [Trump's] type," [could be true, but unknown to Ms. Loomer],  (4) Trump is a "dog" who has to be sleeping with someone [veracity unknown to Ms. Loomer], and (5) the person that Trump is sleeping with is not his wife, Melania [veracity unknown to Ms. Loomer]. These five statements are juxtaposed together by Defendants to create the false, defamatory implication that Ms. Loomer was sleeping with President Trump and committing adultery.

Accordingly, Ms. Loomer has more than sufficiently pled a cause of action for defamation by implication.

### d.    Ms. Loomer Has More Than Sufficiently Alleged Actual Malice

Actual malice is shown when the Plaintiff pleads "facts giving rise to a reasonable inference that the defendant published the story knowing that it was false or with reckless disregard for whether it was false or not." *Dershowitz v. Cable News Network, Inc*. 541 F. Supp. 3d 1354, 1367  (S.D. Fla. 2021) (internal quotation omitted). "[M]ost authorities suggest that a failure to retract, in

conjunction with other circumstances, may be used to establish the requisite level of [constitutional] malice." John C. Martin, Comment, The Role of Retraction in Defamation Suits, 1993 U. Chi. Legal F. 293, 295 (1993). Furthermore, the Complaint lays out twenty-four (24) "badges" or indicators of actual malice in medial publications, many of which apply here. Comp. ¶ 23, <u>Exhibit 1</u>. Awareness of facts prior to the defamatory statements being made which strongly suggested innocence of plaintiff from the published accusations shows actual malice. *Cape Publ'ns v. Adams*, 336 So. 2d 1197 (Fla. 4th DCA 1976). Lastly, whether in the context of the facts of this case the statements were published with actual malice is a question for the jury. *Southern Air Transport, Inc. v. Post-Newsweek Stations, Florida, Inc.*, 568 So.2d 927, 929 (Fla. App. 3 Dist. 1990).

Importantly, the Court need not even consider whether Ms. Loomer has alleged actual malice, which she did,  because, as set forth below in *supra* section II, the Defamatory Statement is defamatory *per se*. *Lawnwood Med. Ctr. Inc. v. Sadow*, 43 So. 3d 710, 727 (Fla. Dist. Ct. App. 2010)("the law presumes malice in their utterance" making it unnecessary to prove express malice."); *see also Wolfson v. Kirk*, 273 So. 2d 774, 776 (Fla. Dist. Ct. App. 1973) ("The law at an early time recognized a distinction between defamations "per se" and defamations "per quod". The reason underlying the distinction is that some statements are so obviously defamatory, that is damaging to reputation, that the mere publication of them **gives rise to an absolute presumption both of malice and damage**." (emphasis added). Thus, the Court need not undertake any analysis as to whether Ms. Loomer has alleged actual malice, as such is presumed under the

facts of this case. However, even if the Court does undertake such an analysis, it is clear that actual malice has been more than sufficiently alleged by Ms. Loomer.

As a threshold matter, the Defendants' Motion is a motion to dismiss under Rule 12(b)(6) and not one for summary judgment. Thus, all of the extraneous materials that the Defendants have included in Defendants' Motion pages 19 – 20  to try to assert that "social media posts and reporting by other media outlets gave Defendants ample reason to believe the Statement that Trump and Laura Loomer 'may' be sleeping together to be true" are not properly considered on such a motion and are simply not relevant under *Dershowitz*. In any event, however, even if the Court converts Defendants' Motion to one for summary judgment and considers these extraneous materials, they still do not defeat Ms. Loomer's allegations that Defendants acted with actual malice.

This is because it is well settled that "individuals are [only] entitled to rely on "previously published reports" from **reputable sources**.'" *Berisha v. Lawson*, 973 F.3d 1304, 1313 (11th Cir. 2020). Each and every "source" that the Defendants cite to are either (1) posts made by random individuals on X (ECF 17 fn. 12) or (2) "articles" aggregating posts made by random individuals on X (ECF 17 fn. 13,14). Thus, the only "sources" that Defendants have are random, unverified people on X speculating about Ms. Loomer and President Trump's relationship without any direct knowledge. That counsel for Defendants would even try to argue that these X posts qualify as "reputable sources" is truly baffling.[4]

---

[4] The Defendants apparently took seriously the satirical quote from Michael Scott in season 3 episode 19 of "The Office," where he says: "Wikipedia is the best

Furthermore, given that Defendants have conceded that relying on random individuals without direct knowledge X posts speculating on Ms. Loomer and President Trump's relationship constitutes the extent of their "investigation," it is clear that such an investigation was wholly inadequate to justify publishing the Defamatory Statement to a global audience on HBO. "When a story is not 'hot news,' 'actual malice may be inferred when the investigation . . . was grossly inadequate in the circumstances.'" *Hunt v. Liberty Lobby*, 720 F.2d 631, 645 (11th Cir. 1983).

*Hunt* is illustrative of the Defendants' failures. *Hunt* involved a publication called Spotlight, published by Liberty Lobby. *Id*. at 634. On the front page of the August 14, 1978 Spotlight was the announcement "CIA TO NAIL HUNT FOR KENNEDY KILLING" and referred the reader to page 4 for details. *Id*. On page four, a larger headline stated "CIA TO 'ADMIT ' HUNT INVOLVEMENT IN KENNEDY SLAYING." *Id*. Furthermore:

> A biography of Victor Marchetti, the author of the article, appeared on this page. This brief background of the author explained that Marchetti "has been involved in U.S. Intelligence activities for almost 20 years, 14 years of that time being with the CIA, the last three years of which he was staff assistant to Richard Helms. He is the author of 'The CIA and the Cult of Intelligence ' and 'The Rope Dancer. ' *Id*.

The article detailed a CIA plot to frame Hunt for the Kennedy assassination. *Id*. Hunt sued for Liberty Lobby for defamation and won. *Id*. On appeal, Liberty Lobby argued that there was insufficient evidence of actual malice, which was

---

thing ever. Anyone in the world can write anything they want about any subject, so you know you are getting the best possible information."

rejected by the Eleventh Circuit. In doing so, they found that (1) the story was not "hot news" and (2) Liberty Lobby's investigation was inadequate. "We believe that the jury could properly decide that Liberty Lobby's "investigation" did not pass muster and, accordingly, infer actual malice therefrom." *Id.* at 645.

Notably, the investigation by Liberty Lobby far exceeds what Defendants here did. The Liberty Lobby investigation consisted of the fact that they trusted Marchetti and that Marchetti had assured them that his sources were reliable. *Id.* at 638. Marchetti had submitted articles that were published by Spotlight in the past without issue. *Id.* Spotlight "thought very highly of Marchetti, believed him to have access to high level confidential information and, in general, felt they had no reason to doubt the veracity of his article." *Id.* In *Liberty Lobby*, the source was at least someone who had experience in the field of his reporting, and someone that they had worked with in the past. Here, the "sources" are random, unverified X posts from individuals with no direct knowledge speculating on Ms. Loomer and President Trump's relationship. Thus, if the investigation in *Liberty Lobby* was deemed inadequate, so too must the "investigation" here. And, if a story about a sitting President's assassination was not considered "hot news," certainly the tabloid fodder here published by the Defendants is not even news at all, much less "hot news." Thus, actual malice can be inferred.

Lastly, it must be stated that none of the "sources" cited by the Defendants actually confirmed that Ms. Loomer and President Trump had a sexual and adulterous relationship. Ms. Loomer's own social media posts only indicated that she was close with President Trump, not that there was any sexual

component to their relationship. The news reports that Ms. Loomer was travelling with President Trump also do not support the logical leap that there was a sexual relationship, particularly because President Trump was amidst a presidential campaign, and Ms. Loomer is a prominent conservative activist and media figure, as well as formerly a candidate for U.S. Congress. Comp. ¶ 3. Furthermore, none of the random X posts that Defendants rely on stated definitively that Ms. Loomer had a sexual relationship with President Trump. Thus, even assuming *arguendo* that these "sources" cited by Defendants were considered reputable, the fact of the matter remains that Defendant Maher still acted with reckless disregard for the truth by falsely equating a close personal relationship between Ms. Loomer and President Trump to "Ms. Loomer is fucking Trump." Put simply, there is no "source" for what Defendant Maher and Defendant HBO published because it was completely and totally made up by the Defendants. This is textbook actual malice and any arguments to the contrary are meritless and must be denied.

**II.    DAMAGES ARE PRESUMED WHEN STATEMENTS ARE DEFAMATORTY PER SE AND, IN ANY EVENT, MS. LOOMER HAS PROPERLY ALLEGED DAMAGES**

It is indisputable that the Defamatory Statement constitutes defamation *per se* because it publishes that Ms. Loomer has  been "fucking" and committing adultery with President Trump, who is a married man. Comp. ¶ 19. "The false accusation of a woman of adultery is libelous per se." *Firestone v. Time, Inc.*, 305 So. 2d 172, 175 (Fla. 1974)(vacated on other grounds); "…words which falsely accuse a woman of adultery are libelous per se and that a plaintiff need not

allege or prove general or special damages. *Bobenhausen v. Cassat Ave. Mobile Homes, Inc*., 344 So. 2d 279, 281 (Fla. Dist. Ct. App. 1977). The Defamatory Statement is also defamatory *per se* because it "it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace… [and] it tends to injure one in his trade or profession." *Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953). Clearly, the false statement that Ms. Loomer had an affair with a married man – the President of the United States no less – would subject her to "hatred, distrust, ridicule, contempt, or disgrace." Furthermore, such an allegation also severely harms her trade or profession as an investigative journalist and media figure because it leads the public to falsely believe that she uses sex to further her career instead of the truth, which is that her success has been built through years of hard work. Because the Defamatory Statement here is clearly defamatory *per se*, damages – as well as actual malice (*supra* section I(d) -  are clearly presumed. *Wolfson v. Kirk*, 273 So. 2d 774 (Fla. Dist. Ct. App. 1973. This ends the inquiry.[5]

## III.  FLORIDA'S ANTI SLAPP STATUTE DOES NOT APPLY TO THIS CASE

It is crucial to recognize, first and foremost, that this case is being brought before a federal court sitting in diversity, and as such, the Florida Anti-SLAPP statute cannot be applied because it imposes a heightened pleading standard on the Plaintiff and thus conflicts with the FRCP. Thus, the Defendants' statements

---

[5] In any event, Ms. Loomer has also alleged special damages to sustain even an allegation for defamation *per quod*. Ms. Loomer has alleged "severe financial damage and damage to her reputation, good will, business opportunities, social relationships, and the career of Plaintiff," Comp. ¶ 36, which is more than sufficient at the pleading stage. However, in the unlikely event that the Court finds otherwise, Ms. Loomer would respectfully request leave to amend in this regard.

that "Federal courts sitting in diversity and applying Florida law routinely award fees under the anti-SLAPP law…" is false. ECF No. 17 at 24. The Chief Judge of the Eleventh Circuit, the Honorable William Pryor recently expressed "serious doubt" as to whether Florida's Anti-SLAPP statute applied:

> **and I have serious doubts about whether the anti-SLAPP statute applies in federal court**. And it seems to me that if it doesn't, then a suit filed in violation of it can't give rise to an attorney's fee award." *Corsi v. Newsmax Media Inc et al*, 21-10480 (Oral Argument of May 19, 2022).

