# IN THE UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF FLORIDA OCALA DIVISION

LAURA LOOMER

                                 Plaintiff,

        v.                                              **Case No: 5:24-cv-00625-JSM-PRL**

BILL MAHER

And

HOME BOX OFFICE, INC.

                                 Defendants.

## PLAINTIFF'S SURREPLY TO DEFENDANTS' REPLY TO RESPONSE IN OPPOSITION TO MOTION TO DISMISS

Plaintiff Laura Loomer hereby submits the following surreply to Defendant Home Box Office, Inc.'s ("HBO") and Bill Maher's ("Maher")(collectively "Defendants") Reply[1] in support of Motion to Dismiss (the "Reply"). Contrary to counsel for Defendants' assertions, Plaintiff has not made any *"ad hominem"* attacks. Instead, it is very much the opposite. When Plaintiff and counsel reached out to Defendants' counsel to try to amicably resolve this matter before having to resort to litigation, Plaintiff was threatened by counsel for Defendants, Katherine Bolger of Davis Wright Tremaine, including with attorney's fees, all the while knowing that Plaintiff has been in part severely financially harmed as a result of Defendants' false, malicious, and defamatory statements.

Furthermore, Defendants' claim that *Trump v. American Broadcasting Companies, Inc. et al*, No. 1:2024cv21050 (S.D. Fla. 2024) ("Trump Case") is "wholly unrelated" is, simply put, bizarre. Counsel for Defendants disingenuously suggest that Plaintiff only mentioned the Trump Case because they also represented Defendants ABC and George Stephanopoulos in the Trump Case and agreed to settle with President Trump for 15 million dollars in addition to attorney's fees, but this ignores the fact that the Chief Judge of the U.S. District Court for the Southern District of Florida, Hon. Cecilia M. Altonaga

---

[1] With regard to LCvR 3.01(b), Plaintiff assumed that she would be given the same number of pages – twenty-five (25) that Defendants were permitted for their motion, as it is standard practice for a motion and opposition to be given equal page limits in the interests of justice and fairness. If necessary, Plaintiff therefore respectfully moves for leave to file a commensurate twenty-five page opposition, equal to what Defendants were allowed.

found that President Trump had sufficiently pled defamation and allowed discovery in an action brought by President Trump over false published statements that President Trump had been "found liable for rape." Judge Altonaga found that in a case where President Trump was falsely accused of having "raped" instead of "sexually abused" E. Jean Carroll, she could not grant Defendants' motion to dismiss because "[w]here a court first determines the statements are susceptible to a defamatory interpretation, factual questions arise that should be resolved by the trier of fact — here, a jury." Here, the Court is also faced with a motion to dismiss, and thus, Judge Altonaga' ruling is directly on point and thus totally related and relevant, particularly given the fact that the allegations in the Trump Case are actually less egregious than the defamation in this instant action, since President Trump had been found liable for sexual abuse. There is no evidence here that Ms. Loomer had sex with and engaged in adultery, that is "fucked" President Trump and committed adultery behind the back of Melania Trump.

The bottom line here is simple—Defendants have largely rehashed the same failed arguments that they presented in their motion to dismiss. Where they have attempted to rebut Plaintiff's compelling arguments, they have failed to do so. Thus, Defendants' motion to dismiss must be denied in its entirety.

## I.     Defendants Concede That Defendant Maher Is Not Entitled To Any Special Protection Against Defamation As A "Comedian"

As a threshold matter, Plaintiff does not concede that Defendant Maher is a "comedian." He is a political pundit who apparently believes that he is a part

of the Hollywood elite and not subject to the rule of law, which is why he evaded service of process and forced Plaintiff to expend significant costs to serve him at home when his counsel could have simply accepted service of process once Defendant HBO was served through its registered agent.

In any event, Defendants now walk back their suggestion that Defendant Maher is entitled to some sort of special protection against defamation because he is an alleged "comedian" or "satirist." *See* ECF No. 17 at 10 where Defendants previously stated, "Courts around the country have held statements made by comedians or satirists like Bill Maher to be protected opinion." Defendants now admit that it does not matter one bit that Defendant Maher is an alleged "comedian" or "satirist" and that a thorough analysis of the full context of the statements at issue and whether they are "readily understood as conjecture, hypothesis, or speculation" must be undertaken. As shown conclusively in Plaintiff's Opposition to Motion to Dismiss, this analysis can only lead to the one conclusion – that Defendant Maher made false statements of **<u>fact</u>** of and concerning Plaintiff. ECF No. 21 at 5 – 15. This can be shown through the context of the Defamatory Statements, namely that (1) it occurred during a non-comedic and serious panel discussion with conservative pollster Kristen Soltis Anderson and former U.S. Senator Al Franken which involved serious topics such as alleged police brutality involving Miami Dolphins receiver Tyreek Hill, (2) when Defendant Maher told the told the purported "joke", it drew more groans from the audience than sparse laughter and the panelists clearly did not view his statement as being "opinion" or "hyperbole," and (3) it is well settled that an

individual also cannot escape liability for defamation simply by tactically attempting to couch his statement of fact as opinion. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990). Thus, Defendants' arguments in this regard are meritless and must be rejected.

