## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF FLORIDA, OCALA DIVISION

-------------------------------------------------------------- x

LAURA LOOMER,

                    *Plaintiff,*

      - against -

BILL MAHER and HOME BOX OFFICE, INC.,

                    *Defendants.*

-------------------------------------------------------------- x

Case No.: 5:24-cv-00625-JSM-PRL

### *REDACTED—PUBLICLY FILED*

### DEFENDANTS' TIME SENSITIVE MOTION FOR A PROTECTIVE ORDER DESIGNATING THE VIDEO DEPOSITION OF BILL MAHER AND PORTIONS OF THE TRANSCRIPT AS CONFIDENTIAL AND DIRECTING THAT THE DEPOSITION BE USED ONLY FOR PURPOSES OF THE LITIGATION

Defendants Home Box Office, Inc. ("HBO") and Bill Maher respectfully request that this Court enter an Order designating the full videotape and portions of the transcript of the deposition of Defendant Bill Maher (the "Deposition") as Confidential, and directing that Plaintiff Laura Loomer and her counsel, Larry Klayman, use the Deposition testimony for purposes of this litigation only and for no other purpose. While Defendants have engaged in the discovery process in good faith, Defendants have grown increasingly concerned that Plaintiff's motives in pursuing the Deposition do not center on the merits of this case.

As the Court knows, this is a defamation action about a joke made by Mr. Maher on the program *Real Time With Bill Maher*. Mr. Maher was deposed on April 4, 2025. The Supreme Court has made clear that the "sole purpose of

1

[discovery is to] assist[] in the preparation and trial, or the settlement, of litigated disputes." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984). Depositions are not a "means to obtain information for publication in the press or other media." *Forrest v. Citi Residential Lending, Inc.*, 73 So. 3d 269, 279 (Fla. Dist. Ct. App. 2011). Yet that is precisely what Plaintiff and her counsel have made clear that they plan to do here.

As an in-camera review of the Deposition will show,[1] the principal reason Plaintiff sought to depose Mr. Maher appears not to have been to litigate this case but rather to exploit Mr. Maher in service of an inappropriate publicity stunt. In fact, since the outset of discovery in this case, Plaintiff and her counsel have been single-mindedly focused on Mr. Maher's deposition in ways that do not comport with standard litigation practice: demanding Mr. Maher's deposition as the first event to occur even before documents were produced, filing a notice of deposition on the public docket that included the address of the Deposition, refusing to agree to a standard protective order, and announcing via a press release the time and location of the deposition on the morning that it was set to occur, *see* Ex. C. Paparazzi waited outside of the building where the Deposition took place, which Defendants can only assume was due to Plaintiff and her counsel's actions.

Even worse, once the Deposition began, the vast majority of Mr. Klayman's questions—to the extent they were questions at all, and not simply conclusive and

---

[1] Defendants are providing the full written transcript, *see* Ex. A, and are of course happy to provide the video if the Court wishes to see it.

condescending leading statements, argumentative ideological grandstanding, or bizarre regurgitations of disproven conspiracy theories—had no bearing on any issue before the Court, and instead consisted of harassing probes into Plaintiff's and Mr. Klayman's assumptions about Mr. Maher's private life, religious beliefs, and other completely irrelevant topics.

Most concerningly, Plaintiff and Mr. Klayman have also made statements before, during, and after the Deposition, making clear their intention not just to disseminate the video of Mr. Maher's Deposition but to fundraise off it. Plaintiff told her followers they could expect a video and asked for monetary contributions. *See, e.g.*, @LauraLoomer, https://x.com/LauraLoomer/status/1904584045155193130 (Mar. 25, 2025) ("[M]y deposition of him will be RECORDED ON VIDEO.") ("Lawsuit Update Tweet"); @LauraLoomer, https://x.com/LauraLoomer/status/1907783525387972620  (Apr. 3, 2025) (noting that she was traveling for Mr. Maher's "video deposition" "in Los Angeles"). And, on April 6, 2025, Mr. Klayman explicitly stated his intention "to release the unclassified deposition of Bill Maher in 15 days" noting that "it's going to come unclassified because there was little to nothing in there that was confidential." *See* Larry Klayman's Freedom Watch, *Update on the Bill Maher Deposition #2 MAHER DEPOSITION IN LOOMER CASE SPELLS DISASTER FOR HIM & HBO!* (Apr. 6, 2025) ("Deposition Update #2"), https://larryklayman.substack.com/p/update-on-the-bill-maher-deposition-e2b, at 0:57. In the same video, Mr. Klayman asked for money to support his litigation efforts. *See id.* at 4:47.

