IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| LAURA LOOMER | Plaintiff, | |
| v. | | |
| BILL MAHER et al | Defendants. | Case No: 5:24-cv-00625-JSM-PRL <br><br> **IN PERSON HEARING BEFORE THE HONORABLE JAMES S. MOODY REQUESTED** |

**PLAINTIFF'S RESPONSE IN OPPOSITION AND RESPONSE TO DEFENDANTS' MOTION FOR AN ORDER REQUIRING PLAINTIFF TO USE THE DEPOSITION OF NINA ROSENSTEIN ONLY FOR LITIGATION PURPOSES**

From the outset of this case, as set forth in prior pleadings over discovery issues, Defendants Bill Maher ("Maher") and Home Box Office ("HBO") and their counsel, have repeatedly filed motions not only to in effect try to turn this case into a mostly star chamber secret proceeding, but also to run up the costs of litigation for Plaintiff Ms. Laura Loomer ("Ms. Loomer"), who is financially in poor shape in large part due to the defamation *per se* perpetrated by Maher and HBO as a cynical and cruel vehicle to harm President Donald Trump by also harming Ms. Loomer in the lead up to the 2024 presidential election.

The latest motion concerns the deposition of HBO, which this honorable Court has access to both in transcript and video format. *See* Plaintiff's Sealed Notice to the Court Regarding Video Depositions.

Plaintiff Ms. Loomer will not belabor the discovery issues previously briefed – which include blatant obstructionist tactics including constant

1

interruptions with speaking objections that tip off witnesses to the "correct" answer. This deluge of Defendants' motions began about eight weeks ago and remain unresolved, save for temporary orders by the magistrate judge that he is taking them under advisement. As moved for in a pleading filed on June 16, 2025, Plaintiff has urged the presiding judge, the Honorable James S. Moody, to redelegate to himself and dispose of the discovery issues, not out of a lack of respect for Magistrate Judge Phillip Lammens, but because the strategy of Defendants counsel is to delay and cause multiple briefing, with the attendant loss of huge time and expense, on discovery issues. While this is a common defense tactic among mega-law firms, particularly with New York City based ones such as Davis, Wright Tremaine LLC, which prides itself on defending anti-Trump media (*See* Exhibit 1), this cannot and should not be permitted.

A review of the transcript and video of the deposition of Nina Rosenstein, the designated HBO corporate representative, will not only show that she was not competent to answer many crucial questions, a tactic which was obviously intended by her counsel and HBO, but also that there is nothing confidential about the testimony she did provide. Defendants indeed seem to acknowledge this, so one has to ask why they even filed their instant motion. The answer is simple, based on their past conduct; to once again run up the costs of litigation and delay this case.

Coupled with the harassment and browbeating at Ms. Loomer's deposition meted out by Defendants counsel Katherine Bolger and her colleagues (the transcript and video has been ordered and will be provided to the Court), was

the fact that at the deposition of Ms. Rosenstein, which as a courtesy Plaintiff's undersigned counsel agreed to be conducted in the New York City offices of Davis, Wright Tremaine LLC, Mr. Klayman was followed, that is trolled, by a security guard assigned to him throughout his stay at the firm. This intimidation tactic was unnecessary as Mr. Klayman, as an officer of the court, was courteous at all times. But this is the way that Ms. Bolger and her firm roll, as also exhibited at Ms. Loomer's deposition. Indeed, it has not been Mr. Klayman and Ms. Loomer who have been uncivil, but quite the opposite.

It is time for the frivolous discovery motions, fully briefed at (1) Response in Opposition to Defendant Maher's Motion for a Protective Order and Motion to Seal, ECF No. 63; (2) Notice of Supplemental Authority, ECF No. 77; and (3) Plaintiff's Surreply to Motion for a Protective Order; ECF No. 72, and (4) Response in Opposition to Motion Requiring Deposition of Laura Loomer Only Be Used for Litigation Purposes, be put to and end and that this case proceed civilly and with all due speed. This case should not be turned into the star chamber Defendants would like. It is a simple defamation case, not a complex financial or national security proceeding. This runs counter to our open system of justice.

Defendants cannot have it both ways. First they maliciously defame Plaintiff Ms. Loomer before an audience of millions of viewers, and then want their testimony sealed off from the public record and the public, filing one non-meritorious motion after anther to delay this case and to improperly run up time and expense not just for Ms. Loomer but also this Court.

Plaintiff Ms. Loomer respectfully requests an in person hearing before the Honorable James S. Moody at the earliest practicable date to resolve these important matters in order that this case can proceed with all due speed, without gamesmanship, with civility, and not to unduly consume valuable time and expense.

