**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA**

LAURA LOOMER

               Plaintiff,

    v.

BILL MAHER et al

               Defendants.

**Case No: 5:24-cv-00625-JSM-PRL**

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' (1) MOTION
FOR A PROTECTIVE ORDER DESIGNATING THE VIDEO DEPOSITION
OF BILL MAHER AND PORTIONS OF THE TRANSCRIPT AS
CONFIDENTIAL AND DIRECTING THAT THE DEPOSITION BE USED
ONLY FOR THE PURPOSES OF THE LITIGATION AND (2) MOTION TO
<u>SEAL</u>**

Plaintiff Laura Loomer ("Plaintiff") hereby submits the following response in opposition to (1) Defendants' Motion for a Protective Order Designating the Video Deposition of Bill Maher and Portions of the Transcript as Confidential and directing that the Deposition be Used Only for Purposes of the Litigation (the "Motion for Protective Order") [ECF No. 57], and (2) Defendants' Motion to Seal [ECF No. 58]. Defendants' Motion to Seal repeats and realleges the same non-meritorious arguments as their Motion for Protective Order, and as such Mr. Klayman responds to both motions in this omnibus response.

While Plaintiff strenuously objects to and strongly opposes Defendants' motions, as there is no basis in fact or law to hold wholesale discovery materials as confidential in this matter, Plaintiff respects the Court's order of April 21, 2025 taking under advisement Defendants' motions and temporarily holding Defendant Maher's deposition video and transcript as confidential. **[REDACTED].** However, as set forth in detail herein, Defendants' motions are

misleading, disingenuous, and often times, flat out false, in addition to being completely unsupported by black-letter law.

## INTRODUCTION AND STATEMENT OF RELEVANT FACTS

This is an extremely straightforward case where Defendant Bill Maher ("Defendant Maher"), using his world-wide platform provided by Defendant Home Box Office, Inc. ("Defendant HBO"), published the following false, malicious, and defamatory statement of and concerning Ms. Loomer:

> **I think maybe Laura Loomer's in an arranged relationship to affect the election because she's very close to Trump. She's 31, looks like his type. We did an editorial here a few years ago...it was basically, who's Trump fucking? Because I said, you know, it's not nobody. He's been a dog for too long, and it's not Melania. I think we may have our answer this week. I think it might be Laura Loomer**. Comp. ¶ 18. (the "Defamatory Statement").

In their Motion for Protective Order, Defendants continue to disingenuously mischaracterize the Defamatory Statement as a "joke" despite this Court having already rejected this frivolous argument in denying the Defendants' motion to dismiss in holding that "**Maher cannot, at this stage, escape liability because he couches his statements as a joke, an opinion, or as 'conjecture, hypothesis, or speculation' because the statements do not appear that way on their face**." ECF No. 39 at 7. This misleading attempt to deflect from the fact that the Defamatory Statement was publicized by Defendants and broadcasted to viewers for millions of persons in this judicial circuit, nationwide, and even worldwide must be rejected by the Court. Ironically and hypocritically however, Defendants are fighting "tooth and nail" to prevent the public disclosure of Defendant Maher's deposition, despite Defendants being the ones

who made this the highly offensive attack on Ms. Loomer public issue in the first place, which constitutes a truly confounding and outrageous amount of unbridled gall on the part of Defendants and their counsel.

Defendants' Motion for Protective Order is, in and of itself, self-defeating because it concedes that there is not much, if anything, in Defendant Maher's deposition that merits even a discussion of possible confidentiality. Defendants concede, in their opinion, in section III of their Motion for Protective Order, that only portions of the deposition transcript that (1) reveal Defendant Maher's salary, (2) reveal the identities of Defendant Maher's business and professional managers, (3) other litigation involving Defendant Maher, and (4) what Defendants describe as "irrelevant, intrusive, and harassing questions and answers (which there were none on Plaintiff's part) warrant any discussion as being potentially confidential. Thus, Defendants admit that the remaining portions of Defendant Maher's deposition do not contain confidential information, but then disingenuously argue that the entire video of Defendant Maher's deposition must be held confidential. This is a self-defeating argument.

Indeed, a review of the video and transcript of Defendant Maher's deposition will reveal that the undersigned counsel, Larry Klayman ("Mr. Klayman"), as well as Ms. Loomer were respectful of both Defendant Maher and his counsel at all times, and it was instead counsel for Defendant Maher who would frequently disrupt the deposition with harassing and disrespectful *ad hominem* personal attacks on Mr. Klayman as well as baseless speaking objections and other obstructionist tactics. Furthermore, the video of the

deposition shows **[REDACTED]**. *See* Deposition Exhibit 9 (<u>Exhibit 1</u>), 10 (<u>Exhibit 2</u>).

Examples of these tweets include:

- **[REDACTED][1]**

It therefore more than appears that the motivation for Defendants and their counsel to hide Defendant Maher's deposition video from the public is simply to try to keep possible decency with regard to a public image, however void of any values,  and avoid embarrassment from their conduct, which does not come close to being a sufficient justification to overcome the clear presumption that court records are as a general rule available to the public. As held by the Supreme Court, "[i]t is clear that the courts of this country recognize a general right [for the public] to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns*, 435 U.S. 589, 597 (1978).

Prior to Defendant Maher's deposition, Mr. Klayman had already courteously agreed to grant Defendants fifteen (15) calendar days to designate any portions of the deposition as confidential.  Then, after, Defendant Maher's deposition, as a matter of professional courtesy, Mr. Klayman agreed to extend that time even further at the request of Defendants' counsel to fifteen (15) business days, which in practice comes out to twenty (20) calendar days. <u>Exhibit</u>

---

[1] In an abundance of caution, Plaintiff is redacting these exhibits for now until the Magistrate Judge can determine whether they need to be confidential, subject to any objection to the presiding Judge. However, these are tweets that are publicly available on X and thus there is nothing confidential about them.

3. At that time, Mr. Klayman hoped, despite his experience with this law firm, Davis, Wright Tremaine ("DWT"), in prior unrelated cases, that Defendants and their counsel were operating in good faith and would earnestly review the transcript and video of Defendant Maher's deposition and then meet and confer on portions that could potentially be designated as confidential. However, it has become clear that counsel for Defendants had no intention of doing so and, appears to have immediately begun preparing their Motion for Protective Order to designate the entire video as "confidential" immediately after Defendant Maher's deposition occurred.

This is in addition to the fact that Defendants have failed to produce a single document in discovery, claiming that they refuse to do so until Plaintiff agrees to a blanket confidentiality agreement. Such an agreement is totally improper and overbroad and there is no way that Plaintiff would ever agree to this, given that this is a way for mega law firms such as DWT to run up costs and burden the court and Plaintiff—who has already been financially drained by the malicious defamatory statements of Defendants and others—creating endless discovery motions to overburden the Plaintiff, her counsel and this court. This is a tactic used by large defense firms against individual plaintiffs with very limited resources. It is also a means that can be used for delay and obstruction and Mr. Klayman has endured this litigation conduct in prior litigation against DWT. This is a simple and straightforward case that does not justify a blanket, overly broad confidentiality agreement, where Defendants can and likely will stamp every document confidential only then to throw the burden of declassification

onto the plaintiff and this Court.  Documents must be considered one at a time, and Mr. Klayman has no problem at all holding documents that warrant confidentiality as such.

