### IN THE UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA

LAURA LOOMER

                    Plaintiff,

     v.

BILL MAHER et al                                    **Case No: 5:24-cv-00625-JSM-PRL**

                    Defendants.

### PLAINTIFF'S OBJECTIONS TO MAGISTRATE JUDGE PHILIP R. LAMMENS' PROTECTIVE ORDER

Plaintiff Laura Loomer ("Plaintiff") hereby objects to Magistrate Judge Philip R. Lammens' ("Magistrate Lammens") July 17, 2025 Protective Order Regarding Confidentiality and Restrictions on Use of Discovery Material, ECF No. 99 ("Protective Order").

A full hearing and oral argument is respectfully necessary before the presiding judge, the Honorable James S. Moody ("Judge Moody") on these issues, as Plaintiff has not yet been afforded the opportunity to address Judge Moody directly on these discovery matters. Plaintiff previously moved to have discovery-related issues referred back to Judge Moody, ECF No. 85, because the obstructionist and dilatory tactics of counsel for Defendants, which are intentionally calculated to needlessly run up time and costs, have severely crippled Plaintiff financially. Plaintiff has already been brought to her knees financially because of the highly offensive, outrageous, false, malicious, and defamatory statements published by the Defendants and now counsel for Defendants, who have scores of attorneys and millions of dollars to burn through, are trying to capitalize on this by burying Plaintiff with needless

motions practice to try to coerce her into dismissing her case. Unfortunately for Defendants, Plaintiff will not capitulate to these tactics.

Evidence of this is found in the Defendants' Protective Order, which will certainly lead to needless motions due to how overly broad and vague it is. Regrettably, the Defendants' proposed Protective Order appears to have been adopted wholesale by Magistrate Lammens, who has throughout this case shown a predisposition to the positions of the Defendants. This is perhaps most evident in his having denied Plaintiff the right to have her even own deposition made publicly available to try to mitigate the great harm and damage inflicted on her by Defendants Maher and HBO,  ECF No. 88, and then ordering compliance with his Order on Motions to Compel ("Compel Order") before even the time to object would otherwise run. Clearly, forcing Plaintiff to comply with the Compel Order before objections were timely filed  would moot out any objection and thus makes no sense. However, this has not stopped counsel for Defendants from threatening to move for contempt, part and parcel to their *modus operandi* of needlessly driving up time and costs and threatening, harassing, and browbeating Plaintiff, which occurred at her deposition, Exhibit A, because they see her as an extension of President Trump, whom they loathe.

In this regard, counsel for Defendants  at Davis Wright Tremaine ("DWT") have proudly advertised having represented anti-Trump lawsuits. This was true when they represented ABC and George Stephanopoulos in a case where they were defendants in a defamation action brought by President Trump over false published statements that President Trump had been "found liable for rape."

*Trump v. American Broadcasting Companies, Inc. et al*, No. 1:2024cv21050 (S.D. Fla. 2024) ("Trump Case"). The Defendants there paid $15 million dollars and also attorneys fees to settle the case, just to avoid being deposed. DWT also represented CBS in another case brought by President Trump, *Trump v. CBS Broadcasting Inc.*, 2:24-cv-00236 (N.D. Tx.), where they had doctored media coverage, and there they also threw in the towel by settling to pay $16 million. These cases are just the tip of the anti-Trump and thus anti-Loomer iceberg.

<u>Exhibit B</u>.  *Article from The Hollywood Reporter*

The bottom line is this: this is an extremely simple and straightforward defamation case. It does not warrant any type of special consideration or treatment, as it is not an antitrust, securities, tax or other business case where trade secrets or things of that nature are at issue. This is simple defamation, where the Defendants have published in this district and to the world the following disgusting, false, and defamatory statement of and concerning Plaintiff:

> **I think maybe Laura Loomer's in an arranged relationship to affect the election because she's very close to Trump. She's 31, looks like his type. We did an editorial here a few years ago…it was basically, who's Trump fucking? Because I said, you know, it's not nobody. He's been a dog for too long, and it's not Melania. I think we may have our answer this week. I think it might be Laura Loomer**. Comp. ¶ 18. (the "Defamatory Statement").

Hypocritically, after having published here malicious Defamatory Statement to their audience of millions, Defendant and their counsel are now insisting that this case be litigated in a secret star chamber. As set forth herein, this runs contrary to not only black-letter case law, but notions of fairness and justice.

## LEGAL ARGUMENT

Thus, Plaintiff objects to Judge Lammens' Protective Order on the grounds that it is overly broad and unnecessary in such a simple, straightforward defamation case that does not involve any trade secrets or sensitive information.

As set forth above, such a Protective Order is totally improper and overbroad, given that this is a way for mega law firms such as DWT to run up costs and burden the court and Plaintiff—who has already been financially drained by the malicious defamatory statements of Defendants and others—creating endless discovery motions to overburden the Plaintiff, her counsel and this court. This is a tactic used by large defense firms against individual plaintiffs with very limited resources. It is also a means that can be used for delay and obstruction and Mr. Klayman, Ms. Loomer's counsel, has endured this litigation conduct in prior litigation against DWT. This is a simple and straightforward case that does not justify a blanket, overly broad confidentiality agreement, where Defendants can and likely will stamp every document confidential only then to throw the burden of declassification onto the Plaintiff and this Court. Yet, Judge Lammens' Protective Order provides for just that:

> Counsel for any party may designate any Discovery Material, in whole or in part, as Confidential if counsel determines, in good faith, that such designation is necessary to protect the interests of the party in information that is proprietary, personal or otherwise sensitive non-public information, including but not limited to unpublished newsgathering materials. Protective Order ¶ 3.

> Counsel for any party may designate any document or information, in whole or in part, as Highly Confidential if counsel determines, in good faith, that such designation is necessary to protect the interests of the client in information that is strategic, proprietary, financial, a

trade secret or otherwise commercially sensitive non-public information, or other similar information that is substantially likely to cause injury to the commercial, financial, strategic, or business interests of such producing party or its employees, customers, or clients if disclosed. Protective Order ¶ 4.

The proper course of action is not this virtual carte blanche to designate discovery information as confidential at will, but rather that documents should be considered one at a time, and Mr. Klayman has no problem at all holding documents that warrant confidentiality as such, as as already been shown with regard to Defendant Maher's financial information which Plaintiff had no issue with deeming confidential. This is the course of action that conserves the resources of the parties and the Court, minimizes needless motions practice, and allows this case to proceed substantively without undue delay. It is therefore not a surprise that Defendants oppose this rational approach, as their goal is to stonewall, obfuscate and delay while trying to harass and threaten Plaintiff into dropping her case. The Court must see Defendant's tactics for what they are and reject Magistrate Lammens' overly broad and unnecessary blanket Protective Order.

## **CONCLUSION**

The bottom line here is simple. Defendants Maher and HBO, while perhaps revered in leftist anti-Trump and anti-Loomer Hollywood circles, are to be afforded no special protected status under the eyes of the law. They are to be treated the same as anyone else and not permitted to hide behind false veils of confidentiality.

Furthermore, Plaintiff cannot be subject to the overly broad and unnecessary Protective Order in such a simple and straightforward defamation case, where the only real question at issue is whether Plaintiff "fucked" President Trump and committed adultery behind the back of Melania Trum, as Defendants falsely published to their audience of millions. There are no trade secrets involved. There is no sensitive information involved. The Protective Order is merely another weapon that counsel for Defendants want to use to artificially inflate time and costs – which they as multi-million dollar firms can afford to burn – in order to prevent Plaintiff from substantively litigating her case. The Court must recognize this transparent tactic for what it is and reject it outright.

Finally, it is not accurate, as the Magistrate Judge writes, that Plaintiff did not try to work things out with Defendants and their counsel. What is proposed above was discussed on several occasions with them and for tactical reasons they would not agree. Now is the time for this Court to step in to prevent what will get out of control, time and cost wise, with the overbroad and vague protective order adopted nearly verbatim as put forth by the Defendants' counsel, notwithstanding that it will result in this case being litigated in a virtual star chamber.

Finally, Plaintiff respectfully requests a hearing before Judge Moody to address these important issues.

Dated:        July 31, 2025                    Respectfully Submitted,

                                              By:/s/ Larry Klayman_____
                                              Larry Klayman, Esq.
                                              Klayman Law Group P.A.

7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
leklayman@gmail.com
Counsel for Plaintiff

# EXHIBIT A

0001
1     UNITED STATES DISTRICT COURT FOR THE
2         MIDDLE DISTRICT OF FLORIDA
3           OCALA DIVISION
4    _____
5    LAURA LOOMER,
6       Plaintiff,
7       v.        Case No.
8    BILL MAHER and HOME BOX     5:24-cv-00625-
9    OFFICE, INC.,        JSM-PRL
10      Defendants.
11   _____
12     VIDEOTAPED DEPOSITION OF LAURA LOOMER
13  DATE:     Wednesday, June 4, 2025
14  TIME:     10:11 a.m.
15  LOCATION:   Davis Wright Tremaine, LLP
16           1301 K Street Northwest, Suite 500 East
17           Washington, DC 20005
18  REPORTED BY:  Samuel Pachon
19
20
21    PAGES 112-114, 117, 178-180, 481-487 ARE CONFIDENTIAL
22
0002
1      A P P E A R A N C E S
2  ON BEHALF OF PLAINTIFF LAURA LOOMER:
3    LARRY KLAYMAN, ESQUIRE
4    Klayman Law Group, P.A.
5    269 South Beverly Drive, Suite 1298
6    Beverly Hills, CA 90212
7    leklayman@gmail.com
8    (310) 595-0800
9
10  ON BEHALF OF DEFENDANTS BILL MAHER; AND HOME BOX
11  OFFICE, INC.:
12    KATHERINE M. BOLGER, ESQUIRE
13    Davis Wright Tremaine, LLP
14    1251 Avenue of the Americas
15    New York, NY 10020
16    katebolger@dwt.com
17    (212) 402-4068
18
19
20
21
22
0003
1      A P P E A R A N C E S (Cont'd)
2  ON BEHALF OF DEFENDANTS BILL MAHER; AND HOME BOX
3  OFFICE, INC.:
4    ALEXANDRA PERLOFF-GILES, ESQUIRE
5    Davis Wright Tremaine LLP
6    1301 K Street Northwest, Suite 500 East

7    Washington, DC 20005
8    alexandraperloffgiles@dwt.com
9    (202) 402-4043
10
11    JESSICA DAVIDOVITCH, ESQUIRE
12    Home Box Office, Inc.
13    1100 Avenue of the Americas
14    New York, NY 10036
15    (212) 512-5937
16
17    ALSO PRESENT:
18      David Campbell, Videographer
19
20
21
22
0004
1              I N D E X
2    EXAMINATION:                    PAGE
3      By Ms. Bolger              10
4      By Mr. Klayman             488
5      By Ms. Bolger              494
6
7              E X H I B I T S
8    NO.        DESCRIPTION              PAGE

9    Exhibit 1    Defendants' First Set of Requests
10                for Production of Documents and
11                Things                 45
12    Exhibit 2    Letter from Ms. Loomer to
13                Mr. Morse, Bates Number 16-24    66
14    Exhibit 3    Tweet, 07/26/23          131
15    Exhibit 4    Tweet with Video, 08/13/23    135
16    Exhibit 5    Tweet, 08/13/23          142
17    Exhibit 6    Tweet with Four Embedded
18                Photos, 08/13/23         145
19    Exhibit 7    Tweet, 08/14/23          147
20    Exhibit 8    Truth Post by President Trump   149
21    Exhibit 9    Quote Tweet, 01/16/24       154
22    Exhibit 10    Tweet with Video, 07/19/24    161
0005
1              E X H I B I T S (Cont'd)
2    NO.        DESCRIPTION              PAGE
3    Exhibit 11    Pages Taken from
4                Document Production        175
5    Exhibit 12    Tweet with Video by Mike Sington   190
6    Exhibit 13    Tweet with Photo, 12/08/22    252
7    Exhibit 14    New York Times Article     270
8    Exhibit 15    Total Document Production
9                by Ms. Loomer            279
10    Exhibit 16    Rolling Stone Article     282
11    Exhibit 17    AP Article              283
12    Exhibit 18    Semafor Article          286
13    Exhibit 19    MSNBC Article            289
14    Exhibit 20    The Guardian Article      292

15  Exhibit 21    Mediaite.com Article          294
16  Exhibit 22    New York Times Article        297
17  Exhibit 23    The Independent Article        301
18  Exhibit 24    NBC Article              305
19  Exhibit 25    Mediaite Article with Video        307
20  Exhibit 26    Tweet, 09/12/24          311
21  Exhibit 27    Tweet, 09/12/24          313
22

0006
1              E X H I B I T S (Cont'd)
2   NO.        DESCRIPTION              PAGE
3   Exhibit 28    Text by Reba, 09/12/24          315
4   Exhibit 29    Text Message, 09/11/24        318
5   Exhibit 30    Ms. Greene Tweet          334
6   Exhibit 30B    Ms. Greene Tweet with
7              Printing Error Correction        349
8   Exhibit 31    Lindsey Graham Tweet          343
9   Exhibit 32    Thom Tillis Tweet          346
10  Exhibit 33    Kamala Harris Tweet          351
11  Exhibit 34    Tweet, 07/13/24          361
12  Exhibit 35    Ms. Greene Tweet, 10/20/23      375
13  Exhibit 36    Ms. Greene Tweet, 06/01/23      378
14  Exhibit 37    Tweet, 06/01/24          380
15  Exhibit 38    Tweet, 11/20/24          387
16  Exhibit 39    Tweet, 10/16/24          390
17  Exhibit 40    Post, 09/11/24          405
18  Exhibit 41    Tweet, 09/13/24          427
19  Exhibit 42    Rumble Channal Video          437
20  Exhibit 43    Truth Post from President Trump    459
21  Exhibit 44    Tax Returns            482
22

0007
1              I N D E X (Cont'd)
2        QUESTIONS INSTRUCTED NOT TO ANSWER
3          PAGE      LINE
4            398      19
5            410      20
6
7          D O C U M E N T S  R E Q U E S T E D
8   NO.        DESCRIPTION              PAGE
9   1        Any Article, Tweet, Publication,
10            Video, Television Show that
11            Discusses What Mr. Maher Said
12            Without Discussing Ms. Loomer's
13            Response          281
14  2        2024 Tax Returns          483
15
16
17
18
19
20
21
22

0008
1                    P R O C E E D I N G S
2              THE VIDEOGRAPHER:  Good morning.  We
3    are going on the record on June 4, 2025.  And the time
4    on the video monitor is 10:11 a.m.  This is media unit
5    number 1 of the video recorded deposition of Laura
6    Loomer.
7              This is in the matter of Laura Loomer
8    vs. Bill Maher and Home Box Office, Inc.  This is in
9    the United States District Court for the Middle
10   District of Florida -- Case Number 5:24-cv-00625-JSM-
11   PRL.  The location of this deposition is 1301 K Street
12   Northwest, Suite 500 East, Washington, DC 20005.
13             My name is David Campbell, representing
14   Veritext, and I'm the videographer.  The court
15   reporter today is Samuel Pachon, also with Veritext.
16             Counsel, will you please identify
17   yourselves for the record, after which the reporter
18   will please swear in the witness, and we can proceed?
19             MR. KLAYMAN:  Larry Klayman of the
20   Klayman Law Group, on behalf of Laura Loomer,
21   Plaintiff.
22             MS. BOLGER:  Katherine Bolger from the
0009
1    Law Firm of Davis Wright Tremaine, on behalf of the
2    defendants.  And with me this morning are my
3    colleague, Lexie Perloff-Giles; and Jessica
4    Davidovitch, who's in-house counsel at Home Box
5    Office.
6              Swear in the witness?
7              THE REPORTER:  Ms. Loomer, please raise
8    your right hand.
9    WHEREUPON,
10                  LAURA LOOMER,
11   called as a witness and having been first duly sworn
12   to tell the truth, the whole truth, and nothing but
13   the truth, was examined and testified as follows:
14             THE REPORTER:  You may proceed.
15             MR. KLAYMAN:  Yes.  I just want to put
16   this on the record that with the exception of income
17   tax materials, which were provided to you, this
18   deposition will be on the public record.
19             We're not claiming any confidentiality
20   in that regard, so I would respectfully request the
21   court reporter, if he get into tax information, have a
22   separate transcript for that, as well as going on a
0010
1    separate video for that.  But everything is public.
2    We're not claiming any confidentiality.
3                    EXAMINATION
4    BY MS. BOLGER:
5         Q   Ms. Loomer, we've met before, but my name is
6    Kate Bolger, as you know, and I represent the
7    defendants in this case.  Have you ever been deposed

8    before?
9        A   Yes.
10       Q   And when were you deposed?
11       A   I believe it was last -- last year.  I think
12   it was last March, and it was for a -- I believe, a
13   malpractice case.
14       Q   Okay.  And were you the -- a party to that
15   litigation?
16       A   Yes.  I filed a malpractice case.
17       Q   And who did you file a malpractice case
18   against?
19       A   Against a former lawyer, Ron Coleman, who at
20   one point, represented me in a lawsuit I filed against
21   CAIR, the Council on American-Islamic Relations.
22       Q   Okay.  And has that litigation come to a
0011
1    conclusion?
2        A   No.  It has not.
3        Q   What is the status, if you know?
4        A   I believe just a few days ago, their motion
5    to dismiss was struck down, and it's about to proceed
6    to trial.
7        Q   Okay.  Have you been deposed in any other
8    litigation other than that one?
9        A   No.
10       Q   Great.  Well, let me give you some ground
11   rules before we go.  Obviously, I ask you questions;
12   you give me answers.  We should try not to talk over
13   each other.  And if you can please remember to use
14   oral responses rather than nodding your head or
15   shaking your head, that's easier for the -- for Samuel
16   to take down.
17       A   Okay.
18       Q   I do tend to talk quickly.  It is just how I
19   talk.  If it is too quick, just say to me, "Hey.
20   You're going to quickly."  And I will try to slow it
21   down.  If you're confused by a question, you can ask
22   me, and I will restate it for you.
0012
1            Mr. Klayman may, from time to time, object
2    to a question.  That means he doesn't like the form of
3    the question, or he has some problem with the question
4    itself.  But you can still answer, unless Mr. Klayman
5    directly instructs you not to answer that question;
6    does that all make sense to you?
7        A   Yes.
8        Q   Okay.  Did you do anything to prepare for
9    this deposition?
10       A   Yes.
11       Q   What did you do?
12       A   I reviewed my case, reviewed all of the
13   filings and the lawsuit, and had conversations with my
14   lawyer.
15       Q   Okay.  And your lawyer being Mr. Klayman in

16    this case?
17        A    Yes.
18        Q    How long did you meet with Mr. Klayman?
19        A    We met this morning, you know, just
20    couple -- couple hours.  Met yesterday, just to review
21    ground rules for the deposition.  And this morning, at
22    breakfast.
0013
1        Q    Okay.  So about how many hours do you think
2    that was?
3        A    It's probably -- with, like, breaks and
4    everything in between -- and of course, it wasn't the
5    only thing we discussed because he's, you know, my --
6    my lawyer in my other litigation as well -- I'd say
7    probably about five hours.
8        Q    Okay.  Did you look at any documents?
9        A    Yes.  I reviewed the complaint.
10        Q    Okay.  Did you talk to anyone else at all
11    about this deposition today?
12        A    I mean, it's public; right?  So people know
13    that I have a deposition today.  But I only spoke with
14    my attorney about the details of my deposition.  But
15    it is public.  It's in the media.  It's been widely
16    publicized.
17        Q    By whom was it widely publicized?
18        A    The media.  People know that there's a
19    deposition.  It's a high profile case.  And I, also,
20    given the fact that, you know, I'm a -- I'm a
21    journalist, and this takes me away from my work as a
22    journalist, I let everybody know that I would be
0014
1    offline today because I have a deposition.
2        Q    And how did you let everybody know that?
3        A    On my X account.
4        Q    You didn't quite answer my question, which
5    was did you talk to anyone else about this deposition,
6    so would you answer that question?
7            MR. KLAYMAN:  Objection --
8    BY MS. BOLGER:
9        Q    Have you had any conversation with anyone
10    else about this deposition?
11            MR. KLAYMAN:  Objection.  Relevancy.
12            MS. BOLGER:  Not a valid objection.
13    BY MS. BOLGER:
14        Q    You may answer.
15            MR. KLAYMAN:  Well, that's not for you
16    to decide.
17            THE WITNESS:  I've only spoken to my
18    attorney about the deposition.  But as I said before,
19    you know, I'm followed by millions of people online.
20    And there are many people -- millions of people who
21    know that I have this deposition today.
22        //
0015

1   BY MS. BOLGER:
2       Q   You were at the White House yesterday;
3   right?
4       A   Yes.
5       Q   Okay.  Who did you speak to at the White
6   House?
7       A   I had a meeting with Vice President JD
8   Vance.
9       Q   Did you speak to anybody else at the White
10  House?
11      A   Just security and his -- his staff.
12      Q   Okay.  Did you mention to JD Vance that you
13  were being deposed today?
14          MR. KLAYMAN:  Objection.  Relevancy.
15          THE WITNESS:  I'm not going to discuss
16  my conversations.  I think it's inappropriate to
17  discuss my conversations.  But no.  I did not talk
18  about my deposition.
19  BY MS. BOLGER:
20      Q   Did you talk about this lawsuit with
21  Mr. Vance yesterday?
22      A   No.  I did not.
0016
1       Q   Did you talk about my law firm with
2   Mr. Vance yesterday?
3       A   No.  I did not.
4       Q   Did you talk to anybody at security about
5   this deposition?
6       A   No.  I did not.
7       Q   Did you talk to anybody in Mr. Vance's staff
8   about this deposition today?
9       A   No.  I did not.
10          MR. KLAYMAN:  Same continuing objection
11  with relevancy.
12  BY MS. BOLGER:
13      Q   Did you talk to anybody -- Mr. Vance's staff
14  about this lawsuit?
15      A   No.  I did not.  But obviously, because this
16  is a widely publicized case that the media has
17  reported on, given your client's defamation of me, and
18  the fact that he is a well-known Trump hater, it is
19  well-known that this lawsuit is ongoing.
20          And so it's not unreasonable that many
21  people, including, you know, members of the White
22  House, are probably aware of this lawsuit.
0017
1       Q   Oh.  What's your basis for believing that
2   members of the White House are aware of this lawsuit?
3       A   Because it's been reported by many media
4   outlets.
5       Q   Have you spoken to anybody in the White
6   House about this lawsuit?
7       A   No.
8       Q   Have you spoken to any staff member of

9    anybody in the White House about this lawsuit?
10        A    Not about the lawsuit.  But again,
11    members -- staff in the White House are aware that the
12    lawsuit is ongoing.
13        Q    How do you know that?
14        A    Because it's -- it directly relates to
15    President Trump, and so I'm confident that his staff
16    would be aware of a high-profile lawsuit involving one
17    of his biggest critics who falsely accused me of
18    having sex with the president of the United States,
19    which is also falsely accusing the president of
20    committing adultery against his wife, our first lady.
21        Q    So I'm confused because you're certain that
22    the White House is aware of this, but you claim you
0018
1    haven't spoken to anybody else.  Can you please -- of
2    anybody at the White House staff --
3        A    Well, it's -- it's my --
4            MR. KLAYMAN:  Objection.  Objection.
5    Wait.
6            MS. BOLGER:  I'm not done asking my
7    question.
8            MR. KLAYMAN:  All right.  It's just --
9    wait, wait, wait.
10           MS. BOLGER:  I'm not done asking my
11    question.  I get to ask my question.
12           MR. KLAYMAN:  There's more than one
13    question.  It's compound.
14    BY MS. BOLGER:
15        Q    I'm confused; what you are testifying is
16    that you don't think you've spoken to anybody about
17    this, but you're sure they're aware --
18        A    Well, it's my best belief --
19        Q    And I'm asking you --
20        A    -- it's my best -- it's my best belief --
21        Q    -- Ms. Loomer --
22        A    -- I'm answering your question.
0019
1        Q    No.  You're not.
2        A    It's my best belief that people --
3        Q    Ms. Loomer, the way this is going to work
4    going forward is --
5            THE REPORTER:  One at a time, please.
6    BY MS. BOLGER:
7        Q    -- that I'm going to ask a question; you're
8    going to wait for me to finish it --
9        A    Yeah.
10        Q    And then I'm going to hear your answer.
11        A    Yeah.
12        Q    That's how this works.
13        A    I answered your question; you don't like my
14    answer --
15        Q    So I'm going to do it again --
16        A    Go ahead.

17    Q    -- and you're going to respond.
18    A    Go ahead.
19          MR. KLAYMAN:  And I request --
20    BY MS. BOLGER:
21    Q    You have testified that --
22    A    Yes.
0020
1     Q    -- you didn't talk to anybody in the White
2     House, but you're certain they know about it.  How do
3     you reconcile those two things if you have no -- if
4     you haven't spoken to anybody about this case?
5          MR. KLAYMAN:  Okay.  That's four
6     questions -- compound question -- inappropriate
7     question.  And please don't badger my witness.  You're
8     being very aggressive -- more than aggressive.  You're
9     being, you know, frankly, disrespectful.
10    BY MS. BOLGER:
11    Q    Ms. Loomer, please answer the question.
12    A    I suppose I can't read their mind, but you
13    know, given the fact that the president has a, you
14    know, very active communications team that monitors
15    all news headlines about President Trump, it's my best
16    belief that they are aware of the fact that this
17    lawsuit is ongoing and are likely aware that I have
18    this deposition today.  I mean, it's been widely
19    reported.
20    Q    You said --
21    A    And I -- I posted about it on my social
22    media.  And most of the president's staff follow me on
0021
1     social media.
2     Q    You have said that this deposition was
3     well-publicized.  It was well-publicized by you;
4     correctly -- correct?
5     A    I have a right to defend myself, and I have
6     a right to fight back against Bill Maher's sexist,
7     misogynistic, and malicious comments about me that are
8     obviously defamatory.
9          He falsely accused me of having sex with the
10    president, and as a result, I've been subjected to a
11    lot of harassment.  It threatens my safety.  And so
12    yes.  I -- I publicized the fact that I am suing Bill
13    Maher and his enabler, HBO.  And I have a right to do
14    that.
15    Q    You said you publicized it on X; is that
16    right?
17    A    Yes.  That's my social media.
18    Q    And when you publicized it this time, did
19    you put a link to your GiveSendGo?
20    A    Yeah.  Of course.  I'm not a millionaire
21    like Bill Maher.  I also -- I'm not worth billions of
22    dollars like HBO.  And my tax records prove that,
0022
1     which you have.  Those are confidential, of course.

2    And I'm not rich.  I'm not -- I'm not ashamed that I'm
3    not rich.
4         I am not a wealthy woman, and I have a lot
5    of supporters.  And people know in this country that
6    there's lawfare -- weaponized lawfare -- is what your
7    law firm specializes in.  You represent the biggest
8    Trump haters.
9         You recently had to settle with President
10   Trump.  You represented George Stephanopoulos in a
11   defamation case.  You falsely accused the president of
12   being a rapist, I believe; right?  That's your firm --
13      Q   Me?
14      A   Well, your -- your firm represented George
15   Stephanopoulos.  And you guys had to settle, which
16   surely, you know you had to give the president
17   $15 million to his presidential library because you
18   advertised that you guys -- you actually go out of
19   your way -- your law firm solicits Trump haters and
20   Democrats who spread lies about the president,
21   including the -- the Steele dossier, which was a lie
22   paid for by President Trump's opposition -- lies that

0023
1    he's a rapist.
2         You represent CNN, which has also spread
3    lies about the president, lies about me.  And so of
4    course, I have a right to defend myself.  And I have
5    every right to post a link to my GiveSendGo to ask my
6    supporters to help me cover the cost of this very
7    expensive litigation.
8      Q   So, Ms. Loomer, my question that got that
9    speech was actually, did you post a GiveSendGo link,
10   which is a yes-or-no question --
11     A   Yes.  I posted it.
12     Q   -- so it's fine that you get to answer the
13   questions however you want.  But just so you know, if
14   you continue to answer the questions in that way time
15   and time again, I will bring you back for a second day
16   of deposition --
17         MR. KLAYMAN:  Well, you --
18   BY MS. BOLGER:
19     Q   -- because that wastes my time.
20         MR. KLAYMAN:  That's not for you to
21   decide, Ms. Bolger.
22         THE WITNESS:  You have seven hours.

0024
1    BY MS. BOLGER:
2      Q   My next question is, what is your email?
3      A   You have seven hours.
4         MR. KLAYMAN:  Stop.  Stop.  Stop for a
5    second.
6    BY MS. BOLGER:
7      Q   What is your --
8         THE REPORTER:  One at a time, please.
9         MR. KLAYMAN:  Yeah.  Stop for a second;

10  okay?  I want to object to badgering the witness --
11          MS. BOLGER:  Okay.
12          MR. KLAYMAN:  -- to the arrogance and
13  belligerency here --
14          MS. BOLGER:  There's no pending
15  question.  There's no pending question.
16          MR. KLAYMAN:  And you do not have the
17  right to make a decision whether she comes back or
18  not --
19          MS. BOLGER:  There's no pending
20  question.
21          MR. KLAYMAN:  -- the judge will.  Yes.
22  And I'm asking you --
0025
1   BY MS. BOLGER:
2       Q   Ms. Loomer, what is your email address?
3           MR. KLAYMAN:  I'm asking -- wait a
4   second.  I'm not done.
5   BY MS. BOLGER:
6       Q   What is your --
7           MS. BOLGER:  Yes.  You are.
8           MR. KLAYMAN:  I'm asking you --
9   BY MS. BOLGER:
10      Q   What is your email address, Ms. Loomer?
11          MR. KLAYMAN:  I'm not done.
12  BY MS. BOLGER:
13      Q   Ms. Loomer, what is your email address?
14      A   Well, I'm not going to "dox" myself
15  publicly.  This is -- there has to be some kind of
16  protection so that I don't get publicly harassed.
17      Q   Your lawyer just gave a whole speech about
18  how this was going to be public.  But if you'd like, I
19  agree to keep this confidential.
20          MR. KLAYMAN:  We'll give you the --
21  BY MS. BOLGER:
22      Q   So what is your email address?
0026
1           MR. KLAYMAN:  Wait a second here.  I
2   will give that to you.
3           MS. BOLGER:  There's no reason she
4   can't answer the question.  I'll keep it confidential.
5   BY MS. BOLGER:
6       Q   What's your email address?
7           MR. KLAYMAN:  No.  I'm not going to put
8   this on the public record here.  We'll have a --
9           MS. BOLGER:  I agree with you.  It
10  doesn't have to go on the public record.
11          MR. KLAYMAN:  We'll have a separate
12  record.  We'll have a separate record.  Okay.
13          MS. BOLGER:  It doesn't have to go on
14  the public record.
15          MR. KLAYMAN:  All right.  Fine.
16  BY MS. BOLGER:
17      Q   What's your email address?

18          MR. KLAYMAN:  Not here.  We're going to
19  have a separate --
20          MS. BOLGER:  No.
21  BY MS. BOLGER:
22     Q    You're answering the question.
0027
1     A    My -- my --
2          MR. KLAYMAN:  No.  Don't answer.  Don't
3  answer; okay?  Don't answer.
4          MS. BOLGER:  I'm sorry.  You're
5  actually instructing the witness not to answer --
6          MR. KLAYMAN:  Correct.
7          MS. BOLGER:  -- the question, "What is
8  your email address" --
9          MR. KLAYMAN:  Correct.
10          MS. BOLGER:  -- after I've agreed to
11  keep it confidential?
12          MR. KLAYMAN:  No.  What I said
13  was -- no.  What I said was --
14  BY MS. BOLGER:
15     Q    I've agreed to keep it confidential,
16  Ms. Loomer.  Please --
17          MR. KLAYMAN:  Let me talk, Ms. Bolger.
18  BY MS. BOLGER:
19     Q    -- what is your email address?
20          MR. KLAYMAN:  Let me talk; all right?
21  Don't be rude to me like you were in the last
22  deposition.
0028
1          MS. BOLGER:  Don't yell at me
2  Mr. Klayman.
3          MR. KLAYMAN:  I'm not yelling at you;
4  you're yelling at my client; okay?
5          MS. BOLGER:  Don't yell at me,
6  Mr. Klayman.
7          MR. KLAYMAN:  You can ask all those
8  questions.  That will be a separate record that you
9  can ask.  Just keep them, and we'll answer those
10  questions in a --
11          MS. BOLGER:  I want the answer now.
12  And we'll keep --
13          MR. KLAYMAN:  -- confidential record.
14  No.
15          MS. BOLGER:  -- it confidential.
16          MR. KLAYMAN:  You're not going to mess
17  up this record.
18  BY MS. BOLGER:
19     Q    What's your email address?
20          MR. KLAYMAN:  No.  No.  Do not answer.
21  Do not answer.
22          MS. BOLGER:  Mr. Klayman, you're
0029
1  instructing the witness --
2          MR. KLAYMAN:  No.

3          MS. BOLGER:  -- not to answer what her
4  email address is.
5          MR. KLAYMAN:  I said to you I don't
6  want apples and oranges here.  We can go in a separate
7  record --
8          MS. BOLGER:  You don't get to decide
9  this.  This is my record.
10          MR. KLAYMAN:  I am --
11  BY MS. BOLGER:
12     Q   What is your email address, Ms. Loomer?
13          MR. KLAYMAN:  No.  Don't answer her.
14          MS. BOLGER:  Okay.  I'll take that to
15  the judge.
16          MR. KLAYMAN:  Please do.
17  BY MS. BOLGER:
18     Q   Is it your general practice to be truthful
19  when you send emails?
20     A   Yes.
21     Q   What's your telephone number?
22          MR. KLAYMAN:  Same thing.  That will be
0030
1  on a separate record, if you want to ask her.
2          MS. BOLGER:  It will not.  This is my
3  deposition.
4          MR. KLAYMAN:  All right.  Don't answer
5  that.
6          MS. BOLGER:  Okay.  I will tell the
7  judge that you will not allow me to get this basic
8  information about a plaintiff who chose to --
9          MR. KLAYMAN:  No.
10          MS. BOLGER:  -- bring a lawsuit in
11  federal court.
12          MR. KLAYMAN:  And --
13          MS. BOLGER:  And you have been
14  grandstanding about how this is public, Mr. Klayman.
15          MR. KLAYMAN:  And that will be a lie;
16  okay?  Because we said we'll go in a separate record.
17  We'll break it up --
18  BY MS. BOLGER:
19     Q   Do you send text messages, Ms. Loomer?
20          MR. KLAYMAN:  Stop.  Stop.  We will go
21  on a separate record --
22    //
0031
1  BY MS. BOLGER:
2     Q   Do you send text messages, Ms. Loomer?
3     A   Yes.  I text.
4     Q   Okay.  Do you text on your phone?
5     A   Yes.
6     Q   Do you use Facebook Messenger?
7     A   No.  I don't have a Facebook account.
8     Q   Is that because you were banned?
9     A   Yes.
10     Q   Do you use Signal?

11    A    I'm a journalist.  Occasionally.
12    Q    Okay.  Do you use WhatsApp?
13    A    Occasionally.
14    Q    Do you instant message people on X?
15    A    It's called a "DM," but yes.
16    Q    Thanks for the correction.  How do you
17  communicate with President Trump?
18    A    Well, sometimes some of his staff will relay
19  messages.
20    Q    How do they relay those messages?
21    A    Call.  They'll call me.  Sometimes --
22  there's been several times that the president has
0032
1  called me from the phone of his staff.  He has had his
2  staff call me.  The president does not use email.  I
3  do not email the president.
4    Q    Do you text him?
5    A    I text with his staff.
6    Q    What app do you use to text with his staff?
7    A    I use just regular text.
8    Q    How many times have you spoken to the
9  president on the phone?
10    A    Numerous times.
11        MR. KLAYMAN:  Indefinite is the time.
12  Objection.
13  BY MS. BOLGER:
14    Q    How many times have you spoken to the
15  president on the phone?
16    A    I don't know.  I mean, I -- I've known the
17  president for several years, so I would say, you know,
18  several times.
19        MR. KLAYMAN:  Objection on relevancy.
20  Continuing objections as well.
21        THE WITNESS:  Many times.
22  //
0033
1  BY MS. BOLGER:
2    Q    Sorry?
3    A    Many times.
4    Q    Oh.  What is "many times"?  Would you say
5  more than a hundred?
6    A    No.
7    Q    Would you say more than 50?
8        MR. KLAYMAN:  Same objection --
9  continuing.  Relevancy.
10        THE WITNESS:  No.  Not more than 50.
11  BY MS. BOLGER:
12    Q    Okay.  About 50?
13    A    Perhaps.  But definitely not more than that.
14  Like I said, I communicate mostly with staff or
15  have -- you know, it's mostly -- mostly staff.  Yeah.
16    Q    Okay.  So you said that you -- I just want
17  to make sure I'm getting this right.  You said that
18  sometimes the staff calls you, and sometimes the

19  president calls you through his staff; is that
20  correct?
21      A   Yeah.  Because it's the president of the
22  United States -- just going to be, you know, calling
0034
1   people.  Like, communications are protected when
2   you're the president, and so for national security
3   purposes, for you know, purposes of protecting
4   people's communication devices.
5          And so you know, the way it works is if
6   somebody calls you, generally, they call on, like, a
7   staff phone or a designated phone, and you know, it's
8   the president.
9       Q   So you said you've spoken to the president
10  about 50 times; is that separate from conversations
11  you've had with the president's staff?
12          MR. KLAYMAN:  Objection.  Testimony
13  speaks for itself.
14          MS. BOLGER:  I didn't finish my
15  question.
16          MR. KLAYMAN:  I thought you did.
17  BY MS. BOLGER:
18      Q   Is it separate for -- you said you spoke to
19  the president about 50 times; is that separate from
20  conversations you've also -- you've had with
21  president's staff?
22          MR. KLAYMAN:  Objection.  Relevancy --
0035
1   continuing.
2          THE WITNESS:  I wouldn't say that it's
3   been 50 direct conversations with the president.  You
4   asked if -- how those communications take place.  And
5   sometimes, they take place through the staff, and so
6   it's a combination.
7   BY MS. BOLGER:
8       Q   Okay.  And how many times have you texted
9   with the president's staff?
10      A   Probably the same amount.  Probably the same
11  amount.
12      Q   So an additional 50 times?
13      A   Yeah.  I would say so.  I mean, these are
14  people that I've known for, you know, several years,
15  so --
16      Q   When did you --
17      A   -- I've been involved in conservative media
18  and conservative politics for about 12 years, and so
19  I've known a lot of his staff for a very long time.
20      Q   What social media accounts do you use?
21      A   Well, it's been widely publicized that I've
22  been banned on social media for speaking the truth and
0036
1   for supporting the president.  And everybody knows
2   that there's, you know, coordinated censorship against
3   the president and his supporters.

4          This has been documented extensively in
5    congressional hearings, lawsuits, testimony by social
6    media executives who admitted that the FBI
7    worked with them to interfere in the election.
8          And so I have been reinstated to X, thanks
9    to Elon Musk.  I use X.  I use Truth Social.
10   Occasionally, I'll use Telegram.  I have a Gab
11   account.  I have a Gettr account.
12          I recently -- just to test the waters to see
13   if -- if Facebook was serious about being against
14   censorship -- try to create another Instagram account,
15   which I don't really use; I use it mostly for research
16   purposes.  But I'm most active on X and Truth Social.
17      Q   What's your handle on X?
18      A   It's at -- well, I have -- I have several
19   accounts.  I have "@LauraLoomer."  I have
20   "@LoomerUnleashed."  And I have another account that's
21   "@LoomeredStrat," which is account -- an account I
22   recently created.
0037
1       Q   I'm sorry.  Can you spell that?
2       A   "LoomeredStrat."
3       Q   Spell it, please.
4       A   L-O-O-M-E-R-E-D-S-T-R-A-T.
5       Q   And what is "LoomeredStrat"?
6       A   "LoomeredStrat" is an X account I created
7    for a research company that I recently launched called
8    Loomered Strategies.
9       Q   And what is the purpose of that?
10      A   Loomered Strategies is a company that I
11   created for the sake of doing research and -- like,
12   opposition research, vetting.  It's just another
13   company.
14      Q   Opposition and vetting for whom?
15      A   Whoever needs opposition, research, or
16   vetting.
17      Q   And what is your Truth Social handle?
18      A   It's "@LauraLoomer."
19      Q   Gettr, what is your handle?
20      A   I believe it's "@LauraLoomer," also.
21      Q   Okay.  How about Gab?
22      A   I believe it's also "@LauraLoomer."
0038
1       Q   And I think you said you just use Telegram
2    sometimes; what's that handle?
3       A   Just -- I think it's at -- it's either,
4    like, "Loomer" or "@LauraLoomer."  I don't really use
5    it that much.  I used to use it a lot more when I was
6    banned because it was one of the only -- the only
7    platforms that I could use.
8          But it's either my name, or "Real Laura
9    Loomer," or "@Loomer" -- one of those.  I -- I'm happy
10   to go and look after the deposition and get it to you.
11      Q   Whose decision was it to bring this lawsuit?

12      A    It was my decision.
13      Q    And did you speak to anybody about the
14  decision to bring it before you brought it?  You don't
15  have to -- please don't -- yeah.  Sorry.  Please don't
16  tell me about conversations with lawyers.  I'm not
17  interested in, like -- in privileged communications.
18      A    Just -- you know, obviously, I filed a
19  lawsuit, so I have an attorney; so just my attorney.
20      Q    Okay.  And how did you find Mr. Klayman?
21      A    I've known Mr. Klayman for several years.
22  He's been my lawyer -- at least one of my lawyers --
0039
1  since, I believe, 2018.
2      Q    Okay.  And where'd you all meet?
3      A    And I met him in Nevada in 2017.
4      Q    What were you doing in Nevada?
5      A    I'm a journalist, and so I was investigating
6  the Las Vegas shooting, which was a -- a shooting that
7  took place at a music festival.  And I had broken a
8  lot of stories.  And I was out there for several
9  months investigating irregularities with the shooting.
10          And Mr. Klayman was there, having a press
11  conference with one of his former clients, Cliven
12  Bundy.  And I showed up to the press conference, and I
13  met him and exchanged contact information with him.
14          And eventually, got in touch with
15  Mr. Klayman when I was banned from Twitter in 2018.
16  And he represented me in filing an antitrust case
17  against several social media companies that banned me.
18      Q    What was the result of that case?
19      A    It went all the way to the Supreme Court.
20  And ultimately, the court decided not to hear the
21  case.
22          But Justice Thomas issued an opinion saying
0040
1  that the case was very well-thought out, and that it
2  raised relevant -- relevant arguments about the
3  influence of social media companies acting as state
4  actors.  And it was of his opinion that the court
5  should take a case up like that in the future.
6      Q    So that was his dissent; right?
7      A    Yes.
8      Q    It's because you lost in the Supreme Court;
9  right?
10      A    Well, they decided not to take the case up.
11      Q    Right.  And you lost in the appellate level
12  beneath that; right?
13      A    Well --
14          MR. KLAYMAN:  Objection.  Relevancy.
15  BY MS. BOLGER:
16      Q    Yes?
17      A    I guess so.
18      Q    And you lost in the trial court too; right?
19          MR. KLAYMAN:  Objection.  Relevancy.

20          THE WITNESS: Oh. There was no trial.
21   BY MS. BOLGER:
22      Q   Well, the trial court -- the first court --
0041
1       A   Yes.
2       Q   -- the first court; that's a "yes"? Okay.
3    I'm going to ask you to --
4       A   But it doesn't mean it doesn't --
5       Q   -- to take --
6       A   -- every --
7       Q   I'm going to ask --
8       A   -- I was -- I would say that --
9       Q   There's no --
10          MR. KLAYMAN: Let her -- she's
11   allowed --
12          THE WITNESS: I just want to -- I want
13   to say --
14          THE REPORTER: One at a time, please.
15          MS. BOLGER: Yes. There is no pending
16   question; you may not speak.
17          MR. KLAYMAN: She's allowed to --
18          MS. BOLGER: May I have --
19          MR. KLAYMAN: You give your answer.
20          MS. BOLGER: She is not.
21          MR. KLAYMAN: No. You know, you --
22          MS. BOLGER: You may ask her a
0042
1    follow-up.
2          MR. KLAYMAN: You're allowed to. No.
3          MS. BOLGER: She may not randomly speak
4    on a record.
5          MR. KLAYMAN: You don't make the rules.
6          THE WITNESS: Well, I'm answering the
7    question.
8          MS. BOLGER: Can I ask you to please
9    mark, as Exhibit 1 --
10          MR. KLAYMAN: You don't make the rules.
11          Go ahead --
12          MS. BOLGER: -- this document --
13          MR. KLAYMAN: -- answer what you want
14   to say.
15          MS. BOLGER: Mr. Klayman --
16          THE WITNESS: Just -- just because I
17   lost the case doesn't mean that it wasn't relevant.
18   And I was ahead of the curve as I usually am. And it
19   was later noted during congressional hearings in which
20   executives of these social media companies testified
21   under oath that they were in fact behaving as state
22   actors and acting at the direction of people like Joe
0043
1    Biden and -- and our law -- federal law enforcement
2    agencies. And they were behaving in a politically
3    biased manner.
4          And so it was our belief that had the

5    case, you know, been reviewed in front of the court
6    after that information, you know, was released under
7    oath in front of Congress, that there would have been
8    a different outcome.  And so you know, some people can
9    say I lost, but a lot of other people say that it
10   was -- it was a pioneering case, as I was the canary
11   in the coal mine.
12              And it really, you know, paved the way
13   for other free speech warriors like myself, and people
14   who have been demonized by President Trump -- excuse
15   me -- demonized because of their support of President
16   Trump to file lawsuits against these social media
17   companies for behaving as state -- as state actors.
18              MS. BOLGER:  Okay.  I'm going to move
19   to strike that.  And I'm going to take that time back
20   because that was not responsive to my question, and
21   I'll add that time to my seven hours.
22              MR. KLAYMAN:  Well, you don't get to
0044
1    decide.
2              MS. BOLGER:  We're going to mark, as
3    Exhibit 1 --
4              MR. KLAYMAN:  Can you please stop being
5    so arrogant --
6              MS. BOLGER:  -- the defendants'
7              MR. KLAYMAN:  -- and abrasive?
8              MS. BOLGER:  -- first set of requests
9    for documents and production things; can you mark that
10   as Exhibit 1 for me?
11             MR. KLAYMAN:  Okay.  It's amazing how
12   you --
13             MS. BOLGER:  Here you go, Mr. Klayman.
14             MR. KLAYMAN:  Don't throw things at me.
15             MS. BOLGER:  Can you mark this?
16             I'm sorry.  I was trying to reach it to
17   you.
18             MR. KLAYMAN:  No.  No.  That's
19   intentional; okay?
20             MS. BOLGER:  It wasn't intentional.
21             MR. KLAYMAN:  You treat both of us
22   with --
0045
1              MS. BOLGER:  Can you mark this as
2    Exhibit 1, please?
3              MR. KLAYMAN:  -- respect.  That's
4    something which has not happened in this case.
5    BY MS. BOLGER:
6        Q    Okay.  I've asked the court reporter to hand
7    you Exhibit 1, which is the document request that were
8    propounded to you by the defendants in this action;
9    have you seen this document, Ms. Loomer?
10             (Exhibit 1 was marked for
11             identification.)
12       A    Yes.

13    Q    Okay.  And what did you do to search for
14  documents responsive to this document?
15            MR. KLAYMAN:  Vague and ambiguous.  You
16  might want to ask her, you know, more specifically.
17            MS. BOLGER:  Mr. Klayman --
18  BY MS. BOLGER:
19    Q    Ms. Loomer, you can answer my question.
20            MR. KLAYMAN:  And there were objections
21  as well, so that should be noted.  This does not
22  reflect the objections.
0046
1  BY MS. BOLGER:
2    Q    So my question was, what did you do to
3  search for documents responsive to this request?
4    A    Well, as I -- as I said -- well, and as my
5  attorney said too, there were objections made
6  regarding relevancy to some of these overreaching
7  requests for documents, and so I provided relevant
8  documents --
9    Q    Okay.  So let's --
10    A    -- unlike Bill Maher.
11    Q    Let's start out by saying number 1, "All
12  documents in communications concerning the
13  September 13th episode -- 2024 episode"; what did you
14  do to search for those documents?
15    A    Well, you have the episode, and you have --
16    Q    I know.  Answer my question, which is "What
17  did you do to search for those documents?"  That's my
18  question.
19    A    The episode on September 13th was aired by
20  HBO.  And so it's not like I planned to wake up and
21  see that Bill Maher had falsely accused me of having
22  sex with President Trump.
0047
1            And so I looked for the transcript, and the
2  video recording of the episode, and the media
3  publications that were published in the aftermath of
4  the airing of this episode.
5    Q    For number 5, where it says "All documents
6  and communications between you and President Trump";
7  what did you do to search for those documents?
8            MR. KLAYMAN:  Well, there's an
9  objection to that in terms of overbreadth, relevancy,
10  vague and ambiguous --
11            MS. BOLGER:  You don't get to testify.
12  Mr. Klayman.
13  BY MS. BOLGER:
14    Q    Ms. Loomer, what did you do to search for
15  those documents?
16            MR. KLAYMAN:  No.  But you're --
17  that -- you are presuming facts --
18            MS. BOLGER:  There's nothing --
19            MR. KLAYMAN:  -- that are not in
20  evidence.

21        MS. BOLGER:  -- objectionable about
22    that question.
0048
1            MR. KLAYMAN:  You're presuming facts
2    that are not in evidence.
3    BY MS. BOLGER:
4        Q    What did you do to search for those
5    documents?
6        A    Well, there was an objection.  And as I
7    said, I'm a -- I'm a journalist, and so there's a lot
8    of, you know, restrictions on what constitutes
9    communications.
10            And you know, the fact of the matter here is
11    that Bill Maher falsely accused me of having sex with
12    President Trump.  And so you know, there's no evidence
13    that I had sex with President Trump.  I have never
14    even been in the same room with President Trump alone.
15    And you know, I --
16        Q    So you're saying you didn't search for those
17    documents?
18        A    I provided all the documents that were
19    relevant, and I did search for documents.  And I
20    provided everything necessary.  I provided the -- the
21    letter that I sent to his staff during the transition
22    team, and --
0049
1        Q    Did you search for your private
2    communications with the -- Mr. Trump or his staff, as
3    requested in this document request?
4        A    Yeah.  I believe -- I believe so.  I --
5        Q    Did you produce them to me?
6        A    -- I turned over whatever I had that was not
7    objected to -- to my -- to my attorney to give to you.
8    But again, there were objections; so --
9        Q    Is it your testimony under oath that you've
10    never exchanged any written communications with
11    Mr. Trump or his team?
12            MR. KLAYMAN:  Asked and answered.
13            THE WITNESS:  I -- I already said that
14    I have communicated with President Trump's staff over
15    the phone.
16    BY MS. BOLGER:
17        Q    You also said you got text messages; right?
18        A    Yes.  But that has nothing to do with --
19        Q    I didn't ask you what --
20        A    But that has nothing to do with it.
21        Q    Wait.  But you --
22        A    And as a -- I'm a journalist, and so you
0050
1    know --
2        Q    So you did not search for any documents --
3        A    That's not true.
4        Q    -- related to your communications --
5        A    That's not true.  They -- they were --

6       Q   Let me ask the question, Ms. Loomer.  You
7   did not search for any documents related to your
8   communications with Mr. Trump or his team that you and
9   Mr. Klayman decided weren't relevant; is that correct?
10              MR. KLAYMAN:  But there were other
11   aspects of the objection.  That mistake --
12   BY MS. BOLGER:
13       Q   Is that correct?
14       A   That's not true.  There were objections.
15       Q   Right.  You decided what your objections
16   were, and then you didn't search for any documents
17   other than what you thought was --
18       A   That -- that's up to the -- that's -- you
19   take it up with the judge.  You take it up with the
20   judge.  But a lot of --
21       Q   Because you didn't search for it?
22       A   -- your requests -- that's not true.
0051
1   Your -- a lot of your requests were very harassing and
2   overreaching, and that's why my attorney objected to
3   them so you can take it up with the judge.  Your --
4   your client didn't even produce documents.
5       Q   Okay --
6       A   Your client wants his entire deposition
7   under seal cause he doesn't want the world to see what
8   a horrible, misogynistic, sexist person he is.
9       Q   So --
10       A   He admitted -- he admitted that he --
11       Q   You --
12       A   -- that he had --
13              MR. KLAYMAN:  Wait, wait, wait, wait,
14   wait, wait.  Wait --
15   BY MS. BOLGER:
16       Q   Ms. Loomer, that is confidential, and you
17   know it's confidential.  And if you want to sit here
18   and violate a court order, you go right ahead.
19       A   I'm not violating any court order.
20       Q   Ms. --
21              MR. KLAYMAN:  She did not give any
22   testimony about what he said.
0052
1   BY MS. BOLGER:
2       Q   Ms. Loomer, did you search for all documents
3   and communications supporting the complaint's
4   allegations that the episode "severely harmed and
5   damaged" you?  That's on page -- it's number 12.
6       A   Yes.  I did.
7       Q   And what documents did you produce?
8       A   I turned over my resume, and I turned over
9   my letter with the transition team.  And obviously,
10   I'm not working in the White House, and so it has
11   damaged me because I was expecting to work in the
12   White House.
13              And you have those documents.  You have

14  those communications that has my email, so you already
15  have my email.
16      Q   So that's it?  All you had was that --
17  all -- the only evidence you have of your reputation
18  being damaged by the report was that one --
19          MR. KLAYMAN:  Misstates testimony.
20  BY MS. BOLGER:
21      Q   -- application you made to the White House?
22      A   I turned over tweets --
0053
1           MR. KLAYMAN:  Misstates testimony.
2  Wait, wait, wait --
3           THE WITNESS:  I turned over tweets.  I
4  turned over media reports that insinuated that I'm a
5  whore; that I was having an affair with the president.
6           I turned over a lot of news
7  publications, including the additional episode that
8  was published and aired by HBO and Bill Maher, in
9  which he tried to compound the damages that he did to
10  my reputation on September 13th and episodes that were
11  seen millions of times.
12  BY MS. BOLGER:
13      Q   Do you understand that when we asked for
14  documents, we were asking for any and all
15  communications you had with anyone about the episode?
16          MR. KLAYMAN:  That misstates what you
17  were asking for.  You can refer to the specific
18  request, but don't --
19  BY MS. BOLGER:
20      Q   Ms. Loomer, please answer my question.
21          MR. KLAYMAN:  No.  She doesn't have to
22  answer your question if it's improperly formed.
0054
1  BY MS. BOLGER:
2      Q   Ms. Loomer, answer my question.  Answer my
3  question.
4          MR. KLAYMAN:  Objection.
5          THE WITNESS:  I turned over documents.
6  And I consulted with my attorney on what was -- on
7  what was acceptable.  And if there's anything that you
8  find unacceptable, you can take it up with the judge.
9  BY MS. BOLGER:
10      Q   But you did not search for any documents
11  that you did not deem acceptable; is that correct?
12      A   I did search for documents, but I'm not
13  required to turn over things that are harassing in
14  nature or are overreaching.  I have protections, and I
15  have rights, just like your client didn't turn over
16  documents.
17      Q   What do you do for a living, Ms. Loomer?
18      A   I'm a journalist.
19      Q   You, in fact, describe yourself as an
20  investigative journalist; correct?
21      A   Yes.

22      Q    Okay.  What does it mean to you to be an

0055

1    investigative journalist?

2        A    Well, I expose fraud, corruption, waste,

3    abuse.  I investigate wrongdoing.  I expose people.  I

4    expose people, like many of your clients, for their

5    involvement in weaponization of government.  I expose

6    malicious law affair.

7            I expose all types of corruption, which is

8    why I have amassed a very large following online

9    because I've broken a lot of very big stories exposing

10    a lot of corruption in our country.

11      Q    Do you follow a particular code of ethics in

12    doing your investigative journalism?

13            MR. KLAYMAN:  Vague and ambiguous.

14    Objection.

15            THE WITNESS:  Yeah.  I report the

16    truth.

17    BY MS. BOLGER:

18      Q    Have you ever heard of the SPJ Code of

19    Ethics, for example?

20      A    Yeah.  But I also know --

21            MR. KLAYMAN:  Objection.  Relevancy.

22            THE WITNESS:  -- that, you know,

0056

1    this -- a lot of the standards that are determined and

2    defined by the mainstream media and a lot of these

3    journalistic entities are biased in nature.  They lean

4    heavily toward the left.

5            And I'm also not naive, and I

6    understand that there's a lot of bias perpetuated by

7    the news, which you're familiar with.  Obviously,

8    you -- you represented -- your firm represented George

9    Stephanopoulos who had to settle with President Trump

10    for $15 million.

11            And you know, you make a lot of money

12    representing the purveyors of fake news, who clearly

13    don't abide by the rules of journalistic ethics, so

14    you should ask your own clients whether or not they

15    understand journalistic ethics.

16    BY MS. BOLGER:

17      Q    So again, my --

18      A    Maybe they wouldn't have had to settle with

19    President Trump for $15 million if -- if your client

20    had understood journalistic ethics; right?

21      Q    Mr. Loomer, my question was, have you ever

22    heard of the SPJ Code of Ethics, and you suddenly

0057

1    launched into a tirade, which you continually do --

2      A    No.  I said -- I said, "Yes" --

3      Q    And I'm just reminding you --

4      A    I said, "Yes."  But I'm also --

5      Q    No --

6      A    I said, "Yes" --

7          THE REPORTER:  One at a time, please.
8    One at a time, please.
9          THE WITNESS:  I said, "Yes."  But I'm
10   also not going to be gaslit by a Democrat lawyer who
11   represents fake news media and has given political
12   donations to Democrats.  I've checked the FEC records
13   because I am an investigative journalist, and I know
14   that you donated to the DCC.
15          You donate to ActBlue.  And you
16   represent Trump haters, who have had to settle with
17   President Trump because they are purveyors of fake
18   news, so I'm not going to be gaslit by you.  I'll
19   answer your questions, but I'm not going to be
20   gaslit --
21          MS. BOLGER:  Ms. Loomer --
22          THE WITNESS:  -- by a Democrat
0058
1    lawyer --
2          MS. BOLGER:  You don't get to yell at
3    me --
4          THE WITNESS:  I'm not -- I'm not --
5          MS. BOLGER:  -- and you don't get to
6    make this personal --
7          THE WITNESS:  -- I'm not yelling at
8    you --
9          MS. BOLGER:  -- because that's
10   pathetic.
11          THE WITNESS:  I'm not yelling at you.
12   I am -- I am --
13   BY MS. BOLGER:
14      Q   My question --
15      A   I'm letting people know, if -- because this
16   is probably going to go to trial, I am letting people
17   know that I understand journalistic ethics.  But your
18   clients -- people should know that you represented
19   CNN.  On your -- on your law firm website, you say
20   that you are Trump's least favorite firm --
21      Q   I don't say that.
22      A   -- you make money, and you -- you
0059
1    monetize -- you did.  You have since deleted --
2    right -- for the record, Davis Wright Tremaine has
3    since deleted this article that they had highlighted
4    on their website -- Hollywood reporter from March of
5    2009 --
6      Q   We're going to start timing these,
7    Ms. Loomer.
8      A   That's fine.  Go ahead.  Go ahead.  We have
9    seven hours.  We're here all day.
10      Q   We're having a lot more, sister.
11      A   They -- they have -- they have an article on
12   their website, which they have since deleted after I
13   exposed them because they like to monetize off of
14   malicious lies from the fake news media.

15      So you should, you should ask yourself and
16  your law firm whether or not you believe in
17  journalistic ethics.
18      Q   So you've never read the SPJ Code of Ethics?
19      A   I don't care about reading, you know,
20  any -- any made-up rules -- any made-up ethics from
21  purveyors of fake news and people that want to put
22  their political affiliation ahead of the truth.
0060
1      Q   So when people read what you write --
2      A   And I don't care to get a lecture from a
3  Democrat lawyer who donates to Democrats  --
4      Q   So when people read what you write, are you
5  holding it out to them as the truth?
6      A   Yes.
7      Q   You referred to yourself earlier as a free
8  speech warrior; right?
9      A   Yes.
10      Q   What's a "free speech warrior"?
11      A   I fight for free speech.
12      Q   You also just referred -- you've also
13  referred yourself as a "free speech absolutist";
14  correct?
15      A   Yes.
16      Q   What does that mean?
17      A   Well, within the realms of acceptable
18  speech, not defamation like your client has -- has
19  committed against me, I fight for -- I fight for
20  freedom of expression and free speech.  But that
21  doesn't include malicious lies, including the lie that
22  I had sex with President Trump.
0061
1      Q   So what other categories of speech do you,
2  as a self-described free speech absolutist, not
3  protect?
4      A   You're a defamation lawyer.  You can't --
5  you -- you surely understand that you cannot just
6  falsely accuse a woman of having sex with the
7  president and -- and trying to ruin his marriage
8  simply because you don't like the fact that that
9  person traveled to a presidential debate with the
10  president and his campaign staff.  Surely, you know
11  that.
12      Q   So you're --
13      A   Or maybe -- maybe you don't because your
14  clients have lost and had to settle with President
15  Trump because they defamed him.  I don't know.  Maybe
16  you don't understand defamation.
17      Q   Have you ever taken a journalism course?
18      A   Yes.  I was valedictorian, and I graduated
19  with a 4.0 GPA from Barry University.  And I majored
20  in broadcast and emerging media, and I minored in
21  political science.
22      Q   Have you ever taken a journalism ethics

0062
1    course?
2        A   Yes.
3        Q   When did you do that?
4        A   When I was in college.
5        Q   What did you learn in that course?
6        A   Well --
7             MR. KLAYMAN:  Objection.  Relevancy.
8    Harassment.
9             THE WITNESS:  I learned that the
10   educational system in our colleges and our
11   universities is plagued by Democrats who pretend to be
12   intellectuals, who want to try to indoctrinate
13   students with a left-wing etiology.
14            I learned about the importance of
15   standing up for your rights.  And I learned about the
16   importance of not being bullied by professors.  And I
17   successfully resisted being indoctrinated into a
18   little "mini-Marxist" and communist, which is what
19   we're seeing come out of a lot of American
20   universities today.
21            You know, it's why President Trump
22   wanted to defund the Department of Education because
0063
1    people know that there's a progressive Marxist rot in
2    our educational institutions.  And so I would say that
3    I took a lot of what I learned in -- in college with a
4    grain of salt because I'm not going to let myself be a
5    vehicle for Marxist indoctrination.
6    BY MS. BOLGER:
7        Q   So just to put that together, in answer to
8    my question --
9        A   I answered your question.
10       Q   -- what did you learn in a journalism ethics
11   course --
12       A   I told you what I learned.
13       Q   -- you said that you learned not to be a
14   Marxist?
15       A   Yes.  That's true.
16       Q   You own a company called Illuminate Media?
17       A   Yes.
18       Q   What is Illuminate Media?
19       A   It's my media company.
20       Q   And what does it do?
21       A   I have a website.  I publish news.  I have a
22   show -- podcast called Loomer Unleashed.  And we
0064
1    publish news reports, and we do investigative
2    reporting.
3        Q   How many people are employed by Illuminate
4    Media?
5             MR. KLAYMAN:  Objection.  Relevancy.
6             THE WITNESS:  Myself, and I have a
7    couple contractors.

8    BY MS. BOLGER:
9       Q    Okay.  Who are those contractors?
10      A    Do you want their names?
11      Q    Yes.
12      A    I have a production company that I pay on a
13   monthly basis.
14      Q    What's that called?  What is that called?
15      A    It's called Ark Studios.  And they --
16      Q    What do they do?
17      A    They just clip my videos from my -- my
18   podcast, and they -- they edit my clips.  And they
19   edit the news clips from my -- my DC correspondent;
20   his name is Charles Downs.
21      Q    Okay.  And Charles Downs is your -- sorry.
22   Just so I understand -- Charles Downs is your DC
0065
1    correspondent?
2       A    Yes.
3       Q    And he is -- is he a contractor or an
4    employee?
5       A    He's a contractor.
6       Q    Okay.  And does he work just for you?
7       A    I believe so.  I mean, I don't get into his
8    personal business; he's a contractor.  He's free to
9    work for other people if he wants to, but he works
10   with me.
11      Q    I've seen your show, Ms. Loomer.
12   Occasionally, you ask someone to put something on a
13   screen or show something.
14      A    Yeah.
15      Q    Who is it that you're talking to?
16      A    My producer.
17      Q    Who is your producer?
18      A    His name is Cannon [ph], and he is an
19   employee of Ark Studios.  So the production company
20   employs their staff, and I contract out the production
21   company.
22      Q    Okay.  So Illuminate Media has no employees;
0066
1    is that right?  Other than you?
2       A    Correct.
3       Q    Okay.  I'm going to ask the court -- ask the
4    court reporter to mark, as Exhibit 2, a document,
5    actually, that you produced, Ms. Loomer, which bears
6    what I believe are the Bates numbers at the bottom
7    right corner, 16 through 24.
8               (Exhibit 2 was marked for
9               identification.)
10              MR. KLAYMAN:  Can I have a copy of
11   that?
12              MS. BOLGER:  Of course, you can.
13              MR. KLAYMAN:  And the witness?
14              MS. BOLGER:  I'm going to try to get it
15   to you without throwing it to you, Larry, but you're

16    far away.
17          MR. KLAYMAN:  That would be nice.  That
18    would be nice.  Thank you.
19    BY MS. BOLGER:
20      Q   I'm going to draw your attention to page 20,
21    but if you want to take a look at it generally, I'm
22    fine with that.
0067
1          MR. KLAYMAN:  Go ahead and look at
2    every page.
3    BY MS. BOLGER:
4      Q   My first question is going to be, do you
5    recognize what this is?
6      A   Yes.
7      Q   What is it?
8      A   This is a letter that I produced in your
9    document request.  It's a letter that I sent to Trent
10    Morse, who currently works in the White House PPO
11    office.  And at the time, he was leading the
12    transition team for President Trump.  And this was
13    sent on November 14, 2024.  It's a copy of my resume
14    and my cover letter.
15      Q   Okay.  Can I ask you to turn to the letter,
16    which starts -- the first page of the letter has the
17    Bates Number 20 in the bottom right corner.  Just let
18    me know when you're there.
19          MR. KLAYMAN:  Can I take a quick
20    bathroom break?
21          MS. BOLGER:  Can we finish this
22    document?
0068
1          MR. KLAYMAN:  Well, that's why I want
2    to do it because I got to go to the bathroom right
3    now.
4          MS. BOLGER:  Sure.  That's fine.  We
5    can take a break.
6          MR. KLAYMAN:  Okay.  Yeah.
7          THE VIDEOGRAPHER:  Off the record at
8    10:57.
9          (Off the record.)
10          THE VIDEOGRAPHER:  Back on the record
11    at 11:02.
12    BY MS. BOLGER:
13      Q   Okay.  Ms. Loomer, I can't remember if I
14    asked you this, so forgive me if I'm repeating the
15    question.  But this is the letter, at 20, that you
16    sent to the Trump transition team on November 14,
17    2024; correct?
18      A   Yes.
19      Q   Okay.  And you drafted this letter?
20      A   Yes.
21      Q   Okay.  Terrific.  You begin by saying, "With
22    ten years of experience as a communications
0069

1  professional, as an investigative journalist"; do you
2  see that?
3      A   Yes.
4      Q   What's the difference, in your mind, between
5  communications professional and investigative
6  journalist?
7      A   Well, they're overlapping.  I mean, I would
8  just -- I would -- I am appealing to the fact that I
9  have many skill sets.  I -- I was the communications
10  director for Project Veritas when I worked for Project
11  Veritas out of college.  And you know, I would say
12  that that qualifies me to say that I'm a
13  communications professional.
14          I worked for a very well-known high
15  profile -- probably, like, the leading undercover
16  investigative journalism company in the entire
17  country, especially during a presidential election
18  year.  And I was their "comms" director, so I was
19  truthful.
20          And I have skills in, you know, doing
21  communications work outside of reporting; right?  So I
22  can serve as a communications director.  I can serve
0070
1  as a press liaison.  I can draft press releases.  I
2  have those skill sets.
3          And when I was applying for a position in
4  the Trump administration.  Yeah.  I was making it
5  known what my talents and my skills are in my
6  background.
7      Q   Did you have a particular position you
8  wanted?
9      A   Well, I was actually told that I was going
10  to be working for President Trump when he hired me in
11  his office in March of 2023 during a private meeting
12  with him and Susie Wiles at Mar-a-Lago.
13          And this was during the primary.  And
14  President Trump had actually instructed Susie to
15  onboard me to do research, and -- research -- yeah --
16  research for -- and perhaps assist with communications
17  as well, in the primary.
18          And then ultimately, you know, there was a
19  whole big story in the New York Times, and that didn't
20  end up happening.  But I had just sent this as kind of
21  like a -- you know, like an official, professional --
22  in a professional manner to just have, like, a record
0071
1  of my resume and my -- my cover letter.
2          Because you know, it's been widely
3  publicized that President Trump had hired me in March.
4  And that, you know, there was discussions about
5  bringing me on during the campaign when I was
6  traveling, even though I wasn't working for the
7  president.  He was just, you know, a fan of my
8  investigative reporting.

9        And then also, after the campaign; right?  I
10   was really hoping that I would have a job.  And
11   President Trump had said on multiple occasions that I
12   would work for him.
13        Q   Okay.  I'm just going to cut that down into
14   smaller bits, just so I understand the timeline, if
15   you don't mind.  So you said that in March of 2023 --
16        A   '23.  Mm-hmm.
17        Q   -- that you were at a sit-down meeting
18   with -- and I -- I'm not trying to misstate your
19   testimony.  I'm trying to get it --
20        A   Yeah.
21        Q   -- correctly because it was quick.
22        A   That's fine.  I understand.
0072
1        Q   So when you were -- in March of 2023, you
2   were at Mar-a-Lago with Susie Wiles and the president,
3   and -- well, the candidate, Trump; now, President
4   Trump --
5        A   Yes.
6        Q   -- and at that time, he offered you a job on
7   his campaign; is that correct?
8        A   Yes.  Mm-hmm.
9        Q   And --
10        A   It was -- it was not supposed to be -- it
11   wasn't a job interview.  I'll tell you what the
12   meeting was.  So I -- I had been investigating Ron
13   DeSantis, the governor of Florida.  And there was
14   always speculation that he was going to run for
15   president.
16        And nobody -- like, President Trump hadn't
17   taken a shot at him yet.  And there hadn't, like, been
18   an official break because people always thought that
19   they were allies, so it's important for people to have
20   the context.
21        And so in my capacity as an investigative
22   journalist, I was reporting on the governor's
0073
1   misappropriation.  And this was widely reported by,
2   you know, left-wing media, right-wing media, of you
3   know, taxpayer funds in the state of Florida while he
4   was governor to run a shadow presidential campaign
5   disguised as a book tour.
6        And so I showed up to the book tour, and you
7   know, I was there to report on it where I was
8   living -- you know, where I ran for Congress.  And
9   ultimately, the governor's -- the governor and his
10   staff called the police.
11        And the police came, and they said we had to
12   leave because we were Trump supporters.  And at that
13   point, the video had gone viral.  It was seen, I
14   believe, like 27 million times.  And it was all over
15   the media.
16        And President Trump had seen the video and

17    that was really, like, the first breaking point that
18    established the fact that Ron DeSantis was running
19    against Trump.  And so I was invited to a meeting at
20    Mar-a-Lago because the president wanted to meet me;
21    right?  He wanted to meet me 'cause he was impressed
22    by my reporting.
0074
1            And he -- in that conversation that took
2    place in his office with Susie Wiles at Mar-a-Lago, he
3    was just asking me, like, all types of different
4    questions about, you know, what I thought about
5    certain issues or my knowledge on certain issues.
6            And the president was very impressed by just
7    how well-versed I was.  And he was very impressed by
8    my reporting and my understanding of political
9    affairs.  And so he said that he wanted to hire me on
10    the spot, even though it was not a job interview.
11            And he instructed Susie Wiles to onboard me,
12    and I was supposed to start working for his
13    presidential campaign on April 1st of 2023.
14    Q    But then you did not; correct?
15    A    I did not.
16    Q    And why was that?  Or why not was that?  Or
17    why was that --
18    A    Well, you know, it's -- it's strange because
19    the president instructed this to happen.  And from my
20    understanding of how it went down, Susie had announced
21    to the campaign in an official meeting -- 'cause they
22    had their weekly meetings -- this is what I was told.
0075
1    I wasn't there in the room, so I -- for -- for this
2    discussion.
3            So I'm going off of what I was told when I
4    had a phone conversation with Susie Wiles.  She had
5    told me that she made an announcement to the campaign
6    staff about the fact that I would be joining the
7    campaign.  And it was her belief -- this is what she
8    told me -- that one of the staff leaked it to the New
9    York Times.
10            And then the New York Times ended up
11    planting a hit piece about -- they changed the title
12    multiple times.  It was something along the lines of
13    like, "Trump has hired" -- you know, they called me,
14    "anti-Muslim activist" 'cause I, you know, report the
15    truth about Islamic terrorism and anti-Semitism in
16    America -- "to work on his campaign."
17            And then they got an -- a lot of anonymous
18    sources to basically say, "Oh.  Well, we didn't -- we
19    didn't like this."  Or "Oh" -- you know -- yeah.  Who
20    knows if they're, like, real sources because they
21    don't, you know, attribute it to real people.
22            But then there was a follow-up article by
0076
1    Maggie Haberman and Jonathan Swan from the New York

2    Times at the end of the day.  And they got another
3    anonymous source to say that I would not be working on
4    the campaign.
5           And so you know, it was kind of the
6    elephants in the room the entire campaign season
7    because you know, there wasn't really anybody else who
8    was breaking the kind of reporting that I was breaking
9    that was so pivotal to President Trump's lawfare.
10          I exposed a lot of the weaponization against
11   the president, and you know, the president was very
12   grateful for it -- and his staff, also.  A lot of his
13   staff were very grateful for it too.
14          And I was, you know, given access, like many
15   other journalists, to the campaign.  Like I said, I
16   have a media company, and so my staff and I
17   oftentimes, you know, traveled to the campaign events.
18   And we were given press credentials to report on some
19   of the rallies; right?
20          You have to apply for the process, of
21   course, like through their communications team.  It's
22   like a -- a form that you fill out, and then it
0077
1    just -- you know, they let you know when you get to go
2    inside the venue.
3           And so you know, I went to South Carolina,
4    went to Iowa, went to New Hampshire.  I was in
5    Florida --
6        Q   Let me just interrupt you.  I'm not sure
7    that this answers my question --
8        A   Well, I'm just trying to explain it to you
9    because you know, there's been a lot of misinformation
10   in the media about it.  So I didn't -- I was not an
11   employee, and I am not an employee of President
12   Trump's.
13          But it was completely normal for me to
14   travel with the campaign.  A lot of journalists
15   traveled with the campaign, actually.  It's just the
16   media wanted to sensationalize me, for some manner.
17       Q   So I'm just talking about the time period of
18   March of 2023 --
19       A   March of 2023.  That's correct.  Yes.
20       Q   -- when you believed you were offered a job
21   by the Trump campaign --
22       A   I was offered a job.  Yes.
0078
1        Q   Okay.  And then -- sorry.  I didn't mean to
2    say otherwise.
3        A   Yeah.
4        Q   You were offered a job by the Trump
5    campaign, and then that offer was withdrawn?
6        A   It wasn't even formally withdrawn.  It was
7    kind of bizarre.  It was kind of just this, like,
8    silent treatment in a sense, where I wasn't really
9    officially contacted to say like, "Oh.  Your

10    employment is being withdrawn."
11          It was just kind of, like, not discussed;
12    right?  So it was just a -- it was -- it was strange,
13    and I didn't want to press it, obviously, 'cause I
14    didn't want to upset the president.
15          And I, you know, don't want to -- obviously,
16    I was upset that this had happened, and that it was
17    leaked.  But I wasn't trying to create drama for the
18    president because I care more -- I cared more about,
19    you know, the president and, you know, my country than
20    I did my ego.
21          And so I was willing to put it aside for the
22    sake of not having some, like, you know, fight in the
0079
1    media that they would have used to attack President
2    Trump and his staff.
3        Q    Okay.  You just mentioned quickly -- you
4    said that when you were getting credentials, "your
5    staff."  And you said you used the phrase, "my staff
6    and I would get credentials"; who was "the staff"?
7        A    My staff -- and I know I've used the term,
8    like, "employee," interchangeably, and I -- I mean
9    staff.  'Cause obviously, you know, there's
10    contractors.  The term, "employee," of course, it's
11    like a difference in tax purposes.
12          But my staff; right?  My contractors, the
13    video production team that I travel with them.  So I
14    would pay the expenses for my video -- the production
15    team that -- and -- and during the campaign too, I
16    was -- I -- I have my own media company.  But because
17    I was doing the show, and it was, like, very
18    extensive, I was working, actually, for a media
19    company at the time too.
20          So I had my own media company, but I was
21    also working for a media company due to the
22    sponsorship arrangement with my show --
0080
1        Q    And who is that?
2        A    -- and I'm not working with that -- I don't
3    work with that company anymore.
4        Q    What company is that?
5        A    It was called TLM -- TLM Media.  But I
6    was -- I was working with them 'cause it was their
7    staff; right?  And eventually, their staff broke off
8    and started their own company because they had, you
9    know, their own internal issues.
10          But I'm -- I'm just -- I'm -- I'm
11    explaining, when I say, like, "I manage a team of
12    employees" -- even though I was employed by that
13    company during that time period while still managing
14    my own company, I still managed the employees; right?
15          Because the employees were my team; right?
16    Like, my production team.  And I was the main client;
17    right?  While I was working there too.  So -- so I

18    just wanted to -- I wanted to clarify that because you
19    know, in media, you can --
20        Q    Ms. Loomer, there's no question pending
21    about that, so let me --
22        A    No.  I know.  But --
0081
1        Q    -- now ask you a question, and then you can
2    answer that question.
3        A    But that's what I mean by, "staff."  I pay
4    for them to go with me --
5        Q    Great.
6        A    -- to travel to cover these events.  Yes.
7        Q    Okay.  Then other than that time in March,
8    2023, when the president told you that he wanted you
9    to work for him, has there ever been a time where the
10    president or a member his staff have -- has offered
11    you a job?
12        A    Yes.
13        Q    When was that?
14        A    During the campaign.  I remember I was
15    sitting on the -- on the plane with the president when
16    I -- I think we were flying to Iowa for the primary.
17    And the president had said, "You're going to come to
18    DC with me."  And his staff on the plane were
19    clapping; right?
20            And they said, "Oh.  You do such fabulous
21    work."  "You do such great work."  And he said that,
22    "You're going to go to DC with me."  And you know,
0082
1    Susie Wiles was on the plane when that happened.  You
2    know, the press team was on the plane when that
3    happened.  A lot of people were on the plane.
4            This president was sitting directly across
5    from me 'cause he had invited me to travel with his
6    team.  I had flown multiple times with them to Iowa,
7    New Hampshire, South Carolina.  And this -- you know,
8    there was an understanding too.
9            I had conversations with Susie Wiles that I
10    would have a position at the White House after the
11    election if -- if President Trump won.  And he did
12    win.  And I had this conversation on the phone and in
13    person multiple times during the campaign.
14        Q    Okay.  So we've talked about the time in
15    March.  We talked about the time you discussed it on
16    the plane to the Iowa caucuses, I assume; right?
17        A    Yeah.  It was -- it was like the week of the
18    Iowa caucus because there were some rallies.  And I'm
19    not remembering the exact dates.  I mean, I don't have
20    a calendar in front of me.  And I saw, you know, some
21    news coverage.
22            But I believe the caucus was January 15th.
0083
1    And so it was, like, the time period leading up to
2    that.  'Cause I spent about two weeks in Iowa.  And I

3  know that I -- I believe I either flew to Iowa or flew
4  back.
5         I think I flew to Iowa with the president
6  and his staff.  And I flew to South Carolina, as well,
7  during the primary.  And I flew to New Hampshire with
8  them as well.
9     Q   Okay.  So there was the time in March, the
10 time in and around the Iowa caucuses that you just
11 talked about.  And then you said there were other
12 times when you --
13    A   Yeah.  Like, right before the election.
14 Like, right -- also, to like, right -- right before
15 the presidential debate, which is when I traveled with
16 President Trump to the presidential debate in
17 Philadelphia.
18    Q   Okay.  And any other times where you talked
19 about working with the president?
20    A   I mean, after the election was over, I had
21 conversations with the transition staff.  You can see
22 from this letter.  And you know, I was like, "Oh.  You
0084
1  have to talk to the transition team."  But I -- like I
2  said, I was promised a position multiple times, not
3  just by President Trump, but also, by Susie Wiles.
4         And so you know, I was told that this was
5  their point of contact because they had a -- it was
6  like a formality; right?  So even though like
7  some -- you know, they had told me that I'd be working
8  for the president, you had to go through the process;
9  right?
10        So this was the process.  And Trent Morse
11 was in charge of the transition.  And now --
12    Q   Great.
13    A   -- he's the -- I believe, the deputy PPO.
14    Q   Great.  Right.  Can you look at the next
15 page of this Exhibit?
16    A   Sorry.  Which page?
17    Q   The bottom says page 21.  It's the second
18 page of your letter.
19    A   Yes.
20    Q   Okay.  So the second full graph starts with
21 "Additionally"; do you see that?
22    A   Yes.  I do.
0085
1     Q   Okay.  And then I'm going to have you just
2  read that.  You're welcome to read.  I'm not trying to
3  trick you.  I'm just having -- to pointing you to the
4  right sentence.
5     A   "Additionally" -- you want me to read it?
6     Q   You'll see right -- no.  No.  No.  The last
7  sentence of that paragraph begins "For reference"; do
8  you see that?
9     A   Yes.
10    Q   And it says, "My average monthly impressions

11  engagements on X alone, for my investigations and 1893
12  insight, over 500 million per month"; do you see that?
13      A   Yes.  Yep.
14      Q   Is that accurate?
15      A   Yeah.  If you look at -- at the time -- at
16  the time, during the election -- obviously, like,
17  people are not as engaged right now 'cause people are
18  a lot more engaged in the middle of an election.
19          But if you were to look at my average
20  impressions at the time between my accounts -- 'cause
21  like I said, I had those two accounts at the time with
22  Loomer Unleashed and Laura Loomer -- it was over -- it
0086
1   was either, like, at or over 500 million per month.
2           And I mean, my account grew exponentially,
3   so it was, you know, very large growing account
4   because people were following my account for news
5   relating to the election.  And it became very central
6   to President Trump's legal cases.
7           Sometimes President Trump would even share
8   my articles.  And so you can imagine when the
9   president, you know, shares your posts, it goes pretty
10  viral.  So yeah.  It was very accurate.
11      Q   Generally, those impressions, are you
12  publishing your own content?  It's not like you're
13  publishing content created by someone else; is that
14  right?
15      A   Well, the way X works is you can publish
16  your content.  You can comment on content.  You could
17  publish content by other people and comment on it.  So
18  sometimes I would upload clips.  So maybe somebody had
19  caught something on camera at a rally or something,
20  and I would comment on it as a, you know, reporter
21  covering on politics.
22          Sometimes I would just post, you know,
0087
1   personal opinions.  But in terms of, like, the overall
2   impressions; right?  The reach, it was 500 million
3   impressions per month.
4           And it was, you know, widely documented,
5   too, in the media multiple times that my -- my account
6   was probably, like, one of the most followed accounts,
7   like, as it related to covering the election.
8       Q   Great.  So what does it mean to get
9   "Loomered"?
10      A   Well, "Loomered" was a term that I coined
11  when I was doing my -- when I was doing my
12  investigative reporting when I first started my media
13  company.  It's kind of like, you know, like a
14  gorilla -- gorilla investigative reporting.
15          To be "Loomered" is to be confronted on
16  video and peppered with questions, generally, about,
17  you know, corruption, or fraud, or -- you know,
18  confronted; right?  On video.  It was this concept of,

19   you know, being, you know, aggressively; right?
20          Like, when I say, "aggressively" -- in a
21   very journalistic manner, peppered with questions,
22   very direct questions about your activities as a
0088
1   politician or your activities as, you know --
2   generally, the target -- the targets of -- of
3   "Loomerings" are members of the media, or politicians,
4   or you know, people who are of public concern.
5      Q   So just so -- I don't think I need to take
6   the time to show you because I think we're talking
7   about the same thing.  But I've seen video of you, for
8   example, following Governor DeSantis.
9          I think it's actually the interlude you just
10   referred to in which you have your phone up, and
11   you're asking questions.  And someone is filming you
12   asking the questions as someone -- is that correct?
13      A   Yeah.  Yeah.  But that's a different
14   reference.  The one that I -- that was during Iowa.
15   That was almost a year after the initial one.  But
16   that -- that was a different encounter.
17          I didn't encounter the governor, like, on
18   video in March when I first got invited to Mar-a-Lago.
19   That was just me standing outside of his book signing
20   in Leesburg, Florida.  I wasn't even in front of the
21   governor.
22          I just was in the parking lot of the
0089
1   Books-A-Million in Leesburg.  And you know, it was me
2   and several elderly Trump supporters who showed up,
3   and they called the cops.  But yes.  That would be an
4   example of "Loomering" the second --
5      Q   Great.
6      A   -- encounter you're talking about.
7      Q   Thank you.  You already testified you worked
8   with Project Veritas, and you were there from about
9   2015 to 2017; is that right?
10      A   Yeah.  I -- about 2017.  But I -- I did -- I
11   mean, James is one of my closest friends, and he wrote
12   the foreword from my book.  And so I worked there in
13   a, like, official capacity until 2017.
14          But even throughout 2018 -- not in a paid
15   capacity.  I was assisting with helping, you know,
16   disseminate some of their communications until I was
17   banned everywhere.
18      Q   Okay.  And did you work with a company
19   called Rebel Media?
20      A   Briefly.  Yes.
21      Q   What is Rebel Media?
22      A   Rebel is a Canadian-based media company that
0090
1   does a lot of investigative journalism.  And they're
2   kind of -- they're kind of international.  And they
3   were looking for New York correspondence.  And at the

4     time, I had been living in New York.
5            And so I had applied to be -- I was
6     initially asked to assist them with fundraising.  And
7     then I had wanted to be their New York correspondent;
8     right?  But I quickly learned that they were more
9     interested in my connections for the sake of raising
10    money, and so I resigned from the company.
11       Q    Okay.  And did you -- and it's -- that's
12    actually not on your resume; is there a reason you
13    left it off?
14       A    Because I was really only there for a couple
15    months, and they didn't really allow me to do a lot of
16    the work that I wanted to do.  Because I -- I came to
17    realize, after the fact, that they were more concerned
18    with my donor connections.
19            They -- they wanted me 'cause I also
20    assisted James O'Keefe with fundraising.  I think they
21    were more interested in me trying to, like, bring them
22    donors.  And when they realized that I wanted to, you
0091
1     know, do my journalism, it felt very restrictive.
2            And I was like, "Ah.  It's not really what I
3     want to do."  Because I don't want to be a
4     professional fundraiser.  I want to do my journalism.
5     So it's like, I wasn't really there long.  I think it
6     was, like, two or three months -- two or three months
7     or so.  I don't even remember.
8        Q    Did you ever work at Info Wars?
9        A    I didn't work for Info Wars.  I contributed
10    to Info Wars.  I was invited on Info Wars several
11    times by Alex Jones, but I never had a contract with
12    Info Wars.  But I have accepted money in the past from
13    Info Wars, I will say, even though I wasn't employed
14    by them.
15            Because they used to do these, like, video
16    contests where if you had, like, really good footage,
17    or you know, you had confronted -- yeah -- covered a
18    story -- excuse me -- they would pay for the footage;
19    right?  I don't think they do that as much anymore.
20    But back in the day, like --
21       Q    Well, they're bankrupt.
22       A    What?
0092
1        Q    They're bankrupt and defunct; right?
2        A    Well, this was -- this was before their
3     lawsuit.  But back in the day, things have obviously
4     changed with the progression of social media.  A lot
5     of freelance journalists or independent journalists
6     would be paid for their content or their clips.
7            And so as an independent journalist,
8     sometimes I would, like, sell some of my footage to,
9     like, Info Wars or Gateway Pundit.  But I was never
10    employed by them.
11       Q    In the past, you --

12     A    It was just a fee.
13     Q    In the past, you referred yourself -- you've
14  referred to yourself as an "activist"; correct?
15     A    Yeah.  I have.
16     Q    And what did you mean by that?
17     A    Well, an activist is somebody that, you
18  know, fights for a specific cause.  And I'm a
19  journalist, but I'm also an activist.  I consider
20  myself to be a human rights activist.  I fight against
21  human rights abuses; right?
22         I'm an activist in the way that I speak out
0093
1   about Islamic terrorism; right?  An activist against
2   anti-Semitism.  An activist against terrorism.  An
3   activist is anybody that uses their voice or their
4   platform to advocate for a cause or to, you know,
5   speak out for something.
6          I mean, I -- I was an activist and am an
7   activist for free speech.  I think everybody, in some
8   capacity, is an activist for the causes that they
9   support.
10     Q    And have you ever referred to yourself as an
11  "influencer"?
12     A    I may have.  Like, again, that's kind of
13  a -- you know, an interesting term.  I don't like
14  calling myself an influencer because I'm a journalist,
15  but I know that a lot of times, like, when you have a
16  large following, people will call you a "social media
17  influencer."
18         But I'm a journalist.  I have a degree in
19  journalism.  I graduated with 4.0.  It's not like I'm
20  a "pretend-journalist."  I have an actual degree in
21  journalism and have a media company.  But again, that
22  term could be used if somebody is influencing
0094
1   something; right?
2          Like, so my journalism could influence
3   people's opinion on something, or my opinions could
4   influence something.  So you know, it kind of just
5   like, depends on your definition of the term,
6   "influencer."
7          But I don't really like when people say,
8   "Oh.  She's a social media influencer."  Because it's
9   like -- you know, I feel like influencers are more
10  people who, like, you know, post photos of themselves,
11  or like -- "Oh.  Buy this handbag" or "Buy this
12  makeup."  You know, it's like -- it's a different --
13  it's -- but --
14     Q    And you're changing -- effect a change in
15  society; right?  Rather than sell a handbag?
16     A    Yeah.  By -- by exposing corruption, waste,
17  fraud, abuse, doing my investigative journalism, you
18  know, speaking out about the political state of our
19  country, reporting on the news.

20      I mean, I may have -- I don't -- like I
21   said, I don't like using the term, "influencer."  I
22   may have used the term in the past to describe myself.
0095
1   But generally, like, if anyone ever calls me an
2   "influencer," I try to say, "Oh.  You know" -- I'm
3   like, "I don't really like that term"; right?
4          But I'm not going to really fight people on
5   it because I don't think a lot of people are trying to
6   be malicious when they say it.  I just think that it's
7   such a, you know, widespread term that it's just a
8   term used now to describe people that have large
9   followings.
10      Q   Do you have a career goal?
11      A   Yeah.
12      Q   What is it?
13      A   I really wanted to work for President Trump,
14   and I wanted to work in the White House.  And I wanted
15   to work in the White House doing communications or you
16   know, being, like, a vetting director.  I wanted to
17   work in the office of PPO.  It's always been a goal
18   and a dream of mine to work in a presidential
19   administration and to work in the White House.
20          I have a lot of goals, and I've always had a
21   lot of goals.  I've unfortunately been subjected to a
22   lot of censorship and targeting by social media
0096
1   companies over the last several years of my life
2   because of my political views.
3          And that has stunted a lot of my
4   aspirations, just like I believe this defamation has
5   stunted my goals and my aspirations.  Because you
6   know, when you accuse somebody of -- of something like
7   sleeping with the president, it kind of makes you
8   radioactive, even if people know that it's fake.
9      Q   Is it the case that you -- there was an
10   article published on CNN -- perhaps it was last week
11   or a couple days ago; who knows what the date it is?
12          Anyway, maybe it was a month ago -- saying
13   that you were -- had wanted a White House press
14   credential.  You're interviewed in the article.  I
15   wondered if that is accurate; that you wanted a White
16   House press credential?
17      A   Yeah.  I wanted a White House press
18   credential.  You know, Karoline Leavitt, who's the
19   press secretary, when she gave her first briefing,
20   she -- I believe it was during the first briefing --
21   may have been, like, one of the first few briefings.
22          She said that they were opening up the press
0097
1   briefing room to new media.  And like, traditionally
2   speaking; right?  Like, the White House's briefing
3   room has been kind of, like, an elitist place where
4   only mainstream media has been allowed to get press

5    credentials.
6           And so the Trump administration wanted to
7    kind of adapt the press briefing to new -- you know,
8    in new, independent media.  And I would say that I'm
9    an independent journalist.  I obviously do not work
10    for a mainstream publication.
11           And most people today consume their media
12    from independent news sources.  And so they said,
13    "We're opening up a new media seat."  They said they
14    actually created a new seat, which is in the front row
15    of the press briefing room.
16           And they were going to start diversifying
17    the press room, and that they invited anybody who
18    wanted to apply as a journalist, whether you're an
19    independent media -- independent journalist, a
20    blogger, a TikToker, a YouTuber; right?  They made it
21    very broad.
22           They said that you could apply to get a
0098
1    White House press badge.  And I applied, and my
2    correspondent, Charles Downs, also applied.  And we
3    did not hear back.  We did not hear back.
4       Q    And yet, in the CNN piece, you say that's
5    because you believe you would -- sorry --
6       A    It was an official form; right?  And so
7    like, when you ask for a lot of these communications,
8    what you have to understand is that they do a lot of
9    these things through forms; right?  So even when
10    you're asking on the campaign to get credentials,
11    like, for my staff; right?
12           You -- they -- it's a link that they -- that
13    they make available to the public.  And then they
14    disable the links, and then you fill out the form.
15    And then you either get, like, a QR code that's sent
16    to you that says, "This is your QR code" when you get
17    through security.  It's not really, like, a
18    communication; right?  So --
19       Q    You had said you had told CNN -- and I'll
20    quote it -- you had said that, "I do think
21    there's" -- and I can show it to you, but I'm just --
22    for the purposes of time --
0099
1       A    That's fine.  You can read it.  It's fine.
2       Q    "'I do think there's a fear that I may ask
3    questions about the loyalties of people in the White
4    House,' Loomer told CNN, 'and they fear me having a
5    national and global microphone to ask those
6    questions'"; does that sound correct to you?
7       A    Yeah.  And I would say that there is an
8    element of professional jealousy, and I'm sure that's,
9    you know, part of the aspect.  I obviously break a lot
10    of stories.
11           And I think that there's a jealousy and an
12    animosity, not just in the media, but also just in the

13  culture of politics, in general, where sometimes
14  people -- maybe they're jealous of my -- you know,
15  when I say my "relationship" with President Trump.
16         The fact that, you know, I wasn't born into
17  a wealthy family.  I wasn't born rich; I'm not rich.
18  I really worked hard as a young woman to have the kind
19  of access that I had and to build my media company
20  despite the adversity.
21         I ran for Congress.  President Trump had
22  endorsed me.  He voted for me.  And I think a lot of
0100
1   people kind of resent the fact that I didn't just give
2   up; right?  After being in lawsuits with, like, some
3   of the most powerful companies in the world.
4          And I think that a lot of people would just
5   like to see me go away and give up, but I kept on
6   fighting.  And I think the president admires that;
7   right?  He always talks about how he likes fighters.
8          And so while there are people who are
9   jealous of me, I think there's also -- like, I -- I'm
10  not a sycophant; right?  So I report on stories, and
11  I, oftentimes -- you know, will call out what I
12  perceive as vetting failures, or -- it's what a
13  journalist is supposed to do.
14         I mean, I'm not a propagandist or a
15  mouthpiece.  You're supposed to report the truth, and
16  sometimes that involves being a bit critical.
17     Q   You think some of the people are a little
18  jealous of your success, in terms of --
19     A   Yeah.  I do.  And I think that they're
20  jealous of the fact that President Trump likes
21  me -- like, genuinely likes me as a person.  And he
22  said it multiple times at rallies.
0101
1      Q   Okay.  Now --
2      A   He said, "Oh.  She's a tremendous person.
3   She's a wonderful woman.  She's a patriot."  I think
4   that it bothers people.  I think that a lot of people
5   get jealous when they're not singled out.
6          And I think a lot of media is jealous
7   because, you know, maybe they're like, "Oh.  Well,
8   she's a journalist.  How come the president, you know,
9   singles her out, as opposed to us"; right?
10         I think the president appreciates the fact
11  that I'm a genuine, nice person.  And I can't read
12  people's minds, but I would say that it's probably an
13  element of jealousy.
14         MS. BOLGER:  Okay.  Now, I need to use
15  the bathroom, so --
16         MR. KLAYMAN:  We've been going about an
17  hour and a half --
18         MS. BOLGER:  Yeah.  Let's take a --
19         MR. KLAYMAN:  Can we take a --
20         MS. BOLGER:  Let's take a quick break.

21          MR. KLAYMAN:  Yeah.
22          MS. BOLGER:  Want to do, like, a
0102
1   five-minute break?
2          MR. KLAYMAN:  Yeah.
3          THE VIDEOGRAPHER:  Off the record at
4   11:33.
5          (Off the record.)
6          THE VIDEOGRAPHER:  Back on the record
7   at 11:46.
8   BY MS. BOLGER:
9      Q   Ms. Loomer, are you married?
10     A   No.
11     Q   Do you have any children?
12     A   No.
13     Q   Do you currently have a romantic partner?
14     A   Yeah.  I have a boyfriend.
15     Q   Okay.  And how long have you had that
16  relationship?
17         MR. KLAYMAN:  Objection.  Relevancy.
18         THE WITNESS:  We've been together for
19  about one year.
20  BY MS. BOLGER:
21     Q   Okay.  So that puts it at like, what -- what
22  is today -- June, 2024; is that right?
0103
1      A   Actually, as of yesterday.  'Cause today's
2   the 4th; right?
3      Q   Yes.
4      A   Yesterday would have been 13 months
5   together, so a year and one month.
6      Q   Okay.  And I'm assuming you've never been
7   unfaithful to your partner?
8      A   Never.
9          MR. KLAYMAN:  Objection.
10         THE WITNESS:  Never.
11         MR. KLAYMAN:  That's --
12         THE WITNESS:  And I have -- I mean,
13  it's fine.  I have no problem answering the question.
14  I've never been unfaithful to my boyfriend, which is
15  why these allegations against me by Bill Maher are
16  also egregious.  Because at the time, when they were
17  made, I was in a relationship as I am now.
18  BY MS. BOLGER:
19     Q   What's the name of your boyfriend?
20     A   I mean, I really don't want my boyfriend to
21  be "doxed."  I -- I --
22         MR. KLAYMAN:  We'll put that on the
0104
1   separate record.
2          MS. BOLGER:  There's not going to be a
3   separate record.
4          MR. KLAYMAN:  Well, then you won't the
5   testimony.

6        MS. BOLGER:  We can designate it as
7   confidential, and we're not going to use it.
8        MR. KLAYMAN:  Then you won't get -- but
9   not on this record.  I want to keep the record
10  separate, so you can't gum it up.
11       MS. BOLGER:  Mr. Klayman, it's not your
12  deposition --
13       MR. KLAYMAN:  You don't like it, go to
14  the judge.
15       THE WITNESS:  I -- I'm --
16       MR. KLAYMAN:  You don't like it, go to
17  the judge.
18       THE WITNESS:  I get -- I get a lot of
19  death threats, and I've been swatted multiple times.
20  And people have threatened to kill me and my family.
21  And my family has also been harassed and sent threats
22  in the mail, and so I was -- I just -- I was --
0105
1   BY MS. BOLGER:
2     Q   I'm just going to remind you that the
3   pending question was, what's the name of your
4   boyfriend?
5     A   I understand.  But I --
6        MR. KLAYMAN:  Let me be clear what --
7   let me --
8        THE WITNESS:  -- don't want my
9   boyfriend to be "doxed."
10       MR. KLAYMAN:  Let me clear what the
11  position is.  I'm not asking for you not to have it on
12  the record.  What I'm saying is, if you want that kind
13  of information, we just have the court reporter break
14  it out.  That's all.  So it's not part of this.
15  Because this part --
16       THE WITNESS:  I'm happy to answer your
17  questions about my relationship.  I just don't want my
18  boyfriend to be physically attacked by some crazy
19  lunatic.
20       MR. KLAYMAN:  Yeah.  Yeah.  Here's the
21  reason.  This --
22       MS. BOLGER:  Please stop making
0106
1   speeches.  I understand your position.
2        MR. KLAYMAN:  I'm a lawyer.
3        MS. BOLGER:  I think your position is
4   ridiculous and designed to gum up a deposition for no
5   reason other than arbitrarily deciding that somehow --
6        MR. KLAYMAN:  No.  You don't --
7        MS. BOLGER:  -- you get to control what
8   I say.  That's what bothers me about it.
9        MR. KLAYMAN:  Yeah.  You're --
10       MS. BOLGER:  And whatever speech you're
11  about to do is not going to dissuade me.
12       MR. KLAYMAN:  Well, I'm going to put it
13  on the record --

14          MS. BOLGER:  So let's do this --
15          MR. KLAYMAN:  -- whether you like it or
16   not.
17          MS. BOLGER:  No.  You're not.
18          MR. KLAYMAN:  Yes.  I am.
19          MS. BOLGER:  Let's do this.
20          MR. KLAYMAN:  Yes.  I am.
21   BY MS. BOLGER:
22      Q    You're telling me you won't tell me the name
0107
1    of your boyfriend --
2          MR. KLAYMAN:  That --
3    BY MS. BOLGER:
4      Q    -- at the moment, but in a separate section
5    of this deposition, which by the way, we're going to
6    do after the seven hours because the idea that I have
7    to accommodate you and don't get the extra time is
8    preposterous -- you will tell me the name of the
9    boyfriend; is that right?
10         MR. KLAYMAN:  You don't get to decide
11   that.
12         THE WITNESS:  I'm -- I'm telling you
13   that I will give you the name of my boyfriend, but I
14   don't want my boyfriend to be "doxed" and subjected to
15   violent threats by people who don't like me, and so I
16   would ask that his name not be disclosed publicly.
17   But I'm happy to --
18         MS. BOLGER:  I agree with that.
19         MR. KLAYMAN:  And the reason is --
20         THE WITNESS:  I'm happy to give you the
21   name of my boyfriend.  That's fine.
22   //
0108
1    BY MS. BOLGER:
2      Q    I agree with that.  And also, by the way,
3    sometimes when you say that sometimes when private
4    people's names get disclosed, it's dangerous to them?
5          MR. KLAYMAN:  No.  Don't answer that
6    question.  That's vague and ambiguous.
7    BY MS. BOLGER:
8      Q    Answer the question.
9          MR. KLAYMAN:  No.  She's not here as a
10   legal expert.
11   BY MS. BOLGER:
12     Q    When you're saying that when a private --
13         MR. KLAYMAN:  Don't answer the
14   question.
15   BY MS. BOLGER:
16     Q    -- person's name gets used publicly --
17         MR. KLAYMAN:  Don't answer the
18   question.
19   BY MS. BOLGER:
20     Q    -- it can put them in jeopardy; is that
21   right?

22          MR. KLAYMAN:  Don't answer the

0109
1    question.
2              THE WITNESS:  I'm not saying that.  I'm
3    speaking to the fact that I have been swatted.  I have
4    been subjected to violence and death threats.  I have
5    a lot of people who also, as a result of Bill Maher's
6    attacks on me, have, you know, been made to think that
7    I'm some kind of a monster, especially because of the
8    follow-up episode he did.
9              I think it was "24 Things You Don't
10   Know About Laura Loomer," where he, you know, accused
11   me of being racist multiple times.  And as a result of
12   all of these attacks on my character and false
13   accusations about me, I received death threats from
14   people who have been put into a frenzy because they
15   have seen -- this has been broadcasted to millions of
16   people.
17             As you know, he has a very large --
18   large audience.  They -- they have been made to
19   believe that I am some kind of a dangerous person
20   or --
21   BY MS. BOLGER:
22     Q   So I'm just going to interrupt again

0110
1    because --
2     A   -- a racist person.
3     Q   -- in fact, my question was, "What's the
4    name of your boyfriend?"  And what you gave me
5    instead --
6     A   Yeah.  And I'm -- 'cause I'm asking --
7     Q   -- was an incredibly long explanation --
8     A   -- I don't want somebody to --
9     Q   Ms. Loomer, I'm talking.
10             THE REPORTER:  One at a time, please.
11   One at a time, please.
12   BY MS. BOLGER:
13     Q   Ms. Loomer, I am talking now.
14     A   Yes.
15     Q   My question was, "What's the name of your
16   boyfriend?"  And you gave me a speech; that's not
17   appropriate, and it wastes time --
18     A   Because there has to be a -- there has to be
19   a protection --
20     Q   Ms. Loomer, I am talking --
21             THE REPORTER:  One at a time.
22   //

0111
1    BY MS. BOLGER:
2     Q   -- and you cannot talk when I am talking.
3     A   It's so unreasonable.  I'm asking you -- I
4    don't want somebody to --
5     Q   It's how a deposition works.
6     A   I'm -- I'm happy to give you the name.

7      Q   Ms. Loomer, you may not talk when I am
8   talking -- deems the rules.
9      A   I understand.  But I'm asking something very
10  reasonable.
11     Q   I told you that I will keep your boyfriend's
12  name confidential.
13     A   Okay.
14     Q   That's agreed.
15     A   Okay.
16          MR. KLAYMAN:  Okay.  And we'll put it
17  on --
18          (Nonconfidential portion of transcript
19          ends.)
20  //
21  //
22  //
0112
1          (Confidential portion of transcript
2          begins.)
3   BY MS. BOLGER:
4      Q   So what's his name?
5      A   My boyfriend's name is Andrew.
6          MR. KLAYMAN:  Wait.  Wait.  No, no.
7   That's as far as you go.
8   BY MS. BOLGER:
9      Q   What's Andrew's last name?
10          MR. KLAYMAN:  Not here.  Not here;
11  okay?  Separate record.
12  BY MS. BOLGER:
13     Q   What's Andrew's last name?
14          MR. KLAYMAN:  No.  She's not giving it
15  here.  We'll have a separate record of that.  We're
16  not going to gum up this deposition.  You're trying to
17  justify the fact that you unreasonably, and in
18  violation of the law, want to keep everything
19  confidential.
20          We're not -- you're not going to use
21  her to make that point because --
22          MS. BOLGER:  Mr. Klayman --
0113
1          MR. KLAYMAN:  -- 99 percent --
2          MS. BOLGER:  -- it must be
3   exhausting --
4          MR. KLAYMAN:  Let me finish.  Let
5   finish.  Ninety-nine percent --
6          MS. BOLGER:  -- having to think --
7          MR. KLAYMAN:  Don't talk over me.
8          MS. BOLGER:  Please sound reasonable --
9          MR. KLAYMAN:  Ninety-nine percent of
10  what we're testifying to is --
11          MS. BOLGER:  You went down from a
12  hundred.
13          MR. KLAYMAN:  -- is not confidential.
14  We will give you that name.

15          MS. BOLGER:  It went down from a
16    hundred.
17          MR. KLAYMAN:  We'll get --
18    BY MS. BOLGER:
19      Q   Other than Andrew, have you had recent
20    relationships?
21      A   No.  I assume you're talking about romantic
22    relationships.
0114
1      Q   Yes.
2      A   No.  I'm in a very committed relationship
3    with my boyfriend, and I have been for 13 months.
4      Q   And before you were in a committed
5    relationship with your boyfriend, Andrew, were you in
6    another relationship?
7      A   No.
8          MR. KLAYMAN:  Objection.  Relevancy.
9          (Confidential portion of transcript
10          ends.)
11    //
12    //
13    //
14    //
15    //
16    //
17    //
18    //
19    //
20    //
21    //
22    //
0115
1          (Nonconfidential portion of transcript
2          begins.)
3    BY MS. BOLGER:
4      Q   Is this your first one?
5      A   No.
6      Q   How many other romantic relationships have
7    you had?
8      A   I don't know.  I mean, not --
9          MR. KLAYMAN:  Relevancy.  Harassment.
10          THE WITNESS:  -- not many.  I mean, I
11    am very busy.  I don't really have time to date, and I
12    wasn't even trying to date during the election season.
13    I met my boyfriend unexpectedly.
14          But I went into the election season
15    saying that I wasn't going to have a boyfriend because
16    quite frankly, I don't really have time to date.  And
17    I wasn't soliciting a romantic partner when I met my
18    boyfriend.  I just, you know --
19    BY MS. BOLGER:
20      Q   Like the guy?
21      A   -- you never know when you're going to meet
22    your -- your boyfriend or your, you know, future

0116
1  spouse.  So I was really against being in a
2  relationship because I'm very busy.
3        But I had the fortune of meeting somebody
4  that was very understanding of my schedule and not
5  demanding; and just happened that way.
6        (Nonconfidential portion of transcript
7        ends.)
8  //
9  //
10  //
11  //
12  //
13  //
14  //
15  //
16  //
17  //
18  //
19  //
20  //
21  //
22  //
0117
1        (Confidential portion of transcript
2        begins.)
3  BY MS. BOLGER:
4      Q    Okay.  You testified that you've not been
5  unfaithful to Andrew, and I assume you would say that
6  you -- I think you said -- and I'm sorry if I'm
7  repeating it -- that you've also never been unfaithful
8  to anybody else?
9      A    Never.
10        (Confidential portion of transcript
11        ends.)
12  //
13  //
14  //
15  //
16  //
17  //
18  //
19  //
20  //
21  //
22  //
0118
1        (Nonconfidential portion of transcript
2        begins.)
3  BY MS. BOLGER:
4      Q    In fact, you think it's defamatory to say
5  that someone commits adultery; right?
6      A    Well, in my case, Bill Maher has no
7  understanding of my personal life.  He was reckless

8    with the regard to the fact that I, you know, have a
9    boyfriend.  And he has no evidence that I had sex with
10   President Trump.  It's just outrageous.
11           And so as it relates to my situation, yes.
12   It's -- it was -- it's defamatory.
13       Q   Well, you've actually --
14       A   I'm not -- I'm not married.  I have reported
15   on political affairs -- like, actual political affairs
16   with documented evidence.  But there is no evidence in
17   this case.
18           And I have never slept with a married man.
19   I've never had sexual relations with President Trump,
20   and I've never been unfaithful to my boyfriend.
21       Q   But you actually brought this lawsuit saying
22   that the word -- accusing someone of adultery is
0119
1    itself defamatory per se -- defamatory by itself; just
2    calling someone --
3        A   Well, you have to be --
4            MR. KLAYMAN:  Wait, wait, wait, wait,
5    wait, wait.
6            MS. BOLGER:  I'm going to answer -- I'm
7    going to ask my question.  Everybody, let me finish my
8    question.
9            MR. KLAYMAN:  Just stop.  Just stop;
10   okay?  I will make an objection.
11   BY MS. BOLGER:
12       Q   You brought this lawsuit saying that simply
13   calling someone an "adulterer" is defamatory on its
14   face; right?
15           MR. KLAYMAN:  I object.  That's not
16   what has been pled.
17           MS. BOLGER:  No.  But you don't get to
18   testify.  You get to object.
19           MR. KLAYMAN:  I --
20   BY MS. BOLGER:
21       Q   Please answer the question.
22           MR. KLAYMAN:  I object.  That
0120
1    mischaracterizes --
2            MS. BOLGER:  Good.  "Objected" --
3            MR. KLAYMAN:  -- the lawsuit --
4            MS. BOLGER:  -- you've objected.
5            MR. KLAYMAN:  -- all right?
6    BY MS. BOLGER:
7        Q   What's your answer, Ms. Loomer?
8            MR. KLAYMAN:  -- and it's harassing.
9            THE WITNESS:  I brought this
10   lawsuit -- this defamation lawsuit against Bill Maher
11   and HBO because he falsely accused me of "fucking,"
12   which is another term of having sex with, with
13   President Trump.  And I have never fucked, or had sex,
14   or had any romantic involvement with President Trump
15   or any married man for that matter.

16    BY MS. BOLGER:
17        Q    And you think it's defamatory to say that
18    someone has a relationship outside of their marriage;
19    right?
20        A    It's defamatory for Bill Maher to accuse me
21    of having sex with President Trump.
22        Q    President Trump has had a lot of adulterous
0121
1    affairs; hasn't he?
2             MR. KLAYMAN:  Objection.
3             THE WITNESS:  Bill Maher defamed me
4    when he accused me of having sex with President Trump.
5    BY MS. BOLGER:
6        Q    So that's not responsive to my question.  My
7    question was, President Trump has had adulterous
8    affairs; hasn't he?
9             MR. KLAYMAN:  There's no foundation for
10    that.  There's no foundation for that.
11             THE WITNESS:  I'm not -- I'm not here
12    to speak under oath for President Trump.  I'm speaking
13    about myself, and the fact that I have never been
14    unfaithful to my boyfriend.  And I have never had sex
15    with President Trump.
16    BY MS. BOLGER:
17        Q    Okay.  But I didn't ask you that question.
18        A    And I was accused of having sex with
19    President Trump.
20        Q    So now, I'm going to have answer my question
21    because that's how this is going to work -- is I'm
22    going to ask questions, and you're going to going to
0122
1    answer them.  So --
2        A    It's not relevant to the case because this
3    is about Bill Maher falsely accusing me of -- of
4    myself, engaging in adultery, which is sleeping with a
5    married man.  And I have never, ever slept with a
6    married man.  And I have never had sex with or had any
7    kind of romantic involvement with President Trump.
8             And I've never even been in the same room
9    alone with President Trump.  And I filed this lawsuit
10    because it was broadcasted to millions of people by
11    Bill Maher that I -- he says I had sex with President
12    Trump.
13        Q    Okay.  Now, I'm going to ask you -- I'm
14    going to strike all of that.  I'm going to remind you
15    that if you keep --
16             MR. KLAYMAN:  You don't get to strike
17    anything.
18             MS. BOLGER:  -- if you keep
19    answering --
20             THE WITNESS:  I answered your question.
21             MS. BOLGER:  -- every question
22    inappropriately, it's just going to --
0123

1       THE WITNESS:  It's not inappropriate.
2       MS. BOLGER:  -- bring you back for a
3  second day of a deposition.
4       THE WITNESS:  It's not inappropriate.
5       MR. KLAYMAN:  You know --
6  BY MS. BOLGER:
7       Q   So let me now ask the question I asked; are
8  you aware that President Trump was unfaithful to his
9  wife, Ivanka [sic], with Marla Maples?
10       MR. KLAYMAN:  Presumes facts not in
11  evidence.
12       THE WITNESS:  It has been reported that
13  President Trump has been divorced several times.
14  BY MS. BOLGER:
15       Q   And that he was unfaithful to Ivana Trump
16  with Marla Maples; correct?
17       MR. KLAYMAN:  Same objection.
18       THE WITNESS:  I was never present, nor
19  did I ever witness President Trump be unfaithful to
20  any of his wives.
21  BY MS. BOLGER:
22       Q   And it's your position, as you sit here,
0124
1  that you should never report that someone does
2  something sexually unless you're personally aware of
3  it; right?
4       MR. KLAYMAN:  Objection.  Misstates
5  testimony.
6       THE WITNESS:  I'm answering questions
7  about the defamation committed against me.  And I
8  answered your question about President Trump.
9       And I have never witnessed President
10  Trump be unfaithful to his wife, Melania Trump.  And I
11  have never had sex with President Trump.
12  BY MS. BOLGER:
13       Q   And as you sit here as a in investigative
14  journalist, who so holds herself out as reporting the
15  truth, is it your position that you should never
16  report on someone's sexual behavior without facts that
17  substantiate your reporting?
18       MR. KLAYMAN:  Objection.  Irrelevant.
19       THE WITNESS:  It's my position that I
20  never had sex with President Trump.  And it's my
21  position that Bill Maher defamed me when he
22  broadcasted, twice, to an audience on September 13,
0125
1  2024, and September 20, 2024, that I had sex with
2  President Trump.
3       And that he was -- that President Trump
4  was not sleeping with his wife, Melania Trump, and
5  that I was a groupie, and that I was having an affair
6  with the president.  I'm here today to answer
7  questions about defamation committed by Bill Maher.
8       MS. BOLGER:  Okay.  So I'm going to

9   move to strike that answer as nonresponsive, because
10  it was.
11  BY MS. BOLGER:
12      Q   And I'm going to ask you the same question I
13  asked you again.
14              MR. KLAYMAN:  Harassment.
15              MS. BOLGER:  It's not related to this
16  lawsuit.
17              MR. KLAYMAN:  She responded.
18              MS. BOLGER:  It's a question.  There's
19  no pending question, Larry.  You can't accuse me of
20  harassing when there's no pending question.
21              MR. KLAYMAN:  Wait.  The record speaks
22  for itself.
0126
1   BY MS. BOLGER:
2       Q   The question is, is it your position,
3   sitting here as an investigative journalist, that you
4   should not report on the sexual behavior of someone
5   unless you have hard facts that support the
6   description of the conduct that you are reporting on?
7               MR. KLAYMAN:  Objection.
8               THE WITNESS:  It's my --
9               MR. KLAYMAN:  Objection.  Compound
10  question.  Irrelevant.
11  BY MS. BOLGER:
12      Q   Go ahead, Ms. Loomer.
13      A   It's my position that the facts show that I
14  have never had a romantic relationship with President
15  Trump.  And the facts show that I have never had sex
16  with President Trump, and that I have never been alone
17  in the same room with President Trump.
18          And I have never been a witness to President
19  Trump ever being unfaithful to any of his wives.  I
20  have never witnessed that with my own eyes.  And I
21  have never had sex with President Trump.
22              MS. BOLGER:  So I'm going to, again,
0127
1   move to strike that answer as nonresponsive.
2   BY MS. BOLGER:
3       Q   And I'm going to, actually, just put you on
4   notice.  And I'm going to move to compel you to answer
5   the question that I asked because it is relevant, and
6   I'm entitled to an honest response.  So I'm going to
7   give you one more time --
8               MR. KLAYMAN:  You know what?
9   BY MS. BOLGER:
10      Q   -- to answer my question --
11              MR. KLAYMAN:  Stop badgering her.
12  BY MS. BOLGER:
13      Q   -- which is -- my question is --
14              MR. KLAYMAN:  Make our day.  Make our
15  day.
16  BY MS. BOLGER:

17      Q   -- is it the -- your position as an
18   investigative journalist -- divorced from the facts of
19   this case, as you sit here, is it your position, as an
20   investigative journalist, who holds herself out as
21   reporting the truth, that a journalist should not
22   report on the sexual behavior of another person
0128
1   without personal knowledge as to that sexual behavior?
2           MR. KLAYMAN:  That's five questions.
3   Compound question.
4   BY MS. BOLGER:
5      Q   You can answer it.
6           MR. KLAYMAN:  Objection as to form,
7   irrelevancy.
8           MS. BOLGER:  Great.
9   BY MS. BOLGER:
10     Q   Ms. Loomer, please answer the question.
11     A   It is my position that my reputation as a
12   investigative journalist has been damaged by Bill
13   Maher's false accusations that I had sex with
14   President Trump.  And he has no evidence, whatsoever,
15   that I had sex with President Trump.
16          And I'm here today to answer questions about
17   whether or not I had sex with President Trump because
18   that's why I filed this lawsuit.  Because I have been
19   smeared as a whore, and as a groupie, and as a bimbo.
20   And I am not working in the White House right now
21   because of Bill Maher's false accusations against me,
22   in which he stated that I had an affair with President
0129
1   Trump.
2      Q   Is there a reason you're scared to answer my
3   question?
4           MR. KLAYMAN:  Objection.  And that's --
5           THE WITNESS:  I'm not scared to answer
6   your question --
7           MR. KLAYMAN:  -- that's harassment.
8           THE WITNESS:  -- I'm just not going to
9   give fodder to any idea or insinuation that I have
10   ever been unfaithful to my boyfriend, or that I use my
11   sexuality or have, you know, used my -- you know,
12   my -- my looks or my body to advance my career.
13   BY MS. BOLGER:
14     Q   Is the reason you won't answer my question
15   because you frequently report on people's sexual
16   behavior without any basis --
17           MR. KLAYMAN:  Objection.
18   BY MS. BOLGER:
19     Q   -- and you don't want to be caught?
20           MR. KLAYMAN:  Objection.  Compound
21   question.  Irrelevant.  You know, I take offense at
22   this.  You are a woman; okay?  You are beating up on a
0130
1   woman who was falsely accused of adultery --

2   BY MS. BOLGER:
3       Q    Just answer the question, Ms. Loomer.
4           MR. KLAYMAN:  -- okay?  This is
5   despicable conduct.
6           MS. BOLGER:  Sure.
7   BY MS. BOLGER:
8       Q    Answer the question, Ms. Loomer.
9       A    I filed this lawsuit because Bill Maher
10  falsely accused me of what he said was "fucking
11  President Trump."  And he has no evidence that I'm
12  having sex with President Trump.  And I answered the
13  question.  I answered the question.  There's
14  nothing --
15          MS. BOLGER:  I'm going to ask you to
16  mark, as Exhibit 3, a tweet --
17          THE WITNESS:  -- nothing else --
18  there's nothing else that --
19          MS. BOLGER:  We're done, Ms. Loomer,
20  with the speech.
21          THE WITNESS:  Okay.
22          MS. BOLGER:  We're going to mark, as
0131
1   Exhibit 3 --
2           THE WITNESS:  I'm answering your
3   question.  You just don't want it.
4   BY MS. BOLGER:
5       Q:   All right.  You're going to mark, as
6   Exhibit 3, a tweet of yours from July 26, 2023.
7           (Exhibit 3 was marked for
8           identification.)
9           Oh.  Shoot.  I have that.  Okay.
10          Ms. Loomer, do you recognize this tweet?
11      A    Yes.
12      Q    Okay.  Could you read it to me?
13      A    "Another note from President Trump tonight.
14  I love him so much.  He fights for us, so we fight for
15  him.  #Trump2024 #ForeverTrumper."
16      Q    Great.  And there's an image there, of
17  a -- I guess it's a tweet from you that the president
18  has written a note on; is that correct?
19      A    Yeah.  It's a tweet.  And the president
20  doesn't email.  And the president doesn't really do
21  any electronic communication.  And so he's known for
22  printing out tweets that are presented to him from his
0132
1   staff.  And he generally, like, writes, you know, his
2   notes in Sharpies.  That's how he communicates, for
3   the most part.
4           And then the staff send it over, or they,
5   like, will personally mail it to you as well.  So
6   oftentimes, you'll get, like, literal manila envelopes
7   in the mail with your printed tweets with the notes
8   from the president.
9           So yeah.  He wrote, "Laura, this is amazing.

10   I'm posting on Truth."  And it's a video of me
11   confronting disgraced former FBI director, James
12   Comey.
13       Q   And you say the words, "another note from
14   President Trump"; have you gotten many notes from
15   President Trump?
16              MR. KLAYMAN:  Objection.  Relevancy.
17              THE WITNESS:  Well, I -- I've posted
18   this image.  And as I said before, sometimes the staff
19   would either mail notes or convey notes.
20   BY MS. BOLGER:
21       Q   So the answer to my question is "yes";
22   you've gotten other notes from President Trump?
0133
1        A   Yeah.  About -- yeah.  About my reporting.
2        Q   About how many?
3        A   I don't know.  I don't count them.  A few.
4    I mean, he has posted my reports on Truth Social.
5        Q   Did you say you've gotten 20 notes?
6        A   Maybe, like, 15 or so.  I -- I really don't
7    remember.  Maybe, like, 15 or so.
8        Q   When was the last time you got one?
9        A   Like, before the presidential election.
10   Before the presidential election, I believe.  It was
11   mostly -- it was mostly during the primary.  And it
12   was mostly, like I said, during the primary, which is
13   when this -- July 26, 2023.
14       Q   Okay.  I'm going to -- sorry.  It's -- this
15   is --
16       A   I don't -- I honestly don't remember the
17   last time.  I do know, though, that it was -- I
18   really --
19       Q   Do you post every time you get a note from
20   him?
21       A   No.  I haven't -- I didn't post all of the
22   notes I -- I received.
0134
1        Q   Do you keep them?
2        A   I have some of them.
3        Q   Where do you keep them?
4        A   I have them in a folder in a box that I --
5    that I had that -- it's, like, a manila envelope.
6    I -- I try not to take them out 'cause it's -- it's
7    like -- it's historic, in my opinion.
8            It's like a box that I have -- or had.  I
9    don't know.  They're like manila envelopes.  I keep
10   them in the original envelopes that they were sent in.
11       Q   Because you think they're valuable?
12       A   Well, they're sentimental.  They're
13   sentimental.  I mean, it's not every day that you get
14   recognized by the president of the United States for
15   your journalism.
16           And I find great pride in the fact that the
17   president said that my video confronting the former

18    FBI director who's now under investigation for
19    threatening to assassinate the president of the United
20    States, which is a felony, sent me a note.
21       Q    Great.  I'm going to ask you to -- ask the
22    court reporter to mark, as Exhibit 4, another tweet of

0135
1    yours.  And then it actually contains a video, so
2    we're going to --
3                (Exhibit 4 was marked for
4                identification.)
5       A    And I said, "I love him so much" --
6       Q    -- look at the video.
7       A    -- he's the greatest president ever.  I
8    think he's great.  I love Trump.
9                MS. BOLGER:  Here you go, Mr. Klayman.
10               THE WITNESS:  This is it?  Do I need
11   to -- it needs to be noted?
12               MS. BOLGER:  It just needs to be
13   marked.
14               MR. KLAYMAN:  That was 3?
15               MS. BOLGER:  Nope.  4.
16               MR. KLAYMAN:  The prior one was 4?
17               MS. BOLGER:  The prior one was 3.
18               (Video played.)
19               MR. KLAYMAN:  3.  Yeah.
20               MS. BOLGER:  The one I just handed you
21   is 4.
22               MR. KLAYMAN:  Yeah.  Exhibit 4.  Okay.

0136
1                MS. BOLGER:  Okay.  So just -- sorry.
2                MR. KLAYMAN:  What's this?
3                MS. BOLGER:  Sorry.  There's lots of
4    audio/visual.
5                THE WITNESS:  Mm-hmm.
6    BY MS. BOLGER:
7       Q    So for the record, Ms. Loomer, the document
8    I just handed you is a tweet that you tweeted on
9    August 13, 2023; can you read it to me?
10      A    Says "Loomer."  And then there's, like, an
11   emoji there that's supposed to, like, indicate I'm
12   sitting next to him.  "Trump.  Best president ever.  I
13   love him so much."  And that's --
14      Q    Just so you know that the reason I asked you
15   to read it's my cowardice in not knowing how to read
16   out loud what that emoji was, so thank you very much
17   for telling me what the emoji was.
18      A    It's like -- it's supposed to be like a -- I
19   think they're like joining hands where it looks
20   like -- kind of like two fists coming together.  And
21   it's, like, an emoji that's, like, conveyed when,
22   like, there's, like a -- like a -- you know -- I don't

0137
1    know -- like, two people sitting together.
2                It's just a common emoji that's used online

3    when you're, like, either showing a video of two
4    people sitting together.  Or it looks like two fists
5    that are kind of, like, going like this together;
6    so --
7        Q    Like, holding hands; right?
8        A    I mean, I guess.  But it's not, like,
9    romantic holding hands.  It's more of, like, you know,
10   "Oh.  You're -- you're, like, united in, like, a
11   shared cause"; right?  It's supposed to be like a
12   unity emoji.
13       Q    Okay.  And there's a video here.
14       A    And I'm unified with President Trump.
15       Q    Okay.  And there's a video.  You'll see --
16   from the image I handed you, you can see there's a
17   video; correct?
18       A    Yeah.  It's from his golf club.  That's from
19   August 13th.  I actually had just given a speech to
20   the New York Young Republicans, and I went, the next
21   day, to Bedminster.  'Cause they were having -- I
22   believe it was the LIV Golf Tournament.
0138
1             And I had never been.  I'm really not into
2    sports at all, but I know that President Trump is.
3    And I have some friends -- my friend, Paul Ingrassia,
4    who just got appointed by President Trump to work in
5    the administration.
6             He -- he, and I, and his sister, and some of
7    his family, and other members of the New York Young
8    Republican Club decided that we wanted to go to the
9    golf club.  And so I just had a regular ticket, and I
10   was standing on the side of the golf course.
11            And President Trump is known to, like, drive
12   around in his golf -- golf cart.  And he saw me, and
13   he was like, "Oh.  It's Laura.  She's a fantastic
14   journalist."  And there are witnesses to this; right?
15            Like I said, I was there with Paul
16   Ingrassia, who now works for President Trump in the
17   administration.  President Trump's secretary, Natalie
18   Harp, was there.  Media was there.  It was widely
19   reported.
20            And he was just talking about how he thinks
21   I'm great.  And I think, like -- he even was like,
22   "Oh.  I -- I love this girl.  She's amazing"; right?
0139
1    Like, "She does such great work."
2             And I got a photo with him.  And then as he
3    was in his golf cart, he turned around, and he told
4    Natalie -- and he said, "Make sure that she gets to
5    come up to the suite."
6             And then he said, "How many people are you
7    here with?  Your friends are more than welcome to come
8    up to my private suite" where he was hanging out with
9    all the pro golfers and there were some, like, donors
10    and club members.

11         And so -- I mean, it was shocking because,
12  you know, I'm not a donor, and I'm certainly not a
13  member of the club.  And it's not every day that the
14  president of the United States invites you and your
15  friends.
16         And he literally invited all of us.  There
17  was about five of us -- Paul; his sister; I think, his
18  mom; and then two other people, I think, from the
19  Republican club -- or one other.  I don't remember
20  exactly, but we were all there.
21         And we got to sit -- that -- that room right
22  there is his suite.  And there were, you know, about
0140
 1  ten other people -- fifteen people in the room.  It
 2  was very -- it's very private.  I mean, it was very
 3  exclusive.
 4         And then there's a balcony door that
 5  oversees the -- the golf tournament that was taking
 6  place at his Bedminster club.  And so we filmed the
 7  video, and I was sitting next to him.
 8         He got a Sharpie in his hand.  He was
 9  signing hats.  'Cause I said, "Oh, man.
10  Mr. President, look at all these people outside.
11  You're so popular.  Everybody loves you.  You know,
12  you're -- you're the best president ever."
13         And I said, "You should sign all these hats
14  that are sitting here and throw them off the balcony.
15  People would love it.  The media would go crazy."  And
16  he said, "You know, Laura, that's actually a really
17  good idea."
18         And he signed about 50 hats and then
19  proceeded, after we filmed this video, to walk onto
20  the balcony.  And he threw a bunch of hats, and he had
21  his staff film him.  And if you look at the date from
22  when this video was published, you'll see videos
0141
 1  online of him throwing hats to supporters.
 2         So yeah.  I mean, I said I love him.  I love
 3  President Trump.  Millions of Americans love the
 4  president.  You can love your -- love your dad;
 5  doesn't mean you're sleeping with your dad.
 6         You can love your mom; doesn't mean you have
 7  a sexual relationship with your mom.  I love my dogs.
 8  It doesn't mean that I'm committing bestiality and
 9  fucking my dogs; right?  As Bill Maher would say,
10  I -- I --
11    Q    Can we just watch the video?  So I'm just
12  going to --
13    A    Yeah.  You can play it.
14    Q    So let's play the video --
15    A    Go ahead.  Yeah.
16    Q    -- of LIV.
17         (Video played.)
18  BY MS. BOLGER:

19   Q   And you posted that; right?
20   A   Yeah.
21   Q   Great.
22   A   It's a great video.  It's amazing.  I mean,
0142
1    again, it's pretty cool that the president invited me
2    to go to his private suite, and he called me
3    opinionated.  He says I'm special.  It's awesome.
4    It's probably one of the most exciting moments ever.
5    Q   Great.
6    A   I mean, it's awesome.  I meant everything I
7    said in the video.
8        MS. BOLGER:  Okay.  Just as I'm going
9    to ask the court reporter to mark, as Exhibit 5,
10   another tweet, which I think is from the same day.
11       (Exhibit 5 was marked for
12       identification.)
13   BY MS. BOLGER:
14   Q   And just for the record, you -- this is a
15   tweet from you on August 13th.  It says, "President
16   Trump invited me to sit with him inside his private
17   box at #Bedminster to watch the #LIVGolfTournament";
18   do you see that?
19   A   Yep.  And I just said, too.  Mm-hmm.
20   Q   You posted that; correct?
21   A   Yep.  That's from the same video.  That's,
22   like, a wider shot.  And you can see my testimony is
0143
1    accurate because he's sitting there with a ton of hats
2    with the Sharpie in his hand.
3        And you can see the suite and the -- the
4    drinks of, like, the soda machine behind us.  And you
5    can see the reflection of people sitting on the
6    balcony.  So everything I said was accurate about him
7    signing the hats, and you know --
8    Q   And there's no one with you guys in that
9    picture; right?
10   A   Well, they're to the side because I wanted,
11   you know, my own photo --
12       MR. KLAYMAN:  Objection.  You know,
13   this is so offensive, you know --
14       THE WITNESS:  You can see -- but you
15   can see -- you can clearly see somebody in the corner.
16   But like I said, there's witnesses.  You're lawyers --
17   like, you could easily ask Paul Ingrassia --
18       MR. KLAYMAN:  Objection.  Objection.
19   This --
20       THE WITNESS:  But it's fine --
21       MS. BOLGER:  There's literally no
22   pending question.
0144
1        THE WITNESS:  It's fine, Larry.  You
2    know, it's okay.
3        MR. KLAYMAN:  I'm putting an objection.

4          MS. BOLGER:  There's no pending
5   question.
6          MR. KLAYMAN:  This is so offensive.
7   I've been at Bedminster too.  I've been with the
8   president; doesn't mean I'm sleeping with the
9   president.
10          MS. BOLGER:  There's no pending
11   question, Mr. Klayman.
12          THE WITNESS:  Yeah.  But like I said, I
13   don't have anything --
14          MR. KLAYMAN:  It's a insinuendo.
15   You're trying to smear her in the context of this
16   deposition.
17          THE WITNESS:  But there were witnesses.
18   Like I said, you could ask any of the staff.
19          MS. BOLGER:  Hey.  Ms. Loomer, there's
20   literally no question pending.  No one should be
21   talking.
22          THE WITNESS:  Okay.  I will just say
0145
1   it's pretty obvious someone's taking a photo, so there
2   is somebody else in the photo.  There's two people --
3   the person taking the photo --
4          MS. BOLGER:  Again, there's no pending
5   question.  You are not permitted to speak.  I will
6   move to strike speeches that are made not in response
7   to a question.
8          THE WITNESS:  All right.  Okay.
9          MS. BOLGER:  Okay.  Do you have this
10   one?  It's not --
11          Okay.  I'm going to ask the court
12   reporter to mark as, Exhibit 6, another tweet from
13   that day.
14          (Exhibit 6 was marked for
15          identification.)
16          So I'm going to have to get you a
17   photocopy of this after -- at the break, but you're
18   welcome to look on.
19   BY MS. BOLGER:
20      Q   So Exhibit 6 is another tweet from you from
21   August 13, 2023.
22          THE REPORTER:  Starting from -- from
0146
1   here?
2          MS. BOLGER:  From here.
3          This is a different form of it, Larry,
4   but I can get you the real one at the break.
5          MR. KLAYMAN:  This is Exhibit 6?
6          MS. BOLGER:  Yep.
7   BY MS. BOLGER:
8      Q   And, Ms. Loomer, this is your tweet;
9   correct?  And it had four pictures embedded in it?
10      A   Yeah.
11      Q   Okay.  And it begins with the sentence,

12    "Today was the best day of my life"; right?
13        A    Yeah.  It was a pretty cool day.
14        Q    Okay.  Is that still the best day of your
15    life?
16            MS. BOLGER:  Larry, this is the tweet.
17            THE WITNESS:  I mean, I've had a lot of
18    really great best days of my life since then.  Like,
19    the election, I'm really glad President Trump won the
20    election, so election night was probably the topper to
21    that.
22            MS. BOLGER:  Okay.
0147
1    BY MS. BOLGER:
2        Q    Okay.  I'm going to ask the court reporter
3    to mark, as Exhibit 7, another tweet of yours from
4    August 14, 2023.
5            (Exhibit 7 was marked for
6             identification.)
7            MS. BOLGER:  Here you go, Larry.
8    BY MS. BOLGER:
9        Q    Came from Mr. -- for the record, Ms. Loomer,
10    what is this?
11        A    That was a photo that somebody snapped of
12    the moment.  Remember I -- I said prior, on your -- I
13    think two questions ago that when President Trump, you
14    know, got out -- was leaving in his golf cart, he
15    turned around and said, "Oh.  You know, get her to
16    come over."
17            And he came over and invited me to his
18    suite, and he was saying how great my work was; right?
19    I did say that he was telling people, "Oh.  She's
20    amazing.  She does such great work."  And this was a
21    photo of him talking; he talks with his hands.
22            And I gave him a hug.  And I, kind of,
0148
1    remember it was funny.  Like, Secret Service kind of,
2    like, grabbed my hand 'cause you know, it's taboo to
3    grab the president of the United States.  And he was
4    like, "No.  No.  No.  It's fine.  It's fine."
5            And he actually gave hugs to several people.
6    You know, he's a very nice guy.  And so that's a photo
7    of me looking up, talking to him.  He's, like, looking
8    down.  And he has his hands up, and he was like, "Oh.
9    You do some of the best reporting ever."  So --
10        Q    And then there's an emoji?
11        A    Yeah.
12        Q    What's the emoji?
13        A    It's an emoji with, like, the "heart eyes"
14    because it was awesome.  I mean, this was -- aside
15    from my -- what's the date on this?  This was
16    August 14th.
17            So aside from meeting him in his office at
18    Mar-a-Lago, this was, like, one of the only other
19    times, like, from that time in March up until August

20    that I was able to, you know, like, sit down -- like,
21    sit down with him and -- and talk with him in person.
22         And so I posted that "heart eye" emoji
0149
1    because it was just, like, such an amazing moment.  So
2    it was, like, a very exciting moment for me.  I loved
3    it.  I loved the fact that it felt really nice to be
4    appreciated and publicly recognized in front of so
5    many people.
6         And you can clearly see the barricade too.
7    Like, they kept some people behind the line.  And the
8    fact that he let me pass the line, it meant a lot to
9    me.  Because you know, he's the most powerful man in
10   the world, praising me for my work.  And it was just
11   exhilarating.
12      Q   Okay.  I'm going to --
13         UNIDENTIFIED SPEAKER:  Do we have an
14   actual still of this?  149.
15         MS. BOLGER:  Okay.  I'm going to ask
16   Court Reporter to mark, as Exhibit -- 7?
17         THE REPORTER:  8.
18         MS. BOLGER:  8.  A --
19         (Exhibit 8 was marked for
20         identification.)
21   BY MS. BOLGER:
22      Q   Is it called a "Truth" when there's a post
0150
1    on Truth Social?
2      A   Yeah.  A Truth post.  Yeah.
3      Q   So a Truth post by Donald J. Trump that
4    says, "Thanks, Laura."  One second.  And have you seen
5    this before?
6      A   Yeah.
7      Q   Okay.  We're going to play the clip of it.
8    And let me go ahead.
9         (Video played.)
10         THE WITNESS:  It's very low.  Can
11   you turn it up?
12         MS. BOLGER:  Yeah.  Very low.
13         You should be recording this.
14         THE WITNESS:  It's very hard to hear.
15         MS. BOLGER:  Yeah.  I agree.
16         THE WITNESS:  Sorry.
17         MS. BOLGER:  Pause it.
18         THE WITNESS:  I mean, I know what the
19   video says, but I -- I know where this is going, but I
20   just --
21         MS. BOLGER:  Can you see what the
22   volume of the computer is at?
0151
1         UNIDENTIFIED SPEAKER:  The volume is
2    all the way up.
3         THE WITNESS:  It's in "Audio."
4         MS. BOLGER:  I don't know why it's not

5   playing.
6                 UNIDENTIFIED SPEAKER:  Should we take
7   it off the thing and just show her?
8                 MS. BOLGER:  Sure.
9                 UNIDENTIFIED SPEAKER:  And see if this
10  makes it better for you?
11                THE WITNESS:  Yeah.  That's fine.
12                MR. KLAYMAN:  This is very
13  entertaining; do we have popcorn?  We can watch all
14  this.
15                THE WITNESS:  It's fine.  I've seen the
16  clip before.
17                MR. KLAYMAN:  I'm being facetious.
18  Irrelevant, but entertaining.
19                (Video played.)
20  BY MS. BOLGER:
21    Q   Did you give that interview, Ms. Loomer?
22    A   Yeah.
0152
1     Q   Great.  And that accurately reflects what
2   you said?
3     A   Yeah.
4                 MR. KLAYMAN:  It speaks for itself.
5                 MS. BOLGER:  Okay.
6                 THE WITNESS:  I mean, like I said,
7   I -- when I say, "dating," you know, dating can
8   construe a lot of things -- like, going out to dinner
9   with someone.  I mean, I'm very clear.  Like, I don't
10  really -- I don't date a lot.  I'm in a very committed
11  relationship throughout my early twenties.
12                I just turned 32.  I have not had many
13  boyfriends.  And the reality is -- is that I am a very
14  career-centered woman.  I'm 32.  My main focus wasn't
15  getting married and having kids.
16                You know, I care more about my work
17  than I do about having a romantic partner.  And I
18  waited to find somebody who would accept the fact that
19  I want to be very successful.  And I --
20  BY MS. BOLGER:
21    Q   Just for the record, my only question was --
22    A   No.  I know.  But I'm --
0153
1     Q   -- did you give that interview?
2     A   I did give the interview, but I'm explaining
3   that --
4     Q   Okay.  That's great.  So then my question
5   is, what was the --
6                 MR. KLAYMAN:  Don't interrupt her.
7   BY MS. BOLGER:
8     Q   -- what was the --
9                 MR. KLAYMAN:  Don't interrupt her.
10  BY MS. BOLGER:
11    Q   -- name of the individual who you
12  referenced?

13      A    Honestly, I don't remember because they were
14  so unimportant to me.  I mean, when I say that they're
15  not important, I really mean it.  Like, I just -- a
16  lot of men want to date me, obviously, because I'm a
17  very high-profile person.
18          And you know, you can -- I can -- can
19  imagine that I -- I get hit on a lot.  I just -- I
20  don't really care for -- care for it because I'm more
21  focused on the mission.
22      Q    Okay.  Going to ask the court reporter to
0154
1  mark, as Exhibit 9 -- assuming I'm counting right --
2  another tweet of yours.
3              (Exhibit 9 was marked for
4              identification.)
5              THE REPORTER:  Marking as Exhibit 9.
6              MS. BOLGER:  Oh.  I'm sorry.  That's
7  mine.  Just give me one more.
8              Here you go.  Sorry --
9              THE WITNESS:  Thank you.
10  BY MS. BOLGER:
11      Q    Okay.  Exhibit 9 is a tweet from you on
12  January 16, 2024; can you read it for me?
13      A    Yeah.  It was a quote tweet of the photo of
14  me -- what day is this?  This was -- okay.  So this
15  was the day after.  Maybe it was the night of the --
16  the Iowa caucus.
17          It was Iowa caucus, and it -- it clearly
18  says "Iowa."  And it's a photo of me behind the stage,
19  giving President Trump a hug right after he had won
20  the Iowa caucus in a blowout victory.
21          And it says, "I just love him so much -- not
22  in a weird way.  I just really love President Trump.
0155
1  He's the most amazing person ever.  It makes me so
2  happy every time I see him or watch his speeches.
3  He's the fighter that we all need, but many don't
4  deserve him.  He deserves the best.  He's my
5  favorite."  And then -- yeah.  It's a -- it's a quote
6  tweet of the post.  Yeah.
7      Q    Okay.  Do you know Randy the Savage?
8      A    Yeah.
9      Q    Okay.  Is it a friend?
10      A    Yeah.  She -- she's -- her name's Reanna.
11  And she's the wife of Brendan Dilley, who is
12  another -- you know, he has something called the
13  Dilley Meme Team.  And they make a lot of
14  memes -- political memes.
15          And President Trump shared their content a
16  lot during the campaign.  And so we became friends and
17  you know, she just commented on the photo.  It was a
18  photo I posted from the Iowa caucus.
19      Q    Okay.
20      A    I think it was -- I think it was from the

21    15th, though, if I'm not mistaken.  And then the --
22    she made the comment on the 16th.  But I -- if I
0156
 1    recall correctly, I think the Iowa caucus was on the
 2    15th of January.  But that is my post, and I did say
 3    all of that.
 4        Q    Great.  You were at the Republican National
 5    Convention; right?
 6        A    Yeah.
 7        Q    How did that come to pass?
 8        A    So I actually flew with President Trump to
 9    the Republican National Convention.  It was actually
10    the day after he was almost assassinated in Butler,
11    Pennsylvania.
12           The president had communicated to me through
13    a staff that he wanted me to -- I -- I broke a story,
14    I believe, about Kamala Harris having a campaign event
15    in a spice shop called Penzeys Spice Shop.  I believe
16    that's the name of it.
17           And I was talking about how the owner of the
18    Spice Shop was very radical -- like, posted a lot of
19    anti-Trump things, and that the people that they had
20    there for this, like, very staged event with Kamala
21    Harris was staged.
22           These people were Democrat party volunteers,
0157
 1    and I exposed it.  And the president, like, loved the
 2    story.  It was so funny.  It was all over social
 3    media, and it went super viral.  And so then the
 4    president was like, "Oh.  Do you want to go to the
 5    Republican National Convention?"
 6           I was like, "I would love to.  I was going
 7    to go anyway, and I was going to bring my team with
 8    me -- my staff -- and cover it, and live stream it.
 9    And so I would love to."  He's like, "Great.  Connect
10    with my staff, and you can fly there with us."  This
11    was --
12        Q    Was that conversation on the phone?
13        A    Yes.
14        Q    He called you?
15        A    Yes.  But through the phone of a staffer, I
16    believe.  So he called me from the plane from the
17    staff.  Like, the staff he had -- he -- sometimes he
18    uses his staff's phone.  Like, the -- he will have the
19    staff call, and then he will grab the phone.
20           So the staff, I -- I think it was his
21    secretary or so.  I don't remember who exactly.  But
22    they were on the plane.  And then the president
0158
 1    grabbed the phone.  Might -- it may have been Susie
 2    Wiles.  But the president grabbed the phone and then
 3    invited me because they were showing him the story
 4    that I had just broke while they were on the plane.
 5           And you know, on his plane, you can make

6    phone calls.  It's not like a regular plane.  You can
7    make phone calls from that plane.  So he invited me.
8    And I believe this was, like, a week before.
9           And obviously, like, nobody knew what was
10   going to happen the next week.  And then Butler
11   happened on July 13th.  And I was watching the rally
12   on live television.  And I was getting ready to leave.
13   I was getting my hair done, I believe, watching it
14   live on my phone.
15          Because I knew I was going to be flying very
16   early in the morning 'cause I had to fly from Florida
17   to New Jersey and then go to Bedminster.  And that's
18   where they were going to be leaving from.  You had to,
19   like, meet in the motorcade.
20          And I was watching it, and I was like, "Oh,
21   my God.  They just shot the president."  And I thought
22   that he had died because all -- you saw blood, and you
0159
1    saw him fall to the ground.
2           And at that point in time, I was like,
3    "Okay.  Well, I'm definitely not going now because the
4    president just died."  And then the president got up,
5    and they rushed him off stage.  And you know, I
6    thought, "Okay.  Well, they're definitely going to
7    cancel the Republican convention now."
8           But I never heard -- I never heard from
9    anybody.  And so I just assumed that the travel plans
10   were still intact.  So I packed a bag, and I still
11   flew to New Jersey.  And I flew to -- I -- I flew to
12   New Jersey.  And I -- I took a -- a cab to Bedminster.
13          And I believe that I was in the car with
14   Meredith O'Rourke, who was the fundraiser for
15   President Trump.  Because I had texted her about it,
16   and she was also going to be going to the RNC
17   convention.
18          And I was like, "Oh, my God."  It's -- I
19   just assumed that the plans were still intact because
20   nobody contacted me.  And we met at the airport, and
21   then we took the same car to Bedminster.  And then I
22   was on the plane, and they allowed me to travel with
0160
1    the president to -- to Milwaukee the very next day.
2           I mean, I was shocked.  I was shocked.  The
3    president had a bandage on his ear.  He had just been
4    shot, and he still traveled.  I was fully expecting
5    them to cancel the trip.  But I flew to the Republican
6    National Convention with President Trump.
7       Q    And then did you -- when you got to the
8    Republican National Convention, did you have a
9    specific access to President Trump?  Or --
10      A    No.  They -- I had a -- I had a floor pass.
11   But I had, like, put in a request for that months
12   prior, like, through the link.  A lot of people did.
13   'Cause I had asked for it, and they knew that I was

14    going to be covering the convention.
15          And then my staff and I had press
16    credentials to cover.  I had a floor pass.  And then
17    they gave us, like, the press passes, of course.  But
18    I was not with the president, like, for any other part
19    of that trip.
20          I flew there.  And then because he had just
21    been shot, security was way extra tight.  And then I
22    got off the plane, and I went to my hotel, which is a
0161
1    separate hotel from where the president and the staff
2    were staying.  I believe I stayed at the Hilton.
3          And then my -- my staff came in, and I
4    rented an Airbnb for them because we built -- we made
5    the Airbnb into, like, kind of a makeshift studio so
6    that I could do my show and live stream my show
7    because the reception inside the convention was
8    spotty.  And then -- yeah.  I stayed there all week
9    for the convention with my staff.
10    Q   Great.  So then I'm going to ask the court
11    reporter to mark, as what I think is Exhibit 9, as a
12    tweet from you dated July 19, 2024.
13              (Exhibit 10 was marked for
14              identification.)
15              MS. BOLGER:  Sorry, Larry.  I'm
16    throwing this at you again.
17              MR. KLAYMAN:  Okay.
18              THE REPORTER:  You're at Exhibit 10.
19              MS. BOLGER:  Exhibit 10.  I'm sorry.  I
20    can't count.  Do you have it?  No.
21    BY MS. BOLGER:
22    Q   Okay.  And can you just read that to me?
0162
1    A   It's from July 19th.  It says "Watch.
2    Following his speech at the RNC convention.  President
3    Trump blew me a kiss from the stage" with a laughing
4    emoji, and American flag, and like a smiley emoji
5    with, like, cheeks.  I said, "I was" --
6    Q   A blushing emoji.
7    A   Yeah.  I mean, I guess you could call it
8    that, whatever.  It's not romantic.  It's -- you know,
9    people has kisses to people all the time.  Like I
10    said, I don't -- I don't care, like --
11    Q   Could you just read the tweet, though?
12    A   Yeah.  It says "I was in the front row on
13    the floor of the convention all night long, cheering
14    him on.  Best president ever.  #MAGA #Trump2024."
15    Q   Okay.  We're going to play the clip.
16    A   Okay.
17              (Video played.)
18              MS. BOLGER:  I think we can pause it.
19    BY MS. BOLGER:
20    Q   Okay.  You posted that video; right?
21    A   Yeah.

22      Q    I think you said, "Kai"?

0163
1       A    Yeah.  That's his granddaughter, Kai, and
2    then her brother.  Those are Trump's grandchildren.
3    They were on stage with him, with the family.
4       Q    And had you met them before?
5       A    I had never met the grandkids, but his whole
6    family was on stage, and so I've met all of President
7    Trump's children.  But I never met the grandkids.  But
8    I have met them since.
9           Like, I'm -- I -- I met Kai on election
10   night, like, for the celebration that was in Palm
11   Beach.  She was there, and I said "hello" to her.  So
12   I've met Kai before, but I had not met her prior to
13   this.
14      Q    Okay.  You said her name; that's why I asked
15   the question.
16      A    Yeah.  Kai Trump.
17      Q    Okay.  Have you been to Mar-a-Lago?
18      A    Yes.
19      Q    How many times?
20      A    I mean, a bunch of times.  I had been there
21   when I was a candidate for Congress before, you know,
22   I ever had my -- my sit-down meeting.  Because it's an

0164
1    event center too; right?  Like, it's a venue.  And --
2    well, I ran for congress in Palm Beach, Florida, where
3    I was the Republican nominee in Trump's home district.
4           And so a lot of the Republican events were
5    at Mar-a-Lago.  And you know, I had met President
6    Trump prior to my sit-down meeting with him, and I
7    have photos with him.  But it's not like -- it wasn't
8    like we had like a -- like a conversation about
9    employment.
10          It was like, "Oh.  We're in the room, and
11   you get a photo with the president."  They have a lot
12   of fundraisers there.  They have a lot of political
13   events, and so I've been to Mar-a-Lago, like -- I
14   don't know -- 20, 30 times.
15      Q    What number of those times have you met with
16   the president?
17             MR. KLAYMAN:  Objection.  Relevancy.
18             THE WITNESS:  Like, met with him, like,
19   in, like, a professional capacity?  Or just like that
20   he's been there at the same time I've been there?
21   'Cause he's been at events --
22   //

0165
1    BY MS. BOLGER:
2       Q    Why don't you answer both of them?
3       A    Okay.  So --
4       Q    So how many times has he been there when
5    you've been there?
6       A    So you have to understand that Mar-a-Lago is

7    where the president lives, and it's also used for
8    events, so the president will sometimes make special
9    appearances.
10        And I don't know -- maybe like, ten, fifteen
11   times I've been there, when he's, like, come out to
12   surprise people; right?  I've gone to a lot of
13   Republican functions at Mar-a-Lago, but I haven't
14   talked to President Trump every time that I attended
15   these functions.
16        But in terms of, like, communicating with
17   the president while I was there, whether that ranges
18   from me just, like, saying "hello," attending his New
19   Year's Eve party, having a private meeting with him,
20   or you know, shaking his hand -- there's a fist pump
21   photo -- I don't know -- like, maybe ten, fifteen
22   times, also.
0166
1    Q   Have you been in the -- I'm not sure I'm
2    using -- I'm going to use the phrase, "private
3    residence," but I -- I -- his -- the -- his living
4    quarters of the home?
5    A   No.  It's completely roped off.  I've
6    never -- like, technically speaking, all of Mar-a-Lago
7    is called his house.  But there's specific living
8    quarters where he, and the first lady, and Barron
9    Trump live.  I guess that's where, you know, his room
10   would be -- his living quarters outside of, you know,
11   the public areas.
12        When I say "public," I mean accessible to
13   the club members.  'Cause it's a club; you pay a
14   membership.  But no.  I've never ever been to any of,
15   like, the personal living quarters.
16        Only the ballroom.  His office, where Susie
17   Wiles was president -- present at the time.  I've
18   never been alone in the same room with him.  I've been
19   in the ballrooms while other people are there.  By the
20   pool, by where the president has been --
21   Q   Are you a member of the club?
22   A   No.  I mean, I could not afford -- it's very
0167
1    expensive.  It's really expensive.  But I've been
2    invited for dinners by other members of the club, and
3    I've attended events there.  But no.  I --
4    Q   Do you live nearby?
5    A   I used to.  I used to live about, like, two
6    miles or so, when I ran for Congress in Palm Beach.
7    The first time in 2020, I had a condo that I rented on
8    South Ocean Boulevard, so I lived nearby.
9        But like I said, my interactions with
10   President Trump, when I lived in Palm Beach, were just
11   like, "Oh.  You know, he endorsed me, voted for me."
12   "Oh.  I got to shake his hand and take a photo with
13   him at Mar-a-Lago, attend the fundraiser."
14        It wasn't until I moved to The Villages when

15   I ran for Congress the second time in that area
16   encapsulating Ocala, Leesburg, Lady Lake -- all that
17   area -- that I had my, like, private sit-down meeting
18   with him with Susie Wiles.  And that was even after
19   the election; so --
20       Q   I'm sorry.  I don't understand that.  I
21   thought your private sit-down meeting with President
22   Trump and Susie Wiles --

0168
1        A   Well, I'm saying, like -- it was.  What
2    I'm -- what I said is that I lived in Palm Beach from
3    2000 -- like, '18, or '17, or something like that,
4    till 2021.  And then I moved, when I ran for Congress,
5    to the other district, 'cause I ran in a separate
6    district; right?  Which was several hours away from
7    Palm Beach.
8            And so I don't -- I didn't own that condo.
9    I was renting that condo.  And what I was saying is
10   that, like my sit-down meeting with the president --
11   like, my formal meeting -- 'cause all the other times
12   prior to that meeting were just, "Oh.  You know, I'm
13   attending an event at Mar-a-Lago.  I got to shake the
14   president's hand."
15           Sometimes when you go to these events, you
16   get to take a photo with the president and whoever the
17   guest is.  My, like, first real, like, sit-down
18   meeting with Donald Trump was after I had finished
19   both congressional races; that was March of 2023.
20   'Cause you know, the election was over; that's what
21   I'm trying to say.
22       Q   Got you.

0169
1        A   I was not living at the condo.
2        Q   It's confusing.  What election was over?
3    You mean, your own election was over?
4        A   Yes.  So --
5        Q   Okay.  What --
6        A   So -- 'cause my landlord, during COVID,
7    wanted to sell the condo on South Ocean Boulevard.
8    And so I moved because, obviously, I didn't own the
9    condo.  But yeah.  I don't live there.  I don't own
10   it.
11       Q   Okay.  Did you move districts to run for
12   office?
13       A   Yeah.  'Cause it was a redistricting year,
14   and so all the maps were redistricted.  And
15   technically speaking, you don't have to live in the
16   district to run.  But I moved there 'cause, obviously,
17   I wanted to live in the district where I was running
18   for Congress.  It's the proper thing to do.
19       Q   Okay.  When you go down to Palm Beach, do
20   you -- I know it's a club -- I -- do you stay at
21   Mar-a-Lago?
22       A   No.  I've never stayed at Mar-a-Lago.  I've

0170
1  never spent the night at Mar-a-Lago.  I generally stay
2  with friends of mine who have -- I know a lot of
3  people -- I have friends that have houses down there
4  that have guest houses, or I'll stay in a hotel.
5       But I have a lot of friends.  And usually,
6  my friends are always like, "Oh.  Come stay," you
7  know.
8     Q   Great.  And did I understand you say you
9  lived in The Villages?
10    A   I ran for Congress in The Villages.
11    Q   Do you live there?
12    A   No.  Because there's an age capacity.  I --
13 I lived in Lady Lake, and so you have to be 55 or
14 older to live in The Villages.  But it's, like, a half
15 a mile border.
16    Q   So I actually knew that, and I knew you were
17 not 55.  I don't know why I asked that question --
18    A   Yeah.
19    Q   -- so I'm sorry about that.  I didn't --
20    A   It's okay.
21    Q   I didn't mean to prematurely age you.
22    A   But I practically lived in The Villages.

0171
1  It's, like, literally half a mile.  It's just the
2  funniest thing.  Like, technically it's called "The
3  Villages."  But to actually live in The Villages
4  proper, you literally have to be 55; so --
5     Q   You know, I totally aged you
6  inappropriately.  My apologies.  Okay.
7     A   But Lady Lake is the town.  A lot of people
8  just call it, "The Villages," anyway because it's --
9  you know, it extends.  And The Villages is this
10 massive compound, and they're expanding; right?  Into
11 other parts too.  They call it, like, "Disneyland for
12 retired people."  But it's a massive development and
13 they're trying --
14    Q   Got you.
15    A   -- to, like, go all over; so --
16    Q   And how many times have you been to
17 Bedminster?
18    A   Three or four times.
19    Q   And have you seen the president there every
20 time?
21    A   Yes.  Yes.  I went the first time when I was
22 there for LIV.  And then I have a friend who's a

0172
1  member who works in the administration now, who
2  invited me as their guest for two other times 'cause
3  they're golf partners with the president.  And I -- I
4  saw the president there; have lunch with, like,
5  several people, including the president.
6       And then I think the other time -- the
7  fourth time -- was some event.  I think it -- it's

8   like some conservative event that the president
9   attended.
10    Q   Okay.
11         MR. KLAYMAN:  Can we take a lunch now?
12         MS. BOLGER:  Nope.  I need to finish
13  this line of questioning.
14         MR. KLAYMAN:  All right.  Go ahead.
15         MS. BOLGER:  When I'm done with this
16  line of questioning --
17         MR. KLAYMAN:  How long will that be?
18         MS. BOLGER:  I don't know.  A few more
19  minutes.
20  BY MS. BOLGER:
21    Q   You mentioned that you've flown on the plane
22  with the president.  You've mentioned a couple
0173
1   moments.  How many times would you say you've flown on
2   the plane with the president?
3     A   Like, five or six times.
4     Q   And --
5     A   What?
6     Q   -- where have you gone?
7     A    These were all for campaign events or, like,
8   Republican events.  I went to Iowa.  I went to South
9   Carolina.  I went to New Hampshire.  I went to
10  Philadelphia for the presidential debate, which of
11  course, was the subject of Bill Maher's attacks.
12         I went to New York for the 9/11 ceremony,
13  which was, like, directly following the debate.  And I
14  went on a trip to Nashville to the Bitcoin conference
15  with the president and his staff.  And during --
16    Q   When was that?
17    A   It was before the presidential debate.  I
18  don't know the exact date, but it was before -- I
19  think the debate was September 10th.  Yeah.
20  September 10th.  So it was, like, a week or two before
21  that.  And that was Nashville.
22         And then the same day -- 'cause usually,
0174
1   like, the president travels to multiple states in the
2   same day.  And they just do these, like, you know,
3   wild trips where he just gives, like, four rallies.
4   And you go, and you just -- you end up getting back
5   super late at night.
6         So we woke up -- everybody had to wake up
7   super early, and I had to meet at the Palm Beach,
8   like, private hangar there, where the president
9   departs.  And we flew to Nashville for the Bitcoin
10  conference.  And then we flew to Minnesota for a big,
11  like, campaign rally.
12         And then from Minnesota, we flew back to New
13  Jersey.  And then I spent the weekend in New Jersey,
14  and New York.  I was -- I was at Bedminster hanging
15  out with my friend, who took me for lunch.  And then I

16   flew back to -- to Florida.
17        Q    And on each of those times you flew on the
18   president's plane, was that at his request?
19        A    Yes.
20        Q    Okay.  I'm going to ask you to -- yep --
21   to --
22        A    Well, I would say I was at his invitation;
0175
1    right?  Like, he invited me.  And I'm not going to say
2    "no"; right?  So it was him -- him inviting me.  I
3    wouldn't say like, "Oh.  I -- I demand you to come on
4    the plane."
5              It's like, "Oh.  Would you like to come?"
6    Or "Oh.  We're going to this event; would you like to
7    come?"  And I said, "Yes.  Thank you."
8         Q    Okay.  Yeah.  Sorry.  I didn't mean to
9    suggest it was anything other than invitation.
10        A    No.  It's okay.  I was just -- it's his
11   invitation.
12             MS. BOLGER:  We're going to take a look
13   at Exhibit 11.
14             (Exhibit 11 was marked for
15              identification.)
16   BY MS. BOLGER:
17        Q    So Exhibit 11, just so you know, just to cut
18   down on paper, I printed out specific pages of your
19   document production, so these are all taken from your
20   document production.  I just cut down the stack.
21        A    That's fine.
22        Q    So if you take a look at the very first
0176
1    page, which is 28, there's a picture of you and the
2    president.  You're wearing a red dress, maybe.  Maybe
3    it's pink; where was that picture taken?
4         A    That, it's in Nashville, at the Bitcoin
5    conference that I told you about, so that was prior to
6    the presidential debate.  So that was the trip that we
7    flew to Nashville for the Bitcoin conference, where
8    the president gave a speech.  And then we flew to
9    Minnesota for a rally and then flew back to New
10   Jersey.
11        Q    And that was one day?
12        A    That was one day.  Yeah.  We didn't get back
13   till two o'clock in the morning.
14        Q    Okay.  Can you --
15        A    Like I said, it's crazy.  He has so much
16   energy.  And it's, like, this campaign team will --
17   you know, they'll -- you leave in the morning at ten
18   o'clock.  And the president gets back, goes all over
19   the country, and -- yeah.  We didn't get back to New
20   Jersey till about two o'clock in the morning.
21        Q    Okay.  Will you turn to the next page?
22   There's a picture of you and the president.  That's at
0177

1    the Bedminster club; right?
2        A    Yeah.  That's during the primary.  That's
3    2023.  The one in the red dress is 2024.
4        Q    Okay.  And then the third page of the
5    exhibit, which bears the Bates Number 45 on the
6    bottom, you're wearing a printed dress; where's that
7    one?
8        A    That's at Miami.  That's at his golf club.
9    That was for his rally that he had in Miami, Florida.
10    That was, like, before the assassination attempt too.
11        I don't remember the exact date, but I know
12    it was before an assassination attempt.  That was in
13    Miami at the Trump Club there.  You know, they have
14    the Trump Doral.
15            (Nonconfidential portion of transcript
16            ends.)
17    //
18    //
19    //
20    //
21    //
22    //
0178
1            (Confidential portion of transcript
2            begins.)
3    BY MS. BOLGER:
4        Q    Yeah.  And how did you end up at Trump
5    Doral?
6        A    Well, I mean, I -- I tried to cover all of
7    the Florida rallies.  Obviously, like, as an
8    independent journalist, it's cost prohibitive to
9    attend every single rally; right?  'Cause they're not
10    going to have me fly to every single one.
11        But for the -- for, like, the key primaries,
12    I always made sure I would go to, like, New Hampshire;
13    right?  South Carolina, Iowa -- all that -- and
14    Florida.  And so for the Florida rallies, it was easy
15    for me to get there 'cause I could drive.
16        And so I drove to -- with some friends,
17    actually, to -- and I actually -- I went to this event
18    with my boyfriend.  So my boyfriend and I -- Andrew
19    actually went to this -- this event with me.  He was
20    there.
21        And it was a funny story 'cause I was there
22    with my friends, Eric [ph] and Meg [ph]; they're
0179
1    donors.  And so you had to pay $25,000 to get a photo
2    with the president.
3        And they invited me and my boyfriend, and we
4    did not pay $25,000.  But President Trump's
5    fundraiser, Meredith, who I rode in the car with, who
6    has known me for several years -- she knew me from
7    when I ran -- they let me into the photo line, even
8    though I did not pay $25,000.

9          And my boyfriend had never met President
10    Trump, and my boyfriend had never been to a Trump
11    rally.  And so we actually drove to the event.  And my
12    boyfriend was very excited 'cause it was his first
13    time going to a Trump rally, and he wasn't expecting
14    to meet the president.
15          And my friends were very generous to allow
16    my boyfriend to go in the line.  And Trump's people
17    were -- and they go, "Oh.  Mr. President, we're here
18    with a friend of yours" in the photo line.  And he
19    goes, "Oh.  Yeah.  Who's that?"  And he goes, "Laura
20    Loomer."
21          And he goes, "Where is she?"  And then it
22    was this whole big thing.  And he was very excited to
0180
1    see me and say "hello."  And then they go, "Oh.  Yeah.
2    And she brought a man-friend with her."  And he goes,
3    "Laura Loomer has a boyfriend?"
4          He goes, "No man can handle Laura Loomer."
5    And he met my boyfriend, and he -- he shook my
6    boyfriend's hand and got a photo.  And I have a photo
7    with my boyfriend with President Trump in this dress.
8          And so President Trump has met my boyfriend.
9    This was, like, shortly after my boyfriend and I had
10    started dating.  But my boyfriend was there with me at
11    this event.
12              (Confidential portion of transcript
13              ends.)
14    //
15    //
16    //
17    //
18    //
19    //
20    //
21    //
22    //
0181
1              (Nonconfidential portion of transcript
2              begins.)
3    BY MS. BOLGER:
4      Q   Great.  If you look at page 55, which is
5    kind of two pages over, there's a picture of you with
6    a T-shirt that says "Donald Trump did nothing wrong";
7    where was that taken?
8      A   That was at another Miami rally during the
9    primary, so I believe that was in 2023.  So the one
10    prior was 2024, after the primary.  And this one was
11    during the primary in Miami at the same -- I think
12    it -- no.
13              This one was at another venue in Miami.
14    This, the one in the printed dress, was at Trump
15    Doral.  But I forgot the venue for the one where I'm
16    wearing the black shirt.  It was some big venue.  It

17   was, like, outside.  It was all outside.
18       Q    Okay.  And that T-shirt you're wearing, the
19   "Trump did nothing wrong" shirt, I believe -- and I'm
20   sure you'll correct me if I'm wrong -- I believe you
21   were also wearing that shirt in New York City when the
22   president was convicted; is that right?

0182
1        A    Yeah.  I attended the president's trial.
2    Not inside, but outside.  Yeah.  And I -- I wore it on
3    some of the days.
4        Q    Did you meet him in New York during the
5    trial?
6        A    No.  The only time I've ever been in New
7    York with, like -- and met the president in New York
8    was when -- it was after the presidential debate when
9    we all flew to New York for the 9/11 ceremony.
10            And I was in the motorcade with his staff.
11   Other than that, no.  I was outside the courthouse,
12   and I was not inside with his staff or him.
13       Q    Were you there for the whole trial?
14       A    Not the whole trial, but I was there for,
15   like, a lot of the trial outside.  I was covering it
16   outside.  But then some crazy guy lit himself on fire,
17   and they blocked off the protest zone.  Like,
18   literally, that's what happened.
19            So somebody lit himself on fire, and the
20   police shut down the area in front of the courthouse.
21   But I was there the first day of the trial and for
22   several days after.  A lot of the trial, I was

0183
1    reporting on it.
2        Q    Can you go to page 69?  It's the picture of
3    you in the yellow dress again?  The pages' numbers are
4    at the bottom.
5            MR. KLAYMAN:  69 or 79?
6            THE WITNESS:  70; you mean?
7            MS. BOLGER:  69.  69.
8            MR. KLAYMAN:  I don't see a 69.
9            MS. BOLGER:  It's the page after the
10   one I just showed you -- the back of that -- right
11   there.  No, no.  Yeah.  That one.  That one right
12   there.
13            THE WITNESS:  This one?
14            MS. BOLGER:  Yep.
15            THE WITNESS:  Oh.  Okay.  It's listed
16   as 58 -- oh.  69.  I see.  Sorry.  I'm looking at page
17   numbers.  Sorry.
18            MS. BOLGER:  That's fine.
19   BY MS. BOLGER:
20       Q    It's the same day as the Miami?
21       A    Yeah.  So there's two Miami events.  The
22   black shirt was during the primary, and this is

0184
1    during --

2     Q    The one with your boyfriend?
3     A    Yes.
4     Q    Okay.  And then on the next page, which is
5  72, that is the picture of you at Bedminster; correct?
6     A    Which photo?
7     Q    I'm sorry.  Pink dress.
8     A    Yeah.  And that was during the primary.
9  Yeah.  That was for the LIV event.  Yeah.
10    Q    Okay.  Great.  Then on the next page, which
11  is the number 75, it's a picture of you and President
12  Trump holding hands.  You're wearing a Trump hat.  I
13  don't know what hat he's wearing.  I can't read it,
14  actually; but where was that?
15              MR. KLAYMAN:  Which one is this?
16              MS. BOLGER:  Page 75.
17              THE WITNESS:  This one here.  The one
18  in the bottom.
19              That was in Iowa, so it was freezing
20  cold.  And my staff were there.  They had invited my
21  staff, and I -- well, they gave us access; right?  To
22  cover an event.  And it was freezing cold in Iowa.
0185
1  Like, it was -- it was negative 45 degrees.
2              And I had been waiting outside to get
3  in and my -- my hands were, like, still frozen.  And
4  so I was in the photo line.  They let me take a photo
5  with the president.  My -- my staff were there too.
6  And the president was like, "Oh.  You brought your
7  staff.  That's great."
8              And he was like, "Oh.  I love this
9  girl.  She's so great.  She does such amazing work."
10  And he actually gave me a -- a shout-out on video at
11  this same event that he had in Iowa.
12              And I was like, "Oh, my God.  It's
13  so cold outside.  My hands are still freezing.  And
14  it's a testament to how much people love you.  They're
15  willing to stand in negative 45 degree weather."
16              And he grabbed my hand; right?  Like,
17  he grabbed my hand.  I was like, "Oh.  My hands are
18  freezing."  And then he was like, "Oh.  This girl's
19  great.  She does such great work, and she's such a big
20  supporter."  And I gave a thumbs up.
21              And then shortly after that, you could
22  see on the video he was, like, giving -- it was a very
0186
1  small event.  'Cause obviously, like, the snowstorm
2  kind of made outside venues impossible.
3              But he gave me a shout-out and said,
4  "Oh.  She brought her whole team with her this time.
5  They work very hard.  They do a lot of really great
6  work to cover the election."
7  BY MS. BOLGER:
8     Q    Great.  All right.  The next page is
9  page 79.  There's a picture of you and the president,

10    which I think might be at Mar-a-Lago; is that right?
11        A    Yeah.  That was when I ran for Congress.  So
12    I -- remember I said that there were times that I had,
13    like, met the president for photo opportunities, but I
14    hadn't really, like, had conversations?
15            So this was when I introduced myself and was
16    like, "Oh.  You know, I'm -- I wanted to thank you.
17    You voted for me in the primary."  But he didn't
18    really, like, know me very well back then, so it's
19    very quick.  You know, it's like, "Okay.  Thanks."  A
20    million people want photos.  And --
21        Q    That's what that was.  Okay.
22        A    Yeah.  That was that.
0187
1        Q    Next page, which is a picture of you hugging
2    the president in the yellow dress, that's the same
3    event in Miami; correct?
4        A    Yep.
5        Q    Okay.  Then on the next page, which is 93,
6    there's a picture of you getting off a plane; that is
7    going to the first presidential debate in --
8        A    No.  That's the second one.  So there was
9    only one presidential debate between himself and
10    Kamala, and one with Joe Biden.  So this was the one
11    on September 10th, which was the first between himself
12    and Kamala.
13        Q    Okay.  I think that is the first debate.
14        A    Yeah.
15        Q    But okay.  And the woman next to you is?
16        A    I forget her name.  But she was -- I think
17    she was, like, in charge of some focus group.  She
18    wasn't -- she didn't really tell me.  'Cause the way
19    the seating works on the plane is that you have, like,
20    the main section with the president, and then his
21    advisors, and all of his senior staff.
22            And that area is, like, heavily blocked off
0188
1    'cause he had just been shot.  And so then you have
2    the back of the plane, which is where Secret Service
3    sits.  And then they have the guests.  So they have,
4    like, some reporters or you know, some press, or
5    sometimes, like, guests; right?
6            The family sits with the president.  And she
7    was there for some kind of, like, focus group.  I
8    don't really know, like, what her role was, but she
9    sat next to me on the plane.
10        Q    And generally, when you said --
11        A    But nobody was talking 'cause it was very
12    somber.  Like, the president had just been shot, and
13    he walked on the plane with a bandage.
14        Q    When you generally flew on the planes with
15    the president before he was shot, did you sit in the
16    back or the -- with the president?
17        A    I usually sat in the back.  They have --

18    they're very strict about like the -- the seat
19    arrangements, and everybody has a name placard.  And
20    there were sometimes where the president, like,
21    invited me to go sit in the main area with him, and
22    either donors, or his senior staff.
0189
1             But I was always very respectful 'cause they
2    use that time for speech prep, and he takes phone
3    calls.  And I didn't want to impose; right?  I mean,
4    I'm not a groupie -- I'm like -- what Bill Maher says
5    about me.
6             I'm very professional.  And so I sat in my
7    designated seat and only got up if I was asked to get
8    up.
9       Q    Okay.  And then just before lunch, I'm going
10   to show you a tweet that was by a guy named Mike
11   Sington; do you know who Mike Sington is?
12      A    Sounds familiar.  I don't know.  Maybe it
13   was like -- I don't know -- somebody on X.  I don't
14   know.  It sounds familiar, though.  Maybe he's like
15   a --
16      Q    You don't know him, personally?
17      A    I don't know him, personally, though.  But
18   he sounds familiar.  I think he -- if I recall
19   correctly, I think he's like a leftist or -- I don't
20   know.  I think he has, like, a large account.  I'm not
21   sure.  I'd have to see his account, but it sounds
22   familiar.
0190
1       Q    Okay.  I'm not asking to trick you.  I
2    just --
3       A    I don't know him personally, though.  No.
4             MS. BOLGER:  All right.  Then I'm going
5    to ask Court Reporter to mark, as Exhibit 12, a tweet
6    by Mike Sington.
7             (Exhibit 12 was marked for
8             identification.)
9    BY MS. BOLGER:
10      Q    Ms. Loomer, have you -- oh.  Sorry.  You
11   don't have it yet.  Okay.  For the record --
12            MS. BOLGER:  I'm sorry?
13            MR. KLAYMAN:  Oh.  I'm just sitting --
14            THE WITNESS:  Oh.  Sorry.  I was
15   looking at the screen.  I'm sorry.
16            MS. BOLGER:  For the record, this is a
17   tweet by a guy named Mike Sington dated September 12,
18   2024.
19            And it reads "This is why Trump is
20   hanging out with Laura Loomer.  Watch them with their
21   hands all over each other at Mar-a-Lago.  Note:  He's
22   married."  And I'll have Lexie play the video.
0191
1             And can you record this, please?
2             (Video played.)

3    BY MS. BOLGER:
4        Q   Do you know when that occasion was?
5        A    That was a fundraiser at Mar-a-Lago for Jeff
6    Gunter.  That's the guy that's standing next to
7    President Trump.  He was his former ambassador to
8    Iceland.  He ran for senate in Nevada.  And it was --
9    I think it was, like, the beginning of 2024.
10           It was definitely before April of 2024.
11    Because I had -- I know I had, like, not met my
12    boyfriend by then.  And I remember that I wanted to
13    see Jeff win.  And the primary for Nevada was in June,
14    I believe.
15           So I don't know.  I -- I think I, like,
16    posted about Jeff Gunter.  I could get you the date.
17    I think it was, like, February or March, maybe.
18        Q   Okay.  And did you hear the president say,
19    "She's much softer than she looks"?
20        A   Yeah.
21        Q   Okay.  Do you remember that happening?
22        A   Yeah.  I mean, he was saying that's a --
0192
1    "Oh.  She's much softer than she looks" because the
2    media likes to say, "Oh.  She's so vicious."  Or
3    "She's an attack dog for the president."
4           But he was saying like, "Oh.  She's much
5    softer."  Like, she's a much like gentler and kinder
6    person than -- than she is.  And he gave me a hug, and
7    then we posed for photos.
8           But I think that fundraiser was, like,
9    February or March, maybe January.  I -- I honestly
10    don't remember the exact date.  It's pretty cold in
11    Palm Beach during January.
12        Q   You're not dressed like you're cold.
13        A   No.  I know.  I said it's pretty cold.
14    That's what I'm saying.  I'm dressed in a dress, and
15    I'm always really cold.  So I would have been wearing
16    a suit if it was really cold, so I'm thinking it was
17    March.
18           MR. KLAYMAN:  Don't guess.
19           MS. BOLGER:  Yeah.  No.  I know --
20           THE WITNESS:  I -- I don't know, but I
21    can --
22           MS. BOLGER:  I don't want you to guess.
0193
1           THE WITNESS:  All I'm saying is that I
2    can get you the date.  It was a fundraiser.  I have
3    the date somewhere in my phone.  It was a fundraiser
4    for Jeff Gunter who was running for Senate.
5           But it was the -- that -- that video
6    was posted by that guy from September 12th because
7    that was right when -- that was the day before -- that
8    was the day after -- excuse me -- the media started
9    going crazy; right?
10           Saying, "Oh.  Why is Laura Loomer,

11    like, on the plane?"  And "Oh.  Why is Laura Loomer
12    going to the debate?"  And then, you know, of course,
13    he didn't -- he -- when you see the video, maybe
14    you're going to think, "Oh.  That -- that's from
15    September 12th."  But that interaction was from
16    earlier in the year.  That's all I'm trying to say.
17            MS. BOLGER:  Okay.  We do have lunch
18    outside, if you all want to take a break and have
19    lunch.
20            MR. KLAYMAN:  Yeah.  Let's get
21    something.
22            MS. BOLGER:  So it's one; what time
0194
1     would you all like to reconvene?
2             MR. KLAYMAN:  Forty-five minutes?
3             MS. BOLGER:  Sure.  That's great.
4             THE WITNESS:  Is that fine; 45 minutes?
5             MS. BOLGER:  That's fine.
6             THE WITNESS:  That's fine?
7             THE VIDEOGRAPHER:  Okay.
8             MS. BOLGER:  I'm going to check how
9     much time is on the record, but that's all.
10            THE VIDEOGRAPHER:  Off --
11            MR. KLAYMAN:  You want an hour?
12            THE VIDEOGRAPHER:  Off the record at
13    12:59.
14            (Off the record.)
15            THE VIDEOGRAPHER:  Back on the record
16    at 1:56.
17    BY MS. BOLGER:
18        Q   Ms. Loomer, at the very beginning of the
19    day, you testified that at some point, you worked for
20    Project Veritas; correct?
21        A   Yes.
22        Q   And you'll agree with me that Project
0195
1     Veritas is sort of known for secret recordings;
2     correct?
3         A   Yes.  That's true.
4         Q   And you're not recording us today; are you?
5         A   No.  My phone is in my bag, and it's on
6     airplane mode.
7         Q   Okay.  Terrific.
8             MR. KLAYMAN:  Are you recording us?
9             MS. BOLGER:  Yes.  By that camera.
10            THE REPORTER:  My audio as well.
11            THE WITNESS:  That was a joke.  But
12    yeah.  No.  I -- my phone is on airplane mode so it
13    can't record.
14            MS. BOLGER:  Okay.
15    BY MS. BOLGER:
16        Q   And at the end of the -- our session last
17    time, you were talking about meeting the Trump family.
18    And I'm very sorry if I -- if you answered this, and I

19    didn't catch it.  How many times have you met Melania
20    Trump, if you have?
21        A    I have met Melania once before.
22        Q    And where was that?
0196
1        A    It was at the Trump Doral in Miami.
2        Q    When?
3        A    Several years ago.  Don't remember exactly
4    when, but I remember meeting her.  They were on the
5    golf -- on a golf cart together.  It was like for,
6    like, one of the big golf tournaments that they were
7    hosting.  And I think it was in, like, 2014 or 2015.
8    And I was attending college in Miami.
9            And I was always a big supporter of
10    President Trump, and you know, big fan of President
11    Trump, Melania Trump.  And I was a broadcast
12    journalism student.  And so I thought it'd be fun to
13    go to this event.
14            And I, at the time, had been working for
15    WSVN before I started working for Veritas full-time.
16    And I said to a friend of mine at the time in college,
17    "Oh.  Wouldn't it be fun to go to this event?  Let's
18    see how many people, like, we can meet"; right?
19            And we ended up meeting Tiger Woods.  We
20    ended up meeting Donald Trump back when, you know,
21    before he filed to run.  Melania -- Melania Trump.
22    This was before, of course, they ventured into
0197
1    politics.  But she was very nice, you know --
2        Q    Have you met her since?
3        A    No.  But she, you know, was raising Barron.
4    And you know, there's a lot of reporting out there
5    about how she wanted to be with her son as he was
6    transitioning to go to college.  So she wasn't really
7    on the campaign trail a lot during the 2024
8    presidential election.
9            I mean, it's been widely reported that she,
10    you know, was -- I think she was at Mar-a-Lago, or
11    Trump Tower, or something like that -- maybe
12    Bedminster -- when President Trump was shot in
13    Pennsylvania.
14            But she flew separately to the RNC
15    convention; I don't know why.  But she doesn't go
16    to -- or didn't go to a lot of the events during the
17    campaign season.  But she also had a son that was in
18    school.
19            And she, you know, gave interviews when
20    Barron graduated, when he was going to go to
21    college -- he goes to NYU -- about how it was very
22    important for her to make sure that she was always
0198
1    present for her son.  I just assumed she was just
2    being, you know, a good Mom.
3        Q    Great.  We testified a little bit about the

4    week -- that week of September 10th -- or you
5    testified a little bit about it, but I just want to go
6    back and ask you just a couple questions.  And if I --
7    I'm going to try to move things along by asking you
8    leading questions.
9         If I'm mischaracterizing it, please let me
10    know.  So as I understand it, you had a -- a reach-out
11    from some staffer of the president that said, in words
12    or substance, "Would you like to travel with the
13    president to the debate?"
14        A    No.  The president himself -- as I -- as I
15    said before, his staff was on the plane, and they were
16    talking about a story I broke about Penzeys Spice.  I
17    forget the date, but it was, like, just shortly before
18    the debate.  And they were with the president, and
19    they called me.
20         I didn't realize that they were with the
21    president at the time.  And then they passed the phone
22    to him --
0199
1        Q    Got you.
2        A    -- and then he was like, "Oh.  This" -- I
3    think it was Susie Wiles, if I'm not mistaken.  And he
4    was like, "Oh.  This report was so great."  He said,
5    "Oh.  Are you going -- do you want to go to the
6    debate?"
7         And I said, "Yeah.  I would love to.  It'd
8    be an honor."  And then they connected me with the
9    scheduler.  I think her name was Eliza [ph], if I'm
10    not mistaken.  And Eliza [ph] coordinated that, and
11    told me where to go.
12        Q    Okay.  And you said you met them at
13    Bedminster?
14        A    For the debate?  Let me recall.  I can't
15    remember where we took off for the debate.  For the
16    RNC convention, I met at Bedminster.  I'm trying to
17    remember if for the debate, we left from Palm Beach,
18    or we left from Bedminster.
19         I think, if I'm remembering correctly, left
20    from Palm Beach for the debate.  No.  Left from --
21    left from Palm Beach for the debate, out of the Palm
22    Beach private hangar at the airport there, and then
0200
1    left from Bedminster for the RNC convention.
2        Q    Okay.  And so you left, and you went to
3    Philadelphia.  And you talked a little bit about the
4    seating on the plane, and you said you sat in the back
5    in that one; correct?
6        A    Yeah.  Like, when I say the back of the
7    plane, it's divided into sections.  So when you go on
8    Trump's plane, there's a section in the back.  And
9    then, you know, there's the bathroom, and then the
10    pilot; right?
11         And then there's rows for the guests.  Like,

12  if it's, you know, media.  A lot of times, they have
13  traveling press, Secret Service, and then some staff.
14          And then there's the middle section, and
15  there's a divider, like a sliding door.  And then you
16  have the main table where his staff, and his
17  assistant, and his "comms" people sit; and they do
18  their work.
19          And then the middle section is the
20  president's area where he sits.  And that's -- you
21  know, that's where he always sits on the plane.  And
22  then generally, it's his senior advisors that sit

0201
1   there.
2           And then there's some couches on the plane
3   too, in that area.  But you're really not supposed to
4   get up unless you're instructed to.  And I didn't get
5   up.
6       Q   Okay.  On that flight, but you had other
7   times?
8       A   Yeah.  On other times, like on the flight to
9   the Bitcoin conference -- when we were flying to the
10  Bitcoin conference in Nashville, and then we flew to
11  Minnesota.
12          Howard Lutnick, the commerce secretary was
13  on the plane.  And Howard wanted to tell me some
14  stories and was talking to me about the speech he was
15  going to give in Minnesota about jihad because you
16  know, his brother and a lot of his friends were killed
17  in the 9/11 terrorist attacks because their office for
18  Cantor Fitzgerald was on the top floor.
19          And so we were going to Minnesota.  And he
20  was like, "Oh.  What do you think about my speech?"
21  And so he asked me to come sit with him, and he was
22  sitting next to the president.  And then we were just

0202
1   chatting; so --
2       Q   And did you, at any point, have any
3   conversations with the president about preparing for
4   the debate?
5       A   No.  And that was what -- what was so funny
6   about it.  So the media went crazy, and they were
7   like, "Oh.  You know, Laura Loomer -- Laura Loomer
8   told the president to say that Haitians are eating
9   cats and dogs."
10          And I had -- I had a conversation with the
11  president about how the story was going viral about
12  Haitian migrants led in by Joe Biden who were eating
13  people's pets and other animals too, including, like,
14  community geese and ducks that were in local ponds;
15  right?
16          There were police reports.  And then I had
17  talked about it, and I had posted about it.  And at my
18  media company, we had actually confronted Senator
19  Sherrod Brown about this.  He's the Democrat senator

20   for Ohio.
21          And he was one of the senators who was
22   advocating for all of these Haitians to stay in the
0203
1   United States.  But I did not prep the president.  I
2   was not a part of the presidential debate prep team,
3   like the media reported.  And --
4      Q   But you did have a conversation with him
5   about Haitians in Ohio eating cats, and dogs, and
6   geese, and ducks?
7      A   Yeah.  'Cause he had asked me if the police
8   report was real.  'Cause there was a police report
9   that was filed about Haitians eating -- sorry -- I
10   have something in my eye -- about Haitians eating pets
11   and animals, domestic animals in Ohio.
12          And he said, "Is this real?"  And I said,
13   "Yes."  And he said, "Can I see?"  And I showed him
14   the police report that I had posted on Truth Social
15   that was highlighted, and then he instructed Natalie
16   to print it out for him.
17      Q   And where was that conversation?
18      A   That was on the plane.  That was on the
19   plane.  I don't remember if it was, like, going there
20   or going back.  It was on the plane that we had the
21   conversation.  And he posted --
22      Q   Where on the plane?
0204
1      A   On the way -- on the way back from the
2   debate, he had asked me to sit with him and his -- his
3   staff.  So on the way there, I sat in the -- on the --
4   I sat in the back.  And then on the way back from the
5   debate, his -- his staff were all there, and everybody
6   was very excited because it was, like, a very
7   thrilling debate experience.
8          And then if you recall, after the -- the
9   presidential debate, he went into the spin zone.  And
10   it was, like, the first time a president had ever
11   just, like, walked into the spin zone after a debate.
12          The spin zone, if you don't know what it is,
13   it's like the really big media venue -- like,
14   downstairs where all the reporters were reporting on
15   the debate because they didn't allow for an audience
16   for the debate.
17          Like, we were not even allowed to be an
18   audience.  We had to go in a separate room for the
19   debate -- all of his staff.  And we were watching it
20   on a -- a big screen.  And so --
21      Q   You watched the debate with his staff?
22      A   The presidential debate?
0205
1   Q   Yes.
2   A   Yeah.  I was in their private room.
3   Q   And then --
4   A   Because nobody was allowed inside, so the

5    debate that was on the stage, the rules were they
6    weren't allowed to have an audience.  And all the
7    campaign staff for both campaigns -- 'cause they had
8    rules for the debate -- all the campaign staff had to
9    be, like, in their respective areas.
10        So his staff were on one floor.  The
11    motorcade pulled up, and then we all went to one
12    floor.  And then Kamala's staff -- like, they didn't
13    even interact with each other.  And then after the
14    debate, when they escorted everybody through the -- I
15    forget, like, the venue.  It was in Philadelphia.
16        Sorry.  A piece of dust in my eye.
17    They -- everybody got into the motorcade, and then
18    they drove to the spin zone area, which is, like,
19    another part of -- I think it was, like, the
20    convention center.
21        Q    And you were in the president's motorcade
22    for that?
0206
1     A    Yeah.  But when I say, like, "his
2    motorcade," nobody really rides with the president.
3    The staff have their own -- it's like a ten-car
4    motorcade.  And then it has ambulance and you know,
5    police cars.  So nobody rides, like, next to the
6    president inside his own designated SUV; right?
7        He has his own private SUV.  I was in the --
8    I was in the van with his "comm" staff, so that would
9    have been Steven Cheung, Margo Martin, and then his
10    assistant, Natalie Harp.
11        And then they had a -- like, a documentarian
12    who used to work for Tucker Carlson -- this guy named
13    Justin Wells, who was filming part of this series that
14    they just recently released.  And they just announced,
15    like, the series 2 of it.
16        It's called -- I think it's called The
17    Surge, documenting the whole presidential election.
18    And he was in the car, as well, filming it.  And in
19    the video, you can clearly see me, like, getting out
20    and walking with them.
21        So I'm just explaining so that they know
22    that, as I said -- and I was truthful about this -- I
0207
1    was -- I've never been in a vehicle alone with
2    President Trump.  I've never been in a room with
3    President Trump alone --
4        Q    Right.  So I just want to talk about the --
5        A    No.  I'm just --
6        Q    -- the tick-tock.  What happened on
7    September 9th; right?  So -- sorry -- September 10th.
8    So --
9        A    I don't have TikTok.
10        Q    The tick-tock.  Sorry.  That's a -- that is
11    a -- actually, I perceive it as a journalism term for
12    "what happened next," so --

13     A   Oh.  Okay.  Sorry.

14     Q   -- I apologize.

15     A   No.  That's okay.  I was going to -- I don't

16   have TikTok, so -- sorry --

17     Q   No.  It's totally fine.  No.  No.  Neither

18   do I, as it happens.

19     A   No.  That's okay.

20     Q   So did you -- so you -- after the debate,

21   you said you went to the spin zone, and then what did

22   you do after the spin zone?

0208

1     A   So then after that, everybody flew back

2   to -- to -- we all got in the car and then we flew --

3   after the debate, we flew to New York because then the

4   next day was the 9/11 ceremony.

5     Q   And had someone said to you, "Hey" -- in

6   words or substance -- "Hey, Laura.  The president

7   wants you to come with us in the 9/11 ceremony"?  Or

8   was it all sort of a package?

9     A   It was already planned because when they

10   give you the itinerary for what you're doing, like

11   when you're traveling with the president, they're very

12   clear -- like, "Oh.  Okay.  Like, are you -- are you

13   going to need a ride here?"  Or "Oh.  You know, where

14   are you staying"; right?

15         Like, they're -- they're very clear 'cause

16   they want to make sure -- because they're very strict

17   with the way they transport everybody.  So they need

18   to know like, you know, what everybody's itinerary

19   was.  And they said, "Are you going to be staying to

20   attend the -- the ceremony?"

21         And I said, "Well, only if, you know,

22   President Trump wants me to attend the ceremony.  I

0209

1   don't want to impose, obviously."  And he said I could

2   go to the ceremony.  And I obviously wanted to because

3   I wanted to honor the victims of 9/11.

4         And so we all flew to -- we all flew to New

5   York.  They took the president to Trump Tower where he

6   lives -- or has a -- has his apartment there.  And

7   then all of the staff and then the traveling guests

8   stayed at another hotel.

9         And then, you know, we got there at, like,

10   2:30 in the morning.  And everybody had to be up at,

11   like -- ready to go at six o'clock; right?  'Cause he

12   had to be at the 9/11 Memorial very early; right?

13         'Cause they do the -- the moment of silence,

14   and -- so I had to be downstairs.  I didn't even

15   really sleep because to get ready to wake up, like,

16   two hours later, and get dressed, and get ready --

17     Q   And you spoke to the president after the

18   debate?

19     A   Yeah.  We were all on the plane together.

20   Everybody was on the plane flying from Philadelphia to

21  New York.  So I -- he was like, "Oh.  Laura, what did
22  you think about it?"  And I said, "Oh.  It was great.

0210

1   Great debate.
2          I love they're lying about, you know, the
3   eating the dogs and cats.  I think that's probably
4   going to be the most influential line of the debate
5   because it's true.  And I think you've just
6   successfully made immigration the number one issue of
7   this election season, Mr. President.  It was a
8   brilliant line."
9          And we were sitting there.  One of his
10  lawyers was sitting on the plane too.  And we were all
11  just looking at Twitter.  And he has a big screen on
12  the plane, and we were watching news coverage and all
13  the analysis of -- of the presidential debate.
14          And it was good.  He had won the debate, and
15  everybody was talking about it.  And everybody was
16  talking about how he was in the spin zone.  And then
17  we landed in New York.
18  Q    And then after the -- did you -- you
19  attended the 9/11 Memorial; right?
20  A    But he -- but he -- just to be clear, he --
21  yeah.  He had asked me -- he said, "Oh.  Come on up
22  here.  Come sit with me."  He -- and they always order

0211

1   fast food.  President loves McDonald's.  So they
2   ordered McDonald's after the debate, and it's already
3   on the plane.
4          And so they had bags of chicken nuggets and
5   bags of French fries and quarter pounders.  And the
6   president invited me to sit next to him and eat
7   McDonald's with him.  And everybody, they -- they
8   deliver each staffer and everybody on the plane their
9   own individual tray with McDonald's.
10          And so I was eating chicken nuggets and
11  French fries.  And you know, he's like, "Oh.  Do you
12  want a French fry?"  I was like, "Sure.  I'll have a
13  French fry."
14          And we were sitting there talking about the
15  aftermath of the debate.  I don't really like eating
16  fast food, but you know, if President Trump offers you
17  a French fry, what are you going to do; say "no"?
18          So we're all sitting there having a good
19  time, talking about the debate.  And it was a great
20  time.  You know, he -- he won the debate, and then we
21  all went to New York.  And then woke up early in the
22  morning.  Everybody woke up.  The motorcade picked us

0212

1   up.
2          Then the motorcade drove to Trump Tower
3   where President Trump had spent the night.  And we
4   waited downstairs in the lobby for him.  And then
5   everybody congregated.  And then we got in the

6  motorcade and drove to the memorial.  And then we
7  drove to the fire stations.
8      Q   Which was my question; what did you do after
9  the 9/11 Memorial?
10     A   So it was a full day.  So we went to the
11  memorial in New York City where Joe Biden and Kamala
12  Harris were.  And we were there for several hours.
13         Then we were went to several fire stations
14  where a lot of firefighters had perished during 9/11.
15  And they were honoring the fallen firefighters and
16  police officers.  And then after that, we got on
17  the --
18     Q   What fire stations did you go to?
19     A   I don't remember the numbers exactly, but
20  there were two stops.  And we went to take photos with
21  several -- they were, like, official stops with
22  firefighters and their family members, so we took
0213
1  photos with them.
2         I forget the exact numbers of the stations
3  that we went to, but I believe it was two in New York
4  City.  And then we went to the airport again, got on
5  the plane, and we went to Shanksville.
6      Q   Did you sit with the president on the plane
7  to Shanksville?
8      A   No.  I sat next to Lynne Patton, who was one
9  of his senior advisors.  So Lynne and I sat together,
10  and we got to Shanksville.  And then I was in the
11  motorcade with Corey Lewandowski.  And Corey
12  Lewandowski and I were, you know, in one motorcade.
13  And then the -- I think Steven Cheung was also in the
14  motorcade with us in that car 'cause it's, you know,
15  divided by staff.
16         And Natalie was also in the car with me.
17  President Trump was not in the same car 'cause he has
18  his own car, obviously.  And then we drove to the
19  field in Shanksville.  And we went to another memorial
20  there, where the president met with people, took
21  photos.
22         And then got back in the motorcade and drove
0214
1  to another fire station in Shanksville where Joe Biden
2  had spoken a few hours earlier.  And then the
3  president was there and met people, took photos.  And
4  then we left.  And then we got back on the plane and
5  flew back to Palm Beach.
6      Q   Okay.  And you got back to Palm Beach the
7  night of the 11th?
8      A   Yeah.  Around, like, six or seven.  And then
9  they were supposed to go to Tucson, Arizona, the next
10  day.  And I'm from Tucson, Arizona.  And the president
11  was like, "Oh.  Do you want to go to Tucson?  You're
12  more than welcome to travel with us to Tucson."
13         But then they were also going to go to

14    California.  It was going to be like a four-day trip.
15    And you know, I have dogs.  And I needed to get back
16    to taking care of my dogs.
17         And I said, "Oh.  No.  Mr. President.  I
18    really appreciate it.  It's very kind of you, but I
19    need to get back to doing my show.  And I need to go
20    take care of my animals.  Otherwise, I'd love to go to
21    Tucson."
22         And he knew I was from Tucson, so he invited
0215
1    me to go and -- but it was going to be, like I said, a
2    three-day traveling trip because they were going to
3    California.
4         But at that time, you know, they were very
5    comfortable with me traveling because -- because I --
6    well, it was expected that I was going to have a job
7    with the president after he won the election.
8         But then I got off the airplane, and then
9    that's when, you know, all the chaos happened.  And
10    then Bill Maher aired his episode.
11    Q    That was on the 13th?
12    A    Right.  But I'm explaining it.  So I had
13    said, "I'm not going to go to Tucson because I need to
14    take care of my animals."  But there was -- he was
15    like, "Oh.  Well, let us know, you know, when you want
16    to come back.  You know, we love having you.  It's
17    great to have you.  It's fine."
18         He basically left it as, like, an open
19    invitation.  He was very nice.  And I thought, "Okay.
20    Well, I'll probably travel again."  I didn't think
21    that that was going to be my last time on the plane.
22         And then like a couple days later, when Bill
0216
1    Maher aired his episode, I wasn't allowed to go on the
2    plane anymore.  So that was it.
3         That was the last time I was on the plane,
4    even though there was an open invitation, and he had
5    said, "Oh.  Well, you'll -- you'll travel with us
6    again.  You'll travel with us again."  And then after
7    the Bill Maher episode aired, I didn't get to travel
8    again because of the optics; right?
9         Like, it's obviously a lie what Bill Maher
10    said about me, which is why I sued him.  But you know,
11    it was all over -- after what Bill Mahers said, it was
12    all over social media, and people were posting
13    comments.  So --
14    Q    Okay.  So I'm going to interrupt your --
15    A    That was it.
16    Q    -- monologue.
17    A    Well, it's not a monologue.  I'm kind of
18    giving you the --
19    Q    What --
20    A    I'm giving you the --
21    Q    When was the last time you spoke to

22    President Trump?

0217

1         A    The last time I spoke to President Trump?
2                MR. KLAYMAN:  Objection.  Relevancy.
3    Continuing objection on this.
4                THE WITNESS:  Few days ago.
5    BY MS. BOLGER:
6         Q    Okay.  In what context?
7         A    He asked me my opinion about the NASA
8    administrator nominee, Jared Isaacman.  And they
9    pulled his nomination, and he asked me what I thought
10   about the fact that Jared Isaacman had donated to
11   Democrats.
12              And I had said that it wasn't great that he
13   donated to Democrats, but he was highly qualified and
14   had, you know, exceptional credentials as it related
15   to space exploration.  And that I thought that he was
16   more than qualified to be an NASA administrator.
17              But I understood if the president didn't
18   like the fact that Jared Isaacman had donated to
19   Democrats.  But he was just asking my opinion about
20   it.  And then the guy's -- his nomination was pulled;
21   right?
22              Because I had broken this story.  I had

0218

1    posted very publicly, "Oh.  Sources tell me that Jared
2    Isaacson's nomination is about to be pulled."  And you
3    know, oftentimes, like, my reports will go viral, and
4    a lot of people who work for the president follow me.
5    And the president also reads my reports.  And so I was
6    contacted about it and asked my opinion.
7         Q    Would you say you influenced the decision?
8         A    No.  Because I was not in favor of Jared
9    Isaacman having his nomination pulled.  I had said
10   that there were other examples of people who they had
11   made exceptions for.  Like, generally speaking, I
12   would be opposed to people who donated to Democrats
13   working for the president.
14              But the administration had made exceptions,
15   especially in the case of a guy named Sriram Krishnan,
16   who I had been very outspoken about, who went to go
17   work in the administration regarding AI policy.  And I
18   spoke out about him in December.  And as a result, my
19   Twitter account got, you know, suppressed by Elon Musk
20   'cause this guy was friends with Elon Musk.
21              And I was like, "Oh.  He donated -- Sriram
22   Krishnan donated to Democrats a month before the

0219

1    election."  And so I was not saying that Jared
2    Isaacman should have his nomination pulled.
3              I actually said that, you know, he has a lot
4    of really great qualities and credentials, and he's
5    raised a lot of money for childhood cancer research,
6    and that I thought he was qualified.  I didn't say

7    that his nomination should be pulled, so I was just
8    giving my opinion.
9        Q    So nonetheless, the fact that you have
10   really admired the president must be a point of kind
11   of great pride for you, that you have the president's
12   ear?
13       A    Yeah.  Because it's great that the most
14   powerful man in the world, the president of the United
15   States, somebody who I greatly admire and greatly
16   respect, would even ask me for my opinion on these
17   matters.
18            I mean, I don't work for him, I wish I did
19   work for the president, but he asks me my opinions
20   about these matters, and I give him my opinion.  And
21   so it's an honor.  It really is.
22            But it would be an even bigger honor to be
0220
1    working in an official capacity in the White House.
2    And I really do believe that, which is why I filed
3    this lawsuit that Bill Maher stopped that from
4    happening by --
5        Q    So as you sit here today, it's your
6    testimony under oath that the only damages that have
7    been caused to you since the September 10th through
8    13th time period are Bill Maher's statements on
9    September 13th; is that right?
10       A    Well, there's a September 20th episode too,
11   where he basically, like, dug the knife in deeper, and
12   twisted it, and reiterated what he said on the 13th.
13   But then went into like a whole monologue about --
14   24th.
15            He continued to lie about me, like
16   insinuating and saying that I'm a racist, insinuating
17   a lot of nasty things about me.  So it wasn't just the
18   13th; there were two episodes.  It was the 13th and
19   the 20th.
20       Q    So Bill is the only cause of damage you've
21   suffered; is that your contention?
22       A    What do you mean?
0221
1        Q    In this lawsuit, you're saying that the only
2    damage to your reputation that has happened since
3    September 10th of 2024 has been Bill Maher?
4        A    Well, we're -- we're not talking about
5    September 10th.  We're talking about Bill Maher
6    falsely accusing me of having sex with the president,
7    which took place on September 13th and September 20th.
8    So Bill Maher --
9        Q    What was the state of your reputation
10   then --
11            MR. KLAYMAN:  Let her finish.
12   BY MS. BOLGER:
13       Q    -- on September 13th --
14            MR. KLAYMAN:  Let her finish.

15    BY MS. BOLGER:
16        Q    -- on September -- the morning of
17    September 13th, when you woke up --
18             MR. KLAYMAN:  Finish your --
19    BY MS. BOLGER:
20        Q    -- what do you believe the state of your
21    reputation was?
22             MR. KLAYMAN:  Okay.  Finish your
0222
 1    sentence before she interrupted you.
 2    BY MS. BOLGER:
 3        Q    Just answer question, please.
 4             MR. KLAYMAN:  No.  She's going to
 5    have -- she's going to answer the question.
 6             THE WITNESS:  I was still in standing
 7    to have a position with the White House and had an
 8    open invitation to travel with the president --
 9    BY MS. BOLGER:
10        Q    When was that open invitation?
11             MR. KLAYMAN:  Let her finish.
12             THE WITNESS:  After -- when I got off
13    the airplane on September 11th, and the president
14    said, "Would you like to go to Tucson and California
15    with us?  I know you're from Tucson."  And I said, "I
16    would love -- I'd love to come, but I need to go take
17    care of my dogs.
18             "I have animals, and I need to take
19    care of them because I have a dog sitter, and I can't
20    extend my dog sitter."  And he said, "Oh.  Well,
21    there's going to be plenty more opportunities for you
22    to travel with us before November 5th."  And I said,
0223
 1    "Wonderful."  But then; right?  September 13th
 2    happened --
 3    BY MS. BOLGER:
 4        Q    Other than the ability to fly --
 5             MR. KLAYMAN:  Let her finish.  Please
 6    don't interrupt.
 7    BY MS. BOLGER:
 8        Q    It's just -- it would just be good if you
 9    just answer the question.
10        A    I --
11             MR. KLAYMAN:  Yeah.  And it'd be good
12    if you didn't interrupt.
13             MS. BOLGER:  Mr. Klayman, I'm talking.
14             THE WITNESS:  Mm-hmm.
15             MR. KLAYMAN:  No.  No.  You're talking
16    over her --
17             MS. BOLGER:  Mr. --
18             MR. KLAYMAN:  -- and that's
19    objectionable.  And that's an obstructionist --
20             MS. BOLGER:  Mr. Klayman --
21             MR. KLAYMAN:  -- way of doing things.
22        //

0224
1  BY MS. BOLGER:
2      Q   Ms. Loomer, what I'm trying to do is just
3  get very -- answer to the question I'm asking, not a
4  whole discussion of something.
5          So what I'm asking you is very specifically,
6  on the morning of September 10th -- sorry -- morning
7  of September 13th, when you woke up, you say you
8  believed you had a standing invitation to ride on the
9  plane with the president.
10         Other than that, what do you believe the
11  state of your reputation was on the morning of
12  September 13, 2024?
13         MR. KLAYMAN:  See, that's a triple
14  question -- compound.  It assumes facts not in
15  evidence, assumes facts in terms of what she testified
16  to which were incomplete because you cut her off.
17         Just answer the question you want --
18  the way you want to answer the question.
19  BY MS. BOLGER:
20      Q   No.  You have to answer the question I'm
21  asking.
22         MR. KLAYMAN:  Not -- neither -- you're
0225
1  not the judge.  You're not the judge.
2          THE WITNESS:  People have --
3  BY MS. BOLGER:
4      Q   What was the state of your reputation on the
5  morning of September 13, 2024?
6      A   My reputation, as it related to getting a
7  position with the president of the United States of
8  America, as I was told, was completely fine.  And then
9  it -- everything changed after Bill Maher made his
10  comments.
11         And I was not allowed to go back on the
12  plane.  And I had never been accused of having sex
13  with the president or having an affair with the
14  president until Bill Maher made his comments and said
15  I was "effing" President Trump.
16         And so, you know, that's why I filed this
17  lawsuit is because it's one thing if people say, "Oh.
18  You know, I don't like her politics.  I don't like
19  that she's a conservative."
20         Or "Oh.  I don't, you know, like her views
21  on immigration."  Or "Oh.  I don't like this."  But
22  it's a completely separate thing for somebody to say,
0226
1  "Oh.  She's sleeping with the president.  Oh.  She's
2  having an affair with the president.  Oh.  That's the
3  only reason why she's allowed to go on the plane -- is
4  she must be sleeping with the president."
5      Q   So what is the basis of your claim that it
6  was Bill Maher's statement on September 13th that
7  changed the president's mind about whether you could

8    ride on the plane?  What is the basis of your claim?
9        A    Because after this happened, I received a
10   phone call from Chris LaCivita, who is President
11   Trump's -- who was President Trump's campaign
12   manager -- Chris LaCivita.
13       Q    What did he say?
14       A    And he said, "I'm sorry that I have to have
15   this conversation with you.  It's awkward.  But you
16   cannot come on the plane because of the media frenzy
17   that has been created as a result of Bill Maher's
18   comments saying that you had an affair with President
19   Trump."
20       Q    Is your testimony now, under oath, that
21   LaCivita said the name, "Bill Maher," in that sentence
22   with you?
0227
1        A    During my phone call with him?
2        Q    In that conversation with him --
3        A    Yes.
4        Q    -- did he use Bill Maher's name?
5        A    Yes.  He did.  And he said that he had to
6    have a conversation with the president about it as
7    well, because of the way that the media -- including
8    Daily Mail, New York Post, People magazine -- there
9    were a lot of -- this was included in my document
10   production as well -- picked up on what Bill Maher
11   said.
12            And then there was like a frenzy of media
13   articles that came out about "Bill Maher suggests
14   Laura Loomer is having sex with the president."  You
15   know, "Laura Loomer denies having sex with President
16   Trump."  And it was just like a barrage of media hits,
17   and tweets, and just -- it even -- it even parlayed
18   into Morning Joe.
19            Like, Mika and Joe on Morning Joe were
20   insinuating, after what Bill Maher said, that I -- you
21   know, they're like, "Oh.  And some people" -- and I
22   don't recall if they mentioned his name or not, but it
0228
1    was right after his segment ended.  It was obviously a
2    hit piece, like, following the remarks made by Bill
3    Maher insinuating that I was having an affair with the
4    president.
5            And Miko was like, "Oh, my God."  Like, they
6    were really trying to sensationalize it.  And that
7    only happened after Bill Maher --
8        Q    What date was that conversation with
9    LaCivita?
10       A    I don't remember.  But it was, like, either
11   like a day or two -- I don't think it was more than
12   like three days after 'cause it was a phone call.  It
13   was like one to three days, I believe, after the
14   episode on the 13th.
15       Q    Those articles you produced to us aren't

16   about Bill Maher's statements.  They're about your
17   claims against Bill Maher; aren't they?
18            MR. KLAYMAN:  Objection.  The -- are --
19   speak for themselves.
20            THE WITNESS:  Well, Bill Maher has an
21   audience -- had an audience, like, according to --
22   according to websites that calculate all the different
0229
1   ratings.  There were -- it was over a million people
2   watching both episodes on September 13th and
3   September 20th.
4            And so when you broadcast -- when you
5   broadcast a statement like, "Oh.  Laura Loomer is
6   fucking President Trump," people then clipped it.  It
7   was all over social media.
8   BY MS. BOLGER:
9      Q   That wasn't my question.  My question was,
10   the articles you produced in your production aren't
11   about Bill Maher; they're about your suing Bill Maher;
12   aren't they?
13      A   No.  It's not true.  There were articles
14   before I filed the lawsuit --
15      Q   Name one.
16      A   -- against Bill Maher.  I presented them.
17   There were many articles.  I mean, I believe my lawyer
18   gave them to you.  And if not, I'm happy to give them
19   to you.  But there were articles that I gave my
20   attorney when you guys requested the documents.
21            And there was a People -- there was a People
22   magazine article about it.  And it was something along
0230
1   the lines of "Laura Loomer denies having sex with
2   President Trump."
3            There was a New York Post article.  There
4   was also a Daily Mail article.  And this was before I
5   filed my lawsuit.
6      Q   Those are about your denials; aren't they?
7      A   Well, I -- of course, I have to respond to
8   accusations made against me by Bill Maher.  He
9   broadcasted to over 2 million people.  When you look
10   at the -- when you look at the, like -- like, the
11   combined viewership -- and then also, too, it's
12   millions.  It's actually millions more.  It's more
13   than two million.
14            Because his statements then were so
15   sensational that they were clipped by people and
16   posted on social media.  And they were like, "Oh.
17   Bill Maher says Laura Loomer had sex with President
18   Trump," so I had to respond.
19      Q   Right.  They were -- those articles were
20   about --
21      A   And I'm -- I'm a woman.  I'm a professional
22   woman.  I can't just allow for somebody to falsely
0231

1 accuse me in the middle of a presidential election
2 of -- of having an affair with the president.
3     Q   Right.  Those articles are in response to
4 you posting on X that you should so sue Bill Maher?
5     A   No.  They were -- it was -- there were some,
6 also, about me addressing the claims.  And then a lot
7 of people had commented on it as well.  And you can
8 see in the comments what people said.
9     Q   But you said your -- to your 500 million
10 Twitter impressions, your response -- and that was
11 what was picked up; right?
12     A   No.  His comments were picked up, and my
13 response was also picked up.
14     Q   Where were his comments picked up without
15 your response --
16     A   I just said.  I told you these.
17     Q   -- without your response?  Where were his
18 comments --
19     A   It doesn't matter.  His comments were picked
20 up.  It doesn't matter.  Of course, I have a right to
21 respond.  This is what I'm doing right now.  I'm in a
22 deposition 'cause I responded with a lawsuit.  That --
0232
1 that doesn't matter.
2         Just because I responded doesn't protect
3 Bill Maher from broadcasting to millions of people
4 and -- and telling people that I -- that I had sex
5 with President Trump.  I'm allowed to respond.
6 Anybody who is falsely accused has a right in this
7 country to defend themselves.
8     Q   Is he the only person who made a comment
9 about you having an affair with President Trump?
10     A   He was the first person to broadcast it to
11 millions of people on his show.  He was -- he was the
12 first person to say on television or on a broadcast
13 network, "Laura Loomer is fucking President Trump."
14     Q   Is there anyone you know who personally
15 believes what Bill Maher said; thought it was true?
16         MR. KLAYMAN:  Objection.
17         Do not speculate.
18 BY MS. BOLGER:
19     Q   The question was, is there anyone you know
20 who believes that Bill Maher said -- what Bill Maher
21 said is true?
22         MR. KLAYMAN:  Objection.  Vague and
0233
1 ambiguous -- "who you know."
2         THE WITNESS:  There's people that I
3 know because I've met them, and they're malicious
4 people who have spread their own -- or made their own
5 commentary, or made their own remarks after Bill Maher
6 made his comments trying to get attention.
7         But no.  There's nobody -- nobody I
8 know -- nobody I know actually believe -- nobody I

9    know -- like, people -- people who were there; right?
10   Who witnessed my interactions with the president on
11   the plane know that it was all professional.
12              They know that -- that, you know, I was
13   in the back of the plane; that there was no romantic
14   relationship.  But for the -- for the average person
15   who's seen the sensationalized and broadcasted in the
16   way that Bill Mahers suggested it, like, how are they
17   supposed to know; right?
18              So he made it sound -- and he did
19   say -- he didn't -- he didn't just make it sound; he
20   actually said that I was having this affair.  And Bill
21   Maher has access to millions of people.  And so the
22   fact of the matter is -- is that it was said, and it

0234
1    was made to make people believe that it was true.
2    That's why I filed this lawsuit.
3    BY MS. BOLGER:
4         Q   Wait.  So my question was, can you name a
5    single human being on Planet Earth who believes what
6    Bill Maher said is true?
7              MR. KLAYMAN:  Calls for speculation.
8              THE WITNESS:  It's just -- it's like
9    just kind of a ridiculous question because the reality
10   is -- is it doesn't matter.  The fact -- what matters
11   is that he said it.  He said it, and so there are
12   people that believe it is true.
13   BY MS. BOLGER:
14        Q   Name one.
15             MR. KLAYMAN:  Why don't you name one?
16   BY MS. BOLGER:
17        Q   Name a single human being --
18        A   He -- he made the -- he made the claims.
19   And it was enough to --
20        Q   Name a single human being --
21        A   -- enough to make it so that I couldn't
22   travel.

0235
1         Q   Name a single human being --
2         A   There are people --
3         Q   -- on Planet Earth --
4         A   There are people --
5         Q   I'm asking a question.
6              THE REPORTER:  One at a time, please.
7    BY MS. BOLGER:
8         Q   I'm asking a question, Ms. Loomer.  You
9    don't get to talk over me.
10             MR. KLAYMAN:  Don't scream at my
11   client.
12             THE WITNESS:  There's a ton of comments
13   online --
14   BY MS. BOLGER:
15        Q   Ms. Loomer, you may not talk --
16             MR. KLAYMAN:  Stop screaming at my

17  client.
18  BY MS. BOLGER:
19    Q   -- unless I ask you a question.
20        MR. KLAYMAN:  Treat her with respect.
21  BY MS. BOLGER:
22    Q   Name a single human being on Planet Earth
0236
1  who you know of that believes what Bill Maher
2  allegedly said.
3    A   Bill Maher, who I sat across for five hours
4  in a deposition.  He said it.  He said, "Laura Loomer
5  is" --
6        MR. KLAYMAN:  Wait, wait, wait, wait,
7  wait, wait.
8        MS. BOLGER:  Don't interrupt your
9  client.  Let her testify.  You're --
10        MR. KLAYMAN:  No.  I don't want her
11  to --
12        MS. BOLGER:  -- coaching the witness.
13        MR. KLAYMAN:  No.  I don't want her to
14  get into what was said at the deposition.
15        THE WITNESS:  Bill Maher.  Bill Maher.
16        MS. BOLGER:  Yeah.  You can't
17  testify --
18        THE REPORTER:  One at a time, please.
19        THE WITNESS:  I know that the
20  deposition is confidential, but you are well-aware,
21  'cause you were there, that I had a very long
22  deposition --
0237
1  BY MS. BOLGER:
2    Q   Ms. Loomer, if you testify about what he
3  said at that deposition, I will sanction you.
4    A   I'm not testifying.  I just said -- you said
5  name one person, and I said, "Bill Maher."
6    Q   Okay.  Other than Bill Maher, can you
7  name --
8    A   You asked for one person.
9    Q   -- a single human being on Planet Earth --
10    A   You asked one -- you asked me --
11    Q   -- who believe what Bill Maher said?
12    A   -- for one person.  I answered your
13  question.  Bill Maher.
14    Q   Other than Bill Maher, can you name a single
15  human being on all of Planet Earth that believe what
16  Bill Maher said?
17    A   You should ask million -- the millions of
18  people who saw the clip.  You should ask the millions
19  of people.  You should ask the millions of people --
20    Q   You testified a minute ago that you believe
21  that Bill Maher is the first person to tell millions
22  of people that he thought you were sleeping with
0238
1  Donald Trump, which I don't even agree he said.  But

2    for the sake of argument, let's go with that.
3        A    He broadcasted it.
4        Q    Look at Exhibit 12 -- to the right.  It's
5    that tweet right there.
6        A    Oh.  This one.
7        Q    See, that's a quote -- that's a text --
8    tweet from Mike Sington dated September 12, 2024,
9    which I think you'll agree with me, the day before
10   September 13th, that says, "This is why Trump is
11   hanging out with Laura Loomer.  Watch them with their
12   hands all over each other at Mar-a-Lago.  Note:  He's
13   married"; that was the day before; right?
14       A    That's the day before.
15       Q    Right.  And it says at the bottom, it's
16   "3.919 million views"; see that?
17       A    Yeah.
18       Q    Okay.  Is there anyone you know personally
19   who thinks less of you because of what Bill Maher
20   said?
21       A    I -- I'm just going to say Mike's tweet
22   doesn't say "Laura Loomer is fucking Donald Trump."
0239
1    It says "Watch them with their hands all over each
2    other.  This is why Trump is hanging out."  It doesn't
3    say, you know, "Laura's having sex with Trump."
4        Q    "He's married."
5        A    Okay.  So --
6        Q    What is --
7        A    -- but that's not -- that's not the same as
8    saying --
9        Q    Ms. Loomer --
10       A    -- "She's fucking Donald Trump."
11       Q    -- is there anyone who you know, who
12   personally thinks less of you because of Bill Maher?
13       A    I have been denied a position, and I have
14   been smeared as a whore.  And I have been smeared as
15   somebody who sleeps with married men because of what
16   Bill Maher broadcasted.  And it's pretty crazy to me
17   that you're, as a woman too -- Bill Maher, who's a
18   total misogynist and a total sexist -- he hates
19   women --
20       Q    So the answer's "no"?
21       A    -- he's never been married.  He also just
22   makes the most derogatory comments about women in
0240
1    sexual manners.  I believe he's even been sued by a
2    woman too.  I mean, he doesn't want to answer as to
3    what -- I'm just explaining --
4        Q    Ms. Loomer --
5        A    -- it's kind of weird, like --
6        Q    -- if you testify about what happened in
7    that deposition --
8        A    I'm not testifying in the deposition --
9        Q    -- you'll be sanctioned by the courts.

10    A    -- it's well-known.  It's well-known.
11           THE REPORTER:  One at a time.  No
12    crosstalk.
13           THE WITNESS:  It's been reported on.
14    It's been reported on.  It's been reported on that he
15    has had issues with women.  And so it's --
16    BY MS. BOLGER:
17    Q    So the answer to my question is "no"?
18    A    My point is it's --
19    Q    You can't name a single human being --
20    A    -- I mentioned -- I said, "Bill Maher."  And
21    the fact of the matter is -- is that if you read all
22    the comments online, and you read the -- the way that
0241
1    things have been portrayed, they make me out to look
2    like I'm a whore, and I'm a -- that I'm a groupie,
3    like Bill Maher said --
4    Q    So you can't --
5    A    -- he said I'm a groupie.  I named "Bill
6    Maher."
7    Q    You can't, as you sit here --
8    A    I named, "Bill Maher."
9           MR. KLAYMAN:  Stop badgering her.
10    BY MS. BOLGER:
11    Q    You can't --
12           MR. KLAYMAN:  Asked and answered --
13           THE WITNESS:  I said, "Bill Maher."
14           MR. KLAYMAN:  -- ten times.
15           THE WITNESS:  I said, "Bill Maher."
16           THE REPORTER:  No crosstalk on the
17    record.  One at a time, please.
18           THE WITNESS:  I said, "Bill Maher."
19           MS. BOLGER:  Ms. Loomer --
20           MR. KLAYMAN:  And don't scream at me,
21    Court Reporter.
22           MS. BOLGER:  There's no --
0242
1           Hey.  Mr. Klayman, don't you point at
2    the court reporter.  Control yourself.
3           MR. KLAYMAN:  He's screaming.
4           MS. BOLGER:  Mr. Klayman, do not point
5    at the --
6           THE WITNESS:  I said, "Bill Maher."
7           MS. BOLGER:  -- at the court reporter.
8           MR. KLAYMAN:  You know what?  You are
9    disrespectful.  As a woman, I can't believe that
10    you're badgering another woman.
11           MS. BOLGER:  How rude that you're
12    pointing at the court reporter.
13           MR. KLAYMAN:  This is a disgrace.
14    You're acting as a disgrace.
15    BY MS. BOLGER:
16    Q    Ms. Loomer --
17    A    Yes.  I said, "Bill Maher."

18    Q   Ms. Loomer, other than Bill Maher, can you
19  name a single human being on Planet Earth who thinks
20  less of you because of the Bill Maher statement?
21    A   Just read the comments online, and you'll
22  see tons of people --

0243

1    Q   So that's a "no"?
2    A   -- making nasty comments.  I can't.  I don't
3  know all of these people personally.  I don't know the
4  two million people personally that Bill Maher
5  broadcasted his defamatory comments to.
6    Q   So do you --
7    A   That's why I'm suing him.  He -- he tried to
8  smear me in front of millions of people when he made
9  these comments.  You should go ask them.  You guys
10  have a lot of money.
11        You guys should go ask them.  You
12  should -- you guys could do like a -- a study.  You
13  know, you should go ask all these people what they
14  think about me.
15    Q   Have you been financially damaged by
16  Mr. Maher's reporting?
17    A   Yeah.  I mean, if you look at my tax
18  returns, I haven't done my taxes for --
19        MR. KLAYMAN:  Don't get into that on
20  this record.
21        THE WITNESS:  But I'm just saying that,
22  you know, I haven't done my taxes yet for 2024.  But

0244

1  $180,000, which is the salary of somebody who works in
2  the White House, is substantially more.
3        MR. KLAYMAN:  Yeah.  Do not get into --
4        THE WITNESS:  I'm not.  I'm not.
5        MR. KLAYMAN:  -- into your tax returns
6  on this record.
7        THE WITNESS:  I'm not.
8        MS. BOLGER:  Mr. Klayman, stop yelling
9  at the witness.
10        THE WITNESS:  But my point is that --
11        MR. KLAYMAN:  I'm not yelling at
12  anybody.  You get off my back.
13        THE WITNESS:  My -- my point is that I
14  have -- and the fact of the matter is that when you
15  have an official position in the White House too --
16  you know, depends on how long you work at the White
17  House -- it's only, you know, either four years or
18  eight years.  Obviously, President Trump is in his
19  second term.
20        People who get to work in the White
21  House get to then parlay their -- you know, their
22  resume, which includes working for a presidential

0245

1  administration into getting other jobs in the future.
2        And so, you know, when you look at the

3    type of opportunity this is costing me, especially
4    long-term, as it relates to my professional
5    aspirations to work in politics, to work in media,
6    it's very damaging.
7              And you know, it makes me wonder how
8    much it's going to cost me both, in my reputation and
9    also, in -- in monetary value.
10   BY MS. BOLGER:
11       Q   So other than your claim that the reporting
12   about your response to Mr. Maher stopped you from
13   traveling on the airplane and you say getting a job in
14   administration, is there any other financial damage
15   that was caused by Bill Maher reporting?
16       A   As I said before, I would have been paid
17   much more than I was making previously.  And who knows
18   what I could have parlayed having that on my resume
19   into in the future.
20            There are people that go on who work for
21   administrations who get to go work at boards.  There's
22   people that get to have foundations.  They get to go
0246
1    work in future administrations.  They get to, you
2    know, get paid for speaking engagements once they
3    leave their official role with the federal government.
4            You don't know.  You know, there's people
5    that write books.  They -- there's people that get to
6    go become Fox News contributors.  They become
7    contributors on mainstream media.  Look at -- look at
8    somebody like Jen Psaki or Karine Jean-Pierre, for
9    example.  You know, they both have shows.
10            Karine Jean-Pierre just announced a book
11   deal today.  So when you work for an administration,
12   once the person is out of office, or once you're done
13   with your job, you know, that could parlay into a lot
14   of speculative opportunities.
15       Q   Speculative opportunities --
16       A   It's not speculative.  It's -- it -- it
17   really is -- it's compounding, is what it is.  It's
18   compounding damages.  It's punitive damages.
19       Q   So is the difference --
20       A   That is the definition of "punitive
21   damages."
22       Q   That's not the definition of "punitive
0247
1    damages."
2       A   It is, actually --
3       Q   But is the final --
4       A   It's -- it's the -- it's -- it is -- it is
5    the damages that are compounded by what Bill Maher has
6    done to me.  And -- and I can only -- there's
7    nothing -- there's nothing worse than stolen
8    opportunity.
9            And Bill Maher has robbed me of opportunity
10   by falsely smearing me as a -- as a philander, an

11    adulterer, and a groupie.
12        Q    Okay.  You've been a very controversial
13    figure for years; haven't you?
14        A    Depends on what your definition of
15    "controversial" is.  I believe that I'm a -- I'm --
16    I'm a truth seeker and a truth speaker.  And people
17    who, you know, have a hard time with the truth would
18    probably call me "controversial."
19        Q    Well, in 2018, you said you had haters;
20    right?
21        A    Yeah.  I have a lot of haters.  Like, Bill
22    Maher, he's a hater.  He hates Trump.
0248
1         Q    You've had haters since 2018; right?
2         A    I mean, I probably have -- probably have.  I
3    mean, I -- I mean, I'm -- online --
4         Q    2018 is the year you got banned from
5    Twitter; right?
6         A    Yeah.
7         Q    And when you got banned from Twitter, you
8    said, "My haters are celebrating today.  And they're
9    saying this is the end of my career, but I want
10    everyone to know I'm just getting started.  Everyone
11    who knows me knows I don't back down"; right?
12        A    Yeah.
13        Q    And in fact, you didn't back down.  You
14    chained yourself to the Twitter building; right?
15        A    You said I did, or didn't back down?
16        Q    Didn't back down.
17            MR. KLAYMAN:  Lacks foundation.
18    Objection.
19    BY MS. BOLGER:
20        Q    You chained yourself to the Twitter
21    building?
22        A    Yeah.  I -- I handcuffed myself to Twitter
0249
1    headquarters in a protest against political
2    censorship, and against election interference, and
3    against the anti-Semitic attacks on me by Twitter, who
4    banned me for speaking out about the anti-Jewish
5    commentary by a Muslim terror-tied congresswoman named
6    Ilhan Omar, who committed immigration fraud, has been
7    investigated for doing so, and married her brother.
8    It's been widely reported.
9         Q    You did that by wearing a yellow star of the
10    sort that Nazis forced Jews to wear during the
11    Holocaust; right?
12        A    Yeah.  'Cause I'm a -- I'm a Jewish woman --
13            MR. KLAYMAN:  Wait, wait, wait, wait.
14            Compound question.
15            THE WITNESS:  I'm a --
16            MR. KLAYMAN:  Wait, wait, wait.
17            Compound question.  Objection.
18            MS. BOLGER:  Don't yell at the witness,

19   Larry.
20   BY MS. BOLGER:
21      Q    You did it -- that --
22           MR. KLAYMAN:  Don't talk over my
0250
1    client.
2    BY MS. BOLGER:
3       Q    -- by wearing a yellow star of the sort that
4    the Nazis forced Jews to wear during the Holocaust --
5            MR. KLAYMAN:  That --
6    BY MS. BOLGER:
7       Q    -- right before they exterminated them;
8    right?
9            MR. KLAYMAN:  That presumes as -- stop.
10   Okay.  We don't want your testimony, and we don't want
11   your characterization of something in a compound
12   question that's completely objectionable, and you know
13   it.  You've been a lawyer long enough to know that --
14   BY MS. BOLGER:
15      Q    You can answer the question.
16           MR. KLAYMAN:  That's your commentary,
17   not hers.
18   BY MS. BOLGER:
19      Q    You can answer the question.
20      A    I am Jewish.  And my grandfather was
21   arrested by Nazis in Germany for being Jewish.  And I
22   take great offense to the anti-Jewish remarks and
0251
1    support for Islamic terrorism expressed by people like
2    Ilhan Omar and Rashida Tlaib.
3            And I had every right to speak out about
4    Ilhan Omar being pro-Sharia and anti-Jewish.  And I
5    was banned for speaking out about a Muslim
6    congresswoman who is un-American, who has no place
7    serving in the United States Congress.
8            And I was banned for that.  And I believe
9    that we are -- we witnessed a digital extermination of
10   President Trump's supporters online.
11           And I decided to wear a yellow star to raise
12   awareness about the Never Again movement, and the fact
13   that Never Again was repeating itself because we have
14   genocidal jihadist Muslims who hate America, and hate
15   Jews, and hate Christians living -- serving in the
16   United States Congress.
17           And they're the reason why we've seen so
18   much anti-Semitic, anti-Christian, anti-American
19   rhetoric that just got people firebombed by Muslims in
20   Colorado over the weekend.
21           MS. BOLGER:  Sorry.  It's 36.
22           THE WITNESS:  And Twitter had a lot of
0252
1    Muslim investors.  And it was widely reported by the
2    Wall Street Journal that a designated terrorist
3    organization called the Council on American-Islamic

4    Relations lobbied Twitter to ban me.
5    BY MS. BOLGER:
6        Q   This is -- I'm going to ask Court Reporter
7    to mark, as Exhibit 13, a tweet of yours actually from
8    December 8, 2022.
9              (Exhibit 13 was marked for
10              identification.)
11            And, Ms. Loomer, you can -- sorry.  You can
12    read the tweet, but I'm actually just wanted to ask
13    you to look at the picture, which is a picture of you
14    trained -- oops -- you -- chained to the Twitter
15    headquarters in 2018; is that right?
16       A   Yes.  That's me with my sign that was
17    calling out Twitter for allowing Jew hatred and then
18    banning a Jew, so that's yes.  That's me wearing a
19    yellow star to highlight the antisemitism of Twitter.
20       Q   Okay.  You were also banned from Facebook?
21       A   Yes.  I was.
22       Q   And why was that?
0253
1        A   Again, speaking truth.  They decided to
2    designate me as a dangerous individual.  And --
3        Q   And what year was that?
4        A   This was in 2019 -- may of 2019.  They --
5    they banned me.
6        Q   You were also banned from Uber; right?
7        A   Yep.
8        Q   And that was in 2017?
9        A   Yep.
10       Q   And why was that?
11       A   Because I was in an Uber on Rosh Hashanah
12    with a friend of mine, and we had a radical Muslim
13    driver.  And when he saw I was wearing a Star of David
14    necklace, and he heard me and my friend talking about
15    Rosh Hashanah, he started screaming belligerently in
16    Arabic.
17            And he called me "a filthy fucking Jew" and
18    told me to get out of his car.  And he threw us out of
19    a moving vehicle.  We reported the incident to Mayor
20    de Blasio's office.  We reported the incident to Uber.
21    They did nothing because the CEO of Uber, at the time,
22    was a Muslim, and they did nothing to address it.
0254
1            And a month later, a Muslim terrorist who
2    was allowed to come into our country under Obama, used
3    a vehicle while he was an Uber driver to mow down, I
4    believe, 12 people in a bike lane in Manhattan,
5    killing 8 of them.  And then he got out of this --
6        Q   I'm so sorry.  I thought the question was
7    why you got banned --
8            MR. KLAYMAN:  She's allowed to answer.
9    Let her answer.
10           THE WITNESS:  There's a -- because
11    there's context, and you're trying to make the jury,

12  if this goes to trial, think I'm a Nazi and a white
13  supremacist, and I'm not a fucking Nazi.  I'm Jewish;
14  okay?
15          So I'm not going to let you say that I
16  was wearing a yellow star so that you can try to
17  gaslight people into thinking I'm a Nazi.  I'm not
18  going to let you fucking twist this.  And I know what
19  you're doing.
20          I know what type of people you are.
21  You're fucking Democrats; okay?  You represent the
22  filthiest fucking people in our country -- Democrats
0255
1   scumbags.
2   BY MS. BOLGER:
3       Q   I thought you didn't like the word, "fuck,"
4   Ms. Loomer?  I thought you were offended by the word,
5   "fuck"?
6               MR. KLAYMAN:  No.  Because you --
7               THE WITNESS:  I'm talking about it as
8   it relates to --
9   BY MS. BOLGER:
10      Q   Me.  To me.
11      A   -- your misogynistic client --
12      Q   You're using it.
13      A   -- falsely accusing me --
14      Q   You are using it, so it's okay; right,
15  Ms. Loomer?
16              MR. KLAYMAN:  That's not true.
17              THE WITNESS:  He's talking about having
18  sex with President Trump.
19  BY MS. BOLGER:
20      Q   You get to say, "fuck."  You get to call
21  names, but other people can't do that; right?
22      A   There's a difference between using the word,
0256
1   "fuck," and using the word, "fuck," to say that
2   somebody's having sex with the president.
3           But again, you're ideologically focused on
4   this because as I have reviewed your FEC records, you,
5   yourself, have donated to the Democrats multiple
6   times.  In fact, you know, you -- you find Bill --
7   Bill Maher's commentary to be very funny.
8       Q   Ms. Loomer --
9       A   You do.
10      Q   You also got arrested in Nancy Pelosi's
11  home; correct?
12      A   Yep.  And it was because --
13      Q   And that was in 2019; right?
14              MR. KLAYMAN:  I'm going to object to
15  this whole line of questioning.  It's irrelevant.
16  BY MS. BOLGER:
17      Q   That was in 2019?
18      A   Yeah.  I did.  Because I --
19              MR. KLAYMAN:  Irrelevant.

20          THE WITNESS:  -- protested illegal
21  immigration.
22   //
0257
1  BY MS. BOLGER:
2      Q   And --
3      A   But again, you're a Democrat donor, so
4  you're going to have an issue with that.
5      Q   In 2021, you --
6      A   You hate America.  You donate to Democrats.
7      Q   -- decided -- I'm so sorry.  What did you
8  just say I do?
9      A   You donate to Democrats.  People can try --
10     Q   No, no.  Did you tell me I hated America?
11     A   I think you do.  Yes.  I really do.  I think
12  you do.
13     Q   Okay.
14     A   I think you do.
15     Q   Do you have any basis to say that?
16     A   I -- I think that you have an affinity,
17  given the fact that you represent so many anti-Trump
18  and, in my opinion, anti-American clients, especially
19  members of the fake news media, who intentionally lie
20  and spread conspiracies in an effort to promote
21  political violence in our country.
22          I really do think that you are ideologically
0258
1  motivated to try to paint me in a bad light, and to
2  not even mention the fact that I'm Jewish, and to try
3  to make me out to be a Nazi, and not give context as
4  to why I was wearing a yellow star.  I really do think
5  that the Democrat --
6      Q   I believe you're defending --
7          MR. KLAYMAN:  Let her finish.
8          THE WITNESS:  I believe -- I really
9  do --
10  BY MS. BOLGER:
11     Q   I believe you're defending your opinion that
12  I was anti-American just to connect it up.
13         MR. KLAYMAN:  Let --
14         THE WITNESS:  Yeah.  Because I do
15  believe that the Democrat party is very anti-American.
16  I do.  I do.
17         MS. BOLGER:  Okay.
18         THE WITNESS:  And I -- I noticed that
19  you donated over a thousand dollars to the Democrats
20  in 2022.
21         MS. BOLGER:  Great.
22   //
0259
1  BY MS. BOLGER:
2      Q   So in April of 2021, when the Supreme Court
3  refused to hear your lawsuit, you gave an interview
4  with Mr. Klayman, actually.  And you said that, "We

5   are living in a digital gulag.  And I, just like gulag
6   prisoners and prisoners in concentration camps had to
7   have tattoos -- the Nazi-style Holocaust tattoos.
8          "I thought it would be really symbolic to
9   actually get my docket number tattooed on my wrist
10   like a Holocaust-style tattoo because I really do
11   believe that history is repeating itself, and we are
12   witnessing a digital Shoah.
13          "And this is a digital extermination by
14   these actual fascists and tyrants in Silicon Valley.
15   And so I might just get my docket number tattooed on
16   my wrist"; do you remember saying that?
17       A   Yeah.
18       Q   Did you?
19       A   I didn't get it tattooed on my wrist,
20   actually.  'Cause I thought that it'd probably be a
21   little bit too painful to get a tattoo on my wrist,
22   and I have a low pain tolerance.  But --
0260
1       Q   Did you get it tattooed somewhere else?
2       A   I did not get it tattooed on my body.  But
3   again, it was supposed to be representative of the
4   fact that it was quite unprecedented, according to my
5   attorney, that they would refer to me as a docket
6   number as opposed to my name.
7          And my name was pretty much scrubbed from
8   the case, even though I was a main party to that case
9   that made it all the way to the Supreme Court.  And
10   everybody thought it was kind of interesting that my
11   name was not mentioned in it, given the fact that I
12   brought the lawsuit.
13       Q   You were also thrown out of the courthouse
14   during the Pulse nightclub trial; right?
15       A   Yep.  Because --
16       Q   And why was that?
17       A   -- I, again, as a Jewish American who speaks
18   out against Islamic terrorism, the Pulse nightclub --
19   the wife of Omar Mateen, who was the ISIS terrorist
20   who killed over 50 gay people at a gay club in
21   Orlando -- she was shown, during the trial, to have
22   been texting with her husband about his plans to carry
0261
1   out a terrorist attack.
2          And I, during the press conference, asked
3   the family members of -- of the terrorists, whether or
4   not they condemned jihad.  And the family was being
5   represented by CAIR, which is the group that lobbied
6   Twitter to ban me.  They've been designated as an
7   Islamic terrorist organization in the United Arab
8   Emirates and Saudi Arabia.
9          And they were even found during our -- the
10   Holy Land Foundation terrorism trial, the -- our
11   nation's largest terrorism trial -- to be supporting
12   Hamas and the Muslim Brotherhood.  They asked the

13  Obama-appointed judge overseeing the case to remove
14  me.
15        And so the next day, I was removed from the
16  courthouse by a court martial, even though I had a
17  press credential to attend and cover the trial.
18     Q    You also interrupted a performance of Julius
19  Caesar in Central Park; correct?
20     A    Yep.
21     Q    And you did that because they were
22  criticizing Trump?
0262
1      A    Well, they were inciting violence.  It's a
2  crime in this country -- as you know, a felony -- to
3  incite violence against the president.  And they had
4  the Caesar character as a Trump look-alike, and it was
5  all widely publicized.
6        It was publicized all over the media, and it
7  was funded by New York taxpayer dollars at the Public
8  Theater of New York City in Central Park.  And I
9  decided to storm the stage and protest the incitements
10  of violence against Donald Trump as my free speech
11  right to do so.  I had a ticket for the event that I
12  paid over $500 for.
13     Q    Sorry.  You think it's your free speech
14  right to storm the stage during a production?
15     A    It's my free speech right to stop the
16  promotion of a felony assassination porn and the
17  incitement of violence against President Trump.  It's
18  a crime.
19     Q    What's incitement -- what's the crime of
20  incitement?
21     A    Having a Trump look-alike on stage and --
22     Q    No.  I meant the meaning of the elements of
0263
1  the crime.  What kind of incitement?
2        MR. KLAYMAN:  Well, she's not a lawyer.
3  I object to legal conclusions.
4  BY MS. BOLGER:
5      Q    What is the incitement?
6      A    They --
7      Q    If you're telling me about your First
8  Amendment right, what are they?
9      A    Because they were -- they had people on
10  stage that were stabbing this Trump look-alike that
11  was obviously Trump.  And they even stated that Caesar
12  was Trump when they were promoting the play and trying
13  to sell tickets for it.
14        And they -- they were basically encouraging
15  people to stab the president of the United States.
16  And so I decided --
17     Q    So you're familiar with the idea that Caesar
18  was actually stabbed right on the floor of the Senate;
19  right?
20     A    That's what I just said.

21  Q    Right.  In history and in the play --
22  A    Yeah.  Of course.
0264
1    Q    -- Julius Caesar, he was stabbed; right?
2  And that's a play.
3    A    But they could have actually made it Caesar
4  instead of making it look like Donald Trump in
5  an -- with, like, you know, orange -- orange-tainted
6  skin, and a blonde wig, and a wife that had a Eastern
7  European accent that they said, themselves, was
8  supposed to be Melania and Donald Trump.
9    Q    So in the United States of America, we get
10  to criticize the president; don't we?
11    A    You can criticize the president, but it's a
12  felony, actually, to incite a violence against the
13  president.
14    Q    In performing Julius Caesar, you think it's
15  incitement?
16    A    When you intentionally go out of your way to
17  make Caesar Donald Trump, and you make all of the
18  people on stage who are stabbing him a bunch of
19  Women's March activists and Black Lives Matter
20  activists, and you encourage them to, like, gang up on
21  him and stab him.
22       'Cause they modernized it.  They didn't just
0265
1  do Julius Caesar and, like, the Roman garb, and you
2  know, the togas and whatnot.  They -- they had them
3  look like women in the Pink Pussy Hats and the Black
4  Lives Matter shirts.
5       And they were trying to recreate the modern
6  political dynamic in America to incite violence.  And
7  they were trying to get --
8    Q    Weren't they just trying to make a point
9  about their government?
10    A    No.  I think --
11    Q    Aren't you allowed to make points about the
12  government?
13    A    They were trying to get the president
14  killed.
15    Q    You just don't --
16    A    It was widely reported on all --
17    Q    You just don't like it when people say bad
18  things about Trump; right?
19    A    I don't like it when people incite violence
20  against the president --
21    Q    My question was --
22    A    -- 'cause I watched my president almost get
0266
1  shot in the head, and actually, did watch him get shot
2  in the head twice.  So I don't like it when people do
3  that because President Trump was shot in the head in
4  Butler, and somebody tried to assassinate him on his
5  golf course --

6    Q    And Shakespeare in the Park, in 2017, no one
7    got shot in the head; right?  So you're mixing your
8    metaphors there.
9    A    No.  I'm -- I'm saying that I --
10    Q    I'm asking you a question.
11    A    -- I take political violence very seriously.
12    Q    I'm asking you a question.
13         MR. KLAYMAN:  That wasn't a question.
14         THE WITNESS:  And I answered your
15    question.
16    BY MS. BOLGER:
17    Q    Ms. Loomer, I'm asking you --
18         THE REPORTER:  One at a time for the
19    record.
20         THE WITNESS:  You're a Democrat --
21    BY MS. BOLGER:
22    Q    I'm asking you a --
0267
1    A    You're a Democrat, Kate.  You're trying to
2    justify somebody killing Trump.  I get it.  You don't
3    like Trump.
4    Q    I'm asking you a question about what
5    happened in Shakespeare in the Park.
6    A    And I answered the question.
7    Q    And the question I have for you --
8    A    I don't like when people incite violence.
9    Q    Well, I have a question for you, which is
10    why can't people make rhetorical points about the
11    president of the United States, whoever it is.  Isn't
12    it the point of being an American that you get to
13    criticize your government?
14         MR. KLAYMAN:  Relevancy.
15         THE WITNESS:  You can criticize the
16    government, but you are not allowed to joke.  It's
17    actually a felony to even joke; right?  They --
18    whatever they want to say about killing the president.
19         And this is why it's sparked so much
20    controversy when they had the Shakespeare in the Park
21    with Donald Trump as the -- as the portrayal of Caesar
22    because it -- it dominated all of the late night --
0268
1    the late night primetime news -- news shows for, like,
2    three weeks when this was going on.
3         There were so many debates about it.
4    They had panels and discussions about whether or not
5    this took it too far, and it was incitement to
6    violence.  But it's -- it's -- it -- it's -- it's
7    fine.
8         I was -- I was arrested for what I did,
9    and I would gladly do it again because it was an honor
10    to stand up for President Trump.  And it was an honor
11    to take a stand against political violence.  And I
12    have no shame in the fact that I was arrested by the
13    NYPD for -- for what I did.  It's fine --

14    BY MS. BOLGER:
15       Q   How many times have you been arrested?
16       A   -- I'll do it again.  I was arrested at
17    Gavin Newsom's house.  I wasn't arrested at Nancy
18    Pelosi's house, actually.  You got that wrong.  I was
19    arrested at Gavin --
20       Q   Sorry.  That's the recording.
21       A   I was arrested at Gavin Newsom's house for
22    protesting illegal immigration and trespassing.  I
0269
1    was --
2       Q   Is that when you were wearing the sombrero?
3       A   Yeah.  Yeah.  Yeah.  I was wearing a
4    sombrero.  It's fine.  I mean, like, you know, they
5    let illegals pop our border every day.  So I figured
6    that, you know, the governor who wants to let a bunch
7    of criminals, and terrorists, and illegal aliens into
8    our country would be totally fine with me hopping his
9    fence; right?
10          They -- they say, "Everyone's welcome here."
11    I'm just using their own words against them.  I got
12    arrested in New York for protesting the political
13    violence and the assassination porn of Donald Trump.
14    And I guess it was like a paper arrest at the -- the
15    courthouse in -- in Orlando.
16          I think Larry was representing me at the
17    time, I believe.  And I believe that when we
18    threatened to sue them for what they did to me, there
19    was nothing -- there was nothing really happened with
20    the case, if I recall.  I don't even think we got a
21    reply.  But I guess, like, that would be three times.
22          MS. BOLGER:  Okay.  I'm going to ask
0270
1    the court reporter to mark, as Exhibit 14, an article
2    that was published in the New York Times called "Trump
3    wanted to hire a Laura Loomer, anti-Muslim activist."
4          (Exhibit 14 was marked for
5          identification.)
6          MR. KLAYMAN:  We're going to take a
7    break shortly.
8          MS. BOLGER:  I'm going to finish this
9    exhibit.
10          MR. KLAYMAN:  We'll give you that
11    courtesy, something that you don't give us.
12    BY MS. BOLGER:
13       Q   Okay.  Ms. Loomer, this is an article
14    published by Maggie Haberman and Jonathan Swan --
15          MR. KLAYMAN:  Can I have a copy of it,
16    please?
17          MS. BOLGER:  I did.  It's right there.
18    BY MS. BOLGER:
19       Q   This is an article that's published by
20    Maggie Haberman and Jonathan Swan on April 7th of
21    2023; do you see that?

22    A    Yeah.

0271

1    Q    This is the article you referenced earlier
2  in the day?
3    A    Yeah.
4    Q    Okay.  And I think you'll agree with me that
5  April 7, 2023, was before September 13, 2024; correct?
6    A    Yeah.
7    Q    Okay.  So the very first graph says, "Former
8  President Donald Trump told aides to hire Laura
9  Loomer, a far-right and anti-Muslim activist with a
10  history of expressing bigoted views, for a campaign
11  role"; do you see that?
12    A    Yeah.
13    Q    Okay.  And then if you read down,
14    A    But it wasn't "aides," it was Susie Wiles.
15  It was -- it wasn't "aides," it was Susie, as I said.
16    Q    I'm just asking you what the page said.
17    A    Yeah.  I know.
18    Q    On the next page, the first paragraph of the
19  next page -- turn the page.  First paragraph of the
20  next page quotes you as saying, "The president knows I
21  have always been a Trump loyalist.  She added in that
22  I'm committed to helping him win reelection in 2024.

0272

1  He likes me very much.
2         "And it's a shame that he's surrounded by
3  some people that run to a publication that is
4  notorious for attacking him in order to try to cut me
5  at the knees, instead of being loyal to President
6  Trump and respecting their confidentiality
7  agreements"; do you see that?
8    A    Mm-hmm.
9    Q    Did you say that?
10    A    Yes.
11    Q    Great.  Then two paragraphs down -- oh.  No.
12  The next paragraph said, "Ms. Loomer, twice, ran
13  unsuccessfully for Congress and is known for offensive
14  attention-grabbing behavior"; do you see that?
15    A    [No audible response.]
16    Q    Do you see those words?
17    A    Are we on the same page, or is it another --
18    Q    Yep.  Just the next paragraph after your
19  quote.
20    A    Oh.  Yes.  I see it.  Mm-hmm.
21    Q    Okay.  Then it says "She once described
22  Islam as a cancer, and tweeted under the hashtag" --

0273

1         MR. KLAYMAN:  Objection.  Well, I want
2  to understand.  This is irrelevant.  What is the point
3  of repeating words by ultra-leftist haters of Trump,
4  hater of -- Maggie Haberman has no credibility,
5  neither does Jonathan Swan -- a bunch of leftist
6  hacks.

7  BY MS. BOLGER:
8    Q   Okay.  So the question is --
9       MR. KLAYMAN:  What's the point of this?
10  BY MS. BOLGER:
11    Q  "She once described Islam as 'a cancer' and
12  tweeted under the hashtag, '#proudislamophobe.'  And
13  she has celebrated the deaths of migrants crossing the
14  Mediterranean"; do you see that?
15    A   Yeah.
16    Q   Okay.  "2018, she was barred from Twitter
17  for violating its hateful conduct policy.  To protest
18  the ban, Ms. Loomer, who was Jewish affixed a yellow
19  Star of David to her clothes, just as the 'Nazis made
20  Jews wear during the Holocaust,' she said, and
21  handcuffed herself to the entrance of Twitter's" --
22       MR. KLAYMAN:  Objection.  Relevancy.
0274
1  BY MS. BOLGER:
2    Q   -- "New York headquarters"; do you see that?
3    A   Yeah.
4    Q   Okay.  Then in the second -- two paragraphs
5  down, she says -- it says "Ms. Loomer sent the New
6  York Times a screenshot of the tweet that prompted her
7  ban for hateful conduct.  In the tweet, she describes
8  Representative Ilhan Omar, Democrat of Minnesota, as
9  'pro-Sharia' and 'anti-Jewish'" --
10       MR. KLAYMAN:  Do you have a question?
11  BY MS. BOLGER:
12    Q   Then it quotes you as saying, "'I know a lot
13  of people don't like me, but that's their problem, not
14  mine,' she said on Friday.  'I have proven my loyalty
15  to President Trump countless times over.  And even if
16  other people tried to malign me and undermine
17  President Trump's wishes, I will continue to be a
18  ride-or-die Trump supporter.  Trump deserves loyalty
19  and deserves to have loyal people working for him who
20  do not leak the press'"; do you see that?
21    A   Yep.
22    Q   Did you say that?
0275
1    A   Yes.
2    Q   Okay.  It says "She was also barred from the
3  ride-hail apps, Lyft and Uber, for making bigoted
4  comments about Muslim driver -- drivers, asked about
5  these comments in which she called on Twitter for a
6  'non-Islamic form of Uber or Lyft.'
7      "Ms. Loomer said she was responding to a
8  Muslim driver 'throwing me out of an Uber for being a
9  Jew on Rosh Hashanah'"; do you see that?
10    A   Yep.
11    Q   Did you say that?
12    A   Yes.
13    Q   Okay.  And it says "In a 2017 appearance on
14  a far-right podcast called Nationalist Public Radio,

15    Ms. Loomer described her beliefs. 'Someone asked me,
16    are you pro-white nationalism? Yes. I'm pro-white
17    nationalism,' Ms. Loomer said. 'But there's a
18    difference between white nationalism and white
19    supremacy; right? And a lot of liberals and left-
20    wing, globalists, Marxist Jews don't understand that.'
21         "She added, 'So this country really was
22    built as a white Judeo-Christian ethnostate,
0276
1    essentially. Over time, immigration and all these
2    calls for diversity is starting to destroy the
3    country'"; do you see that?
4        A    Yeah.
5        Q    Did you say that?
6        A    I did.
7        Q    Okay. And then you see two paragraphs down,
8    there's a quote that says, "Warning that Ms. Loomer
9    'cannot be trusted,' Ms. Greene said of Mr. Trump,
10    'I'll make sure he knows'"; do you see that?
11         MR. KLAYMAN: Continuing objection on
12    relevancy.
13    BY MS. BOLGER:
14        Q    Do you see that?
15        A    Yeah. I see it.
16        Q    Okay.
17         MR. KLAYMAN: This has nothing to do
18    with her having been accused of fucking Donald Trump.
19    Nothing.
20    BY MS. BOLGER:
21        Q    Then the next page, which --
22         THE VIDEOGRAPHER: I'm sorry.
0277
1    Ms. Loomer, watch your arm against your mic.
2         THE WITNESS: Oh. I'm sorry.
3         THE VIDEOGRAPHER: Thank you.
4         THE WITNESS: Sorry.
5    BY MS. BOLGER:
6        Q    The next page, page 4 of 5, there's a quote
7    from you that says, "'I ran for Congress as the first
8    deplatformed candidate in the United States history,'
9    Ms. Loomer said on Friday.
10         "'I'm a Jewish conservative woman, a Trump
11    loyalist, and a free speech absolutist. And I also
12    used to work at Project Veritas too.'" And then
13    little later on, you say, "It's not like I'm some kind
14    of fringe person. I won the GOP primary 2020, and
15    President Trump literally voted for me." You said
16    that; right?
17        A    Yes.
18        Q    Okay. Then two paragraphs down, it says,
19    "Ms. Loomer has accused Mr. DeSantis and his wife,
20    Casey, who had breast cancer, of wanting 'to play the
21    cancer survivor card to make people think they're
22    untouchable from criticism'"; you see that?

0278
1      A    Yeah.
2              MR. KLAYMAN:  Same continuing
3    objection.  Relevancy.
4    BY MS. BOLGER:
5      Q    Did you say that?
6      A    I mean, I would need to see exactly what I
7    said, but I do remember making a criticism about her
8    use of a breast cancer diagnosis in a campaign
9    commercial.  I -- I felt it to be in poor taste.
10     Q    Okay.  You can put that aside.
11             MS. BOLGER:  And why don't we take that
12   break?
13             MR. KLAYMAN:  Okay.
14             THE VIDEOGRAPHER:  Off the record at
15   3:02.
16             (Off the record.)
17             THE VIDEOGRAPHER:  Back on the record
18   at 3:15.
19             MR. KLAYMAN:  Right.  While we're back,
20   you know, this is getting rather contentious in parts.
21   Ms. Loomer is getting tired, so I would suggest we
22   take a break about every 45 minutes for 5 minutes.
0279
1              MS. BOLGER:  I will see what I can do
2    to accommodate that, but I'm not going to interrupt
3    the line of questioning.
4    BY MS. BOLGER:
5      Q    I'm going to ask the witness to look at
6    Exhibit 15, please.
7              (Exhibit 15 was marked for
8              identification.)
9              MS. BOLGER:  Here you go, Mr. Klayman.
10   BY MS. BOLGER:
11     Q    Ms. Loomer, I will represent to you that
12   this is the total document production that you
13   provided to us in this litigation minus your tax
14   returns, which we'll talk about in a confidential
15   session per your lawyer's request.
16             So bearing that in mind, I think you
17   testified before the break that you believed that you
18   had produced to us articles that picked up Mr. Maher's
19   joke about you.  And you thought that there were
20   articles that had published it without your response.
21             I have looked through this.  I do not see
22   any.  Can you please look through and identify to me
0280
1    what article you think was about Mr. Maher's joke
2    without discussing your response?
3              MR. KLAYMAN:  Well, first of all,
4    that's a six-part question.  I take issue with your
5    characterization of what she said she produced and
6    what she didn't produce.  Because she also pointed out
7    that there were various objections that were made, and

8  documents weren't produced pursuant to those
9  objections.
10          THE WITNESS:  I mean, I believe I --
11  I -- this is what I presented, but there may have been
12  more.  Like I said, hopefully everything was
13  forwarded, but there's a lot of articles.
14  BY MS. BOLGER:
15      Q   And none of them are just about Mr. Maher's
16  statement.  They're all about your response to
17  Mr. Maher's statement; correct?
18          MR. KLAYMAN:  Documents speak for
19  themselves.
20  BY MS. BOLGER:
21      Q   Correct?
22      A   Well, these are about me responding and
0281
1  also, about the lawsuit as well.  But of course, I was
2  going to deny it as I did because it was spreading
3  like wildfire on social media, which is how I was
4  notified about it.
5      Q   So you have not produced any single tweet to
6  us about how it was spreading like wildfire --
7      A   And there's, like, tons of tweets.  I can't
8  print out thousands of pages of tweets.
9          MS. BOLGER:  Well, I call for the
10  production of those materials.
11          MR. KLAYMAN:  And they're available to
12  you as well, so you certain can do it.
13          THE WITNESS:  They're public.  You guys
14  can look at them.
15          MS. BOLGER:  I call for the production
16  of those materials.
17          MR. KLAYMAN:  They're available.
18  They're within your custody, possession, and control.
19  BY MS. BOLGER:
20      Q   Now, the week that you --
21          MS. BOLGER:  Are you being deposed,
22  Mr. Klayman?
0282
1          MR. KLAYMAN:  No.  I'm making an
2  objection.
3  BY MS. BOLGER:
4      Q   The week that you traveled to the debate and
5  the 9/11 Memorial, there was substantial public press
6  about you traveling with the president; correct?
7      A   I would say that there was press the
8  afternoon after I got off the plane, and there was
9  press after I attended the 9/11 Memorial ceremony, but
10  the press became more inflamed after Bill Maher's
11  remarks.
12          MS. BOLGER:  Here is a -- I'm going to
13  ask you to mark this as Exhibit 16.
14          (Exhibit 16 was marked for
15          identification.)

16              THE REPORTER:  16.
17              MS. BOLGER:  Yeah.  Thank you.
18              MR. KLAYMAN:  This is Exhibit 15?
19              MS. BOLGER:  Yes.
20     BY MS. BOLGER:
21         Q     Exhibit 16 is a Rolling Stone article dated
22     September 12, 2024, that says "Trump Commemorating in
0283
1      9/11 with a 9/11 Conspiracy Theorist."  "Laura Loomer
2      has been spotted multiple times among Trump's
3      entourage, and her influence over the former president
4      is making his allies nervous"; do you see that?
5         A     Mm-hmm.
6         Q     Okay.
7              MS. BOLGER:  Exhibit 17.
8              (Exhibit 17 was marked for
9              identification.)
10              THE WITNESS:  I don't understand I'm a
11     "9/11 conspiracy theorist," so -- I said it's a
12     Islamic terrorist attack.
13              MS. BOLGER:  Exhibit 17 -- what did she
14     say?
15              THE WITNESS:  What's 17?
16     BY MS. BOLGER:
17         Q     The Rolling Stone article is from the 12th;
18     correct?  Yes?
19         A     Yeah.
20         Q     Great.
21              MS. BOLGER:  This is Exhibit 17 coming
22     your way.
0284
1      BY MS. BOLGER:
2         Q     That is an AP article that says "Laura
3      Loomer, who Promoted a 9/11 Conspiracy Theory Joins
4      Trump for Ceremonies Marking the Attack."  It's dated
5      September 11, 2024; do you see that?
6         A     Yep.
7         Q     On the third page of that exhibit, you'll
8      see there's a paragraph that on -- my printout is on
9      the third page down -- third paragraph down, but I may
10     be looking at a different one.  Hold on.
11              Third paragraph down is "Trump has a long
12     history of elevating and associating with people who
13     trade in falsehoods and conspiracy theories any
14     regularly" --
15         A     I'm sorry.  Where is this?
16         Q     On the third page -- the third graph that
17     starts --
18         A     Are you including, like, double-sided, also?
19         Q     Yeah.
20         A     So this would be the third page?
21         Q     Yes.
22         A     Okay.  Sorry.  Just want to clarify.
0285

1       Q   No.  Appreciate that.  The third graph
2   starts "Trump has a long history of elevating and
3   associating with people"; do you see that?
4       A   Yes.
5       Q   Okay.  And it says "Trump has a long history
6   of elevating and associating with people who trade in
7   falsehoods and conspiracy theories"; you see that?
8           MR. KLAYMAN:  Objection.  What's the
9   relevancy of this?  It's written by Associated Press;
10  BY MS. BOLGER:
11      Q   Do you see that?
12      A   Yep.
13      Q   Okay.
14          MR. KLAYMAN:  Yeah.  It's written by
15  Associated Press --
16          MS. BOLGER:  And then you can put that
17  away.
18          MR. KLAYMAN:  -- a Trump-hating
19  organization, which the Israelis even had to bomb
20  their building in Gaza because they were supporting
21  Hamas --
22          MS. BOLGER:  Okay.  You can put that to
0286
1   the side.
2           Exhibit 18.
3           MR. KLAYMAN:  What is point of all
4   this?
5           MS. BOLGER:  I don't have to answer
6   your questions, Mr. Loomer [sic].
7           MR. KLAYMAN:  You know, I'm putting it
8   on the record.  This is theater of the absurd.
9           MS. BOLGER:  210, please.  And then
10  212.
11          Okay.  I'm going to ask the court
12  reporter to mark, as Exhibit -- this is 18?
13          (Exhibit 18 was marked for
14          identification.)
15          THE REPORTER:  18.
16          MS. BOLGER:  Okay.
17  BY MS. BOLGER:
18      Q   This is -- sorry.  This is a Semafor
19  article, which was published on September 11th of
20  2024, with the headline, "Republicans Fear Laura
21  Loomer is Influencing Donald Trump."  As I said, it's
22  dated September 11th.
0287
1           You'll see the first page, first paragraph
2   says "She was on the plane with him the day of the
3   debate, and on the ground with him the morning after.
4   Some Republicans are worried she had something to do
5   with what happened in between"; do you see that?
6       A   Yes.
7       Q   Okay.  And the third paragraph on that page
8   says "One person close to the Trump campaign said they

9      were a hundred percent concerned about her
10     exacerbating weaknesses, regardless of any guardrails
11     the Trump campaign puts on her.  'I don't think it's
12     working,' the person said"; do you see that?
13         A   Yeah.  I see it.
14             MR. KLAYMAN:  So what's the point?
15             THE WITNESS:  Well, I don't understand.
16     Like, they don't --
17     BY MS. BOLGER:
18         Q   You can put that aside.
19         A   It doesn't have any credibility.  It's all
20     anonymous.
21         Q   Okay.
22         A   Anonymous --
0288
1              MR. KLAYMAN:  I mean, you're not
2      even --
3              THE WITNESS:  -- anonymous sources
4      don't stand up in court.
5              MR. KLAYMAN:  Well, let me tell say
6      this.  You're not even -- you're -- I mean, this is
7      such a --
8              MS. BOLGER:  Yes.
9              MR. KLAYMAN:  -- bizarre -- you're just
10     making a show here.  You're not even trying to
11     authenticate the document.  All you're doing is
12     throwing this stuff out there for effect.
13             MS. BOLGER:  Can I ask you to mark this
14     as Exhibit 20?
15             MR. KLAYMAN:  Why are you just wasting
16     time like this?
17             MS. BOLGER:  Can I ask you that --
18     ask -- mark that as Exhibit 20?
19             MR. KLAYMAN:  What is the point of what
20     you're doing, Ms. Bolger?
21             UNIDENTIFIED SPEAKER:  We're at 19?
22             MS. BOLGER:  I think we're at 20.
0289
1              MR. KLAYMAN:  The documents speak for
2      themselves.
3              MS. BOLGER:  Are we at 19 or 20?
4              THE REPORTER:  We're at 19.
5              MS. BOLGER:  Okay.  Great.  Can you
6      send that to Laura Loomer?  Great.  Can you hand that
7      to the witness?
8              (Exhibit 19 was marked for
9              identification.)
10             THE WITNESS:  It's all anonymous.  It's
11     all --
12             MS. BOLGER:  Can you hand that to the
13     witness?
14             Okay.  Here you go.
15             And this is --
16             MR. KLAYMAN:  Well, we do appreciate

17    you letting us know the garbage you're going to try to
18    put -- use at trial.
19    BY MS. BOLGER:
20        Q    This is an email -- this is an article that
21    I've marked as Exhibit 19, which is called "Trump's
22    Toxic Ties to Conspiracy Theorist, Laura Loomer,
0290
1    Continue."
2        "The former president's association with the
3    bigoted activists and conspiracy theorists should earn
4    him the same condemnation he received over his
5    dinner -- white nationalist Nick Fuentes and Ye."  And
6    it is dated September 11, 2024; do you see that?
7        A    Yeah.  This is an opinion piece by a
8    anti -- anti-white author from what I've seen from his
9    social media posts.  I remember when this came out.
10    It's an opinion piece.  Looks like it's been
11    Photoshopped.  Did this get Photoshopped when you guys
12    printed it?
13        Q    And it was --
14        A    It said, "Opinion"; did you guys Photoshop
15    "Opinion" out of it?  Because I'm pretty sure it said
16    "Opinion."  It looks like it's been Photoshopped out.
17    Did you -- are you, like, Photoshopping these
18    exhibits?
19        Q    Obviously, we're not Photoshopping these
20    exhibits.
21        A    Well, then why does it not say "Opinion"?
22    Usually, it -- it said "Opinion" on it.  I know for a
0291
1    fact 'cause I remember talking about this article when
2    it came out.  And it -- it said "Opinion."  Now,
3    "Opinion's" gone.  Looks fake.  I'm just saying it's
4    opinion; it's not real --
5        Q    But it was -- you are aware that this
6    article was published --
7        A    Yeah.
8        Q    -- on September 11, 2024.
9        A    It's published by MSNBC, and it said -- if
10    you go, and you look at the website, it says
11    "Opinion."
12        Q    I'm pretty sure if you read --
13        A    It's not really a real news article, it's
14    opinion.
15        Q    Right.  It's called "The ReidOut Blog" --
16        A    It's garbage dribble from a anti-Trump
17    publication, MSNBC, which I believe has been sued,
18    too, because of their lies --
19        Q    Actually, I think you're just looking --
20    reading the wrong place.  Flip to the back.
21        A    Okay.  Well, maybe.
22        Q    It says "Ja'han Jones is an MSNBC opinion
0292
1    blogger."

2        A    Okay.  Well, I don't know.  Perhaps.  I
3   don't see that --
4        Q    Well, it was published then, on
5   September 11, 2020 [sic].
6        A    Yeah.  But like, it's opinion.  It's not a
7   fact.
8        Q    Right.  We get to have opinions in America.
9        A    Right.  But this doesn't stand up in court.
10  It's like --
11            MS. BOLGER:  I'm going to ask you to
12  mark, as Exhibit 20, a document published by The
13  Guardian.
14                (Exhibit 20 was marked for
15                identification.)
16            MR. KLAYMAN:  All leftist publications,
17  I might add -- leftist Trump-hating publications.
18            MS. BOLGER:  No.
19  BY MS. BOLGER:
20        Q    And the headline of this article is
21  "Republicans Point Finger at Laura Loomer for Trump's
22  Pet-Eating Rant."  "Conspiracy theorists said to have
0293
1   been key promoter of false rumor about immigrants
2   ex-president repeated in debate."
3            And you'll see the first graph reads,
4   "Republicans are blaming the influence of Laura
5   Loomer, right-wing conspiracy theorist for this week's
6   botched debate performance by Donald Trump, which
7   included the former president repeating a bizarre and
8   unfounded claim that pet cats and dogs are being eaten
9   by Haitian immigrants"; do you see that?
10            MR. KLAYMAN:  Objection.  Relevancy.
11  What relevancy is there?  It has nothing to do with
12  her -- excuse the French -- fucking Donald Trump and
13  committing adultery.  Not only that, these are
14  ultra-leftist rags; okay?  Which have no credibility
15  at all.
16  BY MS. BOLGER:
17        Q    Did you see it?
18        A    I see it.  But again, I don't think it was a
19  botched debate.  He won the election.
20        Q    Sure.  But this article was published by The
21  Guardian.
22        A    Okay.  But it's, like, I think it's a
0294
1   foreign publication, from my understanding; isn't this
2   like a UK publication?  Why do I --
3        Q    It's actually a Guardian US, as you can
4   tell, if you look in the right-hand corner.
5        A    Okay.  Well, either way, like, why should I
6   care about what they have to say?
7        Q    It was published on September 12, 2024;
8   right?
9        A    Yeah.  But it doesn't say I had an affair

10    with President Trump.  I -- I'm not suing because they
11    have a problem with me talking about pet-eating,
12    illegal aliens and migrants.  I'm talking about --
13        Q    Ms. Loomer, my question was, do you see
14    that?
15        A    No.  I see it.  But this lawsuit is about
16    Bill Maher --
17                MS. BOLGER:  I'm going to ask you to
18    mark this as Exhibit 21.
19                (Exhibit 21 was marked for
20                identification.)
21                THE WITNESS:  -- accusing me of having
22    sex with President Trump, not about Haitians eating
0295
1    pets.
2                MR. KLAYMAN:  It's quite clear that all
3    this is harassment because you're not making any point
4    at all.
5                MS. BOLGER:  Exhibit 21, please.
6                MR. KLAYMAN:  It's totally irrelevant.
7    Totally irrelevant.  You pull out all your friends in
8    the leftist media to try to smear her on a public
9    record?  Do you have another copy of that?
10                MS. BOLGER:  I do.
11    BY MS. BOLGER:
12        Q    Okay.  This is an article published on
13    September 12th on the website, "mediaite.com."  And
14    the headline is, "He Doesn't Take This Election
15    Seriously.  Trump Allies Fear Laura Loomer Will Tank
16    His Campaign," dated September 12, 2024; do you see
17    that?
18        A    Yeah.  But it's fake news.  He won the
19    election.
20        Q    Okay.  And the first graph is "The presence
21    of infamous bigot and conspiracy theorist, Laura
22    Loomer, on Donald Trump's campaign has caused anxiety
0296
1    among close to the former president, sources tell
2    Mediaite.  'She's an extreme liability,' said of
3    former Trump campaign staffer with knowledge of the
4    campaign's inner workings"; do you see that?
5        A    Yeah.  But it's all --
6        Q    It was published on September 12th.
7        A    -- there's no name to this.  It's like,
8    who's saying it?  They have to lie.  Anybody could say
9    anything; right?  Just like Bill Maher said I was
10    having sex with President Trump.  People -- people can
11    say what they want.
12                Like, you have to have a name to this stuff;
13    right?  So where's -- where's -- who's saying this?
14                MS. BOLGER:  Do we have that?
15                THE WITNESS:  There's no -- there's no
16    credibility to this; who's saying it?  They say
17    anonymous things.  Anybody can write anything; right?

18          MS. BOLGER:  Okay.  We're going to ask
19    the court reporter --
20          THE WITNESS:  That's why nobody trusts
21    the media anymore.
22          MS. BOLGER:  I'm going to ask the court
0297
1    reporter to mark, as Exhibit 22, a New York Times
2    article, dated September 12, 2024.
3              (Exhibit 22 was marked for
4              identification.)
5          MR. KLAYMAN:  Same objection on
6    relevancy.  Continuing objection.  This will never
7    come into evidence.  You can have your fun right now,
8    but that will be the last fun you have.
9    BY MS. BOLGER:
10       Q    Okay.  Exhibit 22 is an email -- sorry -- is
11    an article written in the New York Times by Ken
12    Bensinger, dated September 12, 2024.  The headline is
13    "Laura Loomer, a Social Media Instigator is Back at
14    Trump's Side."
15          "The former president's decision to elevate
16    Laura Loomer, a far-right activist known for racist
17    and homophobic posts online, has stunned even some
18    Trump allies"; do you see that?
19       A    Yes.
20       Q    Okay.  And if you go to the third graph on
21    the first page, it says "A far-right activist known
22    for endless stream of sexist, homophobic, transphobic,
0298
1    anti-Muslim, and occasionally, anti-Semitic social
2    media posts and public stunts, Ms. Loomer has made a
3    name for herself over the past decade by unabashedly
4    claiming 9/11 was an inside job."
5          MR. KLAYMAN:  Objection.  Relevancy.
6    The absurdity of this article is --
7    BY MS. BOLGER:
8       Q    "Calling Islam 'a cancer'" --
9          MR. KLAYMAN:  Let me finish.  The
10    absurdity of this article --
11    BY MS. BOLGER:
12       Q    -- "accusing Ron DeSantis's wife of
13    exaggerating breast cancer and claiming that President
14    Biden was behind the attempt to assassinate Mr. Trump
15    in July"; do you see that?
16          MR. KLAYMAN:  This is --
17          THE WITNESS:  I see it.  It doesn't
18    mean it's true.
19    BY MS. BOLGER:
20       Q    But it was published on September 12, 2024;
21    correct?
22       A    It doesn't matter if it's published.
0299
1    He -- Bill Maher -- Bill Maher -- or excuse me -- the
2    New York Times clearly had something against me.

3    They -- they published the original article
4 when -- when it was leaked to the New York Times that
5 Trump had hired me, so I'm not a 9/11 conspiracy
6 theorist. I wrote a book. In my book, it clearly
7 says that 9/11 was an Islamic terrorist attack. So --
8    Q   Isn't this all part of that media frenzy
9 regarding your relationship with Trump that you
10 testified about earlier?
11    A   No. You're trying to make a relationship
12 sound sexual, which is what Bill Maher did. And I do
13 not have a sexual relationship with President Trump.
14 And saying it that way, "your relationship with
15 President Trump," is another way of, like, insinuating
16 that I'm having an affair with the president.
17    When in reality, I'm a professional person.
18 I dress very professionally. I can carry myself very
19 professionally. I am an investigative journalist.
20 My -- my reporting was mentioned during the trial of
21 President Trump in New York City.
22    It was actually my reporting that led to one
0300
1 of the initial gag orders because I exposed the --
2 Judge Merchan's daughter, Lauren Merchan, who has a
3 Democrat political consulting firm. And this is why
4 they lie about me.
5    And the media wants to, you know, create a
6 frenzy around me. And this is why you're trying to do
7 what you're doing right now -- is 'cause you're trying
8 to taint a jury to make people think that there's
9 something wrong with me, when in reality, the media is
10 biased, and what Bill Maher did was wrong.
11    He falsely accused me of -- of having a
12 sexual relationship with President Trump. So nobody
13 trusts the media.
14    Q   So I'm actually --
15    A   Recent -- recent polls show that over 70
16 percent of Americans distrust the media, and it's
17 because the media lies, whether it's Democrat media,
18 Republican media -- it doesn't matter. The media is
19 dishonest.
20    Q   Let's try to answer the question I'm asking
21 you.
22    A   I answered.
0301
1    Q   Earlier in the day, you said that there was
2 a media frenzy after you traveled with Trump?
3    A   Yes. There were a lot of articles about it,
4 which is probably why Bill Maher wanted to do a
5 segment, in addition to him trying to use me as a
6 vehicle to advance his hatred and disdain for
7 President Trump.
8    But as I also testified earlier, this media
9 frenzy was placed on steroids when -- excuse me --
10 when Bill Maher falsely accused me of having an affair

11    with President Trump.
12         So there was a initial media reaction about
13    why I was on the plane.  But these articles never said
14    Laura Loomer is "effing" President Trump.  Bill
15    Maher's the one who said that.
16              MS. BOLGER:  I'm going to ask the court
17    reporter to mark as Exhibit 23, I think, another
18    article.  I think we're at 23.
19              THE REPORTER:  We're at 23.
20              (Exhibit 23 was marked for
21              identification.)
22              THE WITNESS:  And that's why Bill
0302
1     Maher's getting sued, not these other publications.
2              MS. BOLGER:  There you go.
3              THE WITNESS:  Because they didn't say
4     it; he did.  They reported on it, though, after he
5     said it.
6              MS. BOLGER:  I'm going to move to
7     strike that last part as nonresponsive because I
8     didn't understand.
9              MR. KLAYMAN:  Well, your question was
10    incomprehensible.  Because these aren't questions at
11    all.  This is just --
12              MS. BOLGER:  No.
13              MR. KLAYMAN:  -- trying to smear my
14    client here with stuff that's not even relevant to
15    this case from leftist rag publications --
16              MS. BOLGER:  Are you done?
17              MR. KLAYMAN:  -- that you represent --
18              MS. BOLGER:  Are you done with your
19    speech?
20              MR. KLAYMAN:  -- many of them.  Yes.
21    BY MS. BOLGER:
22         Q    Okay.  Exhibit 23 is an article in The
0303
1     Independent column.  And the headline is, "Republicans
2     are concerned Laura Loomer had something to do with
3     trump's poor debate performance."
4         A    He won the election.  This is crazy.
5         Q    And it was dated -- oh --
6         A    He won the election.  This is like --
7         Q    It's dated --
8         A    This is gaslighting.  I'm so sorry.  This is
9     gaslighting.
10        Q    Its dated September 12, 2024.  And if you
11    want to talk about gaslighting, Ms. Loomer, the
12    election hadn't happened on September 12, 2024.
13        A    The media lies and says that, "Oh.  Trump
14    has a poor debate performance because they were trying
15    to pull weight for Kamala Harris, who Joe Biden
16    admitted was a DEI hire."
17             Like, I mean, honestly, I know -- I know
18    you're a Democrat, so you're a little sensitive about

19    this.  But you know, the reality is -- is she had a
20    horrible performance; okay?  She's a moron.  She's a
21    really stupid woman; okay?
22        Q    I'm going to ask you --
0304
1        A    This is why now all the Democrats are
2    writing tell-all books about it because, you know, you
3    had a alleged Alzheimer's patient in the White House,
4    and they were using an autopen to violate the
5    constitution of our country while a DEI hire was
6    embarrassing the Democrat party.  That's why Donald
7    Trump won; you know?
8          I know your -- your party allowed for all
9    these illegal aliens to come in.  They raped innocent
10    little girls; they killed them --
11        Q    Ms. Loomer, I'm done.
12        A    They put terrorists in our country --
13        Q    I'm done.
14        A    Then you're done.  Then you're done.
15        Q    There's no pending question.
16        A    Then you're done.  Then you're done.  Great.
17        Q    There is no pending question.
18        A    At some point, you guys have to take
19    responsibility for what you did to the country.
20        Q    Let's do -- I -- I'm just a lawyer taking a
21    deposition, Ms. Loomer.  I don't know --
22        A    You're not just a lawyer --
0305
1        Q    -- what you're talking about.
2        A    You're a Democrat donor.  You work for a
3    Trump-hating law firm.  You're not --
4        Q    Ms. Loomer, I am now --
5        A    Just be honest.  You want -- but if
6    you're -- you want --
7            MS. BOLGER:  Can you mark this exhibit
8    as whatever the next exhibit number --
9            THE WITNESS:  -- you should be honest
10    about who you are.  Just own it.  I own who I am.  You
11    should be honest about who you are.
12            MS. BOLGER:  What Exhibit is this?
13            THE REPORTER:  24.
14            MS. BOLGER:  24, please.
15            (Exhibit 24 was marked for
16            identification.)
17            MR. KLAYMAN:  Can I have a copy?
18            MS. BOLGER:  When I find one.
19            MR. KLAYMAN:  At least, they have a
20    nice picture.
21    BY MS. BOLGER:
22        Q    Okay.  For the record, Exhibit 24 is an
0306
1    article entitled "Trump attends 9/11 event with a
2    far-right activist who fished -- pushed a conspiracy
3    theory about the tragedy."

4        "Laura Loomer joined the former president at
5    New York fire station in Lower Manhattan.  She has
6    promoted a false conspiracy theory that 9/11 was an
7    inside job"; do you see that?
8        A    I see it.
9        Q    And that is --
10       A    It doesn't mean that's real.
11       Q    -- is dated September 12, 2024; right?
12       A    Yes.
13       Q    And that was published; right?
14       A    Yeah.  But where does it say that I'm
15   sleeping with the president?
16       Q    Right.
17           MS. BOLGER:  Well, actually, why don't
18   we do Michael Steele?
19           MR. KLAYMAN:  Well, he's a good one.
20           MS. BOLGER:  130.
21           MR. KLAYMAN:  Another hack.
22           MS. BOLGER:  Okay.  I am in -- it's got
0307
1    a video.
2            MR. KLAYMAN:  MSNBC political hack.
3            MS. BOLGER:  I'm going to ask the court
4    reporter to mark, as Exhibit 25, an article that says,
5    "Where the hell is Melania?"
6            "Michael Steele says Trump is getting
7    'too close to Laura Loomer.'"  And it's dated
8    September 13, 2024, at 9:48 p.m.  This is going to
9    play it for us.
10           (Exhibit 25 was marked for
11           identification.)
12           MR. KLAYMAN:  Can I have a copy,
13   please?
14           MS. BOLGER:  Oh.  Sure.  It's marked.
15           (Video played.)
16           MR. KLAYMAN:  Hold on.  Wait, wait.  I
17   want to copy first.  Thank you.
18           MS. BOLGER:  Yeah.  Go ahead and play
19   it.
20           (Video played.)
21           MR. KLAYMAN:  Objection.  It belies
22   your --
0308
1    BY MS. BOLGER:
2        Q    Did you hear that Mr. -- did you hear
3    Mr. Steele -- I'm sorry -- Mr. Steele talk about
4    getting "Loomy"?
5        A    Getting what?
6        Q    "Loomy"; what he says at the end.
7        A    Getting "Loomy"?
8        Q    "On Friday night, you're getting Loomy"; did
9    you hear that?
10           MR. KLAYMAN:  Yeah.  Exactly the same
11   day after Maher defamed my client.

12          MS. BOLGER:  It's before.
13          MR. KLAYMAN:  He comes out with this.
14   Same day.  Same day.
15          MS. BOLGER:  It's before.
16          THE WITNESS:  I think that's a play
17   of -- play on words on my last name.  But he -- again,
18   I'm failing to hear where he said that I was fucking
19   Donald Trump, which is what I'm suing over.  There's a
20   difference between --
21          MS. BOLGER:  Okay.  Let's do this.
22          THE WITNESS:  -- he asked, "Where's
0309
1   Melania?"  I guess 'cause she wasn't there.  'Cause
2   like I said, she was taking care of her son, Barron,
3   as she stated in multiple media interviews.
4          I mean, she even addressed this in
5   interviews after the election, saying that people
6   asked where she was.  And she was taking care of her
7   son and preparing him for college.  So I'm just -- I
8   just don't understand, like, what the clip is for.
9   He -- she's --
10   BY MS. BOLGER:
11      Q   What time do you think Bill -- Real Time
12   With Bill Maher airs?
13      A   Airs on the evenings, as far as I know.
14          MR. KLAYMAN:  Different times in
15   different parts of the country.
16   BY MS. BOLGER:
17      Q   Ten o'clock Eastern; right?
18      A   I believe so; right?
19      Q   Yep.  And that's -- 9:38 is before
20   10 o'clock; right?  9:48 is before 10 o'clock?
21      A   Okay.  But what I -- but what I just -- I
22   just said to you is that --
0310
1      Q   The question is, is 9:48 before 10 o'clock?
2          MR. KLAYMAN:  Not Pacific time.
3          THE WITNESS:  I just --
4          MS. BOLGER:  Mr. Klayman, if you
5   testify one more time, you're going to get yourself in
6   trouble with the court.
7          THE WITNESS:  I'm talking about --
8          MR. KLAYMAN:  Just like you did?
9          THE WITNESS:  I'm talking about -- I --
10   I filed a lawsuit against Bill Maher 'cause he said,
11   "Laura Loomer is fucking Donald Trump."  And I didn't
12   hear those words come out of Mr. Steele's mouth.
13   BY MS. BOLGER:
14      Q   Oh yeah.  It says it's -- what time it is on
15   the screen.  But you can go ahead and pretend it's
16   something else.
17          MS. BOLGER:  Why don't you give me
18   199 --
19          THE WITNESS:  No.  I'm not pretending

20  anything.  I'm talking about the words, "effing Donald
21  Trump."  That's what I'm talking about.
22              MS. BOLGER:  No.  It's not --
0311
1               THE WITNESS:  That's what we're talking
2   about here.  We're talking about the -- the actual
3   statement that, "Oh.  Well, she's his type, and we did
4   a segment on the show called, 'Who's Trump Fucking?'
5   And oh.  You know, we know he's not sleeping with
6   Melania."
7           I mean, I'm just saying, like, you know why
8   your client's getting sued.  I didn't hear those words
9   come out of Michael Steele's mouth.  It's very
10   specific as to what I sued over.
11              MS. BOLGER:  Okay.  I'm going to ask
12  court reporter to mark -- what exhibit are we on?
13              (Exhibit 26 was marked for
14              identification.)
15              THE REPORTER:  26.
16              MS. BOLGER:  26.  Is it a Twitter post?
17  "135.6 thousand views" on September 12th.  You want to
18  hand it to the witness?
19              THE WITNESS:  I will also say, too,
20  that I -- I think that this -- this clip should
21  actually be struck.
22              MS. BOLGER:  Actually, there's no
0312
1   pending question.
2           There you go, Mr. Klayman.
3           MR. KLAYMAN:  That's the --
4           MS. BOLGER:  No.  You may not answer
5   it.
6           The witness can read the -- that text,
7   please.
8   BY MS. BOLGER:
9       Q   You'll see that that is the tweet --
10          MR. KLAYMAN:  Thank you, Your Honor.  I
11  didn't know that you were the judge; yeah?
12  BY MS. BOLGER:
13      Q   -- that says -- why don't you read that
14  tweet to me, Ms. Loomer?
15      A   You want me to read this tweet?
16      Q   I do.
17      A   Okay.  It says, "I'll admit I didn't have
18  'Trump fucks Laura Loomer' on my 2024 election bingo
19  card.  I guess that thing with the lawyer, Lady Abdul,
20  didn't work out."
21      Q   Okay.
22      A   I don't know if --
0313
1       Q   What date was that again?
2       A   September 12th.  But I don't even know who
3   this "Crazy Fenak" guy is.  I know who Bill Maher is,
4   and I know that he broadcasted it to millions of

5    people.
6        Q   Ms. Loomer, there's no pending question.
7    You may not give speeches on the record when there's
8    no pending question.
9        A   I mean, I can actually --
10       Q   That's not how this works.
11       A   -- do whatever I want, but that's fine.
12       Q   And I move -- no.  Actually --
13       A   You can pick it up with the court, actually.
14       Q   -- in the courts of the United States of
15   America, you can't do whatever you want.
16           MR. KLAYMAN:  But you -- you've --
17           MS. BOLGER:  This is Exhibit 27.
18           MR. KLAYMAN:  -- been dribbling all
19   over the record with commentary that has nothing to do
20   with anything.
21           (Exhibit 27 was marked for
22           identification.)
0314
1            MS. BOLGER:  This is Exhibit 27.
2            THE WITNESS:  I mean, does this guy
3    have a show on HBO?
4            MS. BOLGER:  Ms. Loomer, there's no
5    pending question, and I move to strike your comment.
6    BY MS. BOLGER:
7        Q   This is a tweet that was published on
8    September 12th, which says "Popular theory going
9    around is Loomer is having an affair with Trump, which
10   I don't really buy, only because she looks and acts
11   like a sleep paralysis demon.  And Trump is viscerally
12   disgusted by even slight body horror"; do you see
13   that?
14       A   Yeah.  It's a post disparaging my -- my
15   looks as a woman.  But I guess that's in tune for your
16   client, Bill Maher, who likes to disparage women and
17   attack them, and you know -- so --
18           MS. BOLGER:  I'm going to ask the court
19   reporter to mark, as Exhibit -- what are we?
20           UNIDENTIFIED SPEAKER:  28.
21           THE REPORTER:  28.
22   //
0315
1            (Exhibit 28 was marked for
2            identification.)
3            MS. BOLGER:  A text dated
4    September 12th, by Reba.  Does the witness have it?
5            THE WITNESS:  I mean, for all I know
6    these could be -- these could be --
7    BY MS. BOLGER:
8        Q   Ms. Loomer --
9        A   I know.  But this could be an anonymous
10   account.
11       Q   -- there's no pending question.
12       A   Is this -- is this -- I'm ask you.

13    Bill -- is this Bill Maher's burner account?
14        Q    There is no pending question.
15        A    But is it?
16        Q    And you may not speak.
17        A    This could be Bill Maher's burner account.
18        Q    Please check the -- I'm going to move to
19    strike that.
20        A    Okay.
21        Q    Please check the exhibit.
22        A    This might be Bill Maher's burner account --
0316
1        Q    Please check --
2        A    It could be an anonymous account used by
3    Bill Maher to spread rumors.  It could be.
4        Q    Again, you may not speak when there is no
5    pending question --
6        A    But you could be planting -- you could be
7    planting this stuff --
8        Q    -- and I will move to strike this.
9        A    You may -- this might actually be an
10    anonymous account that Bill Maher owns.  And maybe you
11    guys are doing this on purpose.
12              MS. BOLGER:  Move to strike.
13              THE WITNESS:  Do you -- do you know who
14    the owner of this account is?
15              MS. BOLGER:  Can you put the exhibit
16    tab on it, please?
17              THE WITNESS:  You don't have a name.
18    It could be a fake account.
19              MS. BOLGER:  Just put the exhibit tab
20    on the exhibit.
21              MS. BOLGER:  Ms. Loomer --
22              THE WITNESS:  And you know this could
0317
1    be a fake account.
2              MS. BOLGER:  Ms. Loomer --
3              THE REPORTER:  One at a time.
4              MS. BOLGER:  -- do not speak when there
5    is no pending question, or I will call the court.
6              THE WITNESS:  This could be a fake
7    account.
8              MS. BOLGER:  Ms. Loomer --
9              THE WITNESS:  There's no name on this
10    account.  This is ridiculous.
11              MS. BOLGER:  Ms. Loomer, somebody is
12    ridiculous.
13              THE WITNESS:  You know, this is
14    ridiculous.  This could be an anonymous account.
15              MS. BOLGER:  Ms. Loomer, you are going
16    to get --
17              THE WITNESS:  This is all anonymous.
18              MR. KLAYMAN:  You made the point.  You
19    made the point.
20              MS. BOLGER:  Ms. Loomer, you may not

21  speak on the record when there is not a pending
22  question.  And if you continue to do it, I will seek
0318
1   sanctions against you.
2              THE WITNESS:  All right.
3              MS. BOLGER:  Can you please give that
4   to the witness?
5              (Exhibit 29 was marked for
6              identification.)
7              MR. KLAYMAN:  I guess we'll hear the
8   sanctions against you first, Ms. Bolger, for harassing
9   my client, disparaging her, and being in stuff that
10  has nothing to with this case.
11             MS. BOLGER:  This is a text message
12  that reads --
13             MR. KLAYMAN:  This is just -- it's
14  character assassination.  That's all it is.
15  BY MS. BOLGER:
16     Q   This is a text message that reads "Loomer
17  blowing Trump is so funny and nasty.  I hope it's
18  really happening."  And it's dated September 12th; do
19  you see that?
20     A   Yeah.  It's another anonymous account.
21     Q   Does that --
22     A   Bluesky --
0319
1      Q   Does that reflect, do you think, public
2   speculation about the nature of your relationship with
3   Trump?
4              MR. KLAYMAN:  That calls --
5              MS. BOLGER:  I don't --
6   BY MS. BOLGER:
7      Q   Answer the question.
8              MR. KLAYMAN:  Lacks foundation.  Lacks
9   foundation.
10  BY MS. BOLGER:
11     Q   You answer the question, Ms. Loomer.  Do you
12  think it reflects --
13             MR. KLAYMAN:  Vague and ambiguous.
14  BY MS. BOLGER:
15     Q   -- public speculation about your
16  relationship with Trump?
17     A   I mean, it's a -- it's an anonymous account
18  that, you know -- who knows?  It could be a burner
19  account belonging to Bill Maher.  But Bluesky is a
20  Democrat -- Bluesky is a Democrat platform, and a lot
21  of people are known to have burner accounts to use to
22  post information to cover their tracks.
0320
1      Q   What's your basis for saying that this is a
2   Bill Maher --
3      A   I'm not saying it is.  I'm just saying there
4   would have to be an investigation.  But because it's
5   anonymous -- there's a lot of people that have burner

6    accounts so that they could plant conversation.
7         It's well-known that a lot of people
8    astroturf comments.  It could -- it could be an
9    account belonging to Bill Maher.  I -- I'm not saying
10   it is.  I'm just saying that there should be an
11   investigation.
12        Q   Right.  Well, my question was, does it
13   reflect --
14        A   Well, maybe there should be like a forensic
15   analysis --
16        Q   I'm talking now, Ms. Loomer.
17        A   -- of his devices.
18        Q   Does it reflect the public speculation about
19   the nature of your relationship with Mr. Trump?
20        A   It's just -- it's just more lies on social
21   media by an anonymous account that could be a burner
22   account belonging to Bill Maher.
0321
1         Q   Well, I only -- I showed you a bunch of
2    them; right?
3         A   Yeah.  Who knows?  There's people --
4         Q   At least one of them had a blue check.
5         A   -- a lot of people -- a lot of people have
6    burner accounts.
7         Q   A lot -- at least one of them had a blue
8    check; right?  Does this reflect public speculation
9    about your relationship with Bill Maher -- with
10   President Trump?
11            MR. KLAYMAN:  Presumes facts not in
12   evidence.
13            THE WITNESS:  It's just unfounded --
14   unfounded claims by anonymous accounts and Crazy --
15   Crazy Fenak isn't like a real name.  So I don't know.
16   I don't know who that is, again.
17            You could have -- you could have
18   accounts and not use your real name, and have a
19   different name that's not your name, and use a blue
20   check.  It could be a burner account.  I don't know.
21   BY MS. BOLGER:
22        Q   You were criticized by Marjorie Taylor
0322
1    Greene for a tweet you made about Kamala Harris;
2    correct?
3         A   Yeah.
4         Q   What was that tweet?
5         A   I'm sure you have the tweet, so why don't
6    you just show it to me?
7         Q   Right.  Again, that's not the way this
8    works.
9         A   Well, I don't have a computer in front of
10   me.
11        Q   I ask you a question --
12        A   I believe -- I believe that it --
13        Q   -- you give an answer.

14        A   No.  I'm saying I -- I don't have a computer
15  in front of me, but I believe it was a tweet I made
16  about -- I believe it was a tweet I made about Kamala
17  Harris --
18              MR. KLAYMAN:  Don't guess; okay?
19  She --
20              THE WITNESS:  I -- I -- like I said, I
21  don't have a computer in front of me, so I would --
22  it's been several months, but I -- I think it was a

0323
1   tweet about Kamala Harris.
2   BY MS. BOLGER:
3        Q   And what were you saying about her?
4        A   Again, I don't have a computer in front of
5   me, but I think it had something to do with -- I think
6   it had something to do with her cooking.
7        Q   What kind of cooking?
8        A   You know, I don't recall.
9              MR. KLAYMAN:  Don't speculate.  Don't
10  speculate.
11             THE WITNESS:  I don't recall.
12             MR. KLAYMAN:  Show her what you claim
13  to be talking about.
14             THE WITNESS:  You have to show me the
15  tweet.  I don't recall.  I just know that -- I just
16  know that Marjorie -- she's very jealous of me because
17  of my -- she wants to be the only -- she wants to be
18  the only conservative woman that gets promoted by
19  President Trump.  It's funny because she actually
20  endorsed me when I ran for Congress.
21  BY MS. BOLGER:
22       Q   Sorry.  Why is she jealous of you?

0324
1        A   I believe that she wants to be the only
2   Republican woman who gets praise from President Trump.
3   Because it's very strange; she endorsed me when I ran
4   for Congress.
5              She said that I was a great friend.  She
6   said that I was a patriot, if you go back and you look
7   at some of her old tweets.  So it's very bizarre to me
8   that somebody would have such a 180 like that.
9        Q   She --
10       A   You go from saying that, "Laura Loomer is so
11  amazing" -- she's actually quoted online saying that
12  I'm one of her very good friends, and she endorsed me.
13  And then all of a sudden, when I was about to get
14  hired, she -- she just did a total 180.  It was very
15  bizarre.  I don't know.
16       Q   So just to be totally clear, my question
17  was, what was your tweet?
18       A   She even donated to my campaign.
19       Q   So why don't try to focus up on my
20  questions?
21             MR. KLAYMAN:  Don't --

22          THE WITNESS:  You're going to have to

0325

1   show me.

2              MR. KLAYMAN:  Don't speculate.

3              THE WITNESS:  I don't want to

4   speculate, because we're under oath.  I don't recall.

5   You'll have to show me.

6   BY MS. BOLGER:

7     Q   Well, her response to your tweet was, "This

8   is appalling and extremely racist.  It does not

9   represent who we are as Republicans or MAGA.  This

10  does not represent President Trump.  This type of

11  behavior should not be tolerated ever.  @LauraLoomer

12  should take this down."

13    A   I don't remember -- I don't remember the

14  tweet.

15             MR. KLAYMAN:  Wait, wait, wait.  Wait,

16  wait, wait.  Lacks foundation.

17             You didn't remember the tweet.

18  BY MS. BOLGER:

19    Q   Do you remember this --

20             MR. KLAYMAN:  This is --

21             MS. BOLGER:  Mr. Klayman.

22    //

0326

1   BY MS. BOLGER:

2     Q   Do you remember Marjorie Taylor Greene's

3   tweet?  "This is appalling and extremely racist.  It

4   does not represent who we are as Republicans or MAGA.

5   This does not represent public -- President Trump.

6   This type of behavior should not be tolerated ever.

7   @LauraLoomer should take this down"; do you remember

8   that?

9              MR. KLAYMAN:  Lacks foundation.  You

10  haven't shown her the tweet.

11             THE WITNESS:  I need to see the tweet.

12  BY MS. BOLGER:

13    Q   Do you remember that tweet?

14    A   I need to see the tweet in order to remember

15  it.

16             MR. KLAYMAN:  What tweet?

17  BY MS. BOLGER:

18    Q   Is that because you get called racist so

19  often that you don't remember it when it happens?

20    A   No.  It's because I'm so busy, and there's

21  so many articles written about me because I break so

22  many stories on a daily basis that there's -- I don't

0327

1   even read all of these articles because there's just

2   so much trash by leftist reporters that post so many

3   news.

4              So I've asked you for this -- I've asked

5   you -- I've asked you ten times to show me the tweet,

6   but you refuse to show me the tweet.  Can you

7     please --
8          Q   I'm asking you --
9          A   Can you please show me the tweet so I can
10    answer your question?
11         Q   Is it actually your testimony under oath
12    that you don't remember being called "extremely
13    racist" by Marjorie Taylor Greene?
14         A   There's so many people who say things about
15    me out of jealousy that I try to tune it out.  I --
16    I -- you know, to be a successful person, you have
17    to -- you have to be very focused.
18              And so I try to, you know, not read every
19    garbage post about me.  So you're going to need to
20    show me the tweet.  I need to see the tweet.  I'm
21    asking you to show me the tweet that --
22              MS. BOLGER:  -- whatever the exhibit
0328
1     number is?
2              THE WITNESS:  -- that she's
3     referencing.  I think that's fair.
4              MS. BOLGER:  What number are we on?
5              THE REPORTER:  29.
6              MS. BOLGER:  Okay.
7              MR. KLAYMAN:  You're not going to show
8     her the tweet?
9              THE WITNESS:  I need to see the tweet.
10             THE REPORTER:  Let me mark it on the
11    record first.
12             THE WITNESS:  Put the tweet in
13    reference too, please.
14             MS. BOLGER:  Nope.
15             THE WITNESS:  Well, then I can't answer
16    your question.
17             MS. BOLGER:  I'm not asking you that
18    question.
19             THE WITNESS:  I need to see --
20             MS. BOLGER:  I'm asking you about this
21    tweet.
22             MR. KLAYMAN:  All right.  We're going
0329
1     to take a break.
2              MS. BOLGER:  You are not --
3              MR. KLAYMAN:  Come on.  Let's get out
4     of here.
5              MS. BOLGER:  You're not taking a break.
6     There is a pending question.  Do not walk out of --
7     Mr. Klayman --
8              MR. KLAYMAN:  I'm walking out.  This is
9     abusive.
10             MS. BOLGER:  There's the exhibits.
11             MR. KLAYMAN:  This is abusive; okay?
12    BY MS. BOLGER:
13         Q   Ms. Loomer --
14             MR. KLAYMAN:  I'm going to have you

15    personally sanction you.
16    BY MS. BOLGER:
17       Q   Ms. Loomer, please read that tweet.  Thank
18    you very much.
19             MR. KLAYMAN:  Is that the tweet?
20             THE WITNESS:  No.  This is --
21    BY MS. BOLGER:
22       Q   The tweet says --
0330
1        A   They're not showing me the original tweet
2     that she commented on.  It's cut off.  It says "the
3     post is unavailable."  I've asked you to show me the
4     tweet.
5        Q   I'm not asking you about your tweet.
6        A   I know.  But I --
7        Q   I'm asking you if you remember --
8        A   -- I need to see -- I need to see --
9        Q   -- Marjorie Taylor Greene's tweet.
10       A   -- I need to see the tweet.
11             MR. KLAYMAN:  You did ask her about her
12    tweet.
13             THE WITNESS:  I can't comment on
14    something under oath, which could be used in a trial,
15    unless I have the original tweet.  I need to see it.
16    I think it's reasonable.
17    BY MS. BOLGER:
18       Q   I'm asking you to talk about Marjorie Taylor
19    Greene's tweet.
20       A   I don't want to speculate.  I'm under oath.
21       Q   I'm not asking you to --
22       A   You are, though.  Because how can I talk
0331
1     about a tweet that she made when I can't even see the
2     tweet that she's talking about?
3        Q   Fine.  Look at Exhibit 16.
4             MR. KLAYMAN:  Why did you withhold that
5     this whole time?  You're just trying to badger her and
6     harass her?  What's your point?
7             THE WITNESS:  I need Exhibit 16,
8     please.  I'm sorry.  I don't know where it is.
9             MR. KLAYMAN:  Here.
10    BY MS. BOLGER:
11       Q   If you look at the sixth page of the
12    exhibit, counting backs of documents, you'll see the
13    first paragraph on that page reads "The tension over
14    Loomer's association with the campaign boiled over in
15    public on Wednesday night when Representative Marjorie
16    Taylor Greene called out Loomer over a post stating
17    that should the vice president win in November, 'the
18    White House will smell like curry, and White House
19    speeches will be facilitated via a call center'"; do
20    you see that?
21       A   Well, that's -- that's a summary of the
22    tweet.  You have the actual tweet?  I need to see

0332
1   actual tweet.
2       Q   It's a quotation of the tweet; do you
3   remember making that tweet?
4       A   Well, Rolling Stone has been sued before for
5   lying.  They -- they had an infamous case where they
6   falsely accused somebody of rape, and they're not a
7   credible --
8       Q   Ms. Loomer, do you remember tweeting --
9       A   I -- I -- because --
10      Q   -- that "the White House will still -- will
11  smell like curry, and White House speeches will be
12  facilitated by a call center"; do you remember
13  tweeting that?
14      A   I believe I said something along those
15  lines.  Yeah.
16      Q   Great.  Then if you now look at the exhibit
17  I just handed to you, which is the Marjorie Taylor
18  Greene, she says to you, "This is appalling and
19  extremely racist.  It does not represent who we are as
20  Republicans or MAGA"; do you remember that tweet?
21              MR. KLAYMAN:  There's no nexus
22  between --
0333
1               MS. BOLGER:  There doesn't need to be.
2               MR. KLAYMAN:  Exhibit 16 and this.
3   BY MS. BOLGER:
4       Q   Do you remember --
5               MR. KLAYMAN:  It does need to be
6   because it lacks foundation, otherwise.
7   BY MS. BOLGER:
8       Q   Do you remember that tweet, Ms. Loomer?
9       A   I remember Marjorie Taylor Greene posting
10  tweets about me.  She's -- she posted a lot of tweets
11  about me.  Like I said, she -- she said that I was her
12  friend.  She said I was an amazing person and a
13  patriot.  You should show that tweet too.
14              MS. BOLGER:  Can I have Exhibit 20 --
15  I'm going to show you what's been --
16              MS. BOLGER:  -- what I'm going to have
17  marked as Exhibit 27 --
18              THE WITNESS:  She also donated to my
19  campaign.
20              MS. BOLGER:  Ms. Loomer, again --
21  Sorry.  30?
22              THE WITNESS:  I know.  But she donated
0334
1   to my campaign, so if she think I'm a racist, why did
2   she donate to my campaign?
3               THE REPORTER:  One at a time, please.
4               MS. BOLGER:  There's no pending
5   question.
6               Exhibit 30.
7               (Exhibit 30 was marked for

8      identification.)
9              MR. KLAYMAN:  We don't have 29.
10    Where's 29?  I don't have that one.
11             MS. BOLGER:  That was the last tweet.
12             MR. KLAYMAN:  Is this it?
13             MS. BOLGER:  Yes.
14             Okay.
15             MR. KLAYMAN:  We're going to take a
16    break after the next question.  It's 45 minutes.
17             MS. BOLGER:  You're not going to take a
18    break.  I'm not done with my line of questioning, and
19    I've asked you --
20             MR. KLAYMAN:  We'll take a break.
21             MS. BOLGER:  -- to let me finish my
22    line of questioning.
0335
1              MR. KLAYMAN:  No.  We're taking a
2      break.
3              MS. BOLGER:  Unless you let me finish
4      line of questioning.  I know you're upset because it's
5      getting too hard for you, but --
6              MR. KLAYMAN:  No.  I'm not getting --
7              MS. BOLGER:  I need you to hang in
8      there.
9              MR. KLAYMAN:  I'm getting upset because
10    you are a very mean, nasty individual, trying to
11    harass my client.
12    BY MS. BOLGER:
13     Q   You'll see that you -- this is a tweet from
14    you.
15     A   Okay.  What tweet?
16     Q   I should say the Marjorie Taylor Greene
17    date -- is dated -- is September 11th; did you notice
18    that?
19     A   Yeah.
20     Q   Okay.  And then you responded.
21     A   But she also -- I will say that she's upset
22    because she wasn't invited to attend the ceremony.
0336
1      Because President -- a lot of President Trump's staff
2      told me they were getting sick and tired of Marjorie.
3      So she was very upset that she wasn't invited to
4      travel to the debate.  She was excluded.
5              Congressman Matt Gaetz was invited.  I was
6      invited.  And she was not because President Trump's
7      staff told me that they can't stand Marjorie Taylor
8      Greene.  And I'm willing to say that under oath.
9      Several of his staff told me that they can't
10    stand her.
11     Q   Ms. Loomer, can I ask you to look at the
12    next exhibit?
13     A   Yeah.  But I'm just --
14     Q   I'm not interested in your speech.
15     A   -- putting it into context.  So --

16     Q   Exhibit 30 --
17     A   She was upset.  She was jealous.
18     Q   Exhibit 30 is your response to her; can you
19  read that out loud to me?
20     A   "Hey, Marjorie.  Remember when you destroyed
21  your family so you could have sex with a Zangief
22  cosplayer?  Tell me again how you and the Arby's in
0337
1  your pants" -- yeah.  That was widely reported.  I
2  mean, that's why she got divorced.  And that divorce
3  records --
4     Q   No.  No.  Read the tweet.
5     A   "Are representatives of the GOP.  You
6  couldn't even run your own family.  Don't tell me how
7  to run my free speech."
8     Q   Okay.  So when you --
9     A   But you're not showing the -- the
10  screenshot.  It's like intentionally blurred out.  I
11  don't know why you blurred it out.  But it showed a
12  document where somebody who she had an affair with
13  showed text messages of her having an affair, and it
14  was well-documented.  It was in text messages.
15         And it's the reason why she ended up getting
16  divorced from her husband, Perry, who I know.  'Cause
17  when -- at the time, during my campaign, they were
18  married, and they came to my event.  And it's
19  well-known.  And she's even admitted to it that they
20  got divorced because of her marital infidelity.  So --
21     Q   Right.  Can you explain to me what it
22  means --
0338
1     A   But I don't understand why you blurred it
2  out.  It's blurred out.
3     Q   Can you explain --
4         MR. KLAYMAN:  Objection.  Relevancy.
5  BY MS. BOLGER:
6     Q   Can you explain to me what it means to say
7  to her that "the Arby's in her pants"?
8     A   Well, Arby's --
9         MR. KLAYMAN:  Objection.  Relevancy.
10  BY MS. BOLGER:
11     Q   Answer the question.
12     A   Arby's sells roast beef.
13     Q   Right.  Can you tell me what -- why you were
14  talking about "the Arby's in her pants"?
15     A   Well, it's just a -- an expression.
16     Q   What is the expression trying to convey?
17     A   It conveys the reason why she got a divorce
18  by her own admission.
19     Q   Because she had roast beef in her pants?
20     A   Yeah.
21     Q   She'd put roast beef in her pants; that's
22  what you're trying to say there?  You're literally
0339

1  saying she put Arby's in her pants?
2      A   I'm saying she literally -- it's so
3  ridiculous.  I'm saying she literally put Arby's in
4  her pants.  Yes.
5            MR. KLAYMAN:  Objection.  Relevancy.
6  BY MS. BOLGER:
7      Q   You're not making a slur about her?
8      A   No.
9      Q   You're literally saying she put an Arby's
10  sandwich in her pants; is that right?
11     A   Yes.  That's correct.  That's correct.
12     Q   Why are you laughing?
13     A   Because I just think it's so funny.
14     Q   What is your basis for saying she put Arby's
15  in her pants?
16     A   I just think it's so funny.  I just think
17  it's so funny.
18     Q   What is your basis for saying she put Arby's
19  in her pants?
20     A   She carries roast beef in her pockets.
21     Q   What is your basis for saying she puts roast
22  beef in her pockets and in her pants?
0340
1            MR. KLAYMAN:  Objection.  Relevancy.
2  Harassment.
3            THE WITNESS:  Because I know she likes
4  roast beef.
5  BY MS. BOLGER:
6      Q   So what is your basis for saying she had
7  Arby's in her pants?
8      A   Because I know she likes to eat at Arby's.
9      Q   And she likes to put it in her pants; you
10  know that?
11     A   Yeah.
12     Q   She puts Arby's in her pants?
13     A   Yeah.  She does.
14     Q   Okay.  If I ask Marjorie Taylor Greene, she
15  would tell you that she puts Arby's in her pants?
16     A   I -- it's my best belief that she would tell
17  you that.  Yes.
18     Q   Okay.  Are you making a derogatory comment
19  about her sex life by talking about Arby's in her
20  pants?
21     A   No.  I'm talking about Arby's, the
22  sandwiches.  I'm talking about Arby's.  I would -- I'm
0341
1  a very direct person.  If I was making a derogatory
2  comment, I would have said it.
3            I just think it's so funny because I -- I
4  feel like you would understand it if you actually
5  hadn't blurred the photo, but it's blurred.
6      Q   We didn't blur a photo.  There may be have
7  been some kind of copy editor, but we'll get you a
8  better copy of it, if that's right.

9      A   Okay.
10     Q   My understanding is that we don't --
11             MR. KLAYMAN:  All right.  Let's take a
12     break.
13             MS. BOLGER:  Actually, I'd like to
14     finish this line of questioning.
15             THE WITNESS:  I just think -- I just
16     think it's so funny.
17             MR. KLAYMAN:  Well, you can finish this
18     exhibit.  Go ahead.
19             MS. BOLGER:  I mean, I'd like to
20     finish --
21             MR. KLAYMAN:  If you'd like to deal
22     more with Arby's, you know --
0342
1              MS. BOLGER:  No.  I have a couple more
2      questions I'd like to ask in this line.
3              MR. KLAYMAN:  Where's the meat?
4      BY MS. BOLGER:
5      Q   So Lindsey Graham also --
6              THE WITNESS:  It's in her pants.
7      BY MS. BOLGER:
8      Q   Lindsey Graham also called you, "toxic"
9      around the time that you were at the debate and --
10     A   Yeah.
11     Q   -- right?
12     A   Yeah.  That's true.
13     Q   Okay.  And you responded to him on Twitter;
14     right?
15     A   Yeah.  I called him, "gay."
16     Q   Okay.
17             MS. BOLGER:  Can you might mark this as
18     Exhibit --
19             THE WITNESS:  It's well-known --
20             MS. BOLGER:  Can we mark this as
21     Exhibit -- whatever we're at?
22             THE REPORTER:  31.
0343
1              MS. BOLGER:  31, please.  Exhibit 31.
2              (Exhibit 31 was marked for
3              identification.)
4              THE WITNESS:  Several of President
5      Trump's staff have told me in confidence that -- that
6      Lindsey Graham is gay.
7              MS. BOLGER:  Hold on.  Ms. Loomer,
8      there's no question.
9              THE WITNESS:  I know.  I'm just
10     explaining --
11             MR. KLAYMAN:  Objection.  Relevancy.
12     There is an objection.  Relevancy.
13             MS. BOLGER:  Exhibit 31, please.
14             MR. KLAYMAN:  All right.  We're
15     finished with that exhibit.  We're taking a break.
16             MS. BOLGER:  You're not.  I didn't ask

17    about the exhibit yet.  You cannot walk out in the
18    middle of an exhibit, as you know.
19              MR. KLAYMAN:  You said you were going
20    to finish it.  Come on.  Come on.
21              MS. BOLGER:  We're going to ask about
22    Exhibit -- Mr. Klayman --
0344
1              MR. KLAYMAN:  Five minutes.  Five
2    minutes.  Come on.
3              MS. BOLGER:  We're going to ask about
4    Exhibit 31.  Do not get up.  We're asking about
5    Exhibit 31.
6              MR. KLAYMAN:  Are you done with that?
7    Can we take a break after that?
8              MS. BOLGER:  I'm done with
9    Exhibit -- no.  I have three exhibits, then we'll take
10    a break.  I'm going to ask you about Exhibit 31.
11    BY MS. BOLGER:
12        Q    31 is a tweet from you.  And it says "It's
13    2024.  There's no reason why Lindsey Graham, South
14    Carolina, needs to hide the fact that he's a gay man.
15    Come on, Lindsey.  I like men too.  No need to hide.
16    I want you to relieve yourself of your toxic closeted
17    anger.  It's 2024.  Nobody needs to hide that they're
18    gay anymore"; do you see that?
19        A    Yeah.  I see it.
20              MR. KLAYMAN:  Objection.  Relevancy.
21    BY MS. BOLGER:
22        Q    And what is your basis for saying that he's
0345
1    gay?
2        A    It's well-known.  I mean, I know a lot of --
3    I ran for Congress.  Like I said, I'm very involved in
4    Republican politics and know a lot of GOP fundraisers.
5              And I know people who have told me that
6    they've attended dinners where he's brought male
7    significant individuals with him -- like, significant
8    others; so --
9        Q    And that tweet, you did it September 13,
10    2024, at 4:19 a.m.?
11        A    Yeah.
12        Q    Is that right?  Boy, you were up late?
13        A    Yeah.  You got to wake up early.
14              MS. BOLGER:  Okay.  And can I have 129?
15    BY MS. BOLGER:
16        Q    You're also --
17        A    I -- I will say that he never denied being
18    gay after I said that.
19        Q    You were also criticized by Thom Tillis on
20    September 11th; right?
21              MR. KLAYMAN:  Share with us what you're
22    talking about, but it's irrelevant.  So objection to
0346
1    relevancy.

2   BY MS. BOLGER:
3     Q   You were also criticized by Thom Tillis
4   around the time of the debate; correct?
5     A   Yeah.  But he doesn't have any credibility.
6         MS. BOLGER:  And I'm going to ask the
7   court reporter to mark this as Exhibit 32.
8         (Exhibit 32 was marked for
9         identification.)
10        THE REPORTER:  Exhibit 32.
11  BY MS. BOLGER:
12    Q   And you'll see that on the -- he tweeted
13  out, "Laura Loomer is a crazy conspiracy theorist who
14  regularly utters disgusting garbage intended to divide
15  Republicans.  A DNC plant couldn't do a better job
16  than she is going -- doing to hurt President's chances
17  of winning reelection enough"; You see that?
18        MR. KLAYMAN:  Objection.  Relevancy.
19        THE WITNESS:  Is it -- yeah.  I've seen
20  it.
21  BY MS. BOLGER:
22    Q   Did you see it at the time?
0347
1     A   Did I what?
2     Q   See it at the time?
3     A   Yeah.  I replied to it, I believe.
4     Q   And what date was that?  Is that
5   September 13th at 3:02 p.m.?
6     A   Yep.
7     Q   Great.  And then you responded -- can you
8   read your response?
9     A   I said "Thom Tillis is a rhino who attacked
10  President Trump after January 6th and called for all
11  the January 6th political prisoners to remain in jail.
12  Thom Tillis is the DNC plan he accuses me of being.
13  Let's examine the" -- the tweet's cut off, so you cut
14  it off.  It needs to be expanded.  Hopefully, there's
15  another page.  But it goes on.
16        It said "Last year, Thom Tillis was
17  censured," and then it says "Show more."  It was like
18  a long tweet, and I -- you could see the rest of it if
19  you were to show the rest of the tweet.  But he was
20  censured by his own Republican party in North Carolina
21  for being against President Trump's initiatives.
22        And so he accused me of being a DNC plant,
0348
1   but yet his own state Republican party censured him.
2   I mean, you -- you have to practically be a Democrat
3   in order to be censured as a Republican senator by
4   your own Republican party.
5         And it's the reason why, like, so many
6   Republican PACs are lining up to primary him and spend
7   millions of dollars because he has a record of being
8   very anti-Trump.
9     Q   And if you're anti-Trump, you're

10    anti-American; right, Ms. Loomer?
11                MR. KLAYMAN:  Objection.  Irrelevant
12    and harassment.
13                THE WITNESS:  Oh.  You know, if
14    you're -- if you're anti-Trump, you shouldn't be
15    accusing other people of being DNC plants.  I mean,
16    he's got to look in the mirror -- the pot calling the
17    kettle black.
18                MS. BOLGER:  We can take that break you
19    guys want.
20                MR. KLAYMAN:  Okay.
21                MS. BOLGER:  We'll take a five-minute
22    break
0349
1                THE VIDEOGRAPHER:  Off the record at
2    4:07.
3                (Off the record.)
4                THE VIDEOGRAPHER:  Back on the record
5    at 4:26.
6                MS. BOLGER:  Great.
7    BY MS. BOLGER:
8        Q   Ms. Loomer, before the --
9                MR. KLAYMAN:  Yeah.  Wait, wait, wait.
10   Wait, wait, wait.  Before you say -- my client has
11   asthma.  She's not feeling well.  We're willing to
12   complete the deposition, but please be less combative;
13   okay?  It's unnecessary.
14   BY MS. BOLGER:
15       Q   Ms. Loomer, the -- before, I had shown you
16   an Exhibit 30, which was a tweet.  And you said that I
17   had deleted the pictures.  I told you that was a
18   printing error, and I would correct it.
19               (Exhibit 30B was marked for
20                identification.)
21       A   Okay.
22       Q   So just to correct the record, here's
0350
1    Exhibit 30.  We'll call it 30B to make sure we
2    affiliated it.
3                MR. KLAYMAN:  How did that happen?
4    BY MS. BOLGER:
5        Q   It was a printing error.
6        A   Okay.  Thank you.
7        Q   Okay.  So, Ms. Loomer, with that correction,
8    do you recognize that as the tweet you posted about
9    Marjorie Taylor Greene?
10       A   Yeah.  I do.
11       Q   Okay.  Terrific.  You mentioned at the
12   beginning of the day that you're an investigative
13   reporter, and that you publish truthful information;
14   correct?
15       A   Yeah.
16       Q   And you publish it both on your Loomer
17   website, and your program, and also, on your Twitter

7367930_unsynchronized.txt[7/29/25, 12:28:40 PM]

18   feed; right?  Or X feed.  I'm sorry.
19      A    My website, my X account, and my show.  Yes.
20      Q    Okay.  Those are the three things; is there
21   another place you publish content?
22      A    Truth Social, Gettr, Gab -- like we went
0351
1   over in the beginning -- Telegram.
2      Q    Are those different?  Do you publish
3   different things on different --
4      A    I post most of my contents on X, and -- and
5   Rumble, and my website, but my -- the video clips from
6   my show get reposted on Telegram, Gettr, and Gab, and
7   Truth Social.
8      Q    Okay.  I'm going to ask the court reporter
9   to mark, as Exhibit 31, a posting of yours on X, dated
10   July 20, '24.
11      A    You mean 32?  We already have Exhibit 30 --
12      Q    I mean, 32.  Apologies.
13           THE REPORTER:  33 -- should be it.  We
14   already marked 32.
15           MS. BOLGER:  Let's go with 33.
16           (Exhibit 33 was marked for
17           identification.)
18           THE WITNESS:  Okay.  Thank you.
19   BY MS. BOLGER:
20      Q    This is a tweet about Kamala Harris, would
21   you mind reading this tweet to me, please?
22      A    "Why is it that the only thing Kamala Harris
0352
1   ever talks about is killing babies?  The only thing
2   this DEI skank ever talks about is murdering babies;
3   have you noticed that?
4       "Meanwhile, she sucks so much dick to get to
5   the top throughout her career, but she doesn't have
6   any biological children of her own to show for all the
7   semen she's swallowed.
8       "She's a stepmom to a transgender, communist
9   freak of nature with @SecondGentleman" -- that's
10   supposed to be Doug Emhoff for reference and context.
11       "And she's been ridden harder than the
12   community bikes in San Francisco, but no kids ever.  I
13   hear abortions destroy your uterus.  I wouldn't know,
14   but I'm sure Kamala does.
15       "I hope people see how deranged it is that a
16   woman who has no children of her own, own an IQ lower
17   than a baby with fetal alcohol syndrome want so badly
18   to kill other people's children.  Truly demonic.
19       "Kamala Harris, just because you swallowed
20   all of your children doesn't mean you have a right to
21   murder other people's children.  Dirty harlot, go
22   away."
0353
1           MR. KLAYMAN:  Objection.  Relevancy.
2   BY MS. BOLGER:

3    Q    And you posted that; right?
4    A    Yes.
5    Q    Is that right?
6    A    Yeah.  I posted it.
7    Q    What is the -- your factual support for the
8    statement that "she sucks so much dick to get to the
9    top throughout her career"?
10    A    What's been widely reported.  And even, I
11    guess you could say, admitted by Kamala Harris and
12    Willie Brown themselves, that they had an affair
13    together.
14          There's newspaper clippings that show Kamala
15    Harris being described as Willie Brown's girlfriend --
16    Willie Brown, the former mayor of San Francisco --
17    while he was married.
18          And these -- these news clippings have
19    actually been, like, uncovered.  And they were the
20    subject of a lot of criticism towards Kamala Harris.
21    And Willie Brown has not denied his affair with --
22    with Kamala Harris.
0354
1          And the fact that they dated was
2    well-publicized -- I mean, it's not -- it's not
3    speculation.  It's, like, a fact.  It is a fact that
4    they dated.
5          And it's been reported on that they dated,
6    and they were sexually involved with each other even
7    while he was married; so --
8    Q    So what is your basis?  I understand that
9    there's -- it's widely published that they dated --
10    A    She supports abortion too, so I --
11    Q    So what's the basis of your claim that she
12    "sucked dick"?
13    A    Well, there's a lot of reports.  Again, she
14    has not denied any of these reports.  Her husband has
15    not denied any of these reports.  Willie Brown has not
16    denied any of these reports that she --
17    Q    Dated him?
18    A    -- has -- yeah.  Dated him and had --
19    Q    What are the reports --
20    A    -- affairs with him and --
21    Q    What are the reports that she "sucked dick"?
22    A    Well, there's reports that Kamala Harris and
0355
1    Willie Brown engaged in those behaviors.  And she has
2    never denied them when she's asked -- been asked about
3    it.
4          And Willie Brown has been -- I think he was
5    asked one time at an event, if I recall, if he can
6    talk or speak about how Kamala Harris gave head to get
7    ahead, and he didn't deny it.
8          He actually just said he wasn't going to
9    talk about his previous romantic relationship with
10    Kamala Harris, from my understanding.

11    Q    What are the reports?  Name a single report
12  that said --
13    A    I -- I don't have a computer in front of me.
14    Q    I'm not done.
15    A    I know.  I'm just saying I don't have a
16  computer.
17    Q    I'm going to talk.  Name a report that you
18  have read that said Kamala Harris --
19          MR. KLAYMAN:  Continuing objection.
20  Relevancy.
21  BY MS. BOLGER:
22    Q    -- had to -- "had no children of her own to
0356
1  show for all the semen she swallowed."  Name a single
2  report in the world that supports that statement.
3    A    Well, Kamala Harris has said herself that
4  she doesn't have any biological children during her
5  address.  She had to borrow her -- her husband's
6  ex-wife's children.  Well, it's kind of very weird.
7          Her husband's ex-wife kind of had to sit in
8  the audience and look onward as Kamala literally
9  borrowed her children and described how her kids call
10  her Mamala as an awkward explanation as to why she
11  doesn't have children.
12    Q    Ms. Loomer, I asked you --
13    A    I just answered your question.
14    Q    -- what your basis was to saying --
15    A    She has no children.
16    Q    that she has -- "for all the semen she's
17  swallowed" -- what is the basis of your claim that
18  Kamala Harris swallowed semen?
19          MR. KLAYMAN:  Asked and answered.
20          THE WITNESS:  I mean, we can ask Kamala
21  Harris herself.
22  //
0357
1  BY MS. BOLGER:
2    Q    Well, you were just expressing your opinion
3  based on some publications about Willie Brown and
4  Kamala Harris; right?
5    A    No.  They've never -- they've never sued
6  over the claims.  They've never denied the claims.
7  They've never denied the claims that Kamala Harris,
8  you know, was orally sexually involved with Willie
9  Brown.
10    Q    What reports are those?
11    A    Like I said, it's been well-documented.
12  There's --
13    Q    Give me one document.
14    A    I would need a -- I would need permission to
15  pull out my -- my device right now.  You could have
16  asked for this in your documents request, and I would
17  have happily shown you all the newspaper clippings.
18  I've tweeted the newspaper clippings.

19    Q    Okay.  What about your sentence, "I hear
20  abortions destroy your uterus.  I wouldn't know, but
21  I'm sure Kamala does"; what are you implying there?
22    A    Well, one of her best friends was Cecile --
0358
1              MR. KLAYMAN:  Relevancy.  Continuing
2  objection.
3              THE WITNESS:  One of her best friends
4  is Cecile Richards, who was the head of Planned
5  Parenthood.  And so I assume that given the fact that
6  she spent so much time with Planned Parenthood and
7  accepted so many contributions, and she speaks out
8  abortions, surely, somebody who encourages women to
9  get abortions would understand the health implications
10  of that.  And it does destroy your uterus.
11              It's scientifically proven that women
12  who undergo abortions have a harder time having
13  children because of the scar tissue that is created
14  when you have an abortion.  And so she talks a lot
15  about abortion.  So she would know that abortion
16  destroys your uterus.  I mean --
17  BY MS. BOLGER:
18    Q    Aren't you implying she had one?
19    A    No.  I'm saying she's very good friends with
20  Cecile Richards.  There's a very well-publicized case
21  where when Kamala Harris was Attorney General of
22  California, she had the home of David Daleiden raided
0359
1  because David Daleiden conducted an undercover
2  investigation into Planned Parenthood where he caught
3  them -- the doctors, who worked with them, talking
4  about selling baby parts, and then using the funds to
5  buy, like, sports cars, like Ferraris.
6              And Kamala Harris had accepted a lot of
7  money and contributions from the Planned Parenthood
8  PAC and had David Daleiden raided at gunpoint, and had
9  his home and his devices confiscated.
10              And so surely, she would know this; right?
11  Because it's well-documented.  And she made an effort
12  as Attorney General to prosecute Christian and
13  conservative activists that spoke up for the unborn.
14    Q    And when you called her --
15    A    And -- and this is what Bill Maher supports.
16  He donated to --
17    Q    When you called her --
18    A    -- Kamala's campaign.  And he's an
19  atheist --
20    Q    When you called her --
21    A    -- so I don't expect him to be pro-life.
22    Q    When you called her a "dirty harlot," was
0360
1  that your opinion?
2    A    Well, some people could say it's opinion, I
3  suppose, but if -- I -- I never -- I never had sex or

4  had an affair with a married man.  The newspaper
5  clippings clearly show Kamala Harris, you know,
6  holding hands -- not just holding hands, but admitting
7  to the fact that she was having an affair and dating
8  Willie Brown while he was still married.  And so --
9      Q    And that makes her, in your opinion, a
10  "dirty harlot"?
11      A    Admitting to having an affair with a married
12  man?
13      Q    In your opinion, makes her --
14      A    It's not just speculation.
15      Q    In your opinion, makes her a "dirty harlot."
16      A    Well, a "harlot," you could say, is a woman
17  that knowingly, and willingly, and shamelessly has an
18  open affair with a married man.
19      Q    So in your opinion, she was a dirty harlot
20  for having an affair with a married man?
21      A    Many people's opinion.
22      Q    Including yours?
0361
1      A    Yes.
2      Q    Okay.  Going to ask the court reporter --
3      A    As well-documented.
4      Q    -- to mark, as Exhibit 34, another tweet of
5  yours, dated July 13th of 2024.  Oh.  This doesn't
6  have the picture.
7              (Exhibit 34 was marked for
8              identification.)
9          Okay.  Sorry.  The printout has the image on
10  the second page.  Okay.  Can you read that to me?
11      A    "I guess you would know a thing or two about
12  trashy Montel Williams, given the fact that you dated
13  and stuck your cock inside Kamala Harris many years
14  ago.  I've heard everything her infested snatch
15  touches also dies a miserable, painful death."
16          Again.  They -- he -- what is on the record
17  is saying that he had sex with Kamala Harris, and they
18  dated.  He was accompanied by her when they were
19  dating to some kind of music award --
20      Q    It's on the -- well, you and Mr. Klayman
21  thought this was funny; right?
22          MR. KLAYMAN:  No.  I don't think it's
0362
1  funny --
2          THE WITNESS:  I don't know.
3          MS. BOLGER:  I saw you --
4          MR. KLAYMAN:  -- it's a nervous
5  reaction.
6          MS. BOLGER:  I saw you laugh,
7  Mr. Klayman.
8          MR. KLAYMAN:  I didn't laugh.
9          MS. BOLGER:  And I saw you laugh too,
10  Ms. Loomer.
11          MR. KLAYMAN:  No.  I didn't laugh.

12    BY MS. BOLGER:
13        Q    So you --
14        A    Well, what I laugh about is the fact that
15    there's all these, like, white boxes here --
16        Q    Flip to the next page.
17        A    There's so many printing -- oh.  Here it is.
18    Great.
19        Q    Yeah.
20        A    So then you know.  They're -- they're,
21    together.
22        Q    Where's the reporting that they had sex?
0363
1        A    He's admitted it.
2        Q    Okay.  And what --
3        A    He's on -- it's like well-documented.  He's
4    talked about it before, and he says that he has the
5    utmost respect for her even though they dated.  It's
6    well-documented that they were an item.
7        Q    Right.  I didn't ask you whether they dated;
8    I asked you whether they had sex.  What is your source
9    for the fact that they had sex?
10            MR. KLAYMAN:  Objection.  Relevancy.
11            THE WITNESS:  They never denied it.
12            MS. BOLGER:  Klayman is cracking up
13    over there.
14            THE WITNESS:  They never denied it.
15    BY MS. BOLGER:
16        Q    And what was the source for your statement
17    that everything --
18            MR. KLAYMAN:  The fact that you say so
19    doesn't mean I'm cracking up.
20    BY MS. BOLGER:
21        Q    -- "everything Kamala Harris's infested
22    snatch touches also dies a miserable, painful death";
0364
1    what is your source for the fact that she had an
2    "infested snatch"?
3        A    Well, "snatch" could mean many things,
4    but --
5            MR. KLAYMAN:  Objection.  Relevancy.
6            THE WITNESS:  -- you know, it's a
7    descriptive word to describe Kamala Harris.
8    BY MS. BOLGER:
9        Q    You meant her vagina?
10        A    But she's -- but you know --
11        Q    You meant her vagina; didn't you?
12        A    -- she -- she contributed to four years of
13    our country almost dying a painful, miserable death.
14    And you know, I think Joe Biden is on his way to
15    having a miserable, painful death.
16        Q    So what you actually said here was -- I
17    heard "everything her infested snatch touches also
18    dies a miserable, painful death"; you were referencing
19    her vagina; were you not?

20      A   I think that's speculative.  It doesn't say
21   "vagina."
22              MR. KLAYMAN:  That's --
0365
1    BY MS. BOLGER:
2       Q    You said it.
3       A    Well, I didn't say "vagina."  I would have
4    said "vagina."
5       Q    Well, you're saying "you stuck your cock
6    inside at Kamala Harris many years ago.  I heard
7    everything her infested snatch touches also dies" --
8              MR. KLAYMAN:  Objection -- continuing.
9    Relevancy.
10   BY MS. BOLGER:
11      Q    -- "a miserable, painful death"; isn't it
12   the case that you were making a reference to her
13   vagina?
14      A    No.  I was just trying --
15      Q    So what were you using that word for?
16      A    I was just talking about Kamala.  Like,
17   everything she touches -- as President Trump says,
18   everything they touch turns to shit; right?
19   The -- President Trump says that a lot too in his
20   speeches.  Everything these Democrats do with DEI and
21   woke turns to shit.  So it's all --
22      Q    So you're making -- you're being
0366
1    hyperbolic -- speaking figuratively?
2       A    Well, I mean --
3              MR. KLAYMAN:  Relevancy.
4              THE WITNESS:  It's obvious that Kamala
5    Harris has contributed to a lot of destruction in our
6    country.  It's why President Trump won the election.
7              It's why everybody who worked in the
8    Biden administration is not writing tell-all books
9    because everything she's involved with dies a
10   miserable, painful death, including her failed
11   campaign.
12   BY MS. BOLGER:
13      Q    Well, you were either saying she had an
14   "infested snatch" as a statement of fact, or you were
15   speaking rhetorically about the fact that she had what
16   you're now characterizing this as an infested
17   snatch --
18              MR. KLAYMAN:  This is --
19   BY MS. BOLGER:
20      Q    -- that denies the -- that destroyed the
21   country; so which one was it?  Are you saying she has
22   an infested snatch, or are you expressing your opinion
0367
1    about her?
2              MR. KLAYMAN:  This case is not about
3    Kamala Harris's alleged infection -- infested snatch.
4              MS. BOLGER:  You guys are -- think it's

5   so funny.
6               THE WITNESS:  All right.  So he --
7               MR. KLAYMAN:  No.  I'm thinking you're
8   funny.  You're funny because you're the one that wants
9   to do this.
10              MS. BOLGER:  Please keep laughing.
11              MR. KLAYMAN:  I'm laughing at you.
12              THE REPORTER:  One at a time for the
13  record.  Do not let the record suffer.
14              THE WITNESS:  I -- I will say I do
15  think it's funny because --
16              MR. KLAYMAN:  I'm laughing at you.
17              THE WITNESS:  -- this has nothing to do
18  with Bill Maher who donated to Kamala Harris, by the
19  way.  So again, it's a conflict of interest.  I think
20  people should be aware of that.
21  BY MS. BOLGER:
22      Q   So it's a joke?  You told a joke; right?
0368
1       A   It's not a joke.  I'm telling it's a fact
2   that Montel Williams had sex with Kamala Harris.
3   It's --
4       Q   I'm talking about the --
5       A   -- just like it's a fact that --
6       Q   -- "infested snatch" line.
7       A   Willie Brown had sex with Kamala Harris.
8   It's a fact.
9       Q   Right.  The "infested snatch" line, you're
10  making a joke; right?
11      A   No.  I'm just saying --
12      Q   Okay.  Then what's your source for the fact
13  that she has an "infested snatch"?  Because it's
14  either a statement of facts --
15      A   Well, it depends on what your definition of
16  the word, "snatch" is.
17              MR. KLAYMAN:  What --
18  BY MS. BOLGER:
19      Q   What's yours?  You wrote it.
20              MR. KLAYMAN:  What she said has nothing
21  to do with --
22  //
0369
1   BY MS. BOLGER:
2       Q   What's yours?  You wrote it.
3               MR. KLAYMAN:  What she said has nothing
4   to do with what Bill Maher said.
5   BY MS. BOLGER:
6       Q   You wrote the words, "infested snatch"; what
7   did you mean by that?
8               MR. KLAYMAN:  This is not a case about
9   Kamala Harris or any of her alleged physical
10  properties.  It's not a case about that.  This is
11  irrelevant.
12  BY MS. BOLGER:

13      Q    You wrote a sentence saying she had an
14  "infested snatch"; what is your basis?
15      A    I don't know what I was referring to,
16  honestly.  I could be referring to Kamala Harris,
17  herself.
18      Q    What?  Of course, you're referring to Kamala
19  Harris.
20      A    Yeah.  I'm talking about Kamala Harris
21  herself.
22      Q    You're talking about her body; you're
0370
1   talking about her vagina?
2       A    No.  I'm just talking about Kamala Harris.
3       Q    Well, a snatch is a vagina; isn't it?
4       A    It's up for interpretation.
5           MR. KLAYMAN:  You know that for a fact?
6   BY MS. BOLGER:
7       Q    What is another possible word -- definition
8   of the word, "snatch," that you've ever heard as a
9   human being on Planet Earth?
10      A    I don't know.  It's up for interpretation.
11      Q    You wrote it.  What did you mean when you
12  wrote --
13      A    I don't know what I meant by it, honestly.
14  I just -- I've just said that everything that I --
15      Q    Ms. Loomer, you're a First Amendment
16  warrior.
17      A    I'm saying that's everything that Kamala
18  Harris touches --
19          MR. KLAYMAN:  Objection.  Relevancy.
20          THE WITNESS:  -- dies a miserable,
21  painful death.
22  //
0371
1   BY MS. BOLGER:
2       Q    You believe in being yourself.
3       A    I do.  And their relationship died a
4   miserable death.  They broke up.  They're not
5   together.  She destroyed our country.
6       Q    I thought you were a First Amendment warrior
7   who was fearless in what you say --
8       A    I am.  I am fearless.
9       Q    Now, you can't remember what you meant?
10      A    I'm fearless.  I'm answering your question,
11  but --
12      Q    You said the president of the United -- the
13  vice president of United State had an infested snatch.
14          MR. KLAYMAN:  Stop badgering the
15  client.  Stop badgering the client.
16          THE WITNESS:  I don't -- I don't
17  understand what this has to do --
18          THE REPORTER:  One at a time.  Do not
19  let the record suffer.  The record is suffering.
20          THE WITNESS:  I don't understand what

21    this has to do --
22    //
0372
 1    BY MS. BOLGER:
 2       Q   I'm not asking you what your understanding
 3    of what this has to do with.  I'm asking you the
 4    following thing.  As a fearless First Amendment
 5    warrior --
 6       A   I don't know.  I just -- I just feel like
 7    this is very --
 8       Q   Ms. Loomer, I'm talking.
 9               MR. KLAYMAN:  Objection.
10               THE WITNESS:  I'm answering your
11    question --
12               MR. KLAYMAN:  Objection.  Objection.
13               MS. BOLGER:  Ms. Loomer, I'm talking.
14    Stop talking.
15    BY MS. BOLGER:
16       Q   You wrote that public --
17       A   Then don't ask me questions.  You told me to
18    stop talking.
19       Q   You wrote -- stop talking.  You wrote a
20    tweet that says that Kamala Harris had an "infested
21    snatch."  Now, be the First Amendment warrior you
22    claim to be and admit that you were saying that the
0373
 1    vice president of the United States had an infested
 2    vagina.  Admit it.  Because that's what you were
 3    doing, and everybody knows it.
 4               MR. KLAYMAN:  Let's say it.
 5               THE WITNESS:  This is coercion.  You
 6    just told me to stop talking.  I'm not going to talk.
 7    I'm not going to be coerced.  You're -- you're asking
 8    me to say something --
 9    BY MS. BOLGER:
10       Q   God.  You're a coward.
11       A   -- that isn't true.  I'm not a coward.
12       Q   You're a coward; you won't even admit to
13    what you did.
14       A   I'm not a coward.  I'm just not going to
15    be --
16       Q   Ms. First Amendment warrior won't admit it.
17       A   -- coerced.
18               MR. KLAYMAN:  Yeah.  Well, you know
19    what?
20    BY MS. BOLGER:
21       Q   You won't admit it.
22               MR. KLAYMAN:  You know, you're an
0374
 1    officer of the court, and you behaving --
 2               THE WITNESS:  I'm not going to --
 3               MS. BOLGER:  Coward.
 4               MR. KLAYMAN:  -- in unethical fashion
 5    by badgering her --

6          MS. BOLGER:  Cowards.
7          MR. KLAYMAN:  -- when something has
8   nothing to do with this case.
9          THE WITNESS:  Not a coward
10         MS. BOLGER:  Coward.
11         THE WITNESS:  Not a coward.  It's
12  politically motivated --
13         MS. BOLGER:  What exhibit are we at?
14         UNIDENTIFIED SPEAKER:  35
15         MS. BOLGER:  What's that?
16         UNIDENTIFIED SPEAKER:  35.
17         THE WITNESS:  Bill Maher -- Bill Maher
18  donated to Kamala Harris.  It's just -- it's just more
19  political bias in this case.  Democrat lawyer,
20  Democrat law firm, Democrat donors.
21         MS. BOLGER:  Move to strike.
22         MR. KLAYMAN:  All irrelevant.
0375
1   Continuing objection.
2          MS. BOLGER:  Okay.  Going to ask the
3   court reporter to mark, as Exhibit -- 35?
4          (Exhibit 35 was marked for
5          identification.)
6          THE REPORTER:  35.
7   BY MS. BOLGER:
8      Q   A tweet of yours dated October 20, 2023.
9   Ms. Loomer, will you read this one to me?
10     A   "She's so smug.  Needs to be primaried ASAP.
11  She thinks independent journalism isn't a real job.
12  Someone should let Marjorie Taylor Greene know that
13  being an independent journalist is more honorable than
14  being a political prostitute and sucking -- sucking
15  McCarthy's dick all day."
16     Q   Okay.  You've misread that slightly.  It's
17  actually said "know that being an independent
18  journalist is a more honorable/real job than being a
19  political prostitute."
20     A   Oh.  Excuse me.  I'm sorry.
21         MR. KLAYMAN:  Objection.  Relevancy.
22  //
0376
1   BY MS. BOLGER:
2      Q   And when you said that she spent the whole
3   day "sucking Speaker McCarthy's dick," what did you
4   mean?
5      A   Like, being a sycophant.  You know, like,
6   when they say, "Oh.  You're like on your knees for
7   this person."  "Oh.  You know, get off your knees."
8          It's like a figure of speech when you're
9   talking about like, "Oh.  This person" -- you know,
10  people will say, "Oh.  They have this person's dick in
11  their mouth."
12         It's like a political term to describe how
13  they're like so enamored by their policies that

14    they're like, you know, unwilling to see straight or
15    like, you know, speak straight.
16       Q   Again, you're speaking rhetorically; right?
17       A  It's a rhetorical expression.
18       Q   Right.
19           MS. BOLGER:  Can I have 45?
20           THE WITNESS:  Being a "political
21    prostitute," like, you know, selling your principles
22    short for -- you know, she -- she campaigned on being
0377
1    against Kevin McCarthy and not wanting to have him as
2    speaker, and then she said that he's one of the best
3    people that she's ever met.
4    BY MS. BOLGER:
5       Q   Right.  So you're using rhetorical speech to
6    express your opinion; right?
7       A  Yes.
8       Q   Great.
9           MS. BOLGER:  Okay.  Going to look at
10    Exhibit 36.
11           MR. KLAYMAN:  Objection.  Relevancy.
12           MS. BOLGER:  No pending question to,
13    Mr. Klayman.
14           MR. KLAYMAN:  No.  It's the whole line
15    of questioning is irrelevant -- all -- this whole
16    line.
17           MS. BOLGER:  Okay.
18           MR. KLAYMAN:  Continuing objection.
19    This has nothing to do with what Bill Maher said and
20    HBO endorsed.
21           MS. BOLGER:  Okay.  This is Exhibit 36.
22      //
0378
1           (Exhibit 36 was marked for
2           identification.)
3           MS. BOLGER:  Sorry, Larry.
4    BY MS. BOLGER:
5       Q   Can you read -- this is a tweet from you
6    dated June 1, 2023; can you read it?
7       A   "MTG is so compromised or McCarthy's penis
8    must be made out of gold.  I mean, this is so shocking
9    and crazy how MTG -- MTG is just blatantly lying about
10    this debt bill and" -- excuse me -- "doubling down on
11    her lies.  I'm stunned."
12       Q   Okay.
13       A  I mean --
14           MR. KLAYMAN:  Objection.  Relevancy.
15    BY MS. BOLGER:
16       Q   Mr. -- Senator McCarthy's married; right?
17       A   Congressman Kevin McCarthy?
18       Q   Sorry.  Yes.  Congressman McCarthy -- former
19    Congressman Kevin McCarthy is married?
20       A   I mean, I think so.  I don't know.  I know
21    that he lost the first bid for speakership because of

22    an affair that was widely reported.  So I don't know
0379
1    if it's like a real marriage or a marriage of
2    convenience.  I don't know.
3            But I mean, like, I think he's still married
4    to his wife.  I don't know.  But I know that he did
5    not win the first round of the speakership because a
6    scandal broke about him having an affair --
7        Q    What does --
8        A    -- with a congresswoman, I believe, by the
9    name of Renee Ellmers.
10        Q    What does it mean to have a "golden dick" in
11    your vocabulary?
12        A    It's like a term used to --
13            MR. KLAYMAN:  Objection.  Relevancy.
14            THE WITNESS:  It's like a term used to,
15    like, describe, like, "Oh.  Wow."  Like, you know,
16    when a guy can do no wrong; right?  Like, "Oh.  His
17    penis must be made of gold."  Like, they -- it's a
18    rhetorical term used to describe a guy that, you know,
19    just pretty much, like, gets away with everything that
20    he does; so --
21    BY MS. BOLGER:
22        Q    So you're, again, using rhetorical language
0380
1    to express your opinion; right?
2        A    Well, it's -- it's a figure of speech to
3    express the fact that Kevin McCarthy just gets away
4    with all of his inconsistencies, which he was.
5            So I was saying MTG is either so compromised
6    in her -- you know, in her backtracking on Kevin
7    McCarthy, or Kevin McCarthy's penis must be made of
8    gold.  Like, isn't -- he couldn't -- he could do no
9    wrong.
10        Q    Okay.  Can I ask you to look at Exhibit 37,
11    which is a tweet of yours from June 1, 2024.  Just
12    have to find it.
13            (Exhibit 37 was marked for
14            identification.)
15        A    Thank you.
16        Q    Ms. Loomer, this is another tweet of yours
17    from June 1, 2024; can you read that to me?
18            MR. KLAYMAN:  Continuing objection.
19    Relevancy.
20            THE WITNESS:  "Daddy issues got you
21    down, Claudia Conway?  Don't hate Trump just because
22    he actually loves his children.  How does it feel
0381
1    knowing that your dad loves attacking President Trump
2    more than he loves you?  Is that why you take your
3    clothes off for five dollars a month looking for other
4    men to call 'Daddy'?  You're one sad, pathetic, broken
5    bitch."
6    BY MS. BOLGER:

7    Q   So she was 19 years old when you tweeted
8  this; right?
9    A   Yeah.  So what?
10       MR. KLAYMAN:  Objection.  Relevancy.
11       THE WITNESS:  She's an adult.  She has
12  an OnlyFans -- or -- or not OnlyFans -- of like some
13  kind of Playboy site.  As you can see there, she was
14  offering nude photos of herself for five dollars a
15  month for seminude photos, so taking her clothes
16  off -- same thing.
17  BY MS. BOLGER:
18    Q   How did you know that George Conway loves
19  attacking President Trump more than he loves her?
20    A   Well, I mean, it's a pretty bad sign when
21  your daughter's taking her clothes off for money.
22  Generally, we would say that -- that's the definition
0382
1  of "daddy issues," or somebody --
2    Q   Do you have a source for that, or are you
3  just giving your opinion?
4    A   Well, I mean, you know, I think you can say
5  that you're -- you failed as a parent if your child is
6  a stripper.
7    Q   That's your opinion; right?
8    A   I mean, it's fact.  If you -- if you raise
9  your child to be a moral person, your daughter's not
10  going to be taking her clothes off.  You fail as a
11  parent if you're -- you have a degenerate child.
12    Q   Sorry.  Women who take their clothes off are
13  degenerate?
14    A   Women who take their clothes off for money
15  are degenerate.  Yes.
16    Q   Strippers are degenerate?
17    A   Women who sell photos of themselves, either
18  naked or semi-naked are degenerate.  Yes.  I don't
19  expect Bill Maher to agree 'cause he's an atheist.
20       And again, he -- there's been many reports
21  about his own issues with women.  Not going to get
22  into it all here, but you know --
0383
1    Q   Also, we're not going to get into it 'cause
2  there's no pending question.  When you say, "you are
3  one sad, pathetic" --
4    A   You know what I'm talking about, though;
5  that he's an atheist, he's not going to care.
6    Q   What does belief in God have to do with
7  whether someone is --
8    A   It has a lot to do it because people --
9    Q   -- is a stripper or not?
10    A   -- are Christian or Jewish -- people of
11  faith have morality.  We don't support abortion.  We
12  do not support prostitution.  We do not support taking
13  your clothes off for money.
14       We do not support immoral behavior.  And I

15  don't expect Bill Maher or his attorneys to understand
16  why I would have a problem with George Conway
17  attacking President Trump when he should be more
18  focused on his daughter.  He was -- he wasn't --
19      Q    You're not attacking George Conway here,
20  though.  You're attacking his 19-year-old daughter;
21  right?
22      A    Well, I attacked him, too, in the tweet.  I
0384
1   said, "knowing your dad" --
2       Q    So you call a 19-year-old girl, "you are one
3   sad, pathetic, broken bitch"; right?
4       A    Yeah.  And she is.
5       Q    Okay.  That's your opinion; right?
6       A    I'd say it's a fact.  She's 19 years old,
7   and she has very wealthy parents, both of whom are
8   millionaires.  And she could have done anything with
9   her life.  Her mother was an advisor to President
10  Trump.  Her father runs a PAC.  And she has privilege.
11          That's what we call "privilege" when you
12  grow up in a household like that, with that kind of
13  status and wealth.  And she could have done anything
14  she wanted to do, but she chose to take her clothes
15  off her money.  So I would say that my statement is a
16  fact.
17      Q    Really?  You think calling someone "a bitch"
18  is a statement of fact?
19      A    Yeah.
20      Q    Really?  What's the definition of "bitch"?
21      A    I guess it's --
22      Q    Isn't that highly subjective?
0385
1       A    I said -- I said, "sad, pathetic, broken
2   bitch."
3       Q    Right.
4       A    I would say that it's pretty sad and
5   pathetic that a 19-year-old girl -- very pretty young
6   girl who has, you know, wealthy parents and her whole
7   future ahead of her is basically allowing herself to
8   be sexually objectified by men.
9           I think it's very sad.  I think that it's
10  very sad state of affairs when young women take their
11  clothes off for money.  It's very sad.  I think it's
12  pathetic, and it's a symbol of a broken home and a
13  broken person.
14      Q    What's the difference, then, between a fact
15  and an opinion?
16          MR. KLAYMAN:  Objection.  That calls
17  for a legal conclusion.
18          THE WITNESS:  Well, this is --
19          MS. BOLGER:  It doesn't.
20  BY MS. BOLGER:
21      Q    But you can tell me your opinion.
22          MR. KLAYMAN:  Yes.  It does.

0386
1          THE WITNESS:  It's a fact that she's
2    taking her clothes off for money.  It says here that
3    she's offering adult content for five dollars a month
4    on Playboy to "reclaim her womanhood."
5          It's a fact.  I'm not saying that this
6    is -- it's not my opinion.  It is a fact that she's
7    taking her clothes off for money.
8    BY MS. BOLGER:
9      Q    But I'm asking you what the difference is
10   between a fact and opinion.  So for example, it may be
11   a fact that she's taking off her clothes for money,
12   but isn't it your opinion that she's a "pathetic,
13   broken bitch"?
14         MR. KLAYMAN:  Calls for a legal
15   conclusion.  Objection.
16         THE WITNESS:  I mean, it's -- it's up
17   for debate, I suppose.  But again, I don't see what
18   this has anything to do with Bill Maher falsely
19   accusing me of having sex with President Trump, which
20   is why I sued.
21   BY MS. BOLGER:
22     Q    That wasn't my question.
0387
1      A    Okay.
2          MS. BOLGER:  I'm going to ask you to
3    mark this as Exhibit 38.
4          (Exhibit 38 was marked for
5          identification.)
6          MS. BOLGER:  Oh.  Sorry.
7          THE WITNESS:  Thank you.
8    BY MS. BOLGER:
9      Q    It's a tweet from you, dated November 20,
10   2024; what is -- you're laughing at your joke?
11     A    It's a fact.
12     Q    Okay.  Why don't you read your tweet?
13     A    I said, "JB Pritzker" -- is the governor of
14   Illinois -- "really wants to show his dick to
15   someone's daughter."
16     Q    Okay.  Why are you laughing?
17     A    Because again, it's -- it's a perversion.
18   He said in his tweet as a protest against Trump for
19   sending protections for trans kids, everyone should
20   use the other gender's bathroom.  He's basically
21   advocating for somebody's young daughter to be
22   molested and raped by a transgender.
0388
1          Why would you want to have a biological male
2    go into the female bathroom where young girls are?
3    It's -- it's predator behavior.  It's disgusting.  And
4    so you know, there's been multiple reported incidents
5    of young children, especially young girls, having
6    themselves exposed to biological men who want to
7    pretend that they are women because of this sickness,

8    this perversion perpetuated by the Democrat party that
9    trans -- there's such thing as a "trans kid."
10             It's called child abuse.  It's called
11   mutilation.  It should be a crime, and it's gross.
12   Why would -- why does JB Pritzker want a grown man to
13   walk into a girl's bathroom?
14        Q   That's not what you say, though.  You say --
15   you don't say that --
16        A   Because that's what happens.  He wants to
17   show his dick to someone's daughter.  I am -- I'm
18   sorry.  But if you -- if you are a grown man, and you
19   want -- if you are saying as a public -- a public --
20   if you are saying as a public official, a governor of
21   a state that, you know, to protect trans kids,
22   everyone should use the other gender's bathroom, you
0389
1    are basically advocating for a grown man to walk into
2    the women's bathroom and show himself to a woman.
3             Because how do men urinate?  They urinate in
4    stalls.  They don't close the door like women do where
5    you know, there's privacy, and you pull your pants
6    down.  And there's a door, and it's shut.  They --
7    they literally take their penises out, and they just
8    piss.
9             He's advocating for a grown man to wield his
10   dick out and show it to a young child and expose
11   himself.  It's disgusting.  It's -- it's disgusting,
12   perverse behavior.
13        Q   That's your opinion; right?
14        A   No.  It's a fact.  It's -- it's gross.  It
15   is so gross to advocate for men to invade women's
16   spaces.  It's a fact.  And unfortunately, the
17   Democrats have -- have promoted this mental illness in
18   our society that they think it's okay to advocate for
19   trans people to invade our bathrooms and to expose
20   themselves.  It's disgusting.  It's degenerate, and
21   it's a mental illness.
22             MS. BOLGER:  Okay.  What exhibit are we
0390
1    on?
2             UNIDENTIFIED SPEAKER:  39.
3             THE REPORTER:  39.
4             (Exhibit 39 was marked for
5             identification.)
6    BY MS. BOLGER:
7        Q   Okay.  I'm going to ask you to look at
8    Exhibit 39.  It's a long exhibit.  I'm actually just
9    asking you to look at your tweet.  Sorry.  I'm sorry.
10   Hold on.  Let me just make sure I have another copy.
11             Okay.  This is a tweet from you, dated
12   October 16, 2024; and can you read that to me?
13        A   "If you call yourself, 'Second Gentleman,'
14   you're just gay.  Men aren't supposed to be second to
15   women.  It's called biological hierarchy, and we

16    should respect it.  There's a reason why she tells him
17    to 'answer your effing phone.'  She has no respect for
18    him because he's lowered himself into being a loser."
19         Q    Okay.  Do you have any reason to believe
20    Doug Emhoff is gay?
21         A    "Gay" can mean either homosexual, or it can
22    also just mean, like, you're, like, weak.  You know,
0391
1    it's like also used as a term to describe, like, weak
2    men.  It is.  So it's like a -- and I do believe that
3    he's a weak man.
4         I mean, there's reports that he allowed his
5    wife to -- he even said it himself.  He said -- she
6    said -- "she told me to answer my effing phone."  I
7    mean, not many people could argue that that's a sign
8    of an abusive relationship.
9         I mean, a wife talking to her husband that
10    way it's not exactly very respectful.  Again, I don't
11    expect Bill Maher to understand what respect is in a
12    relationship.  He's never been married --
13              MR. KLAYMAN:  Continuing objection on
14    relevancy.  That has nothing to do with this case.
15              MS. BOLGER:  You just interrupted your
16    own client.
17    BY MS. BOLGER:
18         Q    Can you finish your answer?
19              MR. KLAYMAN:  I'm putting an objection
20    on the record.
21              THE WITNESS:  I was just saying that
22    it's disrespectful, and he has lowered himself because
0392
1    any man who would allow his wife to speak to him that
2    way doesn't have respect for himself.
3    BY MS. BOLGER:
4         Q    So you're saying that you believe men aren't
5    supposed to be second to women; that's your belief?
6         A    Well, I mean, men are stronger than women,
7    biologically speaking.  It's called -- I said it's
8    biological hierarchy.  Men and women, there's two
9    genders for a reason.  If you haven't been infected
10    with the Democrat delusion that there's a million
11    genders, there's men, and there's women.
12         And men are physically stronger and
13    biologically built different than women.  And there's
14    biological hierarchy; right?  There is.  It's science.
15    It's proven fact.  It's just how the world works.
16    It's worked this way forever.
17         And Kamala Harris is not respecting her
18    husband when she tells him, "answer your effing
19    phone."  It's disrespectful.  It's a sign that she has
20    disrespect for her marriage, speaking to her husband
21    that way.
22         Q    That's your opinion; right?
0393

1      A    Well, I think that a lot of people --
2    anybody who's in a relationship or anybody who's
3    married would be offended if their spouse was going
4    around telling people, "Oh.  Yeah.  I told them to
5    answer his effing phone."
6           I mean, it's like you got to have some
7    respect for your partner.  I think that it's important
8    to respect your partner.
9      Q    Well, but that's not what you're saying.
10   You're saying it's important for a man to be the
11   hierarchical higher member of a relationship?
12     A    I'm saying that there's -- that -- that
13   there's biological hierarchy.  Men are built
14   differently than women, and men are physically
15   stronger than women.  It's biological hierarchy.
16     Q    What does that have to do with him being
17   gay?
18     A    Well, he is just weak.  He's not -- he's not
19   asserting his biological hierarchy in the
20   relationship.
21     Q    That's your opinion; right?
22          MR. KLAYMAN:  Objection.  It's becoming
0394
1    theater of the absurd.  This has nothing to do with
2    this case -- this is --
3    BY MS. BOLGER:
4      Q    That's your opinion; right?
5      A    I mean, look.  We can go over my -- we
6    can -- we can analyze my political analysis of Kamala
7    Harris, and her husband's relationship all we want.
8    But this lawsuit is about Bill Maher falsely accusing
9    me of having sex with Donald Trump.
10     Q    Right.  That's your opinion that you're
11   expressing on X; right?
12     A    Has -- what does this have to do with Bill
13   Maher?
14     Q    I didn't ask you that.  I asked you if that
15   was your opinion.
16     A    I know.  But you just want to, like, you
17   know --
18     Q    I want to know if that's your opinion.
19          MR. KLAYMAN:  She's not a party to
20   the -- she's not a defendant in this case.
21   BY MS. BOLGER:
22     Q    What's your opinion?  Is that -- is --
0395
1    sorry.  That's your opinion; isn't it?
2          MR. KLAYMAN:  Kamala Harris --
3    BY MS. BOLGER:
4      Q    That tweet contains your opinion; correct?
5      A    Yeah.  I didn't say that I -- I never post
6    my opinion.  I give commentary on things.  I talk
7    about things all the time.  But what does this have to
8    do with Bill Maher saying that I slept with President

9    Trump and trying to ruin my career?
10        Q    And you believe that the First Amendment
11   protects your right to give your opinions; right?
12            MR. KLAYMAN:  No.  That -- no --
13            THE WITNESS:  No.  The First Amendment
14   does not protect Bill Maher saying, Laura Loomer had
15   sex with Donald Trump.
16   BY MS. BOLGER:
17       Q    I didn't ask you what you thought about Bill
18   Maher.  I asked you --
19       A    I'm telling you -- I'm answering the
20   questions --
21       Q    It doesn't matter --
22       A    It does matter, though.
0396
1        Q    -- what you want to say.
2        A    It does.
3            THE REPORTER:  One at a time, please.
4            THE WITNESS:  It does matter.
5    BY MS. BOLGER:
6        Q    I get to ask a question, and you get to give
7    me an accurate answer; isn't it the case --
8            MR. KLAYMAN:  All right.  You just
9    turned yourself a motion for sanction.  You're going
10   too far.
11            THE WITNESS:  I get to give you the
12   truthful answer.
13   BY MS. BOLGER:
14       Q    Isn't it the case that you believe that the
15   First Amendment protects your right to express your
16   opinion?
17            MR. KLAYMAN:  This calls for a legal
18   conclusion.
19            THE WITNESS:  My --
20            MR. KLAYMAN:  It's irrelevant in this
21   context.  It has nothing to do with this case.  Please
22   stop badgering my client.  You are going to get a
0397
1    motion for sanctions; it's guaranteed.
2    BY MS. BOLGER:
3        Q    Isn't it the case that you believe that the
4    First Amendment protects your right to have opinions?
5    I would be proud to say that I'm an American.
6        A    It's not an opinion for Bill Maher to say --
7        Q    I didn't ask you that, Ms. Loomer.
8        A    I know.  But that's where this is going.  I
9    understand.  I'm not stupid.
10       Q    Ms. Loomer, how can you possibly be --
11   you're really sitting here -- you, of all people --
12       A    I'm sitting here --
13       Q    -- a proud First Amendment warrior, are not
14   able to say --
15       A    It's not a First Amendment right for Bill
16   Maher to say that I slept with Donald Trump.

17      Q   Is it --
18      A   We're not here about Kamala.  If Kamala has
19  an issue, she should sue me.
20      Q   Is it a First Amendment right for you to
21  express your opinion?
22             MR. KLAYMAN:  That has -- out of
0398
1   context.  Irrelevant.
2              THE WITNESS:  That has nothing to do --
3   you're trying -- it's a leading question.  You're
4   asking me something about Kamala Harris --
5              MR. KLAYMAN:  Vague and ambiguous.
6              THE WITNESS:  -- when -- when this is
7   about Bill Maher.  We should be talking about what
8   your client --
9   BY MS. BOLGER:
10      Q   I'm not asking at all about -- put that
11  tweet --
12      A   -- had any justification for saying I had
13  sex with Trump.
14      Q   Put all those tweets aside.  Put all those
15  tweets aside.  I'm not asking you about any of those
16  tweets.  You pick them up and put them to your side,
17  please.  Pick up the tweet -- the documents and put
18  them to the side.
19             MR. KLAYMAN:  All right.  This is
20  enough.  I'm instructing her not to go answer any more
21  questions.
22  //
0399
1   BY MS. BOLGER:
2      Q   And now, let's ask this question.
3              MR. KLAYMAN:  Do not answer any more
4   questions.  This is badgering.  You're going to be --
5              MS. BOLGER:  Mr. Klayman, I haven't
6   even asked the question.
7              MR. KLAYMAN:  You will have a motion
8   for sanctions.  Do not answer any more questions along
9   here.
10             MS. BOLGER:  Isn't it --
11             MR. KLAYMAN:  You're just being
12  harassed.  That's all.  Stop.
13  BY MS. BOLGER:
14      Q   Doesn't the First Amendment --
15             MR. KLAYMAN:  She's not answering any
16  more questions here.  Do not answer any questions.
17  BY MS. BOLGER:
18      Q   Doesn't the First Amendment protect your
19  right to have opinions; and isn't that wonderful?
20             MR. KLAYMAN:  No.  She's -- this
21  is -- she's not here in a legal context.  She's here
22  as a fact witness.
0400
1              THE WITNESS:  You have laws --

2          MR. KLAYMAN:  Stop --
3          MS. BOLGER:  No.  Mr. Klayman, please
4    don't --
5          MR. KLAYMAN:  -- okay?  I'm instructing
6    you not to answer.  I'm instructing you not to answer;
7    okay?
8    BY MS. BOLGER:
9       Q   Ms. Loomer, if he --
10         MR. KLAYMAN:  This is harassment.
11   BY MS. BOLGER:
12      Q   -- if you don't answer this question, I'm
13   definitely getting you back.  The question is very
14   simple.
15         MR. KLAYMAN:  Well, the judge will
16   decide that.
17   BY MS. BOLGER:
18      Q   Isn't it the case that, in the United States
19   of America, the First Amendment express a right to
20   have opinions; and isn't that fucking fantastic?
21         MR. KLAYMAN:  Well, that's nice, but
22   you --
0401
1    BY MS. BOLGER:
2       Q   What's your answer?
3          MR. KLAYMAN:  Do not answer the
4    question; all right?  She's getting a motion for
5    sanctions.  That's where it stands.
6    BY MS. BOLGER:
7       Q   You're really not going to answer the
8    question, "Doesn't the First Amendment protect your
9    right to have an opinion?"
10         MR. KLAYMAN:  I'm instructing her not
11   to answer.  I'm instructing her not to because you are
12   harassing her.  You're harassing --
13         MS. BOLGER:  That's a ridiculous
14   instruction, Mr. Klayman.
15         MR. KLAYMAN:  No.  I don't care whether
16   you think, because frankly --
17         MS. BOLGER:  So I just want to be clear
18   that this motion --
19         MR. KLAYMAN:  All you want to do is
20   work her over --
21         MS. BOLGER:  This motion that's going
22   to be filed in open court is going to be me saying to
0402
1    the judge, "Ms. Loomer wouldn't answer the
2    question" --
3          MR. KLAYMAN:  Say what you want.
4          MS. BOLGER:  "Doesn't the First
5    Amendment right protect" --
6          MR. KLAYMAN:  Say what you want.  Say
7    what you want.
8          MS. BOLGER:  -- "your ability to have
9    opinions," which I would think Ms. Loomer would love

10  to say.
11        MR. KLAYMAN:  You already threatened
12  her with attorney's fees.  You are badgering her --
13        MS. BOLGER:  I'm sorry.  I don't know
14  what you're talking about.
15        MR. KLAYMAN:  The judge said that's not
16  applicable.  Slap everything else --
17  BY MS. BOLGER:
18     Q   Ms. Loomer, I'm going to ask you one more
19  time --
20     A   There's a difference between --
21        MR. KLAYMAN:  No.  Stop.
22  //
0403
1  BY MS. BOLGER:
2     Q   I'm going to ask you one more time.
3        MR. KLAYMAN:  Stop.
4  BY MS. BOLGER:
5     Q   Doesn't the First Amendment protect your
6  right --
7        MR. KLAYMAN:  You're instructed not to
8  answer.  You're instructed --
9  BY MS. BOLGER:
10     Q   -- to have opinions; and isn't that great?
11  You're a First Amendment warrior.  Doesn't the First
12  Amendment right protect your right to have opinions?
13        MR. KLAYMAN:  No.  This is harassment.
14        You do not answer; okay?
15        Move on.
16  BY MS. BOLGER:
17     Q   Are you really not answering that question?
18        MR. KLAYMAN:  Move on.  Yes.  She's
19  instructed by her lawyer not to answer because this is
20  over the top --
21        MS. BOLGER:  She can actually say, "You
22  know what?  I'm going to not take your instruction."
0404
1  She's a grownup.  She can do that.  The question
2  you're asking her --
3        MR. KLAYMAN:  One more question like
4  this, and this deposition is over.
5        MS. BOLGER:  Mr. Klayman, the question
6  is --
7        MR. KLAYMAN:  One more question like
8  this --
9        MS. BOLGER:  I'm going to ask the
10  question one more time, and I'm going to hope you
11  revisit this.
12        MR. KLAYMAN:  You are a vicious, nasty
13  person.
14  BY MS. BOLGER:
15     Q   Doesn't the First Amendment protect your
16  right to have opinions; and isn't that great?
17        MR. KLAYMAN:  Do not answer the

18  question.  She's getting a motion for sanctions.  This
19  is beyond the pale.  Do not answer the question.
20  BY MS. BOLGER:
21    Q   Are you going to accept that instruction?
22    A   [No audible response.]
0405
1    Q   Ms. Loomer, you have to answer that one.
2         MR. KLAYMAN:  Your lawyer's instructing
3  you not to go further in this question.
4  BY MS. BOLGER:
5    Q   And I just said, are you going to accept
6  that instruction?
7    A   I'm going to take the guidance of my
8  attorney.
9         MS. BOLGER:  Can I have 132?  Actually,
10  can I have 134?
11         Okay.  Exhibit --
12         THE REPORTER:  40.
13         MS. BOLGER:  40.
14         (Exhibit 40 was marked for
15         identification.)
16  BY MS. BOLGER:
17    Q   There it is.  Okay.  Exhibit 40 is a post by
18  you, Ms. Loomer, from September 11, 2024; can you read
19  that, please?
20         MR. KLAYMAN:  Objection.  Relevancy.
21  Continuing objection.  Harassment.
22  //
0406
1  BY MS. BOLGER:
2    Q   Can you read it, please?
3    A   "It's really funny how Marjorie Taylor
4  Greene, a raging anti-Semite has said -- who said Jews
5  use space lasers to control the world, wants to
6  pretend like I'm a racist because I made a funny joke
7  about Kamala Harris making cooking videos and buying
8  curry spice at an anti-Trump spice shop.
9         "And I mocked how she uses her Indian mom as
10  a way to dodge questions.  I won't be apologizing for
11  having a sense of humor.  I also believe in free
12  speech, Marjorie Taylor Greene, which you clearly do
13  not support.  I get it.  You're jealous of me despite
14  your planted hit pieces about me in the New York
15  Times.  I won.  Get over it."
16    Q   What is the "I won" in reference to?
17         MR. KLAYMAN:  Objection.  Relevancy.
18         THE WITNESS:  As I said before, she was
19  not invited to the presidential debate because a lot
20  of President Trump's staff can't stand her.  And so
21  she was very upset and relayed to several people that
22  I know that she was very angry that I was invited to
0407
1  the debate, and Matt Gaetz was invited to the debate,
2  and she was not.

3           She said that she felt, like, passed
4     over.  But she just, you know, it's -- the reality
5     is -- is she didn't want to accept the fact that a lot
6     of President Trump's staff don't like her.
7     BY MS. BOLGER:
8         Q    Okay.  And you are -- you say you made a
9     funny joke about Kamala Harris making cooking videos;
10    do you see that?
11              MR. KLAYMAN:  Objection.  Relevancy.
12    BY MS. BOLGER:
13        Q    Do you see that?
14        A    Yeah.  It was mocking her cooking.
15        Q    Right.  And you believe that your free
16    speech rights protect your ability to make jokes;
17    right?
18              MR. KLAYMAN:  Objection.  Relevancy.
19    What Maher did was not a joke.
20    BY MS. BOLGER:
21        Q    It's not asking about Maher; I'm asking you.
22              MR. KLAYMAN:  It was a statement of
0408
1     fact.
2     BY MS. BOLGER:
3         Q    Don't you believe that your free speech
4     rights protect your rights to make a funny joke about
5     Kamala Harris; isn't that what you wrote here?
6               MR. KLAYMAN:  I hope we're not going to
7     go down the same path of harassing her more.
8     BY MS. BOLGER:
9         Q    Just answer the question, Ms. Loomer.
10        A    I mean -- I mean, it was a funny commentary
11    about her constantly talking about how she cooks.  And
12    then she went to a anti-Trump spice shop.  But again,
13    it was all based off of fact.  And what Bill Maher
14    said about me sleeping with President Trump is not a
15    joke.
16        Q    I just asked if you felt you had the right
17    to your free speech rights meant you could make a
18    joke, which you just said.
19        A    This has nothing to do --
20        Q    But it's what you just --
21        A    But this has -- but this has nothing to do.
22    There's a difference between talking about her making
0409
1     videos about cooking, which she did on multiple
2     occasions, and Bill Maher saying, "Laura Loomer had
3     sex with President Trump."  There's a big difference
4     there.  It's not the same thing.
5         Q    Do you believe that your free speech rights
6     allow you to make a joke about a public figure like
7     Kamala Harris?
8               MR. KLAYMAN:  Objection.  Relevancy.
9     This case is not about Kamala Harris or anything she
10    said with Kamala Harris.

11    BY MS. BOLGER:
12        Q   I just asked, do you feel like --
13            MR. KLAYMAN:  It's part of the
14    harassment.
15    BY MS. BOLGER:
16        Q   -- your free speech rights allow you to make
17    a joke about a public figure?
18        A   I just feel that this has nothing to do with
19    the fact --
20        Q   It doesn't matter that --
21        A   -- that Bill Maher falsely accused me of
22    having sex with President Trump.
0410
1        Q   Ms. Loomer, the question is, do you feel
2    that your free speech rights allow you to make a joke
3    about a public figure?
4            MR. KLAYMAN:  Same objection.
5    Relevancy.
6            THE WITNESS:  I've already answered the
7    question.
8    BY MS. BOLGER:
9        Q   You have not answered the question.
10            MR. KLAYMAN:  That's it.  Move on.
11            THE WITNESS:  I did answer the
12    question.
13    BY MS. BOLGER:
14        Q   Do you believe --
15            MR. KLAYMAN:  Move on.
16    BY MS. BOLGER:
17        Q   -- that your free speech rights, as you say
18    here, allow you to make a joke about a public figure?
19    Because that's what you say in this tweet; isn't it?
20            MR. KLAYMAN:  Do not answer the
21    question.  All right.  This deposition is over.  It's
22    over.  Let's get out of here.  We'll get your
0411
1    sanctions.
2            MS. BOLGER:  I'm sorry.  What are you
3    doing?
4            MR. KLAYMAN:  It's over.  The
5    deposition is over.  Come on.
6            MS. BOLGER:  Mr. Klayman, I would urge
7    you not to do this.
8            MR. KLAYMAN:  We'll go in front of the
9    court.
10    BY MS. BOLGER:
11        Q   The pending question is do you believe your
12    free speech rights allow you to make a joke?
13    Ms. Loomer, this is a poor decision.
14            MS. BOLGER:  Mr. Klayman, this is
15    embarrassing for you.
16            MR. KLAYMAN:  Yeah.  We'll see.  The
17    record speaks for itself.  You're harassing my client.
18    BY MS. BOLGER:

19    Q   The question was, do you believe that your
20   free speech allow you to make a joke about public
21   figures, and you're storming out?
22            MR. KLAYMAN:  Come on.  Let's go.
0412
1             THE WITNESS:  I answered the question.
2             MR. KLAYMAN:  We're not storming out.
3    You're harassing my client.  I asked you to stop.
4             THE WITNESS:  It has nothing to do with
5    Bill Mayer with accusing me of having sex with Donald
6    Trump.
7             MS. BOLGER:  Mr. Klayman, please sit
8    down, and let's continue the deposition.
9             MR. KLAYMAN:  Then stop.  Then stop.
10            MS. BOLGER:  Otherwise, you will be --
11   no.  I will not allow you to tell me what to do.
12            MR. KLAYMAN:  Then stop.  No.  We'll
13   ask the court to deal with this.  They can watch the
14   video.  They can see how you're behaving.
15   BY MS. BOLGER:
16    Q   The question is, do you feel that your free
17   speech rights allow you to --
18            MR. KLAYMAN:  That's right.  And your
19   associate obviously agrees with me.  She's nodding.
20   BY MS. BOLGER:
21    Q   -- make a joke?  And that's a yes-or-no
22   question.
0413
1             MR. KLAYMAN:  Do not answer the
2    question.
3             You want to move on, or this deposition
4    is over.
5             MS. BOLGER:  I want an answer to my
6    question.
7             MR. KLAYMAN:  No.
8    BY MS. BOLGER:
9     Q   Are you going to answer the question,
10   Ms. Loomer?
11            MR. KLAYMAN:  No.  She's not.  I'm
12   instructing not to answer.
13   BY MS. BOLGER:
14    Q   Are you going to accept your lawyer's
15   instruction?  Which, again --
16            MR. KLAYMAN:  This is harassment.
17   BY MS. BOLGER:
18    Q   -- as you are a free speech warrior, the
19   question is, do you think your First Amendment rights
20   give you the right to make jokes about public figures?
21            MR. KLAYMAN:  This is badgering; okay?
22   So she's not answering.
0414
1             THE WITNESS:  What Bill Maher said
2    about me was not a joke.
3    BY MS. BOLGER:

4     Q   It's not my question, Ms. Loomer.
5     A   We're here -- I know.  But we're here today
6  to talk about Bill Maher falsely accusing me of having
7  sex with President Trump.
8     Q   God.  It's embarrassing that you, the free
9  speech warrior, won't answer a simple question like
10  that.
11     A   I answered your question.
12          MR. KLAYMAN:  That's not your --
13  BY MS. BOLGER:
14     Q   How did you find out about Bill Maher's
15  reports?
16          MR. KLAYMAN:  All right.  Good.  We're
17  moving on.
18          MS. BOLGER:  Not because of you
19  Mr. Klayman.
20          MR. KLAYMAN:  I know.  I know.
21  BY MS. BOLGER:
22     Q   What did you --
0415
1          MR. KLAYMAN:  We're moving on because
2  you're in the deep you-know-what.
3  BY MS. BOLGER:
4     Q   Ms. Loomer --
5          MS. BOLGER:  I'm a what?
6          MR. KLAYMAN:  You're in deep trouble --
7  the way you behave.
8          MS. BOLGER:  Oh.  I'm so sorry.  I'm so
9  sorry, Mr. Klayman.  I didn't hear you make that slur
10  about me.
11          MR. KLAYMAN:  Yes.  You're in deep
12  trouble.
13  BY MS. BOLGER:
14     Q   Ms. Loomer, when did you hear about
15  Mr. Maher's report?
16     A   The day that I posted about it, I believe.
17     Q   How did you hear about it?
18     A   I received a lot of calls, and I went on
19  Twitter.  And my -- I got a lot of notifications on
20  Twitter with people tagging me.  And my phone just
21  kept on buzzing and buzzing and buzzing because people
22  had clipped it, and it was being reported online.
0416
1          And every time somebody tags you, your phone
2  just like buzzes and beeps.  And I got a phone call
3  about it too -- several phone calls, actually.
4     Q   Did you watch the show?
5     A   I don't watch Bill Maher's show.
6     Q   Okay.  Have you ever seen the whole -- the
7  show from beginning to end of that night -- the
8  September 13th show?
9     A   Yes.  I have.
10     Q   Okay.  When did you see it from beginning to
11  end?

12        A    I believe, like, the week that it came out.
13    I, for like legal purposes, obviously, I watched it.
14    But I don't watch -- I don't find him to be funny.
15    Like I said, it's not a joke.
16            I don't think he's very funny.  I think he's
17    just a -- he likes to capitalize off of people's
18    hatred of President Trump, and he promotes hatred of
19    President Trump, and so does HBO.
20        Q    Do you know anybody who watches the Bill
21    Maher show?
22        A    Yeah.  There's, obviously, millions of
0417
1    people who watch it because he gets -- he gets over a
2    million views per episode.  So I know people who watch
3    it.  President Trump has seen the show before.  He's
4    commented about it on Truth Social.  He said that he
5    doesn't find Bill Maher to be very funny.
6            I know a lot of people who have watched it.
7    I know Steve Bannon -- Steve Bannon even went on his
8    show.  I know a lot of people who have seen the show.
9    It doesn't mean they watch every single episode, but
10    yeah.  A lot of people watch Bill Maher's show, like I
11    said.
12        Q    Including some people you respect; right?
13    Well, you respect Trump.
14        A    Well --
15            MR. KLAYMAN:  Vague and ambiguous.
16    Objection.
17            THE WITNESS:  It's not -- I -- I
18    wouldn't say -- I -- I do respect President Trump, but
19    I wouldn't say that President Trump was willingly
20    trying to watch Bill Maher's show.  I think that, you
21    know, President Trump has seen the show.
22            I don't want to speak for the
0418
1    president, but I can imagine that, given how often
2    Bill Maher attacks President Trump -- and I mean, I
3    myself have documented thousands of, you know,
4    screenshots.
5            I mean, you've seen these screenshots,
6    obviously.  I don't want to get into the contents of
7    our deposition with Bill Maher, but --
8    BY MS. BOLGER:
9            MS. BOLGER:  So don't.
10            THE WITNESS:  -- there are countless
11    examples that are publicly available online of Bill
12    Maher disparaging President Trump, misleading Melania
13    Trump, the Trump children --
14    BY MS. BOLGER:
15        Q    I'm so sorry.  The question was, do people
16    you respect watch Bill Maher?
17        A    I just said a lot of people -- not
18    willingly.
19        Q    Okay.  Sorry.  Steve Bannon went on Bill

20    Maher under duress; is your testimony?
21        A    There's a difference between going on a show
22    as a guest to talk about -- he wanted a conservative
0419
1    to draw attention because, you know, I have reason to
2    believe that Bill Maher wanted to go to the White
3    House because he wanted to try to lessen a lot of the
4    blowback he received from making these derogatory
5    remarks about me.
6            And he's friends with Kid Rock.  And it's my
7    understanding that he asked Kid -- Kid Rock to arrange
8    this meeting for him with President Trump.  And I have
9    reason to believe that he did this because he wanted
10    to try to --
11        Q    So again, Ms. Loomer, the question I was --
12        A    -- prevent more blowback.
13        Q    -- the question I asked you was --
14        A    I know what I'm saying.
15        Q    -- did Bannon go on under duress.  And now,
16    you're going on a different tangent --
17        A    He went on the show because --
18        Q    So let's --
19        A    -- because he wanted a conservative --
20            MR. KLAYMAN:  Let her finish her
21    answer.
22            THE WITNESS:  He wanted a conservative
0420
1    guest to talk about his -- his ridiculous dinner at
2    the White House with President Trump, which he used as
3    a way to try to diminish blowback from my lawsuit.
4    Because --
5    BY MS. BOLGER:
6        Q    Okay.  We're done with the answer --
7        A    -- he purposely -- he purposely --
8        Q    -- that this is not the answer to my
9    question.
10        A    -- he purposely scheduled the dinner to take
11    place days before our deposition.  And he did it on
12    purpose.
13        Q    Okay.  Ms. Loomer, I'm going to move to
14    strike that.  We can talk about that later.  But my
15    question was, did Steve -- was Steve Bannon coerced
16    into going onto the show?  So you're not answering the
17    questions I'm asking you.
18        A    All right.  I wasn't a part of the
19    conversation --
20        Q    Right.
21        A    -- but I know -- I know Steve Bannon likes
22    to get in the media, so I don't know.  I know he likes
0421
1    to.
2        Q    Okay.  So you said --
3        A    Doesn't mean I agree with his decision to go
4    on the show.

5    Q    So when you -- you said you got telephone
6  calls from people to tell you about the show; correct?
7    A    Yes.
8    Q    Okay.  Who called you?
9    A    My boyfriend was one of the people that
10  called me.
11    Q    Does he watch the show?
12    A    He saw clips of it online that were
13  circulating.  A couple --
14    Q    I'm sure your boyfriend didn't believe it;
15  right?
16        MR. KLAYMAN:  Objection.  She can't
17  testify for her boyfriend.
18        THE WITNESS:  I mean, obviously, I
19  can't speak for my boyfriend, but I'm very faithful to
20  my boyfriend, and I think my boyfriend was just very
21  offended by it because it's derogatory.
22        It's like, you know, falsely accusing
0422
1  me of -- of having an affair with President Trump.
2  It's very disrespectful.  And Bill Maher didn't take
3  that into account when he made these comments.
4        I mean, luckily, my boyfriend is a very
5  secure individual, but these are the types of claims
6  that ruin and put a lot of stress on relationships.
7  And it was very embarrassing, especially in a new
8  relationship having to have this type of press
9  coverage, especially when I had just been introduced
10  to his family.  It was very uncomfortable having to
11  deal with that.
12  BY MS. BOLGER:
13    Q    Did he tell you that he believed Bill Maher?
14    A    No.
15    Q    Okay.  He told you he didn't believe it;
16  right?
17    A    He just showed me the clip, and he called me
18  about it.
19    Q    Okay.
20    A    And said, "Have you seen this?"
21    Q    Okay.  Did he say he believed you were
22  having an affair with the president?
0423
1    A    No.  Because my boyfriend has met President
2  Trump, and my boyfriend knows that these claims are
3  ridiculous.
4    Q    Okay.  What did Mr. Maher say precisely that
5  is the basis of this claim?
6        MR. KLAYMAN:  The complaint speaks for
7  itself.  Show her the complaint.
8        THE WITNESS:  It's in the complaint.
9  We have the complaint.
10  BY MS. BOLGER:
11    Q    No.  I want to know what you remember,
12  Ms. Loomer.  Please tell me.

13          MR. KLAYMAN:  What she remembers is
14  irrelevant.
15              THE WITNESS:  I have that exact quote.
16  There's the exact quote in the complaint.  And the
17  judge and the jury can look at it, and they can see
18  for themselves the exact quote.
19  BY MS. BOLGER:
20      Q   But I'm saying you're asking for --
21      A   But he said that --
22      Q   There you go.
0424
1       A   -- that -- that "Laura Loomer is fucking
2   Trump."
3       Q   You believe that that's exactly what she --
4   he said?
5       A   Again, I told you that I don't have the
6   complaint in front of me, but he has -- he -- he said
7   that -- that -- he said several things.  He said that,
8   "Oh.  Donald Trump is a dog.  He's not sleeping with
9   Melania.  Laura's his type."  And "Oh.  We did a
10  segment on the show, 'Who's Trump Fucking?'  Oh.  I
11  bet it's Laura Loomer."
12      Q   You think those are the exact words he used?
13      A   Again, you can pull up the complaint.  I
14  mean, I've -- I --
15      Q   Well, you've asked for $150 million in
16  damages.  I would think you'd be able to remember what
17  he said.
18      A   Well --
19              MR. KLAYMAN:  Actually, over 150
20  million.
21              THE WITNESS:  I want to be precise, and
22  I know what he said.  But I'm asking you to show the
0425
1   document just so that -- 'cause we're under oath.  And
2   so if you're under oath, and you get one little word
3   wrong, then you could say you're going to try to
4   falsely accuse me of lying under oath.
5               So no.  It's a dirty trick; right?  I'm
6   not new to this.  So I know that that's what will be
7   used against me -- one little word that's wrong,
8   like an --
9   BY MS. BOLGER:
10      Q   I just think it's amazing that you can't
11  remember what you think damaged you $150 million.
12  Let's --
13              MR. KLAYMAN:  She didn't testify to
14  that.
15              THE WITNESS:  I just said --
16              MS. BOLGER:  Let's mark this as
17  Exhibit --
18              THE WITNESS:  I just said he -- he --
19              MR. KLAYMAN:  She didn't testify.  You
20  know that --

21          THE WITNESS:  He accused me of fucking
22     Donald Trump.  He accused me.  I'm just trying to
0426
1     be --
2          THE REPORTER:  One at a time on the
3     record, please.
4          THE WITNESS:  I'm trying to be accurate
5     because we're under oath here.
6          MR. KLAYMAN:  Your editorial --
7          THE WITNESS:  You should care about
8     being under oath.  It's precise.
9          MR. KLAYMAN:  Please avoid your --
10         MS. BOLGER:  Can I ask you to mark this
11    as Exhibit 41, please?
12         MR. KLAYMAN:  Please avoid your
13    editorial comments, Ms. Bolger.
14         THE WITNESS:  Trying to be accurate.
15         MS. BOLGER:  Can you mark this as
16    Exhibit 41?
17         THE WITNESS:  I want to get the exact
18    quote.
19    BY MS. BOLGER:
20       Q   Okay.  Exhibit 41 is a tweet from you; can
21    you read that?
22    //
0427
1          (Exhibit 41 was marked for
2          identification.)
3       A   "I should sue Bill Maher for defamation.
4     This is beyond the pale, and it's complete -- it's a
5     complete and blatant lie.  I've never in my life seen
6     such a coordinated attack by the mainstream media at
7     the White House and leftist personalities to target a
8     private citizen and investigative journalist simply
9     because I flew on a plane and I support Donald Trump.
10         "This is unacceptable, and it's a full-blown
11    lie and incredibly disrespectful to President Trump
12    and First Lady Melania Trump.  It's very obvious some
13    type of memo went out because the reaction to what I
14    said is completely overblown, and it's a full-blown
15    character assassination campaign.  This is a
16    full-blown lie from Bill Maher.  And he is maliciously
17    and deliberately defaming me."
18       Q   Okay.  And you wrote that right?
19       A   Yes.
20       Q   Okay.  And you're retweeting something from
21    someone named The Vigilant Fox; do you know The
22    Vigilant Fox?
0428
1       A   No.  But it's a clip.  So like post -- if
2     you play the clip, it's the clip.  So it doesn't
3     really matter if I know them or not because the
4     reality is -- is that's the exact clip of Bill Maher's
5     words --

6    Q    Yeah.  I'm not criticizing you.  I just
7  wondered if you knew who The Vigilant Fox was.
8    A    No.  I know.  I don't know -- I don't know
9  who they are.
10    Q    Okay.  It says -- you say in -- "I've never
11  in my life seen such a coordinated attack by the
12  mainstream media of the White House and leftist
13  personalities to target you"; what was the
14  "coordinated attack"?
15    A    Well, you know, first, there was all this
16  news coverage about me flying on the plane.  And then
17  when they realized that a lot of people were actually
18  very happy to see that I was on the plane; and when
19  they saw that President Trump performed very well
20  during the debate, and he made comments about Haitians
21  eating people's pets, and that it made him go up in
22  the polls and quickly became the number one trend on
0429
1  TikTok; and polling in the aftermath of the debate
2  showed that he did very well by making immigration the
3  number one issue, the attacks started to become more
4  obscene; right?
5        And so you saw Bill Maher make his claims
6  that -- that I'm fucking Donald Trump.  And then, you
7  know, people trying to insinuate, "Oh.  Well, why was
8  she on the plane?"  Like, why -- it's not the first
9  time a journalist has been on the plane.
10        There are many instances of -- in fact, I've
11  been on the plane when there's been other reporters
12  there.  And there's been many instances where other
13  members of the media have gone on the plane, and they
14  know this.
15        But they deliberately try to make it a
16  scandal because they want to try to ruin my life.
17  They want to try to ruin my reputation.  And the coup
18  de grace to all of this -- because when you -- when
19  you can't destroy a woman based off of, you know, her
20  own words; and you can't destroy a woman because she
21  actually is appealing; or you know, she has talent,
22  like I do, in terms of exposing all this lawfare,
0430
1  which caught President Trump's attention, they go with
2  the cheap shots of saying that they're having sex with
3  the president.
4        And so that's what they -- that's what Bill
5  Maher did.  And then I noticed that the vitriol just
6  like jumped a few notches after Bill Maher made these
7  claims.  And for three weeks straight, it was just
8  nonstop harassment.  Literally, nonstop harassment.
9        I just -- I've never seen so much energy
10  directed towards a private citizen before -- a private
11  individual where you have nonstop -- and I'm not --
12  I'm not exaggerating.  Every single show on every news
13  network, which just like nonstop coverage about Laura

14  Loomer, Laura Loomer, Donald Trump, Laura Loomer,
15  Donald Trump for three weeks straight. It's just --
16      Q   Who are the "they" you're referring to?
17  You've said several times that "they coordinated
18  attacks," or "they did this"; who are the "they" in
19  that?
20      A   Well, it's like the -- the media; right?
21  You have CNN, MSNBC. You have HBO, Bill Maher. You
22  have -- I think it was even, like, the official
0431
1   campaign account for Kamala Harris and Joe Biden made
2   nasty comments about me. It was very coordinated.
3   And -- and according to us --
4       Q   Who was coordinating it?
5       A   It was -- it was coordinated in their
6   messaging. It was all the same stuff. And all of
7   this should show you -- this is not normal, for all of
8   these people to have the same headlines. Like, it --
9   it's just blatant character assassination.
10          Conspiracy theorist, 9/11 conspiracy -- I've
11  never denied 9/11. I wrote a book. I wrote a book
12  that was published in 2021. And I have an entire
13  chapter in my book about 9/11. And I've -- I've never
14  said 9/11 was an inside job.
15          I just don't know where this is coming from.
16  It's like it was planted. They even talked about it
17  in the White House press briefing room. It was just
18  unbelievable. And then Bill Maher --
19      Q   Can I just --
20      A   -- compounded this by doing an additional
21  episode on the 20th of September where he continued to
22  perpetuate lies about me --
0432
1       Q   So the next --
2       A   -- including saying that I don't like brown
3   people.
4       Q   In the third, fourth, fifth paragraph, it
5   says, "it's very obvious some type of memo went out
6   because the reaction to what I said is completely
7   overblown, and it's a full-blown character
8   assassination campaign"; do you see that?
9       A   Yeah.
10      Q   Okay. What do you mean by the -- are you
11  saying, literally, a type of memo?
12      A   Like a -- like a coordinated messaging.
13  Like, "Oh. Let's just keep on attacking." 'Cause it
14  just -- you know, with the producers for all these
15  news stations, it's very obvious that some kind of a
16  memo was circulated or some kind of a talking point.
17  And maybe that was with Bill Maher and his producers
18  too.
19          'Cause obviously, there was -- there was a
20  memo with messaging that went around, because he had
21  that entire segment, "24 Things" -- I think it was

22  called like "24 Things You May Not Know About Laura

0433
1  Loomer."  And so somebody must have had to have
2  circulated like a -- like a fake fact sheet about me
3  because he did an entire segment where -- these
4  talking points.
5       And I noticed there was a similarity in what
6  he was saying to what a lot of these mainstream media
7  people were saying -- trying to say that I don't like
8  brown people, calling me a 9/11 conspiracy theorist,
9  insinuating that I'm having an affair.
10      And those remarks were reiterated by Mika
11  and Joe on Morning Joe.  And then, you know, it's
12  just -- it's just very strange to me how this all came
13  about.  Because I'm not a 9/11 conspiracy theorist.
14  And the things that he said about me in this -- in
15  this clip were completely made up.
16       But coincidentally, they happened to be a
17  lot of the same things that -- aside from the part
18  about me sleeping with President Trump, of
19  course -- that were repeated in all these different
20  articles that you showed me.  And they know it's not
21  true.  They just -- they know it's not true --
22       MR. KLAYMAN:  We've been going 45

0434
1  minutes --
2       MS. BOLGER:  Okay.  Can we take --
3  yeah.
4       MR. KLAYMAN:  We're taking a
5  five-minute break.
6       MS. BOLGER:  That's fine with you;
7  that's fine with me.  I was actually going to ask for
8  one.
9       THE VIDEOGRAPHER:  Off the record at
10  5:26.
11       (Off the record.)
12       THE VIDEOGRAPHER:  Back on the record
13  at 5:41.
14  BY MS. BOLGER:
15    Q   Ms. Loomer, you have a -- I guess I'm
16  struggling for the right way to call it -- a live
17  stream called Loomer Unleashed?
18    A   It's a show.
19    Q   Okay.  It's a show; is it live streamed?
20    A   Yes.  It is on Rumble.
21    Q   Okay.  And then you leave it up on Rumble?
22    A   Mm-hmm.

0435
1    Q   Okay.  And so do you use the word,
2  "episode," to refer to one live stream?  Like, one --
3    A   Do I what?
4    Q   Do you use the word, "episode," to refer --
5    A   Yeah.
6    Q   Okay.  So you did an episode of Loomer

7    Unleashed about -- on September 14th; right?
8        A    I would think so.  I mean, I'd have to see
9    the date that it aired.  The day that it airs is the
10   day that it's aired 'cause it's live.  So if it says
11   September 14th, then it's September 14th.
12       Q    Lexie just sent me a Post-it note that has
13   this --
14       A    I think it was like the Saturday after
15   everything had gone down, so I believe that would be
16   the Saturday; right?  Right after?  Is September 13th
17   the Friday?
18       Q    It was -- yes.
19       A    Yeah.  So then the Saturday, 'cause I did
20   the show on a Saturday.
21       Q    Okay.  And it's episode -- Lexie just told
22   me it's episode 75; does that sound possible?
0436
1        A    Okay.  Probably.  I mean, that's what it
2    says that it is.
3        Q    Where do you film the Loomer Unleashed; in
4    an office?
5        A    The studio.
6        Q    Okay.  In Florida?
7        A    Yeah.
8        Q    Okay.  Is that your, like, usual spot where
9    you do this?
10       A    Mm-hmm.
11       Q    Okay.  And the staff you have working with
12   you -- I'm sorry.  You mentioned earlier, there's a
13   guy who helps you with the clips; right?
14       A    Mm-hmm.
15       Q    Okay.  And is he with you?
16       A    Sometimes.  But it's set up so that it can
17   be remote as well.
18       Q    Okay.  Great --
19       A    They have other clients and so, like, it's
20   sometimes remote.
21       Q    Okay.  Great --
22       A    He was with me the day that this was done.
0437
1            THE VIDEOGRAPHER:  Just watch your arm
2    against your mic.
3            THE WITNESS:  Oh.  Sorry.
4            He was with me the day that this one
5    was done, I believe, to help me get it set up.  Yeah.
6    BY MS. BOLGER:
7        Q    Okay.  Great.  All right.  So we're going to
8    play a couple clips of this, if that's okay with you.
9            (Exhibit 42 was marked for
10           identification.)
11       A    Fine.  Go ahead.
12       Q    You'll see -- well, just -- sorry.
13           MS. BOLGER:  Will you pause it one
14   second?

15    BY MS. BOLGER:
16        Q   The name of the episode is "Media on Warpath
17    to Destroy Laura Loomer"; right?
18        A   I guess if that's my Rumble channel; is that
19    from my Rumble channel?
20        Q   It is.  Yes.
21        A   Yeah.
22        Q   Okay.  Do you type that in?  Like, do you
0438
1     write that?
2         A   My producer types in the titles.
3         Q   But you write the -- like, you write the
4     words, and he types them in?
5         A   Not necessarily.  My producer is the one
6     that types it in.
7         Q   Okay.  All right.  So let's watch --
8         A   He's the one that comes up with the, like
9     the frames --
10        Q   The chyrons?
11        A   The chyrons.  Yes.
12            MS. BOLGER:  Okay.  Go ahead.
13            (Video played.)
14            THE WITNESS:  They're called "lower
15    thirds" for --
16            MS. BOLGER:  Okay.  Great.
17    BY MS. BOLGER:
18        Q   Those clips that you were just showing,
19    before the break, we were talking about your tweet
20    about that you should sue Bill Maher, which is right
21    in front of you.
22            And I'm sorry.  I don't know the Exhibit
0439
1     number; can you tell me what it is?
2         A   41.
3         Q   Okay.  You had said that there -- you
4     believe there was a campaign of some sort of scenario.
5     And in this clip, you're talking about that same
6     campaign; is that correct?
7             MR. KLAYMAN:  Are you giving us a
8     number of this exhibit?
9             MS. BOLGER:  Oh.  Yes.  I am.  Sure.
10    It can be -- we'll use Exhibit 42.
11    BY MS. BOLGER:
12        Q   Is that correct?
13        A   Please repeat the question.
14        Q   Sure.  In that tweet in front of you, you
15    talk about your belief that there was a coordinated
16    attack.
17        A   Yep.
18        Q   And in this video, you're showing some
19    articles.  And I'm asking you, is that the same idea
20    of the coordinated attack that you're referencing in
21    the tweet?
22        A   Yeah.  If I recall correctly, during this

0440
1   episode, I was talking about all the -- like, a lot of
2   the different media articles about me as it related to
3   me going to the 9/11 Memorial.  But this segment was
4   specifically focused on them calling me a 9/11
5   conspiracy theorist, which is what Bill Maher also
6   said about me --
7        Q   Okay.  So what --
8        A   -- 'cause you know, I was -- I was showing
9   the evidence in the -- if you watch the rest of the
10  clip, that I had a controversy when I was in college
11  for speaking out about Islamic terrorism, specifically
12  talking about 9/11, in which I condemned the
13  university for having a speaker/chanter, Allahu Akbar,
14  on 9/11, which I said was disrespectful to the
15  victims, precisely because 9/11 was an Islamic
16  terrorist attack.
17          And so it was just kind of crazy to me that
18  they would accuse me of being a conspiracy theorist
19  because in my book -- and it's really just kind of
20  been a whole part of my, like, career in general --
21  you know, they say, "Oh.  She's anti-Muslim."  Well, I
22  don't hate Muslim people, but I've been critical of
0441
1   Islamic terrorism, specifically 9/11.  So --
2        Q   Okay.  So just let's focus on what -- the
3   question; okay?
4        A   Yeah.
5        Q   So let's move to 01:04:44.
6            (Video played.)
7   BY MS. BOLGER:
8        Q   Okay.  What is the "they" -- you say, "that
9   is why they hate me.  They ran this campaign"; who's
10  the "they"?
11       A   Well, the media.  I said in the -- in the
12  section there, "Media is on a Warpath," I'm talking
13  about the media or the -- I believe Bill Maher's also
14  included in this too.  Just all the people that were
15  on this warpath because it was just -- it's quite
16  unprecedented.
17          I mean, I don't know how familiar you are
18  with the price of media slots, especially a month and
19  a half out from the presidential election, but it's
20  millions of dollars, like, in terms of airtime.
21          And when you calculate the amount of money,
22  when you look at the amount of airtime that was
0442
1   dedicated on the late night shows, and mainstream
2   media, and publications, talking about me,
3   specifically, it's literally a hundred million
4   dollars.
5            Like, if you were to calculate the amount.
6   So it could be considered an in-kind contribution to
7   the Kamala Harris presidential campaign, or you know,

2045

8    a hundred million dollars of in-kind contributions in
9    anti-Trump coverage using me as a vehicle to attack
10    President Trump.
11        Q    Can I ask you a question, though?
12        A    Yeah.
13        Q    I don't quite understand -- this is a -- I
14    don't quite understand what you mean by, "paying for
15    television slots." Do you mean -- and I'm -- this is
16    a genuine question, so let me finish, please.
17            Do you mean the contents of what you see on,
18    for example, a news program in the evening? Or do you
19    mean advertisements placed? I don't understand what
20    you are articulating as --
21        A    If you were -- if you were to take the
22    amount of time that they spent talking about me, which
0443
1    was hours. Like, if you look at all the different
2    shows, and all the different networks, and you add it
3    all up, and you were to make those into advertising
4    slots, in terms of like the time that you would --
5        Q    I understand.
6        A    -- you run an ad -- if you -- and you broke
7    it down because -- and you can talk to any expert
8    about this too in TV ad placement -- the amount of
9    airtime, especially as you get close to a presidential
10    election season, it, like, quadruples the cost of the
11    slot. And so if you were to calculate that in terms
12    of advertisements; right?
13            Like, let's say it's anti-Trump ads, or you
14    know, pro-Kamala Harris ads, it would be the
15    equivalent of about a hundred million dollars of ad
16    money; right?
17        Q    Okay. I understand.
18        A    Like, advertisement money. And they --
19    that's why a lot of this -- that's why a lot of these
20    news networks are now being sued by President Trump
21    too; I'm sure you've seen in the -- in the media.
22            Because whether it's like the interviews
0444
1    that were -- that were edited in certain ways to cover
2    up flubs by Kamala Harris, or it was dishonest
3    coverage, the president and his legal team, I believe,
4    have argued that this was like an in-kind contribution
5    in a sense to Kamala Harris and the Democrat party.
6    And so --
7        Q    Okay. I understand what you mean. Thank
8    you very much.
9        A    That's what I'm talking about when I say "a
10    hundred million dollars."
11        Q    Great. Great. Okay. That's helpful.
12        A    And I just -- to clarify too -- I remember
13    having a conversation with Chris LaCivita around the
14    time, like, when I told you I had that conversation.
15    I was like, "Oh, my God. It's crazy." And Chris

16    LaCivita knows because he has been in campaigns for a
17    long time.  He is President Trump's campaign manager.
18          I even mentioned -- I said, "This has got to
19    be probably, like, a hundred million dollars' worth of
20    coverage that they've dedicated to just trying to
21    attack me."  And he didn't challenge my assertion that
22    it would -- it was about a hundred million dollars
0445
1    when I had a phone conversation with him.
2          MS. BOLGER:  And then 01:17.  Go ahead.
3          (Video played.)
4          MR. KLAYMAN:  Can you raise the volume,
5    please?
6          MS. BOLGER:  That's as high as it goes.
7    BY MS. BOLGER:
8    Q    Okay.  So that -- you were -- that's
9    referencing, again, some of the articles I fetched.
10    We looked at the Semafor article.
11    A    Yeah.
12    Q    Some of the articles we looked at earlier,
13    you're talking about the fact that this coverage is
14    crazy?
15    A    Yeah.  It was just -- it was just -- it was
16    nonstop.  And as I said before, this was on the 14th
17    and so that was the day after the episode aired, and
18    it became increasingly -- I was thinking that, "Oh.
19    You know, it's going to die down.  It's been two days.
20    They're going to let this go.  And you know, there's
21    more important things to talk about.  The election's
22    coming up.  There's other things to talk about aside
0446
1    from Laura Loomer."
2          But I'm not kidding.  Like, when it -- when
3    Bill Maher made his comments, the -- the media
4    coverage throughout the weekend, it was like on
5    steroids.
6    Q    Well, we looked at that Semafor article.
7    That wasn't before his comment; right?
8    A    No.  But I'm -- I'm talking about the
9    coverage.  It continued all throughout the weekend.
10    Like, I remember sitting on my couch with my boyfriend
11    when -- when it was the weekend.  It was Saturday.
12          And we were just sitting there, and we
13    turned the news on.  And we had the TV on in my room.
14    We had the TV on in my living room, and another stream
15    on the DIRECTV live stream on my computer.  And I'm
16    not joking when I say like every Sunday morning show,
17    every weekend show had -- was leading with and ending
18    with commentary about me.
19          And it just was nonstop.  And I think that a
20    lot of the -- a lot of this coverage was inflamed by
21    Bill Maher's remarks because it just added to the
22    salacious nature of it.  And --
0447

1    MS. BOLGER:  I'm going to call again
2    for the production of any article, tweet, publication,
3    video, television show that discusses what Bill Maher
4    said without discussing your response.
5        So I'll call again for that production,
6    which I think would have been responsive to the
7    document request, but I'll just make that for the
8    record.
9        Let's look at the next clip.
10       THE WITNESS:  Can you start it over
11   from the beginning, please?
12       MS. BOLGER:  We're getting to the
13   point --
14       THE WITNESS:  It's really hard to hear
15   too, by the way.
16       (Video played.)
17       MS. BOLGER:  Oh.  I'm sorry.  I should
18   never be allowed near devices.  I'm very sorry.  I
19   didn't mean to stop it.
20       MR. KLAYMAN:  Yeah.  I have to continue
21   this objection on relevancy.  This has nothing to do
22   with anything other than you're trying to --
0448
1    MS. BOLGER:  Okay.  Can we just play
2    the clip, please?
3        THE WITNESS:  Is there a way -- I'm
4    sorry to interrupt, but is there a way to just make it
5    a little louder?  It's just so quiet.  It's really
6    hard to hear.
7        MS. BOLGER:  Not really.  We can take
8    it --
9        THE WITNESS:  Okay.
10       MS. BOLGER:  Keep going.
11       (Video played.)
12   BY MS. BOLGER:
13   Q    Okay.  Do you believe that Marjorie Taylor
14   Greene planted the statement in the Bill Maher show,
15   which is what you seem to say there?
16       MR. KLAYMAN:  Objection.  Relevancy.
17       THE WITNESS:  What I'm saying is
18   that -- and I'll clarify.  Bill Maher made this claim.
19   He's the one that said that I was having an affair.
20   And when this happened, there's an individual who
21   worked with Marjorie Taylor Greene.  It was
22   well-documented.  He's a foreigner.  His name is Milo
0449
1    Yiannopoulos.
2        And he -- he's an agitator, and he was
3    her intern.  He was also living with her.  And he
4    ghostwrote her book.  And when he saw this story from
5    Bill Maher, and when he saw people like the claims
6    made by Bill Maher, he started lying and making up
7    stories and saying things like, "Oh" -- I think there
8    was one post where he said, "Oh.  Laura told a mutual

9    friend of ours that she blew President Trump."
10            And so they were exploiting -- people
11   who didn't like me were exploiting this rumor and this
12   claim posted and published by Bill Maher about me
13   having an affair with President Trump to further
14   inflame the situation and to falsely accuse me of
15   things; right?  It all started with Bill Maher.  So
16   the --
17   BY MS. BOLGER:
18       Q   In that clip, you definitely say, "she
19   planted it with Bill Maher."  That's definitely what
20   you say; are you saying that's not what you meant?
21       A   No.  I'm saying that she -- perhaps
22   I -- perhaps I misspoke.  But Marjorie Taylor Greene
0450
1    was one of the people who originally planted hit
2    pieces about me, like the first time that President
3    Trump wanted to hire me.  And that was well-
4    documented.
5            She came out, and she attacked me viciously
6    when the New York Times story came out.  And it was
7    very weird because the story was published.  And
8    within about like 45 seconds to the point where the
9    New York Times published their report, Marjorie had
10   already had like an entire long tweet drafted talking
11   about how -- about the story.
12           And it's like, you can't read a report that
13   long unless you had advanced knowledge about it.  And
14   I was later alerted to the fact that Marjorie had a
15   role in spreading this New York Times hit piece about
16   me after it was reported by the New York Times I would
17   not be working with President Trump.
18       Q   Okay.  Got it.
19       A   And so I -- that's what I meant when I was
20   talking about planting stories about me.
21       Q   I got it.  Okay.
22       A   And that's documented in tweets too.  Like,
0451
1    she -- you know, she posted a tweet --
2        Q   I get it.  That's not -- we don't need that
3    for this.
4        A   Yeah.  I think I -- I think I misspoke in
5    that sense when I meant to say, "planted the story
6    about me."
7        Q   I have to say I was rather surprised at the
8    idea of Marjorie Taylor Greene planting something on
9    Bill Maher, which is why I stopped it.  It seemed a
10   bit surprising.  So --
11       A   I was talking about the New York Times
12   piece, but I was saying that she has a guy who worked
13   for her named Milo, who he -- he posted a tweet, and
14   it was like, "Oh.  Laura's telling mutual friends of
15   ours that she gave President Trump the best blowjob of
16   his life."

17          And you know, Milo is very resentful of me
18  because he was never able to recover his life after he
19  got deplatformed.  And you know, he was fired from
20  Breitbart for making comments that were, you know,
21  described as being pro-pedophile.
22          And Marjorie took him in, and that she was
0452
1  working with him, and you know, is believed that she
2  was paying him under the table.  And she gave him
3  control of her Twitter account --
4      Q   I totally get it, Ms. Loomer --
5      A   -- and that's all I'm trying say.  Yeah.
6      Q   -- and I don't really want to cut you off,
7  but it just doesn't really -- it's not that -- I just
8  wanted to understand that sentence you mean.  So let's
9  do --
10      A   But that's what I was talking about in -- in
11  terms of Marjorie Taylor Greene.  It's like she
12  allowed her intern to control her X account --
13      Q   Okay.  We get it, Ms. Loomer.
14      A   Okay.
15      Q   Okay.  Let's move on to the next thing.
16      A   Yeah.
17          (Video played.)
18          MS. BOLGER:  Let me back it up a little
19  bit.  Okay.  This is the tweet that we referred to
20  earlier.
21          THE WITNESS:  Okay.  The curry tweet.
22  Yeah.
0453
1          (Video played.)
2  BY MS. BOLGER:
3      Q   So you were making a joke about the curry;
4  right?
5      A   Well, I was making a comment about the fact
6  that she was buying curry spice at that anti-Trump
7  spice shop, and then making these videos where she was
8  talking about how she loves to cook Indian food.
9      Q   Right.  You said, "it was a joke, and it was
10  also a half-truth"; right?
11      A   Well, yeah.  Because --
12      Q   We can go back and replay it.
13      A   -- Indian curry has a very -- and I like
14  curry.
15      Q   Ms. Loomer, the question is, you said in the
16  video, "it was a joke, and it was a half-truth";
17  right?
18          MR. KLAYMAN:  Objection.  Relevancy.
19          THE WITNESS:  And I don't really see
20  how this pertains to Bill Maher accusing me --
21  BY MS. BOLGER:
22      Q   Just answer the question; did you say it or
0454
1  not?

2    A    Well, I said what I said in the video.  Yes.

3    Q    Great.  Terrific.

4    A    I said it, but -- I said it in the video.

5    Q    That also explains -- doesn't it -- why I
6    couldn't show you the curry tweet when you guys were
7    screaming at me earlier?  Because it was taken down;
8    right?

9    A    It was removed.

10    Q    Right.

11    A    I didn't delete it, but it was removed.  But
12    that's what happens --

13    Q    Right.  So that explains why I couldn't show
14    it to you earlier; right?

15    A    But like I -- well, it was printed.  I mean,
16    you had -- it was -- well, it was printed because
17    there was the -- there was a million screenshots of
18    the tweet because the media had shown the tweet, and
19    they were talking about it nonstop trying to pretend,
20    like, I said the N-word or something.  And the reality
21    is -- is that Twitter deleted the -- the tweet, but
22    there was still screenshots of it; so --

0455

1    Q    Okay.  So you said at some point, that you
2    believe that Mr. Maher went to the White House -- I
3    haven't quite ever understood the argument -- to
4    somehow blunt the force of his deposition; is that a
5    fair characterization of what you said?

6    A    Yeah.  It's my understanding that he is
7    friends with Kid Rock, and Kid Rock started following
8    me on Twitter around this time.  And I know that Kid
9    Rock is a friend of President Trump's --

10    Q    Who told you --

11    A    And -- and I know that the way it was
12    described is that Bill Maher -- and I don't know that
13    it was, like, Kid Rock reaching out to Bill Maher, or
14    Bill Maher reaching out to Kid Rock.  But it was --
15    there was a discussion that took place about how Kid
16    Rock helped get Bill Maher this meeting with President
17    Trump at the White House because President Trump loves
18    Kid Rock.

19        And then he, you know, was describing it as
20    like a "unity dinner."  I don't know what that means
21    because just three days after his dinner with
22    President Trump, he was back to speaking badly about

0456

1    President Trump on his show and calling him crazy.  I
2    mean, he's since made a lot of derogatory comments
3    after he had dinner with the president.

4        So I just found the timing to be strange
5    because, I mean, the story about my lawsuit against
6    Bill Maher was publicized.  It was publicized on my X
7    account.  I tweeted about how I was going to be having
8    a deposition in Beverly Hills.

9        And I found it to be rather strange that

10    within like a week or two of -- and I don't remember
11    the exact date -- I know the deposition was on
12    April 4th -- but I know that Steve Bannon was in town
13    in Beverly Hills the same time I was in town because
14    there was an event there at the same time.
15          And we both ended up attending the event in
16    Beverly Hills.  And the next day, he was on Bill
17    Maher's show.  And I didn't even know that Steve was
18    going to be at this event, but then I knew that he was
19    going to be on Bill Maher's show.  And I was like,
20    "Oh.  You know, I'm suing Bill Maher; don't you?"
21          I texted him.  I said -- I was like, "Do you
22    know I'm suing Bill Maher?"  He's like, "Oh.  I didn't

0457
1    know."  And so I just found it to be really strange
2    that he wanted to have like a MAGA voice on his show
3    literally the day after the deposition.  And then the
4    meeting with President Trump was about a week before
5    the deposition.
6       Q    So what -- you said you --
7       A    It's a strange timing.
8       Q    -- you had said you had a source -- or I'm
9    sorry.  What is your basis for thinking that Bill
10    Maher asked Kid Rock to introduce --
11       A    He said it.  He said it himself on a show.
12    He -- or on -- there was like discussion about -- I
13    believe it was either Kid Rock or Bill Maher.  They --
14    or maybe it was President Trump when he was asked
15    about it -- said that -- that Kid Rock was the one
16    that facilitated this.
17       Q    Right.  That's not my question.  My question
18    was, what is your basis for saying that Bill Maher
19    asked Kid Rock to facilitate the discussion?
20       A    Well, he said that when he was -- when he
21    did the -- the episode with Steve Bannon, and he was
22    talking about it, he said he had a conversation with

0458
1    Kid Rock about having dinner.
2       Q    That's not the same thing as Bill Maher
3    approaching Kid Rock, which I thought you -- I
4    understood you to be saying that you believed --
5       A    No.  What I'm saying --
6       Q    -- Bill Maher -- let me just finish, please.
7       A    No.  What I'm -- what I'm trying to say is
8    that I don't know who approached who, but it was
9    either Kid Rock approached Bill Maher, or Bill Maher
10    approached Kid Rock.  That's how I am told that this
11    dinner came about.
12       Q    Okay.  And how -- by whom?
13       A    Well, it was well-publicized in the episode
14    and the aftermath of his meeting -- the one that he
15    had with Steve Bannon where he did the debrief talking
16    about his dinner with Trump.  And then I believe
17    President Trump was also asked about it.

18      And I think he said, "Oh.  Well, you know,
19  Kid Rock came to me, and" -- I don't want to misspeak
20  for the president.  But there was a report or a
21  question about it, either at the Oval Office or a
22  Truth Social post in which it was referenced that Kid
0459
1  Rock had asked or had talked to the president about
2  having dinner with Bill Maher.
3          MS. BOLGER:  Okay.  I'm going to ask
4  the court reporter to mark as Exhibit --
5          UNIDENTIFIED SPEAKER:  43.
6          MS. BOLGER:  Really?  43.  A Truth post
7  from President Trump.
8          Oh.  I'm sorry.  154.
9          (Exhibit 43 was marked for
10          identification.)
11          MR. KLAYMAN:  Can I have a copy?
12          MS. BOLGER:  Well, when I find them.
13          Can you pass that?  Actually, use this
14  one.  Sorry.  This is mine.
15          MR. KLAYMAN:  So 42 is the video?
16          MS. BOLGER:  Yes.
17          THE WITNESS:  Thank you.
18  BY MS. BOLGER:
19     Q   This is a -- a Truth from Donald Trump.  It
20  says "I got a call from a very good guy and a friend
21  of mine, Kid Rock, asking me whether or not it would
22  be possible for me to meet in the White House with
0460
1  Bill Maher, a man who has been unjustifiably critical
2  of anything or anyone Trump.
3          "I really don't like the idea much, and I
4  don't like it much now, but I thought it would be
5  interesting."  And then it goes on from here; is this
6  the post you were thinking about?
7     A   Yeah.  This is the post I was -- I was
8  referring.  I'm glad you have it here 'cause, again, I
9  didn't recall if it was Bill Maher asking Kid Rock, or
10  Kid Rock asking Bill Maher.
11          But I know that there was either a press
12  briefing or Truth Social, and this is the post I was
13  referencing --
14     Q   And have you --
15     A    -- and everything I just said was true.
16     Q   So have you spoken to President Trump about
17  his meeting with Mr. Maher?
18     A   No.  I have not.
19     Q   Have you asked him about it?
20     A   No.  I did not.
21     Q   Will you?
22     A   Will I?
0461
1     Q   Mm-hmm.
2     A   Probably not.

3     Q    Why not?
4     A    I mean, I don't -- despite -- despite what
5   the media says, I don't -- you know, the president
6   will sometimes ask me my opinion on things; right?
7   Like, he asked me the other day about Jared Isaacman
8   and the nomination.
9          But it's not like I'm going to bother the
10   president of the United States with legal drama.  I'm
11   sure he is going to see it -- see it in the news.  But
12   I have not had a conversation with President Trump
13   about this.  And I think it would be inappropriate to
14   bother the busiest man in the world with questions
15   about who he is having dinner with.
16          I mean, I don't like what Bill Maher said.
17   It's defamatory.  It's wrong.  But the president of
18   the United States can have dinner with whoever he
19   wants to have dinner with.  I'm not -- like, who am I
20   to tell Donald Trump?
21          What am I going to do?  Say, "Oh.  You can't
22   have dinner with Bill Maher"?  If the president, I'm
0462
1   sure, is well-aware of the fact that Bill Maher -- I
2   mean, at least I hope he is -- aware of the fact -- I
3   can't speak for him -- that Bill Maher said what he
4   said.  But I cannot tell Donald Trump who he can talk
5   to and who he cannot talk to.
6     Q    So you said that after you got the call from
7   Chris LaCivita in the days after the September 13th
8   episode saying, essentially, you couldn't come back on
9   the plane -- is how I understood that call; is that
10   right?
11     A    Yeah.  Because I wanted to talk to Chris.
12   And one of the reasons I wanted to talk to him was
13   because Marjorie's intern, her staffer, was taking
14   these claims made by Bill Maher, and also, you know,
15   posting them.
16          And I said, you know, "This guy works for
17   Marjorie Taylor Greene.  This is really inappropriate.
18   These are not true claims.  And what Bill Maher said
19   is defamatory.  And what Milo is saying is defamatory.
20   And I think that there should be some intervention
21   here to -- to tell Marjorie that it's inappropriate
22   for her intern to be making these claims.
0463
1          "Because by accusing me of having sex with
2   President Trump, they're also accusing the president
3   of having or committing adultery, with Marjorie Taylor
4   Greene."  And Chris, in the conversation, agreed with
5   me, and said that it was inappropriate, and also told
6   me that because of the optics of it, I could not --
7   and because it was becoming a -- you know, a
8   discussion after what -- after Bill Maher's episode
9   aired -- and he specifically mentioned the episode --
10   that I could not come back on the plane for the rest

11  of the election.
12      Q   Okay.  Can I ask two questions?  One is, did
13  you call him, or did he call you?
14      A   He called me.
15      Q   Okay.  But then you brought up the Marjorie
16  Taylor Greene stuff?
17      A   Yeah.  I brought it up because I was very
18  embarrassed by all of this.  And you know, I went from
19  being on the plane and having conversations -- and I
20  had requested to have a conversation with Chris
21  because I wanted to talk to him about this.  Because I
22  didn't want him thinking that I was the one that was
0464
1   going around saying all this.
2       Q   So you asked to speak to Chris, and then he
3   called you; is that right?
4       A   Yes.  Yes.
5       Q   Okay.  And did you mention the plane or
6   did -- first, or did he mention the plane first?
7       A   I don't remember exactly like what the order
8   of conversation was, but I know that he brought up
9   the -- he brought up the fact that --
10      Q   Well, you had asked him about Milo posting
11  things about you --
12      A   Well, I had -- I had asked him -- I had
13  asked him about whether or not they could clamp down
14  on Marjorie Taylor Greene for having -- using her
15  staff as a vehicle to spread lies about me.  And you
16  know, she didn't do anything to -- to stop it.
17          And I'm like, you know, "This is all coming
18  from Bill Maher's episode and now, Marjorie's staff is
19  like exploiting this.  And you all -- you know this,
20  and you know that Bill Maher's a Trump-hater.  And you
21  know that Bill Maher, you know, spreads lies about
22  President Trump, and he's spreading lies about me."
0465
1           And you know, it wasn't a very pleasant
2   conversation.  It was very awkward.  I mean, I don't
3   want to have to have conversations about made-up
4   stories about me; right?  It's a -- it's a lie.
5       Q   So after --
6       A   And he said there was a discussion that
7   because of the nature of the accusations that were
8   made, I -- because the -- like, the media was just
9   having like a field day with it, and it was a
10  distraction -- is what it was.
11      Q   Okay.  So let's --
12      A   No.  It was a distraction.
13      Q   After that call with Chris LaCivita, did
14  your contacts -- setting aside the plane -- so let's
15  not talk about the plane -- did your contacts with
16  President Trump cease?
17      A   Yes.  It did.  For the rest of the election
18  until the day of the election.

19      Q    Okay.  What happened on the day of the
20    election?
21      A    I believe the president called me to thank
22    me for my support, and I wished him good luck in the
0466
1    election.  And it was -- as I was driving to Palm
2    Beach for the official election -- the election event.
3      Q    Okay.  And you saw him that evening, I
4    assume?
5      A    Well, I saw him at the convention center,
6    and I was promised that I would be able to go to the
7    Mar-a-Lago event.  This is why I was saying like about
8    the optics and everything.  It was very embarrassing
9    because the president had called me and said, "Thank
10    you for your support."
11          And I said, "Good luck, and you're going to
12    win.  You're going to be the next president."  And I
13    believe I called him the 47th president on the phone.
14    And he was like, "Well, it's not over" -- and I don't
15    want to get into all my conversations with President
16    Trump.  But it's like, "It's not over till it's over."
17    And I said, "Oh.  You're going to win.  Everyone knows
18    you're going to win.  It's going to be a great night."
19          And I was expecting to be able to get into
20    the official event 'cause I was promised by Susie
21    Wiles and also, Chris LaCivita, that I'd be allowed to
22    go inside the official event at Mar-a-Lago.  And so I
0467
1    was going -- I was driving to --
2      Q    When was that promise?
3      A    Like, during the campaign -- it was, like,
4    during the campaign that I would be able to attend the
5    official election night --
6      Q    How did that promise -- how was that promise
7    made?
8      A    Verbally.
9      Q    So they just said, "Yeah.  You'll be there.
10    We'll invite you"?
11      A    Yeah.  They said, "You'll be there, of
12    course."  Because obviously, a lot of people were
13    making plans for election night because they had an
14    official event at Mar-a-Lago -- like a very exclusive
15    event.
16          And I -- I was, you know, dressed up, and I
17    was on my way to Palm Beach.  And they're like, "Oh.
18    Yeah.  You're going to -- you're going to get like a
19    QR code with instructions."  And I never got the QR
20    code.  And I -- I believe that I was being iced out.
21          I was slowly being iced out because the --
22    the way people started to communicate with me after
0468
1    this -- you know, these accusations about me having
2    sex with President Trump came out in the media through
3    Bill Maher's show.

4      Q   So when did you get the -- when did they say
5   that you'd get the QR code?
6      A   They said that it would arrive on my phone
7   the day of the election.
8      Q   So when --
9      A   'Cause that's how Secret Service sends it
10   out.
11     Q   But when did --
12     A   It's from Secret Service.
13     Q   Sorry.  When did the -- right.  I understand
14   that they said you'd get it the day of the election,
15   but when did they tell you to -- there was a
16   conversation where someone said to you, "Hey.  You'll
17   get a QR code," or a text, or an email; when did that
18   happen?
19     A   Around the -- the time that I had this
20   conversation with Chris, because I was like, "Well, I
21   know I can't go on the plane, but can I go to the
22   election night event?  I mean, I worked extremely hard
0469
1   to help get President Trump elected."  And he said,
2   "Of course.  Of course, you'll be there.  Of course.
3   We all know that you worked extremely hard to help
4   Donald Trump get elected."
5      Q   Okay.  So you --
6      A   So I assumed that -- that I was going to be
7   able to go.  And I don't know if, you know -- I don't
8   know why I didn't get the QR code.  But I was given a
9   special guest pass at the official -- there were two
10   events.  There was the one at Mar-a-Lago, and then
11   they bussed everybody over to the convention center at
12   Palm Beach.
13          And I was at the official Palm Beach event,
14   and I had a pass that said, "Special guest"; right?
15   But I was expecting to go to both of the events.
16     Q   Okay.  What is -- after -- so after
17   election --
18     A   And I brought my boyfriend as my guest.
19     Q   So after election night, you continued to
20   have contact with President Trump; correct?
21     A   Not as much.  No.  But occasionally, like,
22   I -- he called me via his staff around Christmas.
0470
1      Q   Any particular reason?
2      A   He wanted my opinion on his pick for the
3   ambassador to Panama.
4      Q   Okay.
5      A   Because I had done some reporting in Panama,
6   and I went down to the Darien Gap.  And he asked me
7   what I thought about the guy that was in his office at
8   the time.  And again, I wasn't expecting it to be
9   President Trump because it was a -- I was trying to
10   get a job; right?
11          Like, I was told I was going to get a good

12    job. I was told that I was going to meet up work in
13    the White House. And so after the election when
14    everything had kind of cooled off, I thought, "Okay.
15    Well, obviously, it's a lie." I'm not having an
16    affair with -- with President Trump.
17          I would expect people to know this, aside,
18    like, the people who were around President Trump on
19    his campaign. 'Cause they were witnesses to
20    everything that went down. They know that I was never
21    in the room alone with President Trump; right?
22          'Cause you travel with the campaign team.
0471
1    And so I thought that now that the election was over,
2    and he had won, that things were going to go my way.
3          And so Sergio Gor, who is in charge of PPO,
4    who works for the president and is in charge of
5    personnel -- Trent, in that email that you have as the
6    one of the documents I turned over is his deputy.
7          And so the phone call was from Sergio, and I
8    was assuming it was Sergio. And he was like, "Oh.
9    I'm -- I'm sitting here with the -- with the
10    president. He wants to talk to you." And then, you
11    know, he asked me what I thought about the pick.
12          So I had that conversation with President
13    Trump. I believe it was like the day before
14    Christmas. I think it was Christmas Eve.
15    Q    Okay. Have you spoken to the president
16    other times since then?
17    A    Yeah. As I said earlier, I spoke to him
18    just a few days ago about Jared Isaacman.
19    Q    And you spoke to him about some NSA
20    staffers; right?
21    A    I was invited to the White House in -- I was
22    invited to the White House in March, and I had a
0472
1    meeting with Sergio. And then I was invited back to
2    the White House after I did some reporting on
3    Signalgate, and a couple of the staffers at NSC.
4          And the president saw my reporting, and he
5    wanted to have a private meeting with me. And so --
6    like, private with the staff. And so he invited me to
7    the Oval Office. And then I was -- I had an Oval
8    Office meeting with him on -- forgetting the date -- I
9    think it was, like, April. I don't remember the exact
10    date. I think it was in the beginning of April.
11          I need to check the date. I'm sorry. It
12    just has been a long day. I don't remember the exact
13    date, but I believe it was in April. And I had a
14    private meeting with him in his office with some of
15    his staff about the reporting.
16    Q    And other than the meetings we talked about,
17    have you had other meetings with President Trump since
18    September of 2024?
19    A    You mean, April?

20    Q    No.  I meant September 13, 2024.
21    A    No.
22    Q    Okay.  Do you think --
0473
1     A    I was at the White House yesterday, but I
2    didn't see Trump.  I was with JD Vance.
3     Q    And are you going to see Trump while you're
4    in DC this time?
5     A    No.  I am here for the deposition, and then
6    I have to go to a dinner meeting tonight, if I get out
7    on time, for my deposition at 8 p.m.  And then I have
8    to meet with my DC correspondent, and I'm going -- I'm
9    leaving -- I'm leaving DC on Friday.
10    Q    Do you think there are any other reasons
11    that you haven't been chosen for a position in the
12    White House other than the allegations in this
13    complaint?
14    A    I mean, there may be some compounding
15    factors, like perhaps there's some professional
16    jealousy.  But I do believe that the straw that broke
17    the -- the camel's back or the straw that, like, what
18    gave them ammunition, or you know what really, like --
19    what's the selling point was what Bill Maher said.
20        Because as I said before, everything was
21    fine.  I was told on a plane, "Oh.  Laura, you're
22    going to go to DC with me."  People clapped on the
0474
1    plane.  I was promised a position by Susie Wiles.  I
2    was promised a position by Sergio.  Promised a
3    position by President Trump.
4     Q    Have you spoken to Susie Wiles about whether
5    or not to have a position in the White House since
6    September, 2024?
7     A    I mean, I've -- I've had -- I've had a
8    couple phone calls with her.  I had a phone call in
9    the preparation for my meeting with President Trump
10    because she is the chief of staff, obviously, and
11    controls the president's schedule with the scheduler.
12        And so she goes, "Oh.  It's my understanding
13    that you're going to be meeting with the president.
14    I'll see you at the Oval Office."  And that was it.
15    But I mean, I've been wanting to have conversations,
16    but it just feels like, you know --
17    Q    Have you asked --
18    A    -- feels these conversations never really
19    progressed anywhere.  And you saw in the document
20    request that I'd never received a reply email from
21    Trent; right?
22    Q    Have you asked for a job at White House?
0475
1    A    Well, I applied for a job --
2    Q    Other than that?
3    A    That I was told I had a job.
4    Q    But have you asked --

5     A    Like I said --
6     Q    -- have you followed up -- since sending
7   that letter to Trent, have you followed up on whether
8   you had a job in the White House?
9     A    Yeah.  I've had -- I had conversations.
10   Like I said, I had a private meeting with Sergio in
11   March before my Oval Office meeting -- Sergio, who's
12   in charge of --
13     Q    Was that about a job?
14     A    Well, I had asked him.  I said, "So where's
15   the progress?  You know, am I going to, you know, have
16   a position or whatnot?"
17     Q    What'd he say?
18     A    Just kind of danced around it.  Didn't
19   really say much.
20     Q    What did he say that was dancing around it?
21     A    He just said, "Oh.  You know, like, we're
22   really busy right now.  We haven't really filled all
0476
1   the positions.  We're only at 20 percent.  We have a
2   lot to do.  We have to get all the president's cabinet
3   picks confirmed."
4         It wasn't really an answer, you know.  And I
5   don't really want to push too much because I don't
6   want to pester, and I know that they're busy.  But I
7   just feel like the whole dynamic changed after these
8   comments were made.  And it's uncomfortable; right?
9         Like I can understand, even though the
10   allegations are lies -- they're obvious lies.  And you
11   know, I swear to God in my own life, I've never had
12   any kind of romantic involvement with Donald Trump.
13         And I'm not saying that Melania Trump is
14   upset, or you know, that Melania Trump thinks that I
15   slept with her husband.  But I can understand, like,
16   the narrative that this creates in the media, or you
17   know, that kind of perception because they say
18   perception is reality; right?
19         And so it can -- it's embarrassing.  Like,
20   it was very embarrassing for me to have to have this
21   conversation with Chris LaCivita.  It's embarrassing
22   to even have to have this conversation now.  But I
0477
1   felt like to set the record straight, I -- I needed to
2   file a lawsuit because I can't live on for the rest of
3   my life with people wondering whether or not -- or
4   people believing that I had sex with President Trump.
5         And I don't want this to -- I don't want to
6   be, like, looking back when I'm 80 years old and be
7   like, you know, the reason why I wasn't able to work
8   for Donald Trump is because of these comments made by
9   Bill Maher.  Like --
10     Q    Right.  You just said that they were obvious
11   lies, and they are obvious lies; right?
12     A    They're lies.

13    Q    You still -- right.  And everybody who knows
14  you know that's a lie; right?
15    A    Well, the people who work for President
16  Trump know that it's a lie if they're honest people
17  because they were there, and they know that I've never
18  been in the room alone with Donald Trump.
19         They know that there's not any kind of like
20  romantic relationship.  I mean, there's always Secret
21  Service.  You literally cannot be alone with the
22  president of the United States.
0478
1         Even if I wanted to be alone in a room with
2  the president, Secret Service would never allow for
3  it.  There's -- you cannot be alone in the room with
4  the president of the United States.
5    Q    Okay.  And you also said that there were
6  compounding -- you said that you thought there were
7  "compounding factors" as to why you didn't get a job
8  in the White House.  And one of the "compounding
9  factors" you mentioned was jealousy; were there
10  others?
11    A    Well, that's what I'm talking about is the
12  jealousy.  I think that there's jealousy.  I think
13  that was obvious in the way that, you know, Marjorie
14  Taylor Greene came out attacking me in the aftermath
15  of the initial report in the New York Times when it
16  got leaked by the staff that I was going to be -- I
17  mean, clearly, it got leaked from someone who worked
18  with the president.
19         'Cause I don't understand how you have a
20  private meeting; right?  In the president's office
21  with Susie Wiles.  And then she told me -- she told
22  the staff that I would be joining the campaign, and
0479
1  then it gets leaked.  So obviously, whoever leaked it
2  did so because they don't like it; right?
3         I mean, like why would you want to try to --
4  I mean, I would assume; right?  I would assume that
5  you would want to run to the Trump-hating New York
6  Times, or Maggie Haberman who President Trump has been
7  very critical of, because you don't like me.  I get
8  it.  People don't -- some people don't like me.
9         MS. BOLGER:  I want to ask you for two
10  questions and get these tax returns authenticated,
11  which we're going to do.  But I'm going to reserve my
12  additional time because we will be moving to compel
13  you to produce additional documents.
14         I'm going to reserve some time to call
15  you back for that.  But in the meantime, we're going
16  to do the confidential portion of the deposition.
17         MR. KLAYMAN:  Yeah.  Let's go in a
18  separate video record in a separate transcription
19  record; okay?  Thank you.
20         THE VIDEOGRAPHER:  We'll go off the

21    record at 6:27.
22              (Off the record.)
0480
1               THE VIDEOGRAPHER:  Back on the record
2    at 6:29.
3               (Nonconfidential portion of transcript
4               ends.)
5    //
6    //
7    //
8    //
9    //
10   //
11   //
12   //
13   //
14   //
15   //
16   //
17   //
18   //
19   //
20   //
21   //
22   //
0481
1               (Confidential portion of transcript
2               begins.)
3               MS. BOLGER:  Great.
4    BY MS. BOLGER:
5        Q    Ms. Loomer, what is your email address?
6        A    laura@loomer.com.
7        Q    Okay.  And what is your telephone number?
8        A    (520) 870-9791.
9        Q    And is that the number you use to text
10   people?
11       A    Yes.  For this.
12       Q    Okay.  And you have another number you use
13   to text, or is that your only text?
14       A    That's my only number.  I mean, I had a
15   campaign phone when I ran for Congress, but I don't
16   use that line anymore.  I haven't used it in like two
17   years.
18       Q    Okay.  What is the name of your boyfriend?
19       A    I mean, this is all confidential; right?
20   This isn't going to be published?
21              MR. KLAYMAN:  It's confidential.
22              THE WITNESS:  So I can give the name of
0482
1    my boyfriend?
2               His name is Andrew Simpson.
3    BY MS. BOLGER:
4        Q    Okay.  Does he live here in Florida?  I'm
5    sorry.  Does he live in Florida?  We're not in

6   Florida.
7       A   He does live in Florida.
8           MS. BOLGER:  Okay.  And then I'm going
9   to ask the court reporter to mark as Exhibit --
10  whatever we're on.
11          THE REPORTER:  44.
12          (Exhibit 44 was marked for
13          identification.)
14  BY MS. BOLGER:
15      Q   Your tax returns.  I'm not going to ask any
16  questions.  I just want to mark them for the record.
17      A   Okay.
18          MS. BOLGER:  Do you want another copy,
19  Mr. Klayman?  Mr. Klayman?
20          MR. KLAYMAN:  Yes.  Thank you.  Say, I
21  want to know what you're using.
22          MS. BOLGER:  Okay.
0483
1   BY MS. BOLGER:
2       Q   Ms. Loomer, I just handed you a copy of what
3   has been produced to us.  And those are your tax
4   returns --
5           MR. KLAYMAN:  What exhibit is this; 44?
6   BY MS. BOLGER:
7       Q   -- for the year 2020 through 2023.
8       A   Okay.
9       Q   Can you take a look at them and tell me are
10  those, in fact, your accurate tax returns?
11      A   Yep.  These are my tax returns.
12      Q   Wait.  Have you filed your 2024 tax returns?
13      A   Not yet.
14          MS. BOLGER:  Okay.  We call for those
15  as well, as part of the continuing production.
16          THE WITNESS:  Well, I haven't filed
17  them.  They're not going to be available till October
18  'cause I have an extension.
19          MS. BOLGER:  I understand.  When you
20  file them in October, I'd like to see them in October.
21          THE WITNESS:  Okay.  That's fine.
22          MS. BOLGER:  Particularly, given
0484
1   your --
2           MR. KLAYMAN:  Well, we'll decide
3   whether that's appropriate or not.
4           MS. BOLGER:  Well, earlier in the
5   deposition, Ms. Loomer testified that when I got her
6   tax returns, I would see that she made less money in
7   2024.  That was actually what she testified to.
8           THE WITNESS:  No.  That's not what I
9   said.  I said that -- I said that you would see
10  that -- that you would see that $180,000, which is the
11  salary, is much more than I would have -- that I made
12  in 2020, 2021, 2022, and 2023.
13          MS. BOLGER:  Okay.  Well --

14          THE WITNESS:  I got my X account back
15  I was deplatformed in 2020, 2021, 2022.  And I got my
16  X account back at the end of 2022 in December.  And so
17  I was able to actually, like, start, you know,
18  promoting my journalism, which is my profession.
19          And so you'll notice that, you know,
20  I'll, you know, show more income.  But in terms of a
21  set salary of $180,000 compared to what I made in
22  2020, 2021, 2022, that's what I was referring to.
0485
1  BY MS. BOLGER:
2      Q   Right.  So you're saying you earned more in
3  2024 than 2020 to 2023?
4      A   I haven't completed my tax returns, but --
5          MR. KLAYMAN:  At this point, wait till
6  that occurs; okay?
7          MS. BOLGER:  No.
8  BY MS. BOLGER:
9      Q   It's that you can answer the question to the
10  best of your knowledge; so have you made more money in
11  2024 than you did in 2020 to 2023?
12     A   I mean, to the best of my knowledge, yes.
13  But I didn't say that -- that whatever you said
14  before.
15     Q   Yeah.  I know.  I --
16     A   I was trying to say is that 180,000 --
17         MR. KLAYMAN:  Don't speculate.
18         THE WITNESS:  Yeah.  I'm not going to
19  speculate.
20         But what I'm saying is that a -- a set
21  salary is more than what shows up and what I've shown
22  you here in these.  I haven't done my taxes for 2024
0486
1  yet.  I was talking about the tax returns that you've
2  received.
3          MS. BOLGER:  Okay.  I must have
4  misunderstood you.
5          But nonetheless, if you're going to
6  claim financial damages, I'm entitled to her 2024 tax
7  returns.
8          MR. KLAYMAN:  Well, we'll take that
9  under advisement.
10         MS. BOLGER:  I mean, that's a
11  continuing request under the federal rules.
12         THE WITNESS:  Well, it's also -- but
13  I -- I also want to make clear too, that as I said,
14  when you have a position, it's also the potential;
15  right?  So it's not necessarily --
16         MS. BOLGER:  I'm not asking you to
17  repeat your testimony.
18         THE WITNESS:  Right.  But it's not
19  immediate.
20         MS. BOLGER:  And there's no pending
21  question.

22          MR. KLAYMAN:  That's fine.  You're

0487

1    fine.

2          THE WITNESS:  All right.  I'm just

3    explaining, though, my thought process.

4          MS. BOLGER:  There's no pending

5    question.  I understand.  There's no pending question.

6    You don't just get to explain.

7          THE WITNESS:  Okay.  Fine.  Okay.

8          MS. BOLGER:  Okay.  Subject to

9    recalling the witness after a motion to compel, I will

10   leave the record open, but I have no further questions

11   for today.

12          MR. KLAYMAN:  Well, let's go back on

13   the other record right now.  I have one question.

14          (Confidential portion of transcript

15           ends.)

16   //

17   //

18   //

19   //

20   //

21   //

22   //

0488

1          (Nonconfidential portion of transcript

2           begins.)

3          THE VIDEOGRAPHER:  Okay.  We go off the

4    record at 6:34.

5          (Off the record.)

6          THE VIDEOGRAPHER:  Back on the record

7    at 6:35.

8              EXAMINATION

9    BY MR. KLAYMAN:

10    Q    Ms. Loomer, I don't want you to testify as

11   to anything that you learned at this time, subject to

12   court rulings at the deposition of Bill Maher.  But

13   based on your own independent knowledge, have you

14   researched Bill Maher's tweets with regard to

15   President Trump?

16    A    Yes.

17    Q    And his family?

18    A    Yes.

19    Q    And what do you remember are the nature of

20   those tweets?

21    A    Well, I remember that I was able to --

22          MS. BOLGER:  Object, for the record, to

0489

1    the form, the relevance, and also the -- even hearsay

2    obligation.

3          Go ahead.

4          THE WITNESS:  I remember that I was

5    able to compile over a hundred pages of -- which was

6    essentially two packets of -- of research.  And I

7    specialized in opposition research, of course, of
8    tweets that were posted by Bill Maher, himself, over
9    the years, between the years that Donald Trump was
10   running for president, from when he was president, and
11   also while he continued running for president, that
12   had very disparaging remarks against President Trump,
13   his wife, Melania Trump, his children, his family, his
14   business enterprises, his campaign, his campaign
15   staff -- just everything anti-Trump.
16   BY MR. KLAYMAN:
17      Q    Did he make disparaging remarks about women?
18      A    Yes.
19      Q    Okay.  Did he make disparaging remarks about
20   Christians and Evangelicals?
21      A    Yes.
22           MS. BOLGER:  Object to the form of the
0490
1    question and the relevance.
2            MR. KLAYMAN:  Yeah.
3            THE WITNESS:  He consistently mocked --
4    BY MR. KLAYMAN:
5       Q    Tell me what you remember.
6       A    He consistently mocked people who believe in
7    God and said, on multiple occasions, that there -- I
8    mean, not quoting him directly, but made reference to
9    the fact that he was an atheist.  And that -- that it
10   wasn't a surprise that a lot of the people who support
11   President Trump are religious because you'd have to be
12   a moron to believe in God.
13           And so he made multiple references like
14   this -- insulting people who believe in God, insulting
15   Christians, and insulting Jews, and suggesting that
16   religious people were delusional.  And he makes it a
17   point to highlight the fact that he hates religion,
18   and he -- he mocks religion, and that he's a proud
19   atheist.
20      Q    What --
21      A    Even though he claims that he's
22   half-Catholic and half-Jewish and was raised Catholic,
0491
1    but he's an atheist.
2       Q    What remarks do you recall that he made with
3    regard to President Trump's sons?
4            MS. BOLGER:  Objection to relevancy, to
5    hearsay, to wasting our time.
6            THE WITNESS:  He took photos of their
7    faces, and I believe he called one of them,
8    "fuckface."  He suggested that one of them was
9    retarded.  He suggested that Barron Trump was
10   autistic.  He just made a lot of nasty comments about
11   Eric Trump.
12           I -- I think he also insinuated that
13   Donald Trump was sleeping with Ivanka Trump in several
14   tweets -- you know, talking about the president's

15   daughter's body, her appearance, and whether she was
16   having sexual relations with her father.
17   BY MR. KLAYMAN:
18       Q   Do you have any belief as to why you were
19   attacked by Bill Maher, vis-a-vis Trump and his
20   family?
21           MS. BOLGER:  Object to the form, and
22   foundation, and relevance.
0492
1            THE WITNESS:  I believe that Bill
2    Maher -- well, it's not that I believe.  We -- I know
3    that Bill Maher is a donor to Kamala Harris.  And I
4    know that he's friends with Kamala Harris.  And he's
5    spoken about his friendship with Kamala Harris on his
6    show.
7            MS. BOLGER:  Oh.  That's a lie.
8            THE WITNESS:  And he's talked about his
9    donations to Kamala Harris.  And it's in the record.
10   It's in the FEC records that he's donated to Kamala
11   Harris, and that he's a Democrat.  And he has talked
12   about how he hates President Trump on his show.
13           And I believe that, you know, the
14   writing was on the wall.  I think that Bill Maher was
15   a bit in denial that Kamala Harris was going to lose
16   the election.  And that, you know, they were just
17   looking for every -- he was looking for a cheap shot
18   to try to use somebody as a vehicle to advance attacks
19   on President Trump less than two months before the
20   presidential election.
21           Because let's be honest, the media left
22   us pundits.  People like Bill Maher were looking for
0493
1    anything they could gather as it related to trying to
2    help Kamala get over the finish line.  And I mean,
3    it's pretty much the subject of every single episode.
4            I mean, every time you watch Bill
5    Maher's show, if you've seen the episodes, or you see
6    headlines, there's always controversy about comments
7    he's made about President Trump, including very
8    controversial comments in the aftermath of the
9    assassination attempt.
10           And which he made a comment that was
11   picked up by the media in which he said that it was
12   believed -- he said it was the best day of his life
13   when President Trump got shot in the head.
14   BY MR. KLAYMAN:
15       Q   Who was the vehicle you're talking about?
16           MS. BOLGER:  Mr. Klayman, can I
17   interrupt for a second?
18           MR. KLAYMAN:  No.
19           MS. BOLGER:  I really need to go to the
20   bathroom, so are you going to be doing this for a long
21   time?  I feel I need a break.
22           MR. KLAYMAN:  No.  This is the last

0494
1  question.
2  BY MR. KLAYMAN:
3      Q    Who's the vehicle that you just referenced
4  to get to Trump?
5              MS. BOLGER:  Object to the form.
6  Object to the form.
7              THE WITNESS:  Myself.  He -- Bill Maher
8  was using me as a vehicle to attack President Trump by
9  falsely accusing me of having sex with Donald Trump,
10  which was an effort to try to derail President Trump's
11  marriage with First Lady Melania Trump, who I have a
12  lot of respect and you know, admiration for, and an
13  effort to interfere in the election.
14             MR. KLAYMAN:  No further questions at
15  this time.
16             MS. BOLGER:  I just have one question.
17                    EXAMINATION
18  BY MS. BOLGER:
19     Q    Ms. Loomer, if I looked at your Twitter feed
20  during the Biden presidency, would I find over a
21  hundred tweets critical of Joe Biden?
22     A    I was --
0495
1              MR. KLAYMAN:  Objection.  Relevancy.
2              THE WITNESS:  I was completely
3  deplatformed on mainstream social media for majority
4  of Joe Biden's presidency, and so I don't know what
5  you would find.  Because like I said, I only got my X
6  account back in December of 2022.
7  BY MS. BOLGER:
8      Q    Have you tweeted something critical of Joe
9  Biden?
10     A    Yeah.
11     Q    Because you're American citizen; you get to
12  do that?
13             MR. KLAYMAN:  Objection.  That's
14  irrelevant.
15             THE WITNESS:  I never accused -- I --
16  again, posting -- posting and -- posting about Joe
17  Biden's policies and their destructive nature, and how
18  un-American his policies were is a lot different than
19  Bill Maher falsely accusing me of having sex with
20  Donald Trump.
21             MS. BOLGER:  Okay.  No further
22  questions for now, but I reserve the right to recall,
0496
1  as we all know.
2              MR. KLAYMAN:  Yeah.  If you prevail on
3  your motion, yes.  And the same is true with mine
4  because I filed a similar motion --
5              MS. BOLGER:  Well, that, I disagree
6  with.  But what else was --
7              MR. KLAYMAN:  -- to resume my

8    deposition of Mr. Maher and HBO.
9         THE WITNESS:  Do we --
10        MS. BOLGER:  Let us end this transcript
11   and stop fighting, Mr. Klayman.
12        THE WITNESS:  Do I keep these, or what
13   do we do with these?
14        MS. BOLGER:  Oh.  We'll take those.
15        THE WITNESS:  These go to you?
16        MS. BOLGER:  Let's go off the record.
17        THE VIDEOGRAPHER:  All right.  If that
18   is everything, off the record on June 4, 2025,
19   at 6:41 p.m.
20        (Whereupon, at 6:41 p.m., the
21        proceeding was concluded.)
22
0497
1         CERTIFICATE OF DEPOSITION OFFICER
2         I, SAMUEL PACHON, the officer before whom
3    the foregoing proceedings were taken, do hereby
4    certify that any witness(es) in the foregoing
5    proceedings, prior to testifying, were duly sworn;
6    that the proceedings were recorded by me and
7    thereafter reduced to typewriting by a qualified
8    transcriptionist; that said digital audio recording of
9    said proceedings are a true and accurate record to the
10   best of my knowledge, skills, and ability; that I am
11   neither counsel for, related to, nor employed by any
12   of the parties to the action in which this was taken;
13   and, further, that I am not a relative or employee of
14   any counsel or attorney employed by the parties
15   hereto, nor financially or otherwise interested in the
16   outcome of this action.
17
18
19
     <%33606,Signature%>
20   SAMUEL PACHON
     Notary Public in and for the
21     District of Columbia
22
0498
1         CERTIFICATE OF TRANSCRIBER
2         I, JOANNE LEE, do hereby certify that this
3    transcript was prepared from the digital audio
4    recording of the foregoing proceeding, that said
5    transcript is a true and accurate record of the
6    proceedings to the best of my knowledge, skills, and
7    ability; that I am neither counsel for, related to,
8    nor employed by any of the parties to the action in
9    which this was taken; and, further, that I am not a
10   relative or employee of any counsel or attorney
11   employed by the parties hereto, nor financially or
12   otherwise interested in the outcome of this action.
13

14
15
16    <%32914,Signature%>
    JOANNE LEE
17
18
19
20
21
22
0499
1    Larry Klayman, Esq.
2    leklayman@gmail.com
3                    June 17, 2025
4    RE:   Loomer v. Maher
5      6/4/2025, Laura Loomer (#7367930)
6      The above-referenced transcript is available for
7    review.
8      Within the applicable timeframe, the witness should
9    read the testimony to verify its accuracy. If there are
10    any changes, the witness should note those with the
11    reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13    Deponent and Errata and return to the deposing attorney.
14    Copies should be sent to all counsel, and to Veritext at
15    cs-ny@veritext.com.
16    Return completed errata within 30 days from
17    receipt of testimony.
18    If the witness fails to do so within the time
19    allotted, the transcript may be used as if signed.
20
21
22                    Yours,
23                    Veritext Legal Solutions
24
25
0500
1    Loomer v. Maher
2    Laura Loomer (#7367930)
3                    E R R A T A  S H E E T
4    PAGE_____ LINE_____ CHANGE_____
5    _____
6    REASON_____
7    PAGE_____ LINE_____ CHANGE_____
8    _____
9    REASON_____
10    PAGE_____ LINE_____ CHANGE_____
11    _____
12    REASON_____
13    PAGE_____ LINE_____ CHANGE_____
14    _____
15    REASON_____
16    PAGE_____ LINE_____ CHANGE_____
17    _____

18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Laura Loomer                    Date
25
0501
1   Loomer v. Maher
2   Laura Loomer (#7367930)
3            ACKNOWLEDGEMENT OF DEPONENT
4      I, Laura Loomer, do hereby declare that I
5   have read the foregoing transcript, I have made any
6   corrections, additions, or changes I deemed necessary as
7   noted above to be appended hereto, and that the same is
8   a true, correct and complete transcript of the testimony
9   given by me.
10
11  _____  _____
12  Laura Loomer                    Date
13  *If notary is required
14           SUBSCRIBED AND SWORN TO BEFORE ME THIS
15           _____ DAY OF _____, 20___.
16
17
18  _____
19  NOTARY PUBLIC
20
21
22
23
24
25

# EXHIBIT B

# Trump's War on "Fake News" and the Law Firm Defending Free Press

hollywoodreporter.com/news/politics-news/trumps-war-fake-news-law-firm-defending-free-press-1197104

Eriq Gardner                                                                                     March 29, 2019



*Taylor Callery*

"Enemy of the people!" goes the rallying cry from the leader of the supposedly free world. President Trump hasn't yet lived up to his campaign pledge to make it easier to sue the media, but emboldened by his war on "fake news," some of Trump's followers are trying anyway. When these individuals get to the courtroom, they often find one particular law firm on the other side.

Davis Wright Tremaine is hardly universally known, but as media finds itself increasingly under attack in the Trump age, this firm has become its best line of defense. Its fingerprints are present across the media spectrum. Jokes told by late-night comedians? Often vetted by its lawyers. #MeToo stories published over the past 18 months? Quite frequently, a DWT attorney responds to threatening letters from the alleged perpetrators. And in court, the firm is tackling huge First Amendment cases, representing the likes of CNN, *The New York Times* and *The Washington Post* in everything from defending defamation claims to securing access to critical documents and regaining access after being exiled from the White House. Simply put: This Seattle-based firm has outsize influence on media at a particularly critical moment. (DWT counsels *THR* too.)

Take the defamation suit from Russian tech entrepreneur Aleksej Gubarev over *BuzzFeed News*' January 2017 publication of the full "Trump Dossier," the report about Russia-Trump ties prepared by former British spy Christopher Steele.

"There were a lot of firms pitching us, and many had strong thoughts," says Nabiha Syed, vp and associate general counsel at BuzzFeed. "Some believed it was a big mistake to publish. It was a scary thing to choose counsel, to place trust with a bet-the-company case." DWT's Katherine Bolger and Nathan Siegel took charge of defeating the suit.

"Our course was set by what [*BuzzFeed News* editor] Ben [Smith] said, that this was an intentional act to inform the public," says Bolger. "It was a defense that ultimately won, and it was a case heavily influenced by what was in the news."

Bolger describes litigating such a high-profile case as "trippy — that's a legal term," and, with a nod to the political dialogue around the Trump Dossier, adds that she couldn't avoid thoughts about the consequences. "Every day we were buffeted by what is in the news, and holy cow if we lose the case," she says. "It was really exhilarating." Soon, pending an appeal over what should remain sealed, the public could learn more about the firm's work in the case, as BuzzFeed's attorneys also investigated the "truth" of the Trump Dossier by taking depositions of Steele and others.

In the Trump era, DWT lawyers are often popping up in fights over the free flow of information. For example, Rachel Strom, one of the firm's youngest partners, had just watched Bolger argue in a New York federal courthouse last April when she got a text about something significant happening a few doors down. The offices of Trump attorney Michael Cohen had been raided by the FBI, and Cohen was appearing at the courthouse to stop prosecutors from looking at material he said was protected by attorney-client privilege. "I ran over," says Strom. "That moment, I was representing ABC, but as the day went on, I started representing other media clients too."

At the beginning of that proceeding, U.S. District Court Judge Kimba Wood expressed an inclination to hold the hearing behind closed doors. It was Strom, without any invitation, who stood up from the benches in the public gallery to argue that there was a First Amendment right to access the courtroom and that the "cat was out of the bag" with respect to the Cohen raid. Not only did she sway the judge, but as the hearing turned to questions about what would be publicly filed — including whether the names of Cohen's clients would be released — Strom persuaded the judge to defer to a presumption of openness. It eventually resulted in Cohen's admission that he had advised Fox News host Sean Hannity.

When it comes to DWT attorneys, the Trump era has meant business. The group has been in court to find out about Trump's gun permit, to unseal documents about the operations of Trump University and to fight when the U.S. attorney general attempted to subpoena a radio reporter. Not every matter made it to a public courtroom, though. At various points over the

past three years, Trump's team sent threatening letters to *The Art of the Deal* co-author Tony Schwartz, *Fire and Fury* author (and *THR* contributor) Michael Wolff, and *Apprentice* star and ex-White House staffer Omarosa Manigault Newman. Each time, DWT's Elizabeth McNamara responded in kind with retorts that essentially quashed potential arbitration.

Then there's the lawsuit from literary group PEN America. After seeing the Trump administration strip CNN reporter Jim Acosta of his press credentials, threaten *Washington Post* owner Jeff Bezos with higher postage rates for Amazon and suggest that NBC's broadcast license be revoked, PEN is seeking judicial intervention to stop further retaliation against free speech.

"Among media lawyers, it is not a norm to represent plaintiffs," says DWT partner Robert Corn-Revere, handling the case. "But sometimes, the way to maintain a robust First Amendment is to go on the offensive."

How did Davis Wright Tremaine get to be such a powerhouse in the media realm?

In the 1960s, the late pioneering First Amendment attorney Cameron DeVore set up shop at a firm that would eventually become DWT. At the time, doing media law was intellectually stimulating and certainly rewarding. The Supreme Court would establish the "actual malice" standard for public figures in libel cases in the 1963 case *New York Times Co. v. Sullivan*, and the following decade would bring a big court battle over the publication of the Pentagon Papers. Then, the Watergate scandal erupted, which would not only lead to a new generation of investigatory reporters following in the footsteps of Bob Woodward and Carl Bernstein, but also a healthy appetite for legal representation.

But by the mid-1990s, the media law bubble sort of collapsed. The rise of the internet began to erode traditional income streams for newspapers and magazines, and many white shoe firms such as Gibson Dunn and O'Melveny & Myers began backing off from seeking to represent news companies in favor of more-well-heeled corporate clients. Plus, there was a sense among many law school graduates around this time that the exciting times had passed them by.

"When I started out, I felt sad because I felt all the big battles had been fought," says Strom. "I wondered whether I would have come up with the argument in *Times v Sullivan*."

Of course, any turn of the century notion that media law would no longer be fruitful only created opportunity for DWT, especially as First Amendment legends like Floyd Abrams got up in age. Quickly, it didn't matter that the firm was based in Seattle — no one's idea of a media hub — and even if it did, the firm began opening up media practice offices in Los Angeles, New York and Washington, D.C. Plus, after Levine Sullivan Koch & Schulz — the firm that handled Gawker's defense in the Hulk Hogan sex tape lawsuit — merged with Ballard Spahr in 2017, DWT took on many of its former rival's top media attorneys (including Bolger, Siegel and Strom).

In retrospect, media law had and has plenty of big battles ahead.

"The First Amendment hasn't changed, but the way that information is transmitted has changed dramatically," says Kelli Sager, a veteran L.A.-based partner. "The breadth of clients — now it's not just a few major media companies but everyone on the internet and Netflix and Amazon."

Because of the far-reaching, hardly-ever-erased nature of information published online, the business of reputation management has recently exploded. The stakes are much greater than they were in the past, when something appeared in a local newspaper and one would have to do heavy research to find it. A story about sexual misconduct allegations, for instance, now can have career-ending consequences, even if later debunked. Plus, amid increasing economic inequality, some wealthy individuals are determined to counter what they see as a legal environment favoring the media. PayPal co-founder Peter Thiel's secret funding of Hulk Hogan's suit against Gawker may be the showcase example, but there are other coordinated efforts to do things like bolster privacy laws and influence whom the courts consider public figures.

"There is definitely a more sophisticated and substantial plaintiff's bar than there used to be," says DWT's Laura Handman, who successfully defended a recent defamation lawsuit brought by a Trump activist whose "OK" hand gesture at the White House was interpreted by one writer as a sign of white supremacy.

Indeed, attorneys like Charles Harder, Thomas Clare and L. Lin Wood are picking up business from sensitivities related to the online consumption of news, the political atmosphere and trends like the #MeToo movement. While those on the offense face a century of precedent tipping to unfettered expression, they have scored successes both obvious and subtle. Everyone knows about the trial that drove Gawkerinto bankruptcy. But Wood's ongoing defamation suit against CNN on behalf of a hospital executive is arguably more consequential: It portends fewer early exits for media companies hauled into federal court.

DWT attorneys worry about the erosion of SLAPP analysis — state laws aimed at curtailing frivolous First Amendment cases — and the prospect, in Sager's words, that "juries will treat everything as fake news."

But then again, jury trials in red states remain extremely rare, and other than one lonely opinion from Supreme Court Justice Clarence Thomas, the judiciary doesn't seem inclined to upset settled law like *Times v. Sullivan*, giving reporters some breathing room to make mistakes. As for cease-and-desists, DWT partner Alonzo Wickers (whose clients include John Oliver, Samantha Bee and *South Park*) says he's seeing more prepublication missives, but he thinks it's actually a positive development. "I almost prefer to get those types of letters, because they often tip the hand showing how strong or weak these claims are," he says.

And then there's Trump, who undoubtedly has incited at least some hatred toward the press but is not quite the formidable foe some think. Yes, he routinely threatened to sue as a real estate mogul, promised on the campaign trail to reshape libel law and now whips his followers into a frenzy any time he mentions "fake news." But he also lacks impulse control and says the nastiest things on Twitter. The latter version of Trump is especially of interest to a law firm doing more than anyone to help the media navigate these dangerous times.

As Strom puts it, "Donald Trump has created some great defamation precedent."

*A version of this story first appeared in the March 27 issue of The Hollywood Reporter magazine. To receive the magazine, click here to subscribe.*

## THR Newsletters

Sign up for THR news straight to your inbox every day

Subscribe Sign Up