## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF FLORIDA, OCALA DIVISION

---------------------------------------------------------- x

LAURA LOOMER,

              *Plaintiff*,

    - against -

BILL MAHER and HOME BOX OFFICE, INC.,

              *Defendants*.

---------------------------------------------------------- x

Case No.: 5:24-cv-00625-JSM-PRL

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 56, Defendants Bill Maher and Home Box Office, Inc. ("HBO") hereby move for summary judgment dismissing Plaintiff Laura Loomer's Amended Complaint in its entirety. This lawsuit arises out of a joke made by comedian Bill Maher during an episode of the HBO original series *Real Time with Bill Maher* ("*Real Time*") on September 13, 2024 ("September 13 Episode"). Like many of the comments made during that (and every) episode of *Real Time*, the joke offered a humorous reflection on one aspect of that week's news cycle.

In that particular week, Plaintiff's close relationship and frequent sightings with then-Presidential candidate Donald Trump were all over the news. Countless reports and social media posts remarked on the fact that she was photographed on President Trump's plane, at his side at a 9/11 memorial, and as his guest to the presidential debate with Kamala Harris. Reporters and commentators recirculated other photos and videos of Plaintiff and President Trump together—many of which Plaintiff herself had shared and captioned with loving commentary and "heart-eyes" emojis. Reporters and commentators also scrutinized Plaintiff's history of incendiary rhetoric, her influence over the President, and reactions to her presence in his inner circle, and mused about whether there was a romantic relationship between them.

For comedians such as Mr. Maher, the repeated public appearances of an attractive younger woman at a presidential candidate's side were natural "fodder for comedy." Decl. of Kate Bolger ("Bolger Decl."), Ex. 3 ("Maher Depo. Tr.") at 184:6–25. As Mr. Maher put it, "I would [have] be[en] remiss if I didn't make jokes about" that. *Id.* So, at the end of that week, during the September 13 Episode*,* he remarked:

> Here's my question, because she said – Laura Loomer said, "Taylor Swift," she believes, "is in an arranged relationship with Travis Kelce to influence the 2024 election." I think maybe Laura Loomer's in an arranged relationship to affect the election, because she's very close to Trump. She's 31, looks like his "type." We did an editorial here a few years ago . . .. It was basically "Who's Trump Fucking?" Because I said, you know, it's not nobody. He's been a dog for too long—and it's not Melania. I think we may have our answer this week. I think it might be Laura Loomer. I'm just saying.

Bolger Decl., Ex. 1 ("Episode Tr.") at 8305-06 (the "Remark"). Many viewers laughed—others may have groaned—but, either way, everyone understood that the Remark was a joke (one that echoed other jokes made on other shows and social media around the same time). And no one would have thought about this joke again, had Plaintiff not filed this lawsuit, seeking $500 million in damages. *See* ECF No. 42 at 21.

Now, after months of discovery, Plaintiff has failed to produce or develop any admissible evidence in support of her claims. For this reason, Defendants respectfully request that the Court grant their motion for summary judgment.

First, Plaintiff has failed to adduce any evidence that would create a genuine dispute as to whether the Remark was a statement of fact. On the contrary, Mr. Maher testified in no uncertain terms that he told a joke and did not intend the Remark to be a statement of fact. Moreover, the record evidence shows that *Real Time* bears all the hallmarks of late-night comedy television. In that context, a reasonable viewer would have understood Mr. Maher to be making a joke based on that week's headlines. Even if it were not understood by the audience to be a joke, the Remark would certainly have been understood as either rhetorical hyperbole or an opinion based on known or disclosed facts, both of which are fully protected under the First Amendment.

Second, even if there were facts in evidence supporting a finding that the Remark was intended and understood to be a statement of fact, the record is bereft of any evidence—and Plaintiff therefore cannot establish as a matter of law—that Mr. Maher acted with actual malice (i.e., a subjective awareness of probable falsity). On the contrary, Plaintiff testified she thought Mr. Maher believed Plaintiff "might" have been sleeping with President Trump. In any event, based on everything that Mr. Maher had read and seen over the prior week, he had ample reason to believe it was possible.

Finally, Plaintiff has failed to create any dispute of material fact whatsoever as to damages. A defamation lawsuit is not a tool for garnering publicity or raising money; it is a means for redressing reputational harm. Plaintiff has suffered none. Indeed, having recently been the subject of lengthy profiles in *The New York Times* and *The Atlantic*, enjoying a widely reported influence over White House personnel decisions, and servicing new "billionaire" clients, Plaintiff's public persona and prospects are more promising today than ever before.

The First Amendment protects unfettered commentary on public figures and matters of public interest, and our political dialogue is richer for it. *See, e.g.*, *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 50 (1988). With no genuine issues of material fact that could support Plaintiff's defamation claims, these principles compel summary judgment in favor of Defendants.

## STATEMENT OF FACTS

### A.    The Parties

#### 1.  Defendant Bill Maher

Bill Maher is a celebrated comedian and satirist. *See* Decl. of Dean Johnsen ("Johnsen Decl.") ¶ 4; Bolger Decl. Ex. 61; Maher Depo. Tr. at 11:24–12:6; Bolger Decl. Ex. 4 ("Rosenstein Depo. Tr.") at 100:5–6. Mr. Maher has been nominated for 83 awards over the years, including 42 Emmys. *See* Bolger Decl. Ex. 7.

Mr. Maher began his career doing stand-up comedy, eventually doing comedy stints on *The Tonight Show* and working as a comedic actor. Maher Depo. Tr. at 10:22–11:13. From 1993 to 2002, he hosted *Politically Incorrect*, a topical comedy show that aired first on Comedy Central and later on ABC. *See* Rosenstein Depo. Tr. at 20:10–13; Maher Depo. Tr. at 13:6–7. Mr. Maher performed 13 stand-up comedy specials distributed by HBO and, until recently, toured the country performing stand-up comedy. *See* Maher Depo. Tr. at 11:11–12:6; Rosenstein Depo. Tr. at 100:5–6.

Since 2003, Mr. Maher has hosted *Real Time*, which premieres at 10 P.M. EST on HBO on a weekly seasonal basis. *See* Johnsen Decl. ¶ 7. *Real Time* is an "award-winning talk/comedy series" that blends comedic monologues with panel discussions and debates about the news of the day. *Id.* ¶ 8; *see* Bolger Decl. Ex. 6.

Each episode of *Real Time* includes both scripted and unscripted elements. The scripted elements typically include (i) an opening monologue, (ii) a collection of jokes pertaining to a particular person or subject with accompanying pictures and graphics, which is always delivered in the middle of the show, (iii) the "New Rules" segment, which is a comedic send-up of "rules" that should be applied to popular culture and American politics, always delivered at the end of the show, and (iv) a final "New

Rule," a closing statement with thoughts and jokes about a topical issue. *See* Johnsen Decl. ¶ 10; Maher Depo Tr. at 13:25–14:12. A team of writers—who take inspiration from the news of the day, Johnsen Decl. ¶ 14—contribute to the scripted portions of each episode, but Mr. Maher ultimately "choose[s]," "endorse[s]," edits, and "perform[s]" the jokes, Maher Depo Tr. at 14:1–5, 112:5–12.

The unscripted elements of each episode include an interview with a guest following the monologue and a panel discussion for the bulk of the rest of the episode, leading up to the New Rules, typically featuring two other guests from different sides of the political spectrum. Johnsen Decl. ¶ 10; *see* Rosenstein Depo. Tr. at 105:21–24. *Real Time* is "probably the only show [of its kind] that consistently has on conservatives," including Robert F. Kennedy Jr., Tulsi Gabbard, Attorney General William Barr, and Kellyanne Conway. Maher Depo. Tr. 51:13–21; *see id.* at 61:20–22 ("We want both sides. I want to hear both sides. Most shows don't do that."). In Mr. Maher's words, it is a "satire show[]" in which he "make[s] jokes about people and people in the news and the news itself." Maher Depo Tr. at 197:25–198:2.

### 2. Defendant HBO

HBO is a media and entertainment company that operates subscription linear television services, as well as the on-demand video streaming service HBO Max. HBO is synonymous with high quality and cutting-edge programming. In addition to distributing *Real Time*, HBO produces and/or distributes documentaries, original series and films in the genres of both comedy and drama, and other late-night comedy shows and stand-up specials. Just this year, HBO was nominated for 142 Emmy

awards, the most of any streaming platform. *See* Bolger Decl. Ex. 110.

