**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

LAURA LOOMER,                    }
                                 }
                                 }
            Plaintiff            }
                                 }        **Case Number: 5:24-cv-00625-JSM-PRL**
        v.                       }
                                 }
BILL MAHER and HOME BOX          }
OFFICE, INC., et al              }
                                 }
            Defendants.          }

---

**PLAINTIFF LAURA LOOMER'S RESPONSE IN OPPOSITION TO**
**DEFENDANTS BILL MAHER AND HOME BOX OFFICE INC.'S MOTION**
**FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF**
**LAW**

Plaintiff Laura Loomer ("Mr. Loomer") hereby submits her opposition to Defendants Bill Maher's ("Defendant Maher") and Home Box Office, Inc.'s ("Defendant HBO") (collectively "Defendants") Motion for Summary Judgment (the "MSJ"). This is a defamation case where Ms. Loomer was used as a vehicle for the Defendants and their counsel to attack President Donald Trump, whom they loathe, during the 2024 Presidential election cycle. This was done in order to try to influence the 2024 Presidential election by attacking Trump's reputation by claiming that he was having an adulterous affair with Ms. Loomer. Specifically, Defendants published:

> **I think maybe Laura Loomer's in an arranged relationship to affect the election because she's very close to Trump. She's 31, looks like his type. We did an editorial here a few years ago...it was basically, who's Trump fucking? Because I said, you know, it's not nobody. He's been a dog for too long, and it's not Melania. I think we may have our answer this week. I think it might be Laura Loomer**. Am. Comp. ¶ 18; Loomer Affidavit ¶ 2 (the "Defamatory Statement").

This constitutes defamation *per se* because it "tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or tends to injure one in his trade or profession." *Sterling v. De La Rosa*, 2025 U.S. Dist. LEXIS 102062, at *9 (M.D. Fla. May 29, 2025) and defamation by implication because it's (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts...."' *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008).

Now, Defendants have filed a MSJ which is near verbatim recycling of their initial Motion to Dismiss, which was already denied by this Court on

January 16, 2025, and which is therefore law of the case. ECF No. 39. The MSJ raises the same arguments already rejected by this Court and fails to establish any "undisputed material facts" necessary to warrant summary judgment. Fed. R. Civ. P. 56(c)(1).

In contrast, Ms. Loomer obtained a clear and unequivocal admission from Defendant Maher at his deposition that he had no knowledge and thus no basis to publish that Ms. Loomer was "fucking" President Trump and committing adultery behind the back of Melania Trump because they have no sexual relations, before he made and published the following malicious, and defamatory statement. At his deposition, Defendant Maher was forced to admit:

> Q You don't have any information, do you, that Ms. Loomer had sex
> with Donald Trump, do you?
> A No…. Maher Deposition 23:7-9.

Thus, given that Defendants have failed to raise any new arguments from their already denied Motion to Dismiss which is now the law of the case, and Ms. Loomer has  provided an admission from Defendant Maher that he had no knowledge and thus no basis to publish that Ms. Loomer was "fucking" President Trump, the Court must deny the Defendants' MSJ for this and the other compelling reasons set forth below, in its entirety.

## INTRODUCTION

Given the lack of colorable legal and factual arguments contained in Defendants' MSJ, it is perhaps unsurprising that their main and now shop-worn argument continues to be that the Defamatory Statement at issue was only a

"joke"—a failed argument that has already been rejected by this Court, which previously held:

> Indeed, and as Loomer argues in her filings, **Maher cannot, at this stage, escape liability because he couches his statements as a joke, an opinion, or as "conjecture, hypothesis, or speculation" because the statements do not appear that way on their face.** Loomer alleges that Maher stated as a fact that Loomer "might" be "fucking" President Trump, a married man, which she claims was and is false and which is capable of being proven false. Maher's use of the term "might" does not automatically render Maher's statements protected opinion or conjecture.

Unfortunately for Defendants, the Court's prior reasoning continues to be an accurate reflection of black-letter defamation law. Thus, despite Defendants' MSJ containing nearly 50 "Hail Mary" attempts to argue that Defendant Maher believed he was telling a joke, this failed argument completely misses the point.

The relevant inquiry <u>is not</u> the mantra of what Defendant Maher now claims, with obviously coached testimony,  to have believed on September 13, 2024—which claim is undoubtedly self-serving, to say the least, as a result of this litigation. The relevant inquiry <u>is</u> how the defamatory statement was perceived by Defendants' millions of viewers, and under any rational analysis, the Defamatory Statement could reasonably and plausibly be perceived as a statement of fact of and concerning Ms. Loomer.

The Defamatory Statement constitutes objectively verifiable fact of and concerning Ms. Loomer. Defendant Maher poses the vulgar and highly offensive statement, "**who's Trump fucking**?" He then states that "**we may have our answer**" to this question: "**Laura Loomer**."  This is reasonably and plausibly understood by any reasonable viewer as Defendant Maher making a factual and

at a minimum implying a false statement of objectively verifiable fact of and concerning Ms. Loomer. Am. Comp. ¶20.  This statement is also plainly false. Am. Comp. ¶ 21; Loomer Affidaivt ¶ 3.

All of the elements of defamation are satisfied and, as set forth below, none of the Defendants' purported "undisputed facts" prove otherwise.

## DEFENDANTS' ALLEGED UNDISPUTED FACTS FAIL TO SUPPORT SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure (the "Rule(s)") 56(a), the Court can only grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a) further mandates that the movant must support the assertion that a fact cannot be disputed and must support that accusation by:

> citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or…showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. *Id*.

Defendants have failed to meet this burden. Defendants' MSJ does not contain a dedicated list of their alleged "undisputed facts." Digging into their motion, it appears that they alleged the following facts are "undisputed": (1) that the Defamatory Statement was not a statement of fact; (2) that Defendant Maher did not act with actual malice, (3) that Ms. Loomer did not suffer damages; (4) that

Defendants did not act with "ill will"; and (5) Ms. Loomer is a public figure. As

set forth below, Defendants fail to demonstrate any "undisputed" material facts.[1]

**A.    UNDISPUTED FACT 1 - Defendants Fail To Demonstrate That The Defamatory Statement Was Not a Statement of Fact and the Defamatory Statement Was an Actionable Statement of Fact.**

The totality of the so called "evidence" cited by Defendants in support of

this spurious argument is Defendant Maher's testimony that he believed he was

telling a joke. "Mr. Maher himself repeatedly testified that, in his mind, he was

making a joke, e.g., Maher Depo. Tr. at 21:12, 22:18–23:25, 57:9–11…." MSJ at 22.

However, as set forth above, and as already found by this Court, the tortfeasor

cannot escape liability *ex post facto* by "couch[ing] his statements as a joke, an

opinion." ECF No. 39 at 7. Given the Court's prior finding, and the fact that

Defendants have failed to provide even a shred of evidentiary support that the

Defamatory Statement was not a statement of fact, they have clearly failed to

satisfy their burden under Rule 56, particularly given the fact that Defendant

Maher is not a comedian. He is a political pundit. Loomer Affidavit ¶ 9.

To the contrary, as testified under oath by Ms. Loomer at her deposition,

she provided evidence that there were people that understood the Defamatory

Statement as a statement of fact. Ms. Loomer testified: "I turned over tweets. I

turned over media reports that insinuated that I'm a whore; that I was having an

affair with the president." Loomer Deposition 53:3-5. For example, Ms. Loomer

produced a tweet from "The Vigilant Fox" which stated: "Bill Maher is flipping

the script on @LauraLoomer, claiming she is in an "arranged relationship" with

---

[1] It is undisputed that Ms. Loomer is a public figure.

Donald Trump. But then he took it even further, suggesting Loomer is doing you

know what with Trump." Loomer Affidavit ¶ 18.

**B.    UNDISPUTED FACT 2 - Defendants Fail To Demonstrate That
Defendant Maher Did Not Act With Actual Malice and Defendants
Acted With Actual Malice.**

At his deposition, Defendant Maher clearly and unequivocally admitted

that he had no basis in fact to allege that Ms. Loomer was "fucking" President

Trump:

> Q: You don't have any information, do you, that Ms. Loomer had sex
> with Donald Trump, do you?
> A: No…. Maher Deposition 23:7-9.

Given this admission, it is impossible for Defendants to claim that it is

"undisputed" that Defendant Maher did not act with actual malice, given that

Defendant Maher conceded that he had no knowledge that Ms. Loomer might be

"fucking" President Trump before publishing the Defamatory Statement.

Defendants attempt to overcome this insurmountable hurdle by referring

to media articles concerning Ms. Loomer's "close relationship" with President

Trump before September 13. MSJ at 8 – 12. Notably absent from these articles,

however, is any reputable report that Ms. Loomer was in a sexual, adulterous

relationship with President Trump. As Defendants are certainly aware,

"individuals are [only] entitled to rely on 'previously published reports' from

**reputable sources**.'" *Berisha v. Lawson*, 973 F.3d 1304, 1313 (11th Cir. 2020). As

they did in their failed motion to dismiss, Defendants' "sources" consist of  (1)

posts made by random individuals on X[ Bolger Decl. Ex. 32, Bolger Decl. Ex. 33,

Bolger Decl. Exs. 68-105] or (2) "articles" aggregating posts made by random

individuals on X. Thus, once again, the only "sources" that Defendants have are random, unverified people on X speculating wildly about Ms. Loomer and President Trump's relationship without any direct knowledge.

Defendants also apparently claim that Ms. Loomer's deposition testimony that she had been on President Trump's airplane supports the allegation that she was in a sexual, adulterous relationship with President Trump. The undersigned is not sure if counsel for Defendants is aware of this fact, but studies have shown people are somehow actually able to share an airplane without having sex. The fact that people are somehow actually able to share a flight without having sex, particularly in this case with presidential staff and media on the plane, is perhaps obviously a staple of the commercial airline industry.  This "Hail Mary" claim is not less than theatre of the absurd.

Thus, Defendants' inability to produce one single credible source stating that Ms. Loomer had engaged in a sexual, adulterous relationship with President Trump, despite months of discovery,  in conjunction with Defendant Maher's own admission that he had no knowledge of it, means that Defendants have fallen substantially short of the summary judgment standard.

**C.    UNDISPUTED FACT 3 - Defendants Fail To Demonstrate That Ms. Loomer Did Not Suffer Damages and Ms. Loomer Suffered Damages.**

With regard to damages, it is clear first and foremost that damages are presumed where a statement is defamatory *per se. Wolfson v. Kirk*, 273 So. 2d 774 (Fla. Dist. Ct. App. 1973).  It is indisputable that the Defamatory Statement constitutes defamation *per se* because it publishes that Ms. Loomer has been

"fucking" and committing adultery with President Trump, who is a married man. Am. Comp. ¶ 19. "The false accusation of a woman of adultery is libelous per se." *Firestone v. Time, Inc.*, 305 So. 2d 172, 175 (Fla. 1974).

Furthermore, as shown in Ms. Loomer's Affidavit, Ms. Loomer has produced evidence that she had applied for a job in President Trump's administration. Loomer Affidavit ¶ 20. This evidence consists of her email exchange with President Trump's staff regarding her resume and cover letter. Loomer Affidavit ¶ 20. The evidence also shows that Ms. Loomer's chances of getting a job in President Trump's administration was not farfetched and in fact likely, given that President Trump had previously offered her a job working on his campaign. Loomer 72:6-8 ("Q -- and at that time, he offered you a job on his campaign; is that correct? A Yes. Mm-hmm."). Ms. Loomer also testified that she had conversations with President Trump's Chief of Staff, Susie Wiles, confirming that she would have a job in President Trump's administration if he won the 2024 election:

> I had conversations with Susie Wiles that I would have a position at the White House after the election if -- if President Trump won. And he did win. And I had this conversation on the phone and in person multiple times during the campaign. Loomer Deposition at 82:9-13.

It was also widely reported prior to the Defamatory Statement, Ms. Loomer had been travelling with President Trump and had access to President Trump. Loomer Affidavit ¶ 23. This was true. What was not true, however, was that she was having a sexual, adulterous relationship with President Trump.

8

Then, Defendants used their platform to broadcast to millions of people that Defamatory Statement on September 13, 2024. Am. Comp. ¶ 18, Loomer Affidavit ¶ 2.  As a direct and proximate result of this Defamatory Statement, the entire attitude from the Trump Administration shifted against Ms. Loomer as she was made "radioactive", as they were clearly trying to distance themselves from the outrageous and scandalous defamatory allegations made by the Defendants. As testified by Ms. Loomer, after the 2024 Presidential election after President Trump has won, Ms. Loomer attempted to engage President Trump's office on their past promise of employment, but was effectively brushed off and referred to the transition team:

> A: I mean, after the election was over, I had conversations with the transition staff. You can see  from this letter. And you know, I was like, "Oh. You have to talk to the transition team." But I -- like I said, I was promised a position multiple times, not just by President Trump, but also, by Susie Wiles. Loomer Deposition at 84:1-3.

And, it is undisputed that a formal offer of employment with President Trump's administration, which the evidence shows that Ms. Loomer had been promised prior to the September 13, 2024 Defamatory Statement, never actually materialized. Loomer Affidavit ¶ 25. Ms. Loomer testified at her deposition that this was caused by the Defamatory Statement:

> And that has stunted a lot of my aspirations, just like I believe this defamation has  stunted my goals and my aspirations. Because you know, when you accuse somebody of -- of something like sleeping with the president, it kind of makes you  radioactive, even if people know that it's fake. Loomer Deposition 96:3-8.

Given this series of events, it is clear that Defendants cannot demonstrate that it is "undisputed" that Ms. Loomer cannot prove damages. Thus, even for

Ms. Loomer's defamation *per quod* claims, Defendants have failed to show as an undisputed material fact that Ms. Loomer has not shown sufficient damages.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Great Lakes Ins. Se. v. Ming,*, 2025 U.S. Dist. LEXIS 169821, at *3 (M.D. Fla. Sep. 2, 2025). "A dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party…. A material fact is one that "might affect the outcome of the suit under the governing law." *Id.* (internal citations omitted). "Courts may not make credibility determinations or weigh the evidence when reviewing the record." *Id.* "**Instead, courts view evidence and draw all reasonable inferences in the nonmoving party's favor**." *Id.* (emphasis added) "In sum, the ultimate question…is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.* at 4.

## LEGAL ARGUMENT

I. **DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON ANY OF MS. LOOMER'S DEFAMATION CLAIMS**

The elements of defamation are "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Peerenboom v. Perlmutter*, 2017 Fla. Cir. LEXIS 14957, *24. To determine whether a statement is defamatory, it must be considered in context of the publication. *Smith v. Cuban*

*Am. Nat'l Found.*, 731 So.2d 702, 705 (Fla. 3d DCA 1999).  A jury issue is present whenever a phrase is "ambiguous and reasonably susceptible of a defamatory meaning." *Perry v. Cosgrove*, 464 So. 2d 664 (Fla. Dist. Ct. App.1985).

