IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| LAURA LOOMER <br><br>                 Plaintiff, <br> v. <br><br> BILL MAHER et al <br><br>                 Defendants. | <br><br><br><br><br> **Case No: 5:24-cv-00625-JSM-PRL** |

### LARRY KLAYMAN'S AND LAURA LOOMER'S RESPONSE TO ORDER TO SHOW CAUSE

Larry Klayman ("Mr. Klayman") hereby submits the following in response to the Court's December 4, 2025 order directing him and counsel for Defendants, Kate Bolger, to "show cause why, for the conduct described, they should not be sanctioned under the Court's authority to maintain standards of civility and professionalism." ECF No. 158 at 11 (the "OSC").

Mr. Klayman understands and shares Magistrate Judge Philip R. Lammens' ("Magistrate Judge Lammens") concerns over how this matter is being litigated. As this case was progressing, Mr. Klayman saw these issues arising, which is why on multiple occasions he on behalf of himself and Plaintiff Laura Loomer ("Ms. Loomer") asked for a hearing before Magistrate Judge Lammens to discuss try to resolve these issues. For instance, in his August 26, 2025 Motion for Sanctions, he wrote, "Plaintiff respectfully requests an in-person discovery conference before the Court to address ongoing discovery issues which have gotten out of hand and have needlessly complicated and hugely raised the litigation costs of this simple and straightforward case to try to punish force Ms. Loomer into submission." ECF No. 115 at 14. *See also* ECF No. 109, 87. Mr.

1

Klayman strongly believes in zealous and ethical representation with the goal of not compromising and protecting the rights of his clients. Equally as strong is Mr. Klayman's belief that litigation should never reach the contentious stage that this matter regrettably has. In this regard, Ms. Loomer and her counsel commit to and assure Magistrate Judge Lammens that this matter will be conducted in a courteous and civil manner going forward.

Many of the instances of contentious conduct set forth in Magistrate Judge Lammens' OSC stem from frustrations that have built up over time in this case. In every deposition that was conducted by Mr. Klayman on behalf of Ms. Loomer, counsel for Defendants at Davis Wright Tremaine ("DWT") and Ms. Kate Bolger ("Ms. Bolger") objected to nearly every single question, regardless of merit, as set forth in Plaintiff's August 26, 2025 Motion for Sanctions. ECF No. 115. This tactic was "cleverly" intended to and did break the flow of questioning and thus severely hampered the efficacy of these depositions, as it caused both witnesses and counsel to lose their train of thought, created confusion and unclear and uncorrupted answers and wasted a significant amount of time. This tactic also runs up cost and expense with regard to attorney time and the expense of court reporters and videographers and necessitates the filing and resolution of motions with the Court. The reason why DWT is able to use this calculated tactic is that they knew that Mr. Klayman and Ms. Loomer did not have the huge resources that they do, and they believed that they can effectively tie down if not bury Ms. Loomer and Mr. Klayman with needless motions practice to prevent a substantive litigation of Plaintiff's highly meritorious case. Mr. Klayman has had

a long history[1] with DWT, having litigated approximately 10 – 15 cases against them, and has found this practice to be repeatedy utilized by DWT's attorneys, in addition to their tendency to not be forthright in their representations to him, his clients, and the courts. *See* Attachment  - Articles from The Hollywood Reporter.

What frustrated Mr. Klayman in particular were where Ms. Bolger's speaking objections contained coaching cues and signals to the witness on how to answer questions. Just a few examples, among many more, include:

> Rosenstein Deposition 25:1-11:  "So object to the form. I don't understand the question. **If you understand the question, you can answer it. But if you don't, please don't guess**."
>
> Maher Deposition 139:14: "But you may answer **if you remember**."
>
> Maher Deposition 218:5-6: "**If you can even understand that question**, you can answer it.
>
> Maher Deposition 219:14-20: "**Sorry, is there a question?** Because that's just you giving a lesson . . . That's not a leading question. That's a statement.
>
> **Rosenstein Deposition 120:11-13**: "**I – I'm lost**. You can answer."

Further adding to these frustrations were  threats and snide and condescending offensive remarks made to both Mr. Klayman and to Ms. Loomer by Ms. Bolger. Again, just a few examples include:

> Maher Deposition 88:14-15: "You're about not to be [a lawyer], Mr. Klayman. And you are misstating the law."

