# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

LAURA LOOMER,

      Plaintiff,

v.                                   Case No: 5:24-cv-625-JSM-PRL

BILL MAHER and HOME BOX OFFICE,
INC.,

      Defendants.

_____

## ORDER

THIS CAUSE comes before the Court on Defendants' Motion for Summary Judgment. The Court having reviewed the motion, response, reply, record evidence, and being otherwise advised in the premises, concludes that Defendants' motion should be granted because Plaintiff does not establish the elements of a false statement, malice, and damages as a matter of law. Accordingly, final judgment will be entered in Defendants' favor.

## BACKGROUND

Plaintiff Laura Loomer is a well-known conservative investigative journalist. Loomer is also a "conservative, Republican, Jewish female activist." She has twice mounted unsuccessful bids for a congressional seat. Bolger Decl. Ex. 38; Dkt. No. 42 ¶¶ 12–13, 16.

Defendant Bill Maher is the host of "Real Time with Bill Maher," a weekly hour-long television program that airs on Defendant Home Box Office, Inc.'s network ("HBO").

Maher is a celebrated comedian and satirist and has been nominated for 83 awards over the years, including 42 Emmys.   Maher began his career doing stand-up comedy, eventually doing comedy stints on The Tonight Show and working as a comedic actor.   From 1993 to 2002, he hosted Politically Incorrect, a topical comedy show that aired first on Comedy Central and later on ABC.   Maher performed 13 stand-up comedy specials distributed by HBO and, until recently, toured the country performing stand-up comedy.

Since 2003, Maher has hosted Real Time, which premieres at 10 P.M. EST on HBO on a weekly seasonal basis.   Real Time is an "award-winning talk/comedy series" that blends comedic monologues with panel discussions and debates about the news of the day. Each episode of Real Time includes both scripted and unscripted elements.   The scripted elements typically include (i) an opening monologue, (ii) a collection of jokes pertaining to a particular person or subject with accompanying pictures and graphics, which is always delivered in the middle of the show, (iii) the "New Rules" segment, which is a comedic send-up of "rules" that should be applied to popular culture and American politics, always delivered at the end of the show, and (iv) a final "New Rule," a closing statement with thoughts and jokes about a topical issue.   *See* Johnsen Decl. ¶ 10; Maher Depo Tr. at 13:25–14:12.   A team of writers—who take inspiration from the news of the day— contribute to the scripted portions of each episode, but Maher ultimately "choose[s]," "endorse[s]," edits, and "perform[s]" the jokes.   Maher Depo Tr. at 14:1–5, 112:5–12.

Loomer filed this defamation action against Defendants, alleging that they broadcasted false, malicious, and defamatory statements of and concerning her into this

judicial circuit, nationwide, and internationally. She claims that numerous people in this judicial district heard these false, malicious, and defamatory statements.

Specifically, Loomer avers that on a September 13, 2024, episode of Maher's "Real Time" show (hereinafter referred to as the "Episode"), Maher made and published the following false, malicious, and defamatory statement of and concerning Loomer:

> I think maybe Laura Loomer's in an arranged relationship to affect the election because she's very close to Trump. She's 31, looks like his type. We did an editorial here a few years ago…it was basically, who's Trump fucking? Because I said, you know, it's not nobody. He's been a dog for too long, and it's not Melania. I think we may have our answer this week. I think it might be Laura Loomer.

According to the allegations: "In this statement, Defendant Maher makes the false statement that Ms. Loomer is in a sexual relationship with Donald Trump, who is a married man." Thus, Defendant Maher "falsely and maliciously accused Ms. Loomer of having committed adultery with Donald Trump."

Defendants filed a motion to dismiss Loomer's initial Complaint and the Court granted the motion in part. Specifically, the Court dismissed Plaintiff's claims for defamation per quod and defamation by implication but held that Plaintiff had sufficiently alleged a claim for defamation per se. In so holding, the Court noted that it "cannot consider . . . purported facts" such as "Ms. Loomer's own statements about her affection for Trump, repeated appearances the two made together in the days leading up to the September 13, 2024 episode, and rumors about their relationship" "at this stage," as such facts beyond the complaint are "a red herring on a motion to dismiss." Dkt. 39 at 9.