Numerous Florida courts have found that Florida's Anti-SLAPP statute imposes a heightened burden on the Plaintiff, which would clearly conflict with the FRCP. Just a few examples of this include, but are hardly limited to: *Gundel v. AV Homes, Inc.*, 264 So. 3d 304, 314 (Fla. Dist. Ct. App. 2019)("Placing the initial burden on the SLAPP defendant to set forth a prima facie case that the Anti-SLAPP statute applies and then **shifting the burden to the claimant** to demonstrate that the claims are not 'primarily' based on First Amendment rights in connection with a public issue and not 'without merit' serves the purpose of the statute…."); *Davis v. Mishiyev*, 339 So. 3d 449 (Fla. Dist. Ct. App. 2022); *Godwin v. Michelini*, 48 Fla. L. Weekly 1769 (Dist. Ct. App. 2023).[6] Ironically, the website for counsel for Defendants, Shullman Fugate, admits this point:[7]

---

[6] This is notwithstanding the fact that Ms. Loomer has more that properly alleged defamation and defamation by implication as set forth herein. Florida's Anti-SLAPP statute does not protect defamatory speech. *Beauharnais v. Illinois*, 343 U.S. 250, 266 (1952).

[7] https://www.shullmanfugate.com/other-news/2019/02/01/florida-appellate-court-addresses-standards-for-anti-slapp/

> …[T]he court recognized it encompasses an evidentiary burden-shifting to the Plaintiff…the court found "[p]lacing the initial burden on the SLAPP defendant to set forth a prima facie case that the Anti-SLAPP statute applies and then shifting the burden to the claimant to demonstrate that the claims are not 'primarily' based on First Amendment rights in connection with a public issue and not 'without merit' serves the purpose of the statute….

Thus, Florida's Anti-SLAPP Statute does not apply here in diversity.[8]

## CONCLUSION

In sum, the Defendants' Motion must be denied in its entirety. Each and every one of Defendants' arguments have been conclusively disproven and shown to be completely meritless, and the defamatory statements here are far more harmful to Ms. Loomer's' financial well-being, good will and reputation and far more egregious than the case that counsel for Defendants was recently forced to settle for $15 million in the Trump Case. And, there is no excuse for what Defendant Maher maliciously and viciously did, which was motivated not only to increase his and HBO's views and profit, as well as his pathological and sick hatred for President Trump and those who associate with him.

This matter must therefore proceed expeditiously to discovery.

Dated: December 16, 2024                    Respectfully submitted,

By: /s/ Larry Klayman
Larry Klayman, Esq.
Florida Bar No.: 246220
Klayman Law Group P.A.
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433

---

[8] *See also Carbone v. CNN, Inc.*, 910 F.3d 1345 (11th Cir. 2018), *Abbas v. Foreign Policy Grp., LLC*, 414 U.S. App. D.C. 465 (2015), *Klocke v. Watson*, 936 F.3d 240 (5th Cir. 2019), *La Liberte v. Reid*, 966 F.3d 79 (2d Cir. 2020).

Tel: 561-558-5536
leklayman@gmail.com

*Counsel for Laura Loomer*

## CERTIFICATE OF SERVICE

I, Larry Klayman, hereby certify that on this day, December 16, 2024 I electronically filed the foregoing with the Clerk of Court using the Court's ECF procedures. I also certify that the foregoing document is being served this day on all counsel of record through the Court's eservice procedures.

*/s/ Larry Klayman*

26

EXHIBIT 1

Case 5:24-cv-00625-JSM-PRL   Document 21   Filed 12/16/24   Page 29 of 78 PageID 172

# Showing Constitutional Malice in Media Defamation



Illustration by Barbara Kelley

There is a myth that it is virtually impossible for a public figure to successfully sue the media for defamation. This myth is based on a perceived insurmountability of the requirement imposed on public figures to prove "actual" or "constitutional" malice by clear and convincing evidence when suing for defamation. In reality, the courts have provided an almost step-by-step guide for finding and proving constitutional malice. The guide is the badges of malice. The phrase "badges of malice" is adapted from the

9/1/23, 17:31

badges of fraud used in tax evasion and fraudulent conveyance cases to categorize types of circumstantial evidence that may support an inference of a subjective intent to defraud.

No doubt showing constitutional malice is an obstacle. Public figures must show constitutional malice to maintain their claim. The requirement of proving constitutional malice is not limited to public figures. Plaintiffs that are not public figures still must show constitutional malice to recover punitive damages.

Constitutional malice, also called actual malice, is the publishing of a defamatory statement either knowing it is false or with reckless disregard for its truth or falsity.[1] Requiring a showing of constitutional malice for a public figure to sue for defamation, or to impose greater than actual damages ( *i.e.* , presumed and punitive damages) on the media, is intended to prevent a chilling effect on news reporting and protect First Amendment rights.[2] The concept of "knowledge of falsity" is familiar to all attorneys in multiple contexts. Recklessness as to falsity, however, has evolved definitions and inferences unique to defamation law.

### Twenty-Four Badges of Constitutional Malice: A Guide

The Supreme Court articulated the parameters of "reckless disregard" in *St. Amant v. Thompson* , 390 U.S. 727, 731 (1965): "Reckless conduct is not measured by whether a reasonably prudent man would have published or would have investigated before publishing. There must be evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."

Accordingly, *St . Amant* reasoned that recklessness may be inferred when "there are obvious reasons" to doubt the veracity of the defamatory statement.[3]

In *Mason v. New Yorker Magazine* , 501 U.S. 496 (1991), the Supreme Court summarized that, for proof of constitutional malice, "mere negligence does not suffice," and that the plaintiff must demonstrate that the author "in fact entertained serious doubts as to the truth of his publication…or acted with a high degree of awareness of probable falsity."[4]

Knowledge of falsity or reckless disregard for falsity is a subjective mental state of the person responsible for publishing the defamatory statement. Consequently, absent an admission by the media, showing constitutional malice is based on circumstantial evidence. The courts have recognized certain fact patterns of circumstantial evidence as probative of constitutional malice. These "badges of malice," some alone and some in combination with others, have been held sufficient to support a jury inference of constitutional malice. There are 24 badges of malice.[5]

• failure to conduct a thorough investigation before publishing serious and damaging allegations that are not "hot news";

• failure to give the plaintiff a fair opportunity to reply to defamatory allegations;

• failure to report exculpatory facts;

• omitting pertinent information to create a false impression;

• destruction, loss, or unavailability of a reporter's notes or research;

• the reporter's knowledge of a quoted source's animosity toward the plaintiff;

• the alteration of quotes to maximize a story's impact;

• a reporter's knowledge of facts conflicting with the report;

• emphasizing unimportant events to support a defamatory statement;

• continued reliance on a source that had proven unreliable in other respects;

• a preconceived determination to disparage a plaintiff or a preconceived slant or view;

• repetitive media attacks on the plaintiff;

• failure to contact key witnesses;

• a reporter's ill will toward the plaintiff;

• competitive pressure for "hot news" story;

• discrepancies, inconsistencies, and equivocation in the testimony of media witnesses;

• a reporter's departure from professional standards;

• failure to supervise the reporter's preparation of the story;

• refusal to publish a retraction upon learning of errors in a story;

• the use of deception to obtain a defamatory story;

• a reporter's lack of credibility;

• prior and subsequent defamatory statements;

• that an investigative agency with the same information as a reporter declined to prosecute or take any action against the plaintiff; and

• making threats in connection with a story.

These badges of malice are a guide and nothing more. The possible scope of evidence that may support an inference of malice is unlimited. The badges are useful because they summarize actual events that tend to repeat themselves in media defamation cases. Evidence of the badges in discovery will support a strong and well-precedented argument for constitutional malice. For each badge developed in discovery, the media will have an explanation. Developing multiple badges of malice can expose the media's serial excuses as pretextual and increase the chances of successfully arguing constitutional malice.

## Malice Typically Is Evaluated from the Accumulation of Circumstantial Evidence

The badges of malice are consistent with the extremely broad scope of evidence that the Supreme Court held must be discoverable by plaintiffs to prove malice. In *Herbert v. Lando* , 441 U.S. 153 (1979), the Supreme Court observed that the First Amendment protections given to the media were balanced by the corollary that the fact finder could consider an extremely broad scope of evidence in determining malice. "[A]ny competent evidence either direct or circumstantial, can be resorted to, and all the relevant circumstances surrounding the transaction may be shown…" to show malice.[6] The specific items of relevant evidence favorably itemized in *Herbert* include 1) all information known to the defamer showing the falsity of defamatory statements; 2) the defamer's thought process and reasons for crediting or discrediting information; 3) the defamer's thought processes and reasons for incorporating only certain information into a press statement; 4) threats made by the defendant; 5) prior defamations by the defendant; 6) subsequent defamations made by the defendant; 7) subsequent statements made by the defendant; and 8) circumstances indicating rivalry, ill will, or hostility.[7]

In *Harte-Hanks Communications, Inc. v. Connaughton* , 491 U.S. 657 (1989),

Case 5:24-cv-00625-JSM-PRL   Document 21   Filed 12/16/24   Page 34 of 78 PageID 177 9/1/23, 17:31

the Supreme Court emphasized that a jury may infer malice from a series of factors none of which alone would have been sufficient. In that case, a newspaper published witness' allegations that a judicial candidate had been bribed. The candidate sued for defamation, and the newspaper argued that it had no knowledge that the bribery allegations were false. The jury found malice, and the newspaper appealed.

*Harte-Hanks* emphasized numerous factors in evaluating the entire record. The newspaper was involved in heated competition with another local paper and was under pressure to "scoop it" on local news (*i.e*., profit motive for the defamation). After hearing the obviously damaging bribery allegations, the newspaper conducted an investigation, but it failed to contact key witnesses. Numerous taped witness interviews were available to the newspaper, but the editorial director did not listen to them. There were discrepancies in the testimony of the newspaper's witnesses. Though no single factor was dispositive, *Harte-Hanks* stressed that the jury may have found that "failure to conduct a complete investigation involved a deliberate effort to avoid the truth."[8]

In *Curtis Publishing Co. v. Butts*, 388 U.S. 130 (1967), a football coach sued a magazine for publishing an article accusing him of fixing games. The evidence showed that this was not "hot news," that the charges were serious, that the editors recognized "the need for a thorough investigation," that the reporter's superiors did not look at the reporter's notes prior to the publication, that a key witness was not interviewed, and that "no attempt was made to screen the films of the game."[9] The Supreme Court held that a jury may infer from this that the magazine "had been anxious to publish an expose and had, thus, wantonly and recklessly seized on a questionable affidavit."[10]

*Hunt v. Liberty Lobby*, 720 F.2d 631 (11th Cir. 1983), affirmed a jury finding

9/1/23, 17:31

of malice in a Florida defamation case. *Hunt* ruled that two factors present in that case independently supported the jury's determination. First, "when an article is not in the category of 'hot news,' that is, information that must be printed immediately or it will lose its newsworthy value, 'actual malice may be inferred when the investigation for a story...was grossly inadequate in the circumstances.'"[11] Second, "an inference of actual malice can be drawn when a defendant publishes a defamatory statement that contradicts information known to him, even when the defendant testifies that he believed that the statement was not defamatory and was consistent with the facts within his knowledge."[12]

A defendant's "inconsistent" and "equivocating" testimony supported a finding of malice in *Texas Disposal Systems Landfill, Inc. v. Waste Management Holdings, Inc.* , 219 S.W.3d 563 (Tex. App. 2007). The court cited a combination of circumstantial evidence from which the jury may have inferred malice. These factors included 1) omitting pertinent information that would have prevented a "false impression" from the information included in the defamatory communication; 2) a failure to attempt verification of the defamatory information; and 3) "inconsistent" and "equivocating" testimony from the defendant.[13]

The frequency and duration of the media's attack on a plaintiff also may help establish malice. In *Bentley v. Bunton* , 94 S.W.3d 561 (Tex. 2002), the court affirmed a jury finding of malice. *Bentley* cited factors that included the fact that the talk show host had "relentlessly" repeated allegations against a particular judge for months while ignoring people that had knowledge of the allegations.[14]

Emphasizing unimportant events to support serious defamatory statements will also support a finding of malice. In *Bolling v. Baker* , 671 S.W. 2d 559 (Tex. App. 1984), a physician accused a nurse of dishonesty. When the nurse

sued for defamation, the physician testified that one reason he doubted the nurse's honesty was an incident in which some lab slips "had been changed."[15] *Bolling* concluded that the physician's "obsession with such an insignificant event warrants the inference that he was using the incident to get even with [the nurse]."[16] Accordingly, the court concluded that there was sufficient evidence to support the jury's finding that the statements were made with knowledge of their falsity or with reckless disregard for the truth. Emphasizing unimportant events also fits within the more general badge of a reporter knowing that the facts do not support a defamatory story.