## II.    Plaintiff Has More Than Sufficiently Pled Damages

Defendants concede that Plaintiff has pled defamation *per se* and that damages are presumed where a statement is found to be defamatory *per se*. ECF No. 34 at 4. The fact that Plaintiff also pleads defamation *per quod* cannot defeat this well-settled law. In this case, damages are still ongoing and this is why discovery is necessary and should not be stayed. Plaintiff has pled that she has suffered ""severe financial damage and damage to her reputation, good will, business opportunities, social relationships, and the career of Plaintiff." Comp. ¶ 36. Furthermore, Plaintiff alleged that she suffered "loss of…professional opportunity and prospects, as well as being damaged financially. " Comp. ¶ 10. These are specific, economic damages suffered by Plaintiff as a result of the defamatory statements made by the Defendants, and are therefore sufficiently pled. However, in the unlikely event that the Court finds otherwise, the proper recourse would be to allow Plaintiff leave to amend in this regard.

## III.    Plaintiff Has More Than Sufficiently Alleged Actual Malice

Defendants make that flat-out false statement that Plaintiff "did not plead actual malice here." This is belied by the words contained in the Complaint— "These false and misleading statements were broadcasted with actual malice, as Defendants knew that they were false and misleading, and/or at a minimum

acted and published with a reckless disregard for the truth." Comp. ¶ 10. There

is absolutely nothing conclusory about this statement either, as the Complaint

expressly alleges how the Defendants acted with actual malice:

> There is not a shred of credible reporting or evidence suggesting
> otherwise. Defendant Maher had no basis in fact to make this
> statement. He simply fabricated it for attention, notoriety, "clicks"
> and profit for himself and Defendant HBO, his employer. Comp. ¶
> 21.

Again, discovery in the form of Defendant HBO's internal documents and

depositions of the Defendants will fully bear this out, but for a case at the

pleading stage where no discovery has yet been permitted, this is more than

sufficient. This is, of course, notwithstanding the "badges" of malice that when

one or more are taken together, will provide additional evidence of actual,

constitutional malice. Comp. ¶ 23, <u>Exhibit 1</u>.

## IV.    Plaintiff Has More Than Sufficiently Pled Defamation By Implication

While Plaintiff's claim for Defamation by Implication is more than

properly pled with regard to Defendants having "juxtapose[d]a series of facts so

as to imply a defamatory connection between them," ECF No. 21 at 16 - 17, it

must also be recognized that Defendants ignore the other basis for defamation by

implication set forth in the Complaint, that Defendants "omitted facts." For

instance, Defendants omitted that there was absolutely no credible source

reporting that Ms. Loomer had "fucked" President Trump and committed

adultery behind the back of President Trump's wife, Melania Trump.

## V.    Florida's Anti-SLAPP Statute Does Not Apply In Federal Court

Defendants conveniently ignores the fact that the Chief Judge of the U.S.

Court of Appeals for the Eleventh Circuit expressed "serious doubt" as to whether Florida's Anti-SLAPP statute applies to a federal court in diversity:

> **and I have serious doubts about whether the anti-SLAPP statute applies in federal cour**t. And it seems to me that if it doesn't, then a suit filed in violation of it can't give rise to an attorney's fee award." *Corsi v. Newsmax Media Inc et al*, 21-10480 (Oral Argument of May 19, 2022).
>
> There's a conflict in what the - the Florida courts even say this – in how the statute works, right?...On the one hand, at least one DCA has said it does create a heightened pleading standard, right?... The other says it doesn't....: If it does, it seems to me, then it conflicts with the federal rules and it doesn't apply.....And if it doesn't create a heightened pleading standard, then it seems to me it's procedural and it also doesn't apply.....**But either way, it seems to me the statute just doesn't apply in federal court**. *Id*. (emphasis added).

The fact of the matter is that numerous courts around the country have found that anti-SLAPP statutes conflict with the Federal Rules of Civil Procedure ("FRCP") and thus the FRCP must govern. These include, but are not limited to, the Eleventh Circuit on Georgia's anti-SLAPP law, *Carbone v. CNN, Inc.*, 910 F.3d 1345 (11th Cir. 2018); (2) the Fifth Circuit on Texas' anti-SLAPP law, *Klocke v. Watson*, 936 F.3d 240 (5th Cir. 2019); (3) the D.C. Circuit, *Abbas v. Foreign Policy Grp., LLC*, 414 U.S. App. D.C. 465 (2015),  and (4) the Second Circuit on California's anti-SLAPP law, *La Liberte v. Reid*, 966 F.3d 79 (2d Cir. 2020).