These and other antics by Plaintiff and Mr. Klayman unfortunately lead to the conclusion that they do not intend to use the testimony for purposes of the litigation at hand, and instead appear to be planning to circulate and exploit Mr. Maher's "unclassified" deposition for other gains, including to raise money and generate publicity for themselves. This is not the purpose of the discovery process; lines must be drawn. Defendants therefore respectfully request that the Court enter a Protective Order designating the video and portions of the transcript of the Deposition Confidential, such that this litigation can proceed in the ordinary course and not descend into public spectacle. [2]

## **BACKGROUND**

### I.   **Plaintiff's Refusal to Agree to Standard Confidentiality Terms**

Defendants have already been forced to seek protection from the Court previously with regards to this Deposition, after Mr. Klayman unilaterally noticed

---

[2] On the condition that Defendants request and pay for an expedited copy of the video and transcript, Plaintiff agreed to provisionally designate the Deposition confidential for only 15 business days after receipt. Defendants expedited a copy of the video and transcript, which were received on April 10, 2025. During the conferral process for this Motion, Defendants requested that Plaintiff maintain the provisional confidentiality designation pending resolution of the Motion, but Plaintiff's counsel refused to maintain the designation , however, Plaintiff's counsel refused to maintain the designation, accused Defendants of "[f]rivolous obstruction," and threatened to cross move for attorneys' fees, costs, and a variety of sanctions. *See* Ex. O. Thus, absent a court order, the video and transcript are confidential only through May 1, 2025. Defendants respectfully request a ruling, by April 30, 2025, that the parties maintain as confidential the Deposition video and transcript until further order of the Court. Such an order would avoid the harm to Defendants and abuse of the litigation process (discussed more fully below and in the accompanying Motion to Seal) that unfettered release of the Deposition by Plaintiff and her counsel would cause pending the Court's full consideration of this Motion.

a deposition date occurring absurdly soon after discovery began and during a week when he had already been informed Mr. Maher and his counsel were unavailable. After this Court's February 25, 2025 Order, in which Mr. Klayman had to be reminded to conduct discovery in "a spirit of cooperation and civility" after falling "well short" of that standard, *see* ECF No. 48 at 2, the parties mutually agreed on dates for the depositions of Mr. Maher and of HBO's Rule 30(b)(6) corporate representative. Mr. Maher's deposition was scheduled for Friday, April 4, 2025. Plaintiff then needlessly filed the Notice of Deposition for Mr. Maher's deposition on the public docket. *See* ECF Nos. 44 & 49.

On February 27, 2025, counsel for Defendants sent Mr. Klayman a draft confidentiality stipulation "in anticipation of the parties beginning to produce documents." *See* Ex. D. Counsel for Defendants explained in a cover note: "The terms are pretty standard and of course protect all parties equally so I am hoping we can mutually agree to these terms and avoid motion practice on a protective order, which would only prolong the production of documents. We are of course happy to discuss or to consider any edits you may have." *Id.* Mr. Klayman responded that same day, promising that he would "look at the protective order." *Id.* Weeks passed without any response from Mr. Klayman.

On March 25, 2025, with Mr. Maher's deposition approaching, Defendants followed up with Mr. Klayman, reattaching the proposed agreement and asking whether he would agree to it. Mr. Klayman did not respond. *Id.* The following day, on March 26, Defendants followed up again, explaining "that Defendants will not

produce documents without a confidentiality agreement in place" and asking again for Plaintiff's "position on the proposed agreement." *Id.*

Two days later, on the afternoon of March 28 (over a month after receiving the draft agreement), Mr. Klayman responded, indicating that his client would not sign any kind of confidentiality order. *See* Ex. F. He wrote: "There is nothing confidential about this straightforward case. The confidential protective order you propose will also compound the time and expense of this litigation. It will in effect cause multiple motions, hearings, loss of time and expense and burden the court. Ms. Loomer will proceed without the documents at this time." *Id.* at 2. Mr. Klayman failed to provide any explanation for the perplexing position that a standard confidentiality agreement—which is meant to *avoid* the need for motion practice  and burden on the court by spelling out designations in advance and procedures for disagreement—would result in the harms that he predicted.

Defendants responded that same afternoon, stating that it was Plaintiff's prerogative to proceed to a deposition without documents if she so chose (a very unusual choice), but asking that Plaintiff at least agree to provisionally designate deposition transcripts confidential for 30 days, as is standard in litigation. *Id.* Mr. Klayman refused, insisting upon a 15 day time frame (again, with no explanation for the urgency)—and demanding that Defendants request and pay for an expedited copy of the video and transcript. *See* Ex. G. In the spirt of civility and cooperation, Defendants agreed to 15 business days. *Id.* The parties received the video on April 10, 2025. The video and Deposition transcript are therefore

confidential under the parties' agreement only through May 1, 2025, absent a Court order.