Dated: June 17, 2025	Respectfully Submitted,

By: /s/ Larry Klayman
Larry Klayman, Esq.
Klayman Law Group P.A.
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
leklayman@gmail.com

*Counsel for Plaintiff*

4

# EXHIBIT 1

# Trump's War on "Fake News" and the Law Firm Defending Free Press

hollywoodreporter.com/news/politics-news/trumps-war-fake-news-law-firm-defending-free-press-1197104

Eriq Gardner                                                                                           March 29, 2019



*Taylor Callery*

"Enemy of the people!" goes the rallying cry from the leader of the supposedly free world. President Trump hasn't yet lived up to his campaign pledge to make it easier to sue the media, but emboldened by his war on "fake news," some of Trump's followers are trying anyway. When these individuals get to the courtroom, they often find one particular law firm on the other side.

Davis Wright Tremaine is hardly universally known, but as media finds itself increasingly under attack in the Trump age, this firm has become its best line of defense. Its fingerprints are present across the media spectrum. Jokes told by late-night comedians? Often vetted by its lawyers. #MeToo stories published over the past 18 months? Quite frequently, a DWT attorney responds to threatening letters from the alleged perpetrators. And in court, the firm is tackling huge First Amendment cases, representing the likes of CNN, *The New York Times* and *The Washington Post* in everything from defending defamation claims to securing access to critical documents and regaining access after being exiled from the White House. Simply put: This Seattle-based firm has outsize influence on media at a particularly critical moment. (DWT counsels *THR* too.)

1/5

Take the defamation suit from Russian tech entrepreneur Aleksej Gubarev over *BuzzFeed News*' January 2017 publication of the full "Trump Dossier," the report about Russia-Trump ties prepared by former British spy Christopher Steele.

"There were a lot of firms pitching us, and many had strong thoughts," says Nabiha Syed, vp and associate general counsel at BuzzFeed. "Some believed it was a big mistake to publish. It was a scary thing to choose counsel, to place trust with a bet-the-company case." DWT's Katherine Bolger and Nathan Siegel took charge of defeating the suit.

"Our course was set by what [*BuzzFeed News* editor] Ben [Smith] said, that this was an intentional act to inform the public," says Bolger. "It was a defense that ultimately won, and it was a case heavily influenced by what was in the news."

Bolger describes litigating such a high-profile case as "trippy — that's a legal term," and, with a nod to the political dialogue around the Trump Dossier, adds that she couldn't avoid thoughts about the consequences. "Every day we were buffeted by what is in the news, and holy cow if we lose the case," she says. "It was really exhilarating." Soon, pending an appeal over what should remain sealed, the public could learn more about the firm's work in the case, as BuzzFeed's attorneys also investigated the "truth" of the Trump Dossier by taking depositions of Steele and others.

In the Trump era, DWT lawyers are often popping up in fights over the free flow of information. For example, Rachel Strom, one of the firm's youngest partners, had just watched Bolger argue in a New York federal courthouse last April when she got a text about something significant happening a few doors down. The offices of Trump attorney Michael Cohen had been raided by the FBI, and Cohen was appearing at the courthouse to stop prosecutors from looking at material he said was protected by attorney-client privilege. "I ran over," says Strom. "That moment, I was representing ABC, but as the day went on, I started representing other media clients too."

At the beginning of that proceeding, U.S. District Court Judge Kimba Wood expressed an inclination to hold the hearing behind closed doors. It was Strom, without any invitation, who stood up from the benches in the public gallery to argue that there was a First Amendment right to access the courtroom and that the "cat was out of the bag" with respect to the Cohen raid. Not only did she sway the judge, but as the hearing turned to questions about what would be publicly filed — including whether the names of Cohen's clients would be released — Strom persuaded the judge to defer to a presumption of openness. It eventually resulted in Cohen's admission that he had advised Fox News host Sean Hannity.

When it comes to DWT attorneys, the Trump era has meant business. The group has been in court to find out about Trump's gun permit, to unseal documents about the operations of Trump University and to fight when the U.S. attorney general attempted to subpoena a radio reporter. Not every matter made it to a public courtroom, though. At various points over the

past three years, Trump's team sent threatening letters to *The Art of the Deal* co-author Tony Schwartz, *Fire and Fury* author (and *THR* contributor) Michael Wolff, and *Apprentice* star and ex-White House staffer Omarosa Manigault Newman. Each time, DWT's Elizabeth McNamara responded in kind with retorts that essentially quashed potential arbitration.

Then there's the lawsuit from literary group PEN America. After seeing the Trump administration strip CNN reporter Jim Acosta of his press credentials, threaten *Washington Post* owner Jeff Bezos with higher postage rates for Amazon and suggest that NBC's broadcast license be revoked, PEN is seeking judicial intervention to stop further retaliation against free speech.

"Among media lawyers, it is not a norm to represent plaintiffs," says DWT partner Robert Corn-Revere, handling the case. "But sometimes, the way to maintain a robust First Amendment is to go on the offensive."

How did Davis Wright Tremaine get to be such a powerhouse in the media realm?