Accordingly, Defendants' Motion for Protective Order and Motion to Seal are meritless and their refusal to produce documents without a blanket confidentiality agreement is in total bad faith.

## THE LAW

"The common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process." *Chi. Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1311 (11th Cir. 2001). "Beyond establishing a general presumption that criminal and civil actions should be conducted publicly, the common-law right of access includes the right to inspect and copy public records and documents." *Id*. Importantly, this Court has found that when deciding whether a deposition should be sealed from public access, the Court must act under a presumption of public access. "A court has discretion to determine which parts of the record should be sealed, but its discretion is guided by the presumption of public access." *Harborview Realty, Inc. v. Fifth Third Bank, Nat'l Ass'n*, 2023 U.S. Dist. LEXIS 194679, at *2 (M.D. Fla. Oct. 31, 2023).

"Public disclosure of discovery material is subject to the discretion of the trial court and the federal rules that circumscribe that discretion." *Id*. at 1310. "Where discovery materials are concerned, the constitutional right of access standard is identical to that of Rule 26(c) of the Federal Rules of Civil Procedure."

*Id.* Accordingly, the party seeking protection must make a showing of "good cause" as to why the materials should be excluded from the constitutional right of access. *Id.* ""[C]onclusory statements . . . do not establish good cause…..Rather, the good cause requirement "contemplates a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Boullosa v. Equifax Info. Servs., LLC*, 2024 U.S. Dist. LEXIS 138916, at *4 (M.D. Fla. Aug. 6, 2024) (internal citations omitted).

"The Eleventh Circuit has 'superimposed a somewhat more demanding balancing of interests approach to the" good cause requirement in Rule 26(c)….This means that before making its decision, the court has a duty to balance the public's right of access against the party's interest in confidentiality. "In balancing the public interest in accessing court documents against a party's interest in keeping the information confidential, courts consider, among other facts, whether allowing access would impair court functions or harm legitimate privacy interests, the degree of and likelihood of injury if made public, the reliability of the information, whether there will be an opportunity to respond to the information, whether the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents." *Clark v. FDS Bank*, 2018 U.S. Dist. LEXIS 208634, at *3-4 (M.D. Fla. Dec. 11, 2018).

I.    **Defendants Have Not Articulated a Single Reason Why the Video of Defendant Maher's Deposition Should be Designated Confidential, Much Less Shown Good Cause for Doing So**

It is extremely telling that in arguing that the entire video of Defendant Maher's deposition should be held confidential, Defendants do not identify a with specificity a single example of something that Defendant Maher said during the deposition that would harm his "legitimate privacy interests" if disclosed to the public. Instead, Defendants' argument boils down to this: <u>the Court should deem Defendant Maher's video deposition as confidential because, otherwise, it will not be confidential and released to the public</u>. This is a nonsensical, circular assertion which certainly falls far short of showing "good cause" why Defendant Maher's deposition video should be held as confidential.

As set forth above, the reason that Defendants have failed to articulate a single reason why Defendant Maher's deposition should be held confidential is patently obvious—no such reason exists. A review of the video and transcript will bear this out, as will the Defendants' motions because they concede that there is little, if anything, in Defendant Maher's deposition that can even arguably be construed as confidential. Again, Defendants admit in section III of their Motion for Protective Order that only portions of the deposition transcript that (1) reveal Defendant Maher's salary, (2) reveal the identities of Defendant Maher's business and professional managers, (3) other litigation involving Defendant Maher, and (4) what Defendants describe as "irrelevant, intrusive, and harassing questions and answers (which there were none on Plaintiff's part) warrant any discussion as being potentially confidential. Thus, Defendants concede that the overwhelmingly vast majority remaining portion of Defendant

Maher's deposition does not contain confidential information and thus cannot harm Defendant Maher if released to the public.

In a clear attempt to deflect from the weakness and lack of merit of their argument, Defendants advance the patently frivolous claim that the video of Defendant Maher's deposition should be confidential because Plaintiff and counsel have publicly discussed the case, and Plaintiff has tried to fundraise to cover the costs of litigation. Notably absent from this argument, of course, is any showing of even potential harm to Defendants, which is what they actually need to show to justify sealing and/or holding confidential Defendant Maher's deposition. Of course, it is fine that Defendants defamed Ms. Loomer as having fucked President Trump, committing adultery behind the back of First Lady Melania Trump, who Maher and HBO suggest does not have sex with the President, but anything Maher testified to must be hidden from the public record and thus buried.

It is true that Plaintiff has publicly discussed her case and has fundraised in order to cover the extensive costs of litigating this matter, which have not been cheap, and have been extremely burdensome on her personally due to her precarious and limited financial resources as a direct and proximate result of Defendants' false and malicious defamatory statements. There is absolutely nothing wrong with this. A party discussing her case in public is perfectly allowable and any restriction on that right would implicate her First Amendment constitutional rights. Importantly, Defendants have not made any contention that Plaintiff or her counsel have disclosed any information that could even remotely

be argued to be confidential. Furthermore, publicizing Defendant Maher's deposition would help also Plaintiff mitigate her damages, particularly since Defendant Maher refused to allow Ms. Loomer on Real Time to deny her relationship with President Trump after receiving notice pursuant to Fla. Stat. § 770.01 of his defamatory statements. Am. Comp. ¶ 33.

Thus, in sum, the Defendants' argument is that Defendant Maher's deposition video should be held confidential because Plaintiff would otherwise make the video public. This is circular reasoning in a nutshell. If Defendant Maher's deposition video is not held confidential, then yes, it would be available on the public record and thus to the public in general. That is the entire point. That is why there is a presumption of public access to court records..

Defendants' argument is completely disingenuous, intellectually dishonest, and meritless, particularly given that it is Defendant Maher who first used his very public platform to maliciously defame Ms. Loomer and now is attempting to seek cover behind alleged "confidentiality" so that his bizarre and disgustingly sick antics, behavior and of course testimony at his deposition as well as his counsel's harassing and vexatious conduct towards Mr. Klayman can be hidden from the public's eye. The video of Defendant Maher's deposition is being provided to this court by agreement with his and HBO's counsel.

## II. Even if Defendants Had Articulated a Single Reason Why the Video of Defendant Maher's Deposition Should Be Held Confidential, It is Improper for the Entire Video to be Sealed

Assuming *arguendo* that Defendants had shown with the requisite "good cause" and specificity that certain portions of Defendant Maher's deposition

video warranted confidentiality—which they have not even attempted to and cannot do—the proper recourse would not entail sealing the entire video.