### 3. Plaintiff Laura Loomer

Plaintiff is self-described "journalist" and "activist" who has twice mounted unsuccessful bids for a congressional seat. Bolger Decl. Ex. 38; ECF No. 42 ¶¶ 12–13, 16. Long before the Remark, she had developed a reputation as one of the most controversial figures in American politics. She is "pro-white nationalism," Bolger Decl. Ex. 9; Bolger Decl. Ex. 5 ("Loomer Depo. Tr.") at 275:13–276:6; a "proud Islamophobe," *id.* at 273:11–14; and a believer in "biological hierarchy" between men and women, *id.* at 392:6–21; and she once retweeted a video promoting the conspiracy theory that September 11th was an inside job, *see* Bolger Decl. Ex. 10.

As Plaintiff acknowledges in her 2021 book *Loomered: How I Became the Most Banned Woman in the World*, and as has been widely reported, her provocative behavior has led her to be banned from numerous social media platforms, including (i) Twitter, for violating the platform's hateful conduct policy, *see* Bolger Decl. Ex. 9 (Loomer Depo. Ex. 14); Loomer Depo. Tr. at 273:16–274:3, (ii) Facebook, which designated her a "dangerous individual," *id.* at 252:20–253:2, (iii) ridesharing platforms Lyft and (iv) Uber, and (v) PayPal, for allegedly receiving donations from hate groups, *see* Bolger Decl. Ex. 9; Loomer Depo. Tr. at 275:2–12; Bolger Decl. Ex. 11. Plaintiff's behavior has prompted prominent conservative figures to disavow her, with one labelling her "mentally unstable and a documented liar." Bolger Decl. Ex. 12.

### B. Plaintiff's Public Reputation Before September 2024

Plaintiff's X account was reinstated in 2021, and she has 1.8 million followers—

including, by her assessment, "most of the President's staff," Loomer Depo. Tr. at 20:22–23:1. Her X feed is replete with highly controversial and offensive jokes.[1]

Long before the Remark, according to public reports, Plaintiff had caused significant unease among Trump campaign staffers due to the incendiary nature of her attacks on then-presidential candidate Kamala Harris. Plaintiff stated on July 13, 2024 that Harris has an "infested snatch" and that anything it touches "also dies a miserable, painful death." Bolger Decl. Ex. 15. That same month, she posted:

> Why is it that the only thing Kamala Harris ever talks about killing babies? The only thing this DEI skank ever talks about is murdering babies . . . Meanwhile, she's sucked so much dick to get to the top throughout her "career," but she doesn't have any biological children of her own to show for all of the semen she's swallowed. . . . [S]he has been ridden harder than the community bikes in San Francisco, but no kids of her own. I hear abortions destroy your uterus. I wouldn't know. But I'm sure Kamala does. . . @Kamala Harris just because you swallowed all of your children doesn't mean you have a right to MURDER other people's children. Dirty harlot go away!

Bolger Decl. Ex. 14. On September 11, 2024, Plaintiff tweeted that if Harris were to win the election, the White House would "smell like curry" and "speeches will be facilitated by a call center." *See* Loomer Depo. Tr. at 332:10–15; Bolger Decl. Ex. 44. The tweet prompted prominent Republicans such as Lindsey Graham and Marjorie Taylor Greene to call Plaintiff "toxic" and label her post "extremely racist." *See* Loomer Depo. Tr. at 342:8–12; Bolger Decl. Ex. 16. Senator Thom Tillis added that Plaintiff was "a crazy conspiracy theorist who regularly utters disgusting garbage intended to divide Republicans." Bolger Decl. Ex. 17. Vice President J.D. Vance said at the time that he "do[es]n't like those comments" and "Laura Loomer is not affiliated

---

[1] *See* Bolger Decl. Exs. 13, 41, 42 & 44.

with the Trump campaign." Bolger Decl. Ex. 18. Plaintiff's reputation also includes a penchant for attacking Republicans who she does not believe are sufficiently loyal to President Trump, including publicly taunting and targeting their children and spouses. *See* Bolger Decl. Exs. 45, 46, 47 & 62. She once stated that Governor Ron DeSantis' wife, a breast cancer survivor, had "overexaggerated [her breast cancer diagnosis] in a desperate effort to get votes for DeSantis." *See* Bolger Decl. Exs. 46 & 49.

Plaintiff also testified at her deposition that, as a result of her controversial opinions, ***and before the Remark***, she was denied a job in the White House due to concerns on the part of President Trump's inner circle. In March of 2023, she had a private meeting with President Trump and his chief of staff, Susie Wiles, at which President Trump purportedly instructed Ms. Wiles to offer her a position on his campaign. *See* Loomer Depo. Tr. at 70:8–17. But the offer was withdrawn after it was reported in April 2023 that the President's aides "feared that hiring Ms. Loomer, who has a long history of bigoted remarks, would set off a backlash." Bolger Decl. Ex. 9; Loomer Depo. Tr. at 78:9–20; *see also* Bolger Decl. Ex. 21.

### C.    Plaintiff's Close Relationship with President Trump Before September 13

Plaintiff testified that she has a close relationship with President Trump. She testified that she has visited Mar-a-Lago at least 20–30 times for political events and met with President Trump during 10–15 of those visits. Loomer Depo. Tr. at 163:17–165:22. On August 13, 2023, she met President Trump at his private box at the Trump National Golf Club in Bedminster. In advance of the meeting, she posted "See you soon @realDonaldTrump! On my way. Can't wait to see you!!! ❤️ ❤️ 😍 😍 😍

"#MAGA." Bolger Decl. Ex. 22. At the golf club, Plaintiff publicly posted recordings showing President Trump with Plaintiff, telling his secretary "I love this girl," and inviting Plaintiff and her friends to come to his "very private" suite. Loomer Depo. Tr. at 137:15–141:10. Plaintiff "gave him a hug"—and while "it's taboo to grab the president of the United States," President Trump told Secret Service, "It's fine. It's fine." Plaintiff described the encounter with him that day as "just exhilarating." *Id.* at 147:11–149:11. After the meeting, Plaintiff shared on social media video of her and President Trump in his private box, in which she tells him "I love you"—and then captioned the post "Best president ever. I love him so much." Bolger Decl. Ex. 23. In a separate post, she wrote: "He wanted me to sit next to him all day, and it was the best day ever. . .. I really love him with all of my heart." Bolger Decl. Ex. 24. In another tweet, she posted a picture of her standing beside President Trump, looking up at him, captioned simply with the "heart-eyes" emoji: 😍 . *See* Bolger Decl. Ex. 25; Loomer Depo. Tr. at 148:13–149:11. In December 2023, President Trump shared on Truth Social an excerpt of an interview Plaintiff gave, in which she said she had ended a romantic relationship because President Trump was her "number-one priority," writing "Thanks, Laura!" Bolger Decl. Ex. 26. On January 16, 2024, Plaintiff posted again about her love for President Trump, reposting a picture of President Trump kissing her cheek and writing "I just love him so much. ❤ Not in a weird way. I just really love President Trump. He's the most amazing person ever. It makes me so happy every time I see him or watch his speeches." Bolger Decl. Ex. 27.

When the presidential campaign entered full swing, Plaintiff was by President Trump's side. She was with him in Miami, Minnesota, Nashville, and Iowa, where it was so cold outside her hands were "freezing" and President Trump "grabbed [her] hand" to warm it up. Loomer Depo. Tr. at 174:9–11, 181:4–17 & 184:17–185:20. At 2:53am on July 19, 2024, after the last day of the Republican Convention, Plaintiff tweeted a video of President Trump in which he sees her in the crowd, points to her and, in response to her yelling "I love you, I love you," blows her a kiss. She goes on to yell, "You're amazing, I love you, I love you." Plaintiff posted the video, writing: "President Trump blew me a kiss from the stage. 😂🇺🇸😌 I was in the front row on the floor of the Convention all night long cheering him on!" Bolger Decl. Ex. 28.

### D.    The "Media Frenzy"

In the week leading up to the September 13 Episode, President Trump invited Plaintiff to accompany him on his private jet five to six times, including to the presidential debate with Harris and to a 9/11 memorial event the next day. *See* Loomer Depo. Tr. at 173:7–15 & 174:17–18. On the flight to New York after the debate, President Trump "invited [Loomer] to sit next to him and eat McDonald's with him." *Id.* at 210:20–211:17. Plaintiff's appearances with President Trump attracted widespread attention. *See* Bolger Decl. Exs. 29, 30, 31, 64 & 106; Johnsen Decl. ¶¶ 24–28, 30. Indeed, Plaintiff testified that there was a "media frenzy" surrounding her travel with him "which is probably why Bill Maher wanted to do a segment." Loomer Depo. Tr. at 301:1–4; *see id.* at 428:15–16 ("[T]here was all this news coverage about me flying on the plane.").