Furthermore, of particular importance to this instant matter is the fact that Florida courts have found that one may not escape liability for defamatory conduct simply by attempting to couch a defamatory statement as  "opinion." *Barnes v. Horan*, 841 So. 2d 472, 476-77 (Fla. Dist. Ct. App. 2002); *Hay v. Indep. Newspapers, Inc.*, 450 So. 2d 293, 295 (Fla. Dist. Ct. App. 1984).

### a.    The Defamatory Statement Is An Actionable Statement of Fact

Defendants do not challenge the fact that Defamatory Statement is "of and concerning" Ms. Loomer and they do not challenge its falsity either. These elements must be conceded. Defendants' primary argument is that the Defamatory Statement is not a statement of fact. Defendants attempt to argue that the Defamatory Statement is "speculative in nature" and "protected rhetorical hyperbole" and that Defendant Maher should apparently be granted some form of blanket "immunity" from defamation because he is a self-described "comedian and political satirist." None of these arguments have any merit.

### i.    There is No Blanket "Immunity" For "Comedians" Against Defamation and the Fact That Defendant Maher is a "Comedian" is Irrelevant

As they attempted to argue in their failed Motion to Dismiss – which is now law of the case - Defendants continue to attempt to manufacture a form of "immunity" against defamation for comedians. This simply has no basis in law.

The relevant inquiry remains unchanged whether the statement was intended as a joke or not. This is clearly set forth in Restatement 2d of Torts, § 563, cmt. c:

> The question to be determined is whether the communication is reasonably understood in a defamatory sense by the recipient….In determining the reasonableness of the recipient's understanding, that meaning is to be given to words which is ordinarily attached to them….. <u>The defamatory imputation may be made by innuendo, by figure of speech, by expressions of belief, by allusion or by irony or satire. So too, it may be made by words spoken in jest if not so understood</u>. (emphasis added).

Defendants have now submitted "reports" from two so called hired gun experts, Jody Baumgartner and Clay Calvert, both of whom wax "poetic" about the history of satire, humor, and late-night television—which are admittedly interesting however wholly irrelevant reads—while offering little and again  no relevant analysis about the actual facts and circumstances at issue in this case, where Defendant Maher has—with admittedly no knowledge thereof—falsely accused Ms. Loomer of "fucking" President Trump. Am. Comp. ¶ 18. Both "experts" just state—as they obviously have been well paid to do, in a conclusory fashion with no supporting analogous case law involving similar facts—that Defendants should not be liable for defamation. But even more important, it is well settled that summary judgment cannot be decided on "the basis of an expert's opinion that fails to provide specific facts from the record to support its conclusory allegations." *Evers v. Gen. Motors Corp.*, 770 F.2d 984 (11th Cir. 1985).  "Experts may not supply legal conclusions or instruct the factfinder on the law; "the court must be the jury's only source of law." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990)." Thus, these "reports" have no

bearing on this actual case, where ultimately the analysis for whether a statement

is a statement of fact is the same regardless of whether an individual self-

identifies as a comedian, and which issue this Court has already ruled upon:

> "The proper focus of judicial inquiry in a case such as this is thus not
> whether the allegedly defamatory statement succeeds as comedy,
> nor whether its audience thought it to be humorous or believed it to
> be true; the threshold inquiry is simply whether the communication
> in question could reasonably be understood in a defamatory sense
> by those who received it." *Polygram Records, Inc. v. Superior Court*,
> 170 Cal. App. 3d 543, 554, 216 Cal. Rptr. 252, 259 (1985).

Ironically, Defendants admit the factual nature of the Defamatory Statement in

their MSJ. MSJ at 26. In attempting to argue that the Defamatory Statement was

an "opinion,"—which it clearly was not as set forth below—Defendants actually

lay out the factual foundation showing why anyone who heard the Defamatory

Statement would reasonably understand it as a statement of fact:

> Before offering his joking speculation, Mr. Maher prefaced it by
> setting out what it was based upon: Loomer's closeness with
> President Trump, President Trump's history of adultery ("he's been
> a dog for too long"), and Melania's absence from the campaign trail
> ("it's not Melania"). Id. at 8305. Based on that, Mr. Maher said he
> "think[s]" "he knows" who Trump is "f***ing." Id. In short, the
> show itself provided the facts on which Mr. Maher's opinion is
> based. MSJ at 26.

Thus, Defendants have effectively conceded that the context of the Defamatory

Statement would lead anyone to interpret it as a statement of fact, or at a

minimum, of mixed law and fact which is also defamatory.

Defendants' purported legal authority to the contrary serves them no

better. In *Pierce v. Warner Bros Entm't, Inc.*, 237 F. Supp. 3d 1375 (M.D. Ga. 2017),

a Plaintiff sued based on a segment called "*What's Wrong with These These Signs?*

*Signs*" on the Ellen DeGeneres Show. *Id*. at 1377. Specifically, in this segment, DeGeneres featured signs from businesses that contained errors or unfortunate double entendres, such as picture of a sign reading "$exchange." DeGeneres proceeds to make a quick joke about the sign, like pronouncing "the word in the sign as 'sex change' and suggest[ing] that 'you can come back from your vacation feeling like a new man.'" *Id*. Plaintiff Titi Pierce had her yard sign featured on this segment, and DeGeneres mispronounces her name as "titty," slang for a woman's breast, instead of its proper pronunciation, "tē-tē." *Id*. Under these facts, the Court found that the Plaintiff failed to state a claim for defamation. *Id*. at 1378. However, importantly, the Court did not make this finding simply because the case involved a segment on DeGeneres' comedic show, which wouldn't have applied here in any event because Defendant Maher is a political pundit, not a comedian. The Court made sure to point out the fact that:

> In determining whether an allegedly false statement is protected under the First Amendment as rhetorical hyperbole, "the pivotal questions are whether [the challenged] statements can reasonably be interpreted as stating or implying defamatory facts about plaintiff and, if so, whether the defamatory assertions are capable of being proved false. *Id*. at 1379.

The *Pierce* Court found that under the specific facts of its case, which have no applicability or bearing on this case, that the Ms. Pierce had failed to allege a defamatory meaning. *Id*. at 1379 – 80. Thus, this case[2] actually cuts against the

---

[2] The same applies to Defendants' other cases. In *Lapine v. Seinfeld*,, 918 N.Y.S.2d 313 (Sup. Ct.), the Court found that "Plaintiff correctly argues that 'humor and comedy have never been held to be entitled to absolute or categorical 1st Amendment protection,'" *id*. at 328, but found that the Plaintiff's specific defamation claim failed as a matter of law.

Defendants' legally unsupported position that Defendant Maher is entitled to some form of blanket "immunity" from defamation simply because he claims to be a comedian and satirist, the former of which in particular is in dispute. Indeed, there are a number of cases where a comedian has been found liable for defamation. For instance, recently, rapper Cardi B won a defamation suit against comedian and blogger Tasha K for having defamed her. *See Belcalis Marlenis Almanzar v. Latasha Transrina Kebe et al*, 1:19-cv-1301 (N.D. GA.).

Defendant Maher is not a comedian. Loomer Affidavit ¶ 9. He is a political pundit and television host. Loomer Affidavit ¶ 9. Real Time is also not comedy production. It is a political talk show. Loomer Affidavit ¶ 10. This is further underscored by context. Defendant Maher made the Defamatory Statement during a panel discussion with conservative pollster Kristen Soltis Anderson and former U.S. senator Al Franken involving serious topics such as alleged police brutality involving Miami Dolphins receiver Tyreek Hill. Loomer Affidavit ¶ 11. When Defendant Maher told the purported "joke", it drew more groans from the audience than sparse laughter. Loomer Affidavit ¶12. Below is a screenshot of the two panelists immediately following the Defamatory Statement:



The expression and reaction of the panelists, and Mr. Franken's in particular, are not ones that the Court might typically expect to see from someone who had just understood Defendant Maher's Defamatory Statement as a "satire" or "joke," evidencing that many people understood it as a statement of fact, particularly given the fact that the Defamatory Statement rings true unlike in *Hustler Mag., Inc. v. Falwell,* 485 U.S. 46, 50 (1988).

Accordingly, the Defendants' argument in this regard totally fails. There is no special protection afforded to Defendant Maher because he claims to be a "comedian." And, even assuming *arguendo* that there was, it is clear from the audience and panel reaction to the Defamatory Statement that it was not understood as being merely "rhetorical hyperbole" or a "joke."

### ii. The Defamatory Statement Is Defamatory Despite How Defendant Maher Attempted to Couch It

Defendants recycle their already failed argument that the Defamatory Statement is not one that "a reasonable viewer would understand to convey actual facts about the plaintiff" because it is "speculative in nature." In advancing this meritless argument, Defendants predictably rely on the claim that Defendant Maher – a veteran, trained media professional – attempted to couch his statements by saying that he "think[s]" that Ms. Loomer "might" be "fucking" President Trump. Unfortunately for Defendants, this outrageous tactic does not protect them from liability for the Defamatory Statement.

The Supreme Court has conclusively found that a party cannot escape liability for defamation simply by couching his defamatory statement under the

guise of opinion, and has even provided a clear illustrative example of this fundamental principle:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. **Simply couching such statements in terms of opinion does not dispel these implications**; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19 (1990) (emphasis added).

The *Milkovich* Court apparently predicted and foretold of Defendant's meritless arguments back in 1990 and found that a Defendant cannot escape liability for his defamatory statements simply by using the phrase, "I think:"

> It would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.'" *Id*. at 19.

*StopLoss Specialists, LLC v. VeriClaim, Inc.*, 340 F. Supp. 3d 1334 (N.D. Ga. 2018) is particularly on point. *StopLoss* was a summary judgment opinion that involved a Plaintiff emergency mitigation and remediation services provider who was retained by Escambia County to be its primary mitigation contractor following a severe rainstorm in 2014. *Id*. at 1338-39. Defendant VeriClaim was hired by Escambia County's insurance carriers to be the insurance adjuster for this project. *Id*. at 1339. At one point during this project, Tom Rongstad, the general claims adjuster for VeriClaim, sent an email to eight people involved with the Escambia County loss that stated the following:

> Team,
> This will confirm documentation exists in several forms:

> 1. Stop Loss is Dumping water into dried buildings.
> 2. Stop Loss then employs 12 temp labors [sic.] to push it around on the concrete slab with squeegees.
> <u>This appears to be Insurance Fraud</u>.
> An investigation has been initiated…. *Id.* at 1342-43 (emphasis added).

This email led to litigation for defamation between the parties, and in particularly the bolded portion of the email was under contention. On summary judgment, the Court found that "Rongstad's use of the phrase '[t]his appears to be insurance fraud,' constitutes defamation per se":

> Rather, a natural reading of the statement, even considering Rongstad's use of the qualifying phrase "this appears," would lead the average reader to the conclusion that the writing, on its face, is stating a defamatory fact about the Plaintiffs that can potentially be proven false (*i.e.*, Rongstad's allegation that Plaintiffs have engaged in insurance fraud can arguably be proven false by Plaintiffs' proffering of relevant facts and evidence that the activities engaged in were undertaken for a lawful purpose). *Id.* at 1352.

Applying this same reasoning to this instant case, Defendant Maher's statement that Ms. Loomer "might" be "fucking" President Trump is also capable of being proven false. Either Ms. Loomer did this and committed adultery, or she did not. This can be proven through affidavits from Ms. Loomer and President Trump.

Similarly, the Court can turn to *Dougherty v. Harvey*, 317 F. Supp. 3d 1287 (N.D. Ga. 2018), which involved the following statement:

> [T]he guy in the middle there he may or may not be HIV positive, I don't know, I have no idea, I have no idea I can't confirm nor deny that, that he is or isn't, I don't know, Chad, I don't know, I don't know . . . I have no idea. *Id.* at 1289.

The Court denied summary judgment on Plaintiff's count for defamation *per se* based on this statement. *Id.* at 1292. In doing so, the Court reasoned that "the out-

of-place insertion of Harvey's apophatic HIV statement is susceptible to but one interpretation—that Dougherty is HIV positive." *Id*. The *Dougherty* Court provided a lesson on linguistics that explains why Harvey's statement was defamatory *per se*, and which also describes Defendant Maher's conduct:

> On its face, Harvey's statement is a form of apophasis—a common rhetorical device in which the speaker or writer brings up a subject couched in a denial or dismissal and stated expressly to make the point denied or dismissed. That is, the device is utilized in order to "deny[] one's intention to speak of a subject that is at the same time mentioned or insinuated. See Webster's Unabridged Dictionary of the English Language, RHR Press (2001). The use of this device has the effect of emphasizing the subject while maintaining plausible deniability. See www.merriam-webster.com/dictionary/apophasis (last visited June 26, 2018)." Robinson v. Perales, 894 F.3d 818, 829 (7th Cir. 2018).Though the term itself is perhaps obscure to non-rhetoricians, apophasis is a common and familiar device that has been used for thousands of years to communicate—on the face of a statement—the very facts the statement pretends to disclaim. **To ignore the obvious import of the defining feature of Harvey's statement would be to improperly elevate form over substance.** *Id*. at 1191-92 (emphasis added).

"Apophasis" describes exactly what Defendant Maher has attempted to do here in an even more egregious fashion than in *Dougherty*. Harvey published that Dougherty "may or may not be HIV positive" and Defendant Maher published that Ms. Loomer "might" be "fucking" President Trump.

Defendants, in ironically conceding the factual nature of the Defamatory Statement, attempt to argue that the Defamatory Statement constitutes opinion because Defendant Maher "prefaced it by setting out what [facts] it was based upon." MSJ at 26. The "facts" were (1) that Ms. Loomer was "close" with President Trump, and (2) President Trump has an alleged history of adultery. However, glaringly omitted by the Defendants is the fact that Ms. Loomer's

"close" relationship was purely professional, Loomer Deposition 233:10-11, given that Ms. Loomer is an investigative journalist who was covering the 2024 Presidential election.  Thus, the logical leap from Ms. Loomer's professional "closeness" with President Trump and President Trump's alleged history of adultery—whether true or not— to alleging that Ms. Loomer was "fucking" President Trump is simply irrational and false.

Thus, in sum, Defendant Maher's couching of the Defamatory Statement using the term "think" and "might" are of no force and effect. Courts have specifically addressed and rejected the use of these dishonest and disingenuous tactics to escape defamation liability and the same result must occur here.

### iii.    The Defamatory Statement is Not Rhetorical Hyperbole

Lastly, Defendant advance the, frankly, bizarre argument that Defendant Maher's Defamatory Statement constitutes "rhetorical hyperbole" and is therefore not actionable. It is impossible to discern what portion of the challenged Defamatory Statement that Ms. Loomer is "fucking" President Trump and committing adultery constitutes "rhetorical hyperbole."