---

[1] In this case, despite Mr. Klayman and Ms. Loomer having  agreed at great expense to travel to New York City to conduct the deposition of Nina Rosenstein at DWT's New York office as a professional courtesy, Mr. Klayman was "trolled" by DWT assigning a huge 6 foot 6 inch security guard to follow Mr. Klayman everywhere, including the bathroom as if he was some type of security threat. Mr. Klayman has he has never once experienced this type of treatment in another other case during his nearly fifty (50) years of practicing law.

<u>Maher Deposition 90:13</u> "You[Mr. Klayman] sure need [an assistant]."

<u>Maher Deposition 50:6-7</u>: "But really, thanks for keeping it classy, Larry."

<u>Maher Deposition 50:10-14</u>: "Super classy and super relevant to this lawsuit. I'm being sarcastic."

<u>Loomer Deposition 317:20 – 318:10</u>: "Ms. Loomer, you may not speak on the record when there is not a pending question. And if you continue to do it, I will seek sanctions against you."

<u>Loomer Deposition 237:1 – 4</u>: "Ms. Loomer, if you testify about what he said at that deposition, I will sanction you."

<u>Loomer Deposition 235:14 – 20</u>:

MS. BOLGER:  Q Ms. Loomer, you may not talk –
MR. KLAYMAN: **Stop screaming at my client**.
MS. BOLGER: Q -- unless I ask you a question.
MR. KLAYMAN: **Treat her with respect**.

The very nature of this case—which arose from highly defamatory, vile and outrageous public statements made by Defendants Bill Maher ("Maher") and Home Box Office, Inc. ("HBO") to millions here and abroad about Ms. Loomer, accusing her of having an adulterous affair with, that is fucking President Trump—has contributed to the contentious nature of this litigation. Specifically, Defendants published:

> **I think maybe Laura Loomer's in an arranged relationship to affect the election because she's very close to Trump. She's 31, looks like his type. We did an editorial here a few years ago…it was basically, who's Trump fucking? Because I said, you know, it's not nobody. He's been a dog for too long, and it's not Melania. I think we may have our answer this week. I think it might be Laura Loomer**. Am. Comp. ¶ 18 (the "Defamatory Statement").

4

To add more insult to the serious injury and damage to Ms. Loomer on the following September 20, 2024 episode of Real Time With Bill Maher, Defendants published a segment titled "24 Things You Don't Know About Laura Loomer" where they continued to make false, disparaging statements about Ms. Loomer. For instance, Defendants published, acting in concert:

> It's because the person, like Trump, the nut at the center of it, starts surrounding himself with – I mean, he normally surrounds himself with pretty crazy people – but this Laura Loomer…she's the new groupie in Trump's circle…here are 24 things you don't know about Laura Loomer. Am. Comp. ¶ 30.

Defendants then proceeded to conjure up fabricated "facts" about and attributed to Ms. Loomer, including but hardly not limited to: (1)"My biggest fear is immigrants taking my job as a right-wing hatemonger" and (2) "I don't hate all brown people, just the brown ones." Am. Comp. ¶ 31. Mr. Maher obviously wanted his pound of flesh from Ms. Loomer, who as a woman he does not pay respect to.

Despite this, Defendant Maher was forced to admit at his deposition that he had no information that Ms. Loomer was "fucking" President Trump behind the back of Melania Trump before making the Defamatory Statement:

> Q You don't have any information, do you, that Ms. Loomer had sex with Donald Trump, do you?
> A No…. Maher Deposition 23:7-9.

This is a case where Ms. Loomer has been publicly branded by the Defendants as a whore, a slut, and a prostitute and used as a vehicle to influence and harm President Trump during the 2024 presidential election period. Being the victim of such conduct would evoke highly contentious emotions from

5

anyone, which has certainly contributed to the situation that the parties are in today. However, Ms. Loomer and her counsel once again commit to and assure Magistrate Judge Lammens that this matter will be conducted in a courteous and civil manner going forward.