Plaintiff filed an Amended Complaint on January 30, 2025, which is the operative pleading. Now, Defendants move for summary judgment on all her claims. The

3

undisputed facts reflect the following. Notably, many of these facts are taken directly from Defendants' motion for summary judgment because they are not disputed in the record.

Long before the Episode, Loomer admitted that she had developed a reputation as one of the most controversial figures in American politics. She is "pro-white nationalism," Bolger Decl. Ex. 9; Bolger Decl. Ex. 5 ("Loomer Depo. Tr.") at 275:13–276:6; a "proud Islamophobe," *id.* at 273:11–14; and a believer in "biological hierarchy" between men and women, *id.* at 392:6–21. Loomer acknowledged in her 2021 book *Loomered: How I Became the Most Banned Woman in the World* that her behavior has led her to be banned from numerous social media platforms, including (i) Twitter, for violating the platform's hateful conduct policy, *see* Bolger Decl. Ex. 9 (Loomer Depo. Ex. 14); Loomer Depo. Tr. at 273:16–274:3, (ii) Facebook, which designated her a "dangerous individual," *id.* at 252:20–253:2, (iii) ridesharing platforms Lyft and (iv) Uber, and (v) PayPal, for allegedly receiving donations from hate groups, *see* Bolger Decl. Ex. 9; Loomer Depo. Tr. at 275:2–12; Bolger Decl. Ex. 11. The record reflects that prominent conservative figures disavowed Plaintiff because of her behavior.

Plaintiff's X account was reinstated in 2021, and she has about 1.8 million followers—including, by her assessment, "most of the President's staff." Loomer Depo. Tr. at 20:22–23:1.

Plaintiff testified at her deposition that, as a result of her controversial opinions, and before the Episode, she was denied a job in the White House due to concerns on the part of President Trump's inner circle. In March of 2023, she had a private meeting with

President Trump and his chief of staff, Susie Wiles, at which President Trump purportedly instructed Wiles to offer Plaintiff a position on his campaign. The offer was withdrawn after it was reported in April 2023, that the President's aides "feared that hiring Ms. Loomer, who has a long history of bigoted remarks, would set off a backlash." Bolger Decl. Ex. 9; Loomer Depo. Tr. at 78:9–20; *see also* Bolger Decl. Ex. 21.

The record is undisputed that, prior to the Episode, Plaintiff believed she had a close relationship with President Trump. She testified that she visited Mar-a-Lago at least 20–30 times for political events and met with President Trump during 10–15 of those visits. Loomer Depo. Tr. at 163:17– 165:22.

On August 13, 2023, she met President Trump at his private box at the Trump National Golf Club in Bedminster. At the golf club, Plaintiff publicly posted recordings showing President Trump with Plaintiff, telling his secretary "I love this girl," and inviting Plaintiff and her friends to come to his "very private" suite. Loomer Depo. Tr. at 137:15– 141:10. Plaintiff "gave him a hug"—and while "it's taboo to grab the president of the United States," President Trump told Secret Service, "It's fine. It's fine."

After the meeting, Plaintiff shared on social media video of her and President Trump in his private box, in which she tells him "I love you"—and then captioned the post "Best president ever. I love him so much." Bolger Decl. Ex. 23. In a separate post, she wrote: "He wanted me to sit next to him all day, and it was the best day ever. . .. I really love him with all of my heart." Bolger Decl. Ex. 24. In another tweet, she posted a picture of her standing beside President Trump, looking up at him, captioned simply with the "heart-eyes" emoji.

5

The record is undisputed that, when the presidential campaign entered full swing, Plaintiff was by President Trump's side.   She was with him in Miami, Minnesota, Nashville, and Iowa, where it was so cold that her hands were "freezing" and President Trump "grabbed [her] hand" to warm it up.   Loomer Depo. Tr. at 174:9–11, 181:4–17 & 184:17–185:20.   At 2:53am on July 19, 2024, after the last day of the Republican Convention, Plaintiff tweeted a video of President Trump in which he sees her in the crowd, points to her and, in response to her yelling "I love you, I love you," blows her a kiss.   She goes on to yell, "You're amazing, I love you, I love you."

In the week leading up to the Episode, President Trump invited Plaintiff to accompany him on his private jet five to six times, including to the presidential debate and to a 9/11 memorial event the next day.   *See* Loomer Depo. Tr. at 173:7–15 & 174:17–18.