Finally, the context of a defamatory statement and the media's use of deception to obtain images for a defamatory story may support a jury inference of malice. In *Braun v. Flynt* , 726 F.2d 245 (5th Cir. 1984), a novelty entertainer who performed an act with a swimming pig at a family-oriented amusement park sued a sexually oriented men's magazine for defamation for publishing her photo in its "Chic Thrills" section. The magazine obtained authority to use the photograph by misrepresenting the nature of the magazine. *Braun* affirmed a jury finding of malice, holding that the jury may infer malice from the magazine's use of deception to obtain the photograph and then inserting the photograph of what the editors knew was a family tourist attraction "in the context of" a lewd magazine.[17]

The media cannot avoid an inference of malice when it publishes a defamatory headline by showing that it published the full truth in the text of the story. In *Kaelin v. Globe Communications Corp.* , 162 F.3d 1036 (9th Cir. 1998), Kato Kaelin sued a newspaper for publishing a headline stating, "COPS THINK KATO DID IT!" after O.J. Simpson was acquitted of murder. The newspaper argued that there was no malice because the body of the story made clear that the "IT" referred to perjury and not the murders. The trial court entered summary judgment for the newspaper. The appellate court reversed *Kaelin* , holding that a jury may infer that the newspaper

intended to convey a false impression from the scandalous headlines for the pecuniary motive of selling more newspapers. The truthful disclosure in the body of the article did not guarantee the newspaper immunity from defamatory headlines. "The editors' statements of their subjective intention," *Kaelin* stressed, "are matters of credibility for a jury."[18]

## Some Badges Alone May Establish Malice

There are instances in which courts have approved an inference of malice from a single item of circumstantial evidence. This occurs in two scenarios. One is when there is evidence of the reporter's lack of credibility regarding the story. This evidence includes the mysterious disappearance of the reporter's research notes, the alteration of quotes for defamatory impact, and the reporter's possession of materials showing that the defamatory story was false. The second scenario focuses on the reporter's conduct after the defamatory publication. When the media refuses to retract a defamatory statement after learning of its falsity, courts have allowed an inference that the defamation was published with malice. Though neither scenario guarantees a finding of constitutional malice, both scenarios may support such a finding if the evidence is material to the defamation.

The destruction or unavailability of a reporter's notes and research supported a finding of malice in *Murphy v. Boston Herald, Inc.* , 449 Mass. 42 (Mass. 2007). There, a newspaper reporter, relying on the statement of a district attorney with animosity toward a judge, published an article accusing the judge of belittling a juvenile rape victim. *Murphy* found that a number of factors combined to furnish clear and convincing evidence of malice.[19] *Murphy* stressed 1) the reporter's knowledge that his source had animosity toward the judge; 2) the reporter's failure to verify the accuracy of the statements attributable to the judge with others who were present; and 3) the reporter's incredible claim that he discarded his notebook where he wrote the information told to him by the district attorney.[20] *Murphy* stressed

that the strongest evidence of malice was the mysterious unavailability of the notebook: "The jury were entitled to draw the negative inference that [the reporter] discarded his notebook in a deliberate effort to conceal what he knew were inaccuracies in his reporting. This inference, in turn, *provides a strong basis for a finding of actual malice*."[21]

Consistent with *Murphy* , numerous courts have held that the destruction or unavailability of a reporter's notes or research may support a jury verdict of malice.[22]

A reporter's alteration of quotes to maximize the impact of the story also supports a verdict of malice. In *Masson v. New Yorker Magazine, Inc* ., 501 U.S. 496 (1991) , the Supreme Court held that a reporter's alteration of quoted words may equate with knowledge of falsity when the alteration results in a material change of the meaning conveyed by the quoted statement.[23] That a reporter in *Masson* might have misunderstood his or her sources is insufficient to overturn a jury's evaluation of the circumstances.[24]

The court in *Southern Air Transport, Inc. v. Post Newsweek Stations Florida, Inc* ., 568 So. 2d 927 (Fla. 3d DCA 1990), upheld a finding of malice when the media aired an uncorroborated claim by an individual of questionable credibility that the plaintiff was a drug trafficker. The court held publishing this serious and uncorroborated allegation without giving the plaintiff a fair opportunity to reply supported the inference of malice. The court also noted that the defamatory broadcast made the informant appear credible and failed to report information that would negatively impact his credibility.[25]

A reporter's possession of documents conflicting with his report supported a finding of malice in *Mitchell v. Griffin Television, LLC*, 60 P.3d 1058 (Okl. App. 2002). There, a veterinarian sued a TV station for falsely reporting that a lawsuit accused him of medicating a champion race horse to hide injuries so

the horse could be sold. The TV station claimed there was no showing of malice because the complaint filed in federal court alleged the veterinarian had medicated the horse prior to the sale. That complaint accused the trainer of trying to mask the horse's unsoundness but made no such accusation as to the veterinarian. Since the TV station had a copy of the complaint, *Mitchell* held that the jury properly found that the false report was made with "reckless disregard."[26]

In *Herbert* , the court held that a defamer's post-publication conduct may be relevant to establishing malice at the time of publication.[27] The key post-publication conduct developed in the caselaw is the media's refusal to retract a defamatory statement after learning that it is false. *Restatement Second of Torts* 580A (1977), Comment D, concludes that a defamer's refusal to retract a defamatory statement after learning it is false "might be relevant in showing recklessness at the time the statement was published." In *Mahnke v. Northwest Publications, Inc.* , 160 N.W. 2d 1 (Minn. 1968), the Minnesota Supreme Court held that a jury may properly consider a defendant's failure to retract defamatory statements as evidence of recklessness. "We think that the failure to retract the defamatory statements," *Mahnke* stressed, "underscored defendant's reckless attitude as to the consequences of what had been published and that the jury was entitled to take that fact into consideration."[28]

## Use of the Badges in Discovery

The focus of discovery on constitutional malice is obtaining evidence that the reporter either knew the truth refuting the defamation or the truth was so readily available that failure to inquire amounts to a deliberate avoidance of truth. The badges suggest where to look for this evidence. The first step is obtaining all investigative research materials, notes, drafts of articles, edits, article or script changes, outtakes communications, tweets, web postings (including both the defamatory article and any guest comments or posts),

9/1/23, 17:31

Facebook posts, and other social media materials concerning the defamatory story. The reporter's familiarity with the subject matter of the story, as well as the identities of his or her sources also warrant discovery. The goal of this phase of discovery is to learn everything the reporter said, wrote, knew, or had access to concerning the defamatory story.

A next step is to identify every item of information known or available to the reporter that is inconsistent with the defamatory sting of the story. This aspect of discovery then focuses on tracing how and why the reporter made editorial decisions to omit, downplay, or not pursue what was inconsistent with the defamation. This should be done at deposition, but it is helpful to initially obtain copies of all drafts or outtakes of the defamatory publication to see what was deleted.

The reporter should be deposed on every step of the investigation conducted on the story. Particular emphasis is on the reasons for a reporter's decision not to pursue research areas that would have exposed the defamatory story as false. The credibility issue surrounding a reporter's explanation of this process is often the lynchpin that decides constitutional malice. Inconsistencies between the reporter's research and the defamatory string of the story may rise to a level where this alone allows an inference of malice.

The next aspect of discovery deals with external influences on the defamatory story. External influences discussed in the caselaw include 1) animosity toward the subject of the defamation; 2) competitive pressure to scoop other media outlets; 3) a pattern of defamatory coverage; and 4) an editorial slant. Also, failure to retract after learning of a defamatory falsity, though not an influence on the story, is an external factor that may support an inference of malice. Accordingly, discovery into the editorial decision not to retract should be as thorough as discovery into the decision to initially

publish the defamation. In cases in which the media issues an inadequate retraction, the retraction can often be pled as an additional defamatory publication requiring discovery in its own right.

Discovery into animosity toward the subject of the defamation can be far ranging or a quick dead end. In cases in which a news outlet had an established relationship with the plaintiff, there is often a falling out predating the defamatory publication — and evidence of animosity. The entire history of the relationship, including all statements made by news outlet representatives about the plaintiff, are in play.

Competitive pressure for attention-grabbing stories is always present but must be shown in the record. There are often emails or other communications discussing a news outlet's market position (circulation or viewers). Media executives normally must acknowledge that their company's source of income (advertising), and often their income depends on their circulation or number of viewers. Editors sometimes direct reporters to pursue certain stories, either orally or in writing, to maximize viewers during ratings periods.

Television stations typically feature their most inflammatory stories during national ratings periods knowns as "sweeps." During this time, there can be increased pressure on reporters to generate high-profile stories or to exaggerate to the point of defaming. Sweeps periods occur four times each year and are usually acknowledged in internal communications. It is important in the industry because the viewership established during sweeps determines advertising revenue. Questioning the reporter regarding his or her basis for publishing multiple defamatory statements will often yield testimony helpful to establish a credibility dispute.

A pattern of defamatory statements about the plaintiff can be key to showing

malice. Identifying every defamatory statement about the plaintiff made by a news outlet is the first step. This includes defamatory statements that were made before and after the defamatory publication. In some cases, the sheer number of false statements made may support an inference of malice. In others, credibility issues are raised by a reporter's attempts to explain this pattern.

## Defending Summary Judgment

The first test of a plaintiff's evidence of constitutional malice is usually the media's motion for summary judgement. It is here that a plaintiff first feels the weight of being required to prove malice by clear and convincing evidence. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), the Supreme Court held that, in ruling on a media motion for summary judgment or a directed verdict on constitutional malice, a court must evaluate the evidence of malice to determine whether a jury reasonably could infer malice under this heavier evidentiary burden. Media defendants, quoting isolated language from *Anderson* and similar cases, exaggerate that a plaintiff's burden is virtually insurmountable.