Defendants attempt to discredit Plaintiff's reliance on *Gundel v. AV Homes, Inc.*, 264 So. 3d 304 (Fla. Dist. Ct. App. 2019), which found that Florida's Anti-SLAPP statute places an additional burden on the claimant. However, the fact remains that *Gundel* is good law and is not a rogue, one-off decision, as Florida's

Second District Court of Appeals has repeatedly confirmed this heightened burden and pleading standard. In *Davis v. Mishiyev*, 339 So. 3d 449 (Fla. Dist. Ct. App. 2022), the Court further held:

> We explained that the statute places the initial burden on a "SLAPP defendant to set forth a prima facie case that the Anti-SLAPP statute applies" and that once that burden is met, the burden is shifted to the SLAPP plaintiff "to demonstrate that the claims are not 'primarily' based on First Amendment rights in connection with a public issue and not 'without merit.'" *Id.*

*See also Godwin v. Michelini*, 48 Fla. L. Weekly 1769 (Dist. Ct. App. 2023). The Defendants' reliance on *Gov't Emps. Ins. Co. v. Glassco Inc.*, 119 F.4th 911 (11th Cir. 2024) for the proposition that although Florida's Anti-SLAPP statute creates an additional burden, it does not conflict with the Federal Rules of Civil Procedure is highly misleading, as the Eleventh Circuit's ruling does not substantively address Florida's Anti-SLAPP statute, and instead is focused solely on the Florida Motor Vehicle Repair Act, which has no applicability here. *Thus*, Glassco is a one-off, outlier rogue decision that does not overrule *Gundel* and is not binding precedent as it emanates from a lone outlier district court, not an appellate court. Lastly, Florida's Anti-SLAPP statute is also inapplicable because it "answers the same question" as the Federal Rules - which as found by Courts sitting in diversity, must govern - in *Sterling v. Doe*, 2022 U.S. Dist. LEXIS 105673 (M.D. Fla. Feb. 2, 2022).

WHEREFORE, for the reasons set forth above, Defendants' Motion to Dismiss must be denied in its entirety.

Dated: January 6, 2024          Respectfully submitted,

*/s/ Larry Klayman*
Larry Klayman, Esq.
**Klayman Law Group P.A.**
7050 W Palmetto Park Rd.
Boca Raton, Florida 33433
Telephone:   (561) 558-5536
Email:  leklayman@gmail.com

Attorney for Plaintiff


## CERTIFICATE OF SERVICE

I, Larry Klayman, hereby certify that on this day, January 6, 2024 I electronically filed the foregoing with the Clerk of Court using the Court's ECF procedures. I also certify that the foregoing document is being served this day on all counsel of record through the Court's eservice procedures.

*/s/ Larry Klayman*_____

EXHIBIT 1

Case 5:24-cv-00625-JSM-PRL   Document 38   Filed 01/06/25   Page 11 of 31 PageID 321

# Showing Constitutional Malice in Media Defamation



Illustration by Barbara Kelley

There is a myth that it is virtually impossible for a public figure to successfully sue the media for defamation. This myth is based on a perceived insurmountability of the requirement imposed on public figures to prove "actual" or "constitutional" malice by clear and convincing evidence when suing for defamation. In reality, the courts have provided an almost step-by-step guide for finding and proving constitutional malice. The guide is the badges of malice. The phrase "badges of malice" is adapted from the

9/1/23, 17:31

badges of fraud used in tax evasion and fraudulent conveyance cases to categorize types of circumstantial evidence that may support an inference of a subjective intent to defraud.

No doubt showing constitutional malice is an obstacle. Public figures must show constitutional malice to maintain their claim. The requirement of proving constitutional malice is not limited to public figures. Plaintiffs that are not public figures still must show constitutional malice to recover punitive damages.

Constitutional malice, also called actual malice, is the publishing of a defamatory statement either knowing it is false or with reckless disregard for its truth or falsity.[1] Requiring a showing of constitutional malice for a public figure to sue for defamation, or to impose greater than actual damages ( *i.e.* , presumed and punitive damages) on the media, is intended to prevent a chilling effect on news reporting and protect First Amendment rights.[2] The concept of "knowledge of falsity" is familiar to all attorneys in multiple contexts. Recklessness as to falsity, however, has evolved definitions and inferences unique to defamation law.

### Twenty-Four Badges of Constitutional Malice: A Guide

The Supreme Court articulated the parameters of "reckless disregard" in *St. Amant v. Thompson* , 390 U.S. 727, 731 (1965): "Reckless conduct is not measured by whether a reasonably prudent man would have published or would have investigated before publishing. There must be evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."

Accordingly, *St . Amant* reasoned that recklessness may be inferred when "there are obvious reasons" to doubt the veracity of the defamatory statement.[3]

In *Mason v. New Yorker Magazine* , 501 U.S. 496 (1991), the Supreme Court summarized that, for proof of constitutional malice, "mere negligence does not suffice," and that the plaintiff must demonstrate that the author "in fact entertained serious doubts as to the truth of his publication...or acted with a high degree of awareness of probable falsity."[4]

Knowledge of falsity or reckless disregard for falsity is a subjective mental state of the person responsible for publishing the defamatory statement. Consequently, absent an admission by the media, showing constitutional malice is based on circumstantial evidence. The courts have recognized certain fact patterns of circumstantial evidence as probative of constitutional malice. These "badges of malice," some alone and some in combination with others, have been held sufficient to support a jury inference of constitutional malice. There are 24 badges of malice.[5]

• failure to conduct a thorough investigation before publishing serious and damaging allegations that are not "hot news";

• failure to give the plaintiff a fair opportunity to reply to defamatory allegations;

• failure to report exculpatory facts;

• omitting pertinent information to create a false impression;