## II.    Plaintiff's Publicity Campaign

From the moment this matter was filed, Plaintiff and Mr. Klayman have sought to use it as vehicles for self-promotion, self-perceived political score-settling, and fundraising. Their public comments about this lawsuit—and about the Deposition and counsel for Defendants specifically—show that Plaintiff's primary aim is to portray herself as seeking retribution against individuals and entities she seeks to demonize as enemies of her publicly portrayed ideological agenda.

Plaintiff has posted extensively about the lawsuit and the Deposition on social media. On March 25, 2025, Plaintiff posted a "LAWSUIT UPDATE" to her 1.6 million followers on X, stating:

> My video deposition of Trump-hater Bill Maher @billmaher will be taking place in Los Angeles, California on Friday, April 4th at noon.

She went on to state, baselessly:

> My attorney will be able to ask Bill Maher questions about why he falsely stated and published to the world on his show that I had sexual relations with President @realDonaldTrump and committed adultery against @MELANIATRUMP when I was invited to the Presidential debate and flew on President Trump's plane in September of 2024. . . .

> The reason why Bill Maher is trying to get to the White House to meet with President Trump is because my deposition of him will be RECORDED ON VIDEO, and Maher wants to blunt his hatred of Trump and his hatred of me since he's going to be asked about it under oath, ON VIDEO. . . .

@LauraLoomer,       https://x.com/LauraLoomer/status/1904584045155193130

(Mar. 25, 2025). She repeatedly noted that she would "be there in person," @LauraLoomer, https://x.com/LauraLoomer/status/1903418889448329404 (Mar. 22, 2025); *see also* @LauraLoomer, https://x.com/LauraLoomer/status/1889721483498270987 (Feb. 12, 2025) ("I will be personally present in the room"), and that the deposition would "be recorded," @LauraLoomer, https://x.com/LauraLoomer/status/1906515436344373341 (Mar. 30, 2025). Whether as a result of her publicity or Mr. Klayman's, paparazzi gathered in front of the Deposition location on the scheduled date.

At the same time, Plaintiff has used this lawsuit, including the Deposition, to raise funds. On multiple occasions, she asked her followers to support the costs associated with the deposition and her travel to Los Angeles, providing a link to a crowdfunding page titled "Laura Loomer Lawfare Fund."[3] @LauraLoomer, https://x.com/LauraLoomer/status/1904585402469462204 (Mar, 25, 2025) ("Donate to my lawfare fund here to help cover the costs associated with my lawfare with radical leftists. I now need to travel to California for this deposition. It's very expensive to engage in lawfare with the Left."); @LauraLoomer, https://x.com/LauraLoomer/status/1906516857621733678 (Mar. 30, 2025) ("Please support my Loomer legal fund here. I will now have to spend money to fly

---

[3] Plaintiff has raised $29,820 (out of a goal of $150,000), much of which was donated after she tweeted about refusing to keep documents confidential. *See* Ex. H.

to CA with my lawyer and pay for a video deposition due to @billmaher's lies."); @LauraLoomer, https://x.com/LauraLoomer/status/1908114919259840593 (Apr. 4, 2025) ("I have to pay for the video deposition and legal fees associated with @billmaher defaming me. . . . Please support my legal fund here."). There is, of course, no obligation for parties to attend depositions with their counsel— Plaintiff did not "have to spend money fly to CA"—but even if there were, the only reason for the imminent expense for travel was Plaintiff and Mr. Klayman's insistence that the Deposition happen when it did.

Mr. Klayman has also discussed the suit, and the Deposition specifically, multiple times on his website, in his newsletter, and on podcasts, always with a focus on a self-serving political playbook that he appears to view as quintessential to his own public image. For instance, shortly after the lawsuit was filed, Mr. Klayman issued a press release, asserting his opinion that HBO and Maher "advocate for Democrat Party officials and values" and baselessly claiming that Defendants made Loomer "a target" "as a vehicle to harm President Trump and his campaign." Larry Klayman, *Bill Maher and Home Box Office Sued By Laura Loomer for Defamation* (Oct. 22, 2024), https://www.larryklayman.com/bill-maher-and-home-box-office-sued-by-laura-loomer-for-defa (last accessed Apr. 17, 2025). In December, Mr. Klayman issued a press release incorrectly stating that counsel for Defendants are "the same lawyers who represented George Stephanopoulos and ABC with the recent settlement with Donald Trump," and stating that "[t]he $15 million dollars which Stephanopoulos and ABC were forced