In the 1960s, the late pioneering First Amendment attorney Cameron DeVore set up shop at a firm that would eventually become DWT. At the time, doing media law was intellectually stimulating and certainly rewarding. The Supreme Court would establish the "actual malice" standard for public figures in libel cases in the 1963 case *New York Times Co. v. Sullivan*, and the following decade would bring a big court battle over the publication of the Pentagon Papers. Then, the Watergate scandal erupted, which would not only lead to a new generation of investigatory reporters following in the footsteps of Bob Woodward and Carl Bernstein, but also a healthy appetite for legal representation.

But by the mid-1990s, the media law bubble sort of collapsed. The rise of the internet began to erode traditional income streams for newspapers and magazines, and many white shoe firms such as Gibson Dunn and O'Melveny & Myers began backing off from seeking to represent news companies in favor of more-well-heeled corporate clients. Plus, there was a sense among many law school graduates around this time that the exciting times had passed them by.

"When I started out, I felt sad because I felt all the big battles had been fought," says Strom. "I wondered whether I would have come up with the argument in *Times v Sullivan*."

Of course, any turn of the century notion that media law would no longer be fruitful only created opportunity for DWT, especially as First Amendment legends like Floyd Abrams got up in age. Quickly, it didn't matter that the firm was based in Seattle — no one's idea of a media hub — and even if it did, the firm began opening up media practice offices in Los Angeles, New York and Washington, D.C. Plus, after Levine Sullivan Koch & Schulz — the firm that handled Gawker's defense in the Hulk Hogan sex tape lawsuit — merged with Ballard Spahr in 2017, DWT took on many of its former rival's top media attorneys (including Bolger, Siegel and Strom).

In retrospect, media law had and has plenty of big battles ahead.

"The First Amendment hasn't changed, but the way that information is transmitted has changed dramatically," says Kelli Sager, a veteran L.A.-based partner. "The breadth of clients — now it's not just a few major media companies but everyone on the internet and Netflix and Amazon."

Because of the far-reaching, hardly-ever-erased nature of information published online, the business of reputation management has recently exploded. The stakes are much greater than they were in the past, when something appeared in a local newspaper and one would have to do heavy research to find it. A story about sexual misconduct allegations, for instance, now can have career-ending consequences, even if later debunked. Plus, amid increasing economic inequality, some wealthy individuals are determined to counter what they see as a legal environment favoring the media. PayPal co-founder Peter Thiel's secret funding of Hulk Hogan's suit against Gawker may be the showcase example, but there are other coordinated efforts to do things like bolster privacy laws and influence whom the courts consider public figures.

"There is definitely a more sophisticated and substantial plaintiff's bar than there used to be," says DWT's Laura Handman, who successfully defended a recent defamation lawsuit brought by a Trump activist whose "OK" hand gesture at the White House was interpreted by one writer as a sign of white supremacy.

Indeed, attorneys like Charles Harder, Thomas Clare and L. Lin Wood are picking up business from sensitivities related to the online consumption of news, the political atmosphere and trends like the #MeToo movement. While those on the offense face a century of precedent tipping to unfettered expression, they have scored successes both obvious and subtle. Everyone knows about the trial that drove Gawkerinto bankruptcy. But Wood's ongoing defamation suit against CNN on behalf of a hospital executive is arguably more consequential: It portends fewer early exits for media companies hauled into federal court.

DWT attorneys worry about the erosion of SLAPP analysis — state laws aimed at curtailing frivolous First Amendment cases — and the prospect, in Sager's words, that "juries will treat everything as fake news."

But then again, jury trials in red states remain extremely rare, and other than one lonely opinion from Supreme Court Justice Clarence Thomas, the judiciary doesn't seem inclined to upset settled law like *Times v. Sullivan*, giving reporters some breathing room to make mistakes. As for cease-and-desists, DWT partner Alonzo Wickers (whose clients include John Oliver, Samantha Bee and *South Park*) says he's seeing more prepublication missives, but he thinks it's actually a positive development. "I almost prefer to get those types of letters, because they often tip the hand showing how strong or weak these claims are," he says.

And then there's Trump, who undoubtedly has incited at least some hatred toward the press but is not quite the formidable foe some think. Yes, he routinely threatened to sue as a real estate mogul, promised on the campaign trail to reshape libel law and now whips his followers into a frenzy any time he mentions "fake news." But he also lacks impulse control and says the nastiest things on Twitter. The latter version of Trump is especially of interest to a law firm doing more than anyone to help the media navigate these dangerous times.

As Strom puts it, "Donald Trump has created some great defamation precedent."

*A version of this story first appeared in the March 27 issue of The Hollywood Reporter magazine. To receive the magazine, click here to subscribe.*

00:11 / 00:30

FEW9IC

i

## THR Newsletters

Sign up for THR news straight to your inbox every day

Subscribe Sign Up

5/5