*Ocasio v. C.R. Bard, Inc.*, 2021 U.S. Dist. LEXIS 113457 (M.D. Fla. June 17, 2021) demonstrates this fundamental principle. In *Ocasio*, both the Plaintiff and the Defendant argued that there existed good cause to seal the entirety of thirty five (35) deposition transcripts. *Id*. at 4. The Defendant argued that "sealing is necessary because the transcripts discuss trade secrets and other highly confidential business information." *Id*. Plaintiff similarly argued that "that good cause exists to seal the thirty five (35) deposition transcripts she requests be sealed because of the stipulated protective order entered in this case." *Id*. at 4. However, despite both parties arguing for confidentiality, the Court still declined to do so, holding after an independent analysis that "Although Defendants represent that sealing the entirety of the depositions is the narrowest method of keeping the proprietary information confidential, the Court finds this blanket statement to be unsupported and improbable. **Bard fails to show why redaction of the depositions would not be a narrower means**." *Id*. at 5. (emphasis added).

*Boullosa v. Equifax Info. Servs*., LLC, 2024 U.S. Dist. LEXIS 138916 (M.D. Fla. Aug. 6, 2024) is similarly binding. *Boullosa* involved a request to seal the entire deposition of Defendant Equifax's Rule 30(b)(6) witness, but the Court held that "the parties fail to identify which portions of the deposition specifically address the confidential policies, instead claiming the majority of the deposition discusses Equifax's policies and procedure." *Id*. at 6. The Court therefore held, "**Such a blanket statement is too conclusory to support the wholesale sealing**

**of the deposition**. Moreover, preliminary review of the deposition reveals it extensively discusses the particular facts of Plaintiff's case as opposed to discussing specific Equifax confidential policies. Thus, the parties fail to establish good cause for sealing the entirety of Karen Cobb's deposition." *Id*. (emphasis added).

Applying the fundamental principles of *Ocasio* and *Boullosa* to the facts of this case,  it becomes clear that there exists no plausible legal or factual grounds for the entirety of Defendant Maher's video deposition to be sealed. Where in both *Ocasio* and *Boullosa* both the parties argued in favor of confidentiality and sealing, no such agreement exists here. And where the moving party has failed to identify with the requisite specificity which portions of the deposition involve confidentiality—which is clearly the case here—it is certainly wholly improper for the Court to order the sealing of the entire deposition.

The guiding principle is clear. "[G]eneral assertions [of confidentiality] are not enough." *United States v. Bradley*, No. 405CR059, 2007 U.S. Dist. LEXIS 42152, at *9 (S.D. Ga. June 11, 2007). "The party wishing to seal a court record must be specific because **permanent sealing (sought here) must be narrow**." *Id*. (emphasis added). Here, at best, Defendants have made "general assertions" of confidentiality, if even that. It is clear that they have fallen woefully short or demonstrating good cause to seal and/or hold confidential <u>any portion</u> of Defendant Maher's deposition video, much less the entirety of the video.

**III.    A Review of the Deposition Transcript and Video Shows That Mr. Klayman's Questions and Demeanor Were Relevant and that He and Plaintiff Were Respectful and Courteous at all Times**

Clearly recognizing that they lack any factual or legal basis to assert confidentiality or to seal any portion of Defendant Maher's deposition, Defendants instead engage the tactic of trying to smear Plaintiff and her counsel in a transparent effort to confuse the issues and prejudice Plaintiff and her counsel before the Court. A review of the transcript and video of Defendant Maher's deposition clearly shows that Mr. Klayman and Plaintiff were respectful and asked relevant questions as well as questions that can lead to relevant evidence, which is textbook discovery practice.

Defendants claim that Mr. Klayman's lines of questioning which involved topics such **[REDACTED]** were "irrelevant." This is not true. Defendant Maher's **[REDACTED]** relevant in a case where he broadcasted to millions of people worldwide the following sick and defamatory  statement concerning Ms. Loomer:

> **I think maybe Laura Loomer's in an arranged relationship to affect the election because she's very close to Trump. She's 31, looks like his type. We did an editorial here a few years ago…it was basically, who's Trump fucking? Because I said, you know, it's not nobody. He's been a dog for too long, and it's not Melania. I think we may have our answer this week. I think it might be Laura Loomer**. Comp. ¶ 18. (the "Defamatory Statement").

Defendant Maher has conceded that he had no knowledge to claim that Ms. Loomer had slept with President Trump and committed adultery behind Melania Trump's back:

**[REDACTED]**

Thus, Defendant Maher's **[REDACTED]** generally are relevant to a showing of actual malice, as set forth by Manual Socias in *Showing Constitutional Malice in Media Defamation* published by the Florida Bar Journal in September/October of 2018.[2] Mr. Socias's article lists twenty-four "badges" which are relevant to showing actual, constitutional malice, including but ill will towards the plaintiff, among other badges such as repetitive media attacks, knowledge of facts conflicting with the report, omitting pertinent information to create a false impression, and failure to give the plaintiff a fair opportunity to reply to defamatory allegations. Am. Comp. ¶ 28. Exhibit 4.

To knowingly publish what Defendant Maher did—that a woman who is an adviser or a trusted confident with a married man (in this case the President of the United States) simply must be sleeping with him and committing adultery in the process—requires an astounding level of misogyny and sexism – if not a total disrespect and contempt for women. Thus, questions concerning **[REDACTED]** were completely relevant, as they evidence misogyny, sexism and thus actual malice. Indeed, **[REDACTED],** and which are attached hereto as Exhibit 1 and Exhibit 2, more than bear this out.

Questions concerning **[REDACTED]** are also relevant because tends to show and helps explain his complete lack of values, which again goes towards a showing of actual malice. Defendant Maher is willing to say and do anything that benefits himself personally, without any consideration as to the negative

---

[2]    https://www.floridabar.org/the-florida-bar-journal/showing-constitutional-malice-in-media-defamation/

effects that his actions have on others. He then hides behind his so called "comedian" claim when it comes time to take accountability for his actions.

Furthermore, Mr. Klayman only raised the issue of settlement when it became evident that, shockingly, Defendant Maher had no idea what was going on in the case and that he had apparently been kept in the dark by his counsel until the day or so leading up to the deposition, including of potential settlement discussions which Ms. Loomer's counsel proposed, but for which Defendant Maher was not even informed. Indeed, without even informing and communicating with their client, Davis, Wright Tremaine, refused to engage in any such possible settlement discussion. This is professionally unethical. **[REDACTED]**. Thus, his counsel were and are litigating the case as if they were the parties.

Finally, Defendants apparently try to raise an issue with the fact that Ms. Loomer personally attended the deposition of Defendant Maher. There is absolutely no prohibition against a plaintiff attending a deposition of a defendant and Defendants provide no authority in that regard. In fact, well-established case law actually dictates: "parties generally have the right to attend depositions." *Wright-Ahern v. City of Clermont*, 2025 U.S. Dist. LEXIS 33106, at *3 (M.D. Fla. Feb. 25, 2025). Only upon a showing of "extraordinary circumstances" may a party be excluded. *Id*.