Plaintiff's frequent presence at President Trump's side led to extensive chattering about the nature of their relationship in the days leading up to the September 13 Episode. *See* Maher Depo. Tr. 186:9–10 ("[M]e and everyone else in the media was commenting on it."). Twitter was abuzz with speculation that Plaintiff and President Trump might be in a relationship. *See* Bolger Decl. Ex. 32 (September 12, 2024 Tweet from Mike Sington with 3.919 million views stating "[t]his is why Trump is hanging out with Laura Loomer. Watch them with their hands all over each other at Mar-a-Lago. Note: He's married"); Bolger Decl. Ex. 33 (September 12, 2024 tweet saying "popular theory going around is Loomer is having an affair with Trump").[2] Tellingly, Plaintiff herself produced 39 tweets that were published by users ***before*** the September 13 Episode premiered, in which users were speculating and making jokes about her being in a sexual relationship with President Trump. *See, e.g.*, Bolger Decl. Ex. 67 (Sept. 13, 2024 1:42 PM tweet: ">no wedding ring >Melania supposedly in NYC but Loomer is Trump's date to 9/11 >Trump has cheated on every woman he's ever married Yeah, I'm thinking he's a Loomer Coomer"); Bolger Decl. Ex. 70 (Sept. 13, 2024 10:59 AM tweet: "So Trump is taking advice from Loomer. He's traveling with her. Taking shady pictures with her and she's STAYING AT MAR-A-Lago which Melania is not. They are banging. Love child on the way"); *see also* Bolger Decl. Exs. 68-105 (tweets written prior to the September 13 Episode produced by Plaintiff).

---

[2] *See also, e.g.*, Bolger Decl. Ex. 34 (Loomer Depo. Ex. 28) (September 12, 2024 post on Blue Sky stating "Loomer bl***ing Trump is so funny and nasty I hope it's really happening"); Bolger Decl. Ex. 35 (Loomer Depo Ex. 26) (September 12, 2024 post with 135,6000 views stating "I'll admit I didn't have 'Trump F***ks Laura Loomer on my 2024 election Bingo card").

News outlets also reported on the rumors swirling around Plaintiff's relationship with and influence over President Trump. The Miami New Times published an article on September 13, 2024 titled "Laura Loomer and Trump Sitting in a Tree, K-I-S-S-I-N-G," which noted the speculation that the two were "a romantic item." Bolger Decl. Ex. 36. OK! Magazine published a similar article at 5:46 PM EST, titled "Donald Trump Accused of Having an Affair With MAGA Conspiracy Theorist Laura Loomer as Wife Melania Remains MIA" and reporting that "[s]everal images have been circulating on X ... showing Trump, 78, getting handsy with the 31-year-old MAGA supporter" and that "several critics" have been "speculat[ing] about their relationship with one another, pointing out how the ex-president's wife, Melania Trump, hasn't been on the campaign trail since the Republican National Convention." Bolger Decl. Ex. 37.

In short, it was nearly impossible to miss the headlines that week about Plaintiff, making her obvious fodder for jokes and comment. *See, e.g.*, Johnsen Decl. ¶ 36 (noting *Jimmy Kimmel Live!* made jokes about Plaintiff); Rosenstein Depo. Tr. at 54:10–14 ("a lot of the late-night hosts were talking about her at the time").

### E.    The September 13 Episode

It was in this environment that the *Real Time* team got to work on the September 13, 2024 episode of *Real Time*. Several of the articles in that week's "Trending morning stories" emails reported on Plaintiff's appearances and relationship with President Trump, including one that referred to their "admiration fest." *See* Johnsen Decl. ¶¶ 25–26, 35 & Exs. A, B, C, G, H, I, V. As Mr. Maher testified:

> [Loomer] was everywhere that week . . . For me not to have commented on that, I would have been remiss in doing my job. I was hardly the only one commenting on it. It was everywhere. She seemed to be everywhere suddenly. She was blowing kisses at him or saying 'I love you. I love you. I love you,' and he was blowing kisses back at her. He had his arm around her saying 'She's softer than you think she is.' They went to the 9/11 memorial together. She was his guest. She was his guest at the debate.

Maher Depo. Tr. at 18:9–21; *see id.* at 184:6–18 ("everywhere in the news that week Laura Loomer was beside the president, I love you, I love you, screaming at him; he, blowing kisses at her, putting his arm around her waist, saying she's a lot softer in person. … It was all over and I was not the only one who was making these kind of jokes or making this kind of speculation. It's in the Drudge Report. Meghan McCain talked about it.[3] Lots of people were."); Decl. of Bill Maher ("Maher Decl.") ¶ 12.

Because of Plaintiff's prominence in the news, some *Real Time* writers drafted jokes about her (along with many other topics). *See* Johnsen Decl. ¶¶ 30–33, 37. Mr. Maher reviewed these drafts, selecting jokes relating to her White-House-smelling-like-curry tweet for the monologue. *Id.* ¶¶ 32, 38. The monologue, as delivered, referred to Plaintiff as President Trump's "new 'bullshit whisperer'" and joked about her exchanges with Rep. Greene and Sen. Graham. *See* Episode Tr. at 8282.[4]

Later in the episode, Mr. Maher spoke with comedian and former Democratic

---

[3] *See* Bolger Decl., Ex. 111 (Meghan McCain: "I think it's a fatal attraction for both of them. . . The way she talks about him is insane. The way she feels about him, it's obviously a deeper love than just an adoration for a human being. The fact that he loves to be loved and this woman is there to do that, I think there is some very weird relationship going on that can be fatal for both of them.").

[4] Of course, Plaintiff was far from the sole focus of the September 13 Episode, which also included a segment relating to the upcoming Country Music Awards, with obviously made-up song titles, and discussion of other news that week including the arrest of football player Tyreek Hill and a lawsuit against a California state senator for alleged sexual abuse. *See* Episode Tr. at 8298–300, 8308.

Senator Al Franken and Republican commentator Kristen Soltis Anderson as part of the panel discussion. While it is true that portions of the panel discussion were "serious" and "non-comedic" as previously noted by the Court, ECF No. 39 at 7, a close review of the panel discussion reveals that it was also humorous and elicited many laughs from the audience, as when Senator Franken used physical humor to describe President Trump getting mad, or when Ms. Anderson quipped that President Trump "should be able to just knock [a debate question about immigration] out of the park. Instead, it was like, '*Squirrel!*'" *See* ECF No. 17-1 at 27:39-41, 28:06-28:36. In response to Senator Franken's observation that President Trump brought Plaintiff to a 9/11 remembrance that week, Mr. Maher quoted a tweet from Plaintiff stating that Taylor Swift "is in an arranged relationship with Travis Kelce to influence the 2024 election" and joked: "I think maybe Laura Loomer is in an arranged relationship to affect the election because she's very close to Trump, she's 31, looks like his type." Episode Tr. at 8305-06. Mr. Maher continued: "We did an editorial here a few years ago. . .. It was basically 'who's Trump f***ing?' Because I said, you know, it's not nobody. He's been a dog for too long. And it's not Melania. I think we may have our answer this week. I think it might be Laura Loomer. I'm just saying." *Id.*

When asked about the Remark, Mr. Maher unambiguously testified:

> **I made a joke**. I made a joke based on their sudden closeness in the news that week. I could have shown a video of them together and all the places they were together and all the things that were going on, the 'I love you' the 'I love you,' the blowing of the kisses, you're very special, all this stuff, and then just said, 'Hey, get a room.' It's just - - this is just comedy. This is -- these are jokes.

Maher Depo. Tr. at 22:18–23:25 (emphasis added); *see also* Rosenstein Depo. Tr. at

81:6 ("[H]e was making a joke."). Indeed, as Mr. Maher explained, in light of the reporting on their closeness, "[i]t was hard *not* to make that joke," Maher Depo. Tr. 21:12 (emphasis added), and he would have been "remiss" had he not commented on "Loomer being by his side every day for a week," *id.* at 213:12–16.

Plaintiff's closeness with President Trump remained in the news in the days after the September 13 Episode. As Plaintiff herself testified, "Every single show on every news network [was] just like nonstop coverage about Laura Loomer, . . . Donald Trump, Laura Loomer, Donald Trump for three weeks straight." Loomer Depo. Tr. at 430:12–15. Thus, the following week, on September 20, 2024, *Real Time* did a segment titled "24 Things You Don't Know About Laura Loomer"—alongside jokes about North Carolina gubernatorial candidate Mark Robinson, country music, and Israel's pager attacks on Hezbollah. Bolger Decl. Ex. 108.

## F.    Plaintiff's Reputation Following the September 13 Episode

Plaintiff is more prominent and influential now than ever before. Plaintiff maintains a remarkable level of access to, and influence over, the White House. She testified that she has spoken on the telephone with President Trump, directly or indirectly through his staff, around fifty times, *see* Loomer Depo. Tr. at 32:8–33:15, and has texted with President Trump's staff approximately fifty times, *see id.* at 35:8–19. In fact, the day before her deposition in this case, she met with the Vice President at the White House. *See id.* at 15:5–8. She has proudly boasted that "[m]y point of access to the White House is Donald Trump." *See* Bolger Decl. Ex. 38.