*Dibble v. Avrich*, 2014 U.S. Dist. LEXIS 146844 (S.D. Fla. Oct. 14, 2014) is illustrative of the Defendants' failed argument. *Dibble* involved a defamation suit based the following published statement:

> What in Tarnation is a Surrogate Dibble, No way this can be a real human beings name, low class redneck pig excrement, redneck asshole, PATHETIC, LOWCLASS, INBRED REDNECK SCUMBAG, venom-spewing, mud-sucking, LOW-CLASS REDNECK, REDNECK LOSERS, SON OF A BITCH, SCUMBAG DRIBBLE, Now do us all a big favor and go play some Russian Roulette with SIX

> rounds in the chamber. WHAT IN TARNATION IS A SURROGATE DIBBLE, This low-class, inbred, half-witted, redneck, idiot, horse's ass, bully, CHEAPSKATE AND ASSHOLE, venom-spewing, mud-sucking clown, NON-CUSTOMER, pig-farmer, miserable redneck loser, Surrogate Dibble yo-yo, son of a bitch, SCUMBAG DRIBBLE. *Id*. at 2.

On a motion to dismiss, the Defendant argued for dismissal on the grounds that the complained of words constituted "rhetorical name-calling or expressions of opinion which cannot be construed as statements of fact." *Id*. at 8. The Court rejected this argument, and reasoned that "Defendant's publications also contain statements about Plaintiff's intelligence, class, ancestry and business-relevant qualities. As examples of the latter, Defendant allegedly stated that Plaintiff might not be a real person, is a cheapskate, a 'non-customer,' and lacks any credibility." *Id*. Thus, the Court was unable to "conclude at this stage that Defendant's comments are mere rhetoric and cannot constitute defamatory publications." *Id*. at 8-9. If the facts of *Dibble* could not justify dismissal on the basis of "rhetorical hyperbole," it is clear that this instant case does not even warrant consideration under this theory. There is nothing outlandish, rhetorical, or hyperbolic about Defendant Maher's statements as to Ms. Loomer, which is exactly why she has been damaged so severely. Defendant Maher delivered the Defamatory Statement as if it were a statement of fact, and it was more than reasonably understood as such.

> **b.  Alternatively, at a Minimum, The Defamatory Statement Is Actionable Mixed-Opinion**

Because the preceding section more than conclusively shows that the Defamatory Statement is an actionable statement of fact, no further analysis in this regard must be undertaken. However, as an alternative argument, the Defamatory Statement at a minimum also constitutes an actionable "mixed opinion" statement.

> A statement of "'mixed opinion,' which is based on undisclosed facts that infer the plaintiff has committed an illegal act, or one that damages his or her business reputation, is actionable." Id. (citation omitted). <u>Additionally, courts have recognized that "'[e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications."</u> *Gottwald v. Bellamy*, 2011 U.S. Dist. LEXIS 62972, at *10 (M.D. Fla. June 15, 2011) (emphasis added).

*Gottwald* involved a defamation case brought by music producer Dr. Luke against a Defendant country music duo, the Bellamy Brothers. *Id.* at 2. The Defendants launched a campaign asserting that one of Plaintiff's songs infringed on their copyrighted song, and published the following statement:

> This isn't the first time [Plaintiffs Max Martin and Dr. Luke] have been accused of copyright infringement. Dr. Luke was sued in 2007 for copyright infringement . . . for "lifting" portions of Avril's hit song "Girlfriend." The suit subsequently settled in 2008. There is also a current Katy Perry song . . . called "California Gurls" produced and co-written by Dr. Luke and Max Martin . . . where the Beach Boys' record label has filed a diminutive claim against the writers and publishers of the song for credit and royalties. Dr. Luke was party to yet another copyright infringement suit in 2008 for the song "Feels Like Tonight" by Daughtry. <u>Although this is not conclusive evidence that Dr. Luke intentionally lifted a phrase from a Bellamy Brothers song, it certainly shows a possible pattern and warrants a more serious look into the matter</u>. *Id*. at 2-3 (emphasis added).

The Court denied the Defendants' motion to dismiss and found that the challenged underlined portion of the statement above was not "pure opinion." *Id*. at 10 – 11. The same applies to the facts here.

Here, Defendants have conceded that at a bare minimum, the Defamatory Statement is actionable "mixed opinion." In their MSJ at 26, Defendants details the contrived "facts" which support the Defamatory Statement: (1) Ms. Loomer is very close to Trump, (2) Ms. Loomer is 31 years old, (3) Ms. Loomer looks like [Trump's] type, and (4) Trump is a  "dog" who is fucking *someone*, but not his wife, Melania." MSJ at 26. Because Defendant Maher's recitation of "facts" is both inaccurate and incomplete—notwithstanding his assessment being totally inaccurate—under *Gottwald*, this constitutes a mixed-opinion which is also actionable as defamation.

### c.    Defendants Are Not Entitled to Summary Judgment on Ms. Loomer's Defamation by Implication Claim

Defamation by implication arises…from what is implied when a defendant '(1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts, [such that] he may be held responsible for the defamatory implication . . . .'" *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). Defamation by implication' is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements." *Id*.

In *Block v. Matesic*, 2023 U.S. Dist. LEXIS 97530 (S.D. Fla. June 5, 2023) the Court denied the defendants' motion to dismiss the plaintiff's claim for

defamation by implication on facts that are highly analogous to this instant case. *Block* involved a letter sent by defendant members of a condo association concerning the Plaintiff, which stated:

> Recently Tower One's members were subjected to at least two email blasts from a disgruntled owner disparaging the Association, its directors, the construction project, and its associated professionals with incorrect statements and facts. These unsolicited emails [sic] blasts to owners visibly listed each member's email address causing serious privacy and security concerns for everyone. Neither the Association nor its management was the source of our owners' email addresses and the method of obtainment by the owner remains unknown. The Association and management staff take your privacy and security seriously. We advise all members to check and consider updating their computer's security and privacy setting. *Id*. at 1-2.

The Plaintiff filed suit, alleging among other causes of action, defamation by implication. The Court found that the subject letter supported a claim for defamation by implication because the Plaintiff had alleged three facts contained in the letter which "imply a defamatory connection between them":

> First, the letter claimed that "[t]hese unsolicited emails [sic] blasts to owners visibly listed each member's email address causing serious privacy and security concerns for everyone."…Second, the letter noted that "[n]either the Association nor its management was the source of our owners' email addresses and the method of obtainment by the owner remains unknown"…..Third, the letter "advise[d] all members to check and consider updating their computer's security and privacy settings." *Id*. at 12 – 13.

In dismissing Ms. Loomer's defamation by implication claim on the initial complaint, the Court reasoned that a such a claim must involve "true facts to create a defamatory effect." ECF No. 31 at 10. The Amended Complaint therefore made clear that Defendants' allegations that "Ms. Loomer is very close to Trump" and "Ms. Loomer is 31 years old" were true. Like in *Block*, these true

24

facts were juxtaposed with the Defamatory Statement in order to create the false and defamatory implication that Ms. Loomer was "fucking" President Trump. Am. Comp. ¶ 18, 24.  And, as set forth in *Jews for Jesus*, the Defamatory Statement is defamatory by implication because it omits material facts, namely that (1) Ms. Loomer was not "fucking" President Trump, and (2) Defendant Maher had no knowledge that Ms. Loomer was "fucking" President Trump.  Defamation by implication thus has a lower evidentiary threshold than simple defamation and is clearly present here.

### d.    Defendants Are Not Entitled to Summary Judgment on the Issue of Actual Malice

Actual malice is shown when the Plaintiff shows "facts giving rise to a reasonable inference that the defendant published the story knowing that it was false or with reckless disregard for whether it was false or not." *Dershowitz v. Cable News Network, Inc.* 541 F. Supp. 3d 1354, 1367  (S.D. Fla. 2021) (internal quotation omitted)."[M]ost authorities suggest that a failure to retract, in conjunction with other circumstances, may be used to establish the requisite level of [constitutional] malice." John C. Martin, Comment, The Role of Retraction in Defamation Suits, 1993 U. Chi. Legal F. 293, 295 (1993). Awareness of facts prior to the defamatory statements being made which strongly suggested innocence of plaintiff from the published accusations shows actual malice. *Cape Publ'ns v. Adams*, 336 So. 2d 1197 (Fla. 4th DCA 1976). Lastly, whether in the context of the facts of this case the statements were published with actual malice is a question for the jury. *Southern Air Transport, Inc. v. Post-Newsweek Stations, Florida, Inc.*, 568 So.2d 927, 929 (Fla. App. 3 Dist. 1990).

Here, it is impossible for Defendants to show an "undisputed material fact" given Defendant Maher's admission at deposition that he had no knowledge that Ms. Loomer was "fucking" President Trump prior to making the Defamatory Statement:

> Q You don't have any information, do you, that Ms. Loomer had sex with Donald Trump, do you?
> A No…. Maher Deposition 23:7-9.

Furthermore, Defendant HBO's corporate representative, Nina Rosenstein, admitted at deposition that all of Defendant Maher's statements are reviewed either before filing or after filming and before airing:

> MS. ROSENSTEIN: Our shows are reviewed by legal, and if there are no legal issues, then the answer is yes, he can say whatever.
> MR. KLAYMAN: So do you have knowledge that the show on September 13, 2024, was reviewed by legal as to content?
> MS. ROSENSTEIN: All our shows are reviewed. The written materials are reviewed prior to the show and the -- once the show is taped, there is a legal sign-off and a programming sign-off.
> MR. KLAYMAN: Did legal review the entire show with regard to any of his ad libs -- Bill Maher's ad libs?
> MS. ROSENSTEIN: Yes. The show is taped at about 4:00 in L.A., and then it's -- and then we have a review that comes right after that in the overtime segment. And then legal programming sign off, and that was reviewed in that way.
> MR. KLAYMAN: So legal -- legal reviewed not just the written content but his ad libs?
> MS. ROSENSTEIN: Correct.
> MR. KLAYMAN: And how long after that review takes place is the show aired -- on September -- was it aired on September 13th?
> MS. ROSENSTEIN: Probably -- so sign-off is usually around, I would say, 10 after 8:00, and the show – Eastern Time, and the show airs at 10:00.
> MR. KLAYMAN: Ten after 8:00 p.m.?
> MS. ROSENSTEIN: Yes, correct.
> MR. KLAYMAN: So there's a two-hour window?
> MS. BOLGER: Object to the form.

> MS. ROSENSTEIN. Well, it's fed right away. But there is a two-hour window between when the show is taped and  when it airs. Rosenstein Deposition 48:3 – 50:6.

Thus, the testimony of Defendants' themselves admits that they had no knowledge that Ms. Loomer was "fucking" President Trump and had time to correct the defamation. Despite having multiple layers of legal review in place, still chose to publish the Defamatory Statement, evidencing a clear intent to defame, particularly given their political predictions in supporting Kamala Harris for president. This testimony alone ends the inquiry, regardless of how Defendants are now trying to walk back this admission by submitting a conflicting declaration of Defendant Maher's declaration now. At a minimum, this creates a disputed material fact, and none of the Defendants' meritless arguments otherwise can change this.

*First*, Defendants attempt to frame Ms. Loomer's response to their intentionally obtuse, confusing, and poorly worded question at deposition as some type of "gotcha" moment. Counsel for Defendants asked, "[n]ame a single human being on Planet Earth who you know of that believes what Bill Maher allegedly said…" to which, after over twenty pages of deposition transcript later, Ms. Loomer responded "Bill Maher." This was a completely disjointed exchange, which counsel for Ms. Loomer objected to because it called for speculation. Loomer Deposition at 232:16-27. In any event, the problem with Defendants' argument is patently obvious. How could Ms. Loomer know what Defendant Maher was thinking when he made the Defamatory Statement?  She was obviously confused by disjointed, lengthy exchange and the intentionally obtuse

verbiage used by counsel for Defendant. Indeed, if any deposition testimony is actually relevant to this question, it is Defendant Maher's own unequivocal admission that he had no knowledge that Ms. Loomer was "fucking" President Trump prior to making the Defamatory Statement:

> Q You don't have any information, do you, that Ms. Loomer had sex
> with Donald Trump, do you?
> A No…. Maher Deposition 23:7-9.

*Second,* as set forth above, Defendants' claimed reliance on Twitter posts and media articles are not justifiable because it is well settled that "individuals are [only] entitled to rely on 'previously published reports' from **reputable sources**.'". *Berisha v. Lawson*, 973 F.3d 1304, 1313 (11th Cir. 2020). Each and every "source" that the Defendants cite to are either (1) posts made by random individuals on X Bolger Decl. Ex. 32, Bolger Decl. Ex. 33, Bolger Decl. Exs. 68-105or (2) "articles" aggregating posts made by random individuals on X. Thus, the only "sources" that Defendants have are random, unverified people on X speculating about Ms. Loomer and President Trump's relationship without any direct knowledge. That counsel for Defendants would even try to argue that these X posts qualify as "reputable sources" is truly baffling.

Furthermore, given that Defendants have conceded that relying on random individuals without direct knowledge X posts speculating on Ms. Loomer and President Trump's relationship constitutes the extent of their "investigation," it is clear that such an investigation was wholly inadequate to justify publishing the Defamatory Statement to a global audience on HBO. "When a story is not 'hot news,' 'actual malice may be inferred when the

investigation . . . was grossly inadequate in the circumstances.'" *Hunt v. Liberty Lobby*, 720 F.2d 631, 645 (11th Cir. 1983).

*Hunt* is illustrative of the Defendants' failures. *Hunt* involved a publication called Spotlight, published by Liberty Lobby. *Id*. at 634. On the front page of the August 14, 1978 Spotlight was the announcement "CIA TO NAIL HUNT FOR KENNEDY KILLING" and referred the reader to page 4 for details. *Id*. On page four, a larger headline stated "CIA TO 'ADMIT ' HUNT INVOLVEMENT IN KENNEDY SLAYING." *Id*. Furthermore:

> A biography of Victor Marchetti, the author of the article, appeared on this page. This brief background of the author explained that Marchetti "has been involved in U.S. Intelligence activities for almost 20 years, 14 years of that time being with the CIA, the last three years of which he was staff assistant to Richard Helms. He is the author of 'The CIA and the Cult of Intelligence ' and 'The Rope Dancer. ' *Id*.

The article detailed a CIA plot to frame Hunt for the Kennedy assassination. *Id*. Hunt sued for Liberty Lobby for defamation and won. *Id*. On appeal, Liberty Lobby argued that there was insufficient evidence of actual malice, which was rejected by the Eleventh Circuit. In doing so, they found that (1) the story was not "hot news" and (2) Liberty Lobby's investigation was inadequate. "We believe that the jury could properly decide that Liberty Lobby's "investigation" did not pass muster and, accordingly, infer actual malice therefrom." *Id.* at 645.

Notably, the investigation by Liberty Lobby far exceeds what Defendants here did. The Liberty Lobby investigation consisted of the fact that they trusted Marchetti and that Marchetti had assured them that his sources were reliable. *Id*. at 638. Marchetti had submitted articles that were published by Spotlight in the

past without issue. *Id*. Spotlight "thought very highly of Marchetti, believed him
to have access to high level confidential information and, in general, felt they had
no reason to doubt the veracity of his article." *Id*. In *Liberty Lobby*, the source was
at least someone who had experience in the field of his reporting, and someone
that they had worked with in the past. Here, the "sources" are random,
unverified X posts from individuals with no direct knowledge speculating on
Ms. Loomer and President Trump's relationship. Thus, if the investigation in
*Liberty Lobby* was deemed inadequate, so too must the "investigation" here. And,
if a story about a sitting President's assassination was not considered "hot news,"
certainly the tabloid fodder here published by the Defendants is not even news at
all, much less "hot news." Thus, actual malice can be inferred.