Addressing specific concerns raised by Magistrate Judge Lammens, questions by Mr. Klayman concerning Defendant Maher's religious beliefs were relevant, as he was setting a foundation to explain how the nature Defamatory Statements do not lend itself to Judeo-Christian morality and values. There was nothing abusive, invasive, or harassing about these questions, as Defendant Maher has publicly and repeatedly proudly proclaimed that he is an atheist on his show and elsewhere. Ironically, Mr. Klayman who used to appear on his show "Politically Incorrect," when it was on ABC, repeatedly witnessed Mr. Maher boasting on air about his atheism. It is no secret and he is proud of it. Indeed, his tweets frequently mock Christians along with President Trump. As just one example among many, disrespectfully disparaging Christians and people of faith in general, Defendant Maher has tweeted:

> Thank Trump for the one good thing he did, He exposed Evangelicals, who are his supporters as the shameless hippocrates[sic] they've always been.
>
> You want to vote for Trump? Fine. But don't pray to him. <u>Maher Deposition Exhibit 9 and 10</u>.

Furthermore, Mr. Klayman's reference to Ocala, Florida as the "Bible Belt" was never intended to imply that Defendants could not receive a fair jury trial in

this Court, which Mr. Klayman has great respect for[2] and is confident that anyone of any ideological belief would receive a fair adjudication in. Mr. Klayman's statement was intended simply to open dialogue on settlement in a case that should have settled under normal circumstances where the Honorable James S. Moody had already denied the Defendants' Motion to Dismiss and found the Defamatory Statement to constitute defamation *per se*. ECF No. 39. This was only done when it became apparent to Mr. Klayman that prior to his deposition, Defendant Maher had not been timely advised by his counsel of the nature of this case despite being it litigation for months, and that he had neither been apprised of a settlement offer made by Ms. Loomer prior to his deposition nor her attempted resolution pursuant to Fla. Stat. § 770.01 before this matter was even initiated[3]. Defendant Maher incredibly revealed at deposition:

> Q Are you aware that I approached your counsel, Ms. Bolger, and said "Would you like to consider settlement?"
> A I don't think I was aware it was you until a couple days ago…
> Maher Deposition 73:11-15.

Thus, Mr. Klayman never intended to insinuate that this Court would be biased or that Defendants could not receive a fair trial in this forum. He only wanted to open a dialogue concerning settlement because it was apparent that the two prior attempts to settle were not communicated to Defendant Maher. Regrettably, this

---

[2] In fact, when Mr. Klayman ran for U.S. Senate in 2003-2004, his headquarters were in Ocala.

[3] Given the nature of the defamation *per se*, which not only outrageously smeared Ms. Loomer but also the current President and his First lady, this is a case which should lend itself to settlement. Ms. Loomer and Mr. Klayman also attempted to settle this matter at court ordered mediation, which proved unsuccessful.

also demonstrates the apparent practice of DWT to run up time and expense billing and fees for their own apparent benefit at their client's expense.

Finally, Mr. Klayman properly instructed Ms. Loomer not to answer questions about whether the First Amendment protects her right to give her opinion or make jokes. This type of improper questioning calls for a layperson to draw legal conclusions that she is not qualified to reach, and as such, Mr. Klayman properly objected in order to protect his clients' rights. If she had answered this improper question no matter what she testified to it would have resulted in more hostile questioning and been, based on experience with DWT, misrepresented and misused in legal pleadings, creating more unnecessary contention, loss of time and expense and likely more costly motion practice.

Throughout this case, with full respect to Magistrate Judge Lammens, it has appeared to Mr. Klayman and Ms. Loomer that Magistrate Judge Lammens has seemed to focus more on him and Ms. Loomer and appear to favor Ms. Bolger, Defendant Maher, and Defendant HBO, particularly since Magistrate Judge Lammens' OSC was issued on Ms. Loomer's own Motion for Sanctions. Adding to this frustration was the fact that this case was effectively sealed to the public for a period of time at the Ms. Bolger's and her clients requests, despite it being a matter of public interest.

However, the bottom line is that Mr. Klayman and Ms. Loomer both understand and share Magistrate Judge Lammens' concerns with how this case was being litigated and Ms. Loomer and her counsel will commit to and assure Magistrate Judge Lammens that this matter will be conducted in a courteous and

civil manner going forward no matter what else happens, and trust that Ms. Bolger and her clients will reciprocate.