Plaintiff's appearances with President Trump attracted widespread attention.   *See* Bolger Decl. Exs. 29, 30, 31, 64 & 106; Johnsen Decl. ¶¶ 24– 28, 30.   Plaintiff testified that there was a "media frenzy" surrounding her travel with him "which is probably why Bill Maher wanted to do a segment."   Loomer Depo. Tr. at 301:1–4; *see id.* at 428:15–16 ("[T]here was all this news coverage about me flying on the plane.").

Plaintiff's frequent presence at President Trump's side led to extensive chattering about the nature of their relationship in the days leading up to the Episode.   *See* Maher Depo. Tr. 186:9–10 ("[M]e and everyone else in the media was commenting on it."). Twitter was abuzz with speculation that Plaintiff and President Trump might be in a relationship.   *See* Bolger Decl. Ex. 32 (September 12, 2024, Tweet from Mike Sington with 3.919 million views stating "[t]his is why Trump is hanging out with Laura Loomer.

6

Watch them with their hands all over each other at Mar-a-Lago. Note: He's married"); Bolger Decl. Ex. 33 (September 12, 2024, tweet saying "popular theory going around is Loomer is having an affair with Trump").

Plaintiff produced 39 tweets that were published by users before the Episode premiered, in which users were speculating and making jokes about her being in a sexual relationship with President Trump.

News outlets also reported on the rumors swirling around Plaintiff's relationship with and influence over President Trump.    The Miami New Times published an article on September 13, 2024, titled "Laura Loomer and Trump Sitting in a Tree, K-I-S-S-I-N-G," which noted the speculation that the two were "a romantic item."    Bolger Decl. Ex. 36. OK! Magazine published a similar article at 5:46 PM EST, titled "Donald Trump Accused of Having an Affair With MAGA Conspiracy Theorist Laura Loomer as Wife Melania Remains MIA" and reporting that "[s]everal images have been circulating on X … showing Trump, 78, getting handsy with the 31-year-old MAGA supporter" and that "several critics" have been "speculat[ing] about their relationship with one another, pointing out how the ex-president's wife, Melania Trump, hasn't been on the campaign trail since the Republican National Convention."    Bolger Decl. Ex. 37.

With respect to the September 13, 2024, Episode, it is undisputed that the Real Time team was influenced by the chatter about Plaintiff and President Trump.    Several of the articles in that week's "trending morning stories" emails reported on Plaintiff's appearances and relationship with President Trump, including one that referred to their "admiration fest."    *See* Johnsen Decl. ¶¶ 25– 26, 35 & Exs. A, B, C, G, H, I, V.    Some

7

Real Time writers drafted jokes about Plaintiff (along with many other topics). *See* Johnsen Decl. ¶¶ 30–33, 37.

During the specific part of the Episode related to Plaintiff, Maher spoke with comedian and former Democratic Senator Al Franken and Republican commentator Kristen Soltis Anderson as part of the panel discussion. Portions of the panel discussion were serious and non-comedic. In response to Senator Franken's observation that President Trump brought Plaintiff to a 9/11 remembrance that week, Maher quoted a tweet from Plaintiff stating that Taylor Swift "is in an arranged relationship with Travis Kelce to influence the 2024 election" and joked: "I think maybe Laura Loomer is in an arranged relationship to affect the election because she's very close to Trump, she's 31, looks like his type." Episode Tr. at 8305-06. Mr. Maher continued: "We did an editorial here a few years ago. . ... It was basically 'who's Trump f***ing?' Because I said, you know, it's not nobody. He's been a dog for too long. And it's not Melania. I think we may have our answer this week. I think it might be Laura Loomer. I'm just saying." *Id.*

When asked about the Episode, Maher testified:

> I made a joke. I made a joke based on their sudden closeness in the news that week. I could have shown a video of them together and all the places they were together and all the things that were going on, the 'I love you' the 'I love you,' the blowing of the kisses, you're very special, all this stuff, and then just said, 'Hey, get a room.' It's just - - this is just comedy. This is -- these are jokes.

Maher Depo. Tr. at 22:18–23:25; *see also* Rosenstein Depo. Tr. At 81:6 ("[H]e was making a joke.").