In reality, *Anderson* also stresses that courts should be cautious in granting summary judgment on constitutional malice:

> [I]t is clear enough from our recent cases that at the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.[29]

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or a directed verdict. The evidence of the non-movant is to be believed, and all justifiable

Case 5:24-cv-00625-JSM-PRL   Document 21   Filed 12/16/24   Page 43 of 78 PageID 186

inferences are to be drawn in his favor. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.[30]

*Anderson* has been inconsistently applied. Some courts invoke *Anderson* as a license to act as jury in weighing the evidence. Others look at whether there are factual issues that may be presented to a jury. This was predicted by the dissent in *Anderson* .[31]

The dissenting justices argued that *Anderson* gave conflicting instructions to trial courts. Specifically, courts were simultaneously instructed to weigh the evidence under the "prism" of the clear and convincing standard and cautioned against weighing the evidence when ruling on a motion for summary judgment or directed verdict. The dissents predicated that *Anderson* would prove devoid of practical application.[32]

In *Hutchinson v. Proxmire*, 443 U.S. 111, n.9 (1979), the U.S. Supreme Court noted in a libel case "the proof of actual malice calls a defendant's state of mind into question [ *citations omitted* ] and does not readily lend itself to summary disposition."[33]

Summary judgment in a Florida defamation case arising from "investigative television news" was addressed in *Southern Air Transport* . There, the plaintiff sued a TV station for broadcasting an investigative story accusing the plaintiff of drug trafficking while engaged in covert arms shipments to the Nicaraguan Contras. The trial court granted summary judgment for the TV station on the issue of malice. The district court reversed, holding that these factors precluded summary judgment: 1) A source's information had proven unreliable in other respects; 2) "the defendants *did not give plaintiff a fair opportunity to reply* to this drug trafficking accusation…"[34]; and 3) the

government declined to prosecute anyone based on the source's information.[35] The court noted that other evidence in the record supported contrary inferences but stressed that weighting them was for the jury.[36]

Media defendants always assert that they believed the truth of the defamation. Constitutional malice pivots on creating a triable issue concerning credibility. The badges of malice help create this issue, but the courts have stressed that it is in the jury's purview to evaluate the credibility of media witnesses and reject their claim that they believed the defamation was true.

In *Harrison v. Williams* , 430 So. 2d 585 (Fla. 4th DCA 1983), a father sent defamatory communications to officials accusing a police officer of beating up his son. The police officer brought a defamation action, and the father's defense was that "he made a good faith mistake about the identity" of the police officer. The trial evidence showed that the son "informed his father" that it was the plaintiff who had attacked him. The assistant state attorney, however, had told the father that the attacker was another officer who looked like the plaintiff. The fact finder resolved the credibility issue in favor of the plaintiff and found that the father had made his accusations with malice. On appeal, the court affirmed, finding substantial competent evidence to support the inference of malice.[37]

*Dibella v. Hopkins* , 403 F.3d 102 (2d Cir. 2005), affirmed a jury's finding of malice and held that it was within the jury's purview to discredit the defamer's account of his mental state in making a defamatory statement.[38] Evidence that creates an issue concerning the reporter's credibility requires a jury determination.

The thrust of the focus on the credibility of the media witnesses is that anything normally impacting a witness' credibility is in play. In particular

situations, these factors may be unique. For instance, a witness' hesitations, tone, and demeanor are properly considered by a jury deciding whether to believe the witness. In the context of a motion for directed verdict, the matter must be put on the record because the transcript will not reflect them. In defending a summary judgment, an argument that the record prevents an issue on the media witnesses' credibility can be supported by videotaped deposition testimony.[39]

## Conclusion

The caselaw developed over the last half century shows that proving constitutional malice is feasible. It takes the discipline of developing every item of circumstantial evidence that may furnish a motive to defame or shows that the reporter knew or should have known the truth. The "should have known" standard applies to negligence, but negligence is a step toward recklessness. The 24 badges of constitutional malice reflect combinations of evidence that can defeat the media's First Amendment defense.

[1] *Gertz v. Welch* , 94 S. Ct. 2997 (1974).

[2] *Id.*

[3] *St. Amant*, 390 U.S. at 732, fn. 3 (citations omitted).

[4] *Mason*, 501 U.S. 496 at 510 (citations omitted).

[5]The badges are summarized here and the cases utilizing the various badges are discussed below.

[6] *Herbert*, 441 U.S. at 177, fn. 12 (citations omitted).

[7] *Id.* Courts typically reject various journalist privileges which normally protect journalists' sources from discovery on the ground that the media waives the privilege when it asserts its First Amendment defenses.

[8] *Harte-Hanks Communications*, 491 U.S. at 685. *See also Celle v. Filipino Reporter Enterprises, Inc* ., 209 F.3d 163 (2d Cir. 2000) (malice finding affirmed based on evidence of reporter's ill will, reporter's conflicting testimony, and reliance on questionable source without conducting investigation).

[9] *Curtis Publishing Co*., 388 U.S. at 157.

[10] *Id.* at fn.20. *See also Healey v. New England Newspapers, Inc* ., 555 A.2d 321 (R.I. 1989) (newspaper report of angry relative blaming doctor for death creates jury issue of malice where newspaper failed to report known facts tending to exculpate the doctor); *Buratt v. Capital City Press* , 459 So. 2d 1268 (La. 1 Cir. 1984) (reckless disregard for truth shown when reporter omits reporting available information because it refuted defamatory point reporter trying to make).

[11] *Hunt*, 720 F.2d at 643.

[12] *Id*. at 645 (citations omitted).

[13] *Texas Disposal Systems Landfill*, 219 S.W.3d at 578-579.

[14] *Bentley,* 94 S.W.3d at 584-585, 600. *See also Kentucky Kingdom Amusement Co. v. Belo Kentucky, Inc*. , 179 S.W.3d 785 (Ky. 2005) (affirming jury finding of malice based on television station's failure to correct inaccuracies in prior reports, continuing commitment to running the same false story line, failure to significantly investigate, and because the general make up and presentation of the story exhibited hostility).

[15] *Bolling,* 671 S.W.2d at 563.

[16] *Id*. at 565.

[17] *Braun*, 726 F. 2d at 257.

[18] *Kaelin,* 162 F. 3d at 1042.

[19] *Murphy* , 449 Mass. at 58.

[20] *Id*. at 58-61.

[21] *Id.* at 61 (emphasis added).

[22] *See Moore v. Vislosky* , 240 F. App'x 457, 469 (3d Cir. 2007) (defamer's claim that she "lost" documentary evidence that supported her defamatory statements was implausible and supports jury finding that she acted with reckless disregard for truth); *Torgerson v. Journal/Sentinel, Inc.* , 563 N.W. 2d 472, 483 (Wis. 1997) (destruction of reporter's notes is sufficient evidence to support a jury verdict of actual malice); *Chang v. Michiana Telecasting Corp.* , 900 F.2d 1085, 1090 (7th Cir. 1990) ("destruction could imply that the notes would have revealed the reporter did not believe what he wrote or said") (citations omitted).

[23] *Masson,* 501 U.S. at 516.

[24] *Id* . at 520-521.

[25] *Southern Air Transport* , 568 So. 2d at 928.

[26] *Mitchell*, 60 P.3d at 1063.

[27] *Herbert,* 441 U.S. at 170-171.

[28] *Mahnke,* 160 N.W.2d at 344. *See also Zerangue v. TSP Newspapers, Inc.* , 814 F.2d 1066 (5th Cir. 1987) (refusal to retract an exposed error supports a finding of malice just as a readiness to retract tends to negate malice); *Golden Bear Distributing Systems of Texas, Inc. v. Chase Revel, Inc.* , 708

F.2d 944 (5th Cir. 1983) (refusal to retract supports jury finding that defamatory article published with reckless disregard of the truth).

[29] *Anderson*, 477 U.S. at 249.

[30] *Id.* at 255 (citations omitted).

[31] *Id.* at 265-268.

[32] *Id* . at 267-269.

[33] *See also Shiavone Const. Co. v. Time, Inc.* , 847 F.2d 1069 (3d Cir. 1988) (reversing summary judgment in media defamation case where media had internal inconsistencies in its research and information contradicting libelous assertions but nevertheless published libelous statements).

[34] *Southern Air Transport* , 568 So. 2d at 928 (emphasis added).

[35] *Id.*

[36] *Id.* at 929.

[37] *Harrison*, 430 So. 2d at 586. *See also Durso v. Lyle Stuart, Inc* ., 337 N.E. 2d. 443, 447 (Ill. App. 1975) (citations omitted) (jury may find malice and disregard defendant's claim that defamatory statement in investigative publication was caused by unintentional "error" where evidence creates issue of author's credibility because (citations omitted) it showed "muckraking intent, the absence of hot news, and an inadequate investigation…").

[38] *See also Newton v. NBC, Inc* ., 930 F.2d 662, 671 (9th Cir. 1990) (malice may be based on jury's negative assessment of reporter's credibility at trial).

[39] The normal rule is that the court should leave credibility issues for the jury.

To the extent that the court weighs evidence to see if a credibility issue satisfies the "clear and convincing" standard, witness demeanor should be in play. The dissent in *Anderson* pointed out that applying the "clear and convincing" standard at the summary judgment stage and telling the courts not to weigh evidence was inherently contradictory. The dissent predicted that *Anderson* would be inapplicable in practice.



**MANUEL SOCIAS** *is a solo practitioner who has represented clients in business litigation for 35 years. He also handles and consults on defamation cases.*

EXHIBIT 2



🖨 Print    ⊗ Close

# George Stephanopoulos and ABC apologize to Trump, are forced to pay $15 million to settle defamation suit

By Gabriel Hays, Brooke Singman

Published December 14, 2024

Fox News

**FIRST ON FOX–** ABC News and its top anchor George Stephanopoulos have reached a settlement with Donald Trump in his defamation suit, which will result in the news network paying the president-elect $15 million.

The settlement was publicly filed on Saturday, revealing that the two parties have come to an agreement and avoided a costly trial. According to the settlement, ABC News will pay $15 million as a charitable contribution to a "Presidential foundation and museum to be established by or for Plaintiff, as Presidents of the United States of America have established in the past." Additionally, the network will pay $1 million in Trump's attorney fees.

Stephanopoulos and ABC News also had to issue statements of "regret" as an editor's note at the bottom of a March 10, 2024, online article, about comments made earlier this year that prompted Trump to file the defamation lawsuit. The note reads, "ABC News and George Stephanopoulos regret statements regarding President Donald J. Trump made during an interview by George Stephanopoulos with Rep. Nancy Mace on ABC's This Week on March 10, 2024."

file_1722.pdf          1 / 10          —   36%   +          □  ↻          ↓  🖨  ⋮



## ABC NEWS' GEORGE STEPHANOPOULOS INACCURATELY SAID TRUMP WAS FOUND 'LIABLE FOR RAPE' 10 TIMES, LEGAL GURUS SAY

ABC News said the network was "pleased" to have concluded the case.

"We are pleased that the parties have reached an agreement to dismiss the lawsuit on the terms in the court filing," an ABC News spokesperson told Fox News Digital.

Trump filed a defamation suit against Stephanopoulos after he asserted that Trump was found "liable for rape" in a civil case during a contentious interview with Rep. Nancy Mace, R-S.C., last March.

After playing a clip of Mace discussing being a victim of rape, Stephanopoulos asked her, "How do you square your endorsement of Donald Trump with the testimony we just saw?"

"You've endorsed Donald Trump for president. Judges and two separate juries have found him liable for rape and for defaming the victim of that rape," Stephanopoulos said, alluding to the legal victory by Trump accuser E. Jean Carroll.

Stephanopoulos repeated that claim ten times during his spat with Mace, despite the fact that a jury actually determined Trump was liable for "sexual abuse," which has a distinct definition under New York law.

After the federal jury found Trump liable for sexual abuse, but not rape, Judge Lewis Kaplan wrote in a later ruling that just because Carroll failed to prove rape "within the meaning of the New York Penal Law does not mean that she failed to prove that Mr. Trump 'raped' her as many people commonly understand the word 'rape.'"

## FETTERMAN SLAMS LEGAL CASES AGAINST TRUMP, HUNTER BIDEN IN FIRST TRUTH SOCIAL POST: 'CASES WERE BOTH BULLS---'



President-elect Trump and ABC News anchor George Stephanopoulos settled outside of court this week following Trump suing the anchor and his network for defamation. (Getty Images)

Initially, Stephanopoulos was defiant in the face of Trump's lawsuit, telling CBS late-night host Stephen Colbert that he wouldn't be "cowed out of doing my job because of a threat."