• destruction, loss, or unavailability of a reporter's notes or research;

• the reporter's knowledge of a quoted source's animosity toward the plaintiff;

• the alteration of quotes to maximize a story's impact;

• a reporter's knowledge of facts conflicting with the report;

• emphasizing unimportant events to support a defamatory statement;

• continued reliance on a source that had proven unreliable in other respects;

• a preconceived determination to disparage a plaintiff or a preconceived slant or view;

• repetitive media attacks on the plaintiff;

• failure to contact key witnesses;

• a reporter's ill will toward the plaintiff;

• competitive pressure for "hot news" story;

• discrepancies, inconsistencies, and equivocation in the testimony of media witnesses;

• a reporter's departure from professional standards;

• failure to supervise the reporter's preparation of the story;

• refusal to publish a retraction upon learning of errors in a story;

• the use of deception to obtain a defamatory story;

• a reporter's lack of credibility;

• prior and subsequent defamatory statements;

• that an investigative agency with the same information as a reporter declined to prosecute or take any action against the plaintiff; and

• making threats in connection with a story.

These badges of malice are a guide and nothing more. The possible scope of evidence that may support an inference of malice is unlimited. The badges are useful because they summarize actual events that tend to repeat themselves in media defamation cases. Evidence of the badges in discovery will support a strong and well-precedented argument for constitutional malice. For each badge developed in discovery, the media will have an explanation. Developing multiple badges of malice can expose the media's serial excuses as pretextual and increase the chances of successfully arguing constitutional malice.

## Malice Typically Is Evaluated from the Accumulation of Circumstantial Evidence

The badges of malice are consistent with the extremely broad scope of evidence that the Supreme Court held must be discoverable by plaintiffs to prove malice. In *Herbert v. Lando*, 441 U.S. 153 (1979), the Supreme Court observed that the First Amendment protections given to the media were balanced by the corollary that the fact finder could consider an extremely broad scope of evidence in determining malice. "[A]ny competent evidence either direct or circumstantial, can be resorted to, and all the relevant circumstances surrounding the transaction may be shown…" to show malice.[6] The specific items of relevant evidence favorably itemized in *Herbert* include 1) all information known to the defamer showing the falsity of defamatory statements; 2) the defamer's thought process and reasons for crediting or discrediting information; 3) the defamer's thought processes and reasons for incorporating only certain information into a press statement; 4) threats made by the defendant; 5) prior defamations by the defendant; 6) subsequent defamations made by the defendant; 7) subsequent statements made by the defendant; and 8) circumstances indicating rivalry, ill will, or hostility.[7]

In *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989),

the Supreme Court emphasized that a jury may infer malice from a series of factors none of which alone would have been sufficient. In that case, a newspaper published witness' allegations that a judicial candidate had been bribed. The candidate sued for defamation, and the newspaper argued that it had no knowledge that the bribery allegations were false. The jury found malice, and the newspaper appealed.

*Harte-Hanks* emphasized numerous factors in evaluating the entire record. The newspaper was involved in heated competition with another local paper and was under pressure to "scoop it" on local news ( *i.e* ., profit motive for the defamation). After hearing the obviously damaging bribery allegations, the newspaper conducted an investigation, but it failed to contact key witnesses. Numerous taped witness interviews were available to the newspaper, but the editorial director did not listen to them. There were discrepancies in the testimony of the newspaper's witnesses. Though no single factor was dispositive, *Harte-Hanks* stressed that the jury may have found that "failure to conduct a complete investigation involved a deliberate effort to avoid the truth."[8]

In *Curtis Publishing Co. v. Butts* , 388 U.S. 130 (1967), a football coach sued a magazine for publishing an article accusing him of fixing games. The evidence showed that this was not "hot news," that the charges were serious, that the editors recognized "the need for a thorough investigation," that the reporter's superiors did not look at the reporter's notes prior to the publication, that a key witness was not interviewed, and that "no attempt was made to screen the films of the game."[9] The Supreme Court held that a jury may infer from this that the magazine "had been anxious to publish an expose and had, thus, wantonly and recklessly seized on a questionable affidavit."[10]

*Hunt v. Liberty Lobby* , 720 F.2d 631 (11th Cir. 1983), affirmed a jury finding

9/1/23, 17:31

of malice in a Florida defamation case. *Hunt* ruled that two factors present in that case independently supported the jury's determination. First, "when an article is not in the category of 'hot news,' that is, information that must be printed immediately or it will lose its newsworthy value, 'actual malice may be inferred when the investigation for a story...was grossly inadequate in the circumstances.'"[11] Second, "an inference of actual malice can be drawn when a defendant publishes a defamatory statement that contradicts information known to him, even when the defendant testifies that he believed that the statement was not defamatory and was consistent with the facts within his knowledge."[12]

A defendant's "inconsistent" and "equivocating" testimony supported a finding of malice in *Texas Disposal Systems Landfill, Inc. v. Waste Management Holdings, Inc.* , 219 S.W.3d 563 (Tex. App. 2007). The court cited a combination of circumstantial evidence from which the jury may have inferred malice. These factors included 1) omitting pertinent information that would have prevented a "false impression" from the information included in the defamatory communication; 2) a failure to attempt verification of the defamatory information; and 3) "inconsistent" and "equivocating" testimony from the defendant.[13]