to pay Trump . . . will ultimately pale in comparison to what Maher and HBO will have to shell out in the end." Larry Klayman, *Laura Loomer's Response to Bill Maher's and Home Box Office's Frivolous Motion to Dismiss* (Dec. 17, 2024), https://www.larryklayman.com/laura-loomers-response-to-bill-mahers-and-home-box-offices-f (last accessed Apr. 17, 2025). After the motion to dismiss decision, Mr. Klayman issued another press release, stating his opinion regarding the defendant Mr. Maher, that "Over the years, Maher has become self-absorbed, arrogant, toxic, mean and unhinged – particularly whenever President Trump is involved in any way! His 'Trump Derangement' and his attacks on my client Ms. Loomer will be his undoing" and including a link to donate to Loomer's "legal defense fund." Larry Klayman, *Laura Loomer Wins Motion to Dismiss Vs. Bill Maher and HBO* (Jan. 17, 2025), https://www.larryklayman.com/laura-loomer-wins-motion-to-dismiss-vs-bill-maher-and-hbo (last accessed Apr. 17, 2025).

On the morning of the deposition, Mr. Klayman sent out yet another press release to news outlets stating that "Maher's deposition is proceeding, and it will be recorded on video today at noon." Ex. C. He also included his email address, inviting anyone to contact him for more information. *Id.* Finally, on April 6, 2025—two days after the Deposition—Mr. Klayman asserted baselessly on his video podcast that Defendants "used Laura Loomer...as a way to get to President Trump" and "as a vehicle to try to destroy Trump." *See* Deposition Update #2 at 3:09-3:43. These diatribes also included a variety of false and inappropriate attacks *ad hominem* attacks on outside counsel for Defendants. *See id.* at 6:04-6:13 (claiming

that counsel for Defendants "don't tell the truth" and are "not straightforward"). In the same video, Mr. Klayman both asked for donations and made clear his intention to publicly release the Deposition (for reasons that Defendants struggle to understand could be in any way related to the merits of the litigation) as soon as the agreed 15 business days expired. *Id*. at 056; 4:47. These press releases and public appeals are unprecedented and without any possible good faith basis that would legitimately further the merits of Plaintiff's claims at issue.

### III.    Mr. Klayman's Conduct During the Deposition

Again, this lawsuit centers on a joke made by Mr. Maher on his late-night show about the close relationship between Plaintiff, a public figure, and President Trump, a public official. Mr. Klayman, however, did not focus his questioning on how Mr. Maher came up with the joke or what news reports about Plaintiff's relationship with President Trump Mr. Maher had read that might have lead him to have made such a joke. Instead, Mr. Klayman probed for intimate details about Mr. Maher's private life, asked repeatedly about Mr. Maher's alleged dislike of those who profess to believe in God (not true), and Mr. Maher's relationships with and purported feelings about all women. Plaintiff also behaved inappropriately throughout the deposition, audibly laughing and snickering, and making comments to Mr. Maher during his testimony. Mr. Klayman and Plaintiff's behavior during the Deposition made clear that their principal goal is to berate and harass Mr. Maher and then publicize their antics to support their fundraising and social media campaigns, rather than obtain testimony relevant to the claims and

defenses at issue in this case.

Mr. Klayman's most intrusive and harassing questions focused on Mr. Maher's private life. For instance, Mr. Klayman asserted that Mr. Maher ███████████ ████████████████████████████████ before asking ████████████ ███████████ Ex. A ("Tr.") 49:23-25. (████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████ *Id.* 50:1-5.) Mr. Klayman repeatedly questioned Mr. Maher about an entirely unrelated lawsuit between Mr. Maher and another person, and continually pressed Mr. Maher to divulge that person's name.[4] Later, Mr. Klayman asked whether ████████████████████████████████ ████████████████████████████████████████████ ████████████████████ Tr. 139:22-140:6. This line of questioning was never clarified, much less connected to the issues in the lawsuit. And, despite his concession that he was not interested in Mr. Maher's documents, *see* Ex. F, Mr. Klayman baselessly asked, ████████████████████████████████████ ████████████████████████████████████████████ Tr. 174:11-13. Needless to say, none of these questions has any bearing on any issue in this case.

When Mr. Klayman pivoted from his prurient questions about Mr. Maher's private life, he often did so to castigate Mr. Maher for his religious beliefs. For

---

[4] Mr. Klayman initially agreed to keep this line of questioning confidential, Tr. at 31:6-7, only to deny doing so upon the completion of the Deposition. Tr. at 223:1-16.

instance, Mr. Klayman harangued Mr. Maher at length regarding  Tr. at 125:2-126:9. He also demanded to know about ███████████████████, *id.* at 151:7-13, and ██████████████

██████████████████████, *id.* at 182:19-20. Here, too, Mr. Klayman's questioning was not only abusive but entirely irrelevant, given that the joke at issue concerned speculating as to whether Plaintiff might have slept with President Trump, not whether Plaintiff (let alone President Trump) believes or does not believe in God.