Defendants have not even attempted to show "extraordinary circumstances." Instead, they baselessly accuse Ms. Loomer of behaving "inappropriately" and "audibly laughing and snickering." Ms. Loomer was there

attending the deposition, as is her right, and helping Mr. Klayman as a *de facto* assistant with exhibits and things of that nature. Ms. Loomer was neither disruptive nor disrespectful. There were times where she reflexively reacted to Defendant Maher's bizarre, unhinged and outrageous conduct – **[REDACTED]** - but she did not try to undermine or derail the proceedings in any way contrary to the Defendants' statements.  Again, the video will bear this out and that is one of the reasons Defendants and their counsel want it buried.

Thus, in sum, the Court need only review the video and transcript of Defendant Maher's deposition. This will clearly reveal that Mr. Klayman and Ms. Loomer never acted inappropriately and that Mr. Klayman's questions were relevant as to Defendant Maher's mindset, motivation, and thus actual malice, in defaming Ms. Loomer. On the other hand, a review of the video and transcript of Defendant Maher's deposition will show that it was counsel for Defendant Maher who was frequently harassing, vexatious, and abusive towards Mr. Klayman by constantly lodging personal *ad hominem* attacks and baseless speaking objections, and provocative, insulting  commentary,  to defect Maher's incriminating testimony, derail and delay the proceedings.

IV.    **Mr. Klayman is Open and Willing to Discuss Sealing any Portions of Defendant Maher's Deposition That Truly Warrants Confidentiality Protections**

Despite the Defendants' calculated, disingenuous and false attempts to smear Mr. Klayman and Ms. Loomer as unreasonable and driven solely by a desire to publicize this matter, the fact remains that Plaintiff and her counsel was and is open to sealing and/or holding confidential any portions of Defendant

Maher's deposition—whether video or transcript—that merit such treatment. This is why Mr. Klayman agreed to grant counsel for Defendants fifteen (15) business days after Defendant Maher's deposition to designate portions that they designated were confidential. It is therefore Defendants and their counsel who have acted in bad faith and disingenuously in attempting the designate the entirety of Defendant Maher's video deposition as confidential.

Furthermore, as conceded by the Defendants, during Defendant Maher's deposition, Mr. Klayman agreed that the line of questioning regarding Mr. Maher's salary could be kept confidential. He stands by this, and Defendants have no basis to claim in their Motion to Seal that they have "no confidence that this agreement will be honored." Mr. Klayman was and remains open to sealing and designating as confidential information that truly warrants this extraordinary treatment. However, the Defendants' overly broad Motion for Protective Order and Motion to Seal does not even attempt to parse out actually confidential information and based on the litany of case law presented to this Court, their motions must therefore be denied.

## <u>CONCLUSION</u>

The bottom line here is simple. Defendant Maher, while perhaps famous in leftist Hollywood circles, is afforded no special protected status under the eyes of the law. He is to be treated the same as any other litigant. Defendant Maher is a party to this case. He is not an outside witness. Indeed, if even discovery and deposition testimony from President Clinton in the Monica Lewinsky affair [*Jones v. Clinton*, 990 F. Supp. 657 (E.D. Ark. 1998)] and now President Donald Trump

[*Carroll v. Trump*, 22-cv-10016, (S.D. Ny 2023)] can be and indeed was made public, so too can Defendant Maher – who is simply a political pundit.

Defendants have failed to articulate with the requisite specificity any plausible grounds to seal and/or hold confidential the entire video of Defendant Maher's deposition. They have not even attempted to do so. And, even if they had, their proposed remedy of sealing the entire video of Defendant Maher's deposition is clearly overly broad and not narrowly tailored. *Bradley*, 2007 U.S. Dist. LEXIS 42152, at *9. In short, a full airing of his matter will further show that Defendants believe they have an unbridled right to severely defame and harm a female investigative journalist, Ms. Loomer, based on her professional support of President Trump, before a vast national and worldwide audience, but when their vile conduct is called on the carpet, they are shielded from any public disclosure.

For having to defend these frivolous motions, Ms. Loomer should respectfully be awarded attorney's fees and costs[3], and this Court, *sua sponte*, has the power to do so to prevent further misleading and obstructionist bad faith behavior over the duration of this case. Otherwise, what is a simple and straightforward case will also fall victim to New York City-style big firm defense litigation tactics, intended to bleed a small individual aggrieved Plaintiff and her sole practitioner counsel dry and overtax the Court with endless discovery motions over contrived claims of confidentiality which do not exist.

---

[3] *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017).

Plaintiff Ms. Loomer and her counsel respectfully request an in person hearing on Defendants' motions at the earliest practicable mutually convenient date, after this honorable Court has the opportunity to view the video, which says it all.

ACCORDINGLY, Defendants' Motion for Protective Order and Motion to Seal must be denied.

Dated:        June 30, 2025                    Respectfully Submitted,

By: /s/ Larry Klayman
Larry Klayman, Esq.
Klayman Law Group P.A.
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
leklayman@gmail.com

*Counsel for Plaintiff*

# EXHIBIT 1
# REDACTED

# EXHIBIT 2
# REDACTED

# EXHIBIT 3

 Gmail

**Oliver Peer <oliver.peerfw@gmail.com>**

---

## Loomer v. Maher

**Bolger, Kate** <KateBolger@dwt.com>                    Fri, Apr 11, 2025 at 10:57 AM
To: Larry Klayman <leklayman@gmail.com>, Oliver Peer <oliverpeerfw@gmail.com>
Cc: "Rachel E. Fugate" <rfugate@shullmanfugate.com>

Dear Larry.

Last evening, we received copy of the Bill Maher transcript.  Per our agreement, the transcript, the video, and their contents are confidential for 15 business days (until May 1).

In addition, please confirm that you still intend to take the deposition of an HBO 30(b)(6) witness on April 30.  If so, please serve a notice of deposition so that we know what topics we need to prepare the witness to address.  In addition, to accommodate the witness, the deposition will need to start at 1 pm.

Thanks.

Kate Bolger



**Kate Bolger**
**Partner |** Davis Wright Tremaine LLP

**P** 212.402.4068  **E** katebolger@dwt.com
**A** 1251 Avenue of the Americas, 21st Floor, New York, NY 10020-1104

---

**DWT.COM**       in

# EXHIBIT 4

# SHOWING CONSTITUTIONAL MALICE IN MEDIA DEFAMATION

📅 **Vol. 92, No. 8   September/October 2018   Pg 38**   👤 **Manual Socias**

📁 **Featured Article**



Illustration by Barbara Kelley

There is a myth that it is virtually impossible for a public figure to successfully sue the media for defamation. This myth is based on a perceived insurmountability of the requirement imposed on public figures to prove "actual" or "constitutional" malice by clear and convincing evidence when suing for defamation. In reality, the courts have provided an almost step-by-step guide for finding and proving constitutional malice. The guide is the badges of malice. The phrase "badges of malice" is adapted from the badges of fraud used in tax evasion and fraudulent conveyance cases to categorize types of circumstantial evidence that may support an inference of a subjective intent to defraud.