Plaintiff testified that President Trump "asks me my opinions" about personnel

matters in his administration, Loomer Depo. Tr. at. at 219:18–21, such as who to nominate for NASA administrator, *id.* at 217:6–21. She is reported to have been responsible for President Trump's firing of six members of his National Security Council, three leaders of the NSA, an appointee of West Point, the director of the National Vetting Center, and multiple federal prosecutors. *See* Bolger Decl. Ex. 39.

To date, and consistent with her prior history, Plaintiff has not secured a job in the Administration. She testified that "there's a jealousy and an animosity, not just in the media, but also just in the culture of politics, in general, where sometimes people – maybe they're jealous of my – you know, when I saw my 'relationship' with President Trump," and that "professional jealousy" has contributed to why she "ha[s]n't been chosen for a position in the White House." Loomer Depo. Tr. at 99:2– 101:13, 473:10–474:3.[5] Just last week, however, Plaintiff announced that she had received press credentials from the Pentagon, while boasting that her "investigative reporting has had a massive impact on the landscape of personnel decisions within the Executive Branch, our intelligence agencies and the Pentagon." Bolger Decl. Ex. 109.

**G.    Procedural History**

After the September 13 Episode aired, Plaintiff served a retraction demand pursuant to Florida Statute § 770.01. Bolger Decl. Ex. 50; *see also* ECF No. 42 ¶ 32.

On October 21, 2024, Plaintiff filed this action in Florida state court. Defendants removed the case to federal court and subsequently moved to dismiss the

---

[5] Plaintiff has likewise speculated online that the reasons she has not been granted a White House press pass are "[p]rofessional jealousy" and "pettiness." Bolger Decl. Ex. 40.

action. The Court dismissed Plaintiff's claims for defamation *per quod* and defamation by implication but held that Plaintiff had sufficiently alleged a claim for defamation *per se*. In so holding, the Court noted that it "cannot consider . . . purported facts" such as "Ms. Loomer's own statements about her affection for Trump, repeated appearances the two made together in the days leading up to the September 13, 2024 episode, and rumors about their relationship" "at this stage," as such facts beyond the complaint are "a red herring on a motion to dismiss." ECF No. 39 at 9. Plaintiff filed an Amended Complaint on January 30, 2025. *See* ECF No. 42.

## ARGUMENT

This lawsuit is about a joke made by a comedian in the context of a boisterous panel discussion about recent topics of public interest. As the United States Supreme Court has affirmed time and again, the First Amendment is intended to protect "uninhibited, robust, and wide-open debate." *Counterman v. Colorado,* 600 U.S. 66, 78 (2023) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). In particular, "[h]umor is an important medium of legitimate expression and central to the well-being of individuals, society, and their government." *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 151 (Tex. 2004) (quoting Robert D. Sack, *Sack on Defamation* § 5.5.2.7.1 (3d ed. 2004)). "Statements that cannot 'reasonably be interpreted as stating actual facts' about an individual" are protected, thus "assur[ing] that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) (quoting *Falwell*, 485 U.S. at 50).

17

This case fits squarely within these protections. Plaintiff—and no doubt others—may purport to find the language at issue offensive (though Plaintiff is certainly no saint when it comes to her own published jokes and insults, *see supra* Statement of Facts Section B). Nevertheless, the Supreme Court has rejected the idea that the "state's interest in protecting public figures from emotional distress is sufficient to deny First Amendment protection." *Falwell*, 485 U.S. at 50. To prevail here, Plaintiff must point to admissible evidence supporting all of the elements of her claim— including that Defendants published a statement of fact about her and did so with knowledge that it was false. Because she cannot do so, summary judgment should be granted. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

"Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Block v. Matesic*, 789 F. Supp. 3d 1131, 1153 (S.D. Fla. 2025) (quoting Fed. R. Civ. P. 56(a)). At summary judgment, the moving party bears the initial burden of showing an absence of genuine issues of material fact. Once this burden is satisfied, "the burden then shifts to the non-moving party to 'come forward with specific facts showing there is a genuine issue for trial.'" *Id.* (quotation omitted). To do so, Plaintiff bears the burden of proving: (1) publication of a statement to a third party, (2) falsity, (3) actual malice, (4) actual damages, and (5) the statement was defamatory. *See Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (citing *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008)). Plaintiff cannot meet this burden.

## A.    The Challenged Statement Was Not A Statement of Fact

This Court should grant summary judgment as to all of Plaintiff's claims because no reasonable viewer of *Real Time* would understand the Remark to be a statement of fact. "A false statement of fact is the *sine qua non* for recovery in a defamation action." *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983); *accord Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 717 (11th Cir. 1985). "[S]tatements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment." *Turner*, 879 F.3d at 1262; *see also Milkovich*, 497 U.S. at 20–21. "When a speaker plainly expresses 'a subjective view, an interpretation, a theory, conjecture or surmise, rather than a claim to be in possession of objectively verifiable false facts, the statement is not actionable.'" *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 186 (4th Cir. 1998) (quotation omitted). While the Court concluded "at th[e] pleading stage, the Complaint adequately alleges Mr. Maher's statements were actionable statements of fact," ECF No. 39 at 7, the full record makes clear the Remark was not. *See, e.g., Moldea v. N.Y. Times Co.,* 22 F.3d 310, 311 (D.C. Cir. 1994) (dismissing claim and emphasizing the need "to take sufficient account of the fact that the statements at issue appeared in the context of a book review, a genre in which readers expect to find spirited critiques…").[6]

---

[6] A district court's denial of an initial motion to dismiss is not a "final judgment." *Aldana v. Del Monte Fresh Produce N.A., Inc.*, 578 F.3d 1283, 1289 (11th Cir. 2009); *see* ECF No. 39 at 7–9 (reiterating that it was looking only to whether the allegations were sufficient "[a]t this pleading stage"). "[A]ny ruling at the motion-to-dismiss stage" does not dictate the "result after considering the record evidence." *Munro v. Fairchild Tropical Botanic Garden, Inc.*, 2022 WL 452257, at *6 n.4 (S.D. Fla. Jan. 13, 2022). Indeed, courts routinely grant summary judgment in defamation cases based on an "opinion" defense after having denied motions to dismiss on those grounds. *See, e.g., Block*, 789 F. Supp. 3d at 1159; *Sandmann v. N.Y. Times Co.*, 2022 WL 2960763, at *4 (E.D. Ky. July 26, 2022).

### 1. The Context and Delivery of the Remark Establish It Was a Joke

The full context of the statements, which the Court did not consider at the motion to dismiss stage, ECF No. 39 at 7, makes clear that a reasonable viewer would not have understood the Remark to be a statement of fact.

In determining whether a statement is one of fact, "context is paramount." *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1379 (S.D. Fla. 2006). The court must "'examine the statement in its totality and the context in which it was uttered or published'" and "'consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published.'" *Id.* (quoting *From v. Tallahassee Democrat, Inc.*, 400 So.2d 52, 57 (Fla. 1st DCA 1981)); *see also Horsley v. Rivera*, 292 F.3d 695, 702 (11th Cir. 2002) (courts "must consider the circumstances in which the statement was expressed"); *Khodorkovskaya v. Gay*, 5 F.4th 80, 85 (D.C. Cir. 2021) ("genre matters when assessing whether challenged speech is reasonably understood to communicate actual facts about a person").