 *Third*, it must be stated that none of the "sources" cited by the Defendants
actually confirmed that Ms. Loomer and President Trump had a sexual and
adulterous relationship. Ms. Loomer's own social media posts only indicated
that she was close with President Trump, not that there was any sexual
component to their relationship. The news reports that Ms. Loomer was
travelling with President Trump also do not support the leap that there was a
sexual relationship, particularly because President Trump was amidst a
presidential campaign, and Ms. Loomer is a prominent conservative activist and
media figure, as well as formerly a candidate for U.S. Congress. Furthermore,
none of the random X posts that Defendants rely on stated definitively that Ms.
Loomer had a sexual relationship with President Trump. Thus, even assuming
*arguendo* that these "sources" cited by Defendants were considered reputable, the

fact of the matter remains that Defendant Maher still acted with reckless disregard for the truth by falsely equating a close personal relationship between Ms. Loomer and President Trump to "Ms. Loomer is fucking Trump." Put simply, there is no "source" for what Defendant Maher and Defendant HBO published because it was completely and totally made up by the Defendants. This is textbook actual malice[3] and any arguments to the contrary are meritless and must be denied.

*Fourth*, The Florida Bar Journal published an article by a prominent legal scholar on defamation titled "*Showing Constitutional Malice in Media Defamation*" which sets forth twenty-four (24) "badges[4]" or additional indicators of actual malice -- beyond even the direct evidence here that Maher and HBO had no knowledge of what they published -- in media publications. Many of these "badges" apply here, including:

---

[3] Importantly, the Court need not even consider whether Ms. Loomer has alleged actual malice, which she did,  because, as set forth below in *supra* section II, the Defamatory Statement is defamatory *per se. Lawnwood Med. Ctr. Inc. v. Sadow*, 43 So. 3d 710, 727 (Fla. Dist. Ct. App. 2010)("the law presumes malice in their utterance" making it unnecessary to prove express malice."); *see also Wolfson v. Kirk*, 273 So. 2d 774, 776 (Fla. Dist. Ct. App. 1973) ("The law at an early time recognized a distinction between defamations "per se" and defamations "per quod". The reason underlying the distinction is that some statements are so obviously defamatory, that is damaging to reputation, that the mere publication of them **gives rise to an absolute presumption both of malice and damage**." (emphasis added). Thus, the Court need not undertake any analysis as to whether Ms. Loomer has alleged actual malice, as such is presumed under the facts of this case. However, even if the Court does undertake such an analysis, it is clear that actual malice has been more than sufficiently alleged by Ms. Loomer.
[4] Manual Socias, "*Showing Constitutional Malice in Media Defamation*," Fla. Bar. J., available at: https://www.floridabar.org/the-florida-bar-journal/showing-constitutional-malice-in-media-defamation/

(a) <u>failure to conduct a due diligence and an investigation before publishing serious and damaging allegations that are not "hot news"</u>, shown Defendant Maher's admission that he had no knowledge that Ms. Loomer was "fucking" President Trump. Maher Deposition 23:7-9.

(b) <u>failure to give the plaintiff a fair opportunity to reply to defamatory allegations</u>, shown through Defendants' refusal seek comment from Ms. Loomer in advance of the subject broadcast and/or to have extended Ms. Loomer the courtesy of appearing on a future episode of "Real Time" to deny the published statements in person and to attempt to mitigate the damages caused by their defamatory statements. Loomer Affidavit ¶ 4.

(c) <u>omitting pertinent information to create a false impression</u>, shown through Defendants' omission of the fact that Defendant Maher's had no knowledge that Ms. Loomer was "fucking" President Trump. Maher Deposition 23:7-9

(d) <u>a reporter's knowledge of facts conflicting with the report</u>, shown through the fact that Defendant Maher knew that his statements were manufactured and false or, at a bare minimum, acted with reckless disregard for the truth to increase his and HBO's viewership, "clicks" and thus profits. Maher Deposition 23:7-9

(e) <u>a preconceived determination to disparage a plaintiff or a preconceived slant or view,</u> shown through the fact that Defendants used Ms. Loomer as the tool to attack President Trump, whom they loathe, during the 2024 election cycle in order to try to influence the election. This preconceived slant is demonstrated in Defendant Maher's tweets, which were exhibits to his deposition. Examples of these tweets are: (1) "Oh for fuck sake, if Trump was any more of a pussy, he'd have to grab himself" *Deposition Exhibit 9* at 13; (2) Does Trump have to actually blow Putin? Is that what it would take? Flagrant D, balls gargling the leader of the Russian Federation? Jus asking." *Deposition Exhibit 9* at 26; (3) Trump's sons (Douchbag Bon Fuckface and Thurston Shitbag the 3rd, you'll recall) look like the date rapist in every after school special ever. *Deposition Exhibit 9* at 3. Defendant Maher even attacked President Trump's wife, Melania, for no apparent reason: "You can tell Trump misses Melania, wherever she is – today he asked Mike Pence to swat away his hand." *Deposition Exhibit 9* at 42. *See also* Maher Deposition 116:10 – 182:22.

(f) <u>repetitive media attacks on the plaintiff</u>, shown through the September 20th episode of "Real Time," where Defendants compounded the damage to Ms. Loomer with a segment titled "24 Things You Don't Know About Laura Loomer" where he continues to make false, disparaging statements about Ms. Loomer such as : It's because the person, like Trump, the nut at

the center of it, starts surrounding himself with – I mean, he normally surrounds himself with pretty crazy people – but this Laura Loomer…she's the new groupie in Trump's circle…here are 24 things you don't know about Laura Loomer." Loomer Affidavit ¶ 5.

(g) a reporter's ill will toward the plaintiff, shown through the September 20th episode of "Real Time," and he fact that Defendants loathe Donald Trump and those who are associated with him, including Ms. Loomer. Maher Deposition Exhibit 9 and 10.

(h) refusal to publish a retraction upon learning of errors in a story, through the Defendants' refusal to retract upon receiving notice of their defamatory statements pursuant to Fla. Stat. § 770.01 and refusal to issue a public apology and have Ms. Loomer appear on an episode of "Real Time" to mitigate the harm done to her. Loomer Affidavit ¶ 4.

(i) prior and subsequent defamatory statements, shown through the September 20th episode of "Real Time." Loomer Affidavit ¶ 5.

Courts around the country have found that actual malice may be inferred from the objective context in which allegedly defamatory statements are made, such as the badges set forth by Mr. Socias. In *Biro v. Conde Nast*, 807 F.3d 541, 545 (2d Cir. 2015)., the U.S. Court of Appeals for the Second Circuit held, "'[a]lthough actual malice is subjective, a court typically will infer actual malice from objective facts,' understanding that a defendant in a defamation action will rarely admit that he published the relevant statements with actual malice." The U.S. Court of Appeals for the First Circuit is in accordance, holding that because direct evidence of a speaker's subjective belief is rare, actual malice "may be shown through inference and circumstantial evidence." *Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 536 (1st Cir. 2023).

Thus, in sum, Defendants have not come even remotely close to demonstrating as an undisputed fact that they are entitled to summary judgment on the issue of actual malice.

## II.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF DAMAGES

It is indisputable that the Defamatory Statement constitutes defamation *per se* because it publishes that Ms. Loomer might be "fucking" and committing adultery with President Trump, who is a married man. Am. Comp. ¶ 18. "The false accusation of a woman of adultery is libelous per se." *Firestone v. Time, Inc.*, 305 So. 2d 172, 175 (Fla. 1974)(vacated on other grounds); "…words which falsely accuse a woman of adultery are libelous per se and that a plaintiff need not allege or prove general or special damages. *Bobenhausen v. Cassat Ave. Mobile Homes, Inc.*, 344 So. 2d 279, 281 (Fla. Dist. Ct. App. 1977). The Defamatory Statement is also defamatory *per se* because it "it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace… [and] it tends to injure one in his trade or profession." *Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953). Clearly, the false statement that Ms. Loomer had an affair with a married man – the President of the United States no less – would subject her to "hatred, distrust, ridicule, contempt, or disgrace." Furthermore, such an allegation also severely harms her trade or profession as an investigative journalist and media figure because it leads the public to falsely believe that she uses sex to further her career instead of the truth, which is that her success has been built through years of hard work. Because the Defamatory Statement here is clearly defamatory *per se*, damages –

as well as actual malice are clearly presumed. *Wolfson v. Kirk*, 273 So. 2d 774 (Fla. Dist. Ct. App. 1973).

Ms. Loomer has produced threatening emails that she received after the Defamatory Statement, showing harm to her reputation and standing as a direct and proximate result of the Defamatory Statement. This includes emails stating:

> "you are the only whore trump has ever denied fucking. I guess he's not gay."

> "Hi you cocksucking filthy ugly CUNT! Wish I could get close enough to you to grab your dirty throat and slowly cut it and watch you bleed out on the floor. I can smell your unwashed disgusting filthy pussy from here."

> "Hey Groomer, Close your legs please." Loomer Affidavit ¶ 16. *See* Exhibit 4 for more tweets.

Furthermore, with regard to Ms. Loomer's defamation *per quod* claims, Defendants are not entitled to summary judgment because Defendants are unable to show that it is "undisputed" that Ms. Loomer cannot prove damages. Ms. Loomer has produced evidence that she had applied for a job in President Trump's administration. Loomer Affidavit ¶ 20. This evidence consists of her email exchange with President Trump's staff regarding her resume and cover letter. Loomer Affidavit ¶ 20. The evidence also shows that Ms. Loomer's chances of getting a job in President Trump's administration was hardly farfetched, given that President Trump had previously offered her a job working on his campaign. Loomer Deposition 72:6-8 ("Q -- and at that time, he offered you a job on his campaign; is that correct? A Yes. Mm-hmm."). Ms. Loomer also testified that she had conversations with President Trump's Chief of Staff, Susie

Wiles, confirming that she would have a job in President Trump's administration

if he won the 2024 election:

> I had conversations with Susie Wiles that I would have a position at
> the White House after the election if -- if President Trump won. And
> he did win. And I had this conversation on the phone and in person
> multiple times during the campaign. Loomer Deposition at 82:9-13.

It was also widely reported prior to the Defamatory Statement, Ms.

Loomer had been travelling with President Trump and had access to President

Trump. Loomer Affidavit ¶ 23. This was true. What was not true, however, was

that she was having a sexual, adulterous relationship with President Trump.

Then, Defendants used their platform to broadcast to millions of people

that Defamatory Statement on September 13, 2024. Am. Comp. ¶ 18, Loomer

Affidavit ¶ 2.  As a direct and proximate result of this Defamatory Statement, the

entire attitude from the Trump Administration shifted against Ms. Loomer, as

they were clearly trying to distance themselves from the outrageous and

scandalous defamatory allegations made by the Defendants. As testified by Ms.

Loomer, after the 2024 Presidential election after President Trump has won, Ms.

Loomer attempted to engage President Trump's office on their past promise of

employment, but was effectively brushed off and referred to the transition team:

> A: I mean, after the election was over, I had conversations with the
> transition staff. You can see  from this letter. And you know, I was
> like, "Oh. You have to talk to the transition team." But I -- like I said,
> I was promised a position multiple times, not just by President
> Trump, but also, by Susie Wiles. Loomer Deposition at 84:1-3.

And, it is undisputed that a formal offer of employment with President Trump's

administration, which the evidence shows that Ms. Loomer had been promised

prior to the September 13, 2024 Defamatory Statement, never actually materialized, Loomer Affidavit ¶ 25, because as Ms. Loomer testified to at her deposition, she had become "radioactive" as a result of the Defamatory Statement. Loomer Deposition 96:3-8.

Given this series of events, it is clear that Defendants cannot demonstrate that it is "undisputed" that Ms. Loomer cannot prove damages. None of their arguments to the contrary are meritorious.

*First*, Defendants' argument that Ms. Loomer "has not identified a *single* individual who was allegedly caused to believe that she was sleeping with President Trump," MSJ at 35, completely misses the point and is a red herring argument. Ms. Loomer having lost the opportunity to work in President Trump's administration was not the result of Ms. Loomer's friends and acquaintances falsely believing that she had "fucked" President Trump. It was due to the public perception of her and President Trump's relationship caused by the Defamatory Statement, and the fact that President Trump and his staff felt the need to publicly distance themselves from her as a direct and proximate result of the Defamatory Statement, causing her to not be given a job in his administration. Thus, the harm and actual injury at issued occurred regardless of Ms. Loomer being able to name a single individual person in her social circle who believed that she had "fucked" President Trump.

*Second*, Defendants' argument that "Plaintiff cannot prove Defendants' statement was the proximate cause of her not being offered a job, in light of her well-documented history of controversial behavior," MSJ at 38, fails because it

irrationally presumes that President Trump and his staff's understanding of what constitutes "controversial" behavior aligns with Davis Wright Tremaine' ultra-leftist beliefs. To the contrary, what the record actually shows is that President Trump and his staff were huge fans of her work, which is one of the reasons why they wanted her to be part of his administration in the first place:

> A: During the campaign. I remember I was sitting on the -- on the plane with the president when I -- I think we were flying to Iowa for the primary. And the president had said, "You're going to come to DC with me." And his staff on the plane were clapping; right? And they said, "Oh. You do such fabulous  work." "You do such great work." And he said that, "You're going to go to DC with me." And you know, Susie Wiles was on the plane when that happened. You know, the press team was on the plane when that happened. A lot of people were on the plane. Loomer Deposition 81: 14 – 82:3.

*Third*, Defendants disingenuously miscast Ms. Loomer's damages as "speculative" simply because Ms. Loomer did not have knowledge of the exact dollar amount that individuals who worked in presidential administrations were able to parlay their increased fame and notoriety into post-administration jobs. It is, frankly, unreasonable and unrealistic for Defendants to expect Ms. Loomer to know how much these individuals made prior to their employment in presidential administrations and how much they made after.   What is indisputable is that these individuals almost always emerge from working in an presidential administration with increased fame and notoriety, which logically translates into increased compensation. As just one prominent example, before serving as Press Secretary in the Biden administration, Jen Psaki was working as a political commentator for CNN. Loomer Affidavit ¶ 28. After her work in the Biden administration, she was given her own prime-time show on MSNBC called

*The Briefing With Jen Psaki*. Loomer Affidavit ¶ 28. This is a clear, astronomical career advancement as a direct and proximate result of her employment in the Biden administration. At her deposition, Ms. Loomer testified:

> People who get to work in the White House get to then parlay their -- you know, their resume, which includes working for a presidential administration into getting other jobs in the future. And so, you know, when you look at the type of opportunity this is costing me, especially long-term, as it relates to my professional aspirations to work in politics, to work in media, it's very damaging. And you know, it makes me wonder how much it's going to cost me both, in my reputation and also, in -- in monetary value. Loomer Deposition 244:20 – 245:9.