For these reasons, neither Mr. Klayman nor Ms. Loomer should respectively be sanctioned in the interest of fundamental fairness for all parties.

Dated: January 6, 2026

Respectfully Submitted,

By: /s/ Larry Klayman
Larry Klayman
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
leklayman@gmail.com

Pro Se

# In "Fake News" Era, Meet the Lawyer Taking on Media Titans

THR hollywoodreporter.com/news/general-news/fake-news-era-meet-lawyer-taking-media-titans-1197154

Paul Bond																																			March 29, 2019



*Courtesy of Subject*

Larry Klayman has been called a right-wing activist by Wikipedia, a conspiracy theorist by *Politico* and a pathologically litigious attorney and professional gadfly by the Southern Poverty Law Center. They're meant as pejoratives, but the former U.S. Department of Justice prosecutor has no problem with the descriptors.

The 67-year-old attorney has filed countless lawsuits against politicians through Freedom Watch and, before that, Judicial Watch (a name Klayman copied from the *West Wing* character Harry Claypool, who's reportedly based on him) — and now he has the media in his crosshairs.

He's suing Sacha Baron Cohen, Showtime and CBS over an interview with former Alabama Supreme Court Chief Justice Roy Moore on *Who Is America?*; he's trying to stopBlumhouse from portraying former Fox News executive Laurie Luhn as a "pimp" for Roger Ailes in *The Loudest Voice*; and he's suing multiple media outlets, including CNN and *Rolling Stone*, on behalf of Joe Arpaio for calling the former sheriff of Arizona's Maricopa County a "felon" when he was guilty only of misdemeanors.

Klayman aims to "help clean up the industry, since it clearly will not police itself," and also has his sights set on big tech. Freedom Watch in August filed a $1 billion class-action complaint against Google, Facebook, Twitter and Apple over their alleged "illegal suppression" of conservative media. Says Klayman, "This case is meant to break up the monopoly of the social media giants to further not just competition, but also to end the discrimination against those who their CEOs do not agree with, politically or otherwise."

He self-identifies as a conservative libertarian but says he's nonpartisan — noting that in the early aughts he sued President George W. Bush and Vice President Dick Cheney over illegal mass surveillance. He gained notoriety by filing more than a dozen lawsuits against the Clinton administration. A decade later, after a successful lawsuit against the NSA over its collection of private phone data, he petitioned the Department of Homeland Security in an effort to have President Barack Obama deported.

"Conspiracies do happen," says Klayman. "It's just two actors agreeing to act in concert to commit illegalities. I am a proud conspiracy theorist."

## Related Stories



### [Roy Moore Claims Sacha Baron Cohen's 'Yerushalayim TV' Fraud Voids Deal](#)

*A version of this story first appeared in the March 27 issue of The Hollywood Reporter magazine. To receive the magazine, [click here to subscribe](#).*

You May Like

## THR Newsletters

Sign up for THR news straight to your inbox every day

[Subscribe Sign Up](#)

# Trump's War on "Fake News" and the Law Firm Defending Free Press

THR hollywoodreporter.com/news/politics-news/trumps-war-fake-news-law-firm-defending-free-press-1197104

Eriq Gardner                                                                                                              March 29, 2019



*Taylor Callery*

"Enemy of the people!" goes the rallying cry from the leader of the supposedly free world. President Trump hasn't yet lived up to his campaign pledge to make it easier to sue the media, but emboldened by his war on "fake news," some of Trump's followers are trying anyway. When these individuals get to the courtroom, they often find one particular law firm on the other side.

Davis Wright Tremaine is hardly universally known, but as media finds itself increasingly under attack in the Trump age, this firm has become its best line of defense. Its fingerprints are present across the media spectrum. Jokes told by late-night comedians? Often vetted by its lawyers. #MeToo stories published over the past 18 months? Quite frequently, a DWT attorney responds to threatening letters from the alleged perpetrators. And in court, the firm is tackling huge First Amendment cases, representing the likes of CNN, *The New York Times* and *The Washington Post* in everything from defending defamation claims to securing access to critical documents and regaining access after being exiled from the White House. Simply put: This Seattle-based firm has outsize influence on media at a particularly critical moment. (DWT counsels *THR* too.)