8

Maher explained, in light of the media frenzy about their closeness, "[i]t was hard not to make that joke," Maher Depo. Tr. 21:12, and he would have been "remiss" had he not commented on "Loomer being by his side every day for a week," *id.* at 213:12–16.

Plaintiff's closeness with President Trump remained in the news in the days after the Episode.   Plaintiff testified, "Every single show on every news network [was] just like nonstop coverage about Laura Loomer, . . . Donald Trump, Laura Loomer, Donald Trump for three weeks straight."   Loomer Depo. Tr. at 430:12–15.

The following week, on September 20, 2024, Real Time did a segment titled "24 Things You Don't Know About Laura Loomer"—alongside jokes about North Carolina gubernatorial candidate Mark Robinson, country music, and Israel's pager attacks on Hezbollah.   Bolger Decl. Ex. 108.   On this episode of "Real Time," Maher, who was already on notice of this potential lawsuit pursuant to Fla. Stat. § 77.01, stated the following, in relevant part:

> It's because the person, like Trump, the nut at the center of it, starts surrounding himself with – I mean, he normally surrounds himself with pretty crazy people – but this Laura Loomer…she's the new groupie in Trump's circle…here are 24 things you don't know about Laura Loomer.

Maher then said the following about and attributed to Loomer, including but not limited to: (1) "My biggest fear is immigrants taking my job as a right-wing hatemonger" and (2) "I don't hate all brown people, just the brown ones."

It is undisputed that HBO and Maher refused to retract the statements about Loomer. The following claims are at issue as alleged in the Amended Complaint against HBO and Maher: defamation *per se*, defamation *per quod*, and defamation by implication.

9

## SUMMARY JUDGMENT STANDARD OF REVIEW

Motions for summary judgment should be granted only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact."   *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original).   The substantive law applicable to the claimed causes of action will identify which facts are material.   *Id.*   Throughout this analysis, the court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor.   *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial.   *Celotex*, 477 U.S. at 324.   The evidence must be significantly probative to support the claims.   *Anderson*, 477 U.S. at 248-49 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990).   "[I]f factual issues are present, the Court must deny the motion and proceed to trial."   *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).   A

10

dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Hoffman v. Allied Corp.*, 912 F.2d 1379 (11th Cir. 1990). However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

## DISCUSSION

"It is well established that when a federal court considers a case that arises under its diversity jurisdiction, the court is to apply state substantive law and federal procedural law." *Royalty Network, Inc. v. Harris*, 756 F.3d 1351, 1357 (11th Cir. 2014). Thus, Florida law provides "the substantive law to the merits of [p]laintiff's defamation claims." *Duffy v. Fox News Network, LLC*, No. 6:14-CV-1545-ORL-37, 2015 WL 5009101, at *3 (M.D. Fla. Aug. 21, 2015).

Under Florida law, the elements of a defamation claim are: (1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official (malice), or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory. *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (citing *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008)).

"[A] claim for defamation may be categorized in one of two ways: defamation *per se* or defamation *per quod*." *Centennial Bank v. ServisFirst Bank Inc.*, No. 8:16-CV-88-T-36JSS, 2019 WL 13037034, at *6 (M.D. Fla. Apr. 17, 2019). A publication rises to the level of defamation *per se* "if, when considered alone and without innuendo, it (1) charges

11

that a person has committed an infamous crime; (2) tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (3) tends to injure one in his trade or profession." *Daniels v. HSN, Inc.*, No. 818CV3088T24JSS, 2020 WL 533927, at *3 (M.D. Fla. Feb. 3, 2020); *see also Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953) (same).

Defamation *per quod* requires explanation of context. "In *per quod* actions, the words used, given their natural and common meaning, are not inherently injurious, but rather are injurious only as a consequence of extrinsic facts, such as innuendo." *See Scobie v. Taylor*, No. 13-60457-CIV, 2013 WL 3776270, at *2 (S.D. Fla. July 17, 2013) (noting that defamation *per quod* "requires an additional explanation of, or an interpretation of innuendo suggested by, the words used to demonstrate the defamatory meaning or that the plaintiff is the subject of the statement").

Defendants' first argument is that there is no genuine issue for trial on the matter of whether the Episode was a statement of fact about Loomer. Defendants contend that the record is undisputed that Maher, a well-known comedian, was making a joke based on the media frenzy surrounding Loomer and President Trump. The Court agrees based on the record evidence.