"Trump sued me because I used the word 'rape,' even though a judge said that's in fact what did happen. We filed a motion to dismiss," Stephanopoulos said.

The settlement came after U.S. Magistrate Judge Lisette M. Reid ordered Trump and Stephanopoulos on Friday to sit for depositions next week ahead of the Dec. 24 deadline for the defendants to file a motion for summary judgment, in order to avoid a trial.

In his lawsuit against Stephanopoulos and ABC, Trump was represented by Florida attorneys Alejandro Brito and Richard Klugh. The settlement with ABC was filed in the Southern District of Florida Federal Court where both parties signed and agreed to the terms.

## NEWT GINGRICH: BIDEN MAY BE PRESIDENT BUT TRUMP IS ALREADY LEADER OF THE FREE WORLD

The settlement comes after a string of legal victories for Trump and his legal team, coordinated by senior legal adviser Boris Epshteyn.

Federal Judge Tanya Chutkan recently granted Special Counsel Jack Smith's recent request to dismiss his case against Trump related to the 2020 election. Smith also tossed his appeal in the classified records case on Monday after a federal judge dismissed

the charges altogether in July, ruling that he was unlawfully appointed as special counsel.

In New York v. Trump, Judge Juan Merchan granted Trump's request to file a motion to dismiss the charges stemming from Manhattan District Attorney Alvin Bragg's case and removed the sentencing date for the president-elect from the schedule.

Trump is also suing CBS News for $10 billion in damages, stating the network practiced "deceptive conduct" for the purpose of election interference in its interview in October with Vice President Kamala Harris.

*Fox News' Brian Flood, David Rutz and Alexander Hall contributed to this report.*

**CLICK HERE TO GET THE FOX NEWS APP**

Gabriel Hays is an associate editor for Fox News Digital.

Print    Close

**URL**
https://www.foxnews.com/media/george-stephanopoulos-abc-apologize-trump-forced-pay-15-million-settle-defamation-suit

Home | Video | Politics | U.S. | Opinion | Entertainment | Tech | Science | Health | Travel | Lifestyle | World | Sports | Weather

Privacy | Terms

This material may not be published, broadcast, rewritten, or redistributed. © FOX News Network, LLC. All rights reserved. Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by FactSet Digital Solutions. Legal Statement. Mutual Fund and ETF data provided by Refinitiv Lipper.Do Not Sell my Personal Information - New Terms of Use - FAQ

George Stephanopoulos doesn't mention ABC News settlement with Trump's defamation suit on his Sunday show



Print    Close

# George Stephanopoulos doesn't mention ABC News settlement with Trump's defamation lawsuit on his Sunday show

By Lindsay Kornick

Published December 15, 2024

Fox News

ABC News host George Stephanopoulos ignored the news about his network's massive settlement with President-elect Donald Trump on his Sunday show.

Fox News Digital first reported on Saturday that ABC News and Stephanopoulos agreed to a settlement to avoid a costly trial over Trump's defamation lawsuit against the network and anchor.

News of the settlement, however, failed to appear on ABC's "This Week." Instead, Stephanopoulos focused on stories about unidentified drones over New Jersey, ongoing conflicts in Syria and Trump's cabinet picks.

He also deleted his X account over the weekend.



George Stephanopoulos avoided referencing the news about ABC's settlement with President-elect Donald Trump on Sunday. (ABC News screenshot)

**LIBERALS UNLOAD ON ABC'S SETTLEMENT WITH TRUMP, DEFEND GEORGE STEPHANOPOULOS: 'KNEE BENT, RING KISSED'**

Stephanopoulos was the focus of the lawsuit after he asserted that Trump was found "liable for rape" in a civil case during a contentious interview with Rep. Nancy Mace, R-S.C., last March.

After playing a clip of Mace discussing being a victim of rape, Stephanopoulos asked her, "How do you square your endorsement of Donald Trump with the testimony we just saw?"

"You've endorsed Donald Trump for president. Judges and two separate juries have found him liable for rape and for defaming the victim of that rape," Stephanopoulos said, alluding to the legal victory by Trump accuser E. Jean Carroll.

Stephanopoulos repeated that claim ten times during his spat with Mace, despite the fact that a jury actually determined Trump was liable for "sexual abuse," which has a distinct definition under New York law.

The "This Week" host was initially defiant against the lawsuit when asked about it in May, adding he would not be "cowed out of

doing my job because of a threat."



Stephanopoulos repeatedly claimed Trump was found liable for rape during a broadcast in March. (Getty Images)

"Trump sued me because I used the word 'rape,' even though a judge said that's in fact what did happen. We filed a motion to dismiss," Stephanopoulos told late-night host Stephen Colbert.

According to the settlement, ABC News will pay $15 million as a charitable contribution to a "Presidential foundation and museum to be established by or for Plaintiff, as Presidents of the United States of America have established in the past." Additionally, the network will pay $1 million in Trump's attorney fees.

Stephanopoulos and ABC News also had to issue statements of "regret" as an editor's note at the bottom of a March 10, 2024, online article, about comments made earlier this year that prompted Trump to file the defamation lawsuit. The note reads, "ABC News and George Stephanopoulos regret statements regarding President Donald J. Trump made during an interview by George Stephanopoulos with Rep. Nancy Mace on ABC's This Week on March 10, 2024."

**TRUMP HOPES TO KEEP WINNING WHEN HE TAKES ABC NEWS, CBS NEWS TO COURT OVER ALLEGED 'DISHONEST REPORTING'**

ABC News said the network was "pleased" to have concluded the case.



ABC News and Stephanopoulos paid a $15 million settlement in the Trump defamation lawsuit. (Getty Images)

"We are pleased that the parties have reached an agreement to dismiss the lawsuit on the terms in the court filing," an ABC News spokesperson told Fox News Digital.

**CLICK HERE TO GET THE FOX NEWS APP**

Lindsay Kornick is an associate editor for Fox News Digital. Story tips can be sent to lindsay.kornick@fox.com and on Twitter: @lmkornick.

Print | Close

URL
https://www.foxnews.com/media/george-stephanopoulos-doesnt-mention-abc-news-settlement-trumps-defamation-lawsuit-his-sunday-show

Home | Video | Politics | U.S. | Opinion | Entertainment | Tech | Science | Health | Travel | Lifestyle | World | Sports | Weather

Privacy | Terms

This material may not be published, broadcast, rewritten, or redistributed. © FOX News Network, LLC. All rights reserved. Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by FactSet Digital Solutions. Legal Statement. Mutual Fund and ETF data provided by Refinitiv Lipper.Do Not Sell my Personal Information - New Terms of Use - FAQ

EXHIBIT 3

3UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-21050-CIV-ALTONAGA/Reid

PRESIDENT DONALD J. TRUMP,

       Plaintiff,

v.

AMERICAN BROADCASTING
COMPANIES, INC.; *et al.*,

       Defendants.

_____/

## ORDER

       **THIS CAUSE** came before the Court for a hearing on July 15, 2024, on Defendants, American Broadcasting Companies, Inc. ("ABC"); ABC News, Inc. ("ABC News"); and George Stephanopoulos's Motion to Dismiss [ECF No. 24], filed on May 10, 2024. Plaintiff, President Donald J. Trump, filed a Response [ECF No. 29]; to which Defendants filed a Reply [ECF No. 30]. The Court has carefully considered the record, the parties' written submissions, and applicable law. For the following reasons, the Motion is denied.

## I. BACKGROUND

       This case arises from a series of actions litigated in the Southern District of New York. The undersigned begins by recounting those cases as described by the deciding court and then turns to the events giving rise to this action. *Cf. Tavares v. Fla. Dep't of Transp.*, No. 22-cv-23745, 2023 WL 9510534, at *7 (S.D. Fla. Dec. 4, 2023) ("Courts *routinely* take judicial notice of other dockets." (emphasis in original; collecting cases)), *report and recommendation adopted*, 2024 WL 417112 (S.D. Fla. Feb. 5, 2024).

       ***Prior litigation.*** In 2019, while Plaintiff was President of the United States, E. Jean Carroll publicly accused him of a sexual assault and rape that occurred three decades before. *See Carroll*

*v. Trump*, 49 F.4th 759, 761 (2d Cir. 2022). "In response to the accusations, [Plaintiff] made a series of public statements, which not only denied the allegations but also questioned Carroll's credibility and assertedly demeaned her personal appearance." *Id.* (alteration added). Following those comments, Carroll filed an action for defamation against Plaintiff in New York state court; the case was removed to federal court. *See id.* That litigation is known as *Carroll I. See, e.g.*, *Carroll v. Trump*, No. 20-cv-7311, 2024 WL 97359, at *1 (S.D.N.Y. Jan. 9, 2024) ("This is a defamation case, frequently referred to as *Carroll I*[.]" (alteration added)).

"Carroll brought a second, closely related action against [Plaintiff] ('*Carroll II*') in November 2022 [seeking] damages for sexual assault" and for another defamatory statement Plaintiff made in October 2022. *Id.* (alterations added). Both cases were tried in the Southern District of New York, before Judge Lewis A. Kaplan. *See Carroll v. Trump*, No. 20-cv-7311, 2023 WL 7924698, at *1–2 (S.D.N.Y. Nov. 16, 2023). *Carroll II* was tried first, while a pre-trial issue in *Carroll I* was appealed to the Second Circuit. *See id.* at *1.

In May 2023, the jury in *Carroll II* returned a verdict for Carroll, finding Plaintiff had "sexually abused" and defamed her. *Carroll v. Trump*, 685 F. Supp. 3d 267, 269 (S.D.N.Y. 2023) (quotation marks omitted). The jury also found, however, that Plaintiff had not "raped" Carroll, as the act is defined by New York Penal Law. *Id.* (quotation marks omitted). Because the New York Penal Law limits the definition of rape to penile penetration, "the jury's finding . . . implicitly determined that [Plaintiff] forcibly penetrated [Carroll] digitally[.]" *Id.* (alterations added).

The jury awarded Carroll two million dollars in compensatory damages, which Plaintiff challenged as excessive because the jury did not find him liable for rape. *See Carroll v. Trump*, 683 F. Supp. 3d 302, 307 (S.D.N.Y. 2023). In considering this challenge, Judge Kaplan noted that "the definition of rape in the New York Penal Law is far narrower than the meaning of 'rape' in

common modern parlance, its definition in some dictionaries, in some federal and state criminal statutes, and elsewhere." *Id.* at 306 (footnote call numbers omitted). Judge Kaplan further concluded that "[t]he finding that [] Carroll failed to prove that she was 'raped' within the meaning of the New York Penal Law does not mean that she failed to prove that [Plaintiff] 'raped' her as many people commonly understand the word 'rape.'" *Id.* at 306–07 (alterations added). "Indeed," he wrote, "the jury found that [Plaintiff] in fact did exactly that." *Id.* at 307 (alteration added). Consequently, the court denied Plaintiff's motion. *See id.* at 334.

When *Carroll I* resumed, Plaintiff brought counterclaims against Carroll, claiming she defamed him when — in a television interview after the verdict in *Carroll II* — she maintained Plaintiff had raped her. *See Carroll*, 685 F. Supp. 3d at 271–72. Judge Kaplan dismissed these counterclaims, explaining that "the jury's verdict in *Carroll II* establishe[d], as against [Plaintiff], the fact that [Plaintiff] 'raped' [Carroll], albeit digitally rather than with his penis." *Id.* at 275 (alterations added). Judge Kaplan concluded Plaintiff did not state a defamation claim because "he fail[ed] plausibly to allege that [] Carroll's statements were not true, and [] in the alternative, [] Carroll's allegedly defamatory statements were substantially true as a matter of law." *Id.* at 277–78 (alterations added).