The frequency and duration of the media's attack on a plaintiff also may help establish malice. In *Bentley v. Bunton* , 94 S.W.3d 561 (Tex. 2002), the court affirmed a jury finding of malice. *Bentley* cited factors that included the fact that the talk show host had "relentlessly" repeated allegations against a particular judge for months while ignoring people that had knowledge of the allegations.[14]

Emphasizing unimportant events to support serious defamatory statements will also support a finding of malice. In *Bolling v. Baker* , 671 S.W. 2d 559 (Tex. App. 1984), a physician accused a nurse of dishonesty. When the nurse

sued for defamation, the physician testified that one reason he doubted the nurse's honesty was an incident in which some lab slips "had been changed."[15] *Bolling* concluded that the physician's "obsession with such an insignificant event warrants the inference that he was using the incident to get even with [the nurse]."[16] Accordingly, the court concluded that there was sufficient evidence to support the jury's finding that the statements were made with knowledge of their falsity or with reckless disregard for the truth. Emphasizing unimportant events also fits within the more general badge of a reporter knowing that the facts do not support a defamatory story.

Finally, the context of a defamatory statement and the media's use of deception to obtain images for a defamatory story may support a jury inference of malice. In *Braun v. Flynt*, 726 F.2d 245 (5th Cir. 1984), a novelty entertainer who performed an act with a swimming pig at a family-oriented amusement park sued a sexually oriented men's magazine for defamation for publishing her photo in its "Chic Thrills" section. The magazine obtained authority to use the photograph by misrepresenting the nature of the magazine. *Braun* affirmed a jury finding of malice, holding that the jury may infer malice from the magazine's use of deception to obtain the photograph and then inserting the photograph of what the editors knew was a family tourist attraction "in the context of" a lewd magazine.[17]

The media cannot avoid an inference of malice when it publishes a defamatory headline by showing that it published the full truth in the text of the story. In *Kaelin v. Globe Communications Corp.*, 162 F.3d 1036 (9th Cir. 1998), Kato Kaelin sued a newspaper for publishing a headline stating, "COPS THINK KATO DID IT!" after O.J. Simpson was acquitted of murder. The newspaper argued that there was no malice because the body of the story made clear that the "IT" referred to perjury and not the murders. The trial court entered summary judgment for the newspaper. The appellate court reversed *Kaelin*, holding that a jury may infer that the newspaper

intended to convey a false impression from the scandalous headlines for the pecuniary motive of selling more newspapers. The truthful disclosure in the body of the article did not guarantee the newspaper immunity from defamatory headlines. "The editors' statements of their subjective intention," *Kaelin* stressed, "are matters of credibility for a jury."[18]

## Some Badges Alone May Establish Malice

There are instances in which courts have approved an inference of malice from a single item of circumstantial evidence. This occurs in two scenarios. One is when there is evidence of the reporter's lack of credibility regarding the story. This evidence includes the mysterious disappearance of the reporter's research notes, the alteration of quotes for defamatory impact, and the reporter's possession of materials showing that the defamatory story was false. The second scenario focuses on the reporter's conduct after the defamatory publication. When the media refuses to retract a defamatory statement after learning of its falsity, courts have allowed an inference that the defamation was published with malice. Though neither scenario guarantees a finding of constitutional malice, both scenarios may support such a finding if the evidence is material to the defamation.

The destruction or unavailability of a reporter's notes and research supported a finding of malice in *Murphy v. Boston Herald, Inc.* , 449 Mass. 42 (Mass. 2007). There, a newspaper reporter, relying on the statement of a district attorney with animosity toward a judge, published an article accusing the judge of belittling a juvenile rape victim. *Murphy* found that a number of factors combined to furnish clear and convincing evidence of malice.[19] *Murphy* stressed 1) the reporter's knowledge that his source had animosity toward the judge; 2) the reporter's failure to verify the accuracy of the statements attributable to the judge with others who were present; and 3) the reporter's incredible claim that he discarded his notebook where he wrote the information told to him by the district attorney.[20] *Murphy* stressed

that the strongest evidence of malice was the mysterious unavailability of the notebook: "The jury were entitled to draw the negative inference that [the reporter] discarded his notebook in a deliberate effort to conceal what he knew were inaccuracies in his reporting. This inference, in turn, *provides a strong basis for a finding of actual malice.*"[21]

Consistent with *Murphy* , numerous courts have held that the destruction or unavailability of a reporter's notes or research may support a jury verdict of malice.[22]

A reporter's alteration of quotes to maximize the impact of the story also supports a verdict of malice. In *Masson v. New Yorker Magazine, Inc* ., 501 U.S. 496 (1991) *,* the Supreme Court held that a reporter's alteration of quoted words may equate with knowledge of falsity when the alteration results in a material change of the meaning conveyed by the quoted statement.[23] That a reporter in *Masson* might have misunderstood his or her sources is insufficient to overturn a jury's evaluation of the circumstances.[24]