Mr. Klayman also raised the issue of settlement, then launched into a series of questions about what Mr. Maher knows about Ocala, Florida. *See* Tr. at 75:6-7 ("Would you like to settle this case or do you want to go to a jury in Ocala, Florida?"); *id.* at 75:11 ("Do you know anything about Ocala, Florida?"); *id.* at 75:16-17 ("Do you know that it's the heart of the Bible Belt?"). Mr. Klayman not only suggested an Ocala jury would be biased against Mr. Maher, *see id.* at 76:4-5 ("I'm saying do you know the makeup of the likely jury in Ocala, Florida? They're very religious people."); *id.* at 76:12 ("You think they are going to like your humor?"), but also that the Court would be, *see id.* at 77:1-2 ("[Y]ou see what's going on with the judges, whether it's left or right, correct?"); *id.* at 78:3-8 ("[Y]ou're aware that [judges] frequently reach decisions based upon their own

personal experience? . . . And beliefs?"). These questions, obviously meant to threaten Mr. Maher, amounted, in Mr. Maher's words, to seemingly "putting a gun to my head and saying this case is going to be tried . . . in an area that is politically hostile to a lot of my politics. And therefore [I] should just surrender." Tr. at 78:10-18. This line of questioning could not possibly relate to the merits of any claims or defenses in this case.

Finally, Mr. Klayman took the Deposition as an opportunity to attack Mr. Maher for Mr. Klayman's false characterization that Mr. Maher has some kind of animus towards women generally. Mr. Klayman repeatedly misconstrued jokes that had *nothing* to do with women—including jokes ████████████████ ████████████████████████, Tr. at 171:11-172:23, and ████████ ████████████████████████, *id.* at 180:4-20—to claim that Mr. Maher ████████████████████████, *id.*, and that ████████ ████████████████████ *id.* at 172:21-23. Mr. Klayman even implied that Mr. Maher ████████████████████████ ████████████, even though this is false, and though Mr. Klayman had *himself* selectively culled the social media posts he used to support his argument. *Id.* at 173:6-18. Mr. Klayman clearly sought to create a misleading moment for easy circulation on his and Plaintiff's social media platforms for purposes having nothing to do with this lawsuit.

## **ARGUMENT**

There is good cause to grant the Defendants' request for a protective order—

as there would be in any litigation in which one side has sought discovery not to prove their case but to publicly harass and berate their opponent. Defendants seek only to keep Plaintiff and her counsel to the standard litigation "rules of conduct": to designate the video and selected portions of the transcript of Mr. Maher's deposition as confidential, as is standard in litigation and as is especially warranted here, given the harassing nature of Mr. Klayman's questioning and given Plaintiff and Mr. Klayman's stated intention to release video of the Deposition publicly and raise money off of it. Moreover, it seems clear that a judicial order will be required to ensure that Plaintiff and her counsel use the testimony only for purposes of the litigation and for no other purpose, as most participants in the civil litigation process inherently understand has always been intended by the Federal Rules and the governing case law.

## I.   Deposition Testimony Is Routinely Treated As Confidential And For Use In Connection with Litigation Alone

Discovery information untethered to any request for substantive relief from the court is generally treated as confidential to protect privacy interests and prevent abuse. As the Supreme Court has recognized, "pretrial discovery by depositions and interrogatories has a significant potential for abuse," not least because such information "may seriously implicate privacy interests of litigants." *Seattle Times Co.*, 467 U.S. at 34-35. Given that "[t]here is an opportunity . . . for litigants to obtain—incidentally or purposefully—information that not only is irrelevant but if publicly released could be damaging to reputation and privacy, [courts] clearly ha[ve] a substantial interest in preventing this sort of abuse of its

processes." *Id.* at 35.

Moreover, as courts in Florida and elsewhere have recognized, once information is made public, that harm cannot be undone. *See Dep't of Children & Family Servs. v. Patterson*, 925 So. 2d 337, 339 (Fla. 2d DCA 2005) ("Once the protected information is divulged[,] without a confidentiality safeguard in place there is no way further disclosure can be avoided."); *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 144 (2d Cir. 2004) (recognizing that once "[t]he genie is out of the bottle," "[w]e have not the means to put the genie back").