No doubt showing constitutional malice is an obstacle. Public figures must show constitutional malice to maintain their claim. The requirement of proving constitutional malice is not limited to public figures. Plaintiffs that are not public figures still must show constitutional malice to recover punitive damages.

Constitutional malice, also called actual malice, is the publishing of a defamatory statement either knowing it is false or with reckless disregard for its truth or falsity.[1] Requiring a showing of constitutional malice for a public figure to sue for defamation, or to impose greater than actual damages ( *i.e.* , presumed and punitive damages) on the media, is intended to prevent a chilling effect on news reporting and protect First Amendment rights.[2] The concept of "knowledge of falsity" is familiar to all attorneys in multiple contexts. Recklessness as to falsity, however, has evolved definitions and inferences unique to defamation law.

**Twenty-Four Badges of Constitutional Malice: A Guide**

The Supreme Court articulated the parameters of "reckless disregard" in *St. Amant v. Thompson* , 390 U.S. 727, 731 (1965): "Reckless conduct is not measured by whether a reasonably prudent man would have published or would have investigated before publishing. There must be evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."

Accordingly, *St . Amant* reasoned that recklessness may be inferred when "there are obvious reasons" to doubt the veracity of the defamatory statement.[3]

In *Mason v. New Yorker Magazine* , 501 U.S. 496 (1991), the Supreme Court summarized that, for proof of constitutional malice, "mere negligence does not suffice," and that the plaintiff must demonstrate that the author "in fact entertained serious doubts as to the truth of his publication...or acted with a high degree of awareness of probable falsity."[4]

Knowledge of falsity or reckless disregard for falsity is a subjective mental state of the person responsible for publishing the defamatory statement. Consequently, absent an admission by the media, showing constitutional malice is based on circumstantial evidence. The courts have recognized certain fact patterns of circumstantial evidence as probative of constitutional malice. These "badges of malice," some alone and some in combination with others, have been held sufficient to support a jury inference of constitutional malice. There are 24 badges of malice.[5]

· failure to conduct a thorough investigation before publishing serious and damaging allegations that are not "hot news";

· failure to give the plaintiff a fair opportunity to reply to defamatory allegations;

· failure to report exculpatory facts;

· omitting pertinent information to create a false impression;

· destruction, loss, or unavailability of a reporter's notes or research;

· the reporter's knowledge of a quoted source's animosity toward the plaintiff;

· the alteration of quotes to maximize a story's impact;

· a reporter's knowledge of facts conflicting with the report;

· emphasizing unimportant events to support a defamatory statement;

· continued reliance on a source that had proven unreliable in other respects;

· a preconceived determination to disparage a plaintiff or a preconceived slant or view;

· repetitive media attacks on the plaintiff;

· failure to contact key witnesses;

· a reporter's ill will toward the plaintiff;

· competitive pressure for "hot news" story;

· discrepancies, inconsistencies, and equivocation in the testimony of media witnesses;

· a reporter's departure from professional standards;

· failure to supervise the reporter's preparation of the story;

· refusal to publish a retraction upon learning of errors in a story;

· the use of deception to obtain a defamatory story;

· a reporter's lack of credibility;

· prior and subsequent defamatory statements;

· that an investigative agency with the same information as a reporter declined to prosecute or take any action against the plaintiff; and

· making threats in connection with a story.

These badges of malice are a guide and nothing more. The possible scope of evidence that may support an inference of malice is unlimited. The badges are useful because they summarize actual events that tend to repeat themselves in media defamation cases. Evidence of the badges in discovery will support a strong and well-precedented argument for constitutional malice. For each badge developed in discovery, the media will have an explanation. Developing multiple badges of malice can expose the media's serial excuses as pretextual and increase the chances of successfully arguing constitutional malice.

## Malice Typically Is Evaluated from the Accumulation of Circumstantial Evidence

The badges of malice are consistent with the extremely broad scope of evidence that the Supreme Court held must be discoverable by plaintiffs to prove malice. In *Herbert v. Lando* , 441 U.S. 153 (1979), the Supreme Court observed that the First Amendment protections given to the media were balanced by the corollary that the fact finder could consider an extremely broad scope of evidence in determining malice. "[A]ny competent evidence either direct or circumstantial, can be resorted to, and all the relevant circumstances surrounding the transaction may be shown..." to show malice.[6] The specific items of relevant evidence favorably itemized in *Herbert* include 1) all information known to the defamer showing the falsity of defamatory statements; 2) the defamer's thought process and reasons for crediting or discrediting information; 3) the defamer's thought processes and reasons for incorporating only certain information into a press statement; 4) threats made by the defendant; 5) prior defamations by the defendant; 6) subsequent defamations made by the defendant; 7) subsequent statements made by the defendant; and 8) circumstances indicating rivalry, ill will, or hostility.[7]

In *Harte-Hanks Communications, Inc. v. Connaughton* , 491 U.S. 657 (1989), the Supreme Court emphasized that a jury may infer malice from a series of factors none of which alone would have been sufficient. In that case, a newspaper published witness' allegations that a judicial candidate had been bribed. The candidate sued for defamation, and the newspaper argued that it had no knowledge that the bribery allegations were false. The jury found malice, and the newspaper appealed.

*Harte-Hanks* emphasized numerous factors in evaluating the entire record. The newspaper was involved in heated competition with another local paper and was under pressure to "scoop it" on local news ( *i.e* ., profit motive for the defamation). After hearing the obviously damaging bribery allegations, the newspaper conducted an investigation, but it failed to contact key witnesses.

Numerous taped witness interviews were available to the newspaper, but the editorial director did not listen to them. There were discrepancies in the testimony of the newspaper's witnesses. Though no single factor was dispositive, *Harte-Hanks* stressed that the jury may have found that "failure to conduct a complete investigation involved a deliberate effort to avoid the truth."[8]

In *Curtis Publishing Co. v. Butts* , 388 U.S. 130 (1967), a football coach sued a magazine for publishing an article accusing him of fixing games. The evidence showed that this was not "hot news," that the charges were serious, that the editors recognized "the need for a thorough investigation," that the reporter's superiors did not look at the reporter's notes prior to the publication, that a key witness was not interviewed, and that "no attempt was made to screen the films of the game."[9] The Supreme Court held that a jury may infer from this that the magazine "had been anxious to publish an expose and had, thus, wantonly and recklessly seized on a questionable affidavit."[10]

*Hunt v. Liberty Lobby* , 720 F.2d 631 (11th Cir. 1983), affirmed a jury finding of malice in a Florida defamation case. *Hunt* ruled that two factors present in that case independently supported the jury's determination. First, "when an article is not in the category of 'hot news,' that is, information that must be printed immediately or it will lose its newsworthy value, 'actual malice may be inferred when the investigation for a story...was grossly inadequate in the circumstances.'"[11] Second, "an inference of actual malice can be drawn when a defendant publishes a defamatory statement that contradicts information known to him, even when the defendant testifies that he believed that the statement was not defamatory and was consistent with the facts within his knowledge."[12]