When the context signals to listeners they will hear jokes and opinions, not facts alone, that context supports the conclusion that a given statement is not reasonably understood as a statement of fact. Courts have thus dismissed defamation claims based on statements by such well-known comedians as Jerry Seinfeld, *see Lapine v. Seinfeld*, 31 Misc. 3d 736, 754 (Sup. Ct. N.Y. Cnty. 2011) (statements made by "well-known comedian" on "a late-night entertainment program" that were "repeatedly punctuated by laughter from the audience"—for example, that plaintiff "was a mentally unhinged

stalker of the Seinfelds"—were protected opinion); Ellen DeGeneres, *see Pierce v. Warner Bros. Ent., Inc.*, 237 F. Supp. 3d 1375, 1380 (M.D. Ga. 2017) (dismissing defamation claim over DeGeneres' mispronunciation of plaintiff's name to sound like "titty" when showing a real yard sign with plaintiff's name and company name, because DeGeneres is "a comedian" and "no person watching the Ellen DeGeneres show could reasonably have believed anything DeGeneres said to be stating actual facts"); and Robin Williams, *see Polygram Recs., Inc. v. Super. Ct.*, 170 Cal. App. 3d 543, 556 (Cal. Ct. App. 1985) (jokes by Williams about "Red Wines," "White Wines," and "Black Wines" "before an audience that knew him as a comedian" were "obvious figments of a comic imagination" and not defamatory).[7]

Importantly, courts have also recognized that satire "is often grounded in truth" and "layer[s] fiction upon fact," just as Mr. Maher's joke about a possible romantic relationship between Plaintiff and President Trump was "layer[ed]" upon the real-world facts of their frequent appearances together. *Farah v. Esquire Mag.*, 736 F.3d 528, 537 (D.C. Cir. 2013). In *Farah*, the court held that, considering a blog post "in its

---

[7] Other courts around the country have likewise dismissed libel claims against comedians or other provocateurs. *See Dworkin v. Hustler Mag. Inc.*, 867 F.2d 1188, 1193–94 (9th Cir. 1989) (looking at "the context in which the statements were made" in determining that the caption for a cartoon in a pornographic periodical was protected opinion); *Riley v. Moyed*, 529 A.2d 248, 252 (Del. 1987) (statements made by "well-known professional provocateur who relie[d] on heavy sarcasm to create controversy or convey a message" were protected opinion); *Myers v. Bos. Mag. Co.*, 403 N.E.2d 376, 379–80 (Mass. App. Ct. 1980) (context of the statements at issue "suggest[s] that the expressed opinions will have an especially humorous inclination and fanciful tone" and is not "conducive to misunderstanding a joke as a statement of fact"); *New Times*, 146 S.W.3d at 161 ("a reasonable reader could only conclude that the article was satirical" and not "stating actual facts" based on "the obvious clues in the article itself," the publication's "intentionally irreverent tone" and "semi-regular publication of satire," and "the satire's timing and commentary on a then-existing controversy").

SELECTED

context, the reasonable reader could not understand [it] to be conveying 'real news'"—even though "apart from its headline, the article did not employ the sort of imitation and exaggerated mimicry that are typical of parody"—because the "primary intended audience . . . would have been familiar with *Esquire*'s history of publishing satirical stories, with recent topics ranging from Osama Bin Laden's television-watching habits to 'Sex Tips from Donald Rumsfeld,'" and thus would have understood the blog post to be "an ironic joke." *Id.* at 536–39.

Here, based on the full context of the episode and the series, as to which there is no dispute of material fact, a reasonable *Real Time* viewer would have understood Mr. Maher to be making a joke, and not a statement of fact about Plaintiff and President Trump. *See* Baumgartner Report at 5–9; Bolger Decl., Ex. 52 ("Calvert Report") at 16–31.[8] Not only did Mr. Maher himself repeatedly testify that, in his mind, he was making a joke, *e.g.*, Maher Depo. Tr. at 21:12, 22:18–23:25, 57:9–11, but the record establishes that viewers of the show know comedians on late-night shows "make jokes" about the headlines of the week and "don't do investigations" or break news. Maher Depo. Tr. at 185:14–15. As Professor Jody Baumgartner, an expert on political humor who has published four scholarly books on the topic and edited the encyclopedia *American Political Humor*, testified in his unrebutted expert report:

> [E]verything about the context of *Real Time with Bill Maher*, from Maher's long history and renown as a self-identified comedian, to the expectation that studio audience members will laugh and applaud, to the set itself, which resembles the

---

[8] To be sure, Defendants are not arguing there is a categorical humor exception to the law of defamation, but instead that summary judgment is appropriate here because the context signals to the viewer that Mr. Maher was making a joke not a statement of fact.

> sets of so many other late-night shows, signals to the audience that the content of the show consists of jokes and other comedic material, not the earnest product of investigative journalism. . . . Maher's program corresponds to what viewers expect of late-night talk-comedy programming and distinguishes it from more informative, news-based programming. . .. [A]udience members and television viewers know that the sender or source of the messages they are receiving from *Real Time* is a comic.

Bolger Decl. Ex. 51 ("Baumgartner Report") at 1–2, 9.[9] In particular, while *Real Time* reflects and includes factual discussions of topical news cycles, as do all "late night" shows, there were numerous contextual elements signaling to the viewer that the challenged statement is likely to be a joke and not a factual news report. *Id.* at 9.

The panel discussion in the September 13 Episode was punctuated with laughter and applause throughout, including immediately after the Remark was made. *See* Episode Tr. at 8306; *see also* ECF No. 42 ¶ 22. The delivery of the Remark was in the format of a joke: It was prefaced by a set-up leading in to the punchline. And even if some audience members "groan[ed]" rather than laughed at that punchline, *id.*, that too is evidence that they understood it to be a joke, just one that warranted a groan— a frequent audience reaction to stand-up comedy and late night comedy jokes. *See* Baumgartner Report at 14. In short, the delivery of the Remark, in the context of a late-night comedy television series centered around jokes and comedic topical commentary, signaled to viewers that this was not a factual statement. A reasonable

---

[9] As Professor Baumgartner concluded in his report, the show had several hallmarks of a late night show comedy show, including that Maher is a comedian and uses vulgarity, that HBO is an entertainment network, and that *Real Time* airs during a late-night time slot, features a comedic monologue, and is filmed before a live studio audience against a cityscape backdrop. Baumgartner Report at 9. All of these context clues signaled to the viewer that the show contained jokes, including the Remark.

person hearing the Remark in full context would not have interpreted it as a fact.

### 2. Mr. Maher Was Offering Opinion, Not Making a Statement of Fact

In any event, the Remark is constitutionally protected because it was clearly conveyed as opinion and speculation in a manner that is not actionable under the law. Statements "readily understood as conjecture, hypothesis, or speculation" are not actionable as defamation. *Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997); *see also Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993) ("[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.") (citations omitted); *Marshall v. Planz*, 13 F. Supp. 2d 1246, 1257–59 (M.D. Ala. 1998) ("speculation or conjecture . . . presents or implies no truly objectively verifiable facts that would infuse it with defamatory content").

Here, Mr. Maher did not predicate the statement at issue by suggesting that he had inside information or would be breaking news about President Trump. He did not introduce the Remark by saying he had spoken to sources close to Plaintiff. Instead, Mr. Maher listed the facts upon which his speculation was based (she's young, looks like his type), then chose words that make abundantly clear he was just speculating when he said "*I think maybe* Laura Loomer is in an arranged relationship" with President Trump, "we *may* have our answer" to the question of "who's Trump f***ing?," and "I *think*" the answer "*might* be Laura Loomer." Episode Tr. at 8305-06.

Moreover, "[c]ommentary or opinion based on facts that are set forth in the [broadcast] or which are otherwise known or available to the [viewer]" are protected.

*Rasmussen v. Collier Cnty. Publ'g Co.*, 946 So.2d 567, 571 (Fla. 2d DCA 2006); *see also From*, 400 So. 2d 52 at 57 (commenting "on facts which are set forth in the article or which are otherwise known or available to the reader or listener as a member of the public" is pure opinion); *Turner v. Wells*, 198 F. Supp. 3d 1355, 1366 (S.D. Fla. 2016) (similar), *aff'd*, 879 F.3d 1355 (11th Cir. 2018). Under Florida law, "for an opinion to be pure and non-actionable, it need not necessarily be based upon facts that the communicator sets forth explicitly in the publication"; "facts 'otherwise known or available to the reader or the listener as a member of the public' will suffice." *Tillett v. BJ's Wholesale Club, Inc.*, 2010 WL 11507322, at *6 n.12 (M.D. Fla. July 30, 2010) (citation omitted); *see also Zambrano v. Devanesan*, 484 So.2d 603, 606 (Fla. 4th DCA 1986) (statement is "pure opinion where the facts are already known to the audience"); *Rasmussen*, 946 So. 2d at 571 (defendant's editorials were opinion because they were "based on facts disclosed in the articles themselves or in the extensive coverage" of the "controversy"); *From*, 400 So. 2d at 57 (statements about a tennis pro were opinion because they were based on facts known in the "Tallahassee tennis community"); *Hay v. Indep. Newspapers, Inc.*, 450 So. 2d 293, 295 (Fla. 2d DCA 1984) (calling plaintiff a "crook" was opinion based on facts in the article and "readily available to the reader as a member of the public").

Here, Mr. Maher's Remark was commenting on facts disclosed to the audience. In his opening monologue, Mr. Maher introduced Loomer, stating "He's with her everywhere now," referring to President Trump. Episode Tr. at 8282. Then, right

before the joke at issue, Senator Franken remarked that Loomer had been travelling with him. *See id.* at 8282, 8304–06. Before offering his joking speculation, Mr. Maher prefaced it by setting out what it was based upon: Loomer's closeness with President Trump, President Trump's history of adultery ("he's been a dog for too long"), and Melania's absence from the campaign trail ("it's not Melania"). *Id.* at 8305. Based on that, Mr. Maher said he "think[s]" "he knows" who Trump is "f***ing." *Id.* In short, the show itself provided the facts on which Mr. Maher's opinion is based.