Accordingly, it is clear that Defendants have fallen woefully short of the daunting summary judgment standard with regard to Ms. Loomer's damages.

## CONCLUSION

In sum, the Defendants' MSJ must be denied in its entirety. Defendants' MSJ recycles its failed arguments from their initial motion to dismiss without introducing any new, relevant and non-objectionable record evidence that comes close to satisfying the daunting summary judgment standard. Defendants continue to push the, frankly, ridiculous narrative that the Defamatory Statement was just a "joke." Notwithstanding the fact that there was nothing funny about the Defamatory Statement, black-letter law makes it clear that it is irrelevant whether Defendants now attempt to couch the Defamatory Statement as a "joke" in order to escape liability for their actions. *Polygram Records, Inc. v. Superior Court*, 170 Cal. App. 3d 543, 554, 216 Cal. Rptr. 252, 259 (1985).

On the other hand, Ms. Loomer has provided more than the requisite record evidence to, at a minimum, show a disputed material fact with regard to

Defendants' failed arguments that concerning the factual nature of the Defamatory Statement, actual malice, and damages.

This is not a run of the mill defamation case. This involves one of the most outrageous and harmful defamatory statements possible, where Defendants have falsely broadcasted to their audience of millions that Ms. Loomer "might be fucking" President Trump—perhaps the most well-known person on earth. The harm to Ms. Loomer as a result of this has been astronomical and she has been painted as a whore, a prostitute, and a slut. The Court must ask itself how it would feel if the victim of such a defamatory statements was its daughter or spouse. Almost certainly the Court would be disgusted and enraged and also rightly bring suit for defamation.

Defendants, however, have refused to take any accountability for the harm that they have caused. After having profited handsomely from the clicks, fame, and notoriety garnered by destroying Ms. Loomer, a woman, to harm President Trump, they are now trying to gaslight Ms. Loomer and the Court into believing that the Defamatory Statement was "just a joke."

As such, Defendants' MSJ must be denied in its entirety.

Dated: December 22, 2025                    Respectfully submitted,

                                            By:/s/ Frederick Sujat_____
                                            Frederick Sujat, Esq.
                                            Fla. Bar # 27081
                                            5675 Brookfield Circle E
                                            Fort Lauderdale, FL, 33312
                                            fsujat@yahoo.com
                                            Tel: 954-815-5221

                                            *Counsel for Plaintiff*

EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

LAURA LOOMER,

        Plaintiff

    v.

BILL MAHER and HOME BOX
OFFICE, INC., et al

        Defendants.

**Case Number: 5:24-cv-00625-JSM-PRL**

**ORAL ARGUMENT REQUESTED**

## AFFIDAVIT OF LAURA LOOMER

1.    I, Laura Loomer, being a party to this case and being over 18 years of age, hereby swear under oath that the following facts are true and correct to the best of my personal knowledge and belief.

### Background Facts

2.    I have been maliciously defamed by Defendants Bill Maher ("Defendant Maher") and Home Box Office, Inc. ("Defendant HBO")(collectively "Defendants"), who on the September 13, 2024 episode of Real Time with Bill Maher, published:

> "I think maybe Laura Loomer's in an arranged relationship to affect the election because she's very close to Trump. She's 31, looks like his type. We did an editorial here a few years ago…it was basically, who's Trump fucking? Because I said, you know, it's not nobody. He's been a dog for too long, and it's not Melania. I think we may have our answer this week. I think it might be Laura Loomer." (the "Defamatory Statement").

3.    The Defamatory Statement is false. I have never had sex with

President Trump nor anything else of that nature! My interactions with President

Trump have always been professional.

4.      After the Defamatory Statement was widely published, my counsel

sent notice pursuant to Fla. Stat.§ 770.01 demanding a retraction of the

Defamatory Statement, a public apology and that I be invited onto "Real Time"

to mitigate prior and any further damage.

5.      Not only did Defendants and their counsel refuse my requests, on

September 20, 2024, Defendants retaliated and compounded the damage to me,

Ms. Loomer, with a segment titled "24 Things You Don't Know About Laura

Loomer" where he continued to make false, disparaging statements about me.

For instance, Maher and his network Defendant HBO published, acting in

concert:

> "It's because the person, like Trump, the nut at the center of it, starts
> surrounding himself with – I mean, he normally surrounds himself
> with pretty crazy people – but this Laura Loomer…she's the new
> groupie in Trump's circle…here are 24 things you don't know about
> Laura Loomer."

6.      Defendant Maher and Defendant HBO then proceeded to conjure up

fabricated "facts" about me and attributed to me, including but not limited to:

(1)"My biggest fear is immigrants taking my job as a right-wing hatemonger"

and (2) "I don't hate all brown people, just the brown ones." There were many

more hateful statements falsely attributed to me, in an effort to damage my

reputation.

7.      I have been used as a vehicle for the Defendants and their counsel to

attack President Trump, whom they loathe, during the 2024 Presidential election

cycle. This was done to try to influence the 2024 Presidential election by ruining President Trump's reputation, and the Defendants have shown they do not care that they were also destroying me financially, harming my reputation, my goodwill, and my career in the process. *See* Maher Deposition Exhibit 9 and 10 (Defendant Maher's Tweets Concerning President Trump) and Maher Deposition Transcript at 116:10 – 182:22.

8.      Defendants are attempting to justify the severe harm they have caused me by trying to gaslight me and the Court into believing that the Defamatory Statement was just a "joke." This argument has already been rejected by the Court in denying their motion to dismiss.

9.      Defendant Maher is not a comedian. He is a political pundit and television host.

10.     "Real Time" is not a comedy production. It is first and foremost a political talk show.

11.     The serious nature of the Defamatory Statement is underscored by the fact that Defendant Maher made the Defamatory Statement during a panel discussion with conservative pollster Kristen Soltis Anderson and former U.S. senator Al Franken, which involved serious topics such as alleged police brutality involving Miami Dolphins receiver Tyreek Hill.

12.     Then, when Defendant Maher told the purported so called "joke", it drew more groans from the audience than sparse laughter. The Court has the video to confirm all of this.

13.     Thus, regardless of how Defendants are now trying to couch the

Defamatory Statement to try in vain to escape liability for their despicable, disgusting and clearly defamatory publications, the harm they have caused me is very severe and real, particularly as a professional woman. The defamatory publications are more than sexist, and Maher has a reputation for his low-class behavior toward women, including trashing First Lady Melania Trump as just one example. He is a proud atheist and apparently does not believe in Judeo-Christian values and teachings when it comes to respecting women, particularly one who supports President Trump. I thus became an "easy" vehicle to attack President Trump.

### *Facts Pertaining to My Damages*

14.     As referenced above, I suffered severe damages as a direct and proximate result of the Defamatory Statement.

15.     My public reputation has been destroyed because I have been falsely painted as a whore, a prostitute, and a slut by Defendants.

16.     I produced in discovery several messages I received from individuals who clearly saw the Defamatory Statement and believed it. These messages not only call me a whore, a prostitute, and a slut, but they also threaten my life. Examples include:

> "You are the only whore trump has ever denied fucking. I guess he's not gay."

> "Hi you cocksucking filthy ugly CUNT! Wish I could get close enough to you to grab your dirty throat and slowly cut it and watch you bleed out on the floor. I can smell your unwashed disgusting filthy pussy from here."

> "Hey Groomer, Close your legs please."

17.    As I testified at my deposition, I have also produced social media posts that "insinuated that I'm a whore; that I was having an affair with the president." Loomer Deposition 53:3-5.

18.    As an example, I produced a tweet from "The Vigilant Fox" which stated: "Bill Maher is flipping the script on @LauraLoomer, claiming she is in an "arranged relationship" with Donald Trump. But then he took it even further, suggesting Loomer is doing you know what with Trump."

19.    I have also suffered lost career opportunities and thus direct financial damage as a direct and proximate result of the Defamatory Statement, as set forth below.

20.    I have produced evidence that I applied for a job in President Trump's administration. This evidence consists of my email exchange with President Trump's staff regarding my resume and cover letter.  I gave the following testimony at my deposition in this regard:

> "I turned over my resume, and I turned over my letter with the transition team. And obviously,  I'm not working in the White House, and so it has damaged me because I was expecting to work in the White House. And you have those documents. You have those communications that has my email, so you already have my email." Loomer Deposition 52:8-15.

21.    President Trump had previously offered me a job working on his campaign. Loomer Deposition 72:6-8 ("Q -- and at that time, he offered you a job on his campaign; is that correct? A Yes. Mm-hmm.").

22.    I also had conversations with President Trump's Chief of Staff, Susie Wiles, confirming that I would have a job in President Trump's administration if

5

he won the 2024 election: ("I had conversations with Susie Wiles that I would have a position at the White House after the election if -- if President Trump won. And he did win. And I had this conversation on the phone and in person multiple times during the campaign.") Loomer Deposition at 82:9-13.

23.    It was also widely reported prior to the Defamatory Statement, that I had been travelling with President Trump and had access to President Trump. This was true and accurate.

24.    After the Defamatory Statement was made, the entire attitude from the Trump campaign and Administration shifted toward me, as they were clearly trying to distance themselves from the outrageous and scandalous defamatory allegations made by the Defendants. As I testified at my deposition, after the 2024 Presidential election when President Trump won, I attempted to engage President Trump's senior staff on their past promise of employment in the administration, but I was effectively brushed off and referred to the transition team: ("A: I mean, after the election was over, I had conversations with the transition staff. You can see from this letter. And you know, I was like, "Oh. You have to talk to the transition team." But I -- like I said, I was promised a position multiple times, not just by President Trump, but also, by Susie Wiles.") Loomer Deposition at 84:1-3.

25.    The formal offer of employment in President Trump's administration, which I had been promised prior to the September 13, 2024 Defamatory Statement, never materialized.

26.    At my deposition, I testified that this was because I had been made

6

"radioactive" as a result of the Defamatory Statement:

> "And that has stunted a lot of my aspirations, just like I believe this defamation has stunted my goals and my aspirations. Because you know, when you accuse somebody of -- of something like sleeping with the president, it kind of makes you radioactive, even if people know that it's fake." Loomer Deposition 96:3-8.

27.    As a result, I have suffered severe financial harm, not only in the lost current and future financial benefit directly garnered from working in President Trump's administration, but from the increased fame, reputation, good will and increased profile that comes with working in a Presidential administration.

28.    As just one prominent example, before serving as Press Secretary in the Biden administration, Jen Psaki was working as a political commentator for CNN. After her work in the Biden administration, she was given her own prime time show on MSNBC called *The Briefing With Jen Psaki*.

Sworn to under penalty of perjury.

Dated: December 22, 2025

_____/s/ Laura Loomer_____
Laura Loomer
Plaintiff

# EXHIBIT 2

# Showing Constitutional Malice in Media Defamation



Illustration by Barbara Kelley

There is a myth that it is virtually impossible for a public figure to successfully sue the media for defamation. This myth is based on a perceived insurmountability of the requirement imposed on public figures to prove "actual" or "constitutional" malice by clear and convincing evidence when suing for defamation. In reality, the courts have provided an almost step-by-step guide for finding and proving constitutional malice. The guide is the badges of malice. The phrase "badges of malice" is adapted from the

badges of fraud used in tax evasion and fraudulent conveyance cases to categorize types of circumstantial evidence that may support an inference of a subjective intent to defraud.

No doubt showing constitutional malice is an obstacle. Public figures must show constitutional malice to maintain their claim. The requirement of proving constitutional malice is not limited to public figures. Plaintiffs that are not public figures still must show constitutional malice to recover punitive damages.

Constitutional malice, also called actual malice, is the publishing of a defamatory statement either knowing it is false or with reckless disregard for its truth or falsity.[1] Requiring a showing of constitutional malice for a public figure to sue for defamation, or to impose greater than actual damages ( *i.e.* , presumed and punitive damages) on the media, is intended to prevent a chilling effect on news reporting and protect First Amendment rights.[2] The concept of "knowledge of falsity" is familiar to all attorneys in multiple contexts. Recklessness as to falsity, however, has evolved definitions and inferences unique to defamation law.

### Twenty-Four Badges of Constitutional Malice: A Guide

The Supreme Court articulated the parameters of "reckless disregard" in *St. Amant v. Thompson* , 390 U.S. 727, 731 (1965): "Reckless conduct is not measured by whether a reasonably prudent man would have published or would have investigated before publishing. There must be evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."

Accordingly, *St . Amant* reasoned that recklessness may be inferred when "there are obvious reasons" to doubt the veracity of the defamatory statement.[3]

In *Mason v. New Yorker Magazine* , 501 U.S. 496 (1991), the Supreme Court summarized that, for proof of constitutional malice, "mere negligence does not suffice," and that the plaintiff must demonstrate that the author "in fact entertained serious doubts as to the truth of his publication...or acted with a high degree of awareness of probable falsity."[4]

Knowledge of falsity or reckless disregard for falsity is a subjective mental state of the person responsible for publishing the defamatory statement. Consequently, absent an admission by the media, showing constitutional malice is based on circumstantial evidence. The courts have recognized certain fact patterns of circumstantial evidence as probative of constitutional malice. These "badges of malice," some alone and some in combination with others, have been held sufficient to support a jury inference of constitutional malice. There are 24 badges of malice.[5]

• failure to conduct a thorough investigation before publishing serious and damaging allegations that are not "hot news";

• failure to give the plaintiff a fair opportunity to reply to defamatory allegations;

• failure to report exculpatory facts;

• omitting pertinent information to create a false impression;

• destruction, loss, or unavailability of a reporter's notes or research;

• the reporter's knowledge of a quoted source's animosity toward the plaintiff;

• the alteration of quotes to maximize a story's impact;

• a reporter's knowledge of facts conflicting with the report;

• emphasizing unimportant events to support a defamatory statement;

• continued reliance on a source that had proven unreliable in other respects;

• a preconceived determination to disparage a plaintiff or a preconceived slant or view;

• repetitive media attacks on the plaintiff;

• failure to contact key witnesses;

• a reporter's ill will toward the plaintiff;

• competitive pressure for "hot news" story;

• discrepancies, inconsistencies, and equivocation in the testimony of media witnesses;

• a reporter's departure from professional standards;

• failure to supervise the reporter's preparation of the story;

• refusal to publish a retraction upon learning of errors in a story;

• the use of deception to obtain a defamatory story;

• a reporter's lack of credibility;

• prior and subsequent defamatory statements;

• that an investigative agency with the same information as a reporter declined to prosecute or take any action against the plaintiff; and

• making threats in connection with a story.