Take the defamation suit from Russian tech entrepreneur Aleksej Gubarev over *BuzzFeed News*' January 2017 publication of the full "Trump Dossier," the report about Russia-Trump ties prepared by former British spy Christopher Steele.

"There were a lot of firms pitching us, and many had strong thoughts," says Nabiha Syed, vp and associate general counsel at BuzzFeed. "Some believed it was a big mistake to publish. It was a scary thing to choose counsel, to place trust with a bet-the-company case." DWT's Katherine Bolger and Nathan Siegel took charge of defeating the suit.

"Our course was set by what [*BuzzFeed News* editor] Ben [Smith] said, that this was an intentional act to inform the public," says Bolger. "It was a defense that ultimately won, and it was a case heavily influenced by what was in the news."

Bolger describes litigating such a high-profile case as "trippy — that's a legal term," and, with a nod to the political dialogue around the Trump Dossier, adds that she couldn't avoid thoughts about the consequences. "Every day we were buffeted by what is in the news, and holy cow if we lose the case," she says. "It was really exhilarating." Soon, pending an appeal over what should remain sealed, the public could learn more about the firm's work in the case, as BuzzFeed's attorneys also investigated the "truth" of the Trump Dossier by taking depositions of Steele and others.

In the Trump era, DWT lawyers are often popping up in fights over the free flow of information. For example, Rachel Strom, one of the firm's youngest partners, had just watched Bolger argue in a New York federal courthouse last April when she got a text about something significant happening a few doors down. The offices of Trump attorney Michael Cohen had been raided by the FBI, and Cohen was appearing at the courthouse to stop prosecutors from looking at material he said was protected by attorney-client privilege. "I ran over," says Strom. "That moment, I was representing ABC, but as the day went on, I started representing other media clients too."

At the beginning of that proceeding, U.S. District Court Judge Kimba Wood expressed an inclination to hold the hearing behind closed doors. It was Strom, without any invitation, who stood up from the benches in the public gallery to argue that there was a First Amendment right to access the courtroom and that the "cat was out of the bag" with respect to the Cohen raid. Not only did she sway the judge, but as the hearing turned to questions about what would be publicly filed — including whether the names of Cohen's clients would be released — Strom persuaded the judge to defer to a presumption of openness. It eventually resulted in Cohen's admission that he had advised Fox News host Sean Hannity.

## Related Stories



### BuzzFeed Beats Defamation Lawsuit Over Trump Dossier Story

When it comes to DWT attorneys, the Trump era has meant business. The group has been in court to find out about Trump's gun permit, to unseal documents about the operations of Trump University and to fight when the U.S. attorney general attempted to subpoena a radio reporter. Not every matter made it to a public courtroom, though. At various points over the past three years, Trump's team sent threatening letters to *The Art of the Deal* co-author Tony Schwartz, *Fire and Fury* author (and *THR* contributor) Michael Wolff, and *Apprentice* star and ex-White House staffer Omarosa Manigault Newman. Each time, DWT's Elizabeth McNamara responded in kind with retorts that essentially quashed potential arbitration.

Then there's the lawsuit from literary group PEN America. After seeing the Trump administration strip CNN reporter Jim Acosta of his press credentials, threaten *Washington Post* owner Jeff Bezos with higher postage rates for Amazon and suggest that NBC's broadcast license be revoked, PEN is seeking judicial intervention to stop further retaliation against free speech.

"Among media lawyers, it is not a norm to represent plaintiffs," says DWT partner Robert Corn-Revere, handling the case. "But sometimes, the way to maintain a robust First Amendment is to go on the offensive."

How did Davis Wright Tremaine get to be such a powerhouse in the media realm?

In the 1960s, the late pioneering First Amendment attorney Cameron DeVore set up shop at a firm that would eventually become DWT. At the time, doing media law was intellectually stimulating and certainly rewarding. The Supreme Court would establish the "actual malice" standard for public figures in libel cases in the 1963 case *New York Times Co. v. Sullivan*, and the following decade would bring a big court battle over the publication of the Pentagon Papers. Then, the Watergate scandal erupted, which would not only lead to a new generation of investigatory reporters following in the footsteps of Bob Woodward and Carl Bernstein, but also a healthy appetite for legal representation.