"A false statement of fact is the *sine qua non* for recovery in a defamation action." *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983); *accord Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 717 (11th Cir. 1985). The challenged statement "must convey to a reasonable reader [or viewer] the impression that it describes actual facts about the plaintiff." *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1379 (S.D. Fla. 2006) (citing *Ford v. Rowland*, 562 So.2d 731, 735 (Fla. 5th DCA 1990)). In

12

determining whether a statement is one of fact, "context is paramount." *Fortson*, 434 F. Supp. 2d at 1379.   The court must "'examine the statement in its totality and the context in which it was uttered or published'" and "'consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published.'"   *Id.* (quoting *From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. 1st DCA 1981)); *see also Horsley v. Rivera*, 292 F.3d 695, 702 (11th Cir. 2002) (courts "must consider the circumstances in which the statement was expressed").

As Defendants point out, courts have dismissed defamation claims based on statements by such well-known comedians as Jerry Seinfeld and Ellen DeGeneres because the context in which their statements were uttered reflected the statements were protected jokes.   *See Lapine v. Seinfeld*, 31 Misc. 3d 736, 754 (Sup. Ct. N.Y. Cnty. 2011) (statements made by "well-known comedian" on "a late-night entertainment program" that were "repeatedly punctuated by laughter from the audience"—for example, that plaintiff "was a mentally unhinged stalker of the Seinfelds"—were protected opinion); *Pierce v. Warner Bros. Ent., Inc.*, 237 F. Supp. 3d 1375, 1380 (M.D. Ga. 2017) (dismissing defamation claim over Ellen DeGeneres' mispronunciation of plaintiff's name to sound like "titty" when showing a real yard sign with plaintiff's name and company name, because DeGeneres is "a comedian" and "no person watching the Ellen DeGeneres show could reasonably have believed anything DeGeneres said to be stating actual facts").

Here, based on the full context of the Episode and the series, as to which there is no dispute of material fact, a reasonable Real Time viewer would have understood Maher was

13

making a joke, and not a statement of fact about Plaintiff and President Trump.  *See also* Baumgartner Report at 5–9; Bolger Decl., Ex. 52 ("Calvert Report") at 16–31.

Maher himself repeatedly testified that, in his mind, he was making a joke.  The record reflects that comedians on late-night shows "make jokes" about the headlines of the week and "don't do investigations" or break news.  Notably, the panel discussion in the September 13 Episode was punctuated with laughter and applause throughout.  While Plaintiff focuses on the fact that some audience members "groan[ed]" rather than laughed at the remarks about Plaintiff and Trump, that too is evidence that they understood it to be a joke, just one that warranted a groan—a frequent audience reaction to stand-up comedy and late-night comedy jokes.  *See* Baumgartner Report at 14.

In sum, the Court concludes that the Episode was not a statement of fact.  The delivery of the Episode, by a well-known comedian, in the context of a late-night comedy television series centered around jokes, signaled to viewers that this was not a factual statement about Loomer or concerning Loomer.  So, Defendants are entitled to summary judgment as a matter of law on Plaintiff's defamation claims.

Assuming, arguendo, that the Episode concerned false facts about Loomer, the claims still fail as a matter of law because the record is bereft of any evidence of "malice." To prove a defamation claim, public figure plaintiffs like Loomer must show that "the defendant made the alleged defamatory statements with 'actual malice.'" *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1252 (11th Cir. 2021) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)).

14

The actual malice standard was designed to allow publishers the "breathing space" needed to ensure robust reporting on public figures and events. *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016); *see also St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) (holding that "to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones."). "This is a subjective test, focusing on whether the defendant 'actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false.'" *Turner*, 879 F.3d at 1273 (quoting *Michel*, 816 F.3d at 702-03).

Maher testified that, to the extent his statement that President Trump may be sleeping with Plaintiff can be construed as a statement of fact, he had no reason to doubt it considering President Trump's reported prior alleged affairs, the reported closeness between President Trump and Plaintiff, and Plaintiff's own commentary about President Trump. Maher Decl. ¶ 16; Johnsen Decl. ¶ 41. There is no evidence that the Episode was so "inherently improbable, or obviously worthy of doubt," to support a finding of actual malice. *Readon v. WPLG, LLC*, 317 So. 3d 1229, 1236 (Fla. 3d DCA 2021).