In January 2024, a jury awarded Carroll $83.3 million on her defamation claim against Plaintiff. *See Carroll v. Trump*, No. 20-cv-7311, 2024 WL 475140, at *1 (S.D.N.Y. Feb. 7, 2024).

***Present litigation.*** This action arises from news coverage of the just-described litigation. On March 10, 2024, Stephanopoulos interviewed United States Representative Nancy Mace; ABC and ABC News broadcast the interview as part of the show *This Week with George Stephanopoulos*. (*See* Compl. [ECF No. 1] ¶¶ 6–8, 37). In the interview, Stephanopoulos asked Mace about her endorsement of Plaintiff despite the fact he was "found liable for rape." (*Id.* ¶ 39

(quotation marks omitted)). He repeated the phrase ten times during the interview, at one point stating "[j]udges and two separate juries have found him liable for rape," and "[t]he Judge affirmed that it was, in fact, rape." (*Id.* ¶ 42 (alterations added; quotation marks omitted)). A screenshot of a newspaper headline stating that "Judge clarifies: Yes, Trump was found to have raped E. Jean Carroll[.]" *Voters have 'moved beyond' Jan. 6: Rep. Nancy Mace* ("Segment"), ABC News (Mar. 10, 2024), https://abcnews.go.com/ThisWeek/video/voters-moved-jan-6-rep-nancy-mace-107976891, at 6:20–6:29 (alteration added), was shown near the end of the broadcast.

The exchange was subsequently publicized on social media. (*See* Compl. ¶¶ 57–76). In other interviews and in other coverage by ABC News, the verdict was described as "[s]exual [a]buse[,]" and the jury's finding that Plaintiff did not "rape" Carroll under New York law was also discussed. (*Id.* ¶¶ 46–49 (alterations added; emphasis and quotation marks omitted)).

Plaintiff now alleges defamation *per se* and defamation *per quod*. (*See id.* ¶¶ 77–97). Defendants move for dismissal, arguing Plaintiff's claims are foreclosed by the New York court's findings. (*See generally* Mot.). Plaintiff disagrees, and, in the alternative, moves the Court for leave to amend his Complaint. (*See generally* Resp.).

## II. LEGAL STANDARDS

"To survive a motion to dismiss [under Federal Rule of Civil Procedure 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration added; quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A pleading withstands a motion to dismiss if it alleges "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-

defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). When considering a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)).

## III. DISCUSSION

Defendants raise three grounds for dismissal. (*See generally* Mot.; Reply). First, they argue the claims are barred by collateral estoppel. (*See* Mot. 11–13). Second, Defendants argue Stephanopoulos's statements were "substantially true." (*Id.* 13–16). Third, Defendants assert Stephanopoulos is shielded by the fair report privilege available to him under Florida law. (*See id.* 16–18). Plaintiff disagrees on each front. (*See generally* Resp.). The Court addresses Defendants' arguments in turn, agreeing with Plaintiff's position on each.

### A. Collateral Estoppel

"The doctrine of collateral estoppel precludes a party from relitigating an issue which has previously been decided against him in a proceeding in which he had a fair opportunity to fully litigate the point." *Kaufman v. Eli Lilly & Co.*, 482 N.E.2d 63, 67 (N.Y. 1985) (quotation marks and citations omitted). The Court first addresses two threshold questions and then considers the parties' collateral estoppel arguments.

#### 1. Timing

Plaintiff argues collateral estoppel is an affirmative defense that cannot be raised at the motion-to-dismiss stage. (*See* Resp. 7–9). Defendants insist collateral estoppel can be raised at this stage of the proceedings because the defense relies on court records, of which the Court may take judicial notice. (*See* Reply 2–3). On this point, the Court agrees with Defendants.

Curiously, Plaintiff makes his argument "[u]nder New York law" but cites exclusively to federal cases from federal district courts in New York and the Second Circuit. (Resp. 7–8 (alteration added; footnote call number omitted)). Although those cases were tried and decided in New York, their holdings are, for the most part, applications and explanations of federal law and the Federal Rules of Civil Procedure. *See, e.g.*, *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74–75 (2d Cir. 1998).

Defendants correctly brief the issue under Eleventh Circuit precedent. (*See* Reply 2–3). "In diversity of citizenship actions, state law defines the nature of defenses, but the Federal Rules of Civil Procedure provide the manner and time in which defenses are raised[.]" *Smith v. R.J. Reynolds Tobacco Co.*, 880 F.3d 1272, 1280–81 (11th Cir. 2018) (alteration added; citation, footnote call number, and quotation marks omitted); *cf. Springer v. Wal-Mart Assocs.' Grp. Health Plan*, 908 F.2d 897, 900 n.1 (11th Cir. 1990) ("We need hardly add that even if there *were* a relevant circuit split [regarding the existence of an exhaustion requirement], the district court is bound by controlling *Eleventh Circuit* precedent." (alteration added; emphases in original)).[1]

In any event, the Eleventh Circuit follows the same framework that Plaintiff describes. Under Federal Rule of Civil Procedure 12(d), a motion to dismiss "must be treated as one for summary judgment" if it presents "matters outside the pleadings[.]" *Id.* (alteration added). Consequently, an affirmative defense like collateral estoppel is more typically raised under Rule 8(c)(1). *See Harrell v. Bank of Am*, 813 F. App'x 397, 400 (11th Cir. 2020) (citing *Concordia v. Bendekovic*, 693 F.2d 1073, 1075 (11th Cir. 1982)).

---

[1] The outcome under New York state law would be the same — and even more easily reached. New York's civil rules expressly entitle parties to raise issue preclusion on a motion to dismiss. *See* N.Y. C.P.L.R. 3211(a)(5) (Consol. 2024).

Yet, collateral estoppel may be raised on a Rule 12(b)(6) motion like the one Defendants have filed if the defense "can be judged on the face of the complaint." *Harrell*, 813 F. App'x at 400 (quotation marks omitted; quoting *Concordia*, 693 F.2d at 1075).[2] "In making this determination, [courts] may . . . take judicial notice of state and federal court records of prior proceedings." *Id.* (alterations added; citing *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 811–12 & n.4 (11th Cir. 2015)). The Court is therefore free to consider Judge Kaplan's opinions in *Carroll I* and *Carroll II*.

Indeed, as Defendants note, "Plaintiff does not (and cannot) object to th[e] Court considering Judge Kaplan's . . . published opinions[.]" (Reply 2 n.1 (alterations added)). Here, those opinions are sufficient to permit Defendants to raise a collateral estoppel defense on a motion to dismiss. *See Harrell*, 813 F. App'x at 402 (affirming dismissal of claims where defendants properly "raise[d] the defense of res judicata in their motions to dismiss because its applicability was apparent from . . . the documents the district court was allowed to consider" and attached state court documents (alterations added; citation omitted)).

### 2. *Choice of Law*

Having determined that Defendants properly raise their collateral estoppel defense, the Court next considers what law governs its analysis. Defendants state that, "[b]ecause the *Carroll* cases were litigated in New York, New York law determines their preclusive effect in this case." (Mot. 11 (alteration added; citations omitted)). Plaintiff apparently agrees and briefs the issue "[u]nder New York law[.]" (Resp. 7 (alterations added; footnote call number omitted); *see also id.* 9, 11).

---

[2] *Harrell* discussed the applicability of res judicata, but the Eleventh Circuit has explained that "[r]es judicata comes in two forms[,]" one of which is collateral estoppel. *Cmty. State Bank v. Strong*, 651 F.3d 1241, 1263 (11th Cir. 2011 (alterations added; citation omitted).

The parties are only partially correct. Defendants' cited cases hold that state collateral estoppel rules apply when the rendering federal court exercised *diversity jurisdiction*. (*See* Mot. 11 (citing *CSX Transp., Inc. v. Gen. Mills, Inc.*, 846 F.3d 1333, 1340 (11th Cir. 2017); *Sellers v. Nationwide Mut. Fire Ins. Co.*, 968 F.3d 1267, 1269 (11th Cir. 2020))). Here, Defendants argue Plaintiff is estopped by *Carroll II*, which was in federal court based on diversity jurisdiction. (*See* Mot. 12; *Carroll v. Trump*, No. 22-cv-10016, Complaint [ECF No. 1] ¶ 15 filed on November 24, 2022 (S.D.N.Y. 2023)). Defendants also argue, however, that Plaintiff is estopped by *Carroll I*, which was in federal court under *federal question jurisdiction*. (*See* Mot. 11–12; *Carroll v. Trump*, No. 20-cv-07311, Notice of Removal [ECF No. 6] ¶¶ 3–4 filed September 9, 2020 (S.D.N.Y. 2024)). In such cases, federal — not state — preclusion principles generally apply. *See Federer v. Zurich Am. Ins. Co.*, 701 F. App'x 835, 840 n.4 (11th Cir. 2017) (collecting cases).

Nonetheless, the parties proceed solely under New York law, and the Court follows suit; it is "well-settled in this and other circuits that . . . a party may, through its briefing (or otherwise) waive its choice-of-law arguments implicitly[.]" *Goodnight v. Boston Sci. Corp.*, 548 F. Supp. 3d 1325, 1335–36 (S.D. Fla. 2020) (alterations added; citations omitted). Thus, "in our adversarial system, a straightforward application of the waiver doctrine . . . sometimes determines what the 'correct law' is." *Id.* at 1336 (alteration added; citation omitted). Here, all parties expressly structure their arguments under New York's collateral estoppel rules and affirmatively cite case law they believe mandates the application of New York law. (*See* Mot. 11–13; Resp. 6–13). Because the parties have reached their own consensus, the Court will not disturb their choice. *See Bahamas Sales Assoc., LLC v. Byers*, 701 F.3d 1335, 1342 (11th Cir. 2012) ("If the parties litigate the case under the assumption that a certain law applies, we will assume that that law applies." (citation omitted)).

### 3.  *Collateral Estoppel Under New York Law*

With that, the Court turns to the question at hand.  "Under New York law, collateral estoppel bars relitigation of an issue when (1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action." *Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 988 F.3d 634, 642 (2d Cir. 2021) (citation and quotation marks omitted).  "[T]he burden of showing that the issue was identical and necessarily decided rests upon the moving party." *Schwartz v. Pub. Adm'r of Bronx Cnty.*, 246 N.E.2d 725, 730 (N.Y. 1969) (alteration added).

At the outset, it bears noting that Defendants have not satisfied their burden to show that under New York law the issues raised by the pleading here are necessary and identical to the ones Judge Kaplan decided.  Although Defendants cite cases that they insist share similar facts, Defendants neither lay out the legal standards for necessity and identicality under New York law; nor do they apply those standards to the alleged facts of this case.  (*See* Mot. 11–13; Reply 4–5).  Certainly, after reading the briefs and hearing the parties' oral arguments, the Court is left uncertain on the issue of necessity.

Defendants argue Plaintiff is estopped by either or both of Judge Kaplan's findings in *Carroll I* and *Carroll II*.  (*See generally* Mot.; Reply).[3]  According to Defendants, "*Carroll I* necessarily decided that [Plaintiff] cannot state a claim for defamation . . . because it is substantially true that he raped [] Carroll."  (Mot. 12 (alterations added)).  Yet, as they also note, Judge Kaplan's substantial truth finding was made "in the alternative" to a separate finding.