The court in *Southern Air Transport, Inc. v. Post Newsweek Stations Florida, Inc* ., 568 So. 2d 927 (Fla. 3d DCA 1990), upheld a finding of malice when the media aired an uncorroborated claim by an individual of questionable credibility that the plaintiff was a drug trafficker. The court held publishing this serious and uncorroborated allegation without giving the plaintiff a fair opportunity to reply supported the inference of malice. The court also noted that the defamatory broadcast made the informant appear credible and failed to report information that would negatively impact his credibility.[25]

A reporter's possession of documents conflicting with his report supported a finding of malice in *Mitchell v. Griffin Television, LLC*, 60 P.3d 1058 (Okl. App. 2002). There, a veterinarian sued a TV station for falsely reporting that a lawsuit accused him of medicating a champion race horse to hide injuries so

the horse could be sold. The TV station claimed there was no showing of malice because the complaint filed in federal court alleged the veterinarian had medicated the horse prior to the sale. That complaint accused the trainer of trying to mask the horse's unsoundness but made no such accusation as to the veterinarian. Since the TV station had a copy of the complaint, *Mitchell* held that the jury properly found that the false report was made with "reckless disregard."[26]

In *Herbert* , the court held that a defamer's post-publication conduct may be relevant to establishing malice at the time of publication.[27] The key post-publication conduct developed in the caselaw is the media's refusal to retract a defamatory statement after learning that it is false. *Restatement Second of Torts* 580A (1977), Comment D, concludes that a defamer's refusal to retract a defamatory statement after learning it is false "might be relevant in showing recklessness at the time the statement was published." In *Mahnke v. Northwest Publications, Inc.* , 160 N.W. 2d 1 (Minn. 1968), the Minnesota Supreme Court held that a jury may properly consider a defendant's failure to retract defamatory statements as evidence of recklessness. "We think that the failure to retract the defamatory statements," *Mahnke* stressed, "underscored defendant's reckless attitude as to the consequences of what had been published and that the jury was entitled to take that fact into consideration."[28]

### Use of the Badges in Discovery

The focus of discovery on constitutional malice is obtaining evidence that the reporter either knew the truth refuting the defamation or the truth was so readily available that failure to inquire amounts to a deliberate avoidance of truth. The badges suggest where to look for this evidence. The first step is obtaining all investigative research materials, notes, drafts of articles, edits, article or script changes, outtakes communications, tweets, web postings (including both the defamatory article and any guest comments or posts),

9/1/23, 17:31

Facebook posts, and other social media materials concerning the defamatory story. The reporter's familiarity with the subject matter of the story, as well as the identities of his or her sources also warrant discovery. The goal of this phase of discovery is to learn everything the reporter said, wrote, knew, or had access to concerning the defamatory story.

A next step is to identify every item of information known or available to the reporter that is inconsistent with the defamatory sting of the story. This aspect of discovery then focuses on tracing how and why the reporter made editorial decisions to omit, downplay, or not pursue what was inconsistent with the defamation. This should be done at deposition, but it is helpful to initially obtain copies of all drafts or outtakes of the defamatory publication to see what was deleted.

The reporter should be deposed on every step of the investigation conducted on the story. Particular emphasis is on the reasons for a reporter's decision not to pursue research areas that would have exposed the defamatory story as false. The credibility issue surrounding a reporter's explanation of this process is often the lynchpin that decides constitutional malice. Inconsistencies between the reporter's research and the defamatory string of the story may rise to a level where this alone allows an inference of malice.

The next aspect of discovery deals with external influences on the defamatory story. External influences discussed in the caselaw include 1) animosity toward the subject of the defamation; 2) competitive pressure to scoop other media outlets; 3) a pattern of defamatory coverage; and 4) an editorial slant. Also, failure to retract after learning of a defamatory falsity, though not an influence on the story, is an external factor that may support an inference of malice. Accordingly, discovery into the editorial decision not to retract should be as thorough as discovery into the decision to initially

publish the defamation. In cases in which the media issues an inadequate retraction, the retraction can often be pled as an additional defamatory publication requiring discovery in its own right.

Discovery into animosity toward the subject of the defamation can be far ranging or a quick dead end. In cases in which a news outlet had an established relationship with the plaintiff, there is often a falling out predating the defamatory publication — and evidence of animosity. The entire history of the relationship, including all statements made by news outlet representatives about the plaintiff, are in play.

Competitive pressure for attention-grabbing stories is always present but must be shown in the record. There are often emails or other communications discussing a news outlet's market position (circulation or viewers). Media executives normally must acknowledge that their company's source of income (advertising), and often their income depends on their circulation or number of viewers. Editors sometimes direct reporters to pursue certain stories, either orally or in writing, to maximize viewers during ratings periods.

Television stations typically feature their most inflammatory stories during national ratings periods knowns as "sweeps." During this time, there can be increased pressure on reporters to generate high-profile stories or to exaggerate to the point of defaming. Sweeps periods occur four times each year and are usually acknowledged in internal communications. It is important in the industry because the viewership established during sweeps determines advertising revenue. Questioning the reporter regarding his or her basis for publishing multiple defamatory statements will often yield testimony helpful to establish a credibility dispute.