For all these reasons, "courts often order[] that discovery information will remain private." *In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 356 (11th Cir. 1987) (quoting *United States v. Anderson*, 799 F.2d 1438, 1441 (1986)); *see 3B Med., Inc. v. ResMed Corp.*, 2016 WL 9527960, at *2 (M.D. Fla. Sept. 15, 2016) (following in-camera review, granting defendant's request to keep confidential information produced in discovery given "the potential for discovery abuse"); *ZeniMax Media, Inc. v. Oculus VR, LLC*, 2016 WL 11430477, at *2 (N.D. Tex. June 2, 2016) (declining to publicly release transcript of deposition to avoid "subject[ing] [well-known deponent] to any embarrassment or annoyance associated with public scrutiny of the deposition materials in a case that has garnered media attention when there is no need to give the public access to these discovery materials").[5]

_____

[5] The public does not have a First Amendment right of access to the deposition transcript or video. "The discovery process, as a 'matter of legislative grace,' is a

Typically, parties to a litigation agree that information produced in discovery or derived through deposition testimony should be treated as confidential—a norm reflected in Magistrate Judge Lammens' own preferences, which state that "the parties are free to enter into private confidentiality agreements"—while recognizing that such information may ultimately be used to support the merits of the claims and defenses of the litigation in public summary judgment filings or trial proceedings. *See* Philip Lammens, *Preferences*, https://www.flmd.uscourts.gov/judges/philip-lammens (last visited Apr. 17, 2025). Courts in this district routinely enter protective orders consistent with those agreements. *See, e.g.*, *Advanta-Star Auto. Res. Corp. of Am. v. Scanlon Imports, Inc.*, Case No. 2:20-cv-00030-TPB-MRM, ECF No. 23 (M.D. Fla. June 4, 2020) (entering stipulated protective order "to protect sensitive and confidential information").

Where, however, the parties do not agree that discovery materials should be kept confidential, Federal Rule of Civil Procedure 26 provides that "[a] party or any

---

statutorily created forum not traditionally open to the public." *In re Alexander Grant & Co. Litig.*, 820 F.2d at 355 (quoting *Seattle Times Co.*, 467 U.S. at 32). Thus, while "[m]aterial filed in connection with any substantive pretrial motion, *unrelated to discovery*, is subject to the common law right of access," *Romero v. Drummond Co., Inc.*, 480 F.3d 1234, 1245 (11th Cir. 2007) (citation omitted) (emphasis added), discovery material not tethered to any substantive motion does not enjoy any presumption of public access. *See Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1312 (11th Cir. 2001) ("[M]aterial filed with discovery motions is not subject to the common-law right of access."); *Hausburg v. McDonough*, 2023 WL 2432322, at *1 (M.D. Fla. Mar. 9, 2023) ("Discovery materials are presumptively confidential.").

17

person from whom discovery is sought may move for a protective order in the court where the action is pending," and "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including "requiring that a deposition be sealed and opened only on court order," or "requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." Fed. R. Civ. P. 26(c)(1)(F)-(G). Federal Rule of Civil Procedure 5.2 provides that the court may, "[f]or good cause," "require redaction of [] information" in court filings. Fed. R. Civ. P. 5.2(e)(1). In short, under the federal rules, "the sole criterion for determining the validity of a protective order" keeping information confidential "is the statutory requirement of 'good cause.'" *In re Alexander Grant & Co. Litig.*, 820 F.2d at 356 (citations omitted). Good cause "generally signifies a sound basis or legitimate need to take judicial action." *Id.* The Eleventh Circuit also requires the district court to balance the parties' interests in deciding whether to issue a protective order under Rule 26(c). *See Chicago Tribune*, 263 F.3d at 1313 (citing *Farnsworth v. Center for Disease Control*, 758 F.2d 1545, 1547 (11th Cir. 1985)).

## II.    The Deposition Video Should Be Designated Confidential

Defendants have good cause to seek a confidentiality order designating the video of Mr. Maher's Deposition as confidential.

Courts around the country have made clear that depositions and other discovery are meant to collect information for use in litigation, *not* for public

dissemination. Because "[d]epositions and other discovery material frequently contain matters that are inadmissible in evidence, irrelevant to the issues in litigation, defamatory, or prejudicial . . . , the discovery process [should not be considered a] means to obtain information for publication in the press or other media." *Forrest*, 73 So. 3d at 279; *see also Tillman v. C.R. Bard, Inc.*, 297 F.R.D. 660, 662 (M.D. Fla. 2014) (litigants do not have a presumptive "right to use [information] produced in discovery for purposes outside litigation").

Here, Plaintiff and her counsel have made clear in numerous ways that their aim is public dissemination, harassment, and profit. Plaintiff's willingness to forego documentary discovery and single-minded promotion of the Deposition and its video to her followers demonstrates that she and her counsel are not earnestly seeking evidence relevant to her claims, but instead creating political theater for likes and fundraising. Likewise, the press releases, social media posts, and other publicity about the Deposition from both Plaintiff and her counsel illustrates their aim of creating political theater. Plaintiff has also raised tens of thousands of dollars on her promise to make the video public. And Plaintiff is not even pretending otherwise: at the start of the deposition, Mr. Klayman *directed* the videographer to "pan to the counsel"—a clear admission that he not only anticipated an audience for the video but also wanted that audience to know who Defendants' lawyers are. Tr. at 6:1-3. Later, Mr. Klayman suggested that Mr. Maher ████████████████████████████ *id.* at 152:8, again admitting he viewed the deposition video as a public document ripe for editing and exploitation. Perhaps

most importantly, the questions themselves were harassing and irrelevant—the hallmarks of discovery abuse.