A defendant's "inconsistent" and "equivocating" testimony supported a finding of malice in *Texas Disposal Systems Landfill, Inc. v. Waste Management Holdings, Inc.* , 219 S.W.3d 563 (Tex. App. 2007). The court cited a combination of

circumstantial evidence from which the jury may have inferred malice. These factors included 1) omitting pertinent information that would have prevented a "false impression" from the information included in the defamatory communication; 2) a failure to attempt verification of the defamatory information; and 3) "inconsistent" and "equivocating" testimony from the defendant.[13]

The frequency and duration of the media's attack on a plaintiff also may help establish malice. In *Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002), the court affirmed a jury finding of malice. *Bentley* cited factors that included the fact that the talk show host had "relentlessly" repeated allegations against a particular judge for months while ignoring people that had knowledge of the allegations.[14]

Emphasizing unimportant events to support serious defamatory statements will also support a finding of malice. In *Bolling v. Baker*, 671 S.W. 2d 559 (Tex. App. 1984), a physician accused a nurse of dishonesty. When the nurse sued for defamation, the physician testified that one reason he doubted the nurse's honesty was an incident in which some lab slips "had been changed."[15] *Bolling* concluded that the physician's "obsession with such an insignificant event warrants the inference that he was using the incident to get even with [the nurse]."[16] Accordingly, the court concluded that there was sufficient evidence to support the jury's finding that the statements were made with knowledge of their falsity or with reckless disregard for the truth. Emphasizing unimportant events also fits within the more general badge of a reporter knowing that the facts do not support a defamatory story.

Finally, the context of a defamatory statement and the media's use of deception to obtain images for a defamatory story may support a jury inference of malice. In *Braun v. Flynt*, 726 F.2d 245 (5th Cir. 1984), a novelty entertainer who performed an act with a swimming pig at a family-oriented amusement park sued a sexually oriented men's magazine for defamation for publishing her

photo in its "Chic Thrills" section. The magazine obtained authority to use the photograph by misrepresenting the nature of the magazine. *Braun* affirmed a jury finding of malice, holding that the jury may infer malice from the magazine's use of deception to obtain the photograph and then inserting the photograph of what the editors knew was a family tourist attraction "in the context of" a lewd magazine.[17]

The media cannot avoid an inference of malice when it publishes a defamatory headline by showing that it published the full truth in the text of the story. In *Kaelin v. Globe Communications Corp.* , 162 F.3d 1036 (9th Cir. 1998), Kato Kaelin sued a newspaper for publishing a headline stating, "COPS THINK KATO DID IT!" after O.J. Simpson was acquitted of murder. The newspaper argued that there was no malice because the body of the story made clear that the "IT" referred to perjury and not the murders. The trial court entered summary judgment for the newspaper. The appellate court reversed *Kaelin* , holding that a jury may infer that the newspaper intended to convey a false impression from the scandalous headlines for the pecuniary motive of selling more newspapers. The truthful disclosure in the body of the article did not guarantee the newspaper immunity from defamatory headlines. "The editors' statements of their subjective intention," *Kaelin* stressed, "are matters of credibility for a jury."[18]

## Some Badges Alone May Establish Malice

There are instances in which courts have approved an inference of malice from a single item of circumstantial evidence. This occurs in two scenarios. One is when there is evidence of the reporter's lack of credibility regarding the story. This evidence includes the mysterious disappearance of the reporter's research notes, the alteration of quotes for defamatory impact, and the reporter's possession of materials showing that the defamatory story was false. The second scenario focuses on the reporter's conduct after the defamatory publication. When the media refuses to retract a defamatory statement after learning of its falsity, courts have allowed an inference that the defamation was published with

malice. Though neither scenario guarantees a finding of constitutional malice, both scenarios may support such a finding if the evidence is material to the defamation.

The destruction or unavailability of a reporter's notes and research supported a finding of malice in *Murphy v. Boston Herald, Inc.* , 449 Mass. 42 (Mass. 2007). There, a newspaper reporter, relying on the statement of a district attorney with animosity toward a judge, published an article accusing the judge of belittling a juvenile rape victim. *Murphy* found that a number of factors combined to furnish clear and convincing evidence of malice.[19] *Murphy* stressed 1) the reporter's knowledge that his source had animosity toward the judge; 2) the reporter's failure to verify the accuracy of the statements attributable to the judge with others who were present; and 3) the reporter's incredible claim that he discarded his notebook where he wrote the information told to him by the district attorney.[20] *Murphy* stressed that the strongest evidence of malice was the mysterious unavailability of the notebook: "The jury were entitled to draw the negative inference that [the reporter] discarded his notebook in a deliberate effort to conceal what he knew were inaccuracies in his reporting. This inference, in turn, *provides a strong basis for a finding of actual malice.*"[21]

Consistent with *Murphy* , numerous courts have held that the destruction or unavailability of a reporter's notes or research may support a jury verdict of malice.[22]

A reporter's alteration of quotes to maximize the impact of the story also supports a verdict of malice. In *Masson v. New Yorker Magazine, Inc* ., 501 U.S. 496 (1991) , the Supreme Court held that a reporter's alteration of quoted words may equate with knowledge of falsity when the alteration results in a material change of the meaning conveyed by the quoted statement.[23] That a reporter in *Masson* might have misunderstood his or her sources is insufficient to overturn a jury's evaluation of the circumstances.[24]

The court in *Southern Air Transport, Inc. v. Post Newsweek Stations Florida, Inc* ., 568 So. 2d 927 (Fla. 3d DCA 1990), upheld a finding of malice when the media aired an uncorroborated claim by an individual of questionable credibility that the plaintiff was a drug trafficker. The court held publishing this serious and uncorroborated allegation without giving the plaintiff a fair opportunity to reply supported the inference of malice. The court also noted that the defamatory broadcast made the informant appear credible and failed to report information that would negatively impact his credibility.[25]

A reporter's possession of documents conflicting with his report supported a finding of malice in *Mitchell v. Griffin Television, LLC*, 60 P.3d 1058 (Okl. App. 2002). There, a veterinarian sued a TV station for falsely reporting that a lawsuit accused him of medicating a champion race horse to hide injuries so the horse could be sold. The TV station claimed there was no showing of malice because the complaint filed in federal court alleged the veterinarian had medicated the horse prior to the sale. That complaint accused the trainer of trying to mask the horse's unsoundness but made no such accusation as to the veterinarian. Since the TV station had a copy of the complaint, *Mitchell* held that the jury properly found that the false report was made with "reckless disregard."[26]