The facts on which the opinion was based were also known to the viewing public. President Trump has been reported to have had affairs in the past. *See* Maher Depo. Tr at 66:2–4, 66:12–16 & 187:9–14. And, in the days before the September 13 Episode, as Plaintiff testified, there was a "media frenzy" surrounding her appearances on President Trump's campaign plane and at his side. *See* Loomer Depo. Tr. at 301:1–4. Countless news outlets, from *The New York Times* and *The Washington Post* to *Rolling Stone*, reported on those appearances. *See, e.g.*, Bolger Decl. Exs. 30, 31 & 65. Pictures of them together were everywhere, in the news, *e.g.*, Bolger Decl. Ex. 107, and on social media, where they racked up millions of views, *e.g.*, Bolger Decl. Exs. 32 & 67. Plaintiff herself repeatedly posed photos with President Trump with kissy face emojis, boasted of their closeness, and declared her love for him. *See supra* at 8–10. In short, Mr. Maher was offering speculation or conjecture based on facts both set forth in the September 13 Episode itself and otherwise "known or available" to the viewer.

### 3. The Remark Is Rhetorical Hyperbole

Finally, the Remark is clearly "rhetorical hyperbole," which is protected under

the First Amendment. As the Supreme Court remarked in *Falwell*, "despite their sometimes caustic nature, from the early cartoon portraying George Washington as an ass down to the present day, graphic depictions and satirical cartoons have played a prominent role in public and political debate," and "our political discourse would have been considerably poorer without them." 485 U.S. at 54–55. So too with verbal rather than graphic satire and exaggeration. In *Milkovich*, the Court held that the First Amendment protects "loose, figurative, or hyperbolic language which would negate the impression that the" speaker is making an assertion of fact. 497 U.S. at 21.

The Remark is consistent with this tradition. Slang, crass language, and obscenity are the hallmarks of rhetorical hyperbole. *See, e.g.*, *Scott v. Moon*, 2019 WL 332415, at *2 (W.D. Va. Jan. 24, 2019) (finding that crass language and insults like f***er were rhetorical hyperbole), *aff'd*, 773 F. App'x 138 (4th Cir. 2019); *Graham v. UMG Recordings, Inc.*, 2025 WL 2879607, at *9-10 (S.D.N.Y. Oct. 9, 2025) ("profanity," "trash-talking," and "vitriolic words and imagery" are "indicia" of protected rhetorical hyperbole). Mr. Maher uses just such "loose, figurative, or hyperbolic language," including curse words and slang.

Defendants respectfully submit that the Court should grant summary judgment because no reasonable viewer would understand them to have made a statement of actual fact. "To hold otherwise would run afoul of the First Amendment and chill the free speech rights of all comedy performers and humorists, to the genuine detriment of our society." *Polygram Recs.*, 170 Cal. App. 3d at 557.

**B.    Plaintiff Cannot Prove Defendants Acted With Actual Malice**

Plaintiff's claims also all fail because she cannot prove actual malice. There is no dispute Plaintiff is a public figure. *See* ECF No. 39 at 8. As such, she must show that a jury could find, by clear and convincing evidence, that Defendants acted with actual malice. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56 (1986); *Dershowitz v. Cable News Network, Inc.,* 153 F.4th 1189, 1193 (11th Cir. 2025) (Florida requires actual malice as a matter of state law). This standard applies at the summary judgment stage.[10] "Actual malice" does not mean common-law malice in the sense of ill will or spite; it means knowledge of falsity or reckless disregard for the truth. *Sullivan*, 376 U.S. at 279–80. And "reckless disregard" does not mean recklessness in the typical objective sense of gross negligence. It is, instead, a purely "subjective test" that addresses the defendant's state of mind. *Turner*, 879 F.3d at 1273. Essentially, "reckless disregard" means the defendant actually, subjectively believed a statement was very likely false, but went ahead and published it anyway. *Id.*[11] "All that matters are the speakers' subjective beliefs about the truth of their own statements." *Dershowitz*, 153 F.4th at 1193.

Notably, Plaintiff testified at her deposition that Mr. Maher believed the challenged statements to be true. When asked under oath to "[n]ame a single human being on Planet Earth who you know of that believes what Bill Maher allegedly said,"

---

[10] *See Anderson*, 477 U.S. at 255–56 ("[T]he appropriate summary judgment question [is] whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not.").
[11] Neither "a failure to investigate" nor "a departure from reasonable journalistic standards" constitutes actual malice. *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016) (citation omitted).

her only response was "Bill Maher." Loomer Depo. Tr. at 235:22–257:13.[12] That admission alone proves Defendants could not have acted with actual malice.

Mr. Maher has likewise testified that, to the extent his statement that President Trump "may" be sleeping with Plaintiff can be construed as a statement of fact, he had no reason to doubt it—in light of President Trump's reported prior affairs, the reported closeness between him and the young, attractive Laura Loomer, and Plaintiff's own commentary about President Trump, he thought it was possible that they might actually be sleeping together. Maher Decl. ¶ 16; Johnsen Decl. ¶ 41.

Nor was the Remark so "inherently improbable, or obviously worthy of doubt," as might support a finding of actual malice. *Readon v. WPLG, LLC*, 317 So.3d 1229, 1236 (Fla. 3rd DCA 2021). President "Trump's history of infidelity" is no secret. *See* Maher Depo. Tr. at 66:2–4. And as Mr. Maher said, when "this very attractive young woman," appeared "at the side of the president everywhere," "blowing kisses at him or saying 'I love you. I love you. I love you,'" Maher Depo. Tr. at 18:9–21, Loomer Depo. Tr. at 153:18–19, it caused many to wonder if the two were romantically involved.

Mr. Maher and the *Real Time* writers were also well-aware of the reporting about Plaintiff's closeness with President Trump in the week leading up to the September 13 Episode. *See* Johnsen Decl. ¶¶ 24–27. As noted, several articles about

---

[12] She even doubled down, insisting "you said name one person, and I said, 'Bill Maher.'" Loomer Depo. Tr. at 235:22–257:13. And, when pressed on whether she could name a single human being "who believe[d] what Bill Maher said" "[o]ther than Bill Maher," she again said: "I answered your question. Bill Maher." *Id.*

Plaintiff's appearances with President Trump were circulated in the "Trending Morning Stories" email. *See* Johnson Decl. Exs. A-C, F-H, T-V. One of those articles, for example, discussed "Laura Loomer's increasing presence in former President Trump's inner circle," the "significant time" they have spent together, and concerns raised by other Republicans about her "access to Trump"; referencing "the Trump-Loomer admiration fest," it noted that Trump has "given her shout-outs while on stage at his rallies, and sent her handwritten notes." Johnson Decl. Ex. U. *Real Time* also reviewed Plaintiff's posts on X, where they saw not many photos of her and Trump together, captioned with hearts, heart-eyes emojis, and statements like "I really love him with all of my heart." *See* Johnsen Decl. Ex. Q; *supra* at 10. In short, the Remark was not improbable.

In her Amended Complaint, Plaintiff points to a 2018 Florida Bar Journal article discussing 24 "badges" of malice, ECF No. 42 ¶ 28, but no court anywhere has ever cited that article or adopted its "badges of malice" theory. Citing those "badges," Plaintiff will no doubt point to the facts that Defendants did not seek comment from her, did not issue a retraction, and did not invite her to appear on a future episode of *Real Time*, as she requested, as purported evidence of actual malice. But such facts are irrelevant, as the "failure to print [plaintiff's] denials . . . does not constitute actual malice," *Dockery v. Fla. Democratic Party*, 799 So.2d 291, 296 (Fla. 2nd DCA 2001), "the failure to retract or correct a falsehood does not prove actual malice," *Hunt v. Liberty Lobby*, 720 F.2d 631, 643 n.19 (11th Cir. 1983) (citation omitted), and even the "[f]ailure to investigate and poor journalistic standards are insufficient to

establish actual malice," *Klayman v. City Pages*, 650 F. App'x 744, 750–51 (11th Cir.
2016) (citation omitted).