9/1/23, 17:31

These badges of malice are a guide and nothing more. The possible scope of evidence that may support an inference of malice is unlimited. The badges are useful because they summarize actual events that tend to repeat themselves in media defamation cases. Evidence of the badges in discovery will support a strong and well-precedented argument for constitutional malice. For each badge developed in discovery, the media will have an explanation. Developing multiple badges of malice can expose the media's serial excuses as pretextual and increase the chances of successfully arguing constitutional malice.

## Malice Typically Is Evaluated from the Accumulation of Circumstantial Evidence

The badges of malice are consistent with the extremely broad scope of evidence that the Supreme Court held must be discoverable by plaintiffs to prove malice. In *Herbert v. Lando* , 441 U.S. 153 (1979), the Supreme Court observed that the First Amendment protections given to the media were balanced by the corollary that the fact finder could consider an extremely broad scope of evidence in determining malice. "[A]ny competent evidence either direct or circumstantial, can be resorted to, and all the relevant circumstances surrounding the transaction may be shown..." to show malice.[6] The specific items of relevant evidence favorably itemized in *Herbert* include 1) all information known to the defamer showing the falsity of defamatory statements; 2) the defamer's thought process and reasons for crediting or discrediting information; 3) the defamer's thought processes and reasons for incorporating only certain information into a press statement; 4) threats made by the defendant; 5) prior defamations by the defendant; 6) subsequent defamations made by the defendant; 7) subsequent statements made by the defendant; and 8) circumstances indicating rivalry, ill will, or hostility.[7]

In *Harte-Hanks Communications, Inc. v. Connaughton* , 491 U.S. 657 (1989),

the Supreme Court emphasized that a jury may infer malice from a series of factors none of which alone would have been sufficient. In that case, a newspaper published witness' allegations that a judicial candidate had been bribed. The candidate sued for defamation, and the newspaper argued that it had no knowledge that the bribery allegations were false. The jury found malice, and the newspaper appealed.

*Harte-Hanks* emphasized numerous factors in evaluating the entire record. The newspaper was involved in heated competition with another local paper and was under pressure to "scoop it" on local news ( *i.e* ., profit motive for the defamation). After hearing the obviously damaging bribery allegations, the newspaper conducted an investigation, but it failed to contact key witnesses. Numerous taped witness interviews were available to the newspaper, but the editorial director did not listen to them. There were discrepancies in the testimony of the newspaper's witnesses. Though no single factor was dispositive, *Harte-Hanks* stressed that the jury may have found that "failure to conduct a complete investigation involved a deliberate effort to avoid the truth."[8]

In *Curtis Publishing Co. v. Butts* , 388 U.S. 130 (1967), a football coach sued a magazine for publishing an article accusing him of fixing games. The evidence showed that this was not "hot news," that the charges were serious, that the editors recognized "the need for a thorough investigation," that the reporter's superiors did not look at the reporter's notes prior to the publication, that a key witness was not interviewed, and that "no attempt was made to screen the films of the game."[9] The Supreme Court held that a jury may infer from this that the magazine "had been anxious to publish an expose and had, thus, wantonly and recklessly seized on a questionable affidavit."[10]

*Hunt v. Liberty Lobby* , 720 F.2d 631 (11th Cir. 1983), affirmed a jury finding

of malice in a Florida defamation case. *Hunt* ruled that two factors present in that case independently supported the jury's determination. First, "when an article is not in the category of 'hot news,' that is, information that must be printed immediately or it will lose its newsworthy value, 'actual malice may be inferred when the investigation for a story...was grossly inadequate in the circumstances.'"[11] Second, "an inference of actual malice can be drawn when a defendant publishes a defamatory statement that contradicts information known to him, even when the defendant testifies that he believed that the statement was not defamatory and was consistent with the facts within his knowledge."[12]

A defendant's "inconsistent" and "equivocating" testimony supported a finding of malice in *Texas Disposal Systems Landfill, Inc. v. Waste Management Holdings, Inc.* , 219 S.W.3d 563 (Tex. App. 2007). The court cited a combination of circumstantial evidence from which the jury may have inferred malice. These factors included 1) omitting pertinent information that would have prevented a "false impression" from the information included in the defamatory communication; 2) a failure to attempt verification of the defamatory information; and 3) "inconsistent" and "equivocating" testimony from the defendant.[13]

The frequency and duration of the media's attack on a plaintiff also may help establish malice. In *Bentley v. Bunton* , 94 S.W.3d 561 (Tex. 2002), the court affirmed a jury finding of malice. *Bentley* cited factors that included the fact that the talk show host had "relentlessly" repeated allegations against a particular judge for months while ignoring people that had knowledge of the allegations.[14]

Emphasizing unimportant events to support serious defamatory statements will also support a finding of malice. In *Bolling v. Baker* , 671 S.W. 2d 559 (Tex. App. 1984), a physician accused a nurse of dishonesty. When the nurse

sued for defamation, the physician testified that one reason he doubted the nurse's honesty was an incident in which some lab slips "had been changed."[15] *Bolling* concluded that the physician's "obsession with such an insignificant event warrants the inference that he was using the incident to get even with [the nurse]."[16] Accordingly, the court concluded that there was sufficient evidence to support the jury's finding that the statements were made with knowledge of their falsity or with reckless disregard for the truth. Emphasizing unimportant events also fits within the more general badge of a reporter knowing that the facts do not support a defamatory story.

Finally, the context of a defamatory statement and the media's use of deception to obtain images for a defamatory story may support a jury inference of malice. In *Braun v. Flynt*, 726 F.2d 245 (5th Cir. 1984), a novelty entertainer who performed an act with a swimming pig at a family-oriented amusement park sued a sexually oriented men's magazine for defamation for publishing her photo in its "Chic Thrills" section. The magazine obtained authority to use the photograph by misrepresenting the nature of the magazine. *Braun* affirmed a jury finding of malice, holding that the jury may infer malice from the magazine's use of deception to obtain the photograph and then inserting the photograph of what the editors knew was a family tourist attraction "in the context of" a lewd magazine.[17]

The media cannot avoid an inference of malice when it publishes a defamatory headline by showing that it published the full truth in the text of the story. In *Kaelin v. Globe Communications Corp.*, 162 F.3d 1036 (9th Cir. 1998), Kato Kaelin sued a newspaper for publishing a headline stating, "COPS THINK KATO DID IT!" after O.J. Simpson was acquitted of murder. The newspaper argued that there was no malice because the body of the story made clear that the "IT" referred to perjury and not the murders. The trial court entered summary judgment for the newspaper. The appellate court reversed *Kaelin*, holding that a jury may infer that the newspaper

intended to convey a false impression from the scandalous headlines for the pecuniary motive of selling more newspapers. The truthful disclosure in the body of the article did not guarantee the newspaper immunity from defamatory headlines. "The editors' statements of their subjective intention," *Kaelin* stressed, "are matters of credibility for a jury."[18]

## Some Badges Alone May Establish Malice

There are instances in which courts have approved an inference of malice from a single item of circumstantial evidence. This occurs in two scenarios. One is when there is evidence of the reporter's lack of credibility regarding the story. This evidence includes the mysterious disappearance of the reporter's research notes, the alteration of quotes for defamatory impact, and the reporter's possession of materials showing that the defamatory story was false. The second scenario focuses on the reporter's conduct after the defamatory publication. When the media refuses to retract a defamatory statement after learning of its falsity, courts have allowed an inference that the defamation was published with malice. Though neither scenario guarantees a finding of constitutional malice, both scenarios may support such a finding if the evidence is material to the defamation.

The destruction or unavailability of a reporter's notes and research supported a finding of malice in *Murphy v. Boston Herald, Inc.* , 449 Mass. 42 (Mass. 2007). There, a newspaper reporter, relying on the statement of a district attorney with animosity toward a judge, published an article accusing the judge of belittling a juvenile rape victim. *Murphy* found that a number of factors combined to furnish clear and convincing evidence of malice.[19] *Murphy* stressed 1) the reporter's knowledge that his source had animosity toward the judge; 2) the reporter's failure to verify the accuracy of the statements attributable to the judge with others who were present; and 3) the reporter's incredible claim that he discarded his notebook where he wrote the information told to him by the district attorney.[20] *Murphy* stressed

that the strongest evidence of malice was the mysterious unavailability of the notebook: "The jury were entitled to draw the negative inference that [the reporter] discarded his notebook in a deliberate effort to conceal what he knew were inaccuracies in his reporting. This inference, in turn, *provides a strong basis for a finding of actual malice*."[21]

Consistent with *Murphy* , numerous courts have held that the destruction or unavailability of a reporter's notes or research may support a jury verdict of malice.[22]

A reporter's alteration of quotes to maximize the impact of the story also supports a verdict of malice. In *Masson v. New Yorker Magazine, Inc* ., 501 U.S. 496 (1991) , the Supreme Court held that a reporter's alteration of quoted words may equate with knowledge of falsity when the alteration results in a material change of the meaning conveyed by the quoted statement.[23] That a reporter in *Masson* might have misunderstood his or her sources is insufficient to overturn a jury's evaluation of the circumstances.[24]

The court in *Southern Air Transport, Inc. v. Post Newsweek Stations Florida, Inc* ., 568 So. 2d 927 (Fla. 3d DCA 1990), upheld a finding of malice when the media aired an uncorroborated claim by an individual of questionable credibility that the plaintiff was a drug trafficker. The court held publishing this serious and uncorroborated allegation without giving the plaintiff a fair opportunity to reply supported the inference of malice. The court also noted that the defamatory broadcast made the informant appear credible and failed to report information that would negatively impact his credibility.[25]

A reporter's possession of documents conflicting with his report supported a finding of malice in *Mitchell v. Griffin Television, LLC*, 60 P.3d 1058 (Okl. App. 2002). There, a veterinarian sued a TV station for falsely reporting that a lawsuit accused him of medicating a champion race horse to hide injuries so

the horse could be sold. The TV station claimed there was no showing of
malice because the complaint filed in federal court alleged the veterinarian
had medicated the horse prior to the sale. That complaint accused the
trainer of trying to mask the horse's unsoundness but made no such
accusation as to the veterinarian. Since the TV station had a copy of the
complaint, *Mitchell* held that the jury properly found that the false report was
made with "reckless disregard."[26]

In *Herbert* , the court held that a defamer's post-publication conduct may be
relevant to establishing malice at the time of publication.[27] The key post-
publication conduct developed in the caselaw is the media's refusal to
retract a defamatory statement after learning that it is false. *Restatement
Second of Torts* 580A (1977), Comment D, concludes that a defamer's
refusal to retract a defamatory statement after learning it is false "might be
relevant in showing recklessness at the time the statement was published."
In *Mahnke v. Northwest Publications, Inc.* , 160 N.W. 2d 1 (Minn. 1968), the
Minnesota Supreme Court held that a jury may properly consider a
defendant's failure to retract defamatory statements as evidence of
recklessness. "We think that the failure to retract the defamatory
statements," *Mahnke* stressed, "underscored defendant's reckless attitude
as to the consequences of what had been published and that the jury was
entitled to take that fact into consideration."[28]

## Use of the Badges in Discovery

The focus of discovery on constitutional malice is obtaining evidence that
the reporter either knew the truth refuting the defamation or the truth was so
readily available that failure to inquire amounts to a deliberate avoidance of
truth. The badges suggest where to look for this evidence. The first step is
obtaining all investigative research materials, notes, drafts of articles, edits,
article or script changes, outtakes communications, tweets, web postings
(including both the defamatory article and any guest comments or posts),

Facebook posts, and other social media materials concerning the defamatory story. The reporter's familiarity with the subject matter of the story, as well as the identities of his or her sources also warrant discovery. The goal of this phase of discovery is to learn everything the reporter said, wrote, knew, or had access to concerning the defamatory story.

A next step is to identify every item of information known or available to the reporter that is inconsistent with the defamatory sting of the story. This aspect of discovery then focuses on tracing how and why the reporter made editorial decisions to omit, downplay, or not pursue what was inconsistent with the defamation. This should be done at deposition, but it is helpful to initially obtain copies of all drafts or outtakes of the defamatory publication to see what was deleted.

The reporter should be deposed on every step of the investigation conducted on the story. Particular emphasis is on the reasons for a reporter's decision not to pursue research areas that would have exposed the defamatory story as false. The credibility issue surrounding a reporter's explanation of this process is often the lynchpin that decides constitutional malice. Inconsistencies between the reporter's research and the defamatory string of the story may rise to a level where this alone allows an inference of malice.

The next aspect of discovery deals with external influences on the defamatory story. External influences discussed in the caselaw include 1) animosity toward the subject of the defamation; 2) competitive pressure to scoop other media outlets; 3) a pattern of defamatory coverage; and 4) an editorial slant. Also, failure to retract after learning of a defamatory falsity, though not an influence on the story, is an external factor that may support an inference of malice. Accordingly, discovery into the editorial decision not to retract should be as thorough as discovery into the decision to initially

publish the defamation. In cases in which the media issues an inadequate retraction, the retraction can often be pled as an additional defamatory publication requiring discovery in its own right.

Discovery into animosity toward the subject of the defamation can be far ranging or a quick dead end. In cases in which a news outlet had an established relationship with the plaintiff, there is often a falling out predating the defamatory publication — and evidence of animosity. The entire history of the relationship, including all statements made by news outlet representatives about the plaintiff, are in play.

Competitive pressure for attention-grabbing stories is always present but must be shown in the record. There are often emails or other communications discussing a news outlet's market position (circulation or viewers). Media executives normally must acknowledge that their company's source of income (advertising), and often their income depends on their circulation or number of viewers. Editors sometimes direct reporters to pursue certain stories, either orally or in writing, to maximize viewers during ratings periods.

Television stations typically feature their most inflammatory stories during national ratings periods knowns as "sweeps." During this time, there can be increased pressure on reporters to generate high-profile stories or to exaggerate to the point of defaming. Sweeps periods occur four times each year and are usually acknowledged in internal communications. It is important in the industry because the viewership established during sweeps determines advertising revenue. Questioning the reporter regarding his or her basis for publishing multiple defamatory statements will often yield testimony helpful to establish a credibility dispute.

A pattern of defamatory statements about the plaintiff can be key to showing

malice. Identifying every defamatory statement about the plaintiff made by a news outlet is the first step. This includes defamatory statements that were made before and after the defamatory publication. In some cases, the sheer number of false statements made may support an inference of malice. In others, credibility issues are raised by a reporter's attempts to explain this pattern.

## Defending Summary Judgment

The first test of a plaintiff's evidence of constitutional malice is usually the media's motion for summary judgement. It is here that a plaintiff first feels the weight of being required to prove malice by clear and convincing evidence. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), the Supreme Court held that, in ruling on a media motion for summary judgment or a directed verdict on constitutional malice, a court must evaluate the evidence of malice to determine whether a jury reasonably could infer malice under this heavier evidentiary burden. Media defendants, quoting isolated language from *Anderson* and similar cases, exaggerate that a plaintiff's burden is virtually insurmountable.