But by the mid-1990s, the media law bubble sort of collapsed. The rise of the internet began to erode traditional income streams for newspapers and magazines, and many white shoe firms such as Gibson Dunn and O'Melveny & Myers began backing off from seeking to represent news companies in favor of more-well-heeled corporate clients. Plus, there was a sense among many law school graduates around this time that the exciting times had passed them by.

"When I started out, I felt sad because I felt all the big battles had been fought," says Strom. "I wondered whether I would have come up with the argument in *Times v Sullivan*."

Of course, any turn of the century notion that media law would no longer be fruitful only created opportunity for DWT, especially as First Amendment legends like Floyd Abrams got up in age. Quickly, it didn't matter that the firm was based in Seattle — no one's idea of a media hub — and even if it did, the firm began opening up media practice offices in Los Angeles, New York and Washington, D.C. Plus, after Levine Sullivan Koch & Schulz — the firm that handled Gawker's defense in the Hulk Hogan sex tape lawsuit — merged with Ballard Spahr in 2017, DWT took on many of its former rival's top media attorneys (including Bolger, Siegel and Strom).

In retrospect, media law had and has plenty of big battles ahead.

"The First Amendment hasn't changed, but the way that information is transmitted has changed dramatically," says Kelli Sager, a veteran L.A.-based partner. "The breadth of clients — now it's not just a few major media companies but everyone on the internet and Netflix and Amazon."

Because of the far-reaching, hardly-ever-erased nature of information published online, the business of reputation management has recently exploded. The stakes are much greater than they were in the past, when something appeared in a local newspaper and one would have to do heavy research to find it. A story about sexual misconduct allegations, for instance, now can have career-ending consequences, even if later debunked. Plus, amid increasing economic inequality, some wealthy individuals are determined to counter what they see as a legal environment favoring the media. PayPal co-founder Peter Thiel's secret funding of Hulk Hogan's suit against Gawker may be the showcase example, but there are other coordinated efforts to do things like bolster privacy laws and influence whom the courts consider public figures.

"There is definitely a more sophisticated and substantial plaintiff's bar than there used to be," says DWT's Laura Handman, who successfully defended a recent defamation lawsuit brought by a Trump activist whose "OK" hand gesture at the White House was interpreted by one writer as a sign of white supremacy.

Indeed, attorneys like Charles Harder, Thomas Clare and L. Lin Wood are picking up business from sensitivities related to the online consumption of news, the political atmosphere and trends like the #MeToo movement. While those on the offense face a century of precedent tipping to unfettered expression, they have scored successes both obvious and subtle. Everyone knows about the trial that drove Gawkerinto bankruptcy. But Wood's ongoing defamation suit against CNN on behalf of a hospital executive is arguably more consequential: It portends fewer early exits for media companies hauled into federal court.

DWT attorneys worry about the erosion of SLAPP analysis — state laws aimed at curtailing frivolous First Amendment cases — and the prospect, in Sager's words, that "juries will treat everything as fake news."

But then again, jury trials in red states remain extremely rare, and other than one lonely opinion from Supreme Court Justice Clarence Thomas, the judiciary doesn't seem inclined to upset settled law like *Times v. Sullivan*, giving reporters some breathing room to make mistakes. As for cease-and-desists, DWT partner Alonzo Wickers (whose clients include John Oliver, Samantha Bee and *South Park*) says he's seeing more prepublication missives, but he thinks it's actually a positive development. "I almost prefer to get those types of letters, because they often tip the hand showing how strong or weak these claims are," he says.

And then there's Trump, who undoubtedly has incited at least some hatred toward the press but is not quite the formidable foe some think. Yes, he routinely threatened to sue as a real estate mogul, promised on the campaign trail to reshape libel law and now whips his followers into a frenzy any time he mentions "fake news." But he also lacks impulse control and says the nastiest things on Twitter. The latter version of Trump is especially of interest to a law firm doing more than anyone to help the media navigate these dangerous times.

As Strom puts it, "Donald Trump has created some great defamation precedent."

## Related Stories



### In "Fake News" Era, Meet the Lawyer Taking on Media Titans

*A version of this story first appeared in the March 27 issue of The Hollywood Reporter magazine. To receive the magazine, click here to subscribe.*

You May Like

## THR Newsletters

Sign up for THR news straight to your inbox every day

Subscribe Sign Up