To show malice, Plaintiff points to the facts that Defendants did not seek comment from her, did not issue a retraction, and did not invite her to appear on a future episode of Real Time, as she requested. The Court agrees with Defendants that these facts are immaterial because the "failure to print [plaintiff's] denials . . . does not constitute actual malice." *Dockery v. Fla. Democratic Party*, 799 So. 2d 291, 296 (Fla. 2nd DCA 2001). Also, "the failure to retract or correct a falsehood does not prove actual malice." *Hunt v.*

*Liberty Lobby*, 720 F.2d 631, 643 n.19 (11th Cir. 1983) (citation omitted). Even the "[f]ailure to investigate and poor journalistic standards are insufficient to establish actual malice." *Klayman v. City Pages*, 650 F. App'x 744, 750–51 (11th Cir. 2016) (citation omitted).

Plaintiff also points to the fact that Defendants aired the "24 Things You Don't Know About Laura Loomer" segment on the following week's episode. But this is also immaterial because, as a matter of law, actual malice requires proof that statements were known "to be false at the time they were made" or that the defendant "disregarded the truth or falsity of these statements at the time they were made." *Dockery*, 799 So. 2d at 294. Thus, what Maher did or did not say days later does not inform the analysis. Accordingly, the Court concludes that no reasonable jury could conclude based on the record evidence that Defendants acted with actual malice.

Finally, the defamation claims fail as a matter of law for the separate reason that Plaintiff does not establish a genuine issue of fact as to her alleged damages. Contrary to Plaintiff's position, Florida law requires a defamation plaintiff in a case against a media entity to prove damages. *See, e.g., Edelstein v. WFTV, Inc.*, 798 So. 2d 797, 798 (Fla. 4th DCA 2001) (holding that "a plaintiff suing a media defendant must nevertheless plead and prove actual injury," even in cases of defamation per se); *Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1119 (S.D. Fla. 2021) ("Florida law applies the Supreme Court's ruling from the well-known First Amendment defamation case of *Gertz v. Robert Welch Inc.*, 418 U.S. 323 (1974), which eliminates presumed damages for defamation per se actions against media defendants."); *Mid-Fla. Television Corp. v. Boyles*, 467 So. 2d 282,

16

283 (Fla. 1985) ("At common law, before Gertz, we said '[w]ords amounting to a libel per se necessarily import damage and malice in legal contemplation, so these elements need not be pleaded or proved, as they are conclusively presumed as a matter of law.' This statement is no longer accurate regarding a libel action against the media.") (quotation omitted).

As Defendants contend, Plaintiff has not identified a single individual who believed that she was sleeping with President Trump because of the Episode or a single relationship that was damaged as a result of the Episode. She has not offered any expert testimony quantifying her reputational harm. She has not introduced income statements or tax records from the year of the Episode or after to prove a decline in her income. The record reflects that, to the contrary, Loomer testified that her income increased in 2024 compared to prior years and that she continues to speak to and meet with President Trump, he continues to solicit her opinions, and she continues to receive invitations to the White House. Plaintiff's remaining evidence of alleged damages associated with lost job opportunities is entirely speculative. Indeed, the record reflects that, prior to the Episode, Plaintiff failed to obtain certain jobs because of her public remarks about controversial topics.

In sum, the Court concludes that the Episode was made by a comedian, Maher, about a public figure, Loomer, during a time when the environment was rife with jokes and speculation about Loomer's relationship with President Trump. Because no reasonable person would take the Episode as Maher commenting on facts and because Plaintiff has

not proved Defendants acted with actual malice, or that she suffered damages, Defendants are entitled to summary judgment in their favor.

Accordingly, it is ORDERED AND ADJUDGED that:

1.      Defendants' Motion for Summary Judgment (Dkt. 149) is granted.

2.      The Clerk of Court is directed to enter Final Judgment in favor of Defendants and against Plaintiff on all claims.

3.      The Court further concludes that any remaining matters are moot.

4.      The Clerk of Court is directed to close this case and terminate any pending motions as moot.

**DONE** and **ORDERED** in Tampa, Florida, this April 22, 2026.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record

18