---

[3] Defendants do not argue that estoppel arises directly from the jury's verdict.  (*See generally* Mot.; Reply).  Nor could they because, on its face, the jury's verdict found Plaintiff liable for sexual abuse and not rape, under New York Penal Law.  The additional interpretation of this verdict as signifying that Plaintiff committed rape arises from Judge Kaplan's subsequent findings.

*Carroll*, 685 F. Supp. 3d at 277; (*see* Mot. 12).  Defendants do not brief the preclusive effect of alternative findings under New York law — which, as it turns out, is a rather complicated question. *See, e.g.*, *Tydings v. Greenfield, Stein & Senior, LLP*, 11 N.Y.3d 195, 199–200 (N.Y. 2008).

Similarly, Defendants argue that Judge Kaplan's *Carroll II* findings estop Plaintiff because "Judge Kaplan specifically found that 'the finding that [Plaintiff] digitally raped [] Carroll was necessary to support the judgment in *Carroll II*."  (Mot. 12 (alterations adopted; other alterations added; quoting *Carroll*, 685 F. Supp. 3d at 277)).  In his analysis, however, Judge Kaplan was discussing substantial truth, not collateral estoppel.  *See Carroll*, 685 F. Supp. 3d at 277.  As Defendants also recognize, Judge Kaplan made his findings in "his denial of post-trial motions" related to damages; the conclusions did not disturb the jury's liability findings.  (Mot. 12).  On the issue of whether findings related to a damages award are "necessary" to the outcome of a case, Defendants offer neither briefing nor argument.  (*See generally id.*; Reply).[4]

In any event, regardless of whether the "formal prerequisites" for collateral estoppel are met, the doctrine is not to be "applied automatically[.]"  *People v. Fagan*, 66 N.Y.2d 815, 816 (N.Y. 1985) (alteration added; citation omitted); *see also Gilberg v. Barbieri*, 53 N.Y.2d 285, 292 (N.Y. 1981) (explaining that, as a matter of history and necessity, collateral estoppel "can never be rigidly or mechanically applied" (collecting cases)).  As the New York Court of Appeals has cautioned:

> The doctrine . . . is a flexible one, and the enumeration of these elements is intended
> merely as a framework, not a substitute, for case-by-case analysis of the facts and
> realities.  In the end, the fundamental inquiry is whether relitigation should be
> permitted in a particular case in light of fairness to the parties, conservation of the
> resources of the court and the litigants, and the societal interests in consistent and

---

[4] By contrast, Plaintiff ambitiously argues that estoppel can only arise from findings necessary to support "the jury's express findings[.]" (Resp. 11 (alteration added)).  He cites no case law suggesting the necessity inquiry is limited to the jury's verdict form, and the Court is not persuaded that it is.  (*See generally id.*).  Nonetheless, it is Defendants' burden to show that the post-trial findings here were necessary to the case's outcome, and they have not done so.

accurate results. No rigid rules are possible, because even these factors may vary in relative importance depending on the nature of the proceedings[.]

*Buechel v. Bain*, 766 N.E.2d 914, 919 (N.Y. 2001) (alterations added; quotation marks and citation omitted).

At bottom, collateral estoppel is an "equitable doctrine[.]" *Id.* (alteration added). "The point of the inquiry . . . is not to decide whether the prior determination should be vacated but to decide whether it should be given conclusive effect beyond the case in which it was made[.]" *Gilberg*, 53 N.Y.2d at 292 (alterations added; citation omitted).

With these principles in mind, the Court is not persuaded to bar this action on a collateral estoppel defense. Admittedly, a finding's preclusive effect is not always tied to the finding's factual underpinnings. *See Paramount Pictures Corp. v. Allianz Risk Transfer AG*, 96 N.E.3d 737, 743 (N.Y. 2018) (explaining that collateral estoppel applies "even if [an essential issue] recurs in the context of a different claim" (alteration added; citation omitted)). Nevertheless, in considering Judge Kaplan's findings, the Court is doubly aware that context is key — both because the Court is being asked to apply collateral estoppel, *see Buechel*, 766 N.E.2d at 919 (emphasizing "case-by-case analysis" and "the nature of the proceedings" (quotation marks and citation omitted)); and because it is comparing two different defamation claims, *see Smith v. Cuban Am. Nat'l Found.*, 731 So. 2d 702, 705 (Fla. 3d DCA 1999) ("To determine whether a statement is defamatory, it must be considered in the context of the publication." (collecting cases)).

Here, the "facts and realities" of the prior litigation show that Judge Kaplan's findings, however broadly they were phrased, arose while considering a meaningfully distinct context from the "facts and realities" presented in this case given Plaintiff's allegations. *Buechel*, 766 N.E.2d at 919. In *Carroll II*, Judge Kaplan was reviewing a jury's damages award. *See* 683 F. Supp. 3d at 327–28. His analysis necessarily focused on what Carroll had and had not proved at trial, as

11

well as the harm Carroll experienced from Plaintiff's abuse. *See id.* There was no discussion of how to accurately report on the jury's findings. *See generally id.*

In *Carroll I*, of course, Judge Kaplan confronted a defamation claim. *See* 685 F. Supp. 3d at 275–78. But that defamation claim involved an entirely different set of statements by an entirely different party. *See id.* In his analysis, Judge Kaplan focused on "the substantial truth of [] Carroll's 'rape' accusations"; whether Plaintiff "plausibly [] allege[d] that [] Carroll's statements were not true"; and whether "Carroll's allegedly defamatory statements were substantially true[.]" *Id.* at 277–78 (alterations added).

By contrast, Plaintiff's defamation claims in this case arise from Stephanopoulos's statements, which were not the same as, or even similar to Carroll's. Where Carroll reiterated and relayed her own experience, Stephanopoulos represented that he was describing the jury's verdict (or verdicts). *Compare id.* at 268–70 (describing Carroll's allegedly defamatory statements), *with* (Segment).[5] Judge Kaplan's findings on one set of allegedly defamatory statements "do[] not for all time and in all circumstances insulate [different statements] from similar claims." *Bansbach v. Zinn*, 1 N.Y.3d 1, 11 (N.Y. 2003) (alterations added).

Thus, the Court is not persuaded Judge Kaplan's findings "should be given conclusive effect beyond the case[s] in which [they were] made[.]" *Gilberg*, 53 N.Y.2d at 292 (alterations added; citation omitted). Moreover, "considerations of fairness and efficiency" do not justify the application of collateral estoppel on the basis of findings made in response to a different set of

---

[5] Defendants insist this is a meaningless distinction, arguing that it is "mere rhetorical sophistry" because "one could just as readily flip that description to characterize this case as being about what [] Stephanopoulos 'believed' the jury had found and the other to be about what [] Carroll said actually happened." (Reply 4 (alterations added)). This is unpersuasive. Again, context is key in defamation cases, *see Cuban Am. Nat'l Found.*, 731 So. 2d at 705–06, and Stephanopoulos gave no indication that he was expressing an opinion or belief about the jury's verdict on his news program (*see generally* Segment).

statements entirely. *Bansbach*, 1 N.Y.3d at 10. Fairness requires that Plaintiff be given the opportunity of pressing a set of substantively different claims.

To be clear, the Court is not reaching the merits of Plaintiff's claims. Defendants may very well convince a reasonable factfinder to follow Judge Kaplan's reasoning or to adopt other reasoning leading to the conclusion that Stephanopoulos's statements were not defamatory. That is not the issue before the Court now. At this stage, the Court only decides that Defendants have not satisfied their burden to show collateral estoppel should apply, and that collateral estoppel would not be fairly applied in these circumstances.

### B. Substantial Truth

Defendants' next argument is that Plaintiff's claims can be dismissed because Stephanopoulos's statements were "substantially true." (Mot. 13–16). Plaintiff disagrees, arguing that this determination should not be made on a motion to dismiss. (*See* Resp. 13–16).

"Under the substantial truth doctrine, a statement does not have to be perfectly accurate if the 'gist' or the 'sting' of the statement is true." *Klayman v. Jud. Watch, Inc.*, 22 F. Supp. 3d 1240, 1253 (S.D. Fla. 2014) (quotation marks omitted; quoting *Cuban Am. Nat'l Found.*, 731 So. 2d at 706–07). The initial inquiry under the doctrine is "[w]hether particular statements may have a defamatory meaning"; this raises "an issue of law for the court." *Clark v. Clark*, No. 93-47, 1993 WL 528464, at *3 (Fla. 4th Cir. Ct. June 22, 1993) (alterations added; quotation marks and citations omitted).

In determining whether a statement may have a defamatory meaning, "the court must examine it in the context in which it was published." *Fidelity Warranty Servs., Inc. v. Firstate Ins. Holdings, Inc.*, 74 So. 3d 506, 515 (Fla. 4th DCA 2011) (quotation marks and citation omitted). Similarly, "the court should consider all of the circumstances surrounding the statement[.]" *Id.*

(alteration added; quotation marks and citation omitted). If the statement is revealed to be "confusing or ambiguous, raising the question of whether readers might have read it in a defamatory way[,]" a jury question is presented. *Clark*, 1993 WL 528464, at *3 (alteration added; citation omitted).

Plaintiff argues the "gist" and "sting" of a statement raise factual issues inappropriate for resolution on a motion to dismiss. (*See* Resp. 13–16). To this, Defendants cite several cases in which courts dismissed claims precisely because an initial review revealed the statements at issue were true or substantially true. *See, e.g.*, *Clark*, 1993 WL 528464, at *2–3; *Moore v. Lowe*, 591 F. Supp. 3d 1087, 1109 (N.D. Ala. 2022); *Nanji v. Nat'l Geographic Soc'y*, 403 F. Supp. 2d 425, 431 (D. Md. 2005).

But Defendants' cited cases stand only for the proposition that a court *can* dismiss a complaint based on substantial truth if no factual questions are present. Where a court first determines the statements are susceptible to a defamatory interpretation, factual questions arise that should be resolved by the trier of fact — here, a jury. *See, e.g.*, *Turner v. Wells*, 879 F.3d 1254, 1269 (11th Cir. 2018) ("Whether [a] publication is defamatory becomes an issue of fact for the jury only where the publication is susceptible of two reasonable interpretations, one of which is defamatory." (alteration added; citations omitted)); *Keller v. Miami Herald Pub. Co.*, 778 F.2d 711, 714–15 (11th Cir. 1985) ("Florida law requires as part of a successful libel suit that the statement at issue be reasonably capable of a defamatory interpretation; this determination is to be made by the trial judge in the first instance, prior to the jury's evaluation of whether the statement was in fact understood as defamatory." (citations and footnote call number omitted)).[6]

---

[6] (*See also* Resp. 14 (citing *Maletta v. Woodle*, No. 20-cv-1004, 2022 WL 2818108, at *3 (M.D. Fla. July 19, 2022) ("*Where a communication is ambiguous and reasonably susceptible to defamatory meaning,* it is for the trier of fact to decide whether the communication was understood in the defamatory sense." (emphasis added; quotation marks and citation omitted)); *Pep Boys v. New World Communications of*

In determining whether Stephanopoulos's statements are susceptible to a defamatory interpretation, the Court is mindful of the specific setting in which the statements were made.  *See Fidelity Warranty Servs., Inc.*, 74 So. 3d at 515 (requiring a reviewing court to consider a statement's "context" and "circumstances" (quotation marks and citations omitted)).   Here, Stephanopoulos was not describing Plaintiff's actions or Carroll's testimony against him; he was describing the jury's verdict.[7]

This distinguishes several of the cases Defendants cite.  (*See* Mot. 14).  In those cases, courts concluded it is substantially true for publications to describe forced sexual contact as rape when reporting on the events themselves.  *See, e.g.*, *Moore*, 591 F. Supp. 3d at 1108–09 (concluding that it was substantially true to report that the plaintiff was accused of attempted rape, even if the statement would lead readers to believe he was accused of "forced vaginal sex rather than forced oral sex"); *Nanji*, 403 F. Supp. 2d at 431–32 (concluding it was not inaccurate to "use [] the term 'rape' as shorthand for sexual misconduct" when recounting "the abundance of sexual misconduct evidence in the public records" (alteration added)).