A pattern of defamatory statements about the plaintiff can be key to showing

malice. Identifying every defamatory statement about the plaintiff made by a news outlet is the first step. This includes defamatory statements that were made before and after the defamatory publication. In some cases, the sheer number of false statements made may support an inference of malice. In others, credibility issues are raised by a reporter's attempts to explain this pattern.

## Defending Summary Judgment

The first test of a plaintiff's evidence of constitutional malice is usually the media's motion for summary judgement. It is here that a plaintiff first feels the weight of being required to prove malice by clear and convincing evidence. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), the Supreme Court held that, in ruling on a media motion for summary judgment or a directed verdict on constitutional malice, a court must evaluate the evidence of malice to determine whether a jury reasonably could infer malice under this heavier evidentiary burden. Media defendants, quoting isolated language from *Anderson* and similar cases, exaggerate that a plaintiff's burden is virtually insurmountable.

In reality, *Anderson* also stresses that courts should be cautious in granting summary judgment on constitutional malice:

> [I]t is clear enough from our recent cases that at the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.[29]

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or a directed verdict. The evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.[30]

*Anderson* has been inconsistently applied. Some courts invoke *Anderson* as a license to act as jury in weighing the evidence. Others look at whether there are factual issues that may be presented to a jury. This was predicted by the dissent in *Anderson* .[31]

The dissenting justices argued that *Anderson* gave conflicting instructions to trial courts. Specifically, courts were simultaneously instructed to weigh the evidence under the "prism" of the clear and convincing standard and cautioned against weighing the evidence when ruling on a motion for summary judgment or directed verdict. The dissents predicated that *Anderson* would prove devoid of practical application.[32]

In *Hutchinson v. Proxmire*, 443 U.S. 111, n.9 (1979), the U.S. Supreme Court noted in a libel case "the proof of actual malice calls a defendant's state of mind into question [ *citations omitted* ] and does not readily lend itself to summary disposition."[33]

Summary judgment in a Florida defamation case arising from "investigative television news" was addressed in *Southern Air Transport* . There, the plaintiff sued a TV station for broadcasting an investigative story accusing the plaintiff of drug trafficking while engaged in covert arms shipments to the Nicaraguan Contras. The trial court granted summary judgment for the TV station on the issue of malice. The district court reversed, holding that these factors precluded summary judgment: 1) A source's information had proven unreliable in other respects; 2) "the defendants *did not give plaintiff a fair opportunity to reply* to this drug trafficking accusation..."[34]; and 3) the

Case 5:24-cv-00625-JSM-PRL    Document 38    Filed 01/06/25    Page 26 of 31 PageID 336

government declined to prosecute anyone based on the source's information.[35] The court noted that other evidence in the record supported contrary inferences but stressed that weighting them was for the jury.[36]

Media defendants always assert that they believed the truth of the defamation. Constitutional malice pivots on creating a triable issue concerning credibility. The badges of malice help create this issue, but the courts have stressed that it is in the jury's purview to evaluate the credibility of media witnesses and reject their claim that they believed the defamation was true.

In *Harrison v. Williams*, 430 So. 2d 585 (Fla. 4th DCA 1983), a father sent defamatory communications to officials accusing a police officer of beating up his son. The police officer brought a defamation action, and the father's defense was that "he made a good faith mistake about the identity" of the police officer. The trial evidence showed that the son "informed his father" that it was the plaintiff who had attacked him. The assistant state attorney, however, had told the father that the attacker was another officer who looked like the plaintiff. The fact finder resolved the credibility issue in favor of the plaintiff and found that the father had made his accusations with malice. On appeal, the court affirmed, finding substantial competent evidence to support the inference of malice.[37]

*Dibella v. Hopkins*, 403 F.3d 102 (2d Cir. 2005), affirmed a jury's finding of malice and held that it was within the jury's purview to discredit the defamer's account of his mental state in making a defamatory statement.[38] Evidence that creates an issue concerning the reporter's credibility requires a jury determination.

The thrust of the focus on the credibility of the media witnesses is that anything normally impacting a witness' credibility is in play. In particular

situations, these factors may be unique. For instance, a witness' hesitations, tone, and demeanor are properly considered by a jury deciding whether to believe the witness. In the context of a motion for directed verdict, the matter must be put on the record because the transcript will not reflect them. In defending a summary judgment, an argument that the record prevents an issue on the media witnesses' credibility can be supported by videotaped deposition testimony.[39]

## Conclusion

The caselaw developed over the last half century shows that proving constitutional malice is feasible. It takes the discipline of developing every item of circumstantial evidence that may furnish a motive to defame or shows that the reporter knew or should have known the truth. The "should have known" standard applies to negligence, but negligence is a step toward recklessness. The 24 badges of constitutional malice reflect combinations of evidence that can defeat the media's First Amendment defense.

[1] *Gertz v. Welch* , 94 S. Ct. 2997 (1974).

[2] *Id.*

[3] *St. Amant*, 390 U.S. at 732, fn. 3 (citations omitted).

[4] *Mason*, 501 U.S. 496 at 510 (citations omitted).

[5] The badges are summarized here and the cases utilizing the various badges are discussed below.

[6] *Herbert*, 441 U.S. at 177, fn. 12 (citations omitted).