The risks that the deposition process will be exploited for improper media-driven purposes are heightened when it comes to the release of deposition *videos* as opposed to written transcripts. In *Stern v. Cosby*, the defendant moved for a protective order prohibiting the disclosure of the transcript and video of her deposition. 529 F. Supp. 2d 417 (S.D.N.Y.2007). The court granted the request, holding that the media attention to the case (which involved a high-profile plaintiff) would impede the administration of justice and subject the defendant to "annoyance, embarrassment, oppression, or undue burden or expense." *Id.* at 422-23. The court emphasized that videos are especially susceptible to media abuse "as they can be cut and spliced and used as 'sound-bites' on the evening news or sports shows, or, even worse, on 'celebrity gossip' talk shows."[6] *Id.* at 423. The court therefore prohibited the public release of the video (as well as the transcript) of the deposition at issue. Similarly, in *Paisley Park Enterprises, Inc. v. Uptown Productions*, the court restricted the release of a video deposition of the plaintiff, a well-known musician, principally because the defendants sought to make commercially-motivated, "non-litigation use of the video[]." 54 F. Supp. 2d 347, 348 (S.D.N.Y. 1999). The court emphasized the extent to which the defendants

---

[6] Mr. Klayman referenced this danger himself during the Deposition, when he asserted his opinion that ███████████████████████████████████████ ████████████████████████████████████████████████████ Tr. at 145:9-13.

publicized the litigation and the deposition, including by posting the notice of deposition and press releases on their website. *Id.*

Numerous other courts have likewise recognized the dangers posed by the release of deposition videos and imposed restrictions on their circulation. *See, e.g.*, *Springs v. Ally Fin., Inc.*, No., 2014 WL 7778947, at *8 (W.D.N.C. Dec. 2, 2014) (finding good cause to restrict plaintiff's dissemination of deposition video as part of YouTube video defaming defendant and defendant's corporate representative), *aff'd*, 2015 WL 506471 (W.D.N.C. Feb. 6, 2015), *order vacated in nonrelevant part*, 657 F. App'x 148 (4th Cir. 2016); *Baker v. Buffenbarger*, 2004 WL 2124787, at *4 (N.D. Ill. Sept. 22, 2004) (limiting the use of videotaped deposition testimony to purposes directly related to settlement and trial preparation and prohibiting the dissemination of the depositions prior to trial); *Seaman v. Wyckoff Heights Med. Ctr., Inc.*, 8 Misc. 3d 628, 633 (N.Y. Sup. Ct. 2005) (prohibiting dissemination of deposition and discovery materials to the press and imposing monetary sanctions on attorneys who delivered the only copy of the videotaped deposition to tabloid news program), *aff'd*, 25 A.D.3d 598 (N.Y. App. Div. 2006), *pet. for review dismissed*, 7 N.Y.3d 864 (2006*). See generally Low v. Trump Univ., LLC*, 2016 WL 4098195, at *6 (S.D. Cal. Aug. 2, 2016) ("[C]ourts have tended to restrict access to video depositions . . . where the improper purpose for which the deposition is sought is commercial gain or prurient interest in exposing the details of a [deponent's] personal life.").

These well-founded concerns about deposition videos being disseminated

publicly for purposes other than to advance a litigation compel confidentiality here. Mr. Maher and his counsel have already been subject to considerable vitriol in connection with Plaintiff and Mr. Klayman's public posts about the litigation. Such harassment will only increase once the "sound-bites" Plaintiff and Mr. Klayman are presumably planning to highlight in support of their non-litigation priorities and fundraising activities online. *Stern*, 529 F. Supp. 2d at 422. Such release "will only add to . . . [the] 'circus-like' atmosphere," *id.*, that Plaintiff and Mr. Klayman have created by continuously posting about the case on their public platforms—including by issuing press releases, like the defendants in *Paisley*. Finally, as in *Paisley*, there can be no doubt that Plaintiff and Mr. Klayman will continue to leverage the deposition for commercial gain, by (at a minimum) raising funds publicly via posts containing clips of the video. The mere mention of the Deposition on Plaintiff's X account resulted in tens of thousands of dollars in donations (without any clarity as to whether these donations were in fact used to fly Plaintiff to Los Angeles to attend the deposition or pay for the costs of the deposition that she insisted upon at a premature stage in the discovery process); Plaintiff's publication of the video from the Deposition for further "fundraising" will undoubtedly generate far greater returns.