In *Herbert* , the court held that a defamer's post-publication conduct may be relevant to establishing malice at the time of publication.[27] The key post-publication conduct developed in the caselaw is the media's refusal to retract a defamatory statement after learning that it is false. *Restatement Second of Torts* 580A (1977), Comment D, concludes that a defamer's refusal to retract a defamatory statement after learning it is false "might be relevant in showing recklessness at the time the statement was published." In *Mahnke v. Northwest Publications, Inc.* , 160 N.W. 2d 1 (Minn. 1968), the Minnesota Supreme Court held that a jury may properly consider a defendant's failure to retract defamatory statements as evidence of recklessness. "We think that the failure to retract the

defamatory statements," *Mahnke* stressed, "underscored defendant's reckless attitude as to the consequences of what had been published and that the jury was entitled to take that fact into consideration."[28]

## Use of the Badges in Discovery

The focus of discovery on constitutional malice is obtaining evidence that the reporter either knew the truth refuting the defamation or the truth was so readily available that failure to inquire amounts to a deliberate avoidance of truth. The badges suggest where to look for this evidence. The first step is obtaining all investigative research materials, notes, drafts of articles, edits, article or script changes, outtakes communications, tweets, web postings (including both the defamatory article and any guest comments or posts), Facebook posts, and other social media materials concerning the defamatory story. The reporter's familiarity with the subject matter of the story, as well as the identities of his or her sources also warrant discovery. The goal of this phase of discovery is to learn everything the reporter said, wrote, knew, or had access to concerning the defamatory story.

A next step is to identify every item of information known or available to the reporter that is inconsistent with the defamatory sting of the story. This aspect of discovery then focuses on tracing how and why the reporter made editorial decisions to omit, downplay, or not pursue what was inconsistent with the defamation. This should be done at deposition, but it is helpful to initially obtain copies of all drafts or outtakes of the defamatory publication to see what was deleted.

The reporter should be deposed on every step of the investigation conducted on the story. Particular emphasis is on the reasons for a reporter's decision not to pursue research areas that would have exposed the defamatory story as false. The credibility issue surrounding a reporter's explanation of this process is often

the lynchpin that decides constitutional malice. Inconsistencies between the reporter's research and the defamatory string of the story may rise to a level where this alone allows an inference of malice.

The next aspect of discovery deals with external influences on the defamatory story. External influences discussed in the caselaw include 1) animosity toward the subject of the defamation; 2) competitive pressure to scoop other media outlets; 3) a pattern of defamatory coverage; and 4) an editorial slant. Also, failure to retract after learning of a defamatory falsity, though not an influence on the story, is an external factor that may support an inference of malice. Accordingly, discovery into the editorial decision not to retract should be as thorough as discovery into the decision to initially publish the defamation. In cases in which the media issues an inadequate retraction, the retraction can often be pled as an additional defamatory publication requiring discovery in its own right.

Discovery into animosity toward the subject of the defamation can be far ranging or a quick dead end. In cases in which a news outlet had an established relationship with the plaintiff, there is often a falling out predating the defamatory publication — and evidence of animosity. The entire history of the relationship, including all statements made by news outlet representatives about the plaintiff, are in play.

Competitive pressure for attention-grabbing stories is always present but must be shown in the record. There are often emails or other communications discussing a news outlet's market position (circulation or viewers). Media executives normally must acknowledge that their company's source of income (advertising), and often their income depends on their circulation or number of viewers. Editors sometimes direct reporters to pursue certain stories, either orally or in writing, to maximize viewers during ratings periods.

Television stations typically feature their most inflammatory stories during national ratings periods knowns as "sweeps." During this time, there can be increased pressure on reporters to generate high-profile stories or to exaggerate

to the point of defaming. Sweeps periods occur four times each year and are usually acknowledged in internal communications. It is important in the industry because the viewership established during sweeps determines advertising revenue. Questioning the reporter regarding his or her basis for publishing multiple defamatory statements will often yield testimony helpful to establish a credibility dispute.

A pattern of defamatory statements about the plaintiff can be key to showing malice. Identifying every defamatory statement about the plaintiff made by a news outlet is the first step. This includes defamatory statements that were made before and after the defamatory publication. In some cases, the sheer number of false statements made may support an inference of malice. In others, credibility issues are raised by a reporter's attempts to explain this pattern.

### Defending Summary Judgment

The first test of a plaintiff's evidence of constitutional malice is usually the media's motion for summary judgement. It is here that a plaintiff first feels the weight of being required to prove malice by clear and convincing evidence. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), the Supreme Court held that, in ruling on a media motion for summary judgment or a directed verdict on constitutional malice, a court must evaluate the evidence of malice to determine whether a jury reasonably could infer malice under this heavier evidentiary burden. Media defendants, quoting isolated language from *Anderson* and similar cases, exaggerate that a plaintiff's burden is virtually insurmountable.

In reality, *Anderson* also stresses that courts should be cautious in granting summary judgment on constitutional malice:

> [I]t is clear enough from our recent cases that at the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.[29]

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.[30]

*Anderson* has been inconsistently applied. Some courts invoke *Anderson* as a license to act as jury in weighing the evidence. Others look at whether there are factual issues that may be presented to a jury. This was predicted by the dissent in *Anderson* .[31]

The dissenting justices argued that *Anderson* gave conflicting instructions to trial courts. Specifically, courts were simultaneously instructed to weigh the evidence under the "prism" of the clear and convincing standard and cautioned against weighing the evidence when ruling on a motion for summary judgment or directed verdict. The dissents predicated that *Anderson* would prove devoid of practical application.[32]

In *Hutchinson v. Proxmire*, 443 U.S. 111, n.9 (1979), the U.S. Supreme Court noted in a libel case "the proof of actual malice calls a defendant's state of mind into question [ *citations omitted* ] and does not readily lend itself to summary disposition."[33]

Summary judgment in a Florida defamation case arising from "investigative television news" was addressed in *Southern Air Transport* . There, the plaintiff sued a TV station for broadcasting an investigative story accusing the plaintiff of drug trafficking while engaged in covert arms shipments to the Nicaraguan Contras. The trial court granted summary judgment for the TV station on the issue of malice. The district court reversed, holding that these factors precluded

summary judgment: 1) A source's information had proven unreliable in other respects; 2) "the defendants *did not give plaintiff a fair opportunity to reply* to this drug trafficking accusation..."[34]; and 3) the government declined to prosecute anyone based on the source's information.[35] The court noted that other evidence in the record supported contrary inferences but stressed that weighting them was for the jury.[36]

Media defendants always assert that they believed the truth of the defamation. Constitutional malice pivots on creating a triable issue concerning credibility. The badges of malice help create this issue, but the courts have stressed that it is in the jury's purview to evaluate the credibility of media witnesses and reject their claim that they believed the defamation was true.