Plaintiff is also certain to argue that Defendants exhibited "ill will toward the
plaintiff," ECF No. 42 ¶ 28(g), citing the "24 Things You Don't Know About Laura
Loomer" segment on the following week's episode. Initially, the undisputed evidence
proves not only an absence of ill will, *see* Maher Depo. Tr. at 119:14–15 (Maher: "I do
not hate anyone"), but also that Mr. Maher made jokes about Plaintiff because, by her
own admission, there was "nonstop coverage" about her and President Trump,
Loomer Depo. Tr. at 430:12–15. Maher Depo Tr. at 197:25–198:2. In any event that
is irrelevant: "[i]ll will is different than actual malice." *Klayman v. City Pages*, 2015 WL
1546173, at *13 (M.D. Fla. Apr. 3, 2015) (citations omitted), *aff'd*, 650 F. App'x 744
(11th Cir. 2016). As a matter of law, actual malice requires proof that statements were
known "to be false *at the time they were made*" or that the defendant "disregarded the
truth or falsity of these statements *at the time they were made*," *Dockery*, 799 So.2d at 294
(emphases added) (citation omitted) (emphases added); *accord Bose Corp. v. Consumers
Union of U.S., Inc.*, 466 U.S. 485, 498 (1984). What Mr. Maher did or did not say days
later does not inform the analysis.

Finally, at the pleading stage, this Court credited Plaintiff's allegations that Mr.
Maher "fabricated" the statement "for attention, notoriety, 'clicks,' and profit for
himself and Defendant HBO." ECF No. 39 at 3. But there is *no* evidence in the record
to support this claim. The unrebutted record evidence in fact disproves it. Mr. Maher
testified: "You're assuming I do my show for clicks. I don't. In fact, I had a billboard

up twice and the catch phrase on it was 'He's not in it for the likes.' . . . And that's my
bond with the audience. I don't do it to pander to them. I don't do it for the clicks."
Maher Depo. Tr. 63:20–64:3. No reasonable jury could conclude based on the record
evidence that Defendants acted with actual malice.

## C.    Plaintiff Cannot Prove Damage

### 1.    Plaintiff Failed To Plead Special Damages for Per Quod Defamation

To state a claim for defamation *per quod*, a plaintiff must plead and prove special
damages—"actual, out of pocket losses which must be proven by specific evidence as
to the time, cause and amount."[13] *Falic v. Legg Mason Wood Walker, Inc.*, 347 F. Supp.
2d 1260, 1268 (S.D. Fla. 2004); *accord, e.g.*, *Open Sea Distrib. Corp. v. Artemis Distrib.,
LLC*, 692 F. Supp. 3d 1151, 1202 (M.D. Fla. Sept. 19, 2023) (*per quod* plaintiff "must
specially plead and prove special damages proximately resulting from the
defamation"); *Anderson v. Smith*, 2020 WL 10058207, at *3 (M.D. Fla. Mar. 24, 2020)
(requiring allegations of "a realized or liquidated loss"); *Flynn*, 2023 WL 5985193, at
*5 (same).

Plaintiff has not pled or shown any "actual, out of pocket loss" here anymore
than she did in her original complaint. *See* ECF No. 39 at 11. While she added
conclusory allegations of "lost economic opportunities" in her Amended Complaint,

---

[13] Though Plaintiff does not use the phrase "defamation per quod," that is what she means when she
asserts claims for "defamation" alongside her claims for "defamation per se." "Under Florida law, a
claim for defamation may be categorized in one of two ways: defamation *per quod* or defamation *per
se*." *Flynn v. Cable News Network, Inc.*, 2023 WL 5985193, at *4 (M.D. Fla. Feb. 22, 2023) (quotation
omitted).

Am. Compl. ¶ 44, she pled no concrete losses and has offered no "specific evidence" of the "time" or "amount" of those alleged lost opportunities, *Falic*, 347 F. Supp. 2d at 1268—even after being compelled by this Court to produce her evidence of damages, *see* ECF Nos. 98 & 116. Plaintiff's failure to provide specific evidence of special damages compels dismissal of her defamation *per quod* claim.

### 2.    Plaintiff Was Required To Prove Damages and Did Not

Plaintiff's defamation *per se* and defamation by implication claims must be dismissed because she was required to, but did not prove, actual injury. Florida law requires a defamation plaintiff in a case against a media entity to prove damages. *See, e.g.*, *Edelstein v. WFTV, Inc.*, 798 So. 2d 797, 798 (Fla. 4th DCA 2001) (holding that "a plaintiff suing a media defendant must nevertheless plead and prove actual injury," even in cases of defamation *per se*); *Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1119 (S.D. Fla. 2021) ("Florida law applies the Supreme Court's ruling from the well-known First Amendment defamation case of *Gertz v. Robert Welch Inc.*, 418 U.S. 323 (1974), which eliminates presumed damages for defamation per se actions against media defendants."); *Mid-Fla. Television Corp. v. Boyles*, 467 So. 2d 282, 283 (Fla. 1985) ("At common law, before *Gertz*, we said '[w]ords amounting to a libel per se necessarily import damage and malice in legal contemplation, so these elements need not be pleaded or proved, as they are conclusively presumed as a matter of law.' This statement is no longer accurate regarding a libel action against the media.") (quotation omitted); *see also Rapp*, 997 So.2d at 1108 ("All of the protections of defamation law

that are afforded to the media . . . are therefore extended to the tort of defamation by implication.").

Defendants are quintessential media defendants. *See, e.g.*, *Nichols v. Moore,* 477 F.3d 396, 400 (6th Cir. 2007) (filmmaker was "media defendant" for purposes of constitutional limitations imposed by First Amendment on defamation claims); *Street v. Nat'l Broad. Co.,* 512 F. Supp. 398, 406 n.6 (E.D. Tenn. 1977), *aff'd*, 645 F.2d 1227 (6th Cir. 1981) (applying Gertz's actual damages requirement to acquirer and distributor of television docudrama and noting that "[t]elevision entertainment . . . is under the blanket of First Amendment protection") (citation omitted). News and entertainment are equally parts of the "media" ecosystem. *See Time, Inc. v. Hill*, 385 U.S. 374, 388 (1967) ("[T]he line between the informing and the entertaining is too elusive for the protection of freedom of the press.") (citation modified); *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 501 (1952) ("What is one man's amusement, teaches another's doctrine.") (citation omitted); *Brown v. Ent. Merch. Ass'n.*, 564 U.S. 786, 790 (2011) ("The Free Speech Clause exists principally to protect discourse on public matters, but we have long recognized that it is difficult to distinguish politics from entertainment, and dangerous to try."); Calvert Report at 16–31.

By way of analogy, Florida courts interpreting Section 770.01, which requires plaintiffs to notify media defendants of a defamatory statement before filing suit, have explained that "media defendants are not just those who 'impartially disseminate information,' or 'issue unsolicited disinterested and neutral commentary as to matters of public interest.' The term also applies to those who 'editorialize as to matters of

public interest without being commissioned to do so by [their] clients.'" *Tobinick v.
Novella*, 2015 WL 1191267, at *8 (S.D. Fla. Mar. 16, 2015) (citations omitted); *see also,
e.g.*, *Grlpwr, LLC v. Rodiguez*, 2023 WL 5666203, at *1 (N.D. Fla. Aug. 25, 2023)
(operator of a YouTube channel about pyramid schemes was media defendant for
purposes of Section 770.01). That is precisely what *Real Time* does each week—
editorialize as to matters of public interest. *See, e.g.*, Maher Depo. Tr. at 37:3–4 ("It's
part of my job to render my opinion on the passing parade of American politics.");
Rosenstein Depo. Tr. at 41:13 ("It's an opinion show."). Indeed, Plaintiff
acknowledged that Defendants are media defendants by making a retraction request
under Section 770.01, ECF No. 42 ¶ 32—a process required for claims only against
"media defendants." *Zelinka v. Am. Healthscan, Inc.*, 763 So. 2d 1173, 1175 (Fla. 4th
DCA 2000).

Plaintiff is thus required to prove she was damaged to prevail. She has failed to
do so. She has not identified a *single* individual who was allegedly caused to believe
that she was sleeping with President Trump as a result of the Remark or a *single*
relationship that was damaged. She has not offered any expert testimony quantifying
her reputational harm. She has not introduced income statements or tax records from
the year of the Remark or after, as she would need to do to prove a decline in her
income. In fact, she testified that her income *increased* in 2024 compared to prior years,
Loomer Depo. Tr. at 485:9–14, and that she continues to speak to and meet with
President Trump, to be solicited for her opinions by him, and to receive invitations to
the White House, *see, e.g.*, *id.* at 15:2–4, 32:8–34:8, 216:21–217:21, 219:18–21.

The only record evidence that Plaintiff can point to in support of her claim that she should be working in the White House but for Mr. Maher's statement is her own self-serving deposition testimony, in which she stated:

> [A]fter this happened, I received a phone call from Chris LaCivita, who is President Trump's -- who was President Trump's campaign manager -- Chris LaCivita. . . . And he said, "I'm sorry that I have to have this conversation with you. It's awkward. But you cannot come on the plane because of the media frenzy that has been created as a result of Bill Maher's comments saying that you had an affair with President Trump."