In reality, *Anderson* also stresses that courts should be cautious in granting summary judgment on constitutional malice:

> [I]t is clear enough from our recent cases that at the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.[29]

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or a directed verdict. The evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.[30]

*Anderson* has been inconsistently applied. Some courts invoke *Anderson* as a license to act as jury in weighing the evidence. Others look at whether there are factual issues that may be presented to a jury. This was predicted by the dissent in *Anderson* .[31]

The dissenting justices argued that *Anderson* gave conflicting instructions to trial courts. Specifically, courts were simultaneously instructed to weigh the evidence under the "prism" of the clear and convincing standard and cautioned against weighing the evidence when ruling on a motion for summary judgment or directed verdict. The dissents predicated that *Anderson* would prove devoid of practical application.[32]

In *Hutchinson v. Proxmire*, 443 U.S. 111, n.9 (1979), the U.S. Supreme Court noted in a libel case "the proof of actual malice calls a defendant's state of mind into question [ *citations omitted* ] and does not readily lend itself to summary disposition."[33]

Summary judgment in a Florida defamation case arising from "investigative television news" was addressed in *Southern Air Transport* . There, the plaintiff sued a TV station for broadcasting an investigative story accusing the plaintiff of drug trafficking while engaged in covert arms shipments to the Nicaraguan Contras. The trial court granted summary judgment for the TV station on the issue of malice. The district court reversed, holding that these factors precluded summary judgment: 1) A source's information had proven unreliable in other respects; 2) "the defendants *did not give plaintiff a fair opportunity to reply* to this drug trafficking accusation..."[34]; and 3) the

government declined to prosecute anyone based on the source's information.[35] The court noted that other evidence in the record supported contrary inferences but stressed that weighting them was for the jury.[36]

Media defendants always assert that they believed the truth of the defamation. Constitutional malice pivots on creating a triable issue concerning credibility. The badges of malice help create this issue, but the courts have stressed that it is in the jury's purview to evaluate the credibility of media witnesses and reject their claim that they believed the defamation was true.

In *Harrison v. Williams*, 430 So. 2d 585 (Fla. 4th DCA 1983), a father sent defamatory communications to officials accusing a police officer of beating up his son. The police officer brought a defamation action, and the father's defense was that "he made a good faith mistake about the identity" of the police officer. The trial evidence showed that the son "informed his father" that it was the plaintiff who had attacked him. The assistant state attorney, however, had told the father that the attacker was another officer who looked like the plaintiff. The fact finder resolved the credibility issue in favor of the plaintiff and found that the father had made his accusations with malice. On appeal, the court affirmed, finding substantial competent evidence to support the inference of malice.[37]

*Dibella v. Hopkins*, 403 F.3d 102 (2d Cir. 2005), affirmed a jury's finding of malice and held that it was within the jury's purview to discredit the defamer's account of his mental state in making a defamatory statement.[38] Evidence that creates an issue concerning the reporter's credibility requires a jury determination.

The thrust of the focus on the credibility of the media witnesses is that anything normally impacting a witness' credibility is in play. In particular

situations, these factors may be unique. For instance, a witness' hesitations, tone, and demeanor are properly considered by a jury deciding whether to believe the witness. In the context of a motion for directed verdict, the matter must be put on the record because the transcript will not reflect them. In defending a summary judgment, an argument that the record prevents an issue on the media witnesses' credibility can be supported by videotaped deposition testimony.[39]

## Conclusion

The caselaw developed over the last half century shows that proving constitutional malice is feasible. It takes the discipline of developing every item of circumstantial evidence that may furnish a motive to defame or shows that the reporter knew or should have known the truth. The "should have known" standard applies to negligence, but negligence is a step toward recklessness. The 24 badges of constitutional malice reflect combinations of evidence that can defeat the media's First Amendment defense.

[1] *Gertz v. Welch* , 94 S. Ct. 2997 (1974).

[2] *Id.*

[3] *St. Amant*, 390 U.S. at 732, fn. 3 (citations omitted).

[4] *Mason*, 501 U.S. 496 at 510 (citations omitted).

[5] The badges are summarized here and the cases utilizing the various badges are discussed below.

[6] *Herbert*, 441 U.S. at 177, fn. 12 (citations omitted).

[7] *Id.* Courts typically reject various journalist privileges which normally protect journalists' sources from discovery on the ground that the media waives the privilege when it asserts its First Amendment defenses.

[8] *Harte-Hanks Communications*, 491 U.S. at 685. *See also Celle v. Filipino Reporter Enterprises, Inc* ., 209 F.3d 163 (2d Cir. 2000) (malice finding affirmed based on evidence of reporter's ill will, reporter's conflicting testimony, and reliance on questionable source without conducting investigation).

[9] *Curtis Publishing Co*., 388 U.S. at 157.

[10] *Id*. at fn.20. *See also Healey v. New England Newspapers, Inc* ., 555 A.2d 321 (R.I. 1989) (newspaper report of angry relative blaming doctor for death creates jury issue of malice where newspaper failed to report known facts tending to exculpate the doctor); *Buratt v. Capital City Press* , 459 So. 2d 1268 (La. 1 Cir. 1984) (reckless disregard for truth shown when reporter omits reporting available information because it refuted defamatory point reporter trying to make).

[11] *Hunt*, 720 F.2d at 643.

[12] *Id*. at 645 (citations omitted).

[13] *Texas Disposal Systems Landfill*, 219 S.W.3d at 578-579.

[14] *Bentley,* 94 S.W.3d at 584-585, 600. *See also Kentucky Kingdom Amusement Co. v. Belo Kentucky, Inc*. , 179 S.W.3d 785 (Ky. 2005) (affirming jury finding of malice based on television station's failure to correct inaccuracies in prior reports, continuing commitment to running the same false story line, failure to significantly investigate, and because the general make up and presentation of the story exhibited hostility).

[15] *Bolling,* 671 S.W.2d at 563.

[16] *Id*. at 565.

[17] *Braun*, 726 F. 2d at 257.

[18] *Kaelin,* 162 F. 3d at 1042.

[19] *Murphy* , 449 Mass. at 58.

[20] *Id*. at 58-61.

[21] *Id.* at 61 (emphasis added).

[22] *See Moore v. Vislosky* , 240 F. App'x 457, 469 (3d Cir. 2007) (defamer's claim that she "lost" documentary evidence that supported her defamatory statements was implausible and supports jury finding that she acted with reckless disregard for truth); *Torgerson v. Journal/Sentinel, Inc.* , 563 N.W. 2d 472, 483 (Wis. 1997) (destruction of reporter's notes is sufficient evidence to support a jury verdict of actual malice); *Chang v. Michiana Telecasting Corp.* , 900 F.2d 1085, 1090 (7th Cir. 1990) ("destruction could imply that the notes would have revealed the reporter did not believe what he wrote or said") (citations omitted).

[23] *Masson,* 501 U.S. at 516.

[24] *Id* . at 520-521.

[25] *Southern Air Transport* , 568 So. 2d at 928.

[26] *Mitchell*, 60 P.3d at 1063.

[27] *Herbert,* 441 U.S. at 170-171.

[28] *Mahnke,* 160 N.W.2d at 344. *See also Zerangue v. TSP Newspapers, Inc.* , 814 F.2d 1066 (5th Cir. 1987) (refusal to retract an exposed error supports a finding of malice just as a readiness to retract tends to negate malice); *Golden Bear Distributing Systems of Texas, Inc. v. Chase Revel, Inc.* , 708

F.2d 944 (5th Cir. 1983) (refusal to retract supports jury finding that defamatory article published with reckless disregard of the truth).

[29] *Anderson*, 477 U.S. at 249.

[30] *Id.* at 255 (citations omitted).

[31] *Id.* at 265-268.

[32] *Id* . at 267-269.

[33] *See also Shiavone Const. Co. v. Time, Inc.* , 847 F.2d 1069 (3d Cir. 1988) (reversing summary judgment in media defamation case where media had internal inconsistencies in its research and information contradicting libelous assertions but nevertheless published libelous statements).

[34] *Southern Air Transport* , 568 So. 2d at 928 (emphasis added).

[35] *Id.*

[36] *Id.* at 929.

[37] *Harrison*, 430 So. 2d at 586. *See also Durso v. Lyle Stuart, Inc* ., 337 N.E. 2d. 443, 447 (Ill. App. 1975) (citations omitted) (jury may find malice and disregard defendant's claim that defamatory statement in investigative publication was caused by unintentional "error" where evidence creates issue of author's credibility because (citations omitted) it showed "muckraking intent, the absence of hot news, and an inadequate investigation...").

[38] *See also Newton v. NBC, Inc* ., 930 F.2d 662, 671 (9th Cir. 1990) (malice may be based on jury's negative assessment of reporter's credibility at trial).

[39] The normal rule is that the court should leave credibility issues for the jury.

To the extent that the court weighs evidence to see if a credibility issue satisfies the "clear and convincing" standard, witness demeanor should be in play. The dissent in *Anderson* pointed out that applying the "clear and convincing" standard at the summary judgment stage and telling the courts not to weigh evidence was inherently contradictory. The dissent predicted that *Anderson* would be inapplicable in practice.



**MANUEL SOCIAS** *is a solo practitioner who has represented clients in business litigation for 35 years. He also handles and consults on defamation cases.*

# EXHIBIT 3

# KLAYMAN LAW GROUP

### A PROFESSIONAL ASSOCIATION

Larry Klayman, Esq.                    7050 W. Palmetto Park Rd                    Tel: 561-558-5336
                                       Boca Raton, FL, 33433

Via Federal Express

September 16, 2024

Home Box Office, Inc.
30 Hudson Yards
New York, NY, 10001

Bill Maher
c/o William Morris Endeavor
9601 Wilshire Blvd
Beverly Hills, California, 90210

**Re: Cease and Desist Letter and Demand for Retraction Pursuant to Fla. Stat. § 770.01**

Attn: Bill Maher and Home Box Office, Inc.

This letter is to put you on notice of false, malicious, and defamatory statements of and concerning my client, Laura Loomer ("Ms. Loomer"), made by Bill Maher ("Maher") on the September 13, 2024 episode of Real Time With Bill Maher, which was broadcasted by Home Box Office, Inc. ("HBO") and to demand a correction or retraction of these statements along with a published apology on an episode of Real Time With Bill Maher featuring Ms. Loomer as a guest. These false, malicious, and defamatory statements are set forth below.

> I think maybe Laura Loomer's in an arranged relationship to affect the election because she's very close to Trump. She's 31, looks like his type. We did an editorial here a few years ago…it was basically, who's Trump fucking? Because I said, you know, it's not nobody. He's been a dog for too long, and it's not Melania. I think we may have our answer this week. I think it might be Laura Loomer.

Maher has falsely, and without any factual basis, accused Ms. Loomer of having committed adultery with Mr. Trump, who is married to Melania Trump. These statements are highly damaging to Ms. Loomer's reputation and goodwill and are, in fact, defamatory *per se*. "…words which falsely accuse a woman of adultery are libelous per se and that a plaintiff need not allege or prove general or special damages." *Bobenhausen v. Cassat Ave. Mobile Homes, Inc.*, 344 So. 2d 279, 281 (Fla. Dist. Ct. App. 1977).

Accordingly, with full reservation of all rights to pursue legal remedies including but not limited to filing suit, Ms. Loomer demands correction or retraction of these false, malicious, and

defamatory statements within five (5) days pursuant to Fla. Stat. § 770.01 along with a public apology on an episode of Real Time With Bill Maher featuring Ms. Loomer as a guest.


Dated: September 16, 2024

_____
Larry Klayman, Esq.
leklayman@gmail.com

Counsel for Laura Loomer

# EXHIBIT 4

From: **WordPress** <wordpress@▓▓▓▓▓▓▓▓▓▓▓
Date: Sun, Sep 15, 2024 at 9:32 AM
Subject: "We smell your raunchy cunt all the way in Canada"
To: <laura@▓▓▓▓▓▓▓▓▓▓


From: T.J. Raytrowsky <tjraytrowsky@hotmail.com>
Subject: We smell your raunchy cunt all the way in Canada

Message Body:
Hey Groomer,

Close your legs please.

--
This e-mail was sent from a contact form on Laura Loomer Official

From: **WordPress** <wordpress@ ▮▮▮▮▮▮▮▮▮▮▮▮
Date: Mon, Sep 16, 2024 at 3:18 PM
Subject: "Your filthy pussy!"
To: <laura@l ▮▮▮▮▮▮▮▮▮▮▮


From: Gary Jaramillo <grj87801@gmail.com>
Subject: Your filthy pussy!

Message Body:
Hi you cocksucking filthy ugly CUNT!  Wish I could get close enough to you to grab your dirty throat and slowly cut it and watch you bleed out on the floor. I can smell your unwashed disgusting filthy pussy from here.
Everyone in America wants you dead - especially me!

New Mexico is praying that you're with that cum guzzling fuck Trump the next time an assassin comes for him - and blows your head off too!  It would be a National Holiday!

Fuck you, you rotting filthy cum cunt!

You're a filthy CUNT!

--
This e-mail was sent from a contact form on Laura Loomer Official

From: **WordPress** <wordpress@██████████████>
Date: Sun, Oct 20, 2024 at 2:14 PM
Subject: ""
To: <laura@██████████████>


From: Fuck You CUNT <glorious@gmail.com>
Subject:

Message Body:
you look like a man


I FUCKING HOPE YOU GET SHOT IN THE FACE

--
This e-mail was sent from a contact form on Laura Loomer Official

From: **#Loomered** <wordpress@█████████████>
Date: Wed, Oct 23, 2024 at 1:47 AM
Subject: #Loomered "you are a cunt"
To: <laura@████████████>


From: philip mccrack <philip.mccrack@gmail.com>
Subject: you are a cunt

Message Body:
your transition to being a man seems to be going well. you should come out to sf and be a drag queen entertainer. you are all ready to go on stage without any changes and entertain other ugly wealthy people like yourself. you are the only whore trump has ever denied fucking. i guess he's not gay.

--
This e-mail was sent from a contact form on Laura Loomer Official

From: **#Loomered** <wordpress@███████████>
Date: Wed, Aug 13, 2025 at 10:06 AM
Subject: #Loomered "Deposition"
To: <laura@████████████>


From: Tim Johnson <johnson.tim59@hotmail.com>
Subject: Deposition

Message Body:
You're a fucking moron and nut bag. Commit suicide. Nobody would care. And,
you're NEVER getting a media job on a major network you bigoted, subhuman
dried-up cunt. You look ridiculous and nobody hires a whit nationalist,
Islamophobic kike like you.

https://www.mediaite.com/media/news/the-5-wildest-moments-from-laura-
loomers-rollercoaster-bill-maher-defamation-depostion/


--
This e-mail was sent from a contact form on Laura Loomer Official

EXHIBIT 5

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

LAURA LOOMER,

     Plaintiff,

v.                                 Case No: 5:24-cv-625-JSM-PRL

BILL MAHER and HOME BOX OFFICE, INC.,

     Defendants.

_____

## ORDER

THIS CAUSE comes before the Court on Defendants' Motion to Dismiss (Dkt. 17). The Court having reviewed the motion, response, and the parties' respective replies, concludes that the motion should be denied in part and granted in part. Specifically, the defamation *per se* claims are sufficiently alleged under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The remaining defamation claims are insufficient and will be dismissed with leave to amend.