More to the point, Defendants also cite cases finding substantial truth can arise when describing charges of forced sexual contact as charges for rape.  (*See* Mot. 14).  Yet, these cases all involved underlying law that seemingly did not distinguish between rape and other forced sex crimes.  *See, e.g.*, *Simonson v. United Press Int'l, Inc.*, 654 F.2d 478, 481 (7th Cir. 1981) (noting "that 'rape' as defined by common usage is incorporated into second-degree sexual assault under

---

*Tampa, Inc.*, 711 So. 2d 1325, 1328 (Fla. 2d DCA 1998) (Questions of falsity and interpretation "should be left for a jury to determine *where the communication is ambiguous and is reasonably susceptible of a defamatory meaning*."  (emphasis added; citations omitted)).

[7] Some of Defendants' briefing on the substantial truth issue includes arguments concerning the fair report privilege.  (*See, e.g.*, Mot. 14; Reply 7).  The Court takes up those arguments next and separately.

Wisconsin law" (footnote call number omitted)); *Hovey v. Iowa State Daily Pub. Bd., Inc.*, 372 N.W.2d 253, 256 (Iowa 1985) (citing *Simonson* and noting that "[t]he definition of the crime of rape provided by the criminal law of Iowa was subsumed into the crime of sexual abuse with the adoption of the new Iowa Criminal Code" (alteration added)); *Moore*, 591 F. Supp. 3d at 1108–09 (noting, without addressing, the defendant's argument that forced oral sex constituted rape under Alabama law).

Here, of course, New York *has* opted to separate out a crime of rape; and Stephanopoulos's statements dealt not with the public's usage of that term, but the jury's consideration of it during a formal legal proceeding. Thus, while Defendants' cited cases are compelling, they are not directly responsive to the issue of whether it is substantially true to say a jury (or juries) found Plaintiff liable for rape by a jury *despite* the jury's verdict expressly finding he was *not* liable for rape under New York Penal Law.

To the contrary, one of Defendants' cited cases suggests Florida courts do not consider legal definitions to be mere formalities in this context. *See Clark*, 1993 WL 528464, at *3 (determining that use of the term "rape" to describe an arrest for sexual battery "*in the absence of formal legal charges* is [] not defamatory" (alteration and emphasis added)). The Court thus cannot definitively say it was substantially true to report on the (single) jury's verdict in *Carroll II* — which did not find Plaintiff liable for rape as that term is defined under New York law — as finding Plaintiff liable for rape.

Certainly, Defendants' theory has one credible supporter: Judge Kaplan, who repeatedly determined that the jury's verdict — regardless of its finding that no rape as defined by New York's Penal Law had occurred — amounted to a finding of liability for rape as rape is commonly understood. *See Carroll*, 683 F. Supp. 3d at 306–07; *Carroll*, 685 F. Supp. 3d at 275; *Carroll*,

2024 WL 97359, at *6 (recounting the jury's verdict and concluding that "the fact that [Plaintiff] sexually abused — indeed, raped — [] Carroll has been conclusively established" (alterations added)). As explained, however, Judge Kaplan's findings do not have preclusive effect here. The Court is thus only persuaded that substantial truth would arise if the jury's verdict of "No" (Compl. 7) was presented in combination with Judge Kaplan's additional findings. The Court considers that aspect of Defendants' arguments now, considering the allegedly defamatory segment in its entirety and in context, from the perspective of a reasonable viewer. *See Keller*, 778 F.2d at 715–16 (assessing an allegedly defamatory cartoon from the perspective of "how a reasonable individual would have interpreted it" and "in the light of all the surrounding circumstances"); *Turner*, 879 F.3d at 1263 ("When [assessing whether a statement is defamatory], a court should construe statements in their totality, with attention given to any cautionary terms used by the publisher in qualifying the statement." (alteration added; citing *Keller*, 778 F.2d at 717)).

Under that standard, a reasonable jury could interpret Stephanopoulos's statements as defamatory. Stephanopoulos's exchange with Mace lasted about ten minutes, during which Stephanopoulos *stated ten times that a jury — or juries — had found Plaintiff liable for rape.* (*See generally* Segment). In fact, of course, the *Carroll II* jury did not find Plaintiff liable for rape under New York Penal Law; it was Judge Kaplan who determined that the jury's verdict amounted to liability for rape. Yet, none of these particularities make it into the segment such that a reasonable viewer would have indisputably understood what Defendants now brief in detail. (*See generally id.*).

Instead, at one point, Stephanopoulos asked to display a screenshot of a newspaper article about Judge Kaplan's findings and stated that "the Judge affirmed that it was, in fact, rape."[8] (*Id.*

---

[8] Plaintiff argues that the Court cannot rely on the newspaper article because it is outside the Complaint and, in any event, hearsay. (*See* Resp. 5–6). The Court does not rely on the article for the truth of its

at 6:20–6:29).  This ostensible "clarification" occurred late in the segment and did not include any
further explanation; viewers were simply treated to a ten-second glimpse of a headline and partially
blurred text, with no mention of Judge Kaplan by name or any description of why his description
of the verdict differed from the jury's actual verdict as recounted by Mace.  (*See id.*).  On this
record, the Court finds that the segment is, at least, "confusing or ambiguous" and susceptible to
defamatory interpretation.  *Clark*, 1993 WL 528464, at *3 (citation omitted).

Once again, the Court does not find that a reasonable jury must — or even is likely to —
conclude Stephanopoulos's statements were defamatory.  A jury may, upon viewing the segment,
find there was sufficient context.  A jury may also conclude Plaintiff fails to establish other
elements of his claim.  *See Readon v. WPLG, LLC*, 317 So. 3d 1229, 1235 (Fla. 3d DCA 2021)
("The First Amendment safeguards publishers from defamation suits brought by public figures
unless the publisher acts with actual malice." (citations omitted)).  But a reasonable jury *could*
conclude Plaintiff was defamed and, as a result, dismissal is inappropriate.

### C.  Fair Report Privilege

Defendants' final argument is that they are protected by Florida's fair report privilege.  (*See*
Mot. 16–18; Reply 7–9).  Florida's fair report privilege grants news organizations a "qualified
privilege 'to report accurately on information received from government officials.'"  *Larreal v.
Telemundo of Fla., LLC*, 489 F. Supp. 3d 1309, 1318 (S.D. Fla. 2020) (quoting *Rasmussen v.
Collier Cnty. Publ'g Co.*, 946 So. 2d 567, 570–71 (Fla. 2d DCA 2006)).  "This qualification simply
requires the publication or broadcast be a substantially correct account of information contained
in public records or from a government source."  *Id.* at 1319 (emphasis omitted; collecting cases).

---

contents; nor does the Court consider the article independently.  Rather, the Court simply takes note of the
fact that the video — which Plaintiff concedes can be considered — provided viewers the headline of the
article for context.  (*See id.*).

Relevant here, reporters "need not describe legal proceedings in technically precise language." *Rasmussen*, 946 So. 2d at 570 (citations omitted).

Against this backdrop, Defendants argue Stephanopoulos's statements both "accurately describe Judge Kaplan's . . . Order and the jury verdict in the *Carroll* [l]itigations." (Mot. 17 (alterations and emphasis added)). Plaintiff insists the statements were "plainly incorrect and misleading" because of "substantial inaccuracies and omissions[.]" (Resp. 18 (alteration added)). The Court is not persuaded that the privilege applies.

Defendants are correct that the privilege presents a low bar, and it may be considered on a motion to dismiss. (*See* Mot. 17); *cf. Huszar v. Gross*, 468 So. 2d 512, 516 (Fla. 1st DCA 1985) ("[N]umerous cases . . . confirm that trial courts, upon motions to dismiss, routinely make decisions as to whether a privilege applies to protect an allegedly defamatory statement." (alterations added; collecting cases)). They are also correct, however, that the privilege is "[m]uch like the doctrine of substantial truth" (Mot. 17 (alteration added)), and they share similar legal standards (*see* Reply 7). For the fair report privilege to apply, a report must have been "substantially correct[.]" *Larreal*, 489 F. Supp. 3d at 1319 (alteration added; emphasis omitted). Unsurprisingly, the same flaws in Defendants' substantial truth arguments undermine their fair report privilege arguments.

First, Defendants argue Stephanopoulos's statements "were *literally* accurate" because they, "in essence, merely repeat[ed] what Judge Kaplan had twice determined was the outcome of the *Carroll II* trial." (Reply 8 (alteration added; emphasis in original; footnote call number omitted)). As explained, it is not clear from the broadcast itself that Stephanopoulos was, in fact, reporting on Judge Kaplan's findings, rather than the jury's (or juries') verdict(s). The Court is

thus not persuaded that Stephanopoulos's statements can be described as a "substantially correct" account of those proceedings.

Undeterred, Defendants next assert that Stephanopoulos's statements were also a "substantially correct" recounting of the jury's verdict itself. (*See* Mot. 18). For this, they rely broadly on their previous argument that "mere technical distinctions — like that between sexual assault and rape (both felonies in New York) — cannot defeat the privilege." (*Id.* (citation omitted)). Again, the Court is not persuaded that such broad latitude exists under Florida law. Certainly, as here, public accounts of sexual assault may align with the commonly used definition of rape. But Stephanopoulos was not reporting on statements by Carroll or other commentators; rather, he was discussing the outcome of a legal proceeding in which the jury expressly rejected a charge of rape as defined by New York Penal Law.

True, the fair report privilege absolves the media of the burden to be "technically precise" in their descriptions of legal proceedings. *Rasmussen*, 946 So. 2d at 570 (citations omitted). It also relieves the media of the obligation "to include additional information that would portray the Plaintiff in a more favorable light." *Larreal*, 489 F. Supp. 3d at 1320 (quotation marks and citation omitted). But the privilege does not protect media where the omission of important context renders a report misleading. *See Dershowitz v. Cable News Network, Inc.*, 541 F. Supp. 3d 1354, 1365 (S.D. Fla. 2021) (rejecting the application of the fair report privilege, where playing a partial video clip, as opposed to the full video, "presented an official proceeding in a misleading manner"). Here, a reasonable viewer — especially one who was aware that Plaintiff had been charged with rape under New York Penal Law — could have been misled by Stephanopoulos's statements, which did not include the jury's original findings and only fleetingly referenced the interpretation Judge Kaplan later offered.

At bottom, Defendants have not met their burden of proving the fair report privilege applies. *See Kieffer v. Atheists of Fla., Inc.*, 269 So. 3d 656, 660 (Fla. 2d DCA 2019) ("Qualified privilege is an affirmative defense, and the burden of proving it rests with the defendant." (citation omitted)). Any remaining questions as to the reasonableness of Stephanopoulos's statements are not for resolution on a motion to dismiss. *See Dershowitz*, 541 F. Supp. 3d at 1366 (considering an argument that the defendant had a "reasonable . . . belief" that its report was accurate and explaining that this "is an argument that [it] may present to a jury[,]" rather than one justifying application of the fair report privilege (alterations added)).

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendants, American Broadcasting Companies, Inc.; ABC News, Inc.; and George Stephanopoulos's Motion to Dismiss **[ECF No. 24]** is **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 24th day of July, 2024.

*Cecilia M. Altonaga*

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc: counsel of record