[7] *Id.* Courts typically reject various journalist privileges which normally protect journalists' sources from discovery on the ground that the media waives the privilege when it asserts its First Amendment defenses.

[8] *Harte-Hanks Communications*, 491 U.S. at 685. *See also Celle v. Filipino Reporter Enterprises, Inc* ., 209 F.3d 163 (2d Cir. 2000) (malice finding affirmed based on evidence of reporter's ill will, reporter's conflicting testimony, and reliance on questionable source without conducting investigation).

[9] *Curtis Publishing Co*., 388 U.S. at 157.

[10] *Id*. at fn.20. *See also Healey v. New England Newspapers, Inc* ., 555 A.2d 321 (R.I. 1989) (newspaper report of angry relative blaming doctor for death creates jury issue of malice where newspaper failed to report known facts tending to exculpate the doctor); *Buratt v. Capital City Press* , 459 So. 2d 1268 (La. 1 Cir. 1984) (reckless disregard for truth shown when reporter omits reporting available information because it refuted defamatory point reporter trying to make).

[11] *Hunt*, 720 F.2d at 643.

[12] *Id*. at 645 (citations omitted).

[13] *Texas Disposal Systems Landfill*, 219 S.W.3d at 578-579.

[14] *Bentley,* 94 S.W.3d at 584-585, 600. *See also Kentucky Kingdom Amusement Co. v. Belo Kentucky, Inc*. , 179 S.W.3d 785 (Ky. 2005) (affirming jury finding of malice based on television station's failure to correct inaccuracies in prior reports, continuing commitment to running the same false story line, failure to significantly investigate, and because the general make up and presentation of the story exhibited hostility).

[15] *Bolling,* 671 S.W.2d at 563.

[16] *Id*. at 565.

17 *Braun*, 726 F. 2d at 257.

18 *Kaelin,* 162 F. 3d at 1042.

19 *Murphy* , 449 Mass. at 58.

20 *Id*. at 58-61.

21 *Id.* at 61 (emphasis added).

22 *See Moore v. Vislosky* , 240 F. App'x 457, 469 (3d Cir. 2007) (defamer's claim that she "lost" documentary evidence that supported her defamatory statements was implausible and supports jury finding that she acted with reckless disregard for truth); *Torgerson v. Journal/Sentinel, Inc.* , 563 N.W. 2d 472, 483 (Wis. 1997) (destruction of reporter's notes is sufficient evidence to support a jury verdict of actual malice); *Chang v. Michiana Telecasting Corp.* , 900 F.2d 1085, 1090 (7th Cir. 1990) ("destruction could imply that the notes would have revealed the reporter did not believe what he wrote or said") (citations omitted).

23 *Masson,* 501 U.S. at 516.

24 *Id* . at 520-521.

25 *Southern Air Transport* , 568 So. 2d at 928.

26 *Mitchell*, 60 P.3d at 1063.

27 *Herbert,* 441 U.S. at 170-171.

28 *Mahnke,* 160 N.W.2d at 344. *See also Zerangue v. TSP Newspapers, Inc.* , 814 F.2d 1066 (5th Cir. 1987) (refusal to retract an exposed error supports a finding of malice just as a readiness to retract tends to negate malice); *Golden Bear Distributing Systems of Texas, Inc. v. Chase Revel, Inc.* , 708

F.2d 944 (5th Cir. 1983) (refusal to retract supports jury finding that defamatory article published with reckless disregard of the truth).

[29] *Anderson*, 477 U.S. at 249.

[30] *Id.* at 255 (citations omitted).

[31] *Id.* at 265-268.

[32] *Id* . at 267-269.

[33] *See also Shiavone Const. Co. v. Time, Inc*. , 847 F.2d 1069 (3d Cir. 1988) (reversing summary judgment in media defamation case where media had internal inconsistencies in its research and information contradicting libelous assertions but nevertheless published libelous statements).

[34] *Southern Air Transport* , 568 So. 2d at 928 (emphasis added).

[35] *Id.*

[36] *Id.* at 929.

[37] *Harrison*, 430 So. 2d at 586. *See also Durso v. Lyle Stuart, Inc* ., 337 N.E. 2d. 443, 447 (Ill. App. 1975) (citations omitted) (jury may find malice and disregard defendant's claim that defamatory statement in investigative publication was caused by unintentional "error" where evidence creates issue of author's credibility because (citations omitted) it showed "muckraking intent, the absence of hot news, and an inadequate investigation…").

[38] *See also Newton v. NBC, Inc* ., 930 F.2d 662, 671 (9th Cir. 1990) (malice may be based on jury's negative assessment of reporter's credibility at trial).

[39] The normal rule is that the court should leave credibility issues for the jury.

To the extent that the court weighs evidence to see if a credibility issue satisfies the "clear and convincing" standard, witness demeanor should be in play. The dissent in *Anderson* pointed out that applying the "clear and convincing" standard at the summary judgment stage and telling the courts not to weigh evidence was inherently contradictory. The dissent predicted that *Anderson* would be inapplicable in practice.



**MANUEL SOCIAS** *is a solo practitioner who has represented clients in business litigation for 35 years. He also handles and consults on defamation cases.*