Balancing the interests of the parties also favors keeping the video confidential. The only purpose of releasing the video is to exploit Mr. Maher. Plaintiff would not suffer *any* prejudice in this litigation from the Deposition video remaining confidential. She will be free to use testimony in support of her claims

at summary judgment, and if necessary, at trial. Given the risks posed by disclosure of the Deposition, including to the intent and purpose of the discovery process itself, and that there is absolutely "no need to give the public access to these discovery materials," *ZeniMax Media, Inc.*, 2016 WL 11430477, at *2, the entirety of the video deposition should be designated confidential at this time.

### III. Limited Portions of the Written Transcript Should Be Kept Confidential

As noted, deposition transcripts are typically kept confidential unless and until they are cited in connection with a substantive motion. Nevertheless, in an effort to respect Plaintiff's desire for transparency and to avoid the need for sealing motions in connection with summary judgment briefing, Defendants agree to designate as confidential only those portions of the written transcript not relevant to any claim or defense in this case.

Specifically, Defendants request that this Court keep confidential those portions of the deposition that 1) reveal Mr. Maher's confidential salary, *see, e.g.*, *Rowland v. Bozarth*, 2022 WL 509902, at *2 (N.D. Fla. Jan. 19, 2022) (granting protective order treating "salary/compensation information" as confidential); 2) the identities of Mr. Maher's business and professional managers, *see, e.g.*, *Nielson Consumer LLC v. Circana Grp., L.P.*, 2024 WL 3887152, at *4 (S.D.N.Y. Aug. 20, 2024) (granting protective order treating identities of certain non-parties as confidential); *see also NXP B.V. v. Research In Motion, Ltd.*, 2013 WL 4402833, at *2 (M.D. Fla. Aug. 15, 2013) (granting motion to seal in deference to "non-party's legitimate and private interests"); 3) any unrelated alleged litigation in which Mr.

Maher was involved, *see, e.g.*, *Casperson v. Oring*, 2019 WL 13216565, at *1 (D.N.J. Dec. 13, 2019) (granting motion to seal records of "prior unrelated litigation"); and 4) the irrelevant, intrusive and harassing questions and answers described above, *see generally* Fed. R. Civ. P. 26(c)(holding that a court may issue a protective order to protect parties from "embarrassment"); *Rossbach v. Rundle*, 128 F. Supp. 2d 1348, 1353 (S.D. Fla. 2000) (sealing warranted to "shield[] [individuals] from potentially embarrassing publicity"). So that the Court can more easily understand which matters Defendants seek to keep under seal, Defendants have attached, as sealed Exhibit A, a full, unredacted of the transcript for in camera review and, as sealed Exhibit B, a version of the transcript with the proposed redactions. For the avoidance of doubt, Defendants do not seek to keep confidential those portions of the transcript in which Mr. Klayman questioned Mr. Maher about the alleged defamatory statement.

* * *

This is a defamation claim, not political theater, a fundraising opportunity, or an opportunity to score PR points in a (wrongly) perceived culture war. Defendants are not seeking to keep any information relevant to the disputed issues in the case hidden from the public, but believe that it is necessary for the parties to comport themselves according to standard rules of civility and litigation practice. Defendants therefore respectfully request that this Court enter an order— consistent with ordinary litigation practice—to avoid Mr. Maher and his counsel being subject to any further unnecessary exploitation and abuse.

## CONCLUSION

For the reasons stated above, Defendants respectfully request that the Court grant this Motion and direct that the full video of the Deposition, as well as portions of the transcript identified in Exhibit B, be designated as confidential, and enter an order requiring Plaintiff and her counsel to utilize all materials relating to the Deposition solely for purposes of the litigation and for no other purpose.

## LOCAL RULE 3.01(g) CERTIFICATION

Counsel for Defendants certifies that Defendants have conferred via email with counsel for Plaintiff, who not only opposes the relief sought in this motion but has threatened to cross-move for attorneys' fees, costs, and other sanctions.


Dated: April 18, 2025


Respectfully submitted,

*/s/ Rachel E. Fugate*

Rachel E. Fugate (Bar No. 144029)         Katherine M. Bolger (*pro hac vice*)
Yelan Escalona (Bar No. 1031564)          Alexandra Perloff-Giles (*pro hac vice*)
Shullman Fugate PLLC                       Davis Wright Tremaine LLP
100 South Ashley Drive, Suite 600          1251 Avenue of the Americas, 21st Floor
Tampa, FL 33602                            New York, NY 10020
Tel: (561) 429-3619                        Tel: (212) 489-8230
rfugate@shullmanfugate.com                 katebolger@dwt.com
yescalona@shullmanfugate.com              alexandraperloffgiles@dwt.com

*Counsel for Defendants*