In *Harrison v. Williams* , 430 So. 2d 585 (Fla. 4th DCA 1983), a father sent defamatory communications to officials accusing a police officer of beating up his son. The police officer brought a defamation action, and the father's defense was that "he made a good faith mistake about the identity" of the police officer. The trial evidence showed that the son "informed his father" that it was the plaintiff who had attacked him. The assistant state attorney, however, had told the father that the attacker was another officer who looked like the plaintiff. The fact finder resolved the credibility issue in favor of the plaintiff and found that the father had made his accusations with malice. On appeal, the court affirmed, finding substantial competent evidence to support the inference of malice.[37]

*Dibella v. Hopkins* , 403 F.3d 102 (2d Cir. 2005), affirmed a jury's finding of malice and held that it was within the jury's purview to discredit the defamer's account of his mental state in making a defamatory statement.[38] Evidence that creates an issue concerning the reporter's credibility requires a jury determination.

The thrust of the focus on the credibility of the media witnesses is that anything normally impacting a witness' credibility is in play. In particular situations, these factors may be unique. For instance, a witness' hesitations, tone, and demeanor

are properly considered by a jury deciding whether to believe the witness. In the context of a motion for directed verdict, the matter must be put on the record because the transcript will not reflect them. In defending a summary judgment, an argument that the record prevents an issue on the media witnesses' credibility can be supported by videotaped deposition testimony.[39]

## Conclusion

The caselaw developed over the last half century shows that proving constitutional malice is feasible. It takes the discipline of developing every item of circumstantial evidence that may furnish a motive to defame or shows that the reporter knew or should have known the truth. The "should have known" standard applies to negligence, but negligence is a step toward recklessness. The 24 badges of constitutional malice reflect combinations of evidence that can defeat the media's First Amendment defense.

[1] *Gertz v. Welch* , 94 S. Ct. 2997 (1974).

[2] *Id.*

[3] *St. Amant*, 390 U.S. at 732, fn. 3 (citations omitted).

[4] *Mason*, 501 U.S. 496 at 510 (citations omitted).

[5]The badges are summarized here and the cases utilizing the various badges are discussed below.

[6] *Herbert*, 441 U.S. at 177, fn. 12 (citations omitted).

[7] *Id.* Courts typically reject various journalist privileges which normally protect journalists' sources from discovery on the ground that the media waives the privilege when it asserts its First Amendment defenses.

8 *Harte-Hanks Communications*, 491 U.S. at 685. *See also Celle v. Filipino Reporter Enterprises, Inc* ., 209 F.3d 163 (2d Cir. 2000) (malice finding affirmed based on evidence of reporter's ill will, reporter's conflicting testimony, and reliance on questionable source without conducting investigation).

9 *Curtis Publishing Co*., 388 U.S. at 157.

10 *Id*. at fn.20. *See also Healey v. New England Newspapers, Inc* ., 555 A.2d 321 (R.I. 1989) (newspaper report of angry relative blaming doctor for death creates jury issue of malice where newspaper failed to report known facts tending to exculpate the doctor); *Buratt v. Capital City Press* , 459 So. 2d 1268 (La. 1 Cir. 1984) (reckless disregard for truth shown when reporter omits reporting available information because it refuted defamatory point reporter trying to make).

11 *Hunt*, 720 F.2d at 643.

12 *Id*. at 645 (citations omitted).

13 *Texas Disposal Systems Landfill*, 219 S.W.3d at 578-579.

14 *Bentley,* 94 S.W.3d at 584-585, 600. *See also Kentucky Kingdom Amusement Co. v. Belo Kentucky, Inc.* , 179 S.W.3d 785 (Ky. 2005) (affirming jury finding of malice based on television station's failure to correct inaccuracies in prior reports, continuing commitment to running the same false story line, failure to significantly investigate, and because the general make up and presentation of the story exhibited hostility).

15 *Bolling,* 671 S.W.2d at 563.

16 *Id*. at 565.

17 *Braun*, 726 F. 2d at 257.

18 *Kaelin,* 162 F. 3d at 1042.

19 *Murphy* , 449 Mass. at 58.

20 *Id*. at 58-61.

21 *Id.* at 61 (emphasis added).

22 *See Moore v. Vislosky* , 240 F. App'x 457, 469 (3d Cir. 2007) (defamer's claim that she "lost" documentary evidence that supported her defamatory statements was implausible and supports jury finding that she acted with reckless disregard for truth); *Torgerson v. Journal/Sentinel, Inc.* , 563 N.W. 2d 472, 483 (Wis. 1997) (destruction of reporter's notes is sufficient evidence to support a jury verdict of actual malice); *Chang v. Michiana Telecasting Corp.* , 900 F.2d 1085, 1090 (7th Cir. 1990) ("destruction could imply that the notes would have revealed the reporter did not believe what he wrote or said") (citations omitted).

23 *Masson,* 501 U.S. at 516.

24 *Id* . at 520-521.

25 *Southern Air Transport* , 568 So. 2d at 928.

26 *Mitchell*, 60 P.3d at 1063.

27 *Herbert,* 441 U.S. at 170-171.

28 *Mahnke,* 160 N.W.2d at 344. *See also Zerangue v. TSP Newspapers, Inc.* , 814 F.2d 1066 (5th Cir. 1987) (refusal to retract an exposed error supports a finding of malice just as a readiness to retract tends to negate malice); *Golden Bear Distributing Systems of Texas, Inc. v. Chase Revel, Inc.* , 708 F.2d 944 (5th Cir. 1983) (refusal to retract supports jury finding that defamatory article published with reckless disregard of the truth).

29 *Anderson*, 477 U.S. at 249.

30 *Id.* at 255 (citations omitted).

[31] *Id.* at 265-268.

[32] *Id* . at 267-269.

[33] *See also Shiavone Const. Co. v. Time, Inc.* , 847 F.2d 1069 (3d Cir. 1988) (reversing summary judgment in media defamation case where media had internal inconsistencies in its research and information contradicting libelous assertions but nevertheless published libelous statements).

[34] *Southern Air Transport* , 568 So. 2d at 928 (emphasis added).

[35] *Id.*

[36] *Id.* at 929.

[37] *Harrison*, 430 So. 2d at 586. *See also Durso v. Lyle Stuart, Inc* ., 337 N.E. 2d. 443, 447 (Ill. App. 1975) (citations omitted) (jury may find malice and disregard defendant's claim that defamatory statement in investigative publication was caused by unintentional "error" where evidence creates issue of author's credibility because (citations omitted) it showed "muckraking intent, the absence of hot news, and an inadequate investigation...").

[38] *See also Newton v. NBC, Inc* ., 930 F.2d 662, 671 (9th Cir. 1990) (malice may be based on jury's negative assessment of reporter's credibility at trial).

[39] The normal rule is that the court should leave credibility issues for the jury. To the extent that the court weighs evidence to see if a credibility issue satisfies the "clear and convincing" standard, witness demeanor should be in play. The dissent in *Anderson* pointed out that applying the "clear and convincing" standard at the summary judgment stage and telling the courts not to weigh evidence was inherently contradictory. The dissent predicted that *Anderson* would be inapplicable in practice.

 **MANUEL SOCIAS** *is a solo practitioner who has represented clients in business litigation for 35 years. He also handles and consults on defamation cases.*