*Id.* at 226:5–19.[14] As a threshold matter, this is hearsay that may not be considered on a motion for summary judgment. *See Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) (hearsay evidence "cannot be considered on a motion for summary judgment") (quotation omitted). In any event, the purported hearsay statement goes only to why she was not invited on the plane, not to why she did not get a campaign or administration job. *See* Bolger Decl. Ex. 55 (Supplemental Interrogatory Responses). Finally, damages have to arise from the mistaken belief that the allegedly false statement of fact is true. *See Sullivan*, 376 U.S. at 260 (no proof of damages absent evidence that third parties "actually believed the statements"). But Plaintiff cites no evidence that President Trump's campaign staff believed the statements to be true, thought less of her, and/or denied her a job on that basis. To the contrary, she testified that "nobody I know actually believe[d] [it]. . . . They know that . . . there was no romantic relationship," Loomer Depo. Tr. at 233:7–14, and that "most of the

---

[14] Plaintiff later testified that she was the one who had asked to speak to Mr. LaCivita because she wanted someone to tell Rep. Greene's intern, who was posting about the speculation that President Trump and Plaintiff were sleeping together, to stop doing so. *See* Loomer Depo. Tr. at 462:6–465:12.

president's staff follow me on social media," *id.* at 20:22–21:1. Plaintiff has failed to
prove actual damage.

### 3. Plaintiff Has Not Shown Her Alleged Damage Was Caused by the Remark

In addition to having to prove damages, a defamation plaintiff must also
demonstrate that the allegedly defamatory statements proximately caused that injury.
*See, e.g.*, *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1348 (M.D. Fla. 2006).
In other words, Plaintiff must show that the statements at issue are the "sole cause" of
her asserted damages. *See, e.g.*, *Egwuatu v. Burlington Coat Factory Warehouse Corp.*, 2011
WL 2413833, at *5 (M.D. Fla. June 10, 2011) (granting summary judgment based on
lack of causation); *Wound Care Concepts, Inc. v. Vohra Health Servs. P.A.*, 2022 WL
320952, at *14 (S.D. Fla. Jan. 28, 2022) (same).

Plaintiff's entire theory of damages hinges on her unsupported allegations that
she was denied a job in President Trump's administration because of the Remark and
that she would have been able to "parlay . . . working for a presidential administration
into getting other jobs in the future." Loomer Depo. Tr. at 144:13–245:9.[15] As Plaintiff
acknowledged, that theory of harm is "speculative." *See id.* at 246:11–14 ("So when
you work for an administration, once the person is out of office, or once you're done
with your job, you know, that could parlay into a lot of speculative opportunities.");
*see also id.* at 245:7–9 ("[I]t makes me wonder how much it's going to cost me both in

---

[15] Plaintiff testified that she would make $180,000 if she had a job in the White House. *See* Loomer
Depo. Tr. at 243:21–244:2 & 484:8–22. Even assuming that she will not get that job and that she will
make less than $180,000 in 2024-2028, any difference between her actual earnings and $180,000 over
four years is obviously less than her claimed $150 million in damages.

my reputation and also . . . in monetary value."); *id.* at 245:17–19 ("[W]ho knows what I could have parlayed having that on my resume."); Bolger Decl. Ex. 55.

Moreover, Plaintiff cannot prove Defendants' statement was the proximate cause of her not being offered a job, in light of her well-documented history of controversial behavior. Plaintiff's own documents and testimony establish that: (1) she is a highly controversial figure criticized even by many Republicans and members of President Trump's circle before the September 13 Episode, *see* Loomer Depo. Tr. at 247:19–248:3 ("I have a lot of haters."); Bolger Decl. Ex. 21 (Apr. 7, 2023 E-mail from Laura Loomer to Susie Wiles); Bolger Decl. Ex. 29 (reporting that "Republicans are blaming the influence of Laura Loomer" for Trump's "botched debate performance"); Bolger Decl. Ex. 66 (reporting that Plaintiff's presence on the campaign "has caused anxiety among those close to the former president," with a former Trump campaign staffer calling her "an extreme liability"); *see supra* (tweets from Marjorie Taylor Greene, Lindsey Graham, and Thom Tillis); (2) she had already angled—and failed— to get a job with the Trump campaign a year and a half before the September 13 Episode, *see, e.g.*, Bolger Decl. Ex. 20 at 46:11–35 (people in Trump's circle "were able to block President Trump's orders to hire me on four separate occasions"); Loomer Depo. Tr. at 74:11–15 (testifying that she "was supposed to start working for his presidential campaign on April 1st of 2023" but then "did not"); and (3) countless news outlets and social media commentators were speculating about Plaintiff and President Trump having a romantic relationship before the September 13 Episode, *see supra*. Plaintiff cannot show any actual harm attributable to Defendants' conduct.

### D.   Plaintiff's Defamation By Implication Claim Fails

Finally, Plaintiff's defamation by implication claim also fails for the additional, independent reason that she has already failed once to plead its elements and did not remedy those deficiencies in the Amended Complaint. A "defamation by implication applies in circumstances where literally true statements are conveyed in such a way as to create a false impression." *Rapp*, 997 So.2d at 1108. When the plaintiff alleges the statement at issue is false, the defamation by implication claim must be dismissed. *See, e.g., Jacoby v. CNN,* 537 F. Supp. 3d 1303, 1313 (M.D. Fla. 2021) ("The Court cannot accept as true Plaintiff's allegation in Count I that this statement is false, while also accepting as true Plaintiff's allegation in Count II that this same statement is true."), *aff'd*, 2021 WL 5858569 (11th Cir. Dec. 10, 2021); *Corsi*, 519 F. Supp. 3d at 1124 ("The Complaint pleads only that [defendant's] accusations were false—not that they were true and gave a false implication—which requires dismissal."); *Flynn*, 2023 WL 5585193, at *7 (dismissing claim where "the allegedly false statement of fact underlying her defamation per se claim and the false implication underlying her defamation by implication claim are one and the same"). Plaintiff repeatedly alleges in the defamation by implication claim that the challenged statement—the Remark— is "false." ECF No. 42 ¶¶ 18, 57–60, 62, 85, 87–90, 92. That alone dooms her claim.

Plaintiff tries to avoid that result by alleging that Defendants made "five separate statements" "to create the defamatory implication that Ms. Loomer had committed adultery with President Trump": "(1) Ms. Loomer is 'very close to Trump,'[true], (2) Ms. Loomer is 31 years old [true], (3) Ms. Loomer 'looks like

[Trump's] type,' [could be true, but unknown to Ms. Loomer], (4) Trump is a 'dog' who has to be sleeping with someone [veracity unknown to Ms. Loomer], and (5) the person that Trump is sleeping with is not his wife, Melania [veracity unknown to Ms. Loomer]." *Id.* ¶ 24. But this pleading does not save her claim.[16] Plaintiff does not even allege, much less offer evidence to prove, that three of the statements—that she "looks like his type," that President Trump is a "dog," and that President Trump is not sleeping with Melania, *id.* ¶¶ 18, 24—are literally true. (Indeed, Plaintiff would be hard-pressed to prove the "literal truth" of the figurative expression that President Trump is a "dog.") And the only two statements Plaintiff alleges are "literally true"— that Plaintiff is (or was at the time of the September 13 Episode) 31 years old and that she is "very close to Trump"—are not alleged on their own to convey the implication that is sleeping with President Trump. Indeed, if those two facts alone gave rise to a defamatory implication, every news article discussing Plaintiff would be defamatory.

## CONCLUSION

Mr. Maher made a Remark about a public figure. Because no reasonable reader understood him to make a statement of fact and because Plaintiff has not proved Defendants acted with actual malice or that she suffered damages, and for all of the foregoing reasons, summary judgment should be entered in favor of Defendants.

Respectfully submitted,

---

[16] In fact, Plaintiff's realization that the Remark is based on truthful statements supports Defendants' arguments that the Remark is a statement of opinion based on disclosed facts.

/s/ Rachel E. Fugate

Rachel E. Fugate (#144029)
Yelan Escalona (#1031564)
Shullman Fugate PLLC
100 South Ashley Drive, Suite 600
Tampa, FL 33602
Tel: (561) 429-3619
rfugate@shullmanfugate.com
yescalona@shullmanfugate.com

Katherine M. Bolger (*pro hac vice*)
Alexandra Perloff-Giles (*pro hac vice*)
Davis Wright Tremaine LLP
1251 Ave. of the Americas, Fl. 21
New York, NY 10020
Tel: (212) 489-8230
katebolger@dwt.com
alexandraperloffgiles@dwt.com