## BACKGROUND

The following facts are assumed true at this motion to dismiss stage and taken directly from the Complaint. Plaintiff Laura Loomer is a "well-known conservative investigative journalist." Loomer is also a "conservative, Republican, Jewish female activist." In the past, Loomer has worked for Canadian news publisher The Rebel Media as well as Project Veritas. Loomer also has her own media company called Illoominate Media, which operates in this circuit. Loomer was a Republican candidate for Florida's 11th congressional district in 2022.

Defendant Bill Maher is the host of "Real Time with Bill Maher," a weekly hour-long television program that airs on Defendant Home Box Office, Inc.'s network ("HBO"). Loomer filed this action against Defendants, alleging that they broadcasted false, malicious, and defamatory statements of and concerning Loomer into this judicial circuit, nationwide, and internationally. She claims that numerous people in this judicial district heard these false, malicious, and defamatory statements.

Specifically, the Complaint alleges that on a September 13, 2024, episode of Maher's show "Real Time," which HBO broadcasted nationally and internationally, Maher made and published the following false, malicious, and defamatory statement of and concerning Loomer:

> I think maybe Laura Loomer's in an arranged relationship to affect the election because she's very close to Trump. She's 31, looks like his type. We did an editorial here a few years ago…it was basically, who's Trump fucking? Because I said, you know, it's not nobody. He's been a dog for too long, and it's not Melania. I think we may have our answer this week. I think it might be Laura Loomer.

According to the Complaint: "In this statement, Defendant Maher makes the false statement that Ms. Loomer is in a sexual relationship with Donald Trump, who is a married man." Thus, Defendant Maher "falsely and maliciously accused Ms. Loomer of having committed adultery with Donald Trump."

The Complaint continues to allege that Maher's statements were "plainly false [because] Ms. Loomer has never engaged in sexual relations with President Donald Trump." And that there is not a "shred of credible reporting or evidence suggesting otherwise." Loomer claims that Defendant Maher had no basis in fact to make this

statement.   He simply fabricated it for attention, notoriety, "clicks," and profit for himself and Defendant HBO, his employer.

With respect to malice, the Complaint alleges that Defendants clearly failed to conduct due diligence and investigation of the real facts before publishing their false, malicious, and defamatory statements.   Defendant Maher knew or should have known that his statements were false.

According to the Complaint, as "further evidence of Defendants' intent to defame Loomer," on the September 20, 2024, episode of "Real Time," Defendant Maher, being on notice of this potential lawsuit pursuant to Fla. Stat. § 77.01, retaliated and compounded the damage to Loomer with a segment titled "24 Things You Don't Know About Laura Loomer" where he continued to make false, disparaging statements about Loomer.   He stated on this segment, in relevant part:

> It's because the person, like Trump, the nut at the center of it, starts surrounding himself with – I mean, he normally surrounds himself with pretty crazy people – but this Laura Loomer…she's the new groupie in Trump's circle…here are 24 things you don't know about Laura Loomer.

Maher then said the following fabricated "facts" about and attributed to Loomer, including but not limited to: (1) "My biggest fear is immigrants taking my job as a right-wing hatemonger" and (2) "I don't hate all brown people, just the brown ones."

The Complaint avers that HBO and Maher refused to retract their defamatory statements about Loomer even after she volunteered to appear on Maher's show in an attempt to repair her reputation.   In this lawsuit, Loomer asserts claims against HBO and Maher for defamation *per se*, defamation *per quod*, and defamation by implication.   With respect to her damages, Loomer alleges that Defendants' actions caused her "severe

financial damage and damage to her reputation, good will, business opportunities, social relationships, and [her] career."

Defendants now move to dismiss the entirety of the Complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.   Notably, Defendant Maher withdrew his initial argument that he was improperly served so that matter is moot.

## MOTION TO DISMISS STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a complaint to be dismissed for failure to state a claim on which relief can be granted.   When reviewing a motion to dismiss, courts must limit their consideration to the well-pleaded allegations, documents central to or referred to in the complaint, and matters judicially noticed.   *See La Grasta v. First Union Securities, Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (internal citations omitted); *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).   Courts must accept all factual allegations as true and view the facts in a light most favorable to the plaintiff.   *See Erickson v. Pardus*, 551 U.S. 89, 93–94, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007).

Legal conclusions, however, "are not entitled to the assumption of truth."   *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009).   In fact, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal."   *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).   To survive a motion to dismiss, a complaint must instead contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."   *Iqbal*, 556 U.S. at 678 (internal quotation marks and citations omitted).   This plausibility standard is met when the plaintiff

pleads enough factual content to allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal citations omitted).

## DISCUSSION

"It is well established that when a federal court considers a case that arises under its diversity jurisdiction, the court is to apply state substantive law and federal procedural law." *Royalty Network, Inc. v. Harris*, 756 F.3d 1351, 1357 (11th Cir. 2014). Thus, Florida law provides "the substantive law to the merits of [p]laintiff's defamation claims." *Duffy v. Fox News Network, LLC*, No. 6:14-CV-1545-ORL-37, 2015 WL 5009101, at *3 (M.D. Fla. Aug. 21, 2015).

Under Florida law, the elements of a defamation claim are: (1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory. *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (citing *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008)).

"[A] claim for defamation may be categorized in one of two ways: defamation *per se* or defamation *per quod*." *Centennial Bank v. ServisFirst Bank Inc.*, No. 8:16-CV-88-T-36JSS, 2019 WL 13037034, at *6 (M.D. Fla. Apr. 17, 2019). A publication rises to the level of defamation *per se* "if, when considered alone and without innuendo, it (1) charges that a person has committed an infamous crime; (2) tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (3) tends to injure one in his trade or profession."

*Daniels v. HSN, Inc.*, No. 818CV3088T24JSS, 2020 WL 533927, at *3 (M.D. Fla. Feb. 3, 2020); *see also Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953) (same).

"Defamation *per quod* requires explanation of context. In *per quod* actions, the words used, given their natural and common meaning, are not inherently injurious, but rather are injurious only as a consequence of extrinsic facts, such as innuendo." *See Scobie v. Taylor*, No. 13-60457-CIV, 2013 WL 3776270, at *2 (S.D. Fla. July 17, 2013) (noting that defamation *per quod* "requires an additional explanation of, or an interpretation of innuendo suggested by, the words used to demonstrate the defamatory meaning or that the plaintiff is the subject of the statement").

Defendants' first argument in favor of dismissal of the defamation claims is that Loomer fails to plead a false statement of fact. The Court disagrees. "A false statement of fact is the sine qua non for recovery in a defamation action." *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983); *accord Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 717 (11th Cir. 1985). The challenged statement "must convey to a reasonable reader [or viewer] the impression that it describes actual facts about the plaintiff." *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1379 (S.D. Fla. 2006) (citing *Ford v. Rowland*, 562 So.2d 731, 735 (Fla. 5th DCA 1990)).

In contrast to statements of fact, "statements of pure opinion are protected from defamation actions by the First Amendment," *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018), as are "[c]ommentary or opinion based on facts that are set forth in the [broadcast] or which are otherwise known or available to the [viewer]," *Rasmussen v. Collier Cnty. Pub. Co.*, 946 So. 2d 567, 571 (Fla. 2d DCA 2006); *see also From v.*

6

*Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. 1st DCA 1981) ("Pure opinion occurs when the defendant makes a comment or opinion based on facts which are set forth in the article or which are otherwise known or available to the reader or listener as a member of the public.").

At this pleading stage, the Complaint adequately alleges that Maher's statements were actionable statements of facts concerning Loomer.   Indeed, and as Loomer argues in her filings, Maher cannot, at this stage, escape liability because he couches his statements as a joke, an opinion, or as "conjecture, hypothesis, or speculation" because the statements do not appear that way on their face.   Loomer alleges that Maher stated *as a fact* that Loomer "might" be "fucking" President Trump, a married man, which she claims was and is false and which is capable of being proven false.   Maher's use of the term "might" does not automatically render Maher's statements protected opinion or conjecture.   *See McQueen v. Baskin*, 377 So. 3d 170, 178 (Fla. Dist. Ct. App. 2023) (stating: "Simply couching such statements in terms of opinion does not dispel these implications; and the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.'") (citing *Lipsig v. Ramlawi*, 760 So. 2d 170, 183–84 (Fla. Dist. Ct. App. 2000) ("However, a speaker cannot invoke a 'pure opinion' defense, if the facts underlying the opinion are false or inaccurately presented.")).

Notably, the Court permitted Defendants to file as an exhibit to their motion to dismiss a USB flash drive containing copies of the subject Maher Episodes because they were essential to Loomer's claims.   While Defendants may view Maher's statements as "speculative joking," he made them during a non-comedic and serious panel discussion

with conservative pollster Kristen Soltis Anderson and former U.S. Senator Al Franken that involved topics such as alleged police brutality.  Also, and, as Loomer points out, when Maher told the purported "joke" about Loomer, "it drew more groans from the audience than sparse laughter."   So Defendants' motion to dismiss is denied to the extent the motion argues that the subject statements were not about facts.

Defendants next argue that Loomer did not plead malice, which is required because Loomer is a public figure.  While the Court agrees with Defendants that Loomer must plead malice—even with respect to her defamation *per se* claims—the Court disagrees that malice is not adequately pled in the Complaint.   Loomer alleges that: "These false and misleading statements were broadcasted with actual malice, as Defendants knew that they were false and misleading, and/or at a minimum acted and published with a reckless disregard for the truth."   The Complaint further alleges that there is not a "shred of credible reporting or evidence suggesting otherwise" and that "Defendant Maher had no basis in fact to make this statement.   He simply fabricated it for attention, notoriety, "clicks," and profit for himself and Defendant HBO, his employer."   Assuming the truth of these allegations, which the Court must do at this stage, Maher was knowingly reckless because he fabricated what he said about Loomer "fucking" President Trump.

Also, the Complaint avers that Defendants refused to retract what they said about Loomer after being placed on notice that the statements were false and Maher, again acting with malice, chose to target Loomer in a subsequent September 20, 2024, episode of "Real Time," with a segment titled "24 Things You Don't Know About Laura Loomer" where he continued to make alleged false and disparaging statements about Loomer.

Tellingly, Defendants argue facts that are not alleged in the Complaint to prove their point that Maher was not reckless, a red herring on a motion to dismiss.  For example, Defendants contend that: "in light of Ms. Loomer's own statements about her affection for Trump, repeated appearances the two made together in the days leading up to the September 13, 2024 episode, and rumors about their relationship, Mr. Maher had ample reason to believe they 'may' be sleeping together."  The Court cannot consider these purported facts at this stage.  Accordingly, Defendants' argument that malice is not sufficiently pled is denied.

Defendants' third argument is that Loomer does not state a claim for defamation by implication.  The Court agrees.  "[D]efamation by implication is a well-recognized species of defamation that is subsumed within the tort of defamation."  *Jews for Jesus*, 997 So. 2d at 1108.  Defamation by implication "applies in circumstances where literally true statements are conveyed in such a way as to create a false impression."  *Id.*  Defamation by implication, in other words, "arises not from what is stated, but from what is implied when a defendant (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts."  *Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1123–24 (S.D. Fla. 2021).  Defamation by implication is thus "premised not on direct statements but on false suggestions, impressions and implications arising from otherwise *truthful* statements."  *Id.* at 1124 (emphasis added).

A review of the Complaint reflects that Loomer does not allege the "literally true facts" to plead a claim for defamation by implication.  In other words, she does not aver

the facts that Defendants have either "juxtaposed" in order "to imply a defamatory connection between them" or "omitted" in a way that "creates a defamatory implication." *Corsi*, 519 F. Supp. 3d at 1123–24.

In her filings in response to Defendants' motion to dismiss, Loomer argues that Maher's statements contained true statements to falsely suggest that she might be "fucking" President Trump, but her Complaint does not allege these true statements. Rather, and as Defendants argue, Loomer's allegations focus on Defendants' allegedly false statements, which makes sense because defamation generally involves untruths. "But defamation by implication is, by definition, the manipulation of *true facts* to create a defamatory effect." *Block v. Matesic*, No. 21-61032-CIV, 2023 WL 8527670, at *9 (S.D. Fla. Dec. 8, 2023) (dismissing a defamation by implication claim because, while the plaintiff "provides some contextual material from which a defamation-by-implication claim could (theoretically) proceed, her allegations do not connect the dots.") (citations omitted and emphasis in original). Accordingly, the Court grants Defendants' motion to dismiss as to the defamation by implication claims without prejudice to Loomer to amend the claims if she can do so in good faith.

Finally, Defendants argue that Loomer's defamation *per quod* claims must be dismissed because she does not plead special damages. The Court agrees. Unlike a claim for defamation *per se*, which assumes the plaintiff has been damaged, to state a claim for defamation *per quod*, a plaintiff must allege special damages, i.e., "actual, out of pocket losses." *Flynn v. Cable News Network, Inc.*, No. 8:22-CV-343-MSS-SPF, 2023 WL 5985196, at *5-*6 (M.D. Fla. Mar. 17, 2023) (noting that "[a]llegations for special damages

must be pled in more than a conclusory manner; rather [w]ords actionable ... *per quod* are those who[se] injurious effect must be established by due allegation and proof.") (internal quotations and citations omitted); *Anderson v. Smith*, No. 3:19-cv-222-J-20JRK, 2020 WL 10058207, at *3 (M.D. Fla. Mar. 24, 2020) (requiring allegations of "a realized or liquidated loss").

      In her filings, Loomer essentially concedes that special damages are not pled and requests leave to amend to assert these special damages.   Accordingly, the Court grants Defendants' motion with respect to the defamation *per quod* claims and dismisses these claims without prejudice to Plaintiff to amend if she can plead special damages consistent with Rule 11 of the Federal Rules of Civil Procedure.

      Accordingly, it is ORDERED AND ADJUDGED that:

1.    Defendants' Motion to Dismiss (Dkt. 17) is denied in part and granted in part.

2.    Plaintiff's defamation *per se* claims are properly pled and will not be dismissed.   This moots Defendants' argument that the Complaint violates Florida's anti-SLAPP statute.

3.    Plaintiff's defamation by implication claims are dismissed without prejudice to Plaintiff to file an amended complaint if she can amend these claims in good faith.

4.    Plaintiff's defamation *per quod* claims are dismissed without prejudice to Plaintiff to file an amended complaint if she can amend these claims in good faith.

5.    Any amended complaint shall be filed within fourteen (14) days of this Order.

6.    Defendants shall file their responses within fourteen (14) days of the filing of the amended complaint.

7.    If Plaintiff does not file an amended complaint, Defendants shall file their answers to the non-dismissed claims within twenty-eight (28) days of the filing of this Order.

8.    Defendants' Motion to Stay Discovery (Dkt. 18) is denied as moot.

**DONE** and **ORDERED** in Tampa, Florida, this January 